Richard S. Busch (Pro Hac Vice Pending)
(Tennessee Bar No. 14594)
E-Mail:  rbusch@kingballow.com
KING & BALLOW
315 Union Street; Suite 1100
Nashville, TN  37201
(615) 259-3456 Facsimile:  (615) 726-5417

Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
KING & BALLOW
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000  Facsimile: (858) 597-6008

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East; Suite 1520
Los Angeles, CA 90067
(310) 853-6355  Facsimile: (310) 853-6333

Attorneys for Defendants
NONA MARVISA GAYE and
FRANKIE CHRISTIAN GAYE

RECEIVED
CLERK, U.S. DISTRICT COURT

October 30, 2013

CENTRAL DISTRICT OF CALIFORNIA
BY:      AK      DEPUTY

**NOT FILED**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 1  PHARRELL WILLIAMS, an | |
| 2  individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, | CASE NO. CV13-06004-JAK (AGRx) |
| 3  JR., an individual, | |
| 4 | |
| 5  Plaintiffs, | DEFENDANTS' FRANKIE CHRISTIAN GAYE AND NONA MARVISA GAYE |
| 6  vs. | COUNTERCLAIMS |
| 7  BRIDGEPORT MUSIC, INC., | |
| 8  a Michigan corporation; FRANKIE | JURY TRIAL DEMANDED |
| 9  CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; | Honorable John A. Kronstadt |
| 10  NONA MARVISA GAYE, an Individual. | Magistrate Alicia G. Rosenberg |
| 11 | Complaint Filed:  August 15, 2013 |
| 12  Defendants. | |
| 13 | |
| 14 | |
| 15  FRANKIE CHRISTIAN GAYE, an  individual; NONA MARVISA GAYE, | |
| 16  an individual; | |
| 17  Counter-claimant, | |
| 18 | |
| 19  vs. | |
| 20  PHARRELL WILLIAMS, an | |
| 21  individual, MORE WATER FROM NAZARETH PUBLISHING, INC.; ROBIN | |
| 22  THICKE, an | |
| 23  individual d/b/a I LIKE 'EM THICKE MUSIC; and CLIFFORD HARRIS, | |
| 24  JR., an individual p/k/a T.I., | |
| 25  Counter-Defendants. | |
| 26 | |
| 27  FRANKIE CHRISTIAN GAYE, an individual; NONA MARVISA GAYE, | |
| 28  an individual; | |

Counter-Claimants,

vs.

ROBIN ALAN THICKE, an individual d/b/a I LIKE 'EM THICKE MUSIC; PAULA MAXINE PATTON, an individual d/b/a HADDINGTON MUSIC; STAR TRAK ENTERTAINMENT; GEFFEN RECORDS; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; UNIVERSAL MUSIC DISTRIBUTION; SONY/ATV MUSIC PUBLISHING ACQUISITION, INC.; EMI APRIL, INC.; JOBETE MUSIC CO., INC.,

Counter-Defendants.

## COUNTERCLAIM

1.      Defendants Nona Marvisa Gaye, and Frankie Christian Gaye, (collectively the "Gaye Family") by and through undersigned counsel, having fully Answered the Complaint, now file these Counterclaims against Robin Alan Thicke, individually and d/b/a I Like 'Em Thicke Music ("Thicke"), Pharrell Williams, individually and More Water From Nazareth Publishing, Inc. (collectively, "Williams"), Clifford Joseph Harris, Jr. p/k/a T.I. ("Harris") (collectively the "Plaintiffs" or the "Blurred Writers"), Paula Maxine Patton, individually and d/b/a Haddington Music ("Patton"), Star Trak Entertainment ("Star Trak"), Geffen Records ("Geffen"), Interscope Records ("Interscope"), UMG Recordings, Inc. ("Universal"), Universal Music Distribution ("UMD"), EMI April, Inc. ("EMI"), Jobete Music Co., Inc. ("Jobete"), and Sony/ATV Music Publishing Acquisition, Inc. ("Sony"), (EMI, Jobete and Sony are collectively referred to herein as "EMI").

2.      The Gaye Family hereby incorporates by reference Paragraphs 1-22 set forth in their Answer and Affirmative Defenses.

## NATURE OF THE ACTION

3.      Marvin Gaye was a legendary Grammy Award-winning singer-songwriter commonly referred to as the "Prince of Soul" and known worldwide for his classic Motown hits. Marvin Gaye has appeared on the Billboard charts 67 times, including 41 top-forty hits, 18 top-ten hits, and more than a dozen number one hits.  He is well-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO
PLAINTIFF'S COMPLAINT

known for his social commentary, including the concept album *What's Going On* and the song "Save The Children," which he used in 1971 to launch the Save The Children Foundation. Marvin Gaye died in 1984 at age 44 and was posthumously honored with a Grammy Lifetime Achievement Award and induction into the Rock and Roll Hall of Fame.

4.  This action involves not only the blatant copying of a constellation of distinctive and significant compositional elements of Marvin Gaye's classic #1 song, "Got to Give it Up," but also the duplicitous actions by defendant Thicke of first publicly admitting "Got to Give it Up" was used in creating "Blurred Lines," in order to take advantage of the legend and utmost credibility of Marvin Gaye, and to drive sales, but then joining with his collaborators to file a lawsuit against Marvin Gaye's children when they rightfully raised concerns about his unlawful copying. The Defendants to this counterclaim include those parties involved with the unlawful copying, sale, public performing, licensing, and distribution of "Blurred Lines."

5.  Thicke's candid admissions concerning the use of "Got to Give it Up" include a May 7, 2013 interview with GQ:

> Pharrell and I were in the studio and I told him that one of my favorite songs of all time was Marvin Gaye's 'Got to Give it Up.' I was like, 'Damn, we should make something like that, something with that groove.' Then he started playing a little something and we literally wrote the song in about a half hour and recorded it.

Thicke's admissions also include a July 9, 2013 interview with Billboard:

Pharrell and I were in the studio making a couple records, and then on the third day I told him I wanted to do something kinda like Marvin Gaye's 'Got to Give it Up,' that kind of feel 'cause it's one of my favorite songs of all time. So he started messing with some drums and then he started going 'Hey, hey hey..' and about an hour and a half later we had the whole record finished.

6.     However, after filing his lawsuit against the Gaye Family, Thicke changed his story during an interview with celebrity gossip website, TMZ, and said that he did not have Marvin Gaye in his head when he wrote "Blurred Lines."

Q:     So, so, when you, when you wrote ["Blurred Lines"], do you like think of Marvin Gaye like when you write the music?

A:     No.

7.     As set forth in detail below, not only are significant and substantially similar compositional elements of "Got to Give it Up" copied into "Blurred Lines", but the ordinary observer would recognize this appropriation, as many independent journalists and commentators have remarked.  For example, The New York Times' Rob Hoerburger commented about "Blurred Lines": "[w]hat I keep coming back to is the song's choice DNA…[a]nd that bass line came right from Marvin Gaye's No. 1 hit from the Summer of '77, 'Got to Give it Up'…"  Furthermore, Music Critic Paul Cantor pointed out on Vice Magazine's website in July, 2013, "[y]ou probably don't feel guilty for liking 'Blurred Lines.' Maybe that's because it was originally a Marvin Gaye song, ('Got to Give it Up'), and Marvin Gaye is…awesome."  Writer David Ritz,

who has written a biography of Marvin Gaye, and is working on other material concerning Marvin Gaye, in an August 23, 2013, *Rolling Stone* article, stated: "When I first heard Robin Thicke's 'Blurred Lines,' my reaction was the same as millions of other R&B fans: 'Hey, that's Marvin Gaye's 'Got to Give it Up.'" Bloomberg Business Week's Paul Barrett remarked that "Thicke's work sounds like a slightly tinny knock off of the Gaye classic." There are many more along the same lines.

8.    Furthermore, as pleaded in more detail below, "Got to Give it Up" is not the only Marvin Gaye classic that has been unlawfully copied by Thicke. ALLMUSIC Guide describes Thicke as having a "Marvin Gaye fixation," and the public has observed a number of such instances, including the similar bridge and identical lyrics from Marvin Gaye's "I Want You" in Thicke's similarly-themed work, "Make U Love Me." At this time, the Gaye Family is also asserting a counterclaim herein for the unlawful copying of the Marvin Gaye song, "After the Dance," in the Thicke song "Love After War." "Love After War" continues to be copied, sold, licensed, distributed, publicly performed, and otherwise exploited and the Defendants to that claim include those involved with the unlawful use of "After the Dance."

9.    Finally, the Gaye Family asserts herein a claim for breach of contract and breach of fiduciary duty against defendant EMI. Although the Gaye Family owns the musical composition copyrights to "Got to Give it Up" and "After the Dance", the copyright registrations for which are duly filed with the United States Copyright

Office, the Gaye Family assigned the rights to administer and protect those copyrights, and those of other Gaye songs, to EMI.   However, EMI is also the co-publisher of Williams, whose musical compositions, including "Blurred Lines," are co-owned and controlled by one or more of the EMI parties.

10.    As more fully set forth below, EMI has breached its agreement, including the covenants of good faith and fair dealing, and its fiduciary duties to the Gaye Family by not only failing and refusing to pursue the infringements identified herein, but actively attempting to interfere with and thwart the Gaye Family's pursuit of these claims.   EMI's misconduct includes, but is not limited to:   (1) failing to identify and raise claims based on the Marvin Gaye copyrights; (2) initially advising the Gaye Family and/or its representatives that it heard and understood the similarities between "Got to Give it Up" and "Blurred Lines," and admitting that the claim was viable, but subsequently instructing its litigation attorney to intimidate the Gaye Family from filing an action by antagonistically warning that any lawsuit would be frivolous; (3) refusing to bring the counterclaims herein, even when provided with a renowned musicologist's report supporting the claims; (4) failing to remain neutral when faced with a conflict of interest, and instead giving strong biased support to the Blurred Writers, to the direct detriment of the Gaye Family; (5) refusing the right to bring this action to the Gaye Family by saying that an assignment was not necessary (the Gaye Family believes it has the right to bring this action, but requested that EMI cooperate

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

by simply assigning it that right protectively to avoid any ambiguity or costly litigation on the issue of standing); and (6) Having the chairman of EMI call the Gaye Family legal representative who regularly does work with EMI to provide unsolicited "sage advice" not to pursue this action. Ignoring the fact that the Blurred Writers started this lawsuit, he accused Marvin Gaye's children of "tarnishing" and "ruining an incredible song" ("Blurred Lines"), of "killing the goose that laid the golden egg," and of being responsible for "Blurred Lines" not receiving an MTV Video Music Award. He went on to complain that the pursuit of this matter might kill any chances of "Blurred Lines" winning a Grammy Award for Song of the Year, and incredibly declared that "Marvin Gaye doesn't need credit. Everyone knows who he is". Further, in an attempt to turn public opinion against the Gaye Family, on information and belief, EMI's misconduct also extends to communications between EMI and representatives of Williams and Thicke regarding litigation strategy against the Gaye Family and the planting of a knowingly false story in the press that the Gaye Family supposedly turned down a "six figure settlement," (no such offer was made) in order to make them appear unreasonable.

## THE PARTIES

11.   Defendant/Counter-Claimant Nona Marvisa Gaye is the daughter of Marvin Gaye and as registered with the United States Copyright Office, the co-owner

of the musical compositions "Got to Give it Up" and "After the Dance." Nona Gaye is a resident and citizen of the state of Rhode Island.

12.   Defendant/Counter-Claimant Frankie Christian Gaye is the son of Marvin Gaye and as registered with the United States Copyright Office, the co-owner of the musical compositions "Got to Give it Up" and "After the Dance." Frankie Gaye is a resident and citizen of the state of Rhode Island.

13.   Marvin Gaye III is the son of Marvin Gaye and as registered with the United States Copyright Office, the co-owner of the musical compositions "Got to Give it Up" and "After the Dance." Marvin Gaye III is a resident and citizen of the state of California.

14.   Plaintiff/Counter-Defendant Robin Alan Thicke, individually and d/b/a I Like 'Em Thicke Music ("Thicke"), is a writer, composer, and publisher of the infringing compositions and performer of the infringing sound recordings "Blurred Lines" and "Love After War."

15.   Plaintiff/Counter-Defendant Pharrell Williams is a writer, composer, publisher, and producer of the infringing musical composition and performer of the infringing sound recording "Blurred Lines." His publishing company is More Water From Nazareth Publishing, Inc. Collectively, they are referred to herein as "Williams".

16.    Plaintiff/Counter-Defendant Clifford Joseph Harris, Jr. p/k/a T.I. ("Harris") is a writer, composer, and publisher of the infringing musical composition and performer of the infringing sound recording "Blurred Lines."

17.    Counter-Defendant Paula Maxine Patton individually and d/b/a Haddington Music ("Patton") is a writer and composer of the infringing composition "Love After War."

18.    Counter-Defendant Star Trak Entertainment, LLC ("Star Trak") is a New York limited liability company with its principal place of business in New York. Star Trak released the album *Blurred Lines*, which contains the infringing composition and sound recording "Blurred Lines," and the album *Love After War*, which contains the infringing composition and sound recording "Love After War." Star Trak is a subsidiary of UMG Recordings, Inc. ("Universal"). On information and belief, Star Trak conducts systematic and continuous business in California. On information and belief, Star Trak may be served at 15 Maple St, Somerville, New Jersey, 08876.

19.    Counter-Defendant Geffen Records ("Geffen"), d/b/a Interscope Records ("Interscope"), is an unincorporated division of UMG Recordings, Inc. ("Universal"). Upon information and belief, Geffen released the album *Love After War*, which contains the infringing composition and sound recording "Love After War." As an unincorporated division of Universal, Geffen may be served at its principal place of business, 2220 Colorado Ave., Santa Monica, CA 90404.

20.   Counter-Defendant Interscope Records ("Interscope"), is an unincorporated division of UMG Recordings, Inc. ("Universal"). Interscope released the album *Blurred Lines*, which contains the infringing composition and sound recording "Blurred Lines," and the album *Love After War*, which contains the infringing composition and sound recording "Love After War." On information and belief, as an unincorporated division of Universal, Interscope may be served at its principal place of business, 2220 Colorado Ave., Santa Monica, CA 90404.

21.   Counter-Defendant UMG Recordings, Inc. ("Universal") through its subsidiaries, released the album *Blurred Lines*, which contains the infringing composition and sound recording "Blurred Lines," and the album *Love After War*, which contains the infringing composition and sound recording "Love After War." On information and belief, Universal may be served at its principal place of business, 2220 Colorado Ave., Santa Monica, CA 90404.

22.   Counter-Defendant Universal Music Distribution ("UMD") is a division of Universal Music Group Distribution Corp. and has manufactured and distributed the album *Blurred Lines*, which contains the infringing composition and sound recording "Blurred Lines," and the album *Love After War*, which contains the infringing composition and sound recording "Love After War." Upon information and belief, UMD may be served may be served at its principal place of business, 2220 Colorado Ave., Santa Monica, CA 90404.

23.    Counter-Defendant Sony/ATV Music Publishing Acquisition, Inc. ("Sony") is a Delaware corporation with its principal place of business in New York. Sony serves as Plaintiff, Pharrell Williams' co-publisher and administrator and has now acquired defendant EMI April, Inc. and Jobete Music Co., Inc.   Upon information and belief, Sony conducts business within the state and may be served via its registered agent at 2710 Gateway Oaks Dr. Suite 150N, Sacramento, CA 95833.

24.    Counter-Defendant EMI April, Inc. ("EMI") is a Connecticut corporation with its principal place of business in New York.  EMI, among other things, executed an Administration Agreement with the Gaye Family by an agent in the State of California, and is a party to the Modification agreement, which stipulates that California law controls the parties' relationships. Upon information and belief, EMI conducts business within the state and may be served via its registered agent at 2710 Gateway Oaks Dr. Suite 150N, Sacramento, CA 95833.

25.    Counter-Defendant Jobete Music Co., Inc. ("Jobete") is a Michigan corporation with its principal place of business in New York. Upon information and belief, Jobete Music Co., Inc. is a subsidiary of EMI or Sony. Jobete is a party to a Modification Agreement with the Gaye Family, which it executed in Los Angeles County and which stipulates to the jurisdiction of the California courts.   Upon information and belief, Jobete may be served via its registered agent at 2710 Gateway Oaks Dr. Suite 150N, Sacramento, CA 95833.

## II. JURISDICTION AND VENUE

26.    The jurisdiction of this Court with respect to the copyright infringement claims is based upon 28 U.S.C. §§1331 and 1338(a) in that the controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. §1331.  The jurisdiction of the Court with respect to the claims against EMI are based upon 28 U.S.C. Section 1332 and this Court's supplemental jurisdiction 28 U.S.C. Section 1367 since the state law dispute is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

27.    The Counterclaims arise out of the same matters and transactions described in the Complaint. This Court has jurisdiction over the matters and transactions that are the subject of these Counterclaims pursuant to Fed. R. Civ. P. 13.

28.    This Court has personal jurisdiction over the Plaintiffs and Counter-Defendants because the Plaintiffs and Counter-Defendants may be found, and conduct systematic and continuous business in and/or have executed the subject Agreements and/or stipulated to the jurisdiction of this Judicial District.

29.    Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1400(a) because the Plaintiffs and Counter-Defendants are subject to personal jurisdiction in this Judicial District, and have committed unlawful acts of infringement in this Judicial District.

## III. FACTS RELEVANT TO COUNTERCLAIMS

### A. Infringement of Got to Give it Up

#### 1. Got to Give it Up Background

30.    This action for copyright infringement arises from the Blurred Writers' infringement of the Gaye Family's copyright in the musical composition "Got to Give it Up," written, composed, and recorded by their father, Marvin Gaye, and originally released in 1977. The musical composition "Got to Give it Up" has been registered in the United States Copyright Office, with Copyright Registration Numbers EP 366-530 and RE 910-939.

31.    "Got to Give it Up" was recorded by Marvin Gaye in 1976 and released on or about March 15, 1977 on the album *Live at the London Palladium*. *Live at the London Palladium* reached number one on the Billboard Soul Albums chart and number three on the Pop Albums chart. The "Got to Give it Up" single reached number one on three charts, including the US Billboard Hot 100.

32.    Marvin Gaye died on April 1, 1984. The U.S. copyrights to Marvin Gaye's songs were re-claimed by the Gaye Family by operation of law.

#### 2. Intentional Copying of Got to Give it Up

33.    The Plaintiffs/Counterclaim Defendants are the writers, composers, producers, record labels, distributors, and publishers of the infringing and derivative musical composition "Blurred Lines", the infringing sound recording of "Blurred

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

Lines", and the music video and other products embodying the infringing musical composition and sound recording "Blurred Lines" (collectively, the "Infringing Blurred Works") (the Counterclaim Defendants involved with the unlawful reproduction, distribution and exploitation of the Infringing Blurred Works, as outlined above in the Parties section, are collectively referred to herein as the "Blurred Lines Defendants").

34.    To write and record the song "Blurred Lines," the Blurred Writers intentionally and unlawfully copied and assembled a constellation of distinctive and important elements from the musical composition, "Got to Give it Up." "Blurred Lines" is so substantially similar to "Got to Give it Up" that ordinary observers all over the world have remarked that the two songs sound the same, which they do.

### 3. Unauthorized Release and Exploitation of Blurred Lines

35.    The Blurred Lines Defendants released the single for "Blurred Lines" on or about March 26, 2013, and the album entitled *Blurred Lines* in the United States and throughout the rest of the world on or about July 30, 2013. Star Trak and Interscope and their distributor UMD, released, manufactured, and marketed the single and the album. The infringing "Blurred Lines" composition and sound recording appear on the album titled *Blurred Lines*.

36.    "Blurred Lines" is an unprecedented commercial hit and has reached number one in at least 114 countries. On or about September 16, 2013, the single "Blurred Lines" went sextuple platinum by selling over six million copies.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

Additionally, "Blurred Lines" spent a record-breaking 16 weeks at number 1 on Billboard's Hot R&B/Hip-Hop Songs chart; it is the longest reign atop the chart since Nielsen data began fueling the chart in December 1992. The music video of "Blurred Lines," including its original and "uncensored" versions, has attracted more than two hundred and fifty million views on YouTube and Vevo.

### 4. Substantial Similarity Between Blurred Lines and Got to Give it Up

37.     "Got to Give it Up" and "Blurred Lines" both contain substantially similar defining compositional elements. The substantial similarities found in "Got to Give it Up" and "Blurred Lines" are the result of many of the same deliberate creative choices made by their respective composers, far surpassing the similarities that might result from attempts to evoke an "era" of music or a shared genre, as the Blurred Writers wrongly asserted in this action. Consequently, in addition to and considerably more significant than a mere stylistic resemblance in "feel" or "sound" alone, as incorrectly alleged by the Blurred Writers, these two works are substantially similar compositionally.

38.     Many of the main vocal and instrumental themes of "Blurred Lines" are rooted in "Got to Give it Up"; namely, the signature phrase, vocal hook, backup vocal hook, their variations, and the keyboard and bass lines. Those important and distinctive compositional elements are substantially similar in "Blurred Lines" and "Got to Give it Up." Moreover, the shared departures from convention, such as the unusual cowbell

instrumentation, omission of guitar, and use of male falsetto, all contribute further to the finding of substantial similarity here.

39.     Ordinary observers would not only immediately recognize the substantial similarities between these songs, and recognize the appropriation of "Got to Give it Up" in "Blurred Lines," but have publically so remarked, as discussed above.

40.     The songs' substantial similarities reach the very essence of each work. The constellation of at least eight substantially similar compositional features between the two works is detailed fully in the attached preliminary expert report by musicologist Judith Finell, which is attached hereto as Exhibit A and incorporated herein by reference.

### 5. Unauthorized Exploitation of Got to Give it Up

41.     The Blurred Lines Defendants have, without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gaye Family, created a derivative work of "Got to Give it Up" and reproduced, distributed, displayed, publicly performed and otherwise exploited the Infringing Blurred Works, resulting in substantial revenue, profit and notoriety for the Blurred Writers and other Blurred Lines Defendants.

42.     Thicke and Williams performed and continue to perform "Blurred Lines" on the radio, at live concerts, at personal appearances, in videos, on television and/or otherwise.

43.     Upon information and belief, all Blurred Lines Defendants are responsible in some manner for the events described herein and are liable to the Gaye Family for the damages they have incurred.   Thicke, Williams, and the other Blurred Lines Defendants named herein are the writers, composers, performers, producers, record labels, distributors, and publishers, who were involved with the creation, release, reproduction, distribution, exploitation, licensing, and public performance of the Infringing Blurred Works, embodied in all forms of media, including videos, digital downloads, records, motion pictures and advertisements, all of which constitute, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement. As co-infringers, the Blurred Lines Defendants are jointly and severally liable for all amounts owed.

44.     These acts were willful, knowing, and malicious and perpetrated without regard to the Gaye Family's rights.

45.     In July 2013, the Blurred Writers, Universal, and EMI were given notice of the infringement on the musical composition "Got to Give it Up." All notices were given before the U.S. release of the album *Blurred Lines*.

46.     Despite notice, the Plaintiffs and Blurred Lines Defendants continue to infringe on the musical composition "Got to Give it Up" by reproducing, displaying, distributing, exploiting, licensing, and publicly performing the Infringing Blurred Works. "Blurred Lines" continues to be reproduced, sold, distributed, publicly

performed, licensed and otherwise exploited on compact discs and albums, and as digital downloads, ringtones, and mastertones, in theatrical motion pictures, music videos and advertisements, all without payment to the Gaye Family or songwriter credit to Marvin Gaye.

## B. Love After War's Infringement of After The Dance

### 1. Love After War Background

47.     The musical composition "After The Dance," was written, composed and recorded by Marvin Gaye, and released in 1976 on the album *I Want You*. "After The Dance" has been registered in the United States Copyright Office, with Copyright Registration Numbers EP 351-582, PA 002-617, and RE 903-945.

48.     *I Want You* reached number one on the Billboard Soul Albums chart and number four on the Pop Albums chart. "After The Dance" reached number 10 on the Hot Dance/Disco Chart, number 14 on the Soul Singles Chart, and number 74 on the Pop Singles Chart.

49.     Ownership of the copyright to the musical composition "After The Dance" reverted to the Gaye Family by operation of law, and such ownership has been recorded with the United States Copyright office.

### 2. Intentional Copying of After The Dance

50.     Defendants Thicke and Patton are the writers and composers of the infringing and derivative musical composition "Love After War" embodied in the

infringing sound recording of "Love After War" (collectively, the "Infringing War Works") (the Counterclaim and Defendants involved with "Love After War," as described in the Parties section above, are referred to collectively herein as the "Love After War Defendants").

51.     To write and record the song "Love After War," Thicke and Patton unlawfully copied the musical composition "After The Dance," as the music in "Love After War" is so substantially similar to "After The Dance" that any ordinary observer would immediately recognize "Love After War" as a copy of "After The Dance."

52.     Thicke and Patton had access to "After The Dance" prior to creating "Love After War." As mentioned above, Thicke is a longtime fan of Marvin Gaye.

### 3. Release and Exploitation of After The Dance

53.     Defendants Star Trak, Geffen, Universal, and UMD are the labels and distributors who were involved with the creation, release, reproduction, distribution, administration, public performance, and other exploitation of the Infringing War Works.

54.     These Defendants have, without authorization, and without giving songwriter credit to Marvin Gaye or copyright ownership to the Gaye Family, unlawfully distributed, reproduced, displayed, publicly performed, and otherwise exploited "Love After War" resulting in substantial revenue and profit for these Defendants.

55.    On or about October 11, 2011, Thicke, through his labels Star Trak and Geffen, released the single for "Love After War".  On or about December 6, 2011, Star Trak and Geffen released the album entitled *Love After War* in the United States. Star Trak and Geffen and their distributors Interscope and UMD, released, manufactured, and marketed the album. The infringing sound recording appears on the album *Love After War* and was released, distributed, and marketed throughout the United States including California and throughout the rest of the world.

56.    *Love After War* debuted at number 22 on the Billboard Top 200.

### 4. Substantial Similarity of Love After War and After The Dance

57.    "Love After War" is substantially similar to "After The Dance" and is the result of intentional copying by Thicke and Patton.

58.    "After the Dance" and "Love After War" contain substantially similar compositional material in their choruses, including in the melodies of their hooks. These portions are both qualitatively and quantitatively important to both "After The Dance" and "Love After War."

59.    Each song uses its hook melody and variations of its hook melody throughout most of its own chorus section, rather than moving from one contrasting theme to another. This is significant because in most popular songs, the hook is one single phrase within a larger chorus section containing several contrasting phrases. However, in "Love After War" and "After the Dance," the entire chorus section of each

song is built on this single hook phrase and its variations, so the result is that there is a substantially longer portion of music that is substantially similar between the two works.

60. The songs also share a number of other similar elements: (1) Both songs share unusual and distinctive harmonies accompanying their hooks, which is an important shared feature that contributes to their sounding substantially similar, (2) both songs also share a distinctive (syncopated) rhythm on the last note of their hooks, and (3) the chorus sections occupy an unusually large proportion of both songs, thus expanding the proportion of substantially similar material between them.

61. The ordinary listener would recognize that "Love After War" appropriates this material from "After The Dance."

### 5. Unauthorized Exploitation of After The Dance

62. The Love After War Defendants never procured a license for their use of "After The Dance."

63. Thicke has performed and continues to perform "Love After War" on the radio, at live concerts, at personal appearances, in videos, on television and/or otherwise.

64. Upon information and belief, all Love After War Defendants are responsible in some manner for the events described herein and are liable to the Gaye Family for the damages they have incurred. The Love After War Defendants named

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

herein are the writers, performers, record labels, distributors, and publishers who were involved with the creation, release, reproduction, distribution, exploitation, and public performance of "Love After War," which constitutes, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement. As co-infringers, the Love After War Defendants are jointly and severally liable for all amounts owed.

65.     The acts of the Love After War Defendants were willful, knowing, and malicious and perpetrated without regard to the Gaye Family's rights.

### C. EMI

### 1. EMI Background

66.     As noted above, the Gaye Family's claims against EMI are based on EMI's flagrant disregard of its fiduciary duties and contractual obligations to protect the legal interests of the legendary Marvin Gaye's works.  EMI has made it abundantly plain that its priority lies with the undue acclaim and profits derived and to be derived from the continued unlawful exploitation of the hit "Blurred Lines", notwithstanding its legal, contractual, and ethical obligations to the Gaye Family and their rights and interests. Such willful breach and failure to act underscores a simple fact: EMI has allowed conflicts of interest between the financial treasure they are accumulating through their relationship with Williams and the hit "Blurred Lines" to overshadow and supersede their obligations to protect the Marvin Gaye copyrights.  This conflict has resulted in

EMI's intentional decision to align themselves with the Blurred Writers, without regard to the harm inflicted upon the rights and interests of the Gaye Family, and the legacy of Marvin Gaye. At minimum, EMI could have remained neutral but it willfully chose not to do so.

67. As pleaded above in the Nature of the Action section, despite acknowledging that there are similarities between "Blurred Lines" and "Got to Give it Up," and that the claim is viable, EMI refused to support this action or pursue it, refused to assign to the Gaye Family, to the extent necessary, the right to bring this action, resorted to stonewalling and threats, and ultimately, from the highest levels, blamed the Gaye Family for the lack of awards for "Blurred Lines," and accused the Gaye Family of "killing the golden goose," while giving the Gaye Family's legal representative, who regularly does business with EMI, "sage advice" to drop the matter. EMI's conduct constitutes breach of contract and breach of fiduciary duty.

**2. The EMI Administration Agreement and Modification Agreement**

68. In or around May 1992, the Gaye Family, EMI, and others, entered into an Administration Agreement whereby EMI was "engaged" as "the exclusive administrator" of various Marvin Gaye compositions, including "Got to Give it Up" and "After The Dance" (the "Administration Agreement"), the rights to which the Gaye Family inherited when Marvin Gaye passed away, and which the Gaye Family subsequently re-claimed under the law. The Administration Agreement was modified

in or around April 1996 (the "Modification") (collectively herein the "Administration Agreement" and the "Modification" are referred to as the "Agreements").

69.   Under the Agreements, the EMI "ha[s] the sole and exclusive right" and obligation to administer the compositions which include "Got to Give it Up."   The Agreements, contain a  "Power of Attorney" which provides as follows:

> You hereby irrevocably authorize, empower and appoint Publisher your true and lawful attorney during the Term to administer the Marvin Gaye Interest in each Composition in the Territory…to initiate and compromise any claim or action against infringers of Publisher's and/or your rights in the Compositions…

*See* Paragraph 6.03.

70.   Despite transferring and licensing various rights in Marvin Gaye's compositions to the EMI Defendants, the Gaye Family retained substantial beneficial interests in the compositions, including "Got to Give it Up."  For example, among other interests, the Gaye Family retained (1) ownership of the U.S. copyrights, (2) interests in the right to receive royalties for exploitation of the compositions, (3) interests in the right to receive accountings of gross monies derived from exploiting the compositions, (4) the right to prevent certain forms of exploitation of the compositions, (5) interests in having veto power with respect to significant decisions affecting the compositions, (6) the right to approve and/or disapprove of "any litigation against any third party involving rights in the [c]ompositions or to settle any claim…", and (7) a general

reservation of all "rights in the [c]ompositions not specifically granted to [EMI] pursuant to the [A]greement[s]."

71.     The Gaye Family's retention of these substantial beneficial interests in the compositions, including "Got to Give it Up" and "After The Dance," confer upon them, standing to sue for infringement.  Even if that were not the case, under *Manning v. Miller Music Corporation*, 174 F. Supp. 192 (S.D.N.Y. 1959) and its progeny, the refusal of EMI to pursue this action allows the Gaye Family to do so.

## CAUSES OF ACTION

## COUNT I

**(Direct, Contributory, and Vicarious Copyright Infringement of "Got to Give it Up" by Thicke, Williams, Harris, Star Trak, Interscope, Universal, and UMD, collectively the "Blurred Lines Defendants")**

72.     The Gaye Family repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

73.     The Gaye Family are the sole owners of the U.S. copyright in all rights, titles, and interests in the musical composition "Got to Give it Up" written by Marvin Gaye.  The musical composition is properly registered with the United States Copyright Office.

74.     The Blurred Lines Defendants' unauthorized reproduction, distribution, public performance, display, and creation of a derivative work of "Got to Give it Up"

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO
PLAINTIFF'S COMPLAINT

infringes the Gaye Family's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*

75.     The Blurred Lines Defendants did not seek or receive permission to copy or interpolate any portion of "Got to Give it Up" into "Blurred Lines."

76.     The Blurred Lines Defendants' conduct has at all times been knowing, willful, and with complete disregard to the Gaye Family's rights.

77.     As a proximate cause of the Plaintiffs' and Blurred Lines Defendants' wrongful conduct, the Gaye Family has been irreparably harmed.

78.     The Infringing Blurred Works copy quantitatively and qualitatively distinct, important, and recognizable portions of "Got to Give it Up."

79.     Specifically, "Blurred Lines" copies a constellation of at least eight distinctive and important compositional elements of "Got to Give it Up."

80.     The inclusion of the signature elements of "Got to Give it Up" greatly enhances the musical and financial value of "Blurred Lines."

81.     From the date of the creation of the infringing "Blurred Lines," all of the Blurred Lines Defendants have infringed the Gaye Family's copyright interest in "Got to Give it Up" including: (a) by substantially copying and publicly performing, or authorizing the copying and public performances, including publicly performing "Blurred Lines" at radio, live concerts, personal appearances, and on film, video, television, and otherwise; (b) by authorizing the reproduction, distribution and sale of

the records and digital downloads through the execution of licenses, and/or actually selling, manufacturing, and/or distributing "Blurred Lines" through various sources; (c) by substantially copying and the related marketing and promotion of the sale of the records, videos, tickets to concerts and other performances, and other merchandise; and (d) by participating in and furthering the aforementioned infringing acts, and/or sharing in the proceeds therefrom, all through substantial use of "Got to Give it Up" in and as part of the Infringing Blurred Works, packaged in a variety of configurations and digital downloads, mixes and versions, and performed in a variety of ways including radio, concerts, personal appearances, film, video, television, and/or otherwise.

82.    Marvin Gaye has received no songwriter credit for and the Gaye Family has received no copyright ownership interests in and for any of the exploitations of "Blurred Lines" or any of the works associated with "Blurred Lines."

83.    The infringement by the Blurred Lines Defendants has been, and continues to be, willful and knowing.

84.    With knowledge of the infringement, the Blurred Lines Defendants have induced, caused or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable.

85.    The Blurred Lines Defendants had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that the Blurred Lines Defendants should be found to be vicariously liable.

86.    The infringement is continuing as the album *Blurred Lines*, on which "Blurred Lines" appears, continues to be sold and both the album and single "Blurred Lines" continues to be licensed for sale, downloads, ringtones, mastertones, motion pictures, and advertisements and other exploitations by the Blurred Lines Defendants, or their agents.

87.    As a direct and proximate result of the conduct of the Blurred Lines Defendants, the Gaye Family has suffered actual damages including lost profits, lost opportunities, and loss of goodwill.

88.    Pursuant to 17 U.S.C. § 504(b), the Gaye Family is entitled to damages, including the substantial profits of the Blurred Lines Defendants, as will be proven at trial.

89.    In the alternative, pursuant to 17 U.S.C. § 504(c), the Gaye Family is entitled to the maximum statutory damages of $150,000 per infringement.

90.    The Gaye Family is entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

91.    The Plaintiffs' and Blurred Lines Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause the Gaye Family irreparable injury that cannot be fully compensated or measured in monetary terms. the Gaye Family has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, the Gaye Family is entitled to a permanent injunction prohibiting the reproduction, distribution, sale, public

1   performance or other use or exploitation of "Blurred Lines," including all Infringing

2   Blurred Works.

### COUNT II

**(Direct, Contributory, and Vicarious Copyright Infringement of "After The Dance" by Thicke, Patton, Star Trak, Geffen, Universal, and UMD (the "Love After War Defendants"))**

92.    The Gaye Family repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

93.    The Gaye Family is an owner of the U.S. copyright in all rights, titles, and interests in the musical composition "After The Dance" written by Marvin Gaye.  The musical composition is properly registered with the United States Copyright Office.

94.    The Love After War Defendants' unauthorized reproduction, distribution, public performance, display, and creation of a derivative work of "After The Dance" infringes the Gaye Family's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*

95.    The Love After War Defendants did not seek or receive permission to copy or interpolate any portion of "After The Dance" into "Love After War."

96.    The Love After War Defendants' conduct has at all times been knowing, willful, and with complete disregard to the Gaye Family's rights.

97.    As a proximate cause of the War Defendants' wrongful conduct, the Gaye Family has been irreparably harmed.

98.     The musical composition and sound recording "Love After War" copies quantitatively and qualitatively distinct, important, and recognizable portions of "After The Dance."

99.     Specifically, "Love After War" copies the chorus and hook of "After The Dance."

100.    This copying is recognizable by an ordinary observer.

101.    The inclusion of the signature elements of "Love After War" greatly enhances the musical and financial value of "After The Dance."

102.    From the date of the creation of the infringing "Love After War," all of the Love After War Defendants to this action have infringed the Gaye Family's copyright interest in "After The Dance" including: (a) by substantially copying and publicly performing, or authorizing the copying and public performances, including publicly performing "Love After War" at radio, live concerts, personal appearances, and on film, video, television, and otherwise; (b) by authorizing the reproduction, distribution and sale of the records and digital downloads through the execution of licenses, and/or actually selling, manufacturing, and/or distributing "Love After War" through various source; (c) by substantially copying and the related marketing and promotion of the sale of the records, videos, tickets to concerts and other performances, and other merchandise; and (d) by participating in and furthering the aforementioned infringing

acts, and/or sharing in the proceeds therefrom, all through substantial use of "After The Dance" in and as part of the infringing "Love After War" sound recording.

103.   By reproducing, distributing, creating derivate works, publicly performing, synchronizing, licensing, and exploiting the infringing musical composition and sound recording of "Love After War," the Love After War Defendants have infringed the copyright and exclusive rights in the musical work "After The Dance" granted to the Gaye Family under the Copyright Act.

104.   The Love After War Defendants' infringement, has been, and continues to be, willful and knowing and continuing.

105.   With knowledge of the infringement, the Love After War Defendants have induced, caused or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable.

106.   The Love After War Defendants had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that the Love After War Defendants should be found to be vicariously liable.

107.   The infringement is continuing as the album *Love After War*, on which "Love After War" appears, continues to be sold and both the album and track "Love After War" continues to be licensed for sale, downloads, ringtones, mastertones, and other exploitations by the Love After War Defendants, or their agents.

108.   As a direct and proximate result of the Love After War Defendants' conduct, the Gaye Family has suffered actual damages including lost profits, lost opportunities, and loss of goodwill.

109.   Pursuant to 17 U.S.C. § 504(b), the Gaye Family is entitled to damages, including the substantial profits that the Love After War Defendants have obtained as will be proven at trial.

110.   In the alternative, pursuant to 17 U.S.C. § 504(c), the Gaye Family is entitled to the maximum statutory damages of $150,000 per infringement.

111.   The Gaye Family is entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

112.   The Love After War Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause the Gaye Family irreparable injury that cannot be fully compensated or measured in monetary terms. the Gaye Family has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, the Gaye Family is entitled to a permanent injunction prohibiting the reproduction, distribution, sale, public performance and other exploitation of "Love After War," in any and all formats, configurations and/or media.

## COUNT III

### (Breach of Covenant of Good Faith and Fair Dealing
### Asserted Against EMI)

113.   The Gaye Family repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

114.   Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.   This implied covenant of good faith and fair dealing requires that no party do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement.   The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose.   This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

115.   The Gaye Family brings this claim for breach of the covenant of good faith and fair dealing based upon EMI's failure to adhere to their legal, contractual and ethical obligations to the Gaye Family.

116.   Each and every express contractual term set forth in the Agreements carries with it the duty to exercise that right fairly and in good faith. Thus, the Agreements express terms also imposed upon EMI a duty of good faith and fair dealing.   For instance, EMI expressly agreed with the Gaye Family that it would, among other

things, act as the Gaye Family's attorney-in-fact and initiate litigation against infringers of any of the compositions subject to the Agreements, including "Got to Give it Up." Despite its contractual obligation, EMI has failed to assert the Gaye Family's rights with respect to the initial and continued infringement of "Got to Give it Up" and "After the Dance"by the Blurred Lines Defendants and the Love After War Defendants.

117.   EMI has substantial discretionary power affecting the Gaye Family's rights with respect to the events alleged herein.   EMI is required to exercise such power in good faith.   Had EMI acted in good faith, it would have brought an action asserting "Blurred Lines" was an infringing work.   Not only did EMI fail to bring this action, which is necessary to carry out EMI's duties to protect the Gaye Family's copyrights, but, as discussed fully above, despite admitting that the Gaye Family had reason to pursue this action, EMI attempted to dissuade the Gaye Family from pursuing this action by repeated threats and tactics to intimidate the Gaye Family and its representatives.   On information and belief, this conduct also included working with Williams to the detriment of the Gaye Family.

118.   By this conduct, EMI breached its implied covenant of good faith and fair dealing.

119.   As a result of these breaches of the covenant of good faith and fair dealing, the Gaye Family has suffered injury and will continue to suffer significant economic losses as detailed herein.   the Gaye Family has also incurred and will continue to incur

attorney's fees and other costs and expenses as a result of the conduct of EMI. To the extent that the Agreements purport to contain an exculpatory clause which purports to allow EMI to breach its duty of good faith and fair dealing with impunity, the Gaye Family alleges that such a clause is unenforceable pursuant to Civil Code § 1668 and other applicable law.

120.  EMI's actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling the Gaye Family to punitive damages in an amount appropriate to punish EMI and to deter others from engaging in the same behavior.

## COUNT IV:

### (Breach of Fiduciary Duty Asserted Against EMI)

121.  The Gaye Family repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

122.  At all relevant times, EMI created, accepted, and acted in a fiduciary relationship with, and for the benefit of, the Gaye Family. The fiduciary relationship with the Gaye Family was based on trust and confidence, as well as the express contractual obligations alleged herein. The fiduciary relationship required EMI to, at all times, act in the best interests of the Gaye Family.

123.  Also by virtue of this special relationship that existed between EMI and the Gaye Family, the Gaye Family had confidence in the fidelity and integrity of EMI and entrusted EMI with information and portions of their financial and legal affairs, thereby

creating a confidential relationship which existed at all times relevant to this action, such that EMI owed to the Gaye Family a fiduciary duty to put the interests of the Gaye Family before their own.

124.   Despite having voluntarily accepted the trust and confidence of the Gaye Family, and the express fiduciary duties to which they agreed, EMI breached their fiduciary duties owed to the Gaye Family by, among other things discussed above:  (1) failing to identify and raise claims based on the Marvin Gaye copyrights which the company was entrusted to protect and enforce; (2) initially advising the Gaye Family and/or its representatives that it listened to the two songs, recognized the similarities and the Gaye Family's entitlement to a copyright interest in "Blurred Lines" and that the claim was viable, but subsequently instructing its litigation attorney to intimidate the Gaye Family from filing an action by antagonistically warning that any lawsuit would be frivolous; (3) refusing to bring the counterclaims herein, even when provided with a renowned musicologist's report supporting the claims; (4) failing to remain neutral when faced with a conflict of interest, and instead giving strong biased support to the Blurred Writers, to the direct detriment of the Gaye Family; (5) refusing to cooperate in the Gaye Family's efforts to avoid further dispute and preempt unnecessary and costly litigation concerning standing by confirming the Gaye Family's right to bring this action with a simple assignment of such right; and (6) having the Chairman of EMI call a Gaye Family legal representative to provide a veiled threat in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

the form of unsolicited "sage advice" not to pursue this action, and to make the other statements identified above.

125.   As a direct and proximate consequence and result of the aforementioned acts and breach of their fiduciary duties by EMI, the Gaye Family has sustained damages in an amount not yet ascertained, but to be proven at trial.  To the extent that the Agreements purport to contain an exculpatory clause, which purports to release EMI from this unlawful conduct, the Gaye Family alleges that such a clause is unenforceable pursuant to Civil Code § 1668 and other applicable law.

126.   EMI is guilty of malice, fraud or oppression, as defined in California Civil Code § 3294, and the Gaye Family should therefore recover, in addition to actual damages, punitive damages to make an example of and punish EMI and to deter similar conduct in the future.

## <u>COUNT V:</u>

### (Breach of Contract Asserted Against EMI)

127.   The Gaye Family repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

128.   EMI expressly agreed with the Gaye Family that it would, among other things, act as the Gaye Family's attorney-in-fact and initiate litigation against infringers of any of the compositions subject to the Agreements, including "Got to Give it Up" and "After The Dance."  At the time the parties entered into the Agreements, they were

legally capable of contracting; there was mutual consent, a lawful objective and sufficient consideration.

129.   The Gaye Family has performed all of their obligations as required by the Agreements.   EMI has accepted and benefited from the Gaye Family's performance under the Agreements.

130.   EMI has materially breached the terms of the Agreement by, among other things, refusing and failing to bring a legal action against the Counter-Defendants named herein, and by acting to the detriment of the Gaye Family.   The breach is material.

131.   As a direct and proximate result of the aforementioned acts, the Gaye Family has sustained damages in an amount not yet ascertained but to be proven at trial.  To the extent that the Agreements purport to contain an exculpatory clause which purports to release EMI them from their unlawful conduct, the Gaye Family alleges that such a clause is unenforceable pursuant to Civil Code § 1668 and other applicable law.

## COUNT VI:

### (Rescission Against the EMI Defendants)

132.   The Gaye Family repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

133.   The Gaye Family alleges that the Administration Agreement and Modification were obtained by EMI through mistake and fraud as alleged herein, since

the Gaye Family did not know or understand that EMI would not protect its interests, including bringing legal action if such action would conflict with other EMI deemed to be more important or currently valuable than EMI's legal and contractual obligations to the Gaye Family.

134.   EMI affirmatively and fraudulently concealed from the Gaye Family that it would not carry out its contractual obligations to the Gaye Family in the event of conflicts of interests with other EMI writers, notwithstanding the adverse effect and financial harm to the Gaye Family.   EMI had a duty to so advise the Gaye Family, in light of the fiduciary relationship being established, but failed to do so.

135.   Upon information and belief, the EMI Defendants control approximately thirty percent (30%) of the music publishing market throughout the world. Accordingly, there is a strong likelihood that conflicts of interest, such as the one in the present case, will arise again between the EMI Defendants and the Gaye Family. Based upon the blatant and egregious breach of the EMI Defendants' fiduciary duty and their covenant of good faith and fair dealing, the EMI Defendants have proven that they cannot be trusted to remain neutral and impartial, and that they are unworthy of the level of trust and professional conduct which is required of a copyright administrator charged with protecting the Gaye Family's important interests in copyrighted works created by Marvin Gaye.

136.   The Gaye Family also alleges that EMI has materially breached the terms of the Agreements by failing to bring legal action against the infringement Defendants named herein, by aggressively refusing to assign to the Gaye Family the right to bring such action, and by working with the Blurred Writers against the interests of the Gaye Family.

137.   As a result of these misrepresentations and material breaches by EMI, the Gaye Family has incurred substantial financial damages as herein alleged.  The Gaye Family hereupon serves notice of their demand for rescissionary damages on the grounds of fraudulent misrepresentations, deceit, mistake, material breach, and breach of fiduciary duty by EMI as herein alleged.  To the extent that the Agreements purport to contain an exculpatory clause which purports to release EMI from unlawful conduct, the Gaye Family alleges that such a clause is unenforceable pursuant to Civil Code § 1668 and other applicable law.

138.   The Gaye Family hereby demands restitution from EMI in an amount that will restore them to a position they would have been had EMI not engaged in the willful, intentional, and purposeful conduct alleged herein.  The Gaye Family further alleges that EMI has been unjustly enriched by the actions herein alleged and all the fees, royalties, profits, payments and/or other commissions earned by EMI in connection with the Infringing Blurred Works and the Infringing War Works must be disgorged to the Gaye Family.

139.  The Gaye Family also seeks rescission of the Agreements, and disgorgement of any profits, based on EMI's breaches of various contractual and fiduciary duties owed to them.  The Gaye Family should not be compelled to remain in this contractual relationship, the term of which continues for many more years, in light of the fact that EMI has actively and affirmatively worked against the rights and interests of the Gaye Family, despite its legal and contractual duty to protect those very rights and interests.  EMI has shown that it will not, and cannot be trusted to, perform its contractual obligations and duty to the Gaye Family in accordance with and as intended by the Agreements, and that it has no interest or intention of doing so, particularly when confronted with conflicts of interests that are perceived to adversely affect the proverbial "golden goose" and other interests for EMI.

## **PRAYER FOR RELIEF**

WHEREFORE, the Gaye Family prays for judgment against the Plaintiffs and Counter-Defendants and for the following relief:

A.    A declaration that the Blurred Lines Defendants and Love After War Defendants have willfully infringed the Gaye Family's copyrighted works in violation of the Copyright Act;

B.    A declaration that the Blurred Lines Defendants and Love After War Defendants are directly, vicariously and/or contributorily liable for copyright infringement, as applicable;

C.     A permanent injunction requiring the Blurred Lines Defendants and Love After War Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any one of them, to cease directly and indirectly infringing, and causing, enabling, facilitating, encouraging, promoting, inducing, and/or participating in the infringement of any of Gaye Family's rights protected by the Copyright Act;

D.     An award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, and the profits of the Blurred Lines Defendants and Love After War Defendants as will be proven at trial, or in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 for each act of infringement;

E.     On each and every count, including the counts for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty, compensatory and special damages in accordance with proof at trial;

F.     For punitive damages on each count where available;

G.     Rescission of the Agreements;

H.     An award of attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and under other applicable law;

I.     For pre-judgment and post-judgment interest according to law, as applicable; and

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

1        J.      For such other and further relief as this Court may deem just and proper.

2

3

4    DATED:  October 29, 2013        Respectfully submitted,

5

6                                       KING & BALLOW

7                                       PAUL H. DUVALL
     RICHARD S. BUSCH (Pro Hac Vice
8    Pending)

9

10                                      WARGO FRENCH LLP

11

12                                      By: _____

13                                      MARK L. BLOCK

14                                      Attorneys for Nona Marvisa Gaye and
     Frankie Christian Gaye
15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO
PLAINTIFF'S COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

3
      Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Defendants

4
respectfully demand a trial by jury.

5

6
DATED:  October 29, 2013        Respectfully submitted,

7
      KING & BALLOW

8

9
      PAUL H. DUVALL
      RICHARD S. BUSCH (Pro Hac Vice

10
      Pending)

11
      WARGO FRENCH LLP

12

13
      By: _____

14
      MARK L. BLOCK

15
      Attorneys for Nona Marvisa Gaye and

16
      Frankie Christian Gaye

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COUNTERCLAIMS TO
PLAINTIFF'S COMPLAINT