1   Paul H. Duvall (SBN 73699)
    E-Mail: pduvall@kingballow.com
2   KING & BALLOW
    6540 Lusk Blvd., Suite 250
3   San Diego, CA 92121
    (858) 597-6000
4   Fax: (858) 597-6008
    Attorneys for Defendants and Counter-
5   Claimants Frankie Christian Gaye and
    Nona Marvisa Gaye
6

    Richard S. Busch (TN BPR 014594)
    (pro hac vice)
    E-Mail: rbusch@kingballow.com
    KING & BALLOW
    315 Union Street, Suite 1100
    Nashville, TN 37201
    (615) 259-3456  Fax: (615) 726-5417
    Attorneys for Defendants and Counter-
    Claimants Frankie Christian Gaye and Nona
    Marvisa Gaye

7   Mark L. Block (SBN 115457)
    E-Mail: mblock@wargofrench.com
8   WARGO & FRENCH LLP
    1888 Century Park East, Suite 1520
9   Los Angeles, CA  90067
    (310) 853-6355 Fax: (310) 853-6333
10  Attorneys for Defendants and Counter-
    Claimants Frankie Christian Gaye and
11  Nona Marvisa Gaye

    Paul N. Philips (SBN 18792)
    E-Mail: pnp@pnplegal.com
    The Law Offices of Paul N. Philips
    9255 West Sunset Boulevard
    West Hollywood, CA  90069
    (323)813-1126 Fax:  (323) 854-6902
    Attorney for Defendant and Counter-Claimant
    Marvin Gaye III

12

13                  **UNITED STATES DISTRICT COURT**

14        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15   PHARRELL WILLIAMS, an
     individual; ROBIN THICKE, an
16   individual; and CLIFFORD HARRIS,
     JR., an individual,
17
                    Plaintiffs,
18
             vs.
19
     BRIDGEPORT MUSIC, INC., a
20   Michigan corporation; FRANKIE
     CHRISTIAN GAYE, an individual;
21   MARVIN GAYE III, an individual;
     NONA MARVISA GAYE, an
22   individual; and DOES 1 through 10,
     inclusive,
23
                    Defendants.
24

25   AND RELATED COUNTERCLAIMS
26

     Case No. CV13-06004-JAK (AGRx)

     Hon. John A. Kronstadt

     **COUNTER-CLAIMANTS' JOINT
     MEMORANDUM OF POINTS AND
     AUTHORITIES IN OPPOSITION TO
     PLAINTIFFS AND COUNTER-
     DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT OR, IN THE
     ALTERNATIVE, PARTIAL SUMMARY
     JUDGMENT**

     Date: October 20, 2014
     Time: 8:30 a.m.
     Ctrm: 750

     Action Commenced: August 15, 2013
     Trial Date: February 10, 2015

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

I.      INTRODUCTION ................................................................................ 1

    A.    Plaintiffs' Infringement of "Got to Give it Up" ................................ 3

       1.    Creation of "Got to Give it Up" ............................................... 3

       2.    Creation of "Blurred Lines" .................................................... 3

       3.    Musicological Analysis of "Got to Give it Up" ...................... 4

          a)    Ordinary Observers' Recognition of Infringement ................. 4

          b)    Original Features of "Got to Give it Up" and Infringing Elements of "Blurred Lines" ............................................................ 5

          c)    Substantial Similarity of Main Vocal Melodies ..................... 6

          d)    Substantial Similarity of the Hooks ....................................... 7

          e)    Substantial Similarity of the Hooks with Backup Vocals ...... 7

          f)    Substantial Similarity of Core Theme in "Blurred Lines" and Backup Hook in "Got to Give it Up" ................................. 7

          g)    Substantial Similarity of the Backup Hooks .......................... 7

          h)    Substantial Similarity of Bass Melodies ................................ 8

          i)    Substantial Similarity of Keyboard Parts ............................... 8

          j)    Substantial Similarity of Percussion Choices ......................... 9

          k)    Additional Distinctive Similarities ......................................... 9

          l)    Mashups .................................................................................. 9

       4.    Plaintiffs' References to Prior Art are Irrelevant ................... 10

       5.    Ms. Wilbur's Analysis of "Got to Give it Up" Is Flawed ....... 11

    B.    Plaintiffs' Infringement of "After the Dance" ................................ 13

- i -

1          1.     Background ........................................................................................ 13

2          2.     Musicological Analysis of "After the Dance" ......................................... 13

3          3.     Ms. Wilbur's Analysis of "After the Dance" is Flawed........................... 14

4     II.     STANDARD OF REVIEW................................................................................. 14

5     III.    ARGUMENT ..................................................................................................... 15

6        A.   The Gayes Establish a Viable Claim for Copyright Infringement ................... 15

7        B.   Analytic Dissection under the Extrinsic Test Supports a Finding of Copyright

8              Infringement .................................................................................................. 16

9          1.   The Elements Infringed by Plaintiffs are Protected as Original Musical

10             Expressions ................................................................................................. 16

11         2.   The Elements Infringed by Plaintiffs are not *Scènes à Faire* ................... 17

12         3.   The Elements Infringed by Plaintiffs are not De Minimis ......................... 18

13         4.   The Overall Impact of a Combination of Elements Should be Considered to

14             Determine Infringement ............................................................................... 18

15         5.   The Original Compositional Elements have a High Degree of Protection ............. 21

16       C.   The "Got to Give it Up" Recording is Relevant in Assessing Substantial

17            Similarity Because the Infringement Claim is not Limited to the Elements in

18            the Deposit Copy............................................................................................. 22

19         1.   The Gayes' Claims are not Restricted to the Elements Contained in the

20             Copyright Deposit......................................................................................... 22

21         2.   The "Got to Give it Up" Recording is Relevant in Assessing Substantial

22             Similarity ...................................................................................................... 25

23     IV.    CONCLUSION .................................................................................................. 25

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Cases**

3

4   *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992) .............................. 16

5   *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014)................................... 14

6   *Ellis v. Diffie*, 177 F.3d 503 (6th Cir.1999)................................................................................. 19

7   *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)............................................. 16

8   *Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986)............................................................................. 18

9   *Goldberg v. Cameron*, 787 F. Supp. 2d 1013 (N.D. Cal. 2011) ............................................. 19

10  *Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984)................................................ 23

11  *Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153 (S.D.N.Y. 1986)......................................... 23

12  *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL 5245484 (N.D.

13        Cal. Dec. 17, 2008) ............................................................................................................... 23

14  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................... 15

15  *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904 (9th Cir. 2010)............................................. 21

16  *Pasillas v. McDonald's Corp.*, 927 F.2d 440 (9th Cir. 1991)................................................... 16

17  *Peters v. West*, 776 F. Supp. 2d 742 (N.D. Ill. 2011) *aff'd*, 692 F.3d 629 (7th Cir.

18        2012) ........................................................................................................................................ 22

19  *Radin v. Hunt*, LA CV10-08838 JAK (SSx), (C.D. CA Dec. 15, 2011)................................. 19

20  *Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045 (D. Idaho 2013)....................................... 23

21  *Shady Records, Inc. v. Source Enters., Inc.*, 03 CIV. 9944 (GEL), 2005 WL 14920

22        (S.D.N.Y. Jan. 3, 2005) ........................................................................................................ 24

23  *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990)..............................................................15, 16

24  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th

25        Cir. 1977)................................................................................................................................ 15

26  *Smith v. Jackson*, 84 F.3d 1213 (9th Cir.1996).......................................................................... 15

27  *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004)................................................................ *passim*

28

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) .................................. *passim*

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327 (9th Cir. 1983) ................ 16

*Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409 (S.D.N.Y. 2004).* ............................................................................................................................. 10

**Statutes**

17 U.S.C. § 101 ............................................................................................................ 26

17 U.S.C. § 408 ........................................................................................................ 3, 23

37 C.F.R. § 202.20 ....................................................................................................... 25

Copyright Act of 1909, 35 Stat. 1075 (1909) (repealed 1978) ................................. 26

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................... 14

**Other Authorities**

6 Patry on Copyright § 22:147 ..................................................................................... 25

Paul Goldstein, Goldstein on Copyright § 3.8 (2013) ................................................. 22

# I.    INTRODUCTION

Subscribing to the notion that the best defense is an aggressive offense, Plaintiffs filed this action against the children of Marvin Gaye, and this Motion for Summary Judgment, complete with insults, accusing the Gaye children of "smell[ing] money." Yet, it was Plaintiffs Robin Thicke ("Thicke") and Pharrell Williams ("Pharrell" or "Williams") who attempted to make a fortune by unabashedly marketing and selling "Blurred Lines" as a recreation of Marvin Gaye's legendary and iconic song "Got to Give it Up" in order to ensure the selling of millions of records. Not only was it, therefore, Thicke and Williams who actually "smelled money," but it was they who then played the role of bully by suing Marvin Gaye's children when the Gaye children had the temerity to question why their father was not credited, or why "Got to Give it Up" was not licensed, betting that the Gaye children would not have the will or resources to fight this battle. Thicke and Williams bet wrong, and they will now have to face the consequences of their misjudgment and their blatant copyright infringement.

Thicke and Williams took this action despite publicly admitting they were attempting to recreate "Got to Give it Up" in "Blurred Lines" in numerous videotaped interviews (Thicke, at least 5 times alone), and Williams also separately stated he envisioned himself as Marvin Gaye while making "Blurred Lines." (*See* Declaration of Richard S. Busch ("Busch Decl.") Ex. 2, Ex. 3 tracks 1-5, 7, Ex. 4, Ex. 5). Robin Thicke submitted sworn interrogatory responses ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

When it was time for Thicke and Williams to be deposed in this case, ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

[1] ████████████████████████████████████████████████████████████████████████

[2] The Gayes redacted the deposition testimony of Thicke and Williams from this Response as counsel for Thicke and Williams, without justification, insisted the entire deposition testimony be sealed. The Gayes do not agree that testimony about the creation of "Blurred

- 1 -



Thicke, for his part,

As fully discussed below, this Motion for Summary Judgment should be denied for numerous reasons, including: (1) "Got to Give it Up" was recorded in 1977 in the studio without preexisting lead sheet and the best evidence of the composition is the recording, not a third-party-created post-recording lead sheet, as the Ninth Circuit has recognized in similar cases; (2) "Blurred Lines" copies many original compositional elements from "Got to Give it Up" as shown by expert analysis and audio files submitted herewith; (3) Thicke admitted copying, but, in any event, the two compositions are substantially similar, with or without application of the inverse-ratio rule, which should be applied in light of the overwhelming evidence of access and intent to copy; (4) the expert analysis of Sandy Wilbur is not credible as shown by the Gayes' experts and her varying positions in cases depending upon which side hires her; and (5) "Love After War" copies the core of "After the Dance," as explained below.

---

Lines" is even arguably confidential and object to the sealing.

**A.     Plaintiffs' Infringement of "Got to Give it Up"**

      **1.     Creation of "Got to Give it Up"**

      "Got to Give it Up" was written and recorded by Marvin Gaye in 1976 and released in 1977 on *Live at the London Palladium*. The musical composition of "Got to Give it Up" is equivalent to the recording; there was no preexisting lead sheet for "Got to Give it Up" at the time of its recording, and the composition was created as it was recorded at Marvin Gaye's studio. (*See* Declaration of Janis Gaye at ¶¶ 5-6). Marvin Gaye did not create a lead sheet for "Got to Give it Up." (*See id.* at ¶ 7). The lead sheet, which was deposited at the Copyright Office with the copyright registration, was created by an unknown third-party sometime after the creation of "Got to Give it Up," and was deposited because, at the time, recordings were not allowed to be deposited as the composition (in 1978, that rule was changed to allow the deposit of recordings as the composition *see* 17 U.S.C. § 408). Sandy Wilbur, the expert for Thicke and Williams, has admitted in prior sworn Declarations that lead sheets are not meant to reflect the entire composition, but are only a condensed version of a musical composition. (Busch Decl. Ex. 8 at ¶ 59, Ex. 9 at 106:9-15, 131:6-133:24).

      **2.     Creation of "Blurred Lines"**

      As is evident to any ordinary listener, Plaintiffs not only blatantly copied unique and original elements of "Got to Give it Up" in their sextuple platinum international hit "Blurred Lines," but openly admitted to attempting to copy and recreate "Got to Give it Up" in creating "Blurred Lines." Specifically, Thicke stated in multiple interviews that "Got to Give it Up" is "one of [his] favorite songs of all time, [he] went in [to the studio] and [said] 'you know Pharrell I'd love to make something like this, you know feel like 'Got to Give it Up' and [Pharrell] started with the percussion you know ***trying to get that rhythm*** and then the song actually happened we did the whole record in about an hour."[3] (Busch Decl. Ex. 3 track

---

[3] Thicke made additional admissions in video and radio interviews: "[Question:] Is the song, it feels, cause speaking of old man dances and BBQ dances, it feels sort of like "Got to Give it Up" Part 2. [Thicke:] Definitely. Yeah." "Pharrell and I went in the studio, and I had mentioned to him that one of my favorite songs of all-time is Marvin Gaye's 'Got To Give It Up.' So we tried to get a little groove like that going, . . ." (Busch Decl. Ex. 3 tracks 1-2).

1  | 1).  

2  |

3  |

4  |      As also noted above, Williams admitted in his interview to promote the film

5  | *Despicable Me 2* that he was inspired by "Got to Give it Up" in creating "Blurred Lines,"

6  | and also stated in a separate interview that he imagined himself as Marvin Gaye while doing

7  | so. (*Id.* Ex. 3 track 7, Ex. 5). The wide dissemination of "Got to Give it Up" along with these

8  | admissions are relevant because they provide direct evidence of copying and the Ninth

9  | Circuit uses an inverse-ratio rule which requires "a lesser showing of substantial similarity if

10 | there is a strong showing of access." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481

11 | (9th Cir. 2000) (citing *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)).

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |          **3.      Musicological Analysis of "Got to Give it Up"**

21 |              **a)      Ordinary Observers' Recognition of Infringement**

22 |      Ordinary observers not only immediately recognize the substantial similarities

23 | between these songs and the appropriation of "Got to Give it Up" in "Blurred Lines," but

24 | have publically remarked on Thicke's Marvin Gaye "fixation." (*See* Busch. Decl. Ex. 10;

25 | Finell Decl. Ex. 1 at ¶ 44, 46). *The New York Times*' Rob Hoerburger commented, "[w]hat I

26 | keep coming back to is ['Blurred Lines']'s choice DNA . . . that bass line came right from

27 | Marvin Gaye's No. 1 hit from the Summer of '77, 'Got to Give it Up.'" (Busch. Decl. Ex.

28 | 11). Additionally, David Ritz, the author of a Marvin Gaye biography, stated in *Rolling*

- 4 -

*Stone*: "When I first heard Robin Thicke's 'Blurred Lines,' my reaction was the same as millions of other R&B fans: *'Hey, that's Marvin Gaye's 'Got to Give it Up.'*'" (*Id.* Ex. 12). Further, music critic Paul Cantor stated on *Vice* magazine's website in July 2013, that "[y]ou probably don't feel guilty for liking 'Blurred Lines.' Maybe that's because it was originally a Marvin Gaye song, ('Got to Give it Up'), and Marvin Gaye is [expletive deleted] awesome." (*Id.* Ex. 13).

### b)   Original Features of "Got to Give it Up" and Infringing Elements of "Blurred Lines"

The Gayes' expert musicologists Judith Finell[4] and Dr. Ingrid Monson[5] have identified eight substantial similarities in "Got to Give it Up" and "Blurred Lines": (1) the signature phrase in the main vocal melodies; (2) the hooks; (3) the hooks with backup vocals; (4) the core theme in "Blurred Lines" and backup hook in "Got to Give it Up"; (5) the backup hooks; (6) the bass melodies; (7) the keyboard parts; and (8) the unusual percussion choices. "Blurred Lines" embodies a constellation of these eight features and has other distinctive features from "Got to Give it Up." (*See* Finell Decl. Ex. 1 at ¶ 36-40, 43). Each of these is discussed below and is fully detailed in the expert reports and declarations.

These similarities are also demonstrated in part by the comparison media prepared under the experts' supervision in the form of mashups of "Got to Give it Up" and "Blurred Lines."[6] (Aston Decl. Ex. 1, 2; Court Decl. Ex. 1). The attached mashups clearly demonstrate the substantial similarities of the respective compositions. (*See* Finell Decl. at ¶¶

[4] Ms. Finell is the President of Judith Finell MusicServices Inc. Ms. Finell has an M.A. in Musicology from the University of California at Berkeley and a B.A. from UCLA in Piano Performance.
[5] Dr. Monson is the Quincy Jones Professor of African American Music at Harvard University. Dr. Monson has a Ph.D. and an M.A. in Musicology from NYU with a concentration in Urban Ethnomusicology, and a B.M. from New England Conservatory of Music.
[6] A "mashup" describes a recording in which coinciding passages from two or more recordings are combined and heard simultaneously. "The overlay of audio parts is a heuristic tool to help make the relationships between the songs audible to a lay audience." (Monson Decl. at ¶ 55).

- 5 -

134-44; Decl. of Dr. Ingrid Monson ("Monson Decl.") at ¶ 56). In fact, the "mashup[s] would not work so seamlessly if there were not substantial similarity between the songs." (*Id.* at ¶ 59).

"[T]he copying of 'Got to Give it Up' by 'Blurred Lines' is not the copying of a genre, but the copying of a particular song." (*Id.* at ¶ 22). "Got to Give it Up" and "Blurred Lines" share a constellation of similarities in hand percussion parts, bass lines, drum set parts, vocal melodies, backup vocals, accompaniment parts, and instrumentation that cannot be accidental. (*Id.* at ¶¶ 21, 101). Those important and distinctive compositional elements are substantially similar in "Blurred Lines" and "Got to Give it Up." (*See* Finell Decl. Ex. 1 ¶ 42). The declarations and reports show that it is clear that "'Got to Give it Up' served as the specific model for 'Blurred Lines.'" (Monson Decl. at ¶¶ 21, 35, 62, 101).

The songs' substantial similarities reach the very essence of each work. (*See* Finell Decl. Ex. 1 at ¶ 7). "The chances of professional R&B musicians independently making such similar choices in the combination of instrumentation, accompaniment parts, rhythms, and signature melodic motives without having closely studied the specifics of 'Got to Give it Up' and copied them, is remote." (Monson Decl. at ¶ 62).

### c)   Substantial Similarity of Main Vocal Melodies

Both songs are substantially similar in their vocal melodies. (Finell Decl. Ex. 1 at ¶ 6). The prominent vocal parts of "Got to Give it Up" are taken to create most of the key vocal phrases of "Blurred Lines." Among other vocal melody similarities, the signature phrases[7] in each song are substantially similar and are "crucial elements of the song's identity"; both songs use this melody and other vocal melodies as outgrowths of this signature phrase. (*Id.* Ex. 1 at ¶¶ 13, 16-17). "The signature phrases in both songs are substantially similar not only because of their shared content, but also [because they] share similar functions within their respective songs. . . . [the signature phase] is one of the pivotal elements of the song." (Finell

---

[7] The signature phrase in "Blurred Lines" "is sung to the lyrics 'And that's why I'm gon' take a good girl.' In '[Got to] Give it Up,' this similar signature phrase is sung to the lyrics 'I used to go out to parties.'" (Finell Decl. Ex. 1 at ¶ 13).

1   Decl. at ¶ 52).

2                   **d)      Substantial Similarity of the Hooks**

3         Both songs are also substantially similar in their hooks. "[T]he hook melodies are

4   sung to the lyrics 'keep on dancin'' (in 'Got to Give it Up') and 'take a good girl' (in

5   'Blurred Lines')". (*Id.* at ¶ 56). Three out of four pitches in the hook of "Got to Give it Up"

6   are also found in the hook of "Blurred Lines" and the pitches have similar rhythmic

7   placement. (*Id.*). Mashup Example 3 clearly demonstrates that the hooks of the songs are

8   practically interchangeable. (Court Decl. Ex. 1, track 3).

9                   **e)      Substantial Similarity of the Hooks with Backup Vocals**

10        The hooks and backup vocals also have substantially similar melodic expressions and

11  in each song the "backup vocals are combined similarly with the hook's lead vocals to

12  amplify the primary message of the lyrics." (Finell Decl. at ¶ 58). Additionally, the songs

13  share substantially similar scale degrees here.

14                  **f)      Substantial Similarity of Core Theme in "Blurred Lines" and**

15                  **Backup Hook in "Got to Give it Up"**

16        Further, the core material in the verse in "Blurred Lines" is substantially similar to the

17  backup hook in "Got to Give it Up." (Finell Decl. Ex. 1 at ¶ 21). This core material is similar

18  in scale degrees, rhythm, chromatic movement, and melodic pattern. (*Id.* Ex. 1 at ¶ 23). This

19  core theme "is the melody used for subsequent variations of the song's hook found in the

20  chorus section." (*Id.* Ex. 1 at ¶ 27). This material occurs frequently throughout both songs.

21  (Finell Decl. at ¶ 63).

22                  **g)      Substantial Similarity of the Backup Hooks**

23        Both songs' backup hooks are substantially similar. "The backup hooks are sung to

24  the lyrics 'Dancin' lady' in 'Got to Give it Up' and 'hey, hey, hey' in 'Blurred Lines.'" (*Id.*

25  at ¶ 70). The backup hooks are substantially similar in that "both songs share the feature of

26  distinctive chromatic (half step) sequences, and both do this specifically within the function

27  of the backup hook." (Finell Decl. Ex. 1 at ¶ 28). "This theme is a distinctive feature of both

28  songs' identities." (Finell Decl. at ¶ 71).

                                        - 7 -

### h)    Substantial Similarity of Bass Melodies

"The 'Blurred Lines' bass line considerably overlaps the 'Got to Give it Up' bass line and contributes to the strong perception of a relationship between the two songs." (Monson Decl. at ¶ 34). The substantial similarities between the songs "include their two-measure phrases, which leave space in the middle of each of the bars, rhythms, and points of harmonic arrival." (*Id.* at ¶ 30). This is not simply an element of a genre, as "[i]t is unusual to have bass lines in R&B that leave this much space in the middle of the bar." (*Id.*).

Additionally, the bass lines in "Got to Give it Up" and "Blurred Lines" have substantially similar descending melodies and "share many of the same distinctive syncopated rhythms, in the same locations and often with identical scale degrees, which makes them sound very similar." (Finell Decl. Ex. 1 at ¶¶ 14 n.5, 29, 31). This is more evidence of copying the composition and is decidedly *not* the result of copying a genre. "There are many available melodic possibilities that can be chosen in creating a bass melody, even within the 'funk' or 'soul' genres. The genre does not dictate the specific pitches of a bass melody." (Finell Decl. at ¶ 76).

The bass melody similarities are found in 60% of "Blurred Lines." (*Id.* at ¶ 80). "This is an unusually high proportion of similar material, even in a copyright infringement case." (*Id.*). "The 'Got to Give it Up' and 'Blurred Lines' bass lines are very similar and are not generic. They are more similar to one another than standard R&B bass lines. R&B and Funk bass lines generically tend to be syncopated throughout a phrase. That the 'Got to Give it Up' and 'Blurred Lines' bass lines both leave space where they do points to 'Got to Give it Up' as the model for the 'Blurred Lines' bass line, not genre." (Monson Decl. at ¶ 35).

### i)    Substantial Similarity of Keyboard Parts

The keyboard parts in both songs have distinctive rhythmic suspensions. (Finell Decl. at ¶ 88). "The keyboard material represents much more than a mere idea of placing chords on the offbeat, rather, this comprises similar compositional content." (*Id.* at ¶ 89). Additionally, "the songs' keyboard parts share identical scale degrees, rhythmic duration, rhythmic placement, and a distinctive rhythmic suspension feature, meaning that they share

- 8 -

meaningful expression, content which far exceeds an 'idea.'" (*Id.*). These similarities are also compositional and not dictated by a genre. (*Id.*)

### j)     Substantial Similarity of Percussion Choices

The songs also have substantially similar percussion choices that are not standard in any genre. (Monson Decl. at ¶ 24).  The cowbell sound (played on a coke bottle) in 'Got to Give it Up' creates Latin feel to the percussion accompaniment. (*Id.*). "Blurred Lines" uses a synthetic cowbell for the same sonic result. (Finell Decl. at ¶ 93).  Both songs use the hand percussion (cowbell and agogo bell) to play variations of salsa rhythms. (Monson Decl. at ¶¶ 24-29) Additionally, the cowbell and coke bottle, and agogo bell perform the same function in both songs, adding a very specific color and identity to the rhythm section. (Finell Decl. Ex. 1 at ¶ 33(a)). Adding to the unique sound, "[the] open hi-hat rhythm is placed on the weakest beat of the bar, creating a distinctive 'splash' that is in sharp contrast to the stable rhythms of the drums. This identical open hi-hat rhythm is crucial to the character of both songs." (*Id.* Ex. 1 at ¶ 33(b)).

These similarities are not common to a specific genre. The drums in both songs "make[] use of an uncommon variation of a disco beat." (Monson Decl. at ¶ 36). "The two parts resemble each other more than they do the generic rhythms of disco." (*Id.*).

All of the copying above is of original, protectible, important compositional elements of "Got to Give it Up." (*See generally* Finell Decl.; Monson Decl.).

### k)     Additional Distinctive Similarities

"'Got to Give it Up' and 'Blurred Lines' share additional features that enhance the similarity of the two songs. The similar use of these specific collective traits reflects the same creative choices." (Finell Decl. at ¶ 95). The shared departures from conventional elements of R&B music, such as the party noises, unusual cowbell instrumentation, omission of guitar, and use of male falsetto, all further contribute to the finding of substantial similarity. (*See id.* Ex. 1 at ¶ 43).

### l)     Mashups

The Mashups of "Blurred Lines" and "Got to Give it Up" provide concrete musical

illustrations of the substantial similarities between the compositions "Blurred Lines" and "Got to Give it Up." "The three [Mashups] show that when the similar vocal melodies found in 'Blurred Lines' are merged with the similar instrumental melodies in 'Got to Give it Up,' this material sounds like a perfect, natural match because it blends sonically. The same natural congruence occurs when the similar vocal melodies in 'Got to Give it Up' are merged with the similar instrumental melodies in 'Blurred Lines.'" (Finell Decl. at ¶ 135). This is a powerful indication of their substantial similarity because each songs' vocal lines can be played interchangeably—and on a sustained basis—with the instrumental accompaniment of the other. (*Id.* at ¶ 136). Example 1 plays the vocal material of "Blurred Lines" over the instrumental material of "Got to Give it Up." (*Id.* at ¶ 137; Aston Decl. Ex. 1, track 1). Example 2 plays the vocal material of "Got to Give it Up" over the instrumental material of "Blurred Lines." (*Id.* at ¶ 138; Aston Decl. Ex. 1, track 2). "Example 3 merges the vocals in the hook of "Got to Give it Up" . . . with the instrumental accompaniment of "Blurred Lines." (*Id.* at ¶ 140(d); Court Decl. Ex. 1, track 3). These Mashups expose Ms. Wilbur's faulty methodology, demonstrate that the similarities are not merely "ideas," and show that the exaggerated minor dissimilarities noted in the Wilbur Declaration do not detract from the substantial similarities between the songs. (*Id.* at ¶ 141-43).

### 4. Plaintiffs' References to Prior Art are Irrelevant

Plaintiffs' references to prior art are irrelevant to the similarities between "Got to Give it Up" and "Blurred Lines."[8] "First, none of [the prior art] contains the same or even close to the multitude of similar coinciding features found in 'Got to Give it Up' and 'Blurred Lines.' Second, most of the examples of prior art do not meet the rigid standards and criteria for finding similarity that Ms. Wilbur and [Plaintiffs' Motion] have applied in assessing 'Got to Give it Up' and 'Blurred Lines.' Third, most of the prior art cited contains no substantiation,

---

[8] Alleged similarity to prior art is also not relevant because Thicke and Williams admitted copying "Got to Give it Up." "[T]he similarity of the [infringed work] to other musical works in the public domain [is] not relevant in an originality inquiry where . . . copying is conceded." *Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 414 n.6 (S.D.N.Y. 2004).

- 10 -

1   transcriptions, or recordings." (Finell Decl. at ¶ 46-48). Ms. Wilbur did not even conduct her
2   own prior art research. (Busch Decl. Ex. 9 at 80:18-81:8).

3       Even if the subject prior art was relevant, which it is not, Dr. Monson's Declaration
4   demonstrates that none of the prior works cited by Plaintiffs are as similar to "Got to Give it
5   Up" and "Blurred Lines" as "Got to Give it Up" and "Blurred Lines" are to each other.
6   "Both songs resemble each other more than they resemble prior works." (Monson Decl. at ¶
7   40, 44). Neither the guitar nor the bass line in "Low Rider" are rhythmically similar to the
8   songs at issue here because the guitar in "Low Rider" does not share the offbeat of the
9   keyboard in "Got to Give it Up" and "Blurred Lines" and the bass line in "Low Rider" does
10  not contain the rests that "Got to Give it Up," and "Blurred Lines" feature. (*Id.* at ¶ 67-68).
11  Next, the hi-hat pattern and drum beat in "Superfly" are not consistent with the disco pattern
12  in the songs here. (*Id.* at ¶ 72). Additionally, "[t]he cowbell at the opening of 'Superfly'
13  plays a varied pitch introductory idea, not a timekeeping pattern" like the songs in question
14  here. (*Id.* at ¶ 73). Finally, "[t]he cowbell on "Funkytown" plays continuous sixteenth notes
15  rather than a Latin time keeping rhythm." (*Id.* at ¶ 76). These three musical examples
16  claimed as prior examples of works resembling 'Got to Give it Up' and 'Blurred Lines' are
17  very weak. (*Id.* at ¶ 79).

18          **5.    Ms. Wilbur's Analysis of "Got to Give it Up" Is Flawed**

19      Not only do ordinary observers hear the similarities, but any accurate expert opinion
20  would also recognize the substantial similarity. (*See generally* Finell Decl.; Finell Decl. Ex.
21  1; Monson Decl.). On the other hand, "the findings and conclusions of the Wilbur
22  Declaration and [Plaintiffs' Motion] are flawed as they are based on faulty premises and
23  methodology." (Finell Decl. at ¶ 8).

24      As detailed in Ms. Finell's Declaration, Ms. Wilbur's methodology inappropriately
25  attempts to deny the substantial similarities by: (1) "deconstruct[ing] and microscopically
26  dissect[ing] the individual similar features in isolation, outside the context of the overall
27  musical work"; (2) "dismiss[ing] and obscur[ing] the individual similarities by applying
28  irrelevant and inappropriate criteria to the comparison process"; (3) "defin[ing] as ideas

- 11 -

rather than expression the musical content of the works"; (4) "mischaracteriz[ing] the similar musical features as collections of commonplace devices"; (5) "mislead[ing] by disregarding the continuous presence of the similarities and their significance to 'Blurred Lines'"; (6) "separat[ing] the deposit copy from the recording of 'Got to Give it Up,' attempting to disqualify the recording from the comparison process"; and (7) "cit[ing] irrelevant prior art that . . . does not meet the comparison criteria and standards that the Wilbur Declaration and [Motion] apply to the two songs at issue, and lacks the collective similarities present in these songs." (Finell Decl. at ¶ 11). Ms. Wilbur also distorts her note-by-note analysis to give the impression the songs are less similar than they are. (*See, e.g., id.* at ¶¶ 84, 121).

Additionally, Ms. Wilbur stated in her deposition that she did not take into account the prior statements by Thicke and Williams regarding their blatant copying. (Busch Decl. Ex. 9, at 121:21-123:3, 127:16-128:13). She similarly testified that she was not familiar with and did not consider the inverse-ratio rule, which requires less similarity for the greater the showing of access. (*Id.* Ex. 9 at 121:5-11, 128:6-129:10).

The Wilbur Declaration and Motion do not credibly or accurately address the substantial similarities described in Ms. Finell's preliminary report or the reasons for the findings. (Finell Decl. at ¶ 9). Ms. Finell's findings show that "the similar features operate in combination with one another—intersecting and co-existing—and they permeate 'Blurred Lines.' They are undeniably linked to 'Got to Give it Up.' 'Blurred Lines' simply would not be recognizable without them." (*Id.* at ¶ 9). It is this constellation of elements that "Blurred Lines" has appropriated. (*Id.* at ¶ 10). For an accurate analysis, this constellation of elements must be viewed together. *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004).

In fact, contrary to Ms. Wilbur's analysis here, she has previously admitted that one must look to the *entire* work, rather than focusing on isolated elements. (*See* Busch Decl. Ex. 9 at 166:16-167:6, Ex. 14 at 214:18-21). Moreover, Ms. Wilbur's own website states, "[i]t is the unique combination of elements, some of which can be common or generic, that defines originality." (*Id.* Ex. 15). When questioned about the statements on her website, without telling her the origin of the statements, Ms. Wilbur would not confirm her agreement with

- 12 -

1 | them. (*Id*. Ex. 9 at 135:8-137:8, 137:21-138:13).

2 |       Finally, Ms. Wilbur is applying standards and methodology in this action that are in

3 | stark contrast to those she previously stated were appropriate in a sworn declaration in

4 | another case. (*Id*. Ex. 8, at ¶ 59, Ex. 9 at 129:11-133:35).

5 |       **B.**    **Plaintiffs' Infringement of "After the Dance"**

6 |           **1.**    **Background**

7 |       "After the Dance," was written, composed, recorded, and released by Marvin Gaye in

8 | 1976 on the album *I Want You*. "After the Dance" reached number 10 on the Hot

9 | Dance/Disco Chart, number 14 on the Soul Singles Chart, and number 74 on the Pop Singles

10 | Chart. *I Want You* reached number one on the Billboard Soul Albums chart and number four

11 | on the Pop Albums chart.

12 |           **2.**    **Musicological Analysis of "After the Dance"**

13 |       "Love After War" is substantially similar to "After the Dance" and is the result of

14 | intentional copying by Thicke and Patton.

15 | 

16 |       "The fact that the melody to 'Love After War' can easily be sung to the

17 | recording of 'After the Dance' makes its resemblance to the 'After the Dance' immediately

18 | recognizable to a lay listener." (*See* Monson Decl. at ¶ 97, Ex. 1). Additionally, "[t]he

19 | melodies . . . of the two songs are clearly related. The 'Love After War' chorus melody

20 | inverts the 'After the Dance' melody. An inversion is a musical relationship that the average

21 | listener can hear." (*Id*. at ¶ 98).

22 |       "'Love After War' also copies the instrumentation and general accompaniment of

23 | 'After the Dance.' These elements include thick vocal harmonies, quasi-Latin drum

24 | accompaniment, and the prominence of the hook section in the arrangement of the tune." (*Id*.

25 | at ¶ 99). "The resemblance of 'Love After War' to 'After the Dance' is heightened by their

26 | common tempo, use of thick vocal harmonies, quasi-Latin drum accompaniment, and the

27 | prominence of the hook section in the arrangement of the tune. Both fade out after long

28 | repeats of the hook." (*Id*. at ¶ 96).

The ordinary listener would recognize that "Love After War" appropriates this material from "After The Dance." (*See id.* at ¶ 98). "After the Dance" and "Love After War" contain substantially similar compositional material in their choruses, including in the melodies of their hooks. (*See id.* at ¶ 80-99). These portions are both qualitatively and quantitatively important to both "After the Dance" and "Love After War."

### 3.    Ms. Wilbur's Analysis of "After the Dance" is Flawed

The same problems with Ms. Wilbur's analysis of "Got to Give it Up" and "Blurred Lines" apply to "Love After War" and "After the Dance." (Finell Decl. at ¶ 117). "In the case of 'After the Dance,' the elimination of the recording is a critical mistake and entirely inappropriate towards accurately defining the underlying song." (*Id.* at ¶ 118). Plaintiffs' Motion mischaracterizes the songs as "disparate." (*Id.* at ¶ 120). However, Plaintiffs' Motion "only recognizes a limited part of the vocal melodies, namely only one of the simultaneous interlocking vocal lines, while overlooking much of the material containing the most significant similarities." (*Id.* at ¶ 120). Because of the faulty methodology and comparison of the wrong elements, Ms. Wilbur only found one note in common. (*Id.* at ¶ 121). Additionally, Plaintiffs attempt to distract from the substantial similarity analysis by discussing "irrelevant differences found in comparing the two songs." (*Id.* at ¶ 124). Finally, Ms. Finell's Declaration demonstrates the alleged prior art cited by Plaintiffs is not similar to the content of either "Love After War" or "After the Dance." At her deposition Ms. Wilbur admitted that the choruses of the two songs are similar and stated that whether the similarities rose to the level of substantially similar is a question for the jury. (Busch Decl. Ex. 9 at 90:15-94:14).

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the burden of establishing the absence of a genuine dispute of material fact." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) All inferences drawn from the underlying facts "must be viewed in the

- 14 -

light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v.*
*Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III.   ARGUMENT

### A.   The Gayes Establish a Viable Claim for Copyright Infringement

To establish a claim of copyright infringement, a plaintiff must show ownership of a valid copyright and that the "defendant copied protected elements of the plaintiff's work."[9] *Three Boys Music Corp.*, 212 F.3d at 481 (citing *Smith*, 84 F.3d at 1218). "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Id.*

Here, both Thicke and Williams not only admit to having access to "Got to Give it Up," but have admitted outright copying. Thicke stated in multiple interviews that "Got to Give it Up" was one of his "favorite songs of all time," that he wanted to recreate the groove of "Got to Give it Up," and they even "tr[ied] to get that rhythm." (*See* Busch Decl. Ex. 2, Ex. 3 tracks 1-5 and 7, Ex. 7 at 60:6-12, Ex. 16 track 14). Additionally, Williams stated that when he was recording "Blurred Lines" with Thicke, he was inspired by "Got to Give it Up" and "was trying to pretend that [he] was Marvin Gaye." (*Id.* Ex. 3 track 7, Ex. 4, Ex. 5). These admissions amount to direct evidence of copying and should require denial of the Motion for Summary Judgment.

This evidence of access, and admission of copying, is also critical in the infringement analysis because the Ninth Circuit uses an inverse-ratio rule that requires "a lesser showing of substantial similarity if there is a strong showing of access." *Three Boys Music Corp.*, 212 F.3d at 486 (citing *Smith*, 84 F.3d at 1218). Specifically, a high "degree of access justifies a lower standard of proof to show substantial similarity." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977); *see also Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990) (Admission of access "is a factor to be considered in favor of" the copyright owner.).

---

[9] Plaintiffs do not challenge the Gayes' ownership of the copyrights in the songs at issue.

- 15 -

"Where reasonable minds could differ on the issue of substantial similarity, . . . summary judgment is improper." *Shaw*, 919 F.2d at 1355 (9th Cir. 1990). A party moving for summary judgment "may prevail only if no genuine issue of material fact exists on the questions of substantial similarity of idea and idea expression." *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 (9th Cir. 1983). If the copyright owner presents an "'indicia of a sufficient disagreement concerning the substantial similarity of [the] two works,' then the case must be submitted to a trier of fact." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004) (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992)).

> **B.   Analytic Dissection under the Extrinsic Test Supports a Finding of Copyright Infringement**

If the Court does not deny this Motion based on Plaintiffs' admissions alone, to determine substantial similarity, the Ninth Circuit applies a "two-part test of extrinsic similarity and intrinsic similarity." *Three Boys Music Corp*, 212 F.3d at 485. "Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria" and "often requires analytical dissection of a work and expert testimony."[10] *Id.* "'Analytical dissection' requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity.'" *Swirsky*, 376 F.3d at 845 (9th Cir. 2004).

> **1.   The Elements Infringed by Plaintiffs are Protected as Original Musical Expressions**

The elements infringed by Plaintiffs are highly original and not merely ideas or musical "building blocks." (*See* Finell Decl. at ¶¶ 17, 30). To be original, a work only needs a "modicum of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362

---

[10] "Once the extrinsic test is satisfied, the factfinder applies the intrinsic test. The intrinsic test is subjective and asks 'whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.'" *Three Boys Music Corp.*, 212 F.3d at 485 (quoting *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991)).

- 16 -

(1991). "Got to Give it Up" is highly original in both its selection and arrangement of the infringed elements. (*See* Finell Decl. at ¶ 37). It is the manner in which the unique and original elements are used that make "Got to Give it Up" distinctive and recognizable, and it is this unique and original expression that "Blurred Lines" copies. (*Id.*).

### 2. The Elements Infringed by Plaintiffs are not *Scènes à Faire*

Plaintiffs argue that the original elements in "Got to Give it Up" are *scènes à faire*— which are elements so "commonplace" and "indispensible" that they must be included in the work. *Swirsky*, 376 F.3d at 849-50. They are wrong.

Ms. Finell and Dr. Monson fully discuss the manner in which Ms. Wilbur and Plaintiffs' Motion incorrectly identify the constellation of eight similar features as commonplace or devices. (*See generally* Finell Decl. at ¶¶ 49-99; Monson Decl. at ¶ 101). While the concept of some elements may be considered commonplace, it is how they are expressed and the ways they function in "Got to Give it Up" that is distinctive and original. (*See* Finell Decl. at ¶¶ 58, 65). "There are many available melodic possibilities that can be chosen in creating a bass melody, even within the 'funk' or 'soul' genres. [However,] [t]he genre does not dictate the specific pitches of the bass line." (*Id.* at ¶¶ 76, 83). Moreover, none of the elements Plaintiffs claim are commonplace in their specific content (pitches, rhythms, harmonies) are common to any genre. (*See id.* at ¶¶ 94, 99; Monson Decl. at ¶ 22).

For example, Plaintiffs claim that the similarities between the works' bass lines relate merely to commonplace ideas. (Dkt. No. 89 at 18:18-19). However, "the bass melodies' significant similarities in concrete content and function disprove their mischaracterizations as ideas. Rather, the bass melodies [of the two songs] represent a series of shared creative choices, resulting in similar expressive content." (Finell Decl. at ¶ 75). The similarities between "Got to Give it Up" and "Blurred Lines" clearly rise above common devices. (*See id.* at ¶ 77). The copying here "is not the copying of a genre, but the copying of a particular song." (Monson Decl. at ¶ 22)

"It is inappropriate to grant summary judgment on the basis of *scènes à faire* without independent evidence, unless the allegation of *scènes à faire* is uncontested." *Swirsky*, 376

- 17 -

F.3d at 850. Here, Plaintiffs' allegations are clearly contradicted by Ms. Finell's and Dr. Monson's analysis, which demonstrates that the copying in "Blurred Lines" is not a result of assembling random elements from a musical genre. (*See* Finell Decl. Ex. 1 at ¶42; Monson Decl. at ¶ 23). Moreover, even if they could be classified as *scènes à faire*, which they cannot, as discussed below, it is inappropriate to exclude these elements in the extrinsic analysis. *Apple Computer, Inc.*, 779 F. Supp. at 136.

### 3.    The Elements Infringed by Plaintiffs are not De Minimis

Plaintiffs aver that any copying is de minimis and focus on a purported note-by-note comparison of the works. This is inappropriate and ignores the numerous compositional similarities of the two works, not only outlined by Ms. Finell and Dr. Monson, but obvious to the lay observer.

"[A] use is de minimis only if the average audience would not recognize the appropriation." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004) (citing *Fisher v. Dees*, 794 F.2d 432, 434 n.2 (9th Cir. 1986)). Here, Plaintiffs' appropriation is immediately identifiable by anyone familiar with "Got to Give it Up." (*See* Busch Decl. Ex. 11, Ex. 12; Ex. 13). Moreover, Thicke and Williams have acknowledged publicly the similarities

Plaintiffs cannot publicly acknowledge the appropriation.

Not only have the Gayes' experts detailed a constellation of at least eight compositional similarities, but the public agrees that the appropriation is instantly recognizable. Thus, as a matter of law, the portions copied by "Blurred Lines" rise far above a de minimis use. *Newton*, 388 F.3d at 1193 (citing *Fisher*, 794 F.2d at 434 n.2).

### 4.    The Overall Impact of a Combination of Elements Should be Considered to Determine Infringement

Even if, *arguendo*, some of the substantially similar copied elements are not individually protectible, those elements, when taken together, are protectable under well-

established law in this Circuit and may not be excluded from a substantial similarity analysis. In fact, "[i]t is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because 'the over-all impact and effect indicate substantial appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485; *see also Radin v. Hunt*, LA CV10-08838 JAK (SSx), at 4 (C.D. Cal. Dec. 15, 2011). "Music, like software programs and art objects, is not capable of ready classification into only five or six constituent elements; music is comprised of a large array of elements, some combination of which is protectable by copyright." *Swirsky*, 376 F.3d at 849. "There is no one magical combination of these factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique. So long as the [copyright owner] can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." *Id.*

The elements to be compared vary based on the type of work at issue. For a musical composition, "courts have taken account of additional components of musical compositions, including melody, harmony, rhythm, pitch, tempo, phrasing, structure, chord progressions, and lyrics." *Id.* (citing *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir.1999)); *see also Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1021 (N.D. Cal. 2011). The Ninth Circuit has also recognized that "commentators have opined that timbre, tone, spatial organization, consonance, dissonance, accents, note choice, combinations, interplay of instruments, bass lines, and new technological sounds can all be elements of a musical composition." *Swirsky*, 376 F.3d at 849. "To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis." *Id.* at 848. In other words, while the individual parts of a musical composition are examined, the song must be viewed as a whole if the infringement analysis is to be performed accurately.

In *Three Boys Music Corp*, the court of appeals upheld a finding of copyright infringement based on a combination of five unprotectable elements: "(1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental

figures; (4) the verse/chorus relationship; and (5) the fade ending." *Three Boys Music Corp.*, 212 F.3d at 485. "The jury heard testimony from both [parties'] experts and 'found infringement based on a unique compilation of those elements.'" *Id.*

Additionally, in *Swirsky*, the Ninth Circuit reversed the district court and found that the copyright owner met the requirements of the extrinsic test and was able to withstand summary judgment. In that case, the two songs at issue had dissimilar lyrics and verse melodies and the choruses of the songs were "not exactly identical on paper, [but] when examined in the structural context of harmony, rhythm, and meter, they [were] remarkably similar." *Swirsky*, 376 F.3d at 847.

Thus, examination of compositional elements as a whole is integral to the idea/expression analysis. *Swirsky*, 376 F.3d at 848-49. The test examines both ideas and the expression of those ideas. *Id.* at 845. "The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Id.* "The problem with analytic dissection of copyrighted works is that carried to an extreme, it can preclude copyright protection for works which deserve protection in that they represent creative effort which the copyright laws seek to foster." *Apple Computer, Inc. v. Microsoft Corp.*, 779 F. Supp. 133, 135 (N.D. Cal. 1991) *aff'd*, 35 F.3d 1435 (9th Cir. 1994).

Even if some of the referenced elements were merely ideas, as Plaintiffs' claim, which they are not, combinations of "unprotectible" elements should not be eliminated from the substantial similarity of expression analysis. *Id.* at 136. Plaintiffs have identified elements of "Got to Give it Up" which they claim to be ideas, rather than artistic expressions of those ideas. They include: the cowbell, pitches, melody, backup vocals, melodic hooks, bass melodies, keyboard parts, and percussion. (Dkt. No. 89 at 10, 17-19). This list is nearly identical to the elements recognized by two Ninth Circuit Court of Appeals decisions as not only relevant for determining substantial similarity under the extrinsic test, but the Court of Appeals found that a failure to consider these elements would be "an incomplete and distorted musicological analysis." *Swirsky*, 376 F.3d at 848.

These important elements may also not be deemed merely "a list of random

similarities," as Plaintiffs claim, but instead form the foundation for the overall substantial similarity between the two works, and appear simultaneously and repeatedly throughout "Blurred Lines." (Finell Decl. at ¶ 13). As discussed above, "Got to Give it Up" and "Blurred Lines" are similar in their bass lines, vocal melodies, backup vocals, instrumentation, accompaniment parts, percussion, and other elements. (*Id.* at ¶¶ 19, 43). "The eight intersecting similarities . . . are not one-time occurrences or random fragments. Rather, together, they form the identity of 'Blurred Lines,' occupying its essence in vocal melodies and instrumental material, occurring throughout the chorus and verse sections. They **are** the song." (*Id.* (emphasis in original) (footnote omitted)).

The elements here are numerous enough in their selection and arrangement that together they constitute an original work of authorship. *See Swirsky*, 376 F.3d at 847 (comparing three "unprotectible" elements); *Three Boys Music Corp.*, 212 F.3d at 485 (examining five "unprotectbile" elements).

Plaintiffs' Motion and the Wilbur Declaration distract from the appropriate collective analysis, as required by *Swirsky*. Specifically, rather than evaluate the combination of elements, Ms. Wilbur "focus[es] myopically on 'Got to Give it Up''s isolated individual elements." (*See* Finell Decl. at ¶ 11). This methodology is inappropriate, as Ms. Wilbur has previously acknowledged in her own instructional materials. *Swirsky*, 376 F.3d at 848; (*see* Busch Decl. Ex. 8 at ¶ 61, Ex. 15, Finell Decl. at ¶ 11).

### 5. The Original Compositional Elements have a High Degree of Protection

Plaintiffs argue that this combination of original elements somehow only provides "thin" protection to "Got to Give it Up." The case law cited by Plaintiffs in support of their claim, however, is not applicable here, and "Got to Give it Up" must be accorded a broad level of protection as an artistic work as a whole. *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010) ("If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work.").

Plaintiffs further contend that the two works must be virtually identical for there to be infringement. However, "other than in digital sampling cases, copyright infringers are rarely found to have copied verbatim entire passages from another work." (*See* Finell Decl. at ¶ 27).

Unable to find any authority in this Circuit to support their position, Plaintiffs' reference an Illinois District Court case which itself is wholly inapplicable because the contested elements in that case were "similar titles, references to Kate Moss, and portions of the hooks" which referenced the maxim "that which does not kill me makes me stronger." *Peters v. West*, 776 F. Supp. 2d 742, 747 (N.D. Ill. 2011) *aff'd*, 692 F.3d 629 (7th Cir. 2012) (comparing songs named "Stronger" by Vincent Peters and Kanye West). In *Peters*, the court held that the title was not subject to copyright protection, the reference to Kate Moss was an unprotectible fact, and the maxim in the hook was in the public domain. *Id.* at 749. By contrast, the elements in "Got to Give it Up" are unique, distinctive, and creative musical expressions and combine to create one of the most instantly iconic songs of all time.

**C.    The "Got to Give it Up" Recording is Relevant in Assessing Substantial Similarity Because the Infringement Claim is not Limited to the Elements in the Deposit Copy**

**1.    The Gayes' Claims are not Restricted to the Elements Contained in the Copyright Deposit**

Plaintiffs baselessly claim that the review of substantial similarity should be restricted to the lead sheet. This is patently incorrect. The copyright deposit is not the composition. (*See* Monson Decl. at ¶ 15, 80,). Instead, the composition is the recorded work as performed by Marvin Gaye. (*Id.* at ¶ 18). The deposit requirement under 17 U.S.C. § 408(b) "is to identify the copyrighted work for the purposes of registration." Paul Goldstein, Goldstein on Copyright § 3.8 (2013). "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's] definition of a 'complete copy' is *broad and deferential*: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Three Boys*

*Music Corp.*, 212 F.3d at 486 (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984)) (emphasis added); *see also Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (finding that identification materials are not required to disclose every element in which they claim a copyright); *KnowledgePlex, Inc. v. Placebase, Inc.*, C 08-4267 JF (RS), 2008 WL 5245484, at \*10 (N.D. Cal. Dec. 17, 2008) (finding the Ninth Circuit has rejected the argument that claims are limited to the scope of the deposit copy).

By their nature, lead sheets do not delineate every aspect of a musical composition; they often only include the melody, lyrics, and harmony. (Finell Decl. at ¶ 40-44). A deposit copy "is normally termed a 'lead sheet,' and it is not intended to represent fully the composition. At best, it is a skeletal representation or sketch, and usually shows only the most basic vocal melodies, typically only a single iteration of the beginning sections, some beginning lyrics, and chord indications." (Finell Decl. at ¶ 41 119). In fact, Plaintiff's own expert Ms. Wilbur admitted that a lead sheet is a "simplified, less fleshed-out" version of the composition. (Busch Decl. Ex. 8 at ¶ 59, Ex. 9 at 106:9-15, 131:6-133:24). When only the deposit copy is relied upon, it ignores "material found on the recording that is integral to the composition" and any "conclusions are based on incomplete materials." (Finell Decl. at ¶ 119). Thus, the recording of each song must serve as the basis of comparison, not the copyright deposit. (*Id.* at ¶ 42; Monson Decl. at ¶ 15, 80). Indeed, Ms. Wilbur herself did not rely on the lead sheet at all, and instead based her faulty analysis on the recordings. (Finell Decl. at ¶ 44).

Moreover, "musical compositions often go through numerous revisions. Compelling the owner of the copyright to deposit each revision pursuant to [The Copyright Act] would be unwise and unmanageable." *Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153, 1159 n.13 (S.D.N.Y. 1986). Thus, the contents of the lead sheet are for the purpose of identifying the work that has been registered and *not* to identify each any every claimed element of the registered work. *See KnowledgePlex, Inc.*, 2008 WL 5245484, at \*9.

In *Three Boys Music Corp.*, the defendant argued that the plaintiff's deposited lead sheet differed from the recorded version of the infringed song and did not "include the

1  majority of the musical elements that were part of the infringement claim." *Three Boys*
2  *Music Corp.*, 212 F.3d at 486. The Ninth Circuit Court of Appeals "refuse[d] to disturb the
3  jury's finding of infringement of the composition as reflected in the recording because (1)
4  there was no intent to defraud and prejudice and (2) any inaccuracies in the deposit copy
5  were minor and do not bar the infringement action." *Id.* at 486-87. Here, Plaintiffs do not
6  allege that there is any fraud on the copyright office, nor do they argue that any prejudice has
7  occurred.

8       The case law upon which Plaintiffs rely is not applicable to the case at bar. First,
9  Plaintiffs cite *Shady Records, Inc. v. Source Enters., Inc.*, for the proposition that the "entire
10 copyrightable content" of the work must be deposited with the Copyright Office. 03 CIV.
11 9944 (GEL), 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005) (quoting 37 C.F.R. § 202.20(b)(2)(i)).
12 However, this relies on a provision of the Code of Federal Regulations that did not become
13 effective until September 19, 1978. *See* 37 C.F.R. § 202.20 (originally adopted Sept. 19,
14 1978). Because "Got to Give it Up" was written and recorded in 1976 and registered in
15 1977, the registration requirements under the 1909 Act apply, rather than the 1976 Act,[11] and
16 the registration requirements for "Got to Give it Up" are not controlled by the subsequently
17 enacted 37 C.F.R. § 202.2. Instead, the 1909 Act merely required a deposit of a complete
18 copy of the best edition[12] of the work, and at the time a recording was not allowed to be
19 submitted as the composition. *See* Copyright Act of 1909, § 12, 35 Stat. 1075 (1909)
20 (repealed 1978).

21      Second, *Shady Records, Inc.*, an unpublished Southern District of New York case,
22 lends no support to Plaintiffs' argument that "the scope of a registered copyright is limited to
23 what is set forth in the copyright deposit," because that position is directly contradicted by
24 Ninth Circuit Court of Appeals precedent. *See Three Boys Music Corp.*, 212 F.3d at 486.
25

26 [11] The 1976 Act became effective January 1, 1978.
27 [12] "The 'best edition' of a work is the edition, published in the United States at any time
   before the date of deposit, that the Library of Congress determines to be most suitable for its
28 purposes." 17 U.S.C. § 101.

- 24 -

Moreover, *Shady Records, Inc.*, concerned sound recordings and not a musical composition as in the instant case, and sound recordings have the capability of capturing the entire copyrighted work, whereas a lead sheet cannot capture the entirety of the protected musical composition, as the Copyright Office now recognizes. Finally, there is no evidence any lead sheet existed at the time "Got to Give it Up" was created. (*See generally* Gaye Decl.). The case at hand is most analogous to *Three Boys Music Corp.*, where the court explicitly ruled that a copyright owner is not constrained by what appears in the deposited lead sheet.

> **2.    The "Got to Give it Up" Recording is Relevant in Assessing Substantial Similarity**

The Ninth Circuit Court of Appeals has directly addressed whether a sound recording may be used as evidence of copyrightable elements of a musical composition in an infringement analysis. In *Three Boys Music Corp.*, the Isley Brothers sued Michael Bolton for infringing their musical composition "Love is a Wonderful Thing." 212 F.3d at 480; *see also* 6 Patry on Copyright § 22:147 n.17. Bolton argued that the scope of review was limited to what appeared in the lead sheet deposited with copyright office and the popular sound recording could not be used as a basis to determine infringement. *Three Boys Music Corp.*, 212 F.3d 486-87. The appellate court disagreed and found that the jury's consideration of elements not contained within the lead sheet was appropriate. *Id.* Thus, like in *Three Boys Music Corp.*, reliance on the "Got to Give it Up" sound recording to determine substantial similarity is appropriate.

Although Plaintiffs cite *Newton v. Diamond* on this issue, it is not applicable. The Ninth Circuit in *Newton* found that the portion taken from the musical composition was not protected by copyright because the three notes allegedly taken from the composition were de minimis; the Ninth Circuit did not rule that sound recordings cannot be used as proof of the elements contained in a musical composition.

## IV.    CONCLUSION

Based on the foregoing, the Gayes respectfully request that this Court deny Plaintiffs' and Counter-Defendants' Motion for Summary Judgment in its entirety.

Dated: September 8, 2014

Respectfully submitted,

KING & BALLOW

By: /s/ Richard S. Busch
RICHARD S. BUSCH
PAUL H. DUVALL

WARGO & FRENCH, LLP

By: /s/ Mark L. Block
MARK L. BLOCK

*Attorneys for Defendants and Counter-Claimants Nona and Frankie Gaye*

THE LAW OFFICES OF PAUL N. PHILIPS

By: /s/ Paul N. Philips
PAUL N. PHILLIPS

*Attorney for Defendant and Counter-Claimant Marvin Gaye III*

- 26 -