3

```
 1
 2
 3    ALSO PRESENT:
 4
 5              Judith Finell, Expert Witness
 6              Judith Finell
 7              Music Services, Inc.
 8              81 Pondfield Road, Suite 246
 9              Bronxville, New York  10708
10
11              Ingrid Monson, Consultant
12              Music Department
13              Harvard University
14              Quincy Jones Professor of
15              African American Music
16              Cambridge, Massachusetts  02138
17
18              Kristin Zarnetski, Videographer
19
20
21
22
23
24
25
```

80

1                    Sandra Wilbur

2        Q    Tell me what you did to do an

3    analysis of prior art for "Got To Give It

4    Up"; tell me everything you did.

5        A    Okay.  Because, initially, I

6    didn't think there was any substantial

7    similarity, I didn't think it was necessary

8    to do prior art research.  After reviewing

9    the Finell report, after I did my own

10   report, I used prior art as a way to

11   illustrate the points that I was trying to

12   make.

13              And I found many examples that

14   were closer to one or the other of these

15   than the two were to each other -- the two

16   songs were the "Got To Give It Up" and the

17   "Blurred Lines" were to one another.

18       Q    Again, I am asking you, ma'am,

19   to please tell me, not your conclusions at

20   the end --

21       A    Okay.

22       Q    -- at the end of your analysis.

23   What I want to know is everything you did

24   to find prior art.  Let's start with "Got

25   To Give It Up."

```
 1                    Sandra Wilbur
 2          A     Okay.  I asked two people who
 3    were expert in that -- in that time frame
 4    to come up with other songs that had --
 5    that had similarities.
 6          Q     Who -- who were these people?
 7          A     One was Alan Friedman.  One was
 8    Richard Arico, both musicians.
 9          Q     They don't work for you?
10          A     They -- I consult with them.
11          Q     They are third parties?
12          A     They are.
13          Q     They are not employed by you?
14          A     They are not.
15          Q     Did you pay them?
16          A     I did.
17          Q     Okay.
18          A     The others, the others -- the
19    others came out of my own head.
20          Q     All right.  But tell me --
21    other than going to these third parties who
22    I don't -- strike the question.
23                Other than going to these third
24    parties and asking them to provide you with
25    other songs that they believed are similar
```

106

```
 1                  Sandra Wilbur
 2          record.)
 3                  THE VIDEOGRAPHER:  The time is
 4          12:22 p.m. on August 27th, 2014.  This
 5          is tape number three, back on the
 6          record.
 7     CONTINUED EXAMINATION
 8     BY MR. BUSCH:
 9          Q    Okay.  Ms. Wilbur, would you
10     agree with me that a lead sheet is a
11     simplified version of a composition that is
12     not really fleshed out?
13          A    It really depends.  It really
14     depends.  But the answer is, yes, it's
15     basically the song.
16          Q    Please answer my question.
17                Would you agree with me that a
18     lead sheet is a simplified, less fleshed
19     out version of a composition?
20                MR. KING:  Objection.  Asked
21          and answered.
22          A    No.  I said no.
23          Q    Have you ever written a cover
24     or an arrangement of a preexisting song?
25                MR. KING:  Objection to the
```

121

```
 1                    Sandra Wilbur
 2           you mean that's not true?  Our legal
 3           advice to her as to -- is work
 4           product.  You know that.
 5           Q    Have you ever heard in the
 6    Ninth Circuit California courts that the
 7    courts apply what is called the inverse
 8    ratio rule?
 9           A    I think it was brought up with
10    this law firm.  But I don't -- I don't
11    know.
12           Q    You don't know?
13           A    I --
14                MR. KING:  She's not going to
15           answer questions --
16           A    -- am vaguely familiar with the
17    concept.
18           Q    Okay.  Do you understand
19    that -- did you take into account -- well,
20    since -- okay.
21                I understand from your last two
22    answers that -- that, one, you have never
23    examined or know about any statements made
24    by Robin Thicke about what he was trying to
25    capture when creating "Blurred Lines,"
```

122

1                    Sandra Wilbur

2    correct?

3        A    Correct.

4        Q    And I understand from your

5    testimony that -- just a second ago, that,

6    even if you were aware of comments made by

7    Mr. Thicke and even if Mr. Thicke talked

8    about "Got To Give It Up," his

9    consideration of "Got To Give It Up" in

10   creating "Blurred Lines," that you would

11   not find those statements to be relevant.

12               That's what you just said a

13   moment ago.

14               MR. KING:   That misstates her

15        prior testimony.  I will object to the

16        form.

17       Q    Didn't you just say statements

18   by a composer about what he was trying --

19   about alleged intent to copy is not

20   relevant to you?  Didn't you just say that,

21   yes or no?

22       A    I would say that there is a

23   difference between influence and

24   infringement.

25       Q    You have to answer my question,

```
 1                 Sandra Wilbur
 2    ma'am.
 3         A     I don't know --
 4         Q     You are not -- are you going to
 5    refuse to answer my question?
 6              MR. KING:  Richard, why do you
 7         insist, when you don't like what she
 8         is saying, to cut her off and tell her
 9         to stop.
10              MR. BUSCH:  I don't --
11              MR. KING:  It's not only
12         impolite.  It's just not good
13         practice.
14              MR. BUSCH:  Sir --
15              MR. KING:  Let her answer the
16         question; and, if you think she
17         answered it improperly, then harass
18         her.
19              MR. BUSCH:  Sir, stop using the
20         word "harassment."  Stop making a
21         false record.  What I am trying to do
22         is get her to answer my question
23         directly, and I am having a hard time
24         doing that.
25              So if I ask the question three
```

```
 1                 Sandra Wilbur
 2            MR. KING:  Richard, stop.
 3        That's argumentative.  Don't answer
 4        that question.  Just ask her the
 5        questions.  If you don't like the
 6        answer, ask another question.
 7            MR. BUSCH:  Well, we are going
 8        to be here all day --
 9            MR. KING:  I don't care.  I
10        don't care.
11            MR. BUSCH:  I can't be here
12        tomorrow because we have a mediation
13        tomorrow.
14            MR. KING:  And you need to be
15        more precise about timing because --
16        Q     Yes or no, ma'am, yes or no,
17   ma'am.  I didn't ask you about whether
18   Robin Thicke in the past said that he was
19   influenced by Marvin Gaye in some generic
20   way.
21            I asked you several times in
22   this deposition whether you were aware of
23   any statements made by Robin Thicke about
24   his attempt to copy or evoke or create
25   something like "Got To Give It Up" when
```

128

1               Sandra Wilbur

2    specifically creating "Blurred Lines"; and

3    I believe your testimony was you were not

4    aware of any such comments?

5          A     That's correct.

6          Q     Okay.  And I believe it's your

7    testimony, is it not, that, even if you

8    were aware of comments by a composer about

9    an intent to copy a particular song when

10   creating his song, that you do not believe

11   that is relevant to your analysis; isn't

12   that what you also just said a moment ago?

13         A     That's correct.

14         Q     And I am going to ask you --

15   again, then I asked you about whether you

16   were aware of the inverse ratio rule.

17               MR. KING:  She answered that.

18         She answered all of those questions.

19         Q     And with respect to the inverse

20   ratio rule, are you aware or did you take

21   into consideration -- strike the question.

22               I take it then, based upon the

23   answers to my first two questions, that you

24   did not take into account the inverse ratio

25   rule in your analysis.

```
 1                    Sandra Wilbur
 2              In other words, you did not
 3     take into account the fact that California
 4     courts state that the more evidence there
 5     is of access or intent to copy, the less
 6     substantial similarity need be shown?
 7              You did not take that theory or
 8     that rule of law into account in your
 9     analysis; did you?
10          A    No.
11          Q    Okay.  You are aware in this
12     case -- have you read the motion for
13     summary judgment filed by the plaintiff,
14     Pharrell Williams and Robin Thicke and the
15     other plaintiffs in this case?
16          A    I did.
17          Q    You read it from front to back?
18          A    I scanned it.  I will say I
19     scanned it.
20          Q    Okay.  And you saw in your --
21     in your review of the motion for summary
22     judgment, that there are a few different
23     arguments that Mr. Williams and Thicke are
24     making in moving for summary judgment in
25     this case, correct?
```

130

1                        Sandra Wilbur

2          A       Correct.

3          Q       You saw that one argument is

4      that the court should focus on the lead

5      sheet as being the composition in the case,

6      correct?

7          A       Yes.

8          Q       Okay.  And your testimony in

9      this case that you have come into this

10     deposition here today to give has not been

11     influenced by those arguments, correct?

12         A       The first time I heard about

13     them was when I read the motion.

14         Q       Okay.  My point is that you

15     read the motion before your deposition;

16     and, now, you have come in here to testify.

17     And you're telling the truth here today.

18     You are not trying to give testimony --

19         A       No.

20         Q       -- that you believe would be

21     helpful to their motion for summary

22     judgment, correct?

23         A       Absolutely not.

24         Q       Okay.

25         A       Absolutely not.

131

```
 1                    Sandra Wilbur
 2         Q      And you would not come in here
 3    and give false testimony under oath,
 4    correct?
 5         A      No way.
 6         Q      Do you remember a moment ago I
 7    asked you whether a -- exact phrase -- I
 8    asked you whether a lead sheet in general
 9    reflected a simplified, less fleshed out
10    reflection of the composition?
11               Do you remember I asked you
12    that question?
13         A      I do.
14         Q      Okay.  And do you recall saying
15    a moment ago the answer was no?
16         A      That's correct.
17         Q      Did you give an affidavit or
18    declaration in the case of Bourne Company
19    versus Twentieth Century Fox?
20         A      I did.
21         Q      And did you declare, under the
22    penalty of perjury, that the statements
23    that you made in that declaration were true
24    and complete and correct?
25         A      I did.
```

132

```
 1                      Sandra Wilbur
 2          Q     Okay.
 3                MR. BUSCH:   Let's mark as the
 4          next exhibit, the declaration of Sandy
 5          Wilbur.
 6                      (Exhibit No. 503, Declaration
 7          of Sandy Wilbur in case of Bourne
 8          against Twentieth Century Fox, is
 9          marked by the reporter for
10          identification.)
11          Q     Ms. Wilbur --
12                MR. KING:   503.
13                MR. BUSCH:   Yes, 503.
14          Q     Ms. Wilbur, take a look at what
15    I am marking as 503, and tell me if that is
16    your declaration that you gave in that
17    case.
18          A     It looks like that, yes.
19          Q     Okay.  And if you turn to --
20    and is that your signature at the end?
21          A     Yes.
22          Q     And you say that you "declare
23    under penalty of perjury the foregoing is
24    true and correct"?
25          A     Yes.
```

133

```
 1                    Sandra Wilbur
 2         Q     If you turn to paragraph 59 of
 3    your declaration, you will see a statement.
 4    That first sentence in paragraph 59:
 5                    "Most of the differences in the
 6    lead sheet reflect a simplified, less
 7    fleshed out chord pattern."
 8                    Do you see that?
 9         A     Right.  That's why I was
10    explaining to you that it has to be
11    specific to a particular piece.
12         Q     In the -- you made that
13    statement, correct?  That is your
14    statement?
15         A     In this particular case, it was
16    clearly less.  Yes.
17         Q     Okay.  So in this particular
18    case, the case that you submitted a
19    declaration under the penalty of perjury,
20    you agreed that the lead sheet in that case
21    was less than the entire composition, and
22    reflected a simplified, less fleshed out
23    version of the composition, correct?
24         A     I must have.
25         Q     Thank you.
```

    1                    Sandra Wilbur

    2         the question that she understands.

    3         Q    I am asking -- yes.

    4              Did you create anything for

    5    your declaration, any audio samples for

    6    your declaration?

    7         A    No.

    8         Q    Ms. Wilbur, let me ask you -- I

    9    am going to ask you a few -- a few -- I am

   10    going to ask you whether you agree with a

   11    few different statements.  Do you agree

   12    with the following statement:

   13              "That a thorough comparison of

   14    two or more pieces of music which examines

   15    all pertinent music and vocal elements,

   16    including melody, harmony, rhythm,

   17    instrumentation, lyrics, musical style,

   18    samples, vocal sound, and style, et cetera,

   19    in order to determine if there are

   20    problematic similarities between the works

   21    is required"?

   22              MR. KING:  Object to the form

   23         of the question.

   24         A    I don't know what that was

   25    related to.  But if it was a sound-alike

136

 1                     Sandra Wilbur

 2     case, that's a different -- that's a very

 3     different kind of examination than a

 4     copyright infringement.

 5          Q     Okay.  And so with respect to

 6     copyright infringement where litigation is

 7     being considered or it's been initiated, or

 8     just copyright infringement litigation,

 9     then you would not agree with that

10     statement?

11               MR. KING:  Object to the form

12          of the question.

13          A     I think it really depends,

14     again, on the circumstances in the case.

15          Q     Well, you said sound-alike is

16     different.  So what I'm asking you is:

17               Would you agree with this

18     statement that, quote:

19               "A thorough comparison of two

20     or more pieces of work -- music which

21     examines all pertinent music and vocal

22     elements including melody, harmony, rhythm,

23     instrumentation, lyrics, musical style,

24     samples, vocal sound, and style, et cetera,

25     is required in order to determine if there

137

```
 1                    Sandra Wilbur
 2    are problematic similarities between the
 3    works"?
 4                    MR. KING:  Object to the form
 5         of the question.
 6         Q    Do you agree with that in a
 7    copyright infringement case like this?
 8         A    No, because it --
 9                    MR. KING:  You answered.  He
10         will ask you for an explanation if he
11         wants.
12         Q    Do you agree with the following
13    statement:
14                    "Works that sound very similar
15    might only share permissible stylistic
16    similarities with many other works, while
17    works that sound different may have
18    borrowed copyrighted material in ways that
19    are not at first obvious"?
20         A    I agree with that.
21         Q    Do you agree with the following
22    statement:
23                    "It is the unique combination
24    of elements, some of which can be common or
25    generic, that defines originality"?
```

1                    Sandra Wilbur

2                    MR. KING:  Objection to the

3          form of the question.  Incomplete

4          hypothetical.

5          A      Can you read that again.

6          Q      "It is the unique combination

7     of elements, some of which can be common or

8     generic, that defines originality."

9                    Would you agree with that

10    statement?

11         A      That's very vague.  I don't

12    know the context, so I can't answer that

13    question.

14                   MR. BUSCH:  Let's mark as

15         Exhibit Number 504, a printout from

16         Ms. Wilbur's web site.

17                   (Exhibit No. 504, Printout from

18         Ms. Wilbur's web site is marked by the

19         reporter for identification.)

20         Q      Ms. Wilbur, is this a printout

21    from your web site that I have handed you,

22    Exhibit Number 504?

23         A      Correct.

24         Q      If you will turn to the second

25    block of "Musicological Analysis," do you

166

```
 1                  Sandra Wilbur
 2            (Music playing.)
 3       Q     Did the intervening notes
 4  change the rhythmic emphasis?
 5       A     No.  There was definitely one
 6  part where "dum pum dum pum" -- and that
 7  certainly changed the rhythm of the melody.
 8  But --
 9       Q     Okay.  As we talked about
10  earlier, on your web site, as I showed you
11  before, you state that, quote:
12            " It is the unique combination
13  of elements, some of which can be common or
14  generic, that defines originality."
15            Strike that.
16            Have you previously testified
17  that you look at the entire piece when
18  examining a work?
19            MR. KING:  I am going to object
20       to the form.
21       A     I don't know.
22       Q     Do you look at the entire -- is
23  it important to look at the entire piece in
24  total when examining a work for
25  infringement?
```

167

1                    Sandra Wilbur

2        A     Yes.

3        Q     Okay.  Do you agree that it's

4   important to look at the work in totality

5   when examining two works for infringement?

6        A     Yes.

7        Q     Okay.  And in your declaration,

8   you state at paragraph 23:

9                    "All five elements must be

10  compared in order to fully and accurately

11  analyze whether any substantial similarity

12  exists.  The degree and importance of the

13  similar elements also must be taken into

14  consideration."

15                  Is that a correct statement?

16       A     It is.

17       Q     And you agree with that

18  statement?

19       A     I do.

20       Q     Okay.  Would this also include

21  comparing the elements collectively?

22       A     The elements?

23       Q     The five elements that you say

24  must be compared in order to fully and

25  accurately analyze whether any substantial

# Exhibit 10

Sign Up | Log In

Discover    New Releases    Blog    Recommendations      Search



Discography Browser





**Robin Thicke**
*Blurred Lines*

| AllMusic Rating | User Ratings (98) | Your Rating |
|---|---|---|

Overview    Credits    **Awards**    Releases    **Similar Albums**

Review by Andy Kellman [–]

Share this page

When Marvin Gaye was pressured to make a commercial dance record, the singer responded with "Got to Give it Up," which went to the top of the Hot 100. Thirty-five years later, Robin Thicke -- he of the perpetual Marvin fixation -- offhandedly recorded "Blurred Lines," musically based on that 1977 hit, with producer Pharrell. Thicke wasn't gunning for number one, but a deliberately sexist video further polarized opinions and pushed the song to that spot -- a very rare achievement for a 2013 single within the marginalized genre of R&B. Ironically, the album of the same title also contains a motley assortment of high-gloss dance tracks seemingly made for pop-chart contention. "Take It Easy on Me" (produced by Timbaland and J-Roc), "Give It 2 U" (Dr. Luke and Cirkut), "Feel Good" (will.i.am), and the deluxe edition bonus cut "Pressure" (the Cataracs) are nothing like the title track's undeniable disco-funk groove, and not one of them is among Thicke's best. They do, however, lack desperation and help convey the album's prevailing casual, lighthearted feel. Several other songs are more rooted in soul but are just as spirited, if not as moving as 2008's "Magic." Best of all is career highlight "Ooo La La," slick and perfectly crafted -- a 1979/1980 smooth soul throwback featuring some of Thicke's finest melodies and falsetto lines. Tucked near the end, after all the revelry, is "4 the Rest of My Life." A great soul ballad filled with personal flashbacks, like the time young Robin serenaded then-future wife Paula Patton with a Jodeci song, it's nonetheless relatable enough to be played at as many wedding receptions as "Blurred Lines." It adds a little something for longtime fans who might not be all that receptive to the glitzy synthesizers and pounding bass drums.

Collapse ↑

Stream or buy on:

Rdio

| Release Date | July 30, 2013 |
|---|---|
| Genre | R&B<br>Pop/Rock |
| Styles | Adult Contemporary R&B<br>Contemporary R&B |

Submit Corrections

**Album Moods**

| | |
|---|---|
| Boisterous | Brash |
| Carefree | Stylish |
| Witty | Hedonistic |
| Intimate | Laid-Back/Mellow |
| Opulent | Passionate |
| Silly | Striding |
| Strong | Dramatic |
| Energetic | |

**Themes**

**Track Listing**

| | Title/Composer | Performer | Time | Stream |
|---|---|---|---|---|
| 1 | Blurred Lines | Robin Thicke<br>feat T.I. / Pharrell Williams | 4:23 | |
| 2 | Take It Easy on Me | Robin Thicke | 3:47 | |
| 3 | Ooo La La | Robin Thicke | 4:38 | |
| 4 | Ain't No Hat 4 That | Robin Thicke | 3:26 | |
| 5 | Get In My Way | Robin Thicke | 3:11 | |
| 6 | Give It 2 U | Robin Thicke<br>feat Kendrick Lamar | 3:49 | |
| 7 | Feel Good | Robin Thicke | 3:26 | |
| 8 | 4 the Rest of My Life | Robin Thicke | 4:55 | |
| 9 | Top of the World | Robin Thicke | 3:22 | |
| 10 | The Good Life | Robin Thicke | 3:12 | |

| Partying | Passion | | | | | | Sign Up | Highlight denotes track pick |
| Playful | Romance | **Discover** | **New Releases** | **Blog** | **Recommendations** | Search | | |
| Romantic Evening | Seduction | | | | | | | |

AllMovie | AllGame | SideReel | Celebified
Copyright Policy | About | FAQ | Feedback | Advertise | Privacy Policy | Terms of Service
©2014 AllMusic, a division of All Media Network, LLC. | All Rights Reserved

# Exhibit 11

Case 2:13-cv-06004-JAK-AGR   Document 112-1   Filed 09/08/14   Page 25 of 81   Page ID
#:1999
Rob Hoerburger - The 6th Floor Blog - NYTimes.com                                    Page 5 of 13

Aug 8, 6:11 pm 11

# Why 'Blurred Lines' Won't Go Away

By ROB HOERBURGER

Robin Thicke's "Blurred Lines" just notched its ninth week at No. 1 on Billboard's Hot 100, suggesting not only that it's the official summer song of 2013 — an argument that was actually settled weeks ago — but also that its dominance might extend well into the fall. What is it that's giving this bouncy but seemingly lightweight track such staying power?

Well there's the irresistible, insistent groove, the bass line that keeps winding and pulsing and staying several steps ahead of boredom. And then there's the friendly rat-a-tat of the cowbell — I was tempted to make this post about the greatest pop songs to use one, starting with Hugh Masekela's own classic summer song, "Grazin' in the Grass," from 1968. That Thicke's video features barely clad models probably hasn't hurt, either. (For Thicke's reaction to the controversy they stirred, see James C. McKinley's report on the song in The Times.)

But what I keep coming back to is the song's choice DNA. It's got Michael Jackson-like yelps throughout. And that bass line came right from Marvin Gaye's No. 1 hit from the summer of '77, "Got to Give It Up," like "Blurred Lines," a seeming throwaway (it was tacked onto a live album) that turned into a highlight of the singer's storied career. "Got to Give It Up" came out during a very good year for the music business — a year bookended by Fleetwood Mac's "Rumours" and the soundtrack to "Saturday Night Fever," two of the biggest-selling albums of all time (and coincidentally the year Robin Thicke was born). Yet even by then the great pop-rock-soul-disco alliance was starting to splinter, and within a couple of years, you would be hard pressed to find someone who would admit to liking, say, both the Sex Pistols and Sister Sledge.

But Gaye was having none of that. In "Got to Give It Up," he hit all of his marks. The song was funky. It was soulful. It rocked. And though Gaye's rapturous

falsetto sometimes obscured the lyrics, there was a real song there, too, about a wallflower who finds redemption through dancing. He was never more hopeful than when he sang, "No more standin' along the side walls." The song achieved a chart trifecta, reaching No. 1 pop, soul and disco.

Thicke seemed to understand the song's universality, consciously or subconsciously. "Blurred Lines," even in its title, is a song that's meant to decodify, destratify, deformat. And that's the spirit that makes the track more than just a tribute, and keeps it grabbing new audiences or holding on to the ones who have loved it all these weeks. Only time will tell if it will be one of the all-time great summer songs (for a list of vintage summer songs, see Stephan Talty's 1995 article in the magazine, "The No. 1 Summer Song of Love"). But as Gaye sings, "Long as you're groovin', there's always a chance."



Jul 24, 3:40 pm 6

Exhibit 12



# Robin Thicke, You're No Marvin Gaye

In a guest editorial, one of Gaye's collaborators explains what he thinks Thicke is missing about the soul great

*by* DAVID RITZ
AUGUST 23, 2013

When I first heard **Robin Thicke's "Blurred Lines,"** my reaction was the same as millions of other R&B fans: *"Hey, that's Marvin Gaye's 'Got to Give It Up.'"* Thicke and company not only copped Gaye's distinct bass line, but the defining funk of the cowbell accents. I wasn't entirely surprised, since some years earlier **Thicke's "Love After War"** was a virtual lift of **Marvin's "After the Dance"** – just as his **"Million Dolla Baby"** shamelessly copied Gaye's **"Trouble Man."**

The list of **Marvin's** musical children is long: R. Kelly, Maxwell, Usher, John Legend, Miguel, just to name a few. Marvin has become to soul singers what John Coltrane became to saxophonists: the undisputed master. Yet the vast majority of those singers – with Thicke standing as the most recent example – are so eager to emulate Marvin's lush sensuality that they miss the single ingredient that lends Marvin's artistry its spiritual power: his nuanced sense of autobiographical storytelling.

**Where Did Marvin Gaye Rank on Our List of the 100 Greatest Singers of All Time?**

Take "Got to Give It Up." Like "Blurred Lines," it was an across-the-board Number One hit. Marvin wrote it in 1976 at the height of the disco craze. Rather than follow the craze, he fought the craze, crafting an idiosyncratic groove completely foreign from the four-on-the-floor beat that typified disco. Even more radical was the story he told on top of the beat – a tale of a man, much like Marvin, who's deadly afraid of dancing. Gaye paints the portrait of a wallflower "too nervous to really get down," a shy guy whose "body yearned to be free." The song becomes a vehicle to face his fear. And the infectious groove allows him to overcome the fear.

Marvin's message is all about vulnerability and uncertainty. He uses the music to express his human frailty. That's why we love him so much. He's not afraid to say that he's afraid. So the song becomes a journey and the groove becomes a kind of prayer that allows him to move from trepidation to a triumphant conclusion – "Now I've gotten myself together, baby!"

Yet even his triumph veers sharply from the usual boy-woos-and-wins-the-girl scenario. In Marvin's story, the woman is the aggressor. Too shy to pursue her, his hope is that she'll come after him. "I know what you're thinking," he sings, "You wanna turn me out . . . and I'm gonna let you."

The fear of dancing becomes a metaphor for the fear of sex. Overcoming that fear requires not only the aid of the voluptuous groove, but a woman willing to lead the way. In telling his truth, Marvin rips off the mask of machismo and allows us to see his fragile heart.

In contrast, Thicke never removes that mask. "Blurred Lines" is all swag. The tired old "I know you want it" motif deadens any sense of subtlety or surprise. In the silly video, Thicke pushes the macho posture to the point of broadcasting, in huge letters above the topless dancers, his claim of being well-endowed.

Robin might want to revisit Gaye's **"Ego Tripping Out,"** written a couple of years after "Got To Give It Up." It's another journey song, beginning in self-absorption and ending in a cry for God. At the story's conclusion, we realize that Marvin has spoofed his own narcissism and come to see megalomania as a cold and cruel prison.

Great artists like Marvin Gaye understand that irony and emotional complexity are necessary tools for making deep, enduring art. Marvin used music to figure out who he was and who he wanted to be. It was a lot more than a sexy groove; it was riding that groove to search within for a truth that's as confusing as it elusive.

*David Ritz is the author of DIVIDED SOUL: THE LIFE OF MARVIN GAYE and cowriter of "Sexual Healing."*

http://www.rollingstone.com/music/news/robin-thicke-youre-no-marvin-gaye-20130823

# Exhibit 13

f  y  t  ꞓ  ⓐ   United Kingdom

**FEATURES**   **NEW MUSIC**   **REVIEWS**   **PHOTOS**   **VIDEOS**   **YOU NEED TO HEAR THIS**

FEATURED


**Hawk House and The Imminent Emergence of UK's Beast Coast**
They're the Leaders of the New School, adept, and with enough talent to ignite the flame of


**I WENT TO PRINCE'S SECRET GIG**
Armed with only a Twitter refresh button and an undying allegiance to The Purple One, we got into Prince's secret show.


**Jamaican Dancehall Artists are Blinding Themselves by Getting Eyeball Tattoos**
Two young Jamaican artists have done it, and it's disgusting.

**FEATURES**

# WHY DON'T WE HAVE A SONG OF THE SUMMER YET?

By Paul Cantor

  Share  2   Like  13   Tweet  3   +1   Sn   submit



Every summer there's a pop song or two that sweeps the nation, capturing the collective attention of Brits in need of something to soundtrack their rides to the beach, the viral videos they email around their offices, BBQs in the local memorial park and whatever else it is that normal people do for fun in the warmer months.

Unfortunately, the summer of 2013 is pretty dry in this regard. It's damn near August already and you'd be hard-pressed to find a single song that has dominated the zeitgeist the way Carly Rae Jepsen's "Call Me Maybe" or Gotye's "Somebody That I Used To Know" did last year. Or how LMFAO's "Party Rock Anthem" and Pitbull's "Give Me Everything" did the year before that. Or Katy Perry's "California Girls" and Taio Cruz's "Dynamite," or heck even Mike Posner's "Cooler Than Me," did in 2010.

This summer there are a few tunes battling for supremacy, but it could be argued that a) they aren't very good (debatable) and b) that none of them have really dominated the conversation and the listening experience the way songs of the summer are supposed to.

Summer songs are supposed to be inescapable. They should be playing so often and in so many places that they annoy the fuck out of you until the point where you just can't resist them anymore. They should be so omnipresent that you have to stop judging the stupid masses for liking them and start liking them yourself. You shouldn't be able to log into FB without seeing one of those dorks from high school that you never talk to posting links to a different cover version each day.

Can you really say that about Robin Thicke's "Blurred Lines?" Good song, and with over a 100 million plays on Youtube—whether the label juiced those numbers or not—it's definitely been a number one record with legs. There are quite a few cover versions (a quick Google search reveals a handful of roundups from your favorite content farms, but this one from TODAY is a good primer). Still, I just don't get the sense that this song is as popular as the numbers purport to represent. Also, this song is genuinely good. It sounds weird but summer songs are supposed to be kind of bad in a way where you feel guilty liking them. Surely you've heard the term

LET'S MAKE FRIENDS

Like  405,527 people like this.

Follow   Newsletter

YouTube  698K

NOW PLAYING ON YOUTUBE





SUBSCRIBE TO NOISEY

'guilty pleasure' to describe certain pop songs. You probably don't feel guilty for liking "Blurred Lines." Maybe that's because it was originally a Marvin Gaye song ("**Got To Give It Up**"), and Marvin Gaye is fucking awesome.

Is "**Get Lucky**" the song of the summer? Another tune that is playing on the radio endlessly, but because the Daft Punk are producers of this and not the featured performers— Nile Rodgers and Pharrell are at the forefront here— it's hard to really qualify this one. Here's an idea— should we dump this article and talk about Pharrell's comeback after 10 years of launching liquors that nobody likes or whatever the fuck it was he was doing? Maybe.



Finally, there's "We Can't Stop," by good girl gone bad du jour, Miley Cyrus. As of this writing, the song is sitting at number 2 on the Hot 100. Number 2! If there was ever song that screamed out guilty pleasure, this one might be it. From the uninspired chord progression to the clichéd lyrics ("Can't you see it's we who own the night? / Can't you see it's we who 'bout that life?") to Miley Cyrus herself sounding like she's doing Rihanna karaoke, this is a song that is so bad that it becomes good. So maybe Miley Cyrus' "We Can't Stop" is the song of the summer by default, because there's nothing else that terrible on the charts right now. *cries*

The thing is, songs of the summer need not be amazing. Or original. They can be as clichéd as ever. But they have to be feel-good songs that reflect what summer time is all about—being young and having fun. Even if you're not young and not having fun. They have to make you feel that way when you hear them. "Blurred Lines" is just a good song. "Get Lucky" makes me think of 1978. "We Can't Stop" is depressing.

That said, I think the song of the summer is going to eventually (and by that I mean like in like two fucking weeks) be Avicii's "**Wake Me Up.**" Pete Tong debuted the tune on his BBC Radio 1 show in mid-June, and having nothing to do with the fact that Avicii is well, fucking Avicii, the minute I heard its I knew that this song would be everywhere. Half country tune and half American-fried EDM, Aloe Blacc sings about being young and carefree over guitar strums and four-on-the-floor cheesiness. It's perfect. It will be the song of the summer. You'll see. It's already beaten One Direction to the number one spot.

*Follow Paul on Twitter @PaulCantor*

*Read more debates about the state of music:*

*Live Hip-Hop Sucks*

*Why is Robin Thicke Being Singled Out as a Pervert?*

*Why Do UK Festivals Suck Balls at Booking Special Guests?*

Written by: Paul Cantor
Jul 30 2013
Tags: Paul Cantor, Talkabout Charts, Avicii, Miley Cyrus, Daft Punk, Robin Thicke, Blurred Lines, get lucky, We Cant Stop, 1d, One Direction, Song of The Summer

 2   Like  13    Tweet  3    8+1   . Sh  submit



RECOMMENDED ON FACEBOOK



PREMIERE: Vensaire - "See I'm You" | NOISEY
167 people recommend this.

ACTION BRONSON - "STRICTLY 4 MY JEEPS" (OFFICIAL VIDEO) | MUSIC VIDEO PREMIERES | NOISEY
2,965 people recommend this.

See Five Exclusive Pieces From Matt Skiba and Heather Gabel's Art Show | NOISEY
540 people recommend this.

Facebook social plugin

**MORE FROM NOISEY**





**Don't Let Mumford & Sons Trick You Into Liking Them**



**There Are Some Totally Legit Reasons to Hate The Beatles**



**This Modern Love: Britt Warner**



**The Weird Keyboard That Transcends Keys**

Recommended by

**COMMENTS**

Add a comment...

Comment

Facebook social plugin



The Science of the Creationism
Melvin Van Peebles
Take a Stroll... with Rob
Pop Vox - Chode or Chode?
Pool Noodle Girlfriend
Chairman Mao's Underground
Taking A Long Hard Look And



NOISEY 062: BO NINGEN
Dead Musicians: Cab Calloway
NOISEY 061: MOGWAI
An Excellent Mixtape From Toro
NOISEY 056: CULTS
Jonathan Toubin's Soul Clap
NOISEY 059: MUJERES



Labspeak: Kellam Clark and His
Hubble's Most Mind Expanding
Upping Your Terrorism Game:
Electric Independence: Marion
The Profitable Piracy Argument
The Sakawa Boys: Inside the
Future-Proofing the Printed

creatorsproject

Diplo Combs The Globe For
Everything Is Illuminated For
United Visual Artists Bring A
Open Source Prankster, James
Arcade Fire And Chris Milk Light
Jonathan Glazer And
Interpol Explains The

**ADVICE**

Hypebeast
Thrasher
Escapist Magazine
Chictopia
The Awl
Booooooom
8tracks

© 2014 Noisey   About us   Jobs   Contact   Advertising   Press Kit   Newsletter   Founders   Privacy Policy   Terms of Use

Site by Asha Avenue

# Exhibit 14

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 35 of 81  Page ID
#:2009
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 147 of 320  147

WILBUR - DIRECT

1    could have a one-minute restroom break, I'll be right back,

2    Judge.

3              THE COURT:  Sure.  Sure.

4         (Mr. Showalter and Mr. Garcia exit and enter courtroom;

5         discussion off record.)

6              MR. GARCIA:  May I proceed, Your Honor?

7              THE COURT:  Yes.

8              MR. GARCIA:  We next call Sandy Wilbur.  Has she been

9    sworn in?

10             THE WITNESS:  Yes.

11             MR. GARCIA:  Okay.

12             **SANDY WILBUR, DEFENDANT'S WITNESS, SWORN**

13                     **DIRECT EXAMINATION**

14   BY MR. GARCIA:

15   Q    Good morning, Ms. Wilbur.

16   A    Good morning.

17   Q    Would you please state your full name for the Court.

18   A    Sandra Beth Wilbur.

19   Q    And what is your current employment, Ms. Wilbur?

20   A    I'm president of MusioData, which is really Sandy Wilbur

21   Music, Inc., d/b/a MusioData for forensic musicology purposes.

22             THE REPORTER:  Can you speak into the microphone a

23   little more, please?

24   BY MR. GARCIA:

25   Q    And please inform the Court about your educational

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 36 of 81 Page ID
Case 6:12-cv-00042 Document 122 #3010 TXSD on 04/04/14 Page 148 of 320 148
WILBUR - DIRECT

1    background.

2    A    Okay. I was classically trained. I was, in high school,

3    chosen as one of two to study with the head of the Yale Music

4    Department, Classical Piano, for the last two years of high

5    school. That was an honor.

6        I also was a folk singer. I started as a teenager, and we

7    were -- we were awarded the best folk duo for the State of

8    Connecticut and managed to go on the Hootenanny Road Show back

9    in the day.

10       And then I went to Sarah Lawrence College where I studied

11   music as well as other things. I was awarded a Hertz Fellowship

12   in composing. I went to the University of California at

13   Berkeley and did that where I found that the atonal nature of it

14   was not as appealing to me as I had hoped.

15       I was offered a teaching assistantship at UCLA, and I

16   received my master's degree in music with a specialization in

17   musicology. At the time I wanted very much to -- to do song

18   studies -- regional and popular song studies, but I wasn't

19   really allowed at the time. So I did my dissertation on Pawnee

20   American Indians with reference to present-day Oklahoma

21   practices and lived with these folks for part of the summer to

22   collect data on them.

23   Q    And have you also had training in the music business field?

24   A    I have. I -- I was a songwriter for quite some time. I was

25   associate music director of one -- at the time the fifth largest

WILBUR - DIRECT

1  ad agency in the country.

2       It was there that I was first asked to speak in a case in

3  Los Angeles -- in Los Angeles to explain to a jury what the

4  facts were in a case brought against Benton & Bowles Advertising

5  and Schlitz -- Schlitz beer.

6  Q  Have you done work for other advertisers and film companies?

7  And give us some flavor of that background.

8  A  Okay.  I -- I worked for music publishers, record companies.

9  I do -- advertising agencies, lawyers who call.  Basically, I

10  started an entire preventative program.

11       When the Bette Midler sound-alike case happened in the late

12  '80s, I was asked to put together a preventative program so that

13  they wouldn't have so many litigations.  And I put that into

14  practice in the late '80s, and now that's been universally

15  accepted at other agencies.

16       I listen to -- I work with a lot of ad agencies and a lot

17  of music producers, and I listen to be certain that they don't

18  sound like other pieces of music so that there won't be some

19  problem.  I have a form that basically says if it sounds like

20  something else, please let me know.  If you are asked to make it

21  sound like something else, please let me know, et cetera, so

22  that I can actually do that.

23       But even without that I have a team of people who listen to

24  works that are in particular fields so that we can be sure that

25  the work is sufficiently generic, shall we say.

Case 2:13-cv-06004-JAK-AGR   Document 112-1   Filed 09/08/14   Page 38 of 81   Page ID
#:2012
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 150 of 320 150

WILBUR - DIRECT

1    Q    Or whether or not --

2    A    Or unique.

3    Q    Or unique; is that right?

4    A    Right. I've also worked with the Coen brothers on their

5    award-winning film "O Brother, Where Art Thou." I did the

6    research on all the songs on that soundtrack, including their

7    next documentary, "Down from the Mountain," so that -- and it

8    took a year and a half.

9         And what happened in my first meeting with the Coen

10   brothers was they said, "Well, these are all traditional songs.

11   It says so right on the CD. It says 'Traditional.'"

12        And I said, "So what?" It doesn't matter what it says on

13   the label. It really matters what is the song.

14        And so I spent a lot of time in the Library of Congress

15   listening to field recordings and comparing field recordings to

16   the actual songs that they had chosen. We ended up choosing --

17   their main song was a song that I knew with a completely

18   different melody and lyric, but this happened to have been the

19   only song that hadn't been copyrighted. So they were able to

20   use it.

21        But -- but the bottom line is -- is that it was a

22   tremendous amount of work. One day I'd like to write the book

23   on the -- on all the songs that I've -- that I've researched for

24   this film because every song is a story, and they evolve -- they

25   evolve from -- I found songs with the same titles that were

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 39 of 81  Page ID
#:2013
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 151 of 320   151

WILBUR - DIRECT

1   public domain but didn't sound anything like the way they had

2   evolved over time.  So -- so songs have always been my interest.

3       I am a songwriter.  I've had over 40 songs recorded, some

4   chart success.  I've had an album of my work where I've played

5   all the parts released.  I've -- I have done hundreds of jingles

6   and scores for television.

7       I've had my own production company and my own studio.  I'm

8   a thousand years old so -- so I've had -- you know, I've worn a

9   lot of hats in this business.  And my most recent project, as I

10  was mentioning, is doing educational music videos for kids

11  with -- with the idea of teaching kids history so that -- so

12  that -- we have a song I composed and produced the videos using

13  the arranger from the Saturday Night Live band, the

14  cinematographer and video editor from Kevin Burns Production

15  Company.

16      So these are -- these are things that are meant to be

17  distributed as tools to teachers and students.  The first one

18  has, the last time I looked, about 168,000 hits on YouTube.  And

19  I auditioned to kids and recorded kids doing these things.

20  Q   Have you won any awards for any of your work?

21  A   Yes.  I've -- I've won CLIO recognition for a body of

22  Schlitz ads that used recording artists -- used 35 different

23  recording artists.  I went to their studios and recorded them

24  and let them spend as much time as they wanted EQ-ing their

25  drums or whatever.  And, basically, I paid them for one hour of

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 40 of 81  Page ID
#:2014
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 152 of 320 152

WILBUR - DIRECT

1   studio session time because I could have gotten musicians to do

2   it.

3   Q    Have you testified in other copyright infringement cases?

4   A    I have.  This will be the seventh.

5   Q    Have you been hired as an expert witness in other copyright

6   cases?

7   A    I've been a consulting witness in hundreds of cases.

8       And I'd like to -- I'd like to also mention that when a

9   lawyer calls me and asks me if I will work for them or listen to

10  their material, my protocol is as follows:

11      I ask them not to tell me anything.  I ask them not to tell

12  me what side they're on.  I will take it and I will do my

13  analysis, and I will call them and read orally what my report

14  is.  And if it turns out to be it's the same opinion as their

15  own, then I will go forward with the case.  I will not -- I will

16  not take on a new case if I've -- obviously, if I've told them I

17  don't believe -- believe it has merit.

18      So that's -- that's how I -- how I do it.  And I do the

19  same thing with the advertising agencies.  If I think they've

20  made a mistake, I'll do a copyright evaluation to tell them

21  where I think there's a problem.

22      There has been a tremendous rise in litigations in the last

23  couple of years.  I think that's because the music industry has

24  really had a very, very hard time, and so that's -- that's one

25  of the things.

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 41 of 81  Page ID
#:2015
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 153 of 320 153

WILBUR - DIRECT

1      I also do a lot of prior art research.  I also do a lot of

2   public domain research.  I advise -- I advise clients on what

3   songs they might want to license, and I've done a lot of

4   licensing work as well.  Song licensing primarily.

5   Q    And in your litigation expert witness work, is it mostly on

6   the plaintiff's side or the defense side, or how would you --

7   A    It doesn't matter.  It's -- it breaks down about 50/50.

8   Q    You mentioned the concept of a -- of a prior art.  Would you

9   explain to the judge what is prior art and what is a prior art

10   search and what's the significance of that.

11   A    I do prior art searches regardless of if it's on the

12   plaintiff's side or the defendant's side because I think if --

13   if there's a plaintiff case, then I want to be certain that I've

14   done enough due diligence to be certain that there are not prior

15   art -- existing pieces before I would go forward.  If there are,

16   then, of course, I let them know that.

17        Prior art is work that appears before the two works or

18   three works in question that has some of the same

19   characteristics.

20   Q    Have you ever researched songs from Mexico?

21   A    I have.  I worked for three or four advertising agencies

22   that concentrate on the Latin American market or the Mexican

23   market.

24        Now, I've had opportunities to compare Mexican songs, and

25   what I -- and to deal with the Performing Arts Society in Mexico

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 42 of 81 Page ID
#:2016
Case 6:12-cv-00042 Document 122 Filed in TXSD on 04/04/14 Page 154 of 320154

WILBUR - DIRECT

1  City. I do not speak Spanish, but I do have somebody who

2  translates for me.

3      And what I found is that Mexico is an especially difficult

4  market because so much is oral. There is not a lot of

5  documentation of songs. And so it's -- it's sometimes difficult

6  to find examples because so much of Mexican music has not been

7  written down.

8  Q  So what does that mean? It's just -- just played over

9  the --

10  A  It's played. It's folk music that's been around sometimes

11  for generations, passed along, and it's -- it's, you know,

12  played -- played and known, but, you know, not necessarily

13  copyrighted or notated or even recorded.

14  Q  What are some of your notable engagements, if you can just

15  give us a few?

16  A  Well, one, I worked with you on the BMI Beyonce Knowles

17  case. I felt that that had absolutely no merit whatsoever. I

18  worked -- I worked on an interesting case in the Central

19  California court where the Judge basically said -- this was

20  *Frank Gari Productions versus Coca-Cola Company* where -- where

21  the judge basically said, "I don't understand either one of

22  these experts. I don't understand you, and I don't understand

23  you. So the two of you are going to have to decide who you will

24  agree to use for me so that I can have the advice of a

25  musicologist who will then, you know, help me -- help me

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 43 of 81  Page ID
#:2017
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 155 of 320  155

WILBUR - DIRECT

1     understand what you're saying."

2         I ended up doing about two months' worth of prior art

3     research before I came to my conclusion.

4     Q    So you were -- you were the -- you were the musicologist

5     that the two sides agreed should be hired for --

6     A    Right.

7     Q    -- advising the judge?

8     A    So the judge would be able to be helped to understand what

9     they were saying.

10    Q    Currently, how many copyright matters are you engaged in?

11    A    Litigation matters, six.

12    Q    And we have other examples of your qualifications and your

13    background.

14         MR. GARCIA:  Your Honor, they're in Exhibit 22 and 23.

15    I won't go over it or read it all into the record, but would

16    move to admit Exhibit 22 and 23, her resume.

17         THE COURT:  All right.  It's admitted.

18    BY MR. GARCIA:

19    Q    Ms. Wilbur --

20         MR. SHOWALTER:  No objections to 22 and 23.

21         THE COURT:  They're admitted.

22    BY MR. GARCIA:

23    Q    Ms. Wilbur, there was some discussion -- or did you sit

24    through and listen to the testimony of the plaintiff's expert,

25    Robert -- Dr. Robert Gross?

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 44 of 81 Page ID
#:2018
Case 6:12-cv-00042 Document 122 Filed in TXSD on 04/04/14 Page 156 of 320 156

WILBUR - DIRECT

1    A    I did.

2    Q    And there was some discussion about musicologists and

3    forensic musicologists and music theorists.

4         Could you explain to the Court what is a musicologist and

5    the body of music -- forensic musicology and --

6    A    Right.

7    Q    -- what a forensic musicologist does versus what a music

8    theorist does.

9    A    The reason it's called forensic musicology is that it's --

10   it's distinguished from musicology as it's known in academic

11   circles, which is the study of history of music. I did not

12   study the history of music. I studied composing and

13   ethnomusicology.

14        Forensic musicologists look -- compare works and contrast

15   them in -- the forensic part is it looks for fingerprints and

16   sees if there's -- if there's examples of copying. It's -- it

17   deals with copyright issues, basically -- basically -- and prior

18   domain, you know, public domain and prior art in some of these

19   other issues that relate to copyright.

20   Q    And music theory, is that a practice used in the forensic

21   setting or academic, or could you please explain?

22   A    There -- there are several fine forensic musicologists who

23   have a background in theory. One of them was head of the theory

24   department for the school of music for many years. So theory is

25   certainly a background for it.

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 45 of 81 Page ID
#:2019
Case 6:12-cv-00042 Document 122 Filed in TXSD on 04/04/14 Page 157 of 320 157

WILBUR - DIRECT

1     I certainly didn't study forensic musicology. It's not

2   something you study. I got involved in it because I was asked

3   to be involved in it and the lawyers were happy with what I

4   said, and I was able to explain to the lay jury how the music

5   was put together.

6       And then I was asked to do this preventative program, and

7   then, you know, things -- I've never -- I've never been as busy

8   as I am currently and with as many clients and with this many

9   litigation matters, but that seems to be the -- the direction

10  that things are going.

11  Q   Are there other --

12          THE COURT: So you've had -- in other cases you've

13  been involved in, music theorists have testified or been

14  designated as experts?

15          THE WITNESS: Absolutely. Well, yes. Now, if you

16  ask -- I guess I'll let the lawyers ask.

17  BY MR. GARCIA:

18  Q   No, you may answer the judge's question. Please elaborate.

19          THE WITNESS: I have never seen Schenkerian analysis

20  in any of the cases I've been involved in. We're talking about

21  basic music theory. Schenkerian analysis is something that I

22  did in graduate school and composing, and it was really used to

23  understand highly complex classical and atonal works.

24          The idea of consonant substitutions is completely and

25  totally -- certainly even the concept of it I have never seen in

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 46 of 81  Page ID
#:2020
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 158 of 320  158

WILBUR - DIRECT

1  any of these cases.  And I've -- I've been in many.  I've read

2  many expert reports, and -- and this is simply not a methodology

3  that makes -- makes any sense to me at all.  And it goes against

4  the whole idea of copyright because if you can say that any note

5  in a chord could be substituted, then what are we talking about

6  in terms of the melody?  It doesn't make any sense.

7  BY MR. GARCIA:

8  Q   Is a -- is a melody a -- well, explain what a melody is and

9  whether a melody includes substituted notes, or is it a fixed

10  melody?  What is your -- what is the copyrightable melody?

11  A   Well, unlike Dr. Gross, I do not think of melody as clumps

12  of notes.  I think of them as relating to the harmonic

13  structure.  That's the context, if you will, the bones.

14       Sometimes you've got -- you've got -- you've got various

15  elements that you're examining, including the melody, the

16  harmony, the rhythm, the structure, melodic contour, harmonic

17  rhythm, arrangement, lyrics -- you know, a number of -- of

18  various things.

19       And how these elements relate to one another, how they are

20  put together are all relevant, and every single case is

21  different.

22  Q   Have you ever seen an expert report or a forensic -- or a

23  copyright music setting in which notes have been swapped out to

24  show comparison to another work?

25  A   No.  Absolutely not.  And the notion of "swapped out" seems

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 47 of 81  Page ID
#:2021
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 159 of 320 159

WILBUR - DIRECT

1    to imply that somebody knowingly took notes and decided to

2    change them and -- and use different notes that would really

3    create the -- a copy without it seeming like a copy.  That --

4    that doesn't make sense to me in this case whatsoever.

5    Q    Are you familiar with the element of song description?

6    A    Yes.

7    Q    And what is that?

8    A    Well, the first thing -- first thing you do -- or the first

9    thing that I do is get the songs, the recording or whatever

10   other material.

11        In this case I got two recordings and a lead sheet that was

12   the copyrighted version of -- of "Triste."

13   Q    Well, I'll get to what you did, but --

14   A    Okay.

15   Q    -- in terms of the generic, what does that mean?  Song

16   description, what does that mean?

17   A    That really means what are the basic general outlines, what

18   kind of genre, style, key, tempo, you know, structural elements,

19   and what is your first reaction to it.  Because very often I've

20   found that the first reaction might be the reaction that the

21   layperson has, and so, you know, I -- I -- I -- before I delve

22   deeply into it, I listen to the two works and say, "Are these

23   two works similar," or "What -- what ways are they similar?"

24        I focus, then, on the similarities and compare and contrast

25   them, and I look at them in relationship to:  Are they generic

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 48 of 81 Page ID
#:2022
Case 6:12-cv-00042 Document 122 Filed in TXSD on 04/04/14 Page 160 of 320 160

WILBUR - DIRECT

1    with the style?  Is it something that comes out of a genre,

2    or -- and, also, how important are these similarities in

3    relationship to the whole work?

4        So you're looking at a lot of -- a lot of information, and

5    you organize it in such a way that -- that it makes sense and so

6    that you weigh those various things and determine how important

7    they are.

8        One of the things that we use and -- certainly not

9    consonant substitution, but one of the -- one of the ways of

10   looking at melody is to look at important weighted notes.  Where

11   are the important notes in a piece?  Where is it basically

12   going?

13       In -- in this kind of a -- kind of simple folk-type songs,

14   I would say that the first note in the measure -- and if it's

15   not a chord tone, then the -- well, I'm trying to be general.

16   Q    Yeah.  Be general with it.

17   A    So -- so important weighted notes is one of the things that

18   I look at.

19   Q    So then -- now let's be specific.

20       Did you look at the three works that are at issue in this

21   case?

22   A    I did.

23   Q    Okay.  You were provided a copy of the "Triste" --

24   A    Right.

25   Q    -- copyrighted lead sheet, correct?

Case 2:13-cv-06004-JAK-AGR   Document 112-1   Filed 09/08/14   Page 49 of 81   Page ID
#:2023
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 161 of 320   161

WILBUR - DIRECT

1   A   Correct.

2   Q   You reviewed that?

3   A   I did.

4   Q   Were you provided a copy of the "Triste Aventurera" sound

5   recording by Mr. Guzman?

6   A   Yes.

7   Q   Did you review that?

8   A   I reviewed it, and I transcribed it.

9   Q   Did you receive and review a copy of the sound recording of

10  "Cartas de Amor" recorded at Hacienda Records?

11  A   I did.

12  Q   And did you transcribe that?

13  A   I transcribed it.  I transcribe all the recorded things that

14  I get.

15  Q   What does that mean, for the Court?  What does that mean,

16  "transcribed it"?

17  A   That means to put in notation.  Now --

18  Q   Do you have an illustration of your transcriptions?

19  A   Yes.  They're in the report.  They're in the report.

20  Q   That's in --

21  A   The first thing you do is you transcribe in the original

22  key.  So Triste's was in the key of A flat major, so it's

23  transcribed in the key of A flat major.  The other song was in

24  the key of C.

25  Q   Which song?

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 50 of 81 Page ID
#:2024
Case 6:12-cv-00042 Document 122 Filed in TXSD on 04/04/14 Page 162 of 320 162

WILBUR - DIRECT

1   A   "Cartas."

2   Q   Okay?

3   A   And after you transcribe them in the original key, you --

4   you transpose, generally, one of them to the key of the other.

5   In this case we transposed the A flat major to the C major so

6   that it would match the "Cartas" song.

7       I consider the transcriptions very important even though

8   they don't -- they're -- they're illustrating what the melody

9   does.  Obviously, if a singer changes the way they sing a

10  particular note or stops short -- so I -- I -- I agree with

11  Dr. Gross that the attack points are -- are important.

12      I -- I feel very strongly that the transcriptions have to

13  be factually correct.

14  Q   Let's look at those transcriptions.  And do you have an

15  opinion whether Dr. Gross's transcription was correct?

16  A   Okay.

17  Q   First, let's pull up the "Triste" -- the sound recording

18  is -- your transcription is appendix -- appendix --

19  A   I think that --

20  Q   Which one should we pull up?

21  A   (Indicating.)

22  Q   Okay.  You want to pull up that one?

23  A   Yes.

24  Q   Okay.  That is --

25          MR. GARCIA:  That was the original exhibit up here,

WILBUR - DIRECT

1    the big one.

2    A    This one.

3    BY MR. GARCIA:

4    Q    Oh, is that the exhibit?  No, that's your copy.

5         THE WITNESS:  That's my copy.

6         MR. GARCIA:  Mr. Rivers, the exhibits were --

7    originals were here.  Do you remember the ones we marked

8    yesterday?

9         THE CASE MANAGER:  Oh, I think I put them up on

10   Judge's --

11        MR. GARCIA:  The big over-sized copy.  There was a big

12   one.  We marked it yesterday, a couple of demonstrative -- yeah,

13   that one.  Thank you.

14   BY MR. GARCIA:

15   Q    Okay.  You have -- can you see the one on the screen, or

16   would you prefer --

17   A    Just show the -- can I see the title?  Yeah.  That's the

18   correct one.

19   Q    That the one?

20   A    Yeah.

21   Q    Okay.  We have on the screen -- this was a -- an exhibit

22   prepared by Dr. Gross.

23        Do you remember that?

24   A    Yes.

25   Q    And we marked this as Defendant's Exhibit 82.

WILBUR - DIRECT

1  And did you have an opportunity to study this document?

2  A   I did.

3  Q   And what did you observe?

4  A   I observed that it was not accurate.  First of all, I have

5  never seen transcriptions that are marked in this kind of way

6  that obscures the notes and you have to look so hard at what's

7  happening.

8      I remember that Dr. Gross said that there were 81 -- he

9  counted 81 cons- -- I can't remember the term.  Consonance

10  substitutions -- which he called chord tones, and I would say

11  that there are quite a few mistakes here.

12  Q   What -- where are the mistakes?

13  A   Okay.  In the -- I think you went over some of them.  The

14  last two lines were not in the line, some of those kind of

15  things.  And the notes -- any lines on the angles were not

16  reasonable because they weren't happening simultaneously.

17      But the bigger issue, because we want to be sure we're

18  talking about the musical facts in the case and as objectively

19  as possible, is that the part on the second line -- well, as you

20  can see, you have repeated sections, one, two, three, four,

21  five -- six notes, and then they're repeated, and then there are

22  measures in which they continue.

23      The second lane -- the whole first --

24  Q   Do you want to come over here and point to what you're -- so

25  we can know what you're referring to, or do you want me to

WILBUR - DIRECT

1   point?

2   A    Yeah.  If you could do that, that would be fine.

3   Q    All right.  Where are you at?

4   A    Okay.  On the second line -- I just wanted to say in the

5   first case that everything on the first line is in the -- in

6   the -- using the chord C.

7   Q    So --

8   A    The second --

9   Q    -- this upper line (indicating) --

10  A    Right.

11  Q    -- is the chord of C?

12  A    Right.  Now, there are differences, and I'm going to go over

13  the harmonic differences, and I'm going to go over the

14  structural differences as well.  But I just want to point to

15  some of these things now so that we can get these straight right

16  away.

17       In the first -- in the first line -- the first melody line,

18  it goes -- I'm going demonstrate it on the keyboard.  Three

19  (playing keyboard) -- okay?

20       That's the key of C (playing keyboard).  That's the C chord

21  (playing keyboard).  So it's 3, 6, 5, 6, 5, 3.

22  Q    Are you at the upper line or the lower line?

23  A    Right.  The upper line right there.  Those are the notes

24  right there.

25  Q    So 3, 6, 5, 6, 5, 3?

WILBUR - DIRECT

1   A   Right.

2   Q   Those right there?

3   A   Right.

4   Q   All right.

5   A   Now, in the second line he goes -- I'm just going to --

6   Q   Down here (indicating)?

7   A   No.   Next line down, the staff --

8   Q   Oh, this?

9   A   -- right there.

10      If you'll notice that, he has (playing keyboard) -- okay?

11      Now, that actually -- he made quite a big deal about the

12  repeated B, A, B and the odds of that happening.  The only --

13  only problem with that is that that's the harmony part.  It's

14  not in the -- this is not the melody in the recorded version,

15  which is what he's calling the arrangement.  Rather, the notes

16  are (playing keyboard).

17      I have to look at my transcription.

18      We'll put it up later.  In other words, those notes are

19  wrong.  They're actually supposed to be a third below that.

20  Q   So the --

21  A   So instead of B, A, B --

22  Q   -- the line --

23  A   -- they really are G, F, G.  So 5, 4, 5, not 7, 6, 7 as he

24  has indicated.

25  Q   That's on the "Triste"?

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 55 of 81  Page ID
#:2029
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 167 of 320 167

                              WILBUR - DIRECT
 1   A    That's on the "Triste" recording.

 2        Now, another --

 3   Q    So I'm showing Exhibit 33 -- your Exhibit 33.

 4   A    Yeah.  That would be good to show as well.

 5   Q    And that -- so in the "Triste" --

 6   A    Into the --

 7             THE REPORTER:  I'm sorry.  One at a time.

 8   BY MR. GARCIA:

 9   Q    You have to let me finish before you start speaking.

10        So for sake of comparison, you said the upper line was

11   using the melody.  The second line then swaps to the harmony; is

12   that true?

13   A    Correct.  In those two sections, yes.

14   Q    In these two sections.

15        But -- and -- so, actually, in the melody -- if you are

16   consistently comparing melody, you're saying, then, these are

17   really not B, A, B notes in the -- in the melody of "Triste"; is

18   that true?

19   A    Correct.

20   Q    So where is the B, A, B, then, or where -- where are the

21   true notes of the "Triste" sound recording in the second line

22   here that's been --

23   A    Okay.

24   Q    -- not used?

25   A    What I have done on this -- on this graph, which we will

WILBUR - DIRECT

1    refer to often -- and, sadly, it has only my scribbling --

2    writing on top to show you what the notes are. But I have

3    another graph that just uses those notes.

4        On the very top staff all the way through it is the

5    copyrighted version in C. I've transposed it to the key of C,

6    but it's actually the same notes as what appears in the

7    copyrighted version of "Triste."

8    Q    This top line --

9    A    Yes.

10   Q    -- is the copyrighted version of "Triste"?

11   A    Right. And if you go down to in the next grouping of

12   staffs -- no. No. No. That one.

13   Q    Yes.

14   A    -- that continues, and the next grouping of staffs. So the

15   top line of the grouping of staffs is the copyrighted version of

16   "Triste."

17       On the second line is the recording.

18   Q    Right here (indicating)?

19   A    Right.

20   Q    And what I've done is the bigger notes are the -- the

21   melody, and the harmony part is above it, generally. Yeah. The

22   harmony part is above it.

23       And on the third line is the "Cartas" -- the melody of the

24   "Cartas" recording, and it -- including its -- the chords.

25   Q    Okay.

Case 2:13-cv-06004-JAK-AGR  Document 112-1  Filed 09/08/14  Page 57 of 81  Page ID
#:2031
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 169 of 320 169

WILBUR - DIRECT

1   A    So -- yes.   Right there.

2        So if you look at the second line -- I'm sorry.   That's not

3   correct.

4   Q    Of -- of this one on the --

5   A    Right.   What happens is I have them grouped in four -- in

6   four measures across.   So the third line down --

7   Q    Right here (indicating)?

8   A    Yes.   And then the second staff -- right -- where the

9   recording is, you can see that I've written those notes 5, 4, 5.

10       If you look above to the copyrighted version, B, A, B is in

11  the copyrighted version, but it doesn't use the melody -- the

12  copyrighted version doesn't have the same melody as the recorded

13  version.

14       So, in other words, what Dr. Gross did was he used the

15  melody of -- in the beginning (playing keyboard), if you go to

16  the top of the page right there.   So the recorded -- no.   That's

17  the copyright.   That one.   Is (playing keyboard).

18  Q    Right here?

19  A    Is (playing keyboard) okay?   And --

20  Q    So 3, 6, 5, 6, 5, 3?

21  A    Yeah.

22  Q    3, 6, 5, 6, 5, 3?

23  A    Right.   And then it's repeated again (playing keyboard) a

24  second time.   And then if you go to where the second part occurs

25  right there -- that's right.   (Playing keyboard) Okay?

Case 2:13-cv-06004-JAK-AGR Document 112-1 Filed 09/08/14 Page 58 of 81 Page ID
#:2032
Case 6:12-cv-00042 · Document 122 · Filed in TXSD on 04/04/14 · Page 170 of 320 170

WILBUR - DIRECT

1  Q    Right here?

2  A    2, 5, 4, 5, 4, 5, 5, okay?

3  Q    Right.

4  A    So -- so that's the correct song melody.

5       And the other one that he indicated was (playing keyboard).

6  Q    But yet the -- but it has the B, A, B, which is -- really

7  should be the 2, 5, 4, 5, 4 --

8  A    Correct.

9  Q    I got you.

10  A   Right. Right. Now, the biggest --

11  Q   So the -- the -- to be clear, then, the two -- the -- the 5

12  is what note?

13  A   G.

14  Q   This is a G. The next note, 4, is what note?

15  A   F.

16  Q   And the next note is what note?

17  A   G.

18  Q   G.

19      So instead of B, A, B, the true melody in the sound

20  recording is G, F, G is what you're saying?

21  A   That's correct.

22  Q   And we'll get to that in a minute, but just some big

23  picture -- did you want to say any other big picture issues on

24  this one?

25  A   Yeah. The other thing that was very -- a very serious

WILBUR - DIRECT

1  mistake, if you go -- push that up a little further, you'll see

2  where the break is right there.

3  Q    Yes.

4  A    And the top line is the "Triste Aventurera." This is the --

5  he's saying that this is the recorded melody on the top.

6  Q    Right here (indicating)?

7  A    And the -- that entire section all the way through to the

8  bottom of the piece, there and the next staff grouping on the

9  top -- right there all the way to the end -- all those notes are

10 incorrect -- well, most of them are incorrect.

11        And more --

12 Q    And why is that?

13 A    They simply weren't transcribed correctly.

14 Q    Oh, the transcription is wrong?

15 A    The transcription is wrong. I don't know where he got these

16 notes from. I know when you asked him he said he thought that

17 the copyright version was incorrect, but the whole thing was

18 incorrect.

19        But the truth is that the recording did not sing those

20 notes, and -- and much more to the point, he moved the entire

21 line -- the entire melodic line over one measure so that it

22 lines up with the pickup measure, which is -- which is simply

23 not correct.

24        Why he might have done that, I'm going to show you on my

25 transcriptions and show you the difference, but, nonetheless,

WILBUR - DIRECT

1  in -- in -- in that whole section -- now, this is the refrain

2  section. This is the part that's the chorus. This is the part

3  that's repeated. This is the most important part of the song.

4      The -- the chords in the introduction, the chords in the

5  instrumental break are the same chords as used in this refrain

6  section. So to get these notes wrong is -- is a pretty big

7  mistake, but to move them over a measure so that they line up

8  over the pickup three notes below, is --

9  Q   So, in other words, Dr. Gross [sic], you're saying -- excuse

10 me. What Dr. Gross did was that -- as I understand it, to do an

11 apples-to-apples comparison, you compare the simultaneously

12 occurring notes in the two songs?

13 A   Right.

14 Q   But what he did was he took the two songs and he shifted

15 part of it over, then, to line up?

16 A   That is exactly right. He lined -- he lined up those -- the

17 downbeat of the refrain in "Triste" with the wrong notes to the

18 pickup measure. So you don't -- you don't start a chorus with

19 (playing keyboard).

20     So if you're playing the chorus -- I'm just going to do it

21 an octave lower (playing keyboard) -- okay? That's -- that's --

22 those three first notes are called pickup notes. He has it

23 correctly indicated in the very first note of the piece. It

24 comes before the bar line.

25 Q   This note right here is called a pickup note (indicating)?

WILBUR - DIRECT

1    A    That's a pickup note.

2    Q    Okay.

3    A    (Playing keyboard.)  And you can hear it.  The downbeat is

4    (playing keyboard), okay?  And what you have in the refrain is

5    you have three pickup notes (playing keyboard), which is

6    correctly notated.

7        His "Cartas," the one that he did himself, is correctly

8    notated, although I will also say that this is another thing

9    that is kind of a dead giveaway.  He writes down here "Cartas de

10   Amor omits this filler measure."  It doesn't omit a filler

11   measure.  He had to add a measure there so that it would line

12   up.

13   Q    Right here?  Is this the part you're talking about

14   (indicating)?

15   A    Right.  That's what I'm talking about.  Those measures,

16   there's -- there's no break.  If you notice, the pickup measures

17   come right after it.  So it's this (playing keyboard), okay,

18   which is correct.  But he wanted to have a space in there.  I

19   played it all as one unit, which is the way it is heard on the

20   recording.

21       So, in other words, by shifting it over one measure, he had

22   to add that issue there to make it work.  Now, these are pretty

23   serious -- these are pretty serious errors.  And I know that he

24   said that some graduate student or somebody did -- did the

25   transcriptions.  He didn't -- he did the "Cartas"

WILBUR - DIRECT

1   transcriptions, but he didn't do the other ones.  But he's still

2   responsible for -- and there's nothing wrong with somebody else

3   doing transcriptions, by the way.

4        If I have a lot of work to do, I have somebody who I trust

5   do transcriptions, and then I verify them to be certain that

6   they're accurate.  I mean, because I think that that's the

7   most -- one of the most important things -- tools, if you will,

8   in the tool box of a forensic musicologist is that you have to

9   transcribe the music as accurately as you can.

10  Q    Now, we may be breaking shortly for lunch, but before we do,

11  did you prepare a sound demonstration for the Court that

12  illustrated the -- what -- well, let me back up and say this:

13  Did you do a prior art search on the melodies of these songs?

14  A    I certainly did.

15  Q    And as part of a forensic musicological analysis and

16  methodology, is there always a prior art search done?

17  A    Yes.  Well, certainly, here -- yes.

18  Q    In a copyright infringement setting?

19  A    Yes.  It's in much more detail on the defendant's side than

20  the plaintiff's side usually, but yes, always.

21  Q    And did you --

22  A    If -- pardon me.

23  Q    Go ahead.

24  A    If there's any similarity at all.

25  Q    So if they are just totally dissimilar, there may not be a

WILBUR - DIRECT

1   need?

2   A    In the Armour/Knowles case there wasn't.

3   Q    So was there, in fact, some similar melody between the two

4   in that -- did you notice any in that first verse?

5   A    The -- the similarities -- well, the recorded versions have

6   very, very few similarities, but the -- the melody is closer to

7   the copyrighted version because that has (playing keyboard).

8   You know, it has the 5, 1, 7, 1.

9        Those four notes are the same in the copyrighted version,

10   and also (playing keyboard) the -- the second theme, if you

11   will, with the other chord goes down a step.  There's a common,

12   what I call, compositional device.  It's -- I found examples

13   that show this device very clearly.

14   Q    So --

15   A    Certainly, there's nothing unique about 5, 1, 7, 1, and

16   certainly as a compositional device, going down a step when

17   you're going into a different chord, G (playing keyboard).

18        So, in other words -- (playing keyboard) -- if you go to G

19   -- (playing keyboard) -- it's -- it's a parallel pattern using

20   the chord tones of the G scale as opposed to the C scale.

21   Extremely common.

22   Q    Now, as to the 5, 1, 7, 1 that you observed --

23   A    Uh-huh.

24   Q    -- in the "Cartas" piece --

25   A    Right.

WILBUR - DIRECT

1   Q   Actually, let's go ahead and look at that.

2       In the beginning of the song --

3   A   Right.

4   Q   -- 5, 1, 7, 1, 2, 3, do you see that?

5   A   Right (playing keyboard).

6   Q   Is that the "Cartas" --

7   A   Yes.  I'm sorry (playing keyboard).  That's the melody of

8   "Cartas."

9   Q   The "Triste" copyright also has a 5, 1, 7, 1; is that true?

10  A   (Playing keyboard) Correct.

11  Q   And that was the melody that you actually --

12  A   Well, this is the first four notes (playing keyboard) -- is

13  the one of "Cartas" -- (playing keyboard) is the copyrighted

14  version of "Triste."

15  Q   Now, as to that common melody in the beginning measure --

16  A   Uh-huh.

17  Q   -- the 5, 1, 7, 1 that is common to the copyright version

18  and to the "Cartas" sound recording --

19  A   Right.

20  Q   -- were you able to locate prior art --

21  A   Many examples.  Many examples.

22  Q   Is the 5, 1, 7, 1 combination of notes unique to either

23  "Cartas" or "Triste"?

24  A   No.  In fact, the Nutcracker Suite, bum, bum, bum, bum, bum,

25  bum, bum, bum, bum -- I mean, it's a very common blend.

WILBUR - DIRECT

1    MR. GARCIA:  Your Honor, we have a short audio we

2    would like to demonstrate for Your Honor, the 5, 1, 7, 1, and

3    the melodies contrasting the two, similar to what Dr. Gross did.

4            THE COURT:  Sure.

5            MR. GARCIA:  We'd like to play that at this moment.

6            THE COURT:  Which exhibit?

7            MR. GARCIA:  I am going to find it.  It is Exhibit 34

8    on our exhibit list.  It's an audio file.  It wouldn't be in

9    the -- so I'll play that now.

10           *(Exhibit 34 plays.)*

11           MR. GARCIA:  Your Honor, we could go on, or did you

12   want to --

13           THE COURT:  Yeah.  Let's go ahead and break.  This is

14   a good stopping point.  Let's return at -- at 1:30.

15           You may step down.

16           *(Lunch recess taken from 12:32 p.m. to 1:35 p.m; the Court*

17   *heard another matter.)*

18           THE COURT:  All right.  You can be seated.

19           You can continue.

20           You can come back up.

21           MR. GARCIA:  May I proceed, Your Honor?

22           THE COURT:  Yes.

23   BY MR. GARCIA:

24   Q    Ms. Wilbur, before the break you were giving us some

25   background.  What -- I'd like to then, now, go into some of your

Case 2:13-cv-06004-JAK-AGR   Document 112-1   Filed 09/08/14   Page 66 of 81   Page ID
Case 6:12-cv-00042   Document 122   #:2040   TXSD on 04/04/14   Page 178 of 320  178

WILBUR - DIRECT

1   observations.

2       First, did you make some observations regarding the song

3   description between the two works?

4   A    What I regularly do as a methodology is to, you know, kind

5   of look at the general scope of the song and then work into the

6   details.

7       So I look at, you know, the tempo, the duration of the

8   song, what type of style it's in, and do a little background

9   research.  But, basically, I -- I determined that "Triste" was

10  109 beats.  It was 2 minutes and 38 seconds long.  It was in a

11  Norteño style, and that was the -- the "Triste" and the "Cartas"

12  was in a much more contemporary style, and it was --

13  Q    Well, first, what you just described was the "Triste"

14  copyright?

15  A    No.  That was the recorded -- recorded song.

16  Q    The "Triste" recorded --

17  A    I also -- I also looked at the copyrighted version and

18  determined that they were not the same, but the harmony part in

19  the recorded version hit rather closely to the copyrighted

20  version.

21      The last few notes in the copyrighted version were

22  incorrect.  They were probably -- if you -- if you recognized

23  how closely it cued to the harmonic -- harmony part of the

24  recording, it's pretty easy to deduce what those notes are.

25  But -- but, generally, that -- those were the over-- overarching

WILBUR - DIRECT

1   things.

2      I also felt that the harmonic instrumental parts and the

3   introduction and the instrumental breaks of both songs used the

4   same chords as the refrain or the chorus section.  The chorus or

5   refrain is the most important part, generally, of a song.  It's

6   the part that's repeated.

7      Then the next step that I do after just getting kind of a

8   general sense of the songs is I do -- and after I've transcribed

9   them, I look closely at their -- their structures.  The

10  structures are on page 6 of my report.

11  Q   Well, before you get to that on the song -- before we get to

12  the structure, on the song descriptions did you have opportunity

13  to do any research regarding the historical origin and

14  background of the two songs?

15  A   Yes.  Yes.  Because this is, you know, not a style that I

16  was completely familiar with, I did some -- some research.  And

17  I found, actually -- if you wouldn't mind playing a YouTube -- a

18  couple minutes of a YouTube --

19  Q   Did you locate a YouTube document which gave information on

20  the historical origins of Tejano music?

21  A   Yes.

22  Q   Okay.

23      MR. GARCIA:  Your Honor, that is Exhibit 44.  We're

24  not going to play the whole -- the whole segment, but the

25  beginning part of it.

WILBUR - DIRECT

1      MR. SHOWALTER:  We object to some YouTube video coming

2    into trial we know nothing about, no opportunity to

3    cross-examine it, the basis for this person's statements,

4    qualifications, credentials, and it's --

5      THE COURT:  I mean, it does seem like classic hearsay.

6    How do you get around that, Mr. Garcia?

7      MR. GARCIA:  It's part of her research.  You read a

8    book.  You talk -- you make an interview.  You don't, you know,

9    pile everything in --

10      THE COURT:  Well, she can say what she's learned about

11   Tejano music, but I think playing the recording -- that would

12   swallow the hearsay rule if you could publish anything --

13   anything an expert relied on.  So you can ask her what her

14   understanding is based on her research in Tejano music, whatever

15   the point you want to bring out.

16      MR. GARCIA:  Well, as a demonstrative may we play it?

17      THE COURT:  No.

18   BY MR. GARCIA:

19   Q   And from your research and observing that video, what did

20   you learn, Ms. Wilbur?

21   A   This -- this was -- Narcissus was the name of the person

22   being interviewed, and this YouTube clip was -- and he's a

23   respected Norteno musician.

24      He said -- and I've learned subsequently that -- that a lot

25   of Germans and Eastern Europeans settled in the northern part of

WILBUR - DIRECT

1   Mexico and along the border towns, and the German folk songs and

2   the accordion, in fact, were introduced into Mexican music, and

3   this was a very important part of -- of the influence on the

4   music.

5       So the polka and the accordion both originated from -- from

6   Germany, really, and Eastern European countries.  And they

7   produced the waltz, the accordion, and the -- and the polka.

8       So both of these use that 2/4 meter, which is a polka kind

9   of style.  They use the accordion that was introduced by -- by

10  German -- and German folk songs also had an important part.

11      Now, the other thing, of course, is that -- is that music

12  isn't static.  It's influenced by all kinds of things.  And,

13  certainly, the Tejano music has been influenced by -- has had

14  pop influences and rock and roll influences and those kind of

15  influences as well.  But, certainly, the German and Eastern

16  European influence was very major.

17  Q   The -- would you say the origin and roots for the Tejano

18  music originated from Germany and Eastern Europe?

19  A   Well, it -- it was part of a -- of formation of the Norteño

20  style, which was the more traditional Mexican style that was in

21  the northern part of Mexico, with the -- with the German and the

22  Eastern European influences.  And then as time went on, more

23  rock influences and pop influences from the United States.

24  Q   Did you conduct any other research to -- regarding the

25  historical origins of Tejano music?

WILBUR - DIRECT

1  A    I did.  Once I had done my analysis of the song, I contacted

2  Dan Sheehy, who is head of the Smithsonian Folkways Records

3  [sic], who I happen to know well -- and he got his Ph.D. in this

4  very music, and I've known him for years.  He graduated from

5  UCLA in the same musicology department, and he -- he shed some

6  similar light on it.

7       I also asked him -- he confirmed that -- that there were

8  many -- that Mexican music is very oral, and there is not a lot

9  of documentation on it.  He's recorded himself hundreds of

10 pieces of Tejano music.  He's very well aware of it.  He did his

11 Ph.D. in it, and he said that these were both extremely common

12 forms -- extremely common Tejano -- Tejano-type folk songs that

13 would have been part of this genre.

14 Q    When you say "both of these" you mean "Triste" --

15 A    Both "Cartas" and the -- both recordings.

16 Q    "Cartas" and "Triste"?

17 A    Right.

18 Q    In fact, did Dr. Sheehy confirm that to you in writing?

19 A    He certainly did.  He sent a letter to me -- I spoke to him

20 first, and he told me.  And then I asked him if he would send me

21 a letter confirming our conversation, and he did so, and it's --

22 it is in one of the exhibits, I believe.

23            MR. GARCIA:  Well, Your Honor, Exhibit 24 --

24            MR. SHOWALTER:  We object to this exhibit on the same

25 grounds.

WILBUR - DIRECT

1        THE COURT: Sustained.

2        MR. GARCIA: I'll move on, Your Honor.

3  BY MR. GARCIA:

4  Q  Did you also conduct any research regarding similarities of

5  the two songs, anything regarding harmony or chords or anything

6  of that style?

7  A  Well, I certainly determined that the -- the harmony is

8  very, very common. I think that's your question.

9  Q  Yes.

10  A  The harmony is very common. It uses the three basic chords

11  in the C scale. That would be the 1 chord, the 5 chord and the

12  4 chord. And it is a very simple harmonic structure where it

13  has eight measures of the C chord and -- approximately.

14    Now, they are different. They -- they are not exactly the

15  same, and I can go through the breakdown later. But generally

16  speaking they have eight measures with -- or four measures if

17  you think of it as 4/4 time, but eight measures of the C chord.

18  And then it goes generally to the G chord, which is the 5 chord.

19    So you have the C chord (playing keyboard). Then it goes

20  to the G chord (playing keyboard) for eight measures

21  approximately, and then it goes to the 4 chord (playing

22  keyboard) in the refrain.

23  Q  Is there anything unique to either two songs regarding the

24  1, 5, 4 chord usage --

25  A  No. Absolutely not.

WILBUR - DIRECT

1   Q   -- in the C scale?

2   A   No.  And, in fact, the reason that Dr. Gross found so many

3   consonant substitutions was because they are playing one chord,

4   and the notes that would go with that one chord would be

5   consonant to it.  And then when you go to the G chord, there

6   would be a lot of notes that would be consonant to that as well.

7        These are -- these are what I would refer to as

8   harmonically based -- I mean, the harmonies are important in

9   these songs.

10  Q   The -- as far as the 2/4 beat ranchera polka --

11  A   Uh-huh.

12  Q   -- is there -- is that unique to either song?

13  A   No.

14  Q   Is that also common?

15  A   Very common.  It's a polka, basically.  The tempos are

16  different in the two songs.  "Cartas" is slower.  I think one

17  was -- I think it was 101 beats per minute, and one was 109

18  beats.

19       So "Triste," the recording was 109 beats per minute, and

20  "Cartas" was 101 beats per minute.

21  Q   So did you -- we would like for you to elaborate on some of

22  the differences you now found between the two songs.

23  A   Uh-huh.

24  Q   And when I say "two," I guess it's the three "Triste" --

25  there's three "Tristes," and then there's the "Cartas de Amor."

WILBUR - DIRECT

1   A   Right.

2   Q   So would you identify for the Court some of the differences

3   you found.

4   A   Okay.  I found that the refrain sections were quite

5   different using different melodic patterns, different chords,

6   and even though the structure of the songs were -- are common,

7   they were also quite different.

8       I found that the -- the refrains were different and the

9   instrumental parts of both songs in terms of the introduction,

10  the instrumental breaks -- there were two instrumental breaks in

11  "Cartas" and one instrumental break and an introduction in

12  "Triste."

13      These -- these were quite different.  They both are on the

14  4 chord and -- they start on the 4 chord, pardon me, and then

15  they have different chords throughout and different melodies

16  throughout.

17      The instrumental intros are related to the refrains in that

18  they use the same chords and melodic material, and both of them

19  are different.

20      I found it interesting structurally that the -- the refrain

21  in the -- the instrumental parts that related to the refrain

22  were in "Cartas," 95 of the measures out of the 127 measures.

23  And in "Triste" they were 79 measures out of a total of 138.  So

24  "Cartas" used 75 percent of the body of the song on material

25  that relates to the refrain.

WILBUR - DIRECT

1   Now, the reason that refrains, of course, are very

2   important is that they're repeated, and they tend to be the

3   focus.  And you certainly find in both songs that the

4   introductions and the repeated refrains and the instrumental

5   break between the -- the refrains are -- are different, but they

6   also have other differences.

7       The -- the "Cartas" structure has an instrumental

8   introduction, and then it has the -- what I call the verse 1A,

9   which is the theme -- the theme one, which is on the C chord.

10  Then it has --

11             THE COURT:  Why don't we do it this way.  Let's break

12  it up.  It's getting a little long.  Do it by question and

13  answer.

14             And I don't -- I mean, it looks like you're basically

15  just reading your report into the record.

16             THE WITNESS:  Oh, I'm not.

17             THE COURT:  Well, you're reading something.

18             But just go ahead and break it up and ask her some

19  questions.

20  BY MR. GARCIA:

21  Q   Yeah.  Let's talk first about the song structure.

22      Regarding the --

23  A   Can you just put that up on the screen so --

24  Q   Yes.  Yes.  We'll make sure --

25  A   So I don't have to read the notes out of my chart.

WILBUR - DIRECT

1  Q   This is the page -- Exhibit 21, page 6.

2      Did you, in fact, analyze the structure between the two

3  songs?

4  A   I did.

5  Q   And did you, in fact, find differences between the structure

6  of "Triste" and the structure of "Cartas"?

7  A   I did.

8  Q   Um --

9  A   They both started with -- okay.  You can see --

10  Q   First, let's talk one at a time here -- that the -- were the

11  instrumental introductions different --

12  A   Yes, they were.

13  Q   -- between the two?

14      That's what you were describing a moment ago?

15  A   Yes.

16  Q   When you said verse A1, is this the timing difference here?

17  A   Those both are theme one.  The theme ones are different in

18  each piece.

19  Q   And then the -- what are some of the other major structural

20  differences you -- you have identified?

21  A   You'll see that in "Triste" you have verse 1A and 1B.  That

22  simply means the theme that's played on the C chord and the

23  theme that's played on the G chord.

24      Then you have instrumental breaks that are considerably

25  longer in Tristas -- "Triste" than in "Cartas."  You have -- you

Case 2:13-cv-06004-JAK-AGR   Document 112-1   Filed 09/08/14   Page 76 of 81   Page ID
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 188 of 320
#:2050
188

WILBUR - DIRECT

1  have a full second verse, verse 2A and verse 2B.  Then you have

2  a refrain, which is 17 measures, and then you have an

3  instrumental break and then the refrain.

4      The instrumental -- the instrumental -- first instrumental

5  intro and the instrumental between the two refrains are very

6  similar, and they use the chords of the refrain.

7      On the "Cartas" side you have a verse 1 and a verse 2 with

8  a smaller filler, if you will, after the introduction.  Then you

9  have what I call a pre-refrain.  And the reason that I call it a

10 pre-refrain is that it has very different chords leading up to

11 the -- it uses some of the same chords as -- as the beginning of

12 the verse, but it goes into four measures that are different and

13 lead up to the refrain.

14     Again, you can see that there are filler -- filler

15 instrumentals of two measures each on the "Cartas" side and

16 eight or seven on the other, so that's different.

17     You have -- another difference here.  You have the refrain

18 and instrumental break, a pre-refrain again, an instrumental

19 break of two measures, and then you have the refrain again, and

20 then you have another instrumental break, which is related to

21 the previous one.

22     So you have two repeated pre-refrain sections.  You have

23 two refrains and two instrumental breaks and -- and an

24 additional instrumental introduction, all of which are related

25 to the refrain section.

WILBUR - DIRECT

1   Q   So if -- you basically dissected the song?

2   A   Yeah.  I literally went --

3   Q   In other words --

4   A   -- through it measure by measure by measure.  It gave

5   approximate times where the -- the changes of the sections would

6   occur and how many measures were in each section.

7           THE COURT:  So given that there are, as you said, some

8   similarities -- I know you don't think --

9           THE WITNESS:  Of course.

10          THE COURT:  -- it gets anywhere close to substantial

11  similarity.

12          THE WITNESS:  No.

13          THE COURT:  But given that there are some musical

14  similarities, and then you add onto that the fact there are

15  these four lines of lyrics that are with -- you know, but for an

16  "S" or two are identical --

17          THE WITNESS:  I agree.

18          THE COURT:  At the end of the day the question is:

19  Was this copied from Mr. Guzman's song?  And you think it's

20  possible that the four same -- virtually same lines of lyrics

21  and these other -- some similarities in the music could have

22  been generated completely independently?

23          THE WITNESS:  It's a tough one, but yes, I do.  I have

24  seen -- I have seen instances of coincidence like this.  But

25  there's no question that those lyrics are virtually the same.

WILBUR - DIRECT

```
 1             THE COURT:  And you would agree in assessing
 2   substantial similarity or copying -- I mean, you look -- you
 3   said you looked at everything, and you think there are some
 4   things that you think are more important to look at than
 5   others --
 6             THE WITNESS:  Sure.
 7             THE COURT:  -- but you look at the lyrics, you look at
 8   the music, the harmony -- all these different things you talked
 9   about --
10             THE WITNESS:  Right.
11             THE COURT:  -- structure, harmony.  You don't just
12   look at one and say --
13             THE WITNESS:  No.
14             THE COURT:  -- is it substantially.  You look at it
15   all in totality?
16             THE WITNESS:  Correct.  And the lyrics of the rest of
17   the piece are substantially different.  They are -- and the
18   meaning of the lyric.  And I agree with you that those -- those
19   first -- the first half of the first verse lyrically are -- are
20   the same except for the fact that one is singular and one is
21   plural.
22             That has some different meaning in terms of what's the
23   rest of the lyric, and I have -- I have a lyric.  It might be
24   useful just to put it up now so you can see the translation as
25   well --
```

WILBUR - DIRECT

1          THE COURT:  Right.  That would be helpful.

2          THE WITNESS:  -- a side-by-side comparison.

3          MR. GARCIA:  We might as well jump to the lyrics,

4     Judge, if you don't mind.

5          THE COURT:  Sure.  Please.  And just before you show

6     that -- but so you basically -- for it to be a coincidence, the

7     same person -- I think Mr. Ortiz -- who came up with these

8     same -- very similar four lyrics at the beginning of the song

9     writing the lyric as Mr. Guzman also, coincidentally, had, I

10    think what you'll agree, are some musical similarities.

11         THE WITNESS:  Oh, yeah.  Sure.

12         THE COURT:  You have to think both of those things

13    were coincidental -- all right.  Show me the lyrics.  What did

14    you want to point out there?

15         MR. GARCIA:  Mr. Rivera, we'll switch to the computer.

16    Thank you.

17    A    It's hard to see.

18         THE COURT:  Probably blow it up more.

19         MR. GARCIA:  The ELMO might be more --

20         THE COURT:  Yeah.  You can blow it up easier on the

21    ELMO.

22         MR. GARCIA:  Let's just use the ELMO.

23    A    I'd like to look at lyrics on a page because it helps

24    clarify.  Those first two lines are obviously similar.

25         THE COURT:  Right.

WILBUR - DIRECT

1  A    And the translation -- the literal translation is:  I have

2  in my possession a love letter that you have sent me asking for

3  compassion.

4       The other one is:  I have in my possession your love

5  letters that you sent me -- have sent me asking me for

6  compassion.

7       The way you might translate that in English is:  I have

8  your love letter asking for forgiveness.

9       The -- the idea --

10  BY MR. GARCIA:

11  Q    Are the themes different in these lyrics between the two

12  songs?

13  A    Well, what I -- what I also look for in a lyric is rhyme

14  scheme because if, in fact, it's trying to copy, you want to see

15  where -- where -- if there's a rhyme scheme in here.  That's one

16  of the things -- you know, the A, A -- you know, whatever.

17       Those are the kind of fingerprints that I'm talking about,

18  and I don't see -- I don't see any correlation in terms of -- of

19  rhyme scheme.

20       In terms of the real meaning of the lyric, you have the --

21  "Triste" is a very angry one saying, "You're poison, you're

22  deceitful, you're deadly and destructive, and it's useless for

23  you to keep on insisting because your fate has changed.  Your

24  path in life -- you are going to live this -- I -- you're going

25  to be the sad wanderer, adventurer for the rest of your life."

                            WILBUR - DIRECT

 1        The other one is basically, "You played me for a fool, and

 2   don't beg me because I've learned my lesson.  You really hurt

 3   me, and how does it feel to be on the other side of the equation

 4   now?"

 5        Those -- those are -- those are different, but it -- it --

 6   there's no question that those first two lines -- and, yes, the

 7   first four notes -- are -- are are the same.

 8   Q    Looking at the overall melody, the overall theme, the

 9   overall structure, do those -- does it seem, in your opinion, to

10   be substantially similar between the two works?

11   A    No.

12             MR. GARCIA:  Your Honor, since we have --

13             THE COURT:  I think I asked Dr. Gross the same

14   question.  I mean, "substantially similar" is just words, right,

15   like all these legal standards.

16             How similar -- is there another way you can explain

17   what you -- how you evaluate what substantial -- substantially

18   similar is?  And I'm sure you've done cases where you found

19   where it's substantially similar.  That's what you've done for

20   years.

21             THE WITNESS:  Sure.

22             THE COURT:  What's the threshold?  I don't know if

23   you're able to give it more -- I think Dr. Gross said you know

24   it when you see it.  I don't know if there's a way to do better

25   than that, but -- because almost all songs are going to have