WILBUR - DIRECT

1    some similarity, right?

2            THE WITNESS:  Let's put it this way:  If this were a

3    deliberate effort to copy the other song, why would you be so

4    foolish as to copy the exact words, you know?  That doesn't make

5    sense to me.  So that certainly from the standpoint, you know,

6    of copying, it would have been foolish to do that.  So, I mean,

7    that's -- that's -- that's one thing.

8            Could it be coincidence?  Yes.  I look for

9    fingerprints.  That's why I'm a forensic musicology --

10           THE COURT:  I guess I'm saying -- and forgetting this

11   case for a second --

12           THE WITNESS:  Yeah.

13           THE COURT:  -- just in general.  I mean, how many

14   fingerprints -- because I'm sure a lot of these comparisons have

15   some similarities.

16           THE WITNESS:  Sure.

17           THE COURT:  So how many fingerprints does it take to

18   hit that substantial threshold?  I mean, there's probably -- you

19   know, there's two songs that are musical and lyrics word for

20   word, 100 percent similarity.

21           THE WITNESS:  Right.

22           THE COURT:  Then there's probably two songs that have

23   nothing do with each other, 0 percent.  I'm sure most songs fall

24   somewhere in the middle of zero and 100.  Again, I don't know if

25   you can pinpoint any more specifically, but if -- I don't know

WILBUR - DIRECT

1   if you have a sense of how -- you know, what -- how many

2   fingerprints does it take to be substantial.

3          THE WITNESS:  No.  It's difficult because each case is

4   so different.

5          THE COURT:  Right.

6          THE WITNESS:  And, you know, I try to look at the

7   musical facts in isolation from any of the other -- other

8   things.  But, you know, in sitting here for the last week -- I

9   mean, or the last several days --

10         THE COURT:  Right.

11         THE WITNESS:  -- I -- it doesn't pass my threshold

12  that there was access.  That's -- I mean, even if it was played

13  locally I just, you know --

14         MR. SHOWALTER:  I've got to object on her --

15         THE COURT:  Well, I agree.  You don't need to get into

16  the access issue.  But on the similarity issue --

17         THE WITNESS:  Okay.

18         THE COURT:  I mean, it sounds like you are, at least

19  on that, agreeing with Dr. Gross.  You have done this a lot, and

20  you know when it's substantially similar, and you have a sense

21  when it isn't.

22         THE WITNESS:  Yes.  I think you form -- you form an

23  opinion.  When I first listened to the two songs -- and I did

24  not have the lyrics at first, obviously.  I listened to the two

25  songs.  I said, "These songs aren't the same."  They've got

WILBUR - DIRECT

1    different melodies.  They're using different chords and

2    different melodies in the refrain, different melodies in the

3    introduction.  They're using different melodic contours.

4    They're based on simple -- very simple folk melodies that are

5    common."

6            So I didn't feel that there was anything particularly

7    special about the -- or protectable, really, in terms of the

8    melodies.

9            When I did find out that those two lyric lines were

10   the same, you know, I wanted to know more about that.  I -- I

11   did do some research on -- on that.  I did not find another song

12   that had exactly the same lyric.

13           I certainly was -- was told that there's a lot of oral

14   tradition, and I know from my work with both the blues and with

15   folk music as I -- and I've done a ton of that work, that you

16   find these expressions in -- in oral traditions.  There's now a

17   blues database that I've used a lot.

18           And a lot of these lines can be passed on in the oral

19   tradition, and -- and this is something that very well might

20   have been the case.  I've certainly found in the blues and folk

21   that that is often the case, that it's something that goes back

22   a long time.

23           People will say, "Well, my 90-year-old grandmother

24   remembers that line."  I didn't do field research in this,

25   but -- but it's the kind of thing that could have come out of

WILBUR - DIRECT

1    the oral tradition.  And I found in many cases -- and

2    particularly one which I can't go into great detail -- but to

3    say that there was a -- a private equity company that bought a

4    huge catalog, and they also made a claim.

5            And when I -- and they hired me to do the research.

6    And I found, to their dismay, that every single one of these

7    lines in this -- this piece could be found in other works, much

8    that predate it.  And I have -- I had a hard time getting paid

9    for that, but -- but, I mean, I try to tell the truth.  This

10   sounds like something that could have come out of oral tradition

11   to me.

12           THE COURT:  Okay.

13   BY MR. GARCIA:

14   Q   In terms of maybe this not exact sequence of words, but the

15   words and the theme -- some of the themes, like love letters or

16   compassion or those -- is there anything --

17   A   Well, I did do research on that.

18   Q   -- unique --

19   A   I looked -- I looked for -- I put in, you know, a Google

20   search that said love letter compassion, love letter forgiveness

21   lyric, and I found an overwhelming number of -- of those.

22           So -- so needless to say these are common everyday

23   expresses.  I looked for "yo tengo mi poder."  Forgive my

24   pronunciation.  I looked for that phrase because the translation

25   I have in my possession seemed so incredibly formal, and I found

Case 2:13-cv-06004-JAK-AGR Document 112-2 Filed 09/08/14 Page 5 of 91 Page ID
Case 6:12-cv-00042 Document 122 #:4898 TXSD on 04/04/14 Page 198 of 320
#:1098

WILBUR - DIRECT

1    that that was a very, very common -- very, very common phrase.

2    Literally millions of -- I mean, I just couldn't keep going on.

3    There were millions of them.

4        In connection with a love letter, I did not find that.  But

5    certainly love letter forgiveness, love letter compassion, lots

6    and lots of examples.  In terms of -- in terms of --

7    Q    So the combination --

8    A    Even though -- the whole attitude, if you will, there's

9    songs such as, "You had your chance," which is the same kind of

10   thing.  You know, "You're coming back begging, and you had your

11   chance.  How does it feel to be on the other side?"  There

12   were -- there were -- there were, you know, songs with that kind

13   of an attitude.

14       So the -- they are -- they are -- except for those first

15   two lines, they are very different in attitude, and they are

16   very different in -- in sentiments, one being very angry and one

17   being, you know, "You were so beautiful and gorgeous, and I was

18   such a fool," and, you know, these are common -- these are

19   common.

20   Q    So the -- so some of the groupings within the grouping you

21   would say are certainly in the public domain.  Yo tengo mi

22   poder, for example?

23   A    Very much a common expression.

24   Q    That's not unique to either writer?

25   A    No.  And a love letter or love letters --

WILBUR - DIRECT

1   Q    Una carta de amor, I mean, that in itself is not unique to

2   either writer?

3   A    No.

4           MR. GARCIA:  Your Honor, since we have been looking at

5   this document, I'd like to mark it just for demonstrative so we

6   have it in the record.

7           THE COURT:  Sure.

8           MR. GARCIA:  So I move to admit -- I think the next

9   number's 84.  Move to admit Defendant's Exhibit 84.

10           THE COURT:  All right.  That'll be admitted for

11   demonstrative purposes.

12   A    I think it also shows the structural elements.  The lyrics

13   show quite a bit of the structural elements here.  You have

14   repeating refrain.

15           MR. SHOWALTER:  Object to her just talking and talking

16   and talking without responding to questions.

17           THE COURT:  No.  That's -- you can -- you can finish

18   your thought if it's not too long.

19   A    Simply that the repeating sections are obviously the ones

20   that are important as well, and there were two pre- --

21   precourses that were repeated, and then -- and a broke -- broke

22   up.  "But, woman, don't beg me.  I don't want your love.  Don't

23   you see that with my soul, I want to forget you.  But now you

24   come into my thoughts.  Tell me, how does it feel to be on the

25   other side."

WILBUR - DIRECT

1    I mean, basically, that's the one that's repeated.  So --

2  and on the other side it's, "It's useless for you to keep

3  uninsisting [sic] because your fate has changed, your path in

4  life.  Keep on living your life as a sad adventurer.  You will

5  never get anything from men just like me."  Those are pretty

6  different.

7  BY MR. GARCIA:

8  Q   And as to the melodic considerations, have you already given

9  us your input on the -- of your findings regarding melodic --

10  not prior art, melodic considerations?

11  A   I think if -- if I may, if you wouldn't mind just showing

12  the melodic contour chart, which was --

13  Q   Okay.

14  A   -- page 9.

15  Q   Oh, I see.

16  A   But I think everybody can --

17  Q   Sure.

18  A   You can only hear the differences in the terms of melodic

19  contour.

20  Q   What is -- we're at page --

21  A   It's supposed to be color-coded.

22  Q   I think -- it's in color, but it's -- you can barely see the

23  color, but what does this chart show?

24  A   This chart shows --

25  Q   And we're at page 9 of your Exhibit 21.

WILBUR - DIRECT

1    A    The recording is the lower notes, 3, 6, 5, 6 -- 3, 6, 5, 6,

2    5, 3.  The two record -- the copyrighted version, the harmony

3    part of the recording has the same 5, 1, 7, 1, and then they

4    diverge.  One goes up; one stays the same, bum, bum, bum, bum,

5    bum, bum; the other one goes, bum, bum, bum, bum, bum, bum.

6    Q    Right.

7    A    Well, actually, it goes bum, bum, bum, bum, bum, bum.

8    Bottom one goes, bum, bum, bum, bum, bum, bum.  And the

9    copyrighted one goes, bum, bum, bum, bum, bum, bum.

10    Q    So red being --

11    A    Those are different.

12    Q    Red being the "Cartas," so here you have your 5, 1, 7, 1, 2,

13    3?

14    A    Right.  And you can see there are two numbers in each of

15    those because they -- they are the same in the copyrighted

16    version, which is the harmony part of the recording.

17    Q    So the copyrighted version has those same four notes 5, 1,

18    7, 1?

19    A    Correct.  As does --

20    Q    5, 1, 7, 1?

21    A    Uh-huh.

22    Q    But, of course, the copyrighted version's not the one we're

23    hearing in our ear?

24    A    No.

25    Q    You just -- you were playing those notes from the

WILBUR - DIRECT

1  copyrighted version; is that correct?

2  A    That's correct.

3  Q    The one we hear on the sound recording --

4  A    Bum, bum, bum, bum, bum, bum.

5  Q    -- is this one down here (indicating)?

6  A    Right.  Now, the harmony part, the second vocal which is the

7  higher vocal, is actually singing the -- the bum, bum, bum, bum,

8  bum, bum is actually singing -- not in the same rhythm, but

9  singing what is the copyrighted -- it's the harmony part.

10       Where you can certainly hear that it's a harmony part, it's

11  not as loud, and it's not as -- as strong as the -- the lead

12  singer.

13  Q    Do you have any other observations regarding the melodic

14  contours?

15  A    I think the most important one is the compositional device

16  that goes to the -- the second theme on the G chord.

17  Q    Where is that illustrated at?

18  A    Let me -- I think I have a -- well, I think I'm just going

19  to have to play it.  Let me -- I did some prior art on the

20  compositional device of taking the same melodic shape, and then

21  in the G chord, it's just going to be a note lower.  This is a

22  very common device.

23       "The Mexican Hat Dance" goes, ba dum, ba dum, ba dum.

24  That's similar in some ways to bum, bum, bum, bum, bum -- pardon

25  me, bum, bum, bum, bum, bum, bum.

WILBUR - DIRECT

1    One of the things I look at is important weighted notes,

2    dum, dum, dum -- bum, bum, bum, bum, bum, bum -- bum, bum, bum,

3    bum, bum, bum.  Different -- different meters, but they still

4    have important notes.

5        The reason that's important is that "Mexican Hat Dance" --

6    ba bum, ba bum, ba bum, ba, ba, ba, ba, ba, ba bum, ba bum, ba

7    bum, ba bum -- in the G chord it goes down, so (playing

8    keyboard) -- G chord -- sorry.

9        So in the G chord (playing keyboard) -- sorry.  Holding on

10   to my pen.  I can't do that.

11       (Playing keyboard )  It's a very -- it's the same device.

12   And I know that they -- they made fun of my prior art,

13   "La Cucaracha," but -- but (playing keyboard) okay?  So you have

14   the C chord (playing keyboard), very similar to if you look at

15   the -- listen to the important weighted notes (playing

16   keyboard).  Okay?

17       And you have (playing keyboard) -- okay?  (Playing

18   keyboard) -- okay?  That's -- that's the important weighted

19   notes, (playing keyboard).  So you have, starting on the 5

20   (playing keyboard) -- those are all the chord notes of the C

21   chord, G, C, E.

22       Then you have (playing keyboard) -- G, B, D of the G chord.

23   It's just one step lower in the same pattern.  So -- so I think,

24   again, this is one of the most rudimentary common folk patterns

25   that is the way you change a simple pattern from one chord to

```
                               WILBUR - DIRECT
 1   the other.

 2        Now, it's not to say that you don't have other choices, but

 3   you don't have twelve choices, not in a -- in a -- in a Western

 4   7-note scale, and not with something that doesn't have many

 5   accidentals.

 6   Q    The -- in terms of the melodic -- that's the contour --

 7   A    Uh-huh.

 8   Q    -- of whether you go up or down on music --

 9   A    Uh-huh.

10   Q    5, 1, 7, 1, 2, 3 or 5, 1, 7, 1, 2, 3 or 5, 1, 7, 1 -- or you

11   go down?

12   A    Right.

13   Q    So the contours --

14   A    Uh-huh.

15   Q    -- are important to know:  Is it upward, or is it downward

16   music?

17   A    "Cartas" goes up.  The "Triste" recorded version goes down.

18   And the other one goes up and stays flat.  So (playing

19   keyboard) -- that goes up and stays flat (playing keyboard), and

20   then (playing keyboard).

21        So there really are different melodic phrases starting with

22   the same four notes, but they do have differences.  I think --

23   okay.  Sorry.

24   Q    So then after you lined them up and you look for common

25   melody -- or did you look for common melody?
```

WILBUR - DIRECT

1   A   I always look for those areas that are similar and compare

2   and contrast them, yes.

3   Q   And between the "Triste" copyright version and the

4   "Cartas de Amor," were there any same melodies between the two?

5   A   They -- there was closer correlation between the "Cartas"

6   melody and the copyrighted version than there was between the

7   "Cartas" and the recorded version.

8       There were -- the recorded version's melody was quite

9   different, in my estimation, from the melody --

10  Q   So --

11  A   -- of "Cartas."

12  Q   Of the common melody notes, the 5, 1, 7, 1?

13  A   Right.

14  Q   The --

15  A   And they also had the 7, 6, 7.

16      What Dr. Gross had made such a big deal out of with the B,

17  A, B, that was the harmony part or the copyrighted version.  It

18  was not the melody of the song recording.

19  Q   So giving the benefit of the doubt to the "Triste" version

20  that's most closest --

21  A   Uh-huh.

22  Q   -- in melody to "Cartas de Amor," that would be the

23  "Triste Aventurera" copyrighted version, true?

24  A   Yes.

25  Q   Now, and of that copyright --

Case 2:13-cv-06004-JAK-AGR  Document 112-2  Filed 09/08/14  Page 13 of 91  Page ID
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 206 of 320
#:2068

WILBUR - DIRECT

1   A   And may I qualify that?

2   Q   Yes.

3   A   We're just talking about the verse portions.

4   Q   About the --

5   A   We haven't gotten to the refraining at all.

6   Q   Right.  Right.

7   A   Just talking about the melody notes in the verses.

8   Q   In the -- the -- where you sing, the melody of the songs?

9   A   Right.  The verses of the songs.

10  Q   And of those -- of the melody of the two songs --

11  A   Uh-huh.

12  Q   -- "Triste" copyrighted and "Cartas de Amor," what -- how

13  many notes in common in sequence --

14  A   Uh-huh.

15  Q   -- simultaneously played are there?

16  A   Well, what happens in this kind of a piece is that you have

17  a lot of repetition.  So you have 5, 1, 7, 1 repeated four

18  times.  So that's 16 notes that are the same.  I think he said

19  25, so there were 16 of those that -- that 5, 1 -- you know.

20      Now, if you went to the copyrighted version, you'd also

21  have the correlation between the -- not the first note, but the

22  three notes 7, 6, 7 on one of it.

23      In the recording, the harmony note actually --

24  Q   The recording of "Triste"?

25  A   Yes.  I'm sorry.  The recording of "Triste."  It's seven --

WILBUR - DIRECT

1   no, I'm sorry. Wrong. I'm getting it confused with -- with the

2   melody.

3   Q   The "Triste" recordings --

4   A   That's -- that's --

5   Q   Hold on a second.

6      You've got the 5, 1, 7, 1 --

7   A   Uh-huh.

8   Q   -- of the "Triste" copyright?

9   A   Right. And you can see on the lowest line, "Cartas," you

10   have 5, 1, 7, 1.

11   Q   "Cartas" also has 5, 1, 7, 1?

12   A   You can also see in the next phrase 5, 1, 7, 1.

13   Q   And it repeats.

14   A   So the four notes are the same there.

15      When you go to verse 2 you always have 5, 1, 7, 1, but I --

16   I don't have it on -- you know, on the next page.

17      But when you go to the G chord, which is the third line

18   down --

19   Q   G chord here (indicating).

20   A   Right.

21   Q   Okay.

22   A   You have 5, 7, 6, 7.

23   Q   7, 6, 5, 7, 6, 7 right here (indicating)?

24   A   And in the next one you only have the two 7s that are the

25   same because I heard it sung (playing keyboard) -- sorry

WILBUR - DIRECT

1   (playing keyboard).

2       So that second one was, instead of (playing keyboard), it

3   was (playing keyboard). This is a perfectly decent

4   substitution. So the seven notes were the same.

5   Q   But in terms of, like, a string of lyrics together or a

6   string of melody together where somebody would say, "Hey, that's

7   my song," the most in common you've identified were four

8   notes -- simultaneously notes played in common, and that was

9   just the "Triste" copyright compared to the "Cartas"; is that

10  correct?

11  A   That's -- that's correct.

12  Q   The -- now, we heard a demonstration of it.

13          MR. GARCIA: May I ask how much time I have left,

14  Your Honor?

15          THE COURT: Sure.

16          THE LAW CLERK: About an hour 15.

17          THE COURT: How much was it?

18          THE LAW CLERK: An hour 15.

19  BY MR. GARCIA:

20  Q   In terms of the prior art melody, we -- we touched on that

21  with your audio demonstration.

22      I want to also see that visually on the notes -- on the --

23  on the music graph, but -- so you did conduct prior art

24  research, correct?

25  A   I did. And it was -- it was, of course, interesting that

Case 2:13-cv-06004-JAK-AGR   Document 112-2   Filed 09/08/14   Page 16 of 91   Page ID
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 209 of 320
#:2071

WILBUR - DIRECT

1    there were two German folk songs that I found that had the

2    same -- the same melody, again speaking to the German and the

3    accordion influence and the polka style.

4        So I thought that that was interesting, and, of course,

5    this are -- the other ones that I've mentioned.

6    Q    And so looking at the 5, 1, 7, 1, taking that first --

7    A    Uh-huh.

8    Q    -- we've identified --

9            MR. GARCIA:  We're on Exhibit 77, Your Honor,

10   demonstrative.

11           THE COURT:  And how do you find these prior art?  I

12   mean, you enter these note combinations and it'll pull it up?

13   I'm curious how you found these.

14           THE WITNESS:  Well, some of them, you know, you

15   just -- you just pull up.

16           THE COURT:  Right.  But like the German folk songs, I

17   take it.

18           THE WITNESS:  No.  No, not those.

19           THE COURT:  Right.

20           THE WITNESS:  I -- I have access to a lot of melody

21   databases, and, you know, you do searches for -- for them.  I

22   have --

23           THE COURT:  By note?  Like I'm just curious:  What do

24   you type in the database?

25           THE WITNESS:  5, 1, 7, 1.

WILBUR - DIRECT

1        THE COURT:  Yeah.  The note.

2            THE WITNESS:  Yeah.  Or the notes, and then you say in

3    any key.  And -- but these are specific databases that are

4    proprietary that I have access to, and some of them are not.

5    Some of them you can just get online.  So --

6            THE COURT:  Okay.

7            THE WITNESS:  So that -- that was -- and then my

8    knowledge of folk music.

9    BY MR. GARCIA:

10   Q   So then looking at Exhibit 77 on the screen, is this an

11   illustration of the 5, 1, 7, 1 melody that you located in prior

12   art?

13   A   Right.  Yes, it is.

14       And so what happens in this is that although there are

15   connecting notes in between, the -- the 5, 1, 7, 1, 2, actually,

16   since it goes with the "Cartas," repeats in the same place in

17   the measure.  That's -- that's reasonably significant in my

18   estimation because it shows that that's a common repeating

19   pattern.  It just illustrates that point, that it happens in the

20   same part in the measure.

21   Q   So even Beethoven repeated the 5, 1, 7, 1?

22   A   Right.  Right.

23   Q   Is that what you're saying?

24   A   Yes.  I guess, you know, a lot of prior art is -- is to

25   demonstrate that it's not original with -- with the -- either of

WILBUR - DIRECT

1   these songs.

2   Q   So then going to page 2 -- well, actually, you can look at

3   this document here.

4       You've got the 5, 1, 7, 1 --

5   A   Uh-huh.

6   Q   -- on Beethoven, the "Triste" copyright 5, 1, 7, 1, but

7   then --

8   A   I have a graph that demonstrates the prior art that I think

9   you have.

10  Q   It's in the -- it's in your report?

11  A   It's the color graph.

12  Q   Oh, oh.  Well, it's not this one.  We just looked at that.

13  A   No.  No.

14      It was simply to show the -- the comparisons between all

15  three of these versions, and there was plenty of prior art in

16  each one of these cases.

17  Q   Was it in your report or separate?

18  A   No, it was separate.  It was the color -- colored blocks.

19  Q   Oh, oh, oh.  Well, that's in here.

20      These?

21  A   Yes.

22  Q   Okay.  What -- this is page 1, 2 -- page 5 of Exhibit 77.

23      Could you identify for the Court what this document is?

24  A   This is to show prior art examples, but this shows you the

25  pattern of notes and the numbers on -- that correspond to the

WILBUR - DIRECT

 1    notes in the transcription.

 2    Q    So this page is the -- the two --

 3    A    So this just shows you the three main melodies.  The melody

 4    of the "Triste" recording is on the top.

 5    Q    And then --

 6    A    The melodies in common, that is.

 7    Q    And you've got "Cartas" on the next page --

 8    A    Yes.

 9    Q    -- the 5, 1, 7, 1, 2, 3.

10    A    Right.

11    Q    Then the next page shows "Triste," "Cartas," and the

12    Beethoven --

13    A    Uh-huh.

14    Q    -- with Beethoven being on top.

15    A    Okay.  It's just the same thing, but it's sometimes easier

16    for people who don't read music to see it in this -- in this

17    kind of a pattern so they can see what the pattern looks like.

18    Q    And then going back to the notes so -- you can see here

19    where, on page 1 of Exhibit 77, you've got the 5, 1, 7, 1.

20    A    And you also have 2.

21    Q    And Beethoven goes up to 2.  "Cartas" goes up to 2.  But

22    "Triste" diverges at that point; is that correct?

23    A    Correct.

24    Q    And that goes to which note?

25    A    That goes to 7.

WILBUR - DIRECT

1   Q   So that's the 5, 1, 7, 1?

2   A   7, 1.

3   Q   7, 1.  Whereas the Beethoven and "Cartas" continue on with

4   5, 1, 7, 1, 2, 3 -- or 2.

5   A   Well, 2.

6   Q   2.  2.

7       And the "Cartas" goes up to 3.

8       So then looking at the next page, page 2 of your

9   Exhibit 77, you were able to locate other melodies of the 5, 1,

10  7, 1, 2, 3?

11  A   Correct.

12  Q   Those were the Bizet "Galop," correct?

13  A   Yes.

14  Q   From 1835 era?

15  A   Right.

16  Q   And then two German folk songs; is that correct?

17  A   Uh-huh.

18  Q   All had the 5, 1, 7, 1, 2, 3 melody in them as well?

19          THE COURT:  Aren't the vast majority of melodies going

20  to be -- you know, some combination's going to be in some other

21  work?  I mean, how much is truly, you know, original in the

22  sense -- sense of no combination like -- which is what -- we're

23  only talking about six notes or something?

24          THE WITNESS:  Right.

25          THE COURT:  There's how many -- I know there's

WILBUR - DIRECT

1   probably a lot of possibilities if you do factorials and

2   everything.

3           THE WITNESS:  Sure.  You're going to find, you know, a

4   lot.  Although in that case where I was brought in as an expert

5   for the judge, I was only able to find six of the seven notes.

6   I could never find that --

7           THE COURT:  In a prior art?

8           THE WITNESS:  Right.  And for the court, you know, it

9   was a problem.

10          THE COURT:  And isn't -- I mean, but isn't -- in the

11  similarity analysis, it's not just do they have the same

12  combination of notes, but the placement in the song.

13          THE WITNESS:  Sure.

14          THE COURT:  I mean, that --

15          THE WITNESS:  Sure.  And how important it is to the

16  whole song, and all of those things are important.

17  BY MR. GARCIA:

18  Q   So back to the totality of the song.

19      Is it the same deal?  Is it the same song?  Is that what

20  you're -- look to the entire piece?

21  A   We look at the entire piece.  And -- and, yes, these --

22  these -- these opening notes are -- are important and they

23  repeat, but the fact that there are two versions of the one song

24  presents a bit of a problem.

25      Which one -- which one are we talking about?  I mean --

WILBUR - DIRECT

1    Q    You mean the two "Tristes"?

2    A    The two "Tristes."

3              THE COURT:  The copyrighted one and the recorded one?

4              THE WITNESS:  Yeah.

5    A    That's -- I mean, can you copyright all the notes of the

6    C chord?  I mean, can you -- which one is the one that -- which

7    is the one that's been infringed?

8              THE COURT:  Mr. Showalter, what's your -- you're

9    bringing that claim.  Which one do you think's been infringed?

10             MR. SHOWALTER:  Well, the --

11             THE COURT:  I don't think it's all that uncommon that

12   you write a piece of music, and every performance, you know, is

13   going to have variations in the performance.  That's

14   commonplace.

15             MR. SHOWALTER:  Exactly.  Like if you go to a

16   Willie Nelson and he's sung "On the Road Again" 2,000 times,

17   he's requesting to sing that song, but he's going to substitute

18   consonants because he's tired of singing it the way we want to

19   hear it.  He's going to sing it the way it's maybe easier to

20   sing, but it's the same song.  And you wouldn't want to try to

21   sing "On the Road Again" and claim it as your own even if you

22   changed a few of the notes.

23             THE COURT:  But which one -- you think the analysis

24   should be "Cartas" versus which version of "Triste"?

25             MR. SHOWALTER:  I think they're both, like, similar --

WILBUR - DIRECT

1    substantially similar to each other.  So I think you can

2    consider both of them and then see is Ortiz's work substantially

3    similar to those, or is it derivative work?

4              THE COURT:  All right.

5              MR. SHOWALTER:  I think we've got testimony that

6    supports either version as the principal version.

7              MR. GARCIA:  Well, what is -- what is challenging for

8    defendants or really any record label or any other composer,

9    writer out there is, you know, there's this argument you heard

10   something on the radio.  Well, if the copyrighted version is

11   basically a different melody, well, you don't hear a piece of

12   paper on the radio.  That's filed in the Copyright Office.

13             And their argument is, well, somebody might have been

14   listening to the radio in the car at some point in time

15   hypothetically.  And so even if they did, they would not have

16   heard the copyrighted version.  It's a different melody.  So --

17             MR. SHOWALTER:  Well --

18             MR. GARCIA:  -- they must have -- you know, it's

19   really quite a dilemma when, you know, sometimes people actually

20   deposit their -- "This is my song."

21             THE COURT:  Right.

22             MR. GARCIA:  Like Mr. Pena Ortiz deposited his tape,

23   "This is my creation."  Some similar words in the -- you know,

24   this is not the first string of six or seven words that have

25   ever been used that are simultaneous to other songs in the

WILBUR - DIRECT

1    world.

2         So overall, you know, is that -- is that substantially

3    similar?  Are we going to look at the piece of paper, or are we

4    going to look at -- because the truth is the piece of paper is

5    the only thing closest to the "Cartas," as we have heard today.

6    The actual singing, the actual 45 rendition, which we're alleged

7    to have heard --

8              THE COURT:  Is dissimilar.

9              MR. GARCIA:  -- is way dissimilar.  Not even -- and if

10   it's the one on the radio we heard, well, that was never filed

11   with the copyright office, so there goes your statutory damages

12   as a matter of law.

13        So, I mean, it's -- it's a lot of tricky things here,

14   and we're being accused of all this nefarious stuff when the

15   song wasn't, you know -- you know, the -- the paper version was

16   not what was actually -- I'm not blaming Mr. Guzman's band for

17   messing up when they did their 45, but --

18             THE COURT:  Improving it or -- I get what you're

19   saying.

20        Do you want to say something else?

21             MR. SHOWALTER:  Well, I mean, the artist was

22   interpreting the song.  They really are very similar.  Despite

23   their attempts to find differences in them, they're

24   substantially similar, so --

25             MR. GARCIA:  Oh, that's just --

WILBUR - DIRECT

1      MR. SHOWALTER:  That's not a baseline or foundation

2   for it.

3            THE COURT:  Right.

4            Go ahead, Mr. Garcia.  You're on the clock, so --

5   BY MR. GARCIA:

6   Q   So then closing the loop, what we have is if you then go to

7   the -- you found the identical 5, 1, 7, 1, 2, 3 from "Cartas"

8   and these other works.

9        Now, when we go to the "Triste," which is not 5, 1, 7, 1,

10  2, 3, it's 5, 1, 7, 1, 7, 1 --

11  A   Uh-huh.

12  Q   Now, actually, that's not even -- that's not unique to

13  "Triste," is it?

14  A   No.

15  Q   Did you locate prior art for the "Triste" melody of 5, 1, 7,

16  1, 7, 1 --

17  A   Right.

18  Q   -- in other pieces?

19  A   I did.  I found the Gilbert and Sullivan, bum, bum, bum,

20  bum, bum, bum.  "The Nutcracker Suite" is just another example,

21  bum, bum, bum, bum, bum, bum, bum -- same note.

22  Q   And is that illustrated in this graph on Exhibit 77, page 1,

23  2 -- the fourth page here which has the Bates number HAC000716?

24  A   Yes.

25  Q   You've got a YouTube -- you've got a YouTube cite here.  Is

WILBUR - DIRECT

```
 1   that where somebody --

 2   A   Right.  That's just where if somebody wanted to doublecheck

 3   and hear it, they would be welcome to do so.

 4   Q   So if they typed this in, they could listen to the Gilbert

 5   and Sullivan opera as well?

 6   A   Yes.

 7   Q   And then the -- we've already seen the -- rather than

 8   musical notes, if you wanted to see the color melodic contour,

 9   you could look at the last few pages; is that correct?

10   A   Yes.

11   Q   Other than the 5, 1, 7, 1, 2, 3, have you seen any other

12   longer strings of common melody?

13   A   No.  Those are the ones that are similar, and those are the

14   ones that I focused on.

15   Q   Are the rest -- is the rest of the melody between the two

16   songs different or --

17   A   Well, the refrains are very different, and I wanted to

18   show -- show that.

19   Q   Okay.  Let's next go to -- which chart is that which shows

20   the refrain?  Is there a refrain chart?

21   A   The --

22   Q   I'm not seeing it in your report.

23   A   The numbers, the ones --

24   Q   Oh, the new one.

25   A   And I believe --
```

WILBUR - DIRECT

1            MR. GARCIA:  Mr. Rivera, could you switch --

2     BY MR. GARCIA:

3     Q    Is it this one?

4     A    No.  It's (indicating) --

5     Q    Oh, that one.

6          This one?

7     A    Yep.

8     Q    Okay.  I want to show --

9     A    The first --

10    Q    -- show -- show you --

11           MR. GARCIA:  Sorry, Mr. Rivera.  Switching on you.

12    A    This was color-coded, but we could only print it out in

13    black and white.  So I've written on the side which each one is.

14    BY MR. GARCIA:

15    Q    Okay.  I have on the screen now a chart.

16         Is this chart prepared by you?

17    A    Yes.

18    Q    And would you explain to the judge what this chart

19    illustrates.

20         If you want to come down and point and explain it, you're

21    welcome to.

22           MR. GARCIA:  Your Honor, may she come on down --

23           THE COURT:  Sure.

24           MR. GARCIA:  -- and explain this?

25           THE COURT:  Yes.

WILBUR - DIRECT

1   A    Okay.  Right here you have "Cartas."  This is the refrain.

2   These are the three pickup notes.  So measure one starts here

3   (indicating).  "Triste" -- I'm sorry.  The second one starts on

4   the one measure.  As you can see it starts on the 4 here and the

5   1 here (indicating).

6       Now, what Dr. Gross did was he took the entire eight-note

7   passage here and he moved it -- advanced it one measure so that

8   it would line up with the pickup bars.  This last one is the

9   transcription that Dr. Gross's, I guess, graduate student did

10  but which was completely and totally incorrect.  This is both on

11  his transcription of the -- I believe it's called "Client's" --

12  Q    Composition.

13  A    -- "Composition," and it is on the marked-up piece that we

14  first looked at.

15      Okay.  Yeah.  Okay.

16  Q    On the Exhibit 33, the -- this has all three songs, and

17  we'll go to the refrain page.

18      And what does this show you?

19  A    It shows that he took the -- he took the refrain, and he

20  moved it over one bar, and this -- this other -- now, in the

21  beginning of the piece -- let me just show you that, and this is

22  what I talked about initially.

23      He knew very well what pickup -- what a pickup note was.

24  That's bum, bum.  This is before the bar.  In the chorus --

25  Q    Actually, if I may, on Exhibit 83 --

Case 2:13-cv-06004-JAK-AGR Document 112-2 Filed 09/08/14 Page 29 of 91 Page ID
Case 6:12-cv-00042 Document 122 #:2004n TXSD on 04/04/14 Page 222 of 320
WILBUR - DIRECT

1    A    Okay.

2    Q    -- we had Dr. Gross identify where the pickup note was.   He

3    confirmed it's this first note in the measure.

4        Is that correct?  Do you remember that testimony?

5    A    Yes.

6    Q    This is 83.  Okay.  So you can lay on top of there the

7    pickup note.

8    A    Okay.  The -- the chorus -- he has the chorus starting right

9    here (indicating), and this is in A flat major, so these are not

10   the correct notes.  And what I've done is I've taken the numbers

11   of all these notes so that it might be easier to understand, and

12   I can sing them for you.

13       The chorus of "Cartas" goes like this (singing).  Now, the

14   "Triste" copyrighted version goes -- I have to dig into a

15   different key.  I'm sorry.  Okay (singing).

16       This is -- this is what I'm assuming these notes here

17   are -- I put them in because these are the same notes as the

18   harmony notes, and I assume that those are the correct notes.

19   They were incorrect in the transcription.

20       Now, what's happened is that by offsetting -- could you

21   hear the difference in terms of the melodies?  I mean, the --

22   the -- (singing) is very different -- (singing).  Very different

23   melodic contour, very different melody, very different -- if you

24   look at the important weighted notes, which is usually the first

25   note, you're going to have the chord tone F (singing).

WILBUR - DIRECT

 1    With this one (singing). Sorry couldn't get to that low

 2  note. So those are pretty different.

 3    Now, why would you move them over? Well, the reason you

 4  might move them over is to see how the chords line up. See what

 5  happens here when you move them over and you put them on the

 6  pickup notes. The G chords line up. The C chords line up. You

 7  have an F and a G here, but you have the C chords there. You

 8  know, you have a lot more harmonic correspondence.

 9    When you have more harmonic correspondence, they're going

10  to, obviously, sound, when you put them together, much more

11  similar because the chords are going to be the same. So by

12  doing his -- his comparison, you know, it sounded more

13  constant -- harmonic, if you will, by moving it over one

14  measure.

15    I have an audio example of what it sounds like when you put

16  the two on the downbeats, and they're quite dissonant. But we

17  can certainly play it.

18          MR. GARCIA: We can -- I believe Dr. Gross had played

19  a version of a matched-up where he put them on top --

20          THE COURT: Right. I remember.

21          MR. GARCIA: "Hey, they sound pretty close."

22          THE COURT: Right.

23          MR. GARCIA: Well, when you actually put them together

24  when they're in the -- in the sequence of each other, that's --

25          THE COURT: Right. I get what you're saying. You

WILBUR - DIRECT

1   want to play it?

2          MR. GARCIA:  If we may play it, Your Honor?

3          THE COURT:  Sure.

4      (Audio plays.)

5   A    That gives you an idea of what I'm talking about.

6       Now, the notes on the bottom, the incorrect transcription,

7   it starts with a chord, and the chord is F, but I honestly can't

8   figure out where this came from because I thought maybe it was

9   just a mistake and it was really A flat major.  Maybe these were

10  the notes of the A flat major.  But they don't really correspond

11  to any of the other notes.

12      I can sing it, but it doesn't -- it doesn't really make any

13  difference.  It just is completely incorrect.

14  Q    Okay.

15          MR. GARCIA:  Why don't we mark this, Your Honor -- for

16  purposes of demonstrative, since she's been illustrating, if I

17  may mark this one on the -- on this -- on the ELMO as -- I think

18  the next number is -- let's see.  Is it 85?  Yes, the next

19  number's 85, Your Honor.  We move to admit.

20          THE COURT:  All right.  That'll be admitted for

21  demonstrative.

22          MR. GARCIA:  And then we would move to admit 86, the

23  sound file as a demonstrative, that was --

24          THE COURT:  They'll both be admitted.

25  BY MR. GARCIA:

Case 2:13-cv-06004-JAK-AGR   Document 112-2   Filed 09/08/14   Page 32 of 91   Page ID
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 225 of 320
#:2087

WILBUR - DIRECT

1   Q   Any other observations you want to share with us on -- on --

2   A   Well, I just -- I just wanted to say that this is the

3   standard way of notating.  When you have pickups, you certainly

4   never start a chorus on a rest like that.  These are pickups --

5   clearly pickups.  The note starts there (indicating) as the

6   chorus note, and -- and it's very little correspondence in here.

7       There are some things that line up, you know, but really

8   they're very, very different.  And because the chorus sections

9   are so different, that means that the instrumental sections,

10  which are the same chords in the same sequence as the chorus

11  sections, are always different.

12      So we focused on the similarities that we found in the

13  notes in the verses primarily to the copyrighted version and the

14  "Cartas" version, and we certainly understand that the similar

15  two first lines are -- are the -- I would -- I would agree that

16  they're pretty much the same.  One is plural, one isn't, but

17  they're the same.

18      But everything else is really, really, really quite

19  different.  I mean, I put the notes -- I mean the letters -- I

20  mean the numbers on here to make it easier to quickly glance

21  through it, but I think you can see -- see clearly -- obviously,

22  the copyrighted version is different.  If you look at the last

23  two measures of the first line, you'll see that the recorded

24  version goes down, goes 6, 5.

25  Q   Point to the 6, 5.

```
                         WILBUR - DIRECT
 1   A    Okay.  These -- these notes keep going down (indicating).

 2   This goes down, up and down (indicating).  So there are

 3   differences between them.

 4   Q    The two "Tristes," you mean?

 5   A    The two "Tristes," yes.  But -- but really -- in fact, you

 6   can really see that -- that the pattern of notes is really quite

 7   different in both of these and the chords are different.  You

 8   have -- you have the F -- now I can't -- I can't find the chords

 9   easily in here.

10        It's -- I have one that I haven't marked that might be

11   better to see where the chords are.  But I can also show it in

12   the Harmonic analysis, too.

13             MR. GARCIA:  I want to mark this, Your Honor, since we

14   have been -- it is already Exhibit 33 as a demonstrative, but

15   it's -- since it has illustrative markings, we're going to also

16   label this as Exhibit 86, which shows the shifting and the other

17   notations as a demonstrative.

18             THE COURT:  It'll be admitted.

19   A    This is the -- I did not deal with the filler measures.  I

20   just dealt with the eight bars -- or eight measures in each.

21        As you can see here, measures 1 through 6 in both use a C.

22   On 7, "Cartas" uses an F and then goes to a G whereas in

23   "Triste" it goes C and stays on C until the eighth measure, G7.

24        On the second part of the verse where it's on the G chord,

25   you have "Triste" in G7 and "Cartas" in G.  That's not very
```

WILBUR - DIRECT

1   different, and they both go to C on 8.

2       Verse 2A you can see that, again, they -- the "Triste" goes

3   through the whole verse again whereas "Cartas" uses five

4   measures of C, then to C7, and then to the F in the 8 -- in the

5   eighth measure. And here's the refrain where the -- the chords

6   are very different.

7       They both start on the F, but you can see how the -- the

8   patterns of melody notes go F, and then "Cartas" goes to G and

9   C -- two measures of C, two measures of G -- and then back to C

10  and then C7, goes to F, G, C for two bars, G for two bars and C.

11      In "Triste" you have two bars of F to begin with, and then

12  G, C, another F, G and six-beat for two bars, and then C at the

13  end.

14      Now, you can see that if you advance -- if you advance

15  this -- the "Triste" over one measure that -- if you move this

16  over here (indicating), you're going to have the Gs lining up,

17  the Cs lining up the, Gs lining up and the Cs lining up. So

18  that that is -- that is incorrect.

19      So this is -- this is why I think that this is important to

20  show this because these -- these harmonic patterns and melody

21  patterns are different. Even though you're using very basic

22  chords, they are different.

23          MR. GARCIA: Okay. Let me just mark this one chart in

24  this as demonstrative, Your Honor, which she was just referring

25  to, as demonstrative Defendant's No. 87.

WILBUR - DIRECT

1    THE COURT:  It'll being admitted.

2    BY MR. GARCIA:

3    Q    Now, so we've covered the prior art melody.

4         Did you notice any -- have any observations regarding the

5    prior art structure and harmony, or have you already covered

6    that with --

7    A    I think we've covered it.

8    Q    Okay.  That's been covered?  Okay.

9         And then we've already discussed the lyrics.

10        What about the chorus between the two songs?  Have you

11   covered your observations on the chorus?

12   A    The choruses are different in that the -- the instrumental

13   breaks in the introductions are all related to the chorus

14   sections or refrains, and they are all different from one

15   another as I've just demonstrated.

16   Q    And we have seen already Dr. Gross's report.  In terms of

17   your understanding of the methodology of comparing musical works

18   in a copyright setting, did -- in your view, did Dr. Gross

19   follow the generally accepted practices of -- of the elements to

20   consider on musical works in a copyright setting?

21   A    No.  He didn't do the transcription of "Triste" independent

22   of putting it on a chart, which he then marked in such a fashion

23   that it was extremely difficult to understand or read.

24   Q    You talking about those red lines.

25   A    Yes.  I found that to be distracting and unusual.

WILBUR - DIRECT

1  Q   Did -- did he perform a side-by-side comparison of

2  simultaneously occurring notes?

3  A   I do not think so. I mean, it was clear that with his

4  lines, his lines were not always simultaneous. I found that

5  the -- the -- the consonant substitutions extremely problematic

6  from a copyright standpoint because if you can actually replace

7  a note with another note in the chord, and you have simple

8  harmonic patterns, that you have C chord and you can replace it

9  with any note you want, then what is protectable here?

10      I think -- I think I've shown that -- that the melody is --

11  and harmonies are common. I would think it would be very

12  difficult to have to be able to say that nobody else could use

13  those patterns.

14  Q   And on the angling -- remember that red angling that

15  Dr. Gross used -- is the -- is his angling --

16  A   That's not --

17  Q   -- methodology ever used in comparing two musical notes?

18  A   No. No. I mean, that's not simultaneous. They might be

19  the same notes, but to try to draw some connection between them

20  when they're not simultaneous is -- is not relevant.

21  Q   And is it appropriate to shift music over to do a

22  side-by-side comparison of two songs?

23  A   Absolutely not. I found that to be the most disturbing part

24  of the report, not to mention the fact that the notes are wrong.

25  I found that to be ingenious, I think.

WILBUR - DIRECT

1  Q   And was he using the correct refrain in the song?

2  A   No.

3  Q   Which refrain was erroneous, the "Cartas" or the "Triste"?

4  A   No, his -- his transcription of "Cartas" was correct

5  finally.  I mean, while the first one was incorrect and was very

6  confusing because I couldn't figure out where those notes came

7  from, his transcription and supplemental report for "Cartas" was

8  completely accurate.

9      So -- so if he had done the transcription of "Triste" --

10 "Triste," the recording, I would have hoped that that would have

11 been accurate, too.  I -- I am simply assuming that he relied on

12 a graduate student who did not do an accurate transcription,

13 and -- so there's nothing to say about it.

14 Q   And --

15 A   It's wrong.

16 Q   What about the -- have you ever seen in a copyright

17 comparison setting using the practice of the swapping out notes

18 from one song to then compare to the second song?  Have you ever

19 seen that before?

20 A   No.

21 Q   Have you ever -- in all of your years of practice as a

22 musicologist in the music industry, have you ever seen or heard

23 of Schenkerian analysis being used as a tool for comparison of

24 two works?

25 A   No.

```
                          WILBUR - DIRECT
 1   Q    Do you find that to be reliable and helpful, Schenkerian

 2   analysis, in this setting?

 3   A    These are simple songs.  Schenkerian analysis is -- is

 4   controversial in terms of the methodology.  It allows for a lot

 5   of subjective determination.  There's plenty online that can be

 6   read about it.

 7        In one comment it said it's all reduced to 3, 2, 1 or

 8   "Three Blind Mice."  I don't find it helpful or illuminating in

 9   this discussion at all.

10   Q    Would it be misleading as well?

11   A    I think it's misleading, and I think the red marks are

12   extremely misleading.

13   Q    On the theory of consonant substitution, have you -- in all

14   of your years of practice and all of your cases, have you ever

15   seen anyone, any court or any expert or any party, use consonant

16   substitution as a method to compare two works in a copyright

17   setting?

18   A    No.

19   Q    Is that a reliable and helpful method in this -- in the

20   copyright --

21   A    I think it's extremely problematic.

22   Q    -- setting?

23        Would it be misleading?

24   A    I would say it would be misleading because, again, if you

25   put in red all the things that are related to the chord when you
```

WILBUR - DIRECT

1   have a simple chord pattern, that is, a C chord and then a

2   G chord, and you put all those things that would be consonant

3   with it and you show something which has all that red on it, it

4   makes it look like there's got to be a lot of similarity.

5       You have to look through those red marks to find the little

6   dotted -- dotted lines to see where the consonant substitutions

7   are, and that's misleading.

8   Q   Have -- have you -- on the topic of consonant substitution,

9   is -- I guess, is that approach, then, you take any note in a

10  chord, and you can swap it out with the other notes in the

11  chord.  Is that your understanding?

12  A   That was my understanding of how he defined it, and I -- as

13  I said, then we have no melody.  Again, you know, if there was

14  more similarity in terms of the lyric or -- or other than simple

15  repetitive patterns that are common, I would have a very

16  different opinion.

17  Q   In fact, I think we -- Dr. Gross had mentioned that for each

18  note, there were six consonant notes.

19      Do you recall that?

20  A   I do.

21  Q   So if in fact the song "Triste" has about 200 notes as --

22  more or less as Dr. Gross had mentioned on the stand, so how

23  many combinations of songs would be in consonant with the song

24  "Triste" by his Schenkerian math?

25  A   I think he already said it was going to be 6 to the 200th

WILBUR - DIRECT

 1  power or something like that.

 2  Q    Well, and did you do a calculation of what is 6 to the 200th

 3  power?

 4  A    Oh, I think it was four -- wait a minute.

 5  Q    Four point -- does this ring a bell, 4.628 with 155 zeros

 6  following it?

 7  A    Yes.

 8  Q    Something --

 9  A    Something like that.  I did try to calculate it last night.

10  Q    So in your -- is -- is -- is it your opinion -- does -- by

11  Mr. Guzman filing his copyright to "Triste Aventurera," can he

12  claim ownership to 4.628 with 155 zeros versions of that song?

13  A    That's what makes it problematic for me.  I try to look at

14  what the consequences would be, and I can't find that these

15  melodic sequences and patterns can be owned by any one person.

16  Q    What about the -- I heard something about a species

17  counterpoint.  Have you ever seen the use of a species

18  counterpoint in -- as a method or practice of comparing two

19  musical works in a copyright setting?

20  A    Absolutely not.  It's a -- it's an academic exercise.  I've

21  done many of them, but it's not appropriate and -- in a

22  copyright case.

23  Q    Is it -- is -- would it be relevant or helpful or reliable

24  in a copyright setting case?

25  A    No.

WILBUR - DIRECT

1    Q    What about the rhythmic analysis?  Do you remember that?

2    A    I do.  I didn't spend a lot of time on it.  I think that

3    eighth notes and quarter notes are the most common notes used in

4    songs.  Spanish has more words than English.  You would expect

5    more eighth notes at this tempo.

6        I mean, you know, they certainly do have patterns that are

7    similar in terms of the 6 note, 6 note, you know, whatever,

8    but -- but this is -- this is not uncommon, and it's not

9    uncommon to have a string of eighth notes.

10   Q    Do you have other -- let's see here.

11       Did you bring any other charts we need to cover?

12   A    I think not.

13   Q    Anything else that you -- okay.  Ms. Wilbur, based on your

14   training and experience and education and review of all the

15   materials in this case and of both versions of

16   "Triste Aventurera" and "Cartas de Amor," have you formed an

17   opinion as to whether "Triste Aventurera," either version, is

18   substantially similar to "Cartas de Amor"?

19   A    Not substantially similar.

20   Q    What about strikingly similar?

21   A    In all my experience and in all the -- all the consulting

22   work that I've done, I've used the word "strikingly similar"

23   only twice.  I use it very carefully.  It's a very damning word

24   to use, and this certainly doesn't meet that test to me.

25   Q    Do you -- did you find any original elements or components

WILBUR - DIRECT/CROSS

1   that are unique to Mr. Guzman and his song "Triste Aventurera"?

2   A   Melodically I do not think that they're -- that they're -- I

3   think that they're common and generic patterns.

4              MR. GARCIA: Pass the witness, Your Honor.

5              THE COURT: All right. Let's -- let's take a break

6   before we start your cross, Mr. Showalter. Let's return at

7   3:25.

8       (Recess taken from 3:08 p.m. to 3:26 p.m.)

9              THE COURT: You can be seated.

10             MR. GARCIA: Ms. Wilbur's in the restroom. She'll be

11  right out.

12             THE COURT: Yeah. We'll wait for her.

13      (Witness enters courtroom.)

14             THE WITNESS: All right. Mr. Showalter, whenever

15  you're ready, you can begin.

16             MR. SHOWALTER: Thank you, Your Honor.

17                        **CROSS-EXAMINATION**

18  BY MR. SHOWALTER:

19  Q   Good afternoon, Dr. Wilbur.

20  A   It's Ms. Wilbur.

21  Q   Oh, it's not doctor?

22  A   Nope.

23  Q   Oh, I saw the reference to your dissertation, and I thought

24  it was a doctoral dissertation.

25  A   It should have been, but it was a master's dissertation.

Case 2:13-cv-06004-JAK-AGR  Document 112-2  Filed 09/08/14  Page 43 of 91  Page ID
#:2098
Case 6:12-cv-00042  Document 122  Filed in TXSD on 04/04/14  Page 236 of 320  236

WILBUR — CROSS

1   Q   Okay.  Oh, a master -- not a master's thesis?

2   A   No, it was --

3   Q   I was confused.  You -- you did a dissertation, but you're

4   not a doctor, right?

5   A   That's correct.

6   Q   Okay.  Now, how much have you been paid so far to help

7   Hacienda Records in this case?

8   A   I actually have not -- not added it up.  If you're asking

9   what my fee is -- is that what you're asking?

10  Q   Well, no.  I asked you:  How much have you been paid so far

11  to help Hacienda in this case?

12  A   I believe around $15,000.

13  Q   Okay.  And does that include your time to travel?

14  A   Wait.  That must be wrong.  I'm sorry.  I don't remember.

15          THE COURT:  What's your rate?

16          THE WITNESS:  My rate is $300 an hour.

17  BY MR. SHOWALTER:

18  Q   Okay.  And so how much have you been paid before this trial

19  started?

20  A   I'm sorry to say I don't know.  I have to look it up.

21  Q   Okay.

22  A   I'm sorry.

23  Q   That's all right.

24      So how many hours have you spent since you left New York

25  for this trial?

WILBUR - CROSS

1       When did you leave New York?

2   A   Thursday a week ago.

3   Q   Oh, my. And did you go to Houston?

4   A   I did.

5   Q   To work with the lawyers?

6   A   Actually, to see my sister, who had been in the hospital --

7   Q   Okay.

8   A   -- for some of that, and then I did work with them, yes.

9   Q   Okay. So you went to Houston, and you saw the lawyers,

10  right?

11  A   Yes.

12  Q   All right. You don't speak Spanish, do you?

13  A   No.

14  Q   Now, your resume says you're recognized in the forensic

15  field of musicology. Is there a textbook on forensic musicology

16  that we could look at to see that you're recognized as an

17  expert?

18  A   You can certainly see that there is a field of forensic

19  musicology. In fact, the American Musicological Society

20  actually lists forensic musicologists.

21  Q   So just who is it that recognizes you as a leading expert?

22  A   I have a lot of clients, record companies --

23  Q   Okay. People --

24  A   -- film companies.

25  Q   Okay. People who hire you --

WILBUR - CROSS

1   A   Advertising agencies.

2   Q   Excuse me.

3   A   Yes.

4   Q   People that hire you, like Hacienda Records, recognize you

5   as an expert, true?

6   A   Yes.  They call me in to...

7   Q   You -- you, in 2012 alone, cleared approximately 335 pieces

8   of original music for broadcast?

9   A   Yes.

10  Q   Okay.  And does that mean you got the clearances?  As I

11  appreciate that term, you're responsible for getting the

12  licenses to use those works?

13  A   No.  Absolutely not.

14  Q   Okay.  So you were not --

15  A   And that's why it says "clearing original music."

16  Q   Okay.  So you weren't involved in the licensing process?

17  A   I do some licensing, but I was not involved in licensing in

18  those cases.

19  Q   Okay.  You know that if you're going to use a copyrighted

20  work, you need a license from the owner or administrator --

21  A   I do.

22  Q   -- of the copyright?  And if you use it without permission,

23  you're an infringer, right?

24  A   Right.

25  Q   Pretty straightforward, right?

WILBUR - CROSS

```
 1   A    (Nods head up and down.)

 2   Q    Yes?

 3   A    Yes.

 4   Q    Okay.  And if -- you're familiar with the concept of

 5   compulsory licenses, true?

 6   A    Actually, that was new to me.

 7   Q    As an expert -- well, you're not an expert on copyright law,

 8   so that would be new to you, right?

 9   A    No.  That was new to me.

10   Q    Okay.  You've talked --

11   A    That was helpful.

12   Q    You -- well, go to the Copyright Office Web site and

13   research it.  You might find that instructive.

14        You're not a music theorist, correct?

15   A    I love music theory, and I love math, but I do not count

16   myself as a music theorist, no.

17   Q    And by academic training you're not a music theorist,

18   correct?

19   A    That is correct.

20   Q    And you wouldn't begin to put yourself on the same plane as

21   Dr. Robert Gross in the field of music theory, would you?

22   A    I would hope not, no.

23   Q    You've got a master's in ethnomusicology, right?

24   A    No.  It was in music with a specialization in

25   ethnomusicology.
```

WILBUR - CROSS

1    Q    Okay.  And you did your thesis on Pawnee Indians?

2    A    Yep.

3    Q    Okay.  While you don't have a doctorate in music theory, you

4    feel free to criticize Dr. Gross who does, fair enough?

5    A    I would say my practical experience and my -- the work that

6    I've done over the last 30 years should speak for itself.

7    Q    Being paid by people to come to court and take one position

8    or another, is that part of it?

9    A    That is absolutely not part of it.  I never take a case that

10   I don't believe in.

11   Q    I understand that.  And have you ever -- and this case you

12   took, you were going to get paid, right?  That was part of the

13   deal?

14   A    I don't -- I don't really do it for that.

15   Q    You don't do it for the money?

16   A    No.

17   Q    Okay.  You know Dr. Gross used a number of techniques to

18   assess the similarities of the songs?  You're aware of that,

19   right?

20   A    I'm certainly aware of that.

21   Q    And when we're trying to assess the similarity, isn't it a

22   good idea to compare the -- the song from every -- a number of

23   different angles?

24   A    Depends on what those angles are.

25   Q    Well, the more we know about a song, the more we analyze it,

Case 2:13-cv-06004-JAK-AGR   Document 112-2   Filed 09/08/14   Page 48 of 91   Page ID
#:2103
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 241 of 320

WILBUR - CROSS

1    the more we can understand it, true?

2    A    I don't understand your question.

3    Q    Well, isn't it better to know more than to make a decision

4    and rule out certain things and know less and then render

5    opinions on that?

6    A    I don't understand.  I'm sorry.

7    Q    Let me try again.  That wasn't a very good question.

8        When you're rendering opinions, it's better to know more

9    than to know less, right?

10   A    Yes.  And I try to learn as much as possible, which is why I

11   did what I did.

12   Q    When you go to a doctor to diagnose a problem, and he thinks

13   he needs to do this test, that test, and that test, then we want

14   our doctor to know as much information as we can, right?

15   A    Right.

16   Q    And so that's what Dr. Gross did.  He applied these

17   different techniques as he diagnosed or assessed the similarity.

18       Do you understand that?

19   A    I'm aware of that.

20   Q    Note-by-note analysis, is that a recognized technique in

21   music theory?

22   A    "Note-by-note analysis," what do you mean by that?

23   Q    Do you know what that means?

24   A    Well, are you talking about note by note in a line, note by

25   note as vertical or horizontal, or what are you -- what are you

WILBUR - CROSS

1   referring to?

2   Q   Maybe all of that.  Are those recognized techniques in music

3   theory?

4   A   I don't know.

5   Q   Let's -- let's just work through this list together.

6       His next diagnostic technique was consonant substitution.

7   A   Right.

8   Q   Now, you know what he means by that, true?

9   A   Yes, I do.

10  Q   Okay.  And is that a recognized music theory technique to

11  analyze music?

12  A   This might all be very academic.  This might be something

13  that he -- first of all, he explained that he made that term up.

14  He explained that that term talks about using other notes in a

15  chord, and that's what he meant by that.

16      That might be very useful in any kind of discussion of

17  academic -- academics.

18  Q   I appreciate your --

19  A   Yeah.

20  Q   -- your explanation.

21          MR. GARCIA:  Your Honor, he's interrupting her.  She's

22  trying to explain her answer and her position on that.

23          THE COURT:  All right.  Let's let everyone wait for

24  the answer, but let's go back.  I'll read the question.  Hold

25  on.

WILBUR - CROSS

1    All right. I think the question was: "Is that a

2 recognized music theory technique to analyze music?" You were

3 giving your answer. "It might be very useful in any kind of

4 discussion of academics."

5    "I appreciate your" -- and then did you want to add

6 anything?

7    THE WITNESS: I -- I thought it was related more to

8 counterpoint exercises in an academic setting. It's not

9 particularly useful in analyzing two simple songs like this, no.

10 BY MR. SHOWALTER:

11 Q   Do you quibble with his shorthand use of the phrase

12 "consonant substitution" as a way to refer to identifying notes

13 that may be switched around in compositions?

14 A   I mean, from what he said, he basically said that any other

15 note in the chord -- any note that is consonant with another

16 note could be used.

17 Q   Do you quibble with his use of that term to express that

18 concept?

19 A   No.

20 Q   You've coined terms yourself, haven't you?

21 A   No.

22 Q   Species counterpoint, isn't that a recognized music theory

23 principle?

24 A   It's an academic one, yes.

25 Q   Schenkerian analysis is a recognized music theory principle,

                              WILBUR - CROSS

 1    true?

 2    A    It is a philosophy, it is a theory, and it is a technique.

 3    I haven't seen it used in these kind of cases, no, but I'm aware

 4    of it because I studied it myself in graduate school.

 5    Q    Making audio comparisons is a -- is an accepted diagnostic

 6    technique, true?

 7    A    Absolutely.

 8    Q    Statistical analysis is an accepted means in music theory

 9    circles to assess a similarity of work, isn't it?

10    A    Depends on how you use it.  The way he used it, I found it

11    preposterous.  But, you know, in terms of the odds -- you know,

12    the statistical odds of finding those notes, I found that to be

13    peculiar, but I do count numbers.

14         I do count things up in songs, and so certainly using --

15    but using statistical probability is not something that -- that

16    I have used or I've seen used.

17    Q    You -- are you particularly disliking it in this case

18    because it -- it disproves your point?  Is that your problem

19    with it?

20    A    I think the notes were wrong to start with, so that's a big

21    problem.

22    Q    So you really didn't rely on statistic analysis like

23    Dr. Gross did, correct?

24    A    Absolutely not.

25    Q    Form analysis, is that an accepted means of assessing

                              WILBUR - CROSS
 1   similarity in music theory?

 2   A    Do you mean structural analysis?

 3   Q    That's part of it.

 4   A    Form --

 5   Q    That's part of it.

 6   A    And what else is?

 7   Q    You tell us.

 8   A    Form is certainly part of -- part of the song.

 9   Q    And that's an accepted music theory, true?

10   A    Yes.

11   Q    As is rhythmic analysis, true?

12            THE COURT:  You need to say an audible response one

13   way or the other.

14   A    Yes.

15            THE COURT:  Going back to the Schenkerian analysis, I

16   know you don't -- you've never seen it used in a legal

17   setting --

18            THE WITNESS:  Right.

19            THE COURT:  -- and don't think it should be --

20            THE WITNESS:  No, no.  That's not true.  Not in

21   something like this.

22            THE COURT:  Well, in a copyright analysis.

23            THE WITNESS:  Not in a simple song.  It's --

24            THE COURT:  Oh, if it was classical music, it might be

25   appropriate?

Case 2:13-cv-06004-JAK-AGR   Document 112-2   Filed 09/08/14   Page 53 of 91   Page ID
Case 6:12-cv-00042   Document 122 #:3403   TXSD on 04/04/14   Page 246 of 320
#:246

WILBUR - CROSS

```
 1          THE WITNESS:  It certainly -- it's certainly an

 2   academic study for sure, and --

 3          THE COURT:  In academic circles, is it an accepted

 4   analytic technique?

 5          THE WITNESS:  It is a controversial technique, but it

 6   is used in academic settings, yes.

 7          THE COURT:  I mean, a lot of things in academics are

 8   controversial, right?

 9          THE WITNESS:  Of course.

10          THE COURT:  That's how professors get paid, create

11   controversy.  All right.

12   BY MR. SHOWALTER:

13   Q    You talk a lot about the term "prior art" --

14   A    Yes.

15   Q    -- is that correct?

16   A    Uh-huh.

17   Q    Now, I'm familiar with prior art because it talks about

18   patents.

19       Are you saying the term "prior art" refers to copyrights

20   also?

21   A    All the time.

22   Q    All the time?

23   A    All the time.

24   Q    To copyrights or to copyright litigation?

25   A    I do prior art research on a regular basis.  It's to
```

WILBUR - CROSS

1  determine whether something is unique or whether it's something

2  that is generic compositional devices or other things that have

3  already entered into the public domain and are available to

4  anyone, and it's a regular part of what I do.

5  Q   Mr. Guzman has a copyright.  You don't dispute that --

6  A   No.

7  Q   -- do you?

8  A   Huh-uh.

9  Q   Aren't you involved in some cases in -- in taking songs and

10  then figuring out just how much you can change them to, in your

11  opinion, avoid a copyright infringement violation?  You get

12  involved in that, don't you?

13  A   I do.

14  Q   You help people do that, don't you?

15  A   No, no, no.  Let me -- let me explain because this is very

16  important.  As a musicologist --

17  Q   Well --

18         THE COURT:  Let her explain.

19  A   -- I don't -- you asked.

20     As a musicologist, I never get involved in the creative

21  process.  I never tell them what notes to play or what they

22  should do.  I identify for them the problematic areas, and then

23  let them change and let me see if it passes muster.

24  BY MR. SHOWALTER:

25  Q   So it happens a lot, doesn't it?

                              WILBUR - CROSS

1    A    Yeah.

2    Q    And you've seen that a lot, right?

3    A    Yeah.

4    Q    And you weigh in on people who are trying to skirt the

5    copyright law by changing up stuff just enough, don't you?

6    A    I don't -- I don't allow -- I never clear it if it's -- if

7    that's what it's -- what it's about, no.

8    Q    That's the whole point of you being involved in those cases

9    is help them change it enough or tell them it's changed enough

10   so, in your words, it passes muster, right?

11   A    What I do is I have a form that asks if they have used a

12   reference track.  Films do this all the time.  They'll use a

13   reference track in the film, and then they'll get a composer at

14   the end to -- to do the score.

15        And they've already fallen in love with the piece of music

16   that they stuck in there.  They want to have that piece of

17   music.  Well, they have to license that piece of music if they

18   want to.  If they get a composer and the composer makes it sound

19   too close to that other piece, I say that's not okay.

20   Q    So --

21   A    So I'm like a policeman.

22   Q    So they know -- well, so you're working with people who have

23   taken one piece of music and realized they could be infringers,

24   and so they derive another piece of music that's enough

25   different so you can tell them, "Hey, I think you're safe,"

WILBUR - CROSS

```
 1   right?

 2   A   I -- if it's different enough so that I can find two or

 3   three other pieces that share the same similarities, then I say

 4   it's okay.

 5   Q   But they -- they derived it from the work they started from,

 6   and then you -- you try to find other samples out there to make

 7   it sound okay, right?

 8   A   I don't try to make it sound okay.

 9   Q   Let me --

10   A   I simply make an opinion.

11   Q   From -- whether the -- the derived work is different enough

12   from the original work to be -- to pass muster, fair enough?

13   A   There has to be substantially enough difference that it's

14   not a problem.

15   Q   Well, but it's still derived from the first one, but it's

16   changed enough.  So you tell them, "Hey, I think it's different

17   enough.  We're okay," right?

18   A   I -- I would say that, you know, there's a difference

19   between inspiration and trying to rip something off, and I make

20   certain that it has to pass muster.

21   Q   Well, but they started with one work, and they know they

22   can't use it for whatever reason.  But they like it, so they're

23   going to derive something that's safe to use, true?

24   A   As long as it -- as long as it is generic enough and doesn't

25   point specifically -- my rule is this:  It can't point to a
```

WILBUR - CROSS

 1    particular piece of music, a particular song, a particular

 2    artist, a particular sound, a particular group. And if it does

 3    point specifically to one of those things, they've got a

 4    problem.

 5    Q    So they need to change it a little more, right?

 6    A    If I don't pass it and they change it and they -- I get -- I

 7    get to see that it's okay, fine.

 8    Q    So you get paid to disguise music, true?

 9    A    No.

10    Q    You -- you get paid to help -- to participate with people

11    who are deriving a work, changing it enough so in your opinion

12    they can't -- can't be traced back or tagged with infringement

13    on the original work, true?

14    A    No.  That's actually not true at all.  I give seminars to --

15    to ad agencies to tell them how vulnerable they are and to --

16    and because young people seem to feel that they can take

17    whatever they want off the Internet, I try to explain to them

18    that that's not okay.  And so I try give them some framework in

19    which to work.

20        If they don't -- if they don't live up to that, then it

21    doesn't pass.

22    Q    Now, when you're doing this analysis which you call prior

23    work to see if the derived composition is different enough from

24    the original one, isn't it best to use works in the same genre?

25    A    I don't understand the question.  Isn't it best to use --

Case 2:13-cv-06004-JAK-AGR   Document 112-2   Filed 09/08/14   Page 58 of 91   Page ID
#:3443
Case 6:12-cv-00042   Document 122   Filed in TXSD on 04/04/14   Page 251 of 320   251

WILBUR - CROSS

1   what do you mean?

2   Q   Well, if you're trying to change up, say, a pop song to not

3   be like another --

4   A   Let me explain something --

5          THE COURT:   Let him finish his question.

6   BY MR. SHOWALTER:

7   Q   If one of your clients is trying to change up a pop song so

8   it doesn't sound so much like another pop song, aren't you going

9   to do your prior art research in the pop song genre?

10  A   Not necessarily, no.

11  Q   It certainly would be helpful or useful, wouldn't it?

12  A   Depends on the situation.

13  Q   Wouldn't it be helpful to at least start in the genre that's

14  specific to that work and see if there's -- there's other

15  similar sounding songs?

16  A   In most cases I would say that's true.

17  Q   So in this case what -- what prior art research in the

18  Tejano genre did you do?

19  A   Not very much.

20  Q   You talked about these databases that you have access to --

21  A   Uh-huh.

22  Q   -- and Google.

23      What prior art research did you do in your proprietary

24  databases?

25  A   I looked up some of those patterns.

WILBUR - CROSS

1   Q   Oh, you have a Tejano proprietary database?

2   A   I don't think that you have special assignments in one genre

3   of music or other.  They're obviously influenced by the

4   German -- Germans, so I think that that qualifies.

5   Q   Well, we're talking about Tejano music in this case, right?

6   A   So --

7   Q   Or a label that's been put on regional Mexican music.  We're

8   talking about two songs of that genre, agreed?

9   A   They are actually different from one another from that

10  standpoint, but yes.

11  Q   They're songs of the same genre, true?

12  A   Generally speaking.

13  Q   Okay.  And what prior art research did you do in this genre?

14  A   I contacted somebody with a great deal of knowledge on it.

15  Q   And what else?

16  A   Not much else.

17  Q   Okay.  Hm.  Did you talk to Reynaldo Ortiz?

18  A   No.

19  Q   Was there some reason you would not want to get information

20  from the purported composer to see from whence he drew his

21  inspiration?

22  A   That wasn't my job.  My job was to look at the musical facts

23  of these two works.

24  Q   Your job was to try to find differences, right?

25  A   No, that's not what --

WILBUR - CROSS

1   Q   That's what you were paid to do, isn't it?

2   A   No.  I look at the similarities, and I contrast and compare

3   them.

4   Q   Well --

5   A   And, of course, I look at the differences, too.

6   Q   What was -- pardon?

7   A   And I look at the differences, but I focus on the

8   similarities.

9   Q   So you didn't talk to the man who says he -- or that

10  Hacienda says composed it, did you?

11  A   No.

12  Q   You don't know if Ortiz got it from Mr. Guzman, do you?

13  A   I don't have any idea.

14  Q   Pardon?

15  A   I don't have any idea.  But I'm certainly told that he did

16  not.

17  Q   You don't know if he heard it on the radio, do you?

18  A   No.

19  Q   Or heard it in a concert?

20  A   I'm told that he did not.

21          THE COURT:  By whom?

22          THE WITNESS:  By the lawyers.

23          THE COURT:  Have they talked to him?

24          THE WITNESS:  I thought that they had, yes.  I was

25  under the impression they had.

WILBUR - CROSS

 1   BY MR. SHOWALTER:

 2   Q   And you don't know if they changed it up enough to disguise

 3   it like these other clients that you work with, do you?

 4   A   You're asking if I know whether it's deliberately -- was

 5   deliberately copied?

 6   Q   Or disguised, derived?

 7   A   I think that there's a lot that says it was not.

 8   Q   You can't testify that it was not -- that the "Cartas"

 9   version that Hacienda released was not derived from "Triste,"

10   can you?

11   A   I think it's different enough so that it was not.

12   Q   "Triste Aventurera" is certainly prior art to

13   "Cartas de Amor," isn't it?

14   A   Yes.  It came first.

15   Q   Came first.  Copyrighted first.  Those similarities were

16   created by Guzman before the "Cartas" version, true?

17   A   Yes.

18   Q   When we're looking at a song, we don't just focus on this

19   little piece or that little piece and say, "Hey, look how

20   different they are."  We need to look at it as a whole, don't

21   we?

22   A   That's right.  That's what I do.

23   Q   We need to look at music.  We need to look at lyrics, right?

24   A   That's correct.

25   Q   And you can have an infringement of -- got entirely

WILBUR - CROSS

 1  different lyrics, but the music is close, right?

 2  A    Correct.

 3  Q    That happens, doesn't it?

 4  A    Yes.

 5  Q    And you can have an infringement the reverse of that where

 6  you've got entirely different music, but the lyrics are close,

 7  true?

 8  A    True.

 9  Q    And whenever you're using material from another composition

10  that you've derived it from, you need to give credit to the

11  original work, right?

12  A    It depends on whether it's in the public domain or whether

13  you -- it was independently created.

14  Q    Well, if it's in the public domain, then you don't give

15  credit or don't reference it, right?

16  A    Well, you should, but you don't often.

17  Q    Well, do you?

18  A    I certainly do.

19  Q    Okay.  So if it's in the public domain, you give credit for

20  it, right --

21  A    Yes.

22  Q    -- as a source material?

23  A    Right.  I do.

24  Q    And if it's not in the public domain, you need a license,

25  right, to create a derivative work, true?

WILBUR - CROSS

1   A    Sure.

2   Q    Now, you've copyrighted some works, right?

3   A    Certainly have.

4   Q    And the note patterns that are in your copyrighted work that

5   you're claiming to be the original composer of, those note

6   patterns appear in other songs, true?

7   A    Yes.

8   Q    The words that you use, maybe not put together the way you

9   put them together, but they appear in other songs, also, true?

10  A    Yes.

11  Q    But yet you claim -- and yet you claim to be a claimant --

12  original composer of those works, true?

13  A    If -- if there's another source that I can give credit to, I

14  do.

15  Q    Do your songs have 5, 1, 7, 1 in them?

16  A    Not that I can recall.

17  Q    Have you done any prior art searches on the compositions

18  you've registered copyrights in?

19  A    No.

20  Q    Never?

21  A    Never.

22  Q    Don't you think that's kind of risky for someone that has

23  your kind of knowledge and access to all of that prior art?

24  Aren't you taking a chance?

25  A    I think in this business everybody's taking a chance.

WILBUR - CROSS

1   Q   But you're not worried about it enough to do the research

2   and haven't on any of your original compositions, right?

3   A   I've never -- I've never been accused of any violation

4   whatsoever.

5   Q   You're familiar with the case of -- Chuck Berry sued the

6   Beach Boys on their song -- Beach Boy song, "Surfing USA," and

7   his song was "Sweet 16."

8   A   I'm not familiar with that case, no.

9   Q   You know he won that case, right, even though it was all

10  different lyrics and different themes?

11  A   I'm not familiar with the case.

12  Q   Okay.  How about a Marvin Gay's case against Robin Thick?

13  Are you familiar with that one?

14  A   Yes.  I'm very familiar with that one.

15  Q   Are you involved as an expert in that one?

16  A   I'm a consulting expert at this point.

17  Q   For which party?

18  A   Do I have to answer that?  This is kind of confidential.

19          THE COURT:  Why is it confidential, that you're

20  working on the case?  Have you been designated as an expert?

21          THE WITNESS:  I have not yet.  I'm a consulting expert

22  at this time.

23          MR. GARCIA:  I don't think that's appropriate, Judge,

24  if she's a consulting expert.

25          THE COURT:  Well, I don't think it's your -- it's your

WILBUR - CROSS

1    privilege to assert.  It's hers.

2              Do you think you know?

3    BY MR. SHOWALTER:

4    Q    Well, those songs are similar, aren't they?

5    A    Which songs?

6              THE COURT:  What's the relevance of this other case?

7    A    Yes.  Please.

8              MR. SHOWALTER:  Well, it shows her bias.  The only

9    thing in common with Marvin Gay's song or Robin Thick's song

10   "Blurred Lines" to Marvin Gay's song "Got to Give it Up" is the

11   beat, not even the music, not even the lyrics.  It's just the

12   beat.

13   A    I agree with you.

14   BY MR. SHOWALTER:

15   Q    Well, you've just proved our case.  Thank you very much.

16   A    Wait a minute.  Let me be sure I --

17             THE COURT:  I'm confused, Mr. Showalter.  You're

18   saying -- you're saying in that case she's a -- you think she's

19   with the plaintiff?

20             MR. SHOWALTER:  I'm just asking her about the

21   similarities of those songs, and the mere fact that the main

22   commonality is a beat -- not the music, not the lyrics, but just

23   the beat is enough, in her opinion, to say they're substantially

24   similarity.

25   A    Whoa.  That's just the opposite of what I just said.  No.

WILBUR - CROSS

1   You mis- -- I know that you wanted me -- to hear that answer.

2   But now I will tell you that I'm on the side of Robin Thick.

3   BY MR. SHOWALTER:

4   Q   So you're -- you're going to be taking the position that

5   it's not similar and he didn't infringe on that prior

6   composition?

7   A   He was clearly inspired, but he did not infringe, no.

8   There's a difference between infringe -- between infringement

9   and inspiration.

10  Q   So -- so how do you know that Ortiz wasn't -- was either

11  inspired or infringed on Guzman?

12  A   I have no way of knowing what the story is with him because

13  I've never met him.

14  Q   Now, in your search of prior art, you said you did a Google

15  search, right?

16  A   Uh-huh.

17  Q   I remember seeing somewhere in your report you got a --

18  like, 4 million hits when you put in what?  You said love and

19  letters, something like that.

20      What'd you put into Google?

21  A   Love letter compassion.

22  Q   Okay.  And did you put --

23  A   And lyric.

24  Q   Excuse me.  Go ahead.

25  A   Love letter, compassion and lyric.

WILBUR - CROSS

1   Q   Lyric, okay.

2       And did you put those in in English or Spanish?

3   A   I did it in English.  I also did the Spanish versions as

4   well.

5   Q   Of those three words?

6   A   Yes.

7   Q   Okay.

8   A   And all three spellings of compassion as well.

9   Q   Very good.  Okay.  Now, did you put a phrase -- did you put

10  this into Google or any of your proprietary search engines?

11  A   I did, and I did not find them.

12  Q   So in the entire universe -- the entire universe of music

13  for all time, you put this --

14  A   I think --

15  Q   -- you put in this phrase in Spanish, right?

16  A   Correct.

17  Q   And you found no other songs that had these lyrics other

18  than the infringing work, true?

19  A   That is correct.

20  Q   Now, did you -- did you translate this to English, or did

21  somebody else do that for you?

22  A   Somebody else who works with me on Spanish projects.

23  Q   They're Spanish-fluent, true?

24  A   Yes.

25  Q   Okay.  And did you put the English translation of this into

WILBUR - CROSS

1  any and all available search engines to see if you could find

2  this anywhere?

3  A   I did, but --

4  Q   And the results?

5  A   I did not find it.

6  Q   In the entire universe of music, Spanish and English, these

7  lyrics don't appear anywhere except in the infringed work, true?

8  A   I don't know.  I don't know if that's true.  There's a lot

9  of oral tradition out there, and oral tradition means works that

10  have never been documented and are in the folk tradition in

11  Mexico, which is really a significant problem for Mexican works.

12  Q   All right.  Well, you -- if you would have found it, we'd

13  have heard about it, right?

14  A   Absolutely.

15  Q   You didn't find it, did you?

16  A   No.

17  Q   But you looked, didn't you?

18  A   Yep.

19  Q   In one of your graphs or charts, you said you disregarded

20  filler notes to -- I don't even remember the chart it was, but

21  to show the note patterns.

22      Do you remember which one I'm talking about?

23  A   With the numbers on it?

24  Q   I think so.

25  A   Okay.

                           WILBUR - CROSS
 1    Q    You did disregard some of the filler notes, right, for the

 2    purposes of that analysis?

 3    A    I believe Dr. Gross did the same thing.

 4    Q    I understand.  You -- and I'm not criticizing you for doing

 5    that.  I'm just asking you to agree with me that you did

 6    disregard some filler notes, true?

 7    A    Yes.

 8    Q    And the reason he did that and you did that is so it would

 9    be easier to see -- to make your comparisons, true?

10    A    Yes.

11    Q    Now, you said these songs were a little bit different in

12    length.

13         You know what a measure of rest is -- a rest measure?

14    A    Yes.

15    Q    You could add a measure of rest, make a song a little bit

16    longer -- or the same song a little bit longer, but it would

17    still be the same song, right?

18    A    Correct.

19    Q    So you're -- you've got -- seem to have a criticism of

20    Dr. Gross because he took a measure out in order to make the

21    comparison easier between the two songs, right?  You remember

22    that criticism?

23    A    That wasn't the criticism.  You misunderstood, obviously.

24    Q    Well, what was it -- you're criticizing him for taking out a

25    measure, right?

WILBUR - CROSS

1   A    I criticized him for putting the first measure of "Triste"

2   onto -- onto a measure that had pickup notes. By moving it over

3   in that way, that was not the way that chorus would have

4   started.

5   Q    Of course, if you don't make that minor shift, it -- it

6   sounds like a mess on top of each other. But if you do make

7   that minor shift so you can be comparing apples to apples, it's

8   pretty easy to hear the similarity, isn't it?

9   A    I stick with what I said earlier.

10  Q    So you can -- you can add and take out filler notes if it

11  fits your purpose to synchronize the comparison, but when he

12  does it to make it obvious how similar it is, you think it's

13  just absolutely disingenuous, right?

14  A    What he did was disingenuous, I believe. You don't -- you

15  don't put the start of something a measure early over pickup

16  notes. That's not the way it's done. He certainly understands

17  what pickup notes are, and he certainly did it in the verse,

18  so --

19  Q    Well -- go ahead.

20  A    -- he should have known better.

21  Q    Don't you think it's helpful to weed out distractions and

22  get down to the -- the DNA of the song to see how similar it is?

23  A    Not by -- not by moving and shifting things around or using

24  other chord tones to replace the notes in the melody, no.  I

25  don't think that that's legitimate.

WILBUR - CROSS

1   Q   I'm talking about the shift right now.

2       All he did was, like, shift it so it would lock up, right?

3   A   He shifted a measure early --

4   Q   Right.  He shift --

5   A   -- in one case so that it would match up.

6   Q   He shifted one measure, right?

7   A   Yes.  That's right.

8   Q   And then it all matched up, didn't it?

9   A   No, it doesn't match up.  The chords matched up.

10  Q   And don't you shift measures in these cases where you work

11  for your clients?

12  A   Never.

13  Q   Never shift a measure?

14  A   Never.

15  Q   So after he shifted the measure, Dr. Gross did, then his

16  similarities became striking, didn't they?

17  A   No.  Absolutely not.  He simply put them in such a way that

18  the chords would sound the same, and, therefore, they would --

19  they would sound more harmonious.

20  Q   Well, consonant substitution is one technique that an

21  infringer could employ to create a derivative work that sounds

22  different, true?

23  A   I certainly never heard of it.

24  Q   You could swap out notes in a key, right, intentionally to

25  make it sound a little different?

WILBUR - CROSS

1   A   I'm not in the business of -- of -- of, you know, making

2   something sound different, you know, no.  I'm not in the

3   business of just -- you know, that kind of count.

4   Q   What?

5   A   I'm trying to find the words here.

6       I'm not in the business of disguising works.  I'm in the

7   business of saying whether a work is substantially similar or

8   whether it really is too close to something else that needs to

9   be changed.

10  Q   I'm not saying you're in the business of doing it, but you

11  represent clients who are doing it and getting your blessing on

12  a derivative work, basically?

13  A   No.  If it's a derivative work, they do not get my blessing.

14  They only get my blessing if it doesn't point specifically to

15  something else.

16  Q   They've got to change it up enough, right?

17  A   They've got to either throw it out and start again or change

18  it enough so that it doesn't point to something specific.

19  Q   Would you play -- I'm sorry.  Would you play "Twinkle,

20  Twinkle, Little Star" for us.

21  A   (Witness complies.)

22  Q   Okay.  Let's take the first phrase of that, and at the end

23  of the first phrase, substitute a consonant for us.

24  A   After the first phrase?

25  Q   At the end of the first phrase -- last note of the first

WILBUR – CROSS

1    phrase.

2    A    (Witness complies.)

3    Q    Okay.  Now, would you clear that by somebody who liked --

4    wanted to use "Twinkle, Twinkle, Little Star"?

5    A    Well, "Twinkle, Twinkle, Little Star" is in the public

6    domain, so there's really no issue.

7    Q    Okay.

8              THE COURT:  Forgetting that, though.

9    BY MR. SHOWALTER:

10   Q    Can you -- let's assume it's a copyrighted work, fair

11   enough?

12   A    Yeah.

13   Q    Okay.  Would you clear that if they did a consonant

14   substitution?

15   A    No, I wouldn't, because I think that this (playing keyboard)

16   is very recognizable.

17   Q    Well, what about the last -- the last note?

18   A    So if you changed it (playing keyboard), I mean, it's still

19   "Twinkle, Twinkle, Little Star."

20   Q    Okay.

21   A    Because you have (playing keyboard).  You know, you have

22   six -- six notes.

23   Q    You played the phrase for us, right, and you --

24   A    Uh-huh.

25   Q    -- substituted a consonant for the last note of that phrase,

WILBUR - CROSS

1   right?

2   A   Well, actually, the last one was not a consonant.  It was a

3   dissonant.

4   Q   It was a dissonant.  Okay.

5       Was it part of the chord, though?

6   A   No.

7   Q   Okay.  Now, play "Twinkle, Twinkle, Little Star" for us

8   again, please.

9   A   (Witness complies.)

10  Q   Okay.  Now, play that with [sic] us, and add a third harmony

11  to it.

12  A   Okay.  (Playing keyboard.)

13  Q   Now --

14  A   So -- okay.  So now we have the harmony part.

15  Q   Maybe I'm -- maybe I misrequested my -- my song selection.

16      Play "Twinkle, Twinkle, Little Star" and put -- and add a

17  parallel line above -- a third above it.

18  A   (Witness complies.)

19  Q   Okay.  Now, take out the melody and just play the parallel

20  motion part.

21  A   (Witness complies.)

22  Q   And would that pass your -- your copyright clearance muster?

23  A   It probably would.

24  Q   Pretty close, isn't it?

25  A   No.  It's in -- it's certainly -- it's minor, (playing

WILBUR - CROSS

1   keyboard).

2       I mean, again, what are you driving at?

3   Q   Well, that's derived from "Twinkle, Twinkle, Little Star,"

4   isn't it?

5   A   Yes.

6   Q   Now.

7   A   But if it's also similar to a lot of other things or doesn't

8   point to it, then it's okay.

9   Q   Still derived from it, right?

10  A   Yes.

11  Q   Now, when you did your prior art comparison, you went back

12  to Beethoven; is that correct?

13  A   Yes.

14  Q   And you -- you seem to focus on four notes, right, not the

15  whole song?

16  A   Well, that's because those were the notes that were common.

17  After that, they were different.

18  Q   You know how we -- you put this (indicating) on a search and

19  found not one identical comparison anywhere else in the universe

20  except for the infringing work?  Remember that?

21  A   Right.

22  Q   Those questions?

23          THE COURT:  And for the record, he was holding up the

24  four verses of the lyrics -- or four lines of the lyrics.

25  BY MR. SHOWALTER:

WILBUR - CROSS

1    Q    Did you put in more than the four notes that you went back

2    to Beethoven?

3          How many notes did you put in of "Triste Aventurera" to

4    find other songs similar to that one?

5    A    I used the main theme.

6    Q    You're talking about the four notes?

7    A    5, 1, 7, 1, 7, 1, and I found two easy examples for that

8    that I already sang.

9    Q    Well, I'm -- I'm not stopping at the 5, 1, 7, 1.

10         Beyond that -- why didn't you put in the rest of it to see

11   how similar -- what other songs popped up as similar?

12   A    I don't understand your question.

13   Q    Why didn't you put in more notes than just four notes to see

14   if there are all these songs out --

15   A    There were more than four notes.

16   Q    Excuse me.

17              THE COURT:  Let him finish his question.

18              THE WITNESS:  Okay.

19   BY MR. SHOWALTER:

20   Q    Why didn't you put in more than four notes to see if there

21   were so many songs out there, like you say, that are so similar

22   to "Triste Aventurera"?  Why didn't you do that?

23   A    I took the main theme of all -- of the -- the two that were

24   the most similar, the copyrighted version and "Cartas," I took

25   those melodies, and I found examples of those melodies in the

WILBUR - CROSS

1    public domain.

2    Q   The 5, 1, 7, 1?

3    A   5, 1 -- absolutely.

4    Q   That's --

5    A   (Playing keyboard). That's not four notes.

6    Q   Five notes?

7    A   (Playing keyboard). Six notes.

8    Q   Okay. Why did you stop there? That's my question.

9        Why didn't you go ahead and put in the whole first verse to

10   see what similarities there were --

11   A   Well, first of all --

12   Q   -- in other songs out there?

13   A   -- the rest of the song is different. The rest of the line

14   was different. It was all in a downward direction, but it

15   didn't have any similarities.

16   Q   And it didn't harmonize?

17   A   No. I mean --

18   Q   Wasn't -- pardon?

19   A   You know...

20   Q   It did harmonize, didn't it?

21   A   I'd have to look at it again.

22   Q   After all this work, you'd have to look at it again?

23   A   Well, I mean, you know, if you want to talk about consonant

24   substitutions.

25   Q   Let's look at your report here -- or a piece of it. This is

WILBUR - CROSS

1   your -- you're going back to Beethoven to show us how similar

2   these two songs are, true?  Is that part of this exercise here?

3   A    Correct.

4   Q    Now, this is a phrase, right (indicating)?

5   A    Correct.

6   Q    And this is a phrase, right (indicating)?

7   A    Correct.

8   Q    And in "Cartas," this is a phrase, right (indicating)?

9   A    Uh-huh.

10  Q    Is that a yes?

11  A    Yes.

12  Q    And this is a phrase, right (indicating)?

13  A    That's correct.

14  Q    Now, on Beethoven, that's -- it's not two phrases.  That's

15  one complete phrase, isn't it?

16  A    That's correct.

17  Q    And the two Tejano songs end on the tonic note, right?

18  A    The two --

19  Q    "Triste" and "Cartas" end on a tonic?

20  A    End on the tonic?  What are you talking about?  In the -- in

21  the phrase -- they end on the tonic in the phrase, or they end

22  on the tonic in the piece?

23  A    This note right now (indicating).

24  A    That's a tonic, but that's not a tonic on the bottom, no.

25  Q    That's not a tonic?

WILBUR - CROSS

1    A    No, it's not.

2    Q    Okay.

3    A    That's -- that's an E, and the top one is a C.

4    Q    And the Beethoven ends on a dominant, right?

5    A    It ends on a B.

6    Q    Is that the dominant note?

7    A    In this case it is.

8    Q    Okay.  And does "Cartas" end on a dominant?

9    A    No.

10   Q    So these notes here in "Triste" and "Cartas" are pickup

11   notes, aren't they?

12   A    They are.

13   Q    And there's no pickup note in Beethoven, is there?

14   A    There certainly is.

15   Q    At the end of this -- this second theme?

16   A    There certainly is at the front, at the beginning.  That's a

17   pickup note.

18   Q    Well, we're looking right here (indicating).  We're trying

19   to compare apples to apples here, Doctor.

20   A    Actually -- actually --

21   Q    There's not --

22   A    They probably -- there probably -- there might very well be.

23   I stopped there.

24   Q    Well, this is all we have to go on, so that's all I'm

25   looking at.

WILBUR - CROSS

1   A   I actually do think there is a pickup into the next phrase.

2   Q   Well, there's not a pickup in this measure, true?

3   A   No, because it wasn't what I was comparing.

4   Q   There's not a pickup in this measure, true?

5   A   That's correct.

6   Q   But there are pickup notes in "Triste" and "Cartas," true?

7   A   Correct.

8   Q   So they're similar, but as far as your prior art reference

9   to Beethoven just in that one line, there are several

10  dissimilarities, true?

11  A   It served the purpose of showing that the four notes that

12  were in common were the same in Beethoven and appeared in the

13  same place twice.

14  Q   The song is more -- more than about four notes, agreed?

15  A   Absolutely.

16  Q   It's about --

17  A   I found other examples.

18  Q   It's about lyrics, some of which are identical letter for

19  letter except for one letter, and it's about music that has

20  similarities, true?

21  A   I don't think that it's identical except for one letter.

22  I'd have to look at that again, but I don't think so.

23  Q   Do you have something to look at there?

24  A   I do.

25          (Sotto voce discussion between Mr. Showalter and Mr. Leal.)

Case 2:13-cv-06004-JAK-AGR Document 112-2 Filed 09/08/14 Page 81 of 91 Page ID
Case 6:12-cv-00042 Document 122 #Filed in TXSD on 04/04/14 Page 274 of 320 74
WILBUR - CROSS

```
 1   A    There are two words that are different.  One is -- two words

 2   are plural, and two words are singular.

 3   BY MR. SHOWALTER:

 4   Q    Did you have this done by a certified translator?

 5   A    No.  I had it done by a doctoral student who is fluent in

 6   Spanish.

 7   Q    Do -- are they a certified translator?

 8   A    No.

 9   Q    You know on something like this it can be pretty important?

10        Agreed?

11   A    Well, if provided with -- I mean, I'd be happy to review

12   something else if you think this is -- this is not accurate.  I

13   asked that it be translated as literally as possible.

14   Q    Would you agree that these lyrics are strikingly similar

15   between the two songs?

16   A    I would say that they are very similar.

17   Q    Strikingly?  Would you give me that?

18   A    No.

19   Q    Just because of those two "S"s?

20   A    They're -- they're substantially similar.

21   Q    But you won't go --

22             THE COURT:  But -- they're not identical because of

23   the two "S"s --

24             THE WITNESS:  They're not identical.

25             THE COURT:  -- but isn't "strikingly similar" between
```

WILBUR - CROSS

1    "identical" and "substantially similar"?

2             THE WITNESS:  Isn't strikingly similar -- what did you

3    say again?

4             THE COURT:  On the spectrum you've got substantially

5    similar --

6             THE WITNESS:  Well, I mean --

7             THE COURT:  -- and you've got identical.  Strikingly

8    similar is somewhere between those two, right?  It's not -- it's

9    not quite identical.

10            THE WITNESS:  No, no, no.  Striking is a legal term

11   that is very specific.  It means that there is no way that you

12   could independently come up with something on your own.

13            THE COURT:  Right.  My point is:  It's less than

14   identical, right?

15            THE WITNESS:  It's less than identical.

16            THE COURT:  I mean, just say identical, right?  I

17   mean, why do they come up with this legal term "strikingly

18   similar" if it meant identical?

19            THE WITNESS:  Because strikingly similar has a very

20   specific purpose.  I mean, it's basically to say that there's no

21   way that this person could have come up with this without

22   knowing the other piece.

23            THE COURT:  I know what it means.

24            THE WITNESS:  But that's --

25            THE COURT:  Your testimony is it is the same as

Case 2:13-cv-06004-JAK-AGR Document 112-2 Filed 09/08/14 Page 83 of 91 Page ID
Case 6:12-cv-00042 Document 122 #Filed in TXSD on 04/04/14 Page 276 of 320 276

WILBUR - CROSS

1   identical.  In other words, I can rephrase this.  To be

2   strikingly similar, something has to be identical.  Is that your

3   testimony?

4              THE WITNESS:  No.  My -- I guess I'm trying to say

5   that the -- that --

6              THE COURT:  Well, you just said --

7              THE WITNESS:  Strikingly similar -- strikingly similar

8   means that it had to come from that other source, and I don't

9   have the answer to that.  I -- I --

10             THE COURT:  So you're saying even -- something could

11  be identical and still not strikingly similar because there may

12  have been some, you know, extreme coincidence?  Is that what

13  you're saying?

14             THE WITNESS:  I'm saying that there could have been

15  coincidence, right.

16             THE COURT:  So it's a higher standard than identical.

17             THE WITNESS:  The two -- the two phrases are very

18  close, obviously.  You know, I mean, the -- that doesn't take

19  rocket science.  I'm not -- I'm not trying to delude anybody,

20  and I've already said that they're similar.

21             MR. SHOWALTER:  I'm going to pass the witness,

22  Your Honor.

23             THE COURT:  All right.  Anything, Mr. Cole?

24             MR. COLE:  Just a couple of questions.

25                        **CROSS-EXAMINATION**

WILBUR - CROSS/REDIRECT

1   BY MR. COLE:

2   Q   Did you make any attempt to compare the version of "Cartas"

3   that was filed with the Copyright Office to the one that was

4   performed by my client, Mr. Martinez?

5   A   Let me just be sure I understand that.

6       Are you talking about the third song that I never heard

7   except in the courtroom?

8   Q   I don't recall what that song would be, but there was a

9   recording of "Cartas" that had one person playing a guitar.

10      Did you hear that song?

11  A   I never heard that song, no.

12  Q   Okay.

13          MR. COLE:   That's all I have, Your Honor.

14          THE COURT:   All right.

15          MR. GARCIA:   Quick response, Your Honor.

16          THE COURT:   Sure.   You can use all your time left for

17  redirect that you want.

18                  **REDIRECT EXAMINATION**

19  BY MR. GARCIA:

20  Q   The "Beer Barrel Polka" song --

21  A   Yes.

22  Q   -- by Narciso -- who is that by?

23  A   It's in my report.   It's a German song.

24  Q   Narciso Martinez?

25  A   Oh, yeah.

WILBUR - REDIRECT

1   Q   Is -- was that a -- is that Latin music?  And

2   "La Cucaracha," was that a Latin -- Latin music?

3       Did you do -- how did you come up -- where did those, when

4   you were doing your search, but -- I thought you -- heard you

5   didn't do any search in the Latin music, or how did --

6   A   Right.  Well, I certainly -- I certainly did -- did, and

7   that was one of the ones that I did, and you're absolutely

8   right.

9       That was a Spanish song that I -- that I -- "Beer Barrel

10  Polka" was done by -- yes.  I had -- it had quite a bit of

11  similarity.

12  Q   So your search wasn't limited to English pop.  It was --

13  A   No, not by any means.

14  Q   It was a global search?

15  A   Right.

16  Q   Okay.

17  A   And I did -- and I did listen to some songs that Daniel

18  Sheehy sent to me, one of which I thought was -- was quite

19  close.  But because it came reasonably late, I didn't have time

20  to do the analysis.

21  Q   That --

22  A   That predated --

23  Q   -- the Tejano songs?

24  A   Tejano songs, yes.

25          MR. GARCIA:  Pass the witness, Your Honor.

WILBUR - RECROSS

1    THE COURT:   Anything else, Mr. Showalter?

2                        **RECROSS-EXAMINATION**

3    BY MR. SHOWALTER:

4    Q    So you didn't identify any other Tejano song that had even

5    the -- the similarities that you concede other than "Cartas de

6    Amor" to "Triste," true?

7    A    I'm sorry.   I didn't understand the question.

8    Q    You haven't identified any other Tejano song that is as

9    similar to "Triste" as "Cartas," true?

10   A    I did get some late, and I have not had a chance to

11   completely compare them.   And I did think that one actually was

12   quite close, but I didn't do it.

13   Q    You haven't identified any other song, have you?

14   A    Not to this time, no.

15   Q    Thank you.

16           MR. LEAL:   Quick moment, Your Honor.

17       *(Sotto voce discussion between Mr. Showalter and Mr. Leal.)*

18           MR. SHOWALTER:   Nothing further, Your Honor.

19           THE COURT:   All right.   Anything else from anyone

20   else?

21           MR. COLE:   No, Your Honor.

22           MR. GARCIA:   No.

23           THE COURT:   All right.   You're excused, ma'am.   You

24   can step down, free to go, or you can stay if you like.

25               Call your next witness.

Exhibit 15



# >> MUSICOLOGY SERVICES
## FOR MUSIC SUPPLIERS + ADVERTISERS

WWW.MUSIODATA.COM
252 Seventh Ave. Suite 17G New York, NY 10001
TEL 212-217-2566 | FAX 212-217-2567
swilbur@musicolgy.com

### >> IF YOU WISH TO REDUCE THE RISK OF:
- your "original" work *inadvertently infringing* another work
- your musical work getting *too close to a work the composer was asked to "sound like"*
- your piece of music *sounding too familiar* or reminiscent of a well known singer or group
- your version of a public domain song *infringing a copyrighted arrangement* of the public domain song
- the popular song you got a synch license to use *sounding too much like* the popular recording
- your library or source music *sounding too similar to* a particular artist's or group's sound
- using music which has *negative connotations* in foreign cultures.

### >> OR IF YOU NEED TO:
- determine what the *musical facts* are
- determine whether *problematic similarities* support an *infringement claim*, a *sound-alike* claim, or a combination of the two
- get an *expert opinion* as to whether the similarities between two works constitute problematic similarities or are as a result of common stylistic patterns or common compositional devices
- research the *public domain status* of a particular song or arrangement of a public domain song
- obtain *prior art research* that is thorough, exhaustive, and accurate
- do a *sample analysis* in order to determine whether or not a sample or possible sample can be shown to have come from the same recorded source
- find a *music expert* who, if in agreement with your claims, can assist in all music related aspects from *trial preparation through litigation*, and offer *graphic charts* and *musical demonstrations* suitable for presentation to a *non-musical judge and jury*

### >> SERVICES

MUSICOLOGICAL ANALYSIS
A thorough comparison of two or more pieces of music which examines all pertinent music and vocal elements including melody, harmony, rhythm, instrumentation, lyrics, musical style, samples, vocal sound and style, etc. in order to determine if there are problematic similarities between the works. An analysis is often called for if: the work is reminiscent of another work; the composer has been asked to create a work that sounds like another; or in cases where litigation is being considered or has been initiated. Works that sound very similar might only share permissible stylistic similarities with many other works while works that sound different may have borrowed copyrighted material in ways that are not at first obvious. Musiodata can help render a professional opinion as to what elements are protected by music copyright and what elements are not. Even when there appear to be musical similarities, it is sometimes not possible to render an opinion until some prior art research has been attempted (see below). In addition, if infringement is suspected prior to release or broadcast, Musiodata can point to those areas that need changing in order to avoid problematic similarities. * Reports are generally emailed or discussed verbally within five business days or on a rush basis.

ORIGINAL MUSIC CLEARANCE
As a preventative measure to minimize the risk of litigation, all musical, vocal, and sound elements of the piece of music in question are reviewed to assess their originality. It is the unique combination of elements, some of which can be common or generic, that defines originality. If an infringement or sound-alike problem is suspected, changes or additional research might be warranted. In that case, you would be contacted immediately to discuss what is needed and any additional costs. Once a piece of music is clear to air, a clearance document is generally emailed to you as soon as possible but certainly within five business days, or within 24 hours if a rush report is needed.*

## SAMPLE ANALYSIS

There is increasing litigation today regarding samples or potential samples. Using a sample, or the digital reproduction of a part of a work from another recording, is a common practice today, especially in hip-hop music. Producers normally license and pay for the use of samples. If there is a question as to whether or not a sample was used in a particular recording, Musiodata will perform a thorough forensic analysis and compare the sounds using advanced technology and side-by-side comparisons to attempt to determine if they can be proven to be from the same source. In those cases where a sample license was denied, Musiodata can offer musical guidance as to what is permissible to use.*

## PUBLIC DOMAIN RESEARCH

Research can often determine if a piece of music is in the public domain and/or find a public domain version of the piece. Music in the public domain is no longer protected by copyright laws and can be used without permission. However, since different countries around the world have differing and changing copyright laws, it is not always possible to say with certainty a work is PD worldwide. In some of these cases, doing a risk assessment is in order. In order for a work to be in the public domain, it must exist in a public domain source. Works can be "generally considered to be in the public domain" if several examples of the work sharing the same elements can be found in well-respected and reliable sources. However, many popular versions or arrangements of public domain musical works are NOT in the public domain. Because a piece of music is labeled as "traditional" does not necessarily mean it can be used without any legal restrictions. This is a very thorny area and Musiodata can help clarify what versions are in the public domain and/or who has ownership of a particular work.*

## PRIOR ART RESEARCH

Prior art research is often an extensive and exhaustive search for examples that *predate* the two works in question and share the same elements ( a specific melody, lyric, etc.) If the combination of similar elements can be found in prior art, the original elements cannot have originated in either of the works being compared. In a situation where someone is accused or could potentially be accused of infringement, the presentation of prior art is an essential component of a good defense.

## COPYRIGHT VALUATION

Musiodata can determines the value of copyright by analyzing comparable copyrights and determining what those works earned in circumstances similar to the one in question.

## SONG RESEARCH AND CONFIDENTIAL LICENSING INQUIRIES

Song research can determine the authors, publishers, name and status of a piece of music, as well as its availability. Musiodata can assemble lists of appropriate songs for a specific advertising campaign, film, or other use, and follow up with confidential licensing inquiries.

## VERIFICATION OF ORIGINALITY

Musiodata will attempt to cite two or three other songs that share the same elements of concern as those in an original piece of music in order to determine if there has been substantial borrowing in the creation of the piece, or if it employs permissible stylistic elements shared by many works.

## TRIAL PREPARATION & EXPERT WITNESS

If, after careful review and analysis of the musical facts, Sandy Wilbur agrees with the point of view of the inquiring parties, she can assist them in all phases of the litigation process such as analyzing other expert reports, helping outline deposition questions, researching prior art, providing expert testimony, and preparing graphic charts, audio comparisons and musical demonstrations that are suitable for presentation to a non-musical judge and jury. She has had considerable e experience working with legal teams, helping them understand the musical theories and subtleties involved in a particular case.*

## CREATIVE SUPPORT

Having been an Associate Music Director at a major advertising agency, Sandy Wilbur can help you with music direction by researching appropriate songs, artists, composers, or arrangers for film, TV, or other projects.

*Sandy Wilbur does not offer legal advice and recommends consulting an attorney in conjunction with expert music analysis and musicological opinions.

Exhibit 16

1   Paul H. Duvall (SBN 73699)
    E-Mail: pduvall@kingballow.com
2   KING & BALLOW
    6540 Lusk Blvd., Suite 250
3   San Diego, CA 92121
    (858) 597-6000
4   Fax: (858) 597-6008
    Attorneys for Defendants and Counter-
5   Claimants Frankie Christian Gaye and
    Nona Marvisa Gaye
6

7   Mark L. Block (SBN 115457)
    E-Mail: mblock@wargofrench.com
8   WARGO & FRENCH LLP
    1888 Century Park East; Suite 1520
9   Los Angeles, CA 90067
    (310) 853-6355 Fax: (310) 853-6333
10  Attorneys for Defendants and Counter-
    Claimants Frankie Christian Gaye and
11  Nona Marvisa Gaye

Richard S. Busch (TN BPR 014594)
(*pro hac vice*)
E-Mail: rbusch@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 Fax: (615) 726-5417
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and Nona
Marvisa Gaye

Paul N. Philips (SBN 18792)
E-Mail: pnp@pnplegal.com
The Law Offices of Paul N. Philips
9255 West Sunset Boulevard
West Hollywood, CA 90069
(323)813-1126 Fax: (323) 854-6902
Attorney for Defendant and Counter-Claimant
Marvin Gaye III

12          **UNITED STATES DISTRICT COURT**
13      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

14  PHARRELL WILLIAMS, an
    individual; ROBIN THICKE, an
15  individual; and CLIFFORD HARRIS,
    JR., an individual,
16
            Plaintiffs,
17
        vs.
18
    BRIDGEPORT MUSIC, INC., a
19  Michigan corporation; FRANKIE
    CHRISTIAN GAYE, an individual;
20  MARVIN GAYE III, an individual;
    NONA MARVISA GAYE, an
21  individual; and DOES 1 through 10,
    inclusive,
22
            Defendants.
23
    ─────────────────────────────
24  AND RELATED COUNTERCLAIMS
25
26
27
28

Case No. CV13-06004-JAK (AGRx)

Hon. John A. Kronstadt

**FILED UNDER SEAL**

**EXHIBIT 16 TO THE
DECLARATION OF RICHARD S.
BUSCH IN SUPPORT OF COUNTER-
CLAIMANTS' OPPOSITION TO
PLAINTIFFS AND COUNTER-
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL
SUMMARY JUDGMENT**

Date: October 20, 2014
Time: 8:30 a.m.
Ctrm: 750

Action Commenced: August 15, 2013
Trial Date: February 10, 2015

**MANUALLY FILED UNDER SEAL CONCURRENTLY**