1  Paul H. Duvall (SBN 73699)
   E-Mail: pduvall@kingballow.com
2  KING & BALLOW
   6540 Lusk Blvd., Suite 250
3  San Diego, CA 92121
   (858) 597-6000
4  Fax: (858) 597-6008
   Attorneys for Defendants and Counter-
5  Claimants Frankie Christian Gaye and
   Nona Marvisa Gaye
6

   Richard S. Busch (TN BPR 014594)
   (pro hac vice)
   E-Mail: rbusch@kingballow.com
   KING & BALLOW
   315 Union Street, Suite 1100
   Nashville, TN  37201
   (615) 259-3456  Fax:  (615) 726-5417
   Attorneys for Defendants and Counter-
   Claimants Frankie Christian Gaye and Nona
   Marvisa Gaye

7  Mark L. Block (SBN 115457)
   E-Mail: mblock@wargofrench.com
8  WARGO & FRENCH LLP
   1888 Century Park East; Suite 1520
9  Los Angeles, CA  90067
   (310) 853-6355 Fax: (310) 853-6333
10 Attorneys for Defendants and Counter-
   Claimants Frankie Christian Gaye and
11 Nona Marvisa Gaye

   Paul N. Philips (SBN 18792)
   E-Mail: pnp@pnplegal.com
   The Law Offices of Paul N. Philips
   9255 West Sunset Boulevard
   West Hollywood, CA  90069
   (323)813-1126 Fax:  (323) 854-6902
   Attorney for Defendant and Counter-Claimant
   Marvin Gaye III

12

# UNITED STATES DISTRICT COURT

13

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15  PHARRELL WILLIAMS, an
    individual; ROBIN THICKE, an
16  individual; and CLIFFORD HARRIS,
    JR., an individual,
17
            Plaintiffs,
18
            vs.
19
20  BRIDGEPORT MUSIC, INC., a
    Michigan corporation; FRANKIE
21  CHRISTIAN GAYE, an individual;
    MARVIN GAYE III, an individual;
22  NONA MARVISA GAYE, an
    individual; and DOES 1 through 10,
23  inclusive,

            Defendants.
24

25

26  AND RELATED COUNTERCLAIMS

27

28

Case No. CV13-06004-JAK (AGRx)

Hon. John A. Kronstadt

**DECLARATION OF PAUL H. DUVALL
IN SUPPORT OF COUNTER-
CLAIMANTS' OPPOSITION TO
PLAINTIFFS AND COUNTER-
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY
JUDGMENT**

Date: October 20, 2014
Time: 8:30 a.m.
Ctrm: 750

Action Commenced: August 15, 2013
Trial Date: February 10, 2015

# DECLARATION OF PAUL H. DUVALL

I, Paul H. Duvall, declare as follows:

    1.     The information contained in this Declaration is based upon my personal knowledge. If called as a witness in this action, I could and would testify competently to the contents of this declaration.

    2.     I am an attorney admitted to practice before this Honorable Court and I am a partner in the law firm of King & Ballow and counsel for Counter-Claimants Nona Marvisa Gaye and Frankie Christian Gaye in the above captioned matter.

    3.     Attached hereto as **Exhibit 1** is a true and correct copy of the condensed version of the Deposition of Sandra Wilbur taken on August 27, 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of September 2014.

/s/ Paul H. Duvall
Paul H. Duvall

# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CASE NO. CV 13-06004-JAK (AGRx)
Hon. John A. Kronstadt, Ctrm 750
PHARRELL WILLIAMS, an individual;
ROBIN THICKE, an individual; and
CLIFFORD HARRIS, JR., an individual,
    Plaintiffs,
    vs.
BRIDGEPORT MUSIC, INC., a Michigan
corporation; FRANKIE CHRISTIAN GAYE, an
individual; MARVIN GAYE, III, an
individual; and DOES 1 through 10,
inclusive,
    Defendants.
------------------------------------
        VIDEOTAPED TRANSCRIPT OF
    DEPOSITION OF SANDY WILBUR

    TRANSCRIPT of the stenographic
notes of the proceedings in the
above-entitled matter, as taken by and
before TAB PREWETT, a Registered
Professional Reporter, a Certified
Shorthand Reporter, a Certified LiveNote
Reporter, and Notary Public, held at the
Offices of LEVINSOHN ASSOCIATES PC, 1325
Avenue of the Americas, 27th Floor, New
York, New York, on Wednesday, August 27,
2014, commencing at 10:12 a.m.

Page 2

1
2   A P P E A R A N C E S :
3
4       KING, HOLMES,
5       PATERNO & BERLINER, LLP
6       BY: HOWARD E. KING, ESQ.
7       1900 Avenue of the Stars
8       Los Angeles, California 90067
9       Attorneys for the Plaintiffs
10
11      PAUL N. PHILIPS LAW OFFICES
12      BY: PAUL N. PHILIPS, ESQ.
13      9255 Sunset Boulevard
14      West Hollywood, California 90069
15      Attorneys for Marvin Gaye, III
16      Present Telephonically
17
18      KING & BALLOW
19      BY: RICHARD S. BUSCH, ESQ.
20      315 Union Street
21      Suite 1100
22      Nashville, Tennessee 37201
23      Attorneys for
24      Nona and Frankie Gaye
25

Page 3

1
2
3   ALSO PRESENT:
4
5       Judith Finell, Expert Witness
6       Judith Finell
7       Music Services, Inc.
8       81 Pondfield Road, Suite 246
9       Bronxville, New York 10708
10
11      Ingrid Monson, Consultant
12      Music Department
13      Harvard University
14      Quincy Jones Professor of
15      African American Music
16      Cambridge, Massachusetts 02138
17
18      Kristin Zarnetski, Videographer
19
20
21
22
23
24
25

Page 4

1           Sandra Wilbur
2        P R O C E E D I N G S
3        THE VIDEOGRAPHER:  This is tape
4   number one in the videotaped
5   deposition of Sandra Wilbur taken by
6   defendants in the matter of Pharrell
7   Williams, an individual, Robin Thicke,
8   an individual, and Clifford Harris,
9   Junior, an individual, plaintiffs,
10  versus Bridgeport Music, Inc., et al.,
11  defendants, in the United States
12  District Court, Central District of
13  California, Western Division, case
14  number CV 13-06004-JAK (AGRx).
15       This deposition is being held
16  on August 27, 2014, at approximately
17  10:12 a.m.  My name is Kristin
18  Zarnetski.  I am the legal
19  videographer representing Elisa Dreier
20  Reporting.  The court reporter, also
21  in association with Elisa Dreier, is
22  Tab Prewett.  This deposition is
23  held at the office of Levinsohn
24  Associates at 1325 Avenue of the
25  Americas, New York, New York.  Will

1  (Pages 1 to 4)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 5

1  Sandra Wilbur
2  counsel present and on the telephone
3  please introduce themselves and state
4  who they represent for the record.
5  MR. BUSCH: Richard Busch on
6  behalf of Nona and Frankie Gaye.
7  MR. KING: I am Howard King on
8  behalf of plaintiff and cross
9  defendants.
10  MR. BUSCH: Paul, can you
11  identify yourself, please, for the
12  record.
13  MR. PHILIPS: Yes, thank you.
14  Paul Philips for the defendant and
15  counterclaimant, Marvin Gaye, the
16  Third.
17  THE VIDEOGRAPHER: Thank you.
18  Will the court reporter please swear
19  in the witness.
20  SANDY  WILBUR,
21  doing business at Music Data,
22  252 Seventh Avenue Number 17G,
23  New York, New York 10001-7351,
24  having been sworn by the notary public to
25  testify to the truth, testified as follows:

Page 6

1  Sandra Wilbur
2  DIRECT EXAMINATION
3  BY MR. BUSCH:
4  Q  Good morning.
5  A  Good morning.
6  Q  Would you please state your
7  name for the record?
8  A  Sandra Wilbur.
9  Q  Ms. Wilbur, my name is Richard
10  Busch, and I am representing Nona and
11  Frankie Gaye. And I understand that you
12  have been retained by Pharrell Williams and
13  others as an expert witness in this case;
14  is that correct?
15  MR. KING: She's been retained
16  by my law firm.
17  MR. BUSCH: Okay.
18  MR. KING: As you know, we
19  haven't yet designated expert
20  witnesses in the case.
21  Q  You submitted an affidavit, did
22  you not, Ms. Wilbur, in support of the
23  motion for summary judgment that was
24  submitted by Mr. Williams, Mr. Thicke, and
25  others of those aligned with him in this

Page 7

1  Sandra Wilbur
2  case?
3  A  A declaration, yes.
4  Q  Okay. Is there some confusion
5  in your mind about whether you are
6  representing or have been retained by
7  Mr. Williams or Mr. Thicke in this case to
8  be an expert witness?
9  A  I don't understand your
10  question. I have been retained by the law
11  firm.
12  Q  Okay. And what was the
13  engagement that the law firm, Mr. King's
14  office, asked you to do?
15  A  Preliminary musicological
16  analysis was the first -- was the first
17  step. Yes.
18  Q  And when did that occur? When
19  were you -- when were you retained by the
20  law firm to do that preliminary
21  musicology -- musicological analysis?
22  A  I think that was the end of
23  July of 2013.
24  Q  And after you did the
25  preliminary musicological analysis at the

Page 8

1  Sandra Wilbur
2  end of July of 2013, did you submit it to
3  anybody?
4  A  To the law firm.
5  Q  Was it in writing?
6  A  It was a draft.
7  Q  A draft is in writing, correct?
8  A  Correct.
9  Q  Okay. Let me -- let me just
10  go -- before we go into this in more
11  detail, let me just go through with you
12  some of the kind of rules of the road of a
13  deposition so we can move through this
14  thing quickly and not misunderstand each
15  other.
16  Have you ever been deposed
17  before?
18  A  I have.
19  Q  How many times?
20  A  Maybe five, four or five times.
21  Q  Four or five times. And have
22  you ever given trial testimony?
23  A  I have.
24  Q  How many times?
25  A  Again, I am estimating, six or

2  (Pages 5 to 8)

Page 33

1        Sandra Wilbur
2  because they were really not -- not
3  appropriate.
4        Q    Do you have any documents
5  regarding that, any of those cases?
6        A    Cases? These -- this wasn't --
7  these weren't cases.
8        Q    Well, evaluations?
9        A    Evaluations, that was at the
10 end of the '80s. I might have some paper
11 files still from that time.
12       Q    Do you keep files in your
13 possession of all of your different
14 evaluations of cases and things you have
15 been retained to listen to?
16       A    Yes.
17       Q    Okay. Going back how long?
18       A    It was paper files for many,
19 many years; and, certainly, in the past ten
20 years, I make a commitment to the
21 preventive side of my work for advertising
22 agencies and others that my statement will
23 stand for five years. I will keep it in a
24 file for five years. So I do that.
25       Q    Okay.

Page 34

1        Sandra Wilbur
2        A    At that time, I was also --
3  actually, over the years, Davis & Gilbert
4  used me in other cases. But I didn't
5  actually do this work full-time until
6  around 1987, '8, '9, somewhere in there.
7        Q    Okay. And so you have in your
8  office the documents related to engagements
9  from that -- from the time that you began
10 this work in the late '80s to the present?
11       A    Not all of it. No.
12       Q    But you do keep some of it?
13       A    Right. But a lot of what I do
14 is very highly confidential.
15       Q    Well, we are in a very
16 important lawsuit, so we can decide what we
17 are going to ask you to produce.
18            While at Foote Cone, in order
19 to screen to prevent copyright
20 infringement, did you need to recognize
21 even small similarities in those works?
22            MR. KING: Object to the form
23       of the question.
24       A    I don't understand your
25 question.

Page 35

1        Sandra Wilbur
2        Q    What do you mean? How could I
3  better rephrase it? What don't you
4  understand about it?
5        A    Well, you are asking -- what is
6  "small"? I mean, how --
7        Q    Did --
8        A    Are you asking how many notes
9  or how many phrases?
10       Q    I am asking you:
11            While at Foote Cone, in order
12 to screen to prevent copyright
13 infringement, did you need to recognize
14 even very small similarities in musical
15 works?
16            MR. KING: Same objection.
17       Q    Go ahead.
18       A    Yes.
19       Q    And did you use the same
20 methodology used in this case in order to
21 make that evaluation?
22       A    Let me clarify. The small
23 instances where -- when an agency tried to
24 license the piece of music and then created
25 something that sounded like it, and I felt

Page 36

1        Sandra Wilbur
2  that that would be very foolish since the
3  intent was to sound like the other piece of
4  music.
5            So, you know, from a business
6  risk standpoint, I advised them not to use
7  anything like another piece that they tried
8  to license. I thought that was good
9  advice.
10       Q    Okay. All right. Have you
11 published any articles or books?
12       A    I am in the process of
13 finishing two of them right now.
14       Q    Have you -- as you sit here
15 today, have you published any articles or
16 books?
17       A    No.
18       Q    And what is the subject matter
19 of the articles or books that you are
20 finishing right now?
21       A    One involves a book called
22 Learning History Through Music, which is
23 designed as a teaching and performing tool
24 for teachers in K through eight.
25       Q    Okay.

9  (Pages 33 to 36)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 41

Sandra Wilbur

2  A  No.
3  Q  You were not involved in
4  that --
5  A  No.
6  Q  -- from 2006 here in New York?
7  A  No.
8  Q  Okay.  Burland versus Focus
9  Features, again, in New York?
10  A  I don't recall it.
11  Q  Okay.  Jean versus Bug Music?
12  A  No.
13  Q  Smith-Kline versus Watson
14  Pharmacies from 2000?
15  A  No.
16  Q  Santrail versus Burrell?
17  A  Yes.
18  Q  And you were for the plaintiff
19  in this case against MC Hammer?
20  A  Yes.
21  Q  And Creme Records versus Joseph
22  Schlitz Brewing Company?
23  A  That was the one I talked about
24  from '81.
25  Q  Okay.  The decision is from

Page 42

Sandra Wilbur

1  '89, but it's in the '80s?
2
3  A  It took a long time, that
4  decision.
5  Q  Okay.  Okay.  What percentage
6  of the cases that you have been retained
7  involved work being retained by the alleged
8  infringer or the prospective defendant,
9  defendant or potential defendant?
10  A  Can you rephrase that.
11  Q  As a percentage of your work,
12  how often are you on the side of the
13  defendant or potential defendant versus on
14  the side of the plaintiff or potential
15  plaintiff?
16  A  I would say it's divided about
17  50/50.
18  Q  Okay.
19  A  By the way when I am contacted
20  by a law firm, I ask not to have any
21  specifics about it.  I ask them not to even
22  tell me which side they are on, that I take
23  the two pieces of music and render my own
24  opinion on the facts.
25  Q  Okay.  Have you ever written a

Page 43

Sandra Wilbur

2  deposit copy or lead sheet for a song or
3  other musical work that you have composed?
4  A  Yes.
5  Q  Have you ever been engaged to
6  prepare a deposit copy or lead sheet for
7  another artist or composer?
8  A  I don't believe so.
9  Q  Okay.  What do you normally
10  include and exclude from the lead sheet?
11  A  The lead sheet generally has
12  the chords, the lyrics, the melody, the
13  structure, the movements, the -- if they
14  are appropriate to put into the lead sheet
15  and they are important.
16  Q  What is not included in a lead
17  sheet typically?
18  A  Generally, the arrangement.
19  Q  Anything else?
20  A  Certainly, the sound of the
21  artist.
22  Q  Anything else?
23  A  There may be other things.
24  Yes, but --
25  Q  What is included in an

Page 44

Sandra Wilbur

2  arrangement?
3  A  An arrangement is the use of
4  different instruments set into patterns so
5  that they enhance or underscore, if you
6  will, the song that is contained within it.
7  Q  Is arranging a form of
8  composition?
9  A  That's -- that's a legal
10  question.
11  Q  Is arranging a form of
12  composition?  What do you mean by it's a
13  "legal question"?
14  A  Well, I think that -- you know,
15  I have been in many cases where, for
16  instance, arrangers are hired to do
17  arrangements of jingles.  They are
18  generally composers for hire.  People who
19  score and do arrangements, these are
20  contractual arrangements.  And so it
21  depends on the situation.
22  Q  What you are saying is that a
23  new arrangement may be a composition, or it
24  may not be depending upon the arrange --
25  the arrangement between the original

11  (Pages 41 to 44)

Page 45

Sandra Wilbur

1    composer and the person hired to do a new
2    arrangement; is that what you are saying?
3    A    Can you say that again.
4    Q    You just said that an
5    arrange -- whether an arrangement is a form
6    of composition is a legal question, and
7    then you went on to explain that sometimes
8    an arranger is hired.  So I didn't really
9    understand.
10   A    The arrangement is not the
11   song.
12   Q    What is the arrangement?
13   A    The arrangement is the putting
14   instruments in place, often, often used as
15   orchestrating, putting -- putting the
16   song --
17   Q    Is -- do arrangers make
18   compositional decisions?
19           MR. KING: Object to the form
20   of the question.
21   Q    Go ahead.
22   A    Sometimes, I mean, you know.
23   Q    Okay.
24   A    Let me just also say that I do

Page 46

Sandra Wilbur

1    a lot of work with think licensing, and
2    that means people who want to license a
3    song.  And, basically, what I advise them
4    is that they should get the sheet music
5    from the publisher directly, and that what
6    they have bought is basically that.
7           They have not bought the sound.
8    They have not bought the arrangement.  And
9    if they want to do those kinds of things,
10   they really need other permissions.
11   Q    Is what you are --
12           MR. KING: And I will just
13   interject.  You -- you just need to
14   answer his questions.
15           THE WITNESS: Okay.
16   Q    Is orchestration part of the
17   composition in a symphony?
18           MR. KING: Objection to the
19   form.
20   A    It depends on the work really.
21   Q    Is the viola part -- is the
22   viola part of 18th century string quartet
23   part of the composition?
24           MR. KING: Objection to the

Page 47

Sandra Wilbur

1    form of the question.  Lacks
2    foundation.
3    A    I can't answer the question
4    without specifics.
5           MR. KING: The team will be
6    giving him some specifics.
7           THE WITNESS: I am sure.
8    Q    As I understand your answer
9    before, you have never been hired or
10   retained by anyone to prepare or create
11   lead sheets or deposit copies with the
12   Copyright Office, although you have
13   prepared lead sheets for yourself for songs
14   that you have written; is that correct?
15   A    And, you know --
16   Q    Is that correct?
17   A    And co-written.
18   Q    So it is correct for songs you
19   have written and co-written; you have done
20   that; but you have not been retained by
21   third parties to do so, correct?
22   A    Correct.
23   Q    Do your lead sheets differ from
24   the full score of your own songs?

Page 48

Sandra Wilbur

1    A    A lead sheet contains the song.
2    Q    Do your lead sheets differ from
3    the full score of your own songs?
4           MR. KING: Object to the form
5    of the question.
6    Q    Yes or no?
7           MR. KING: You are not limited
8    to yes or no.
9    Q    Well, you can answer yes or no.
10   Then if you want to explain it, you can.
11           But do your lead sheets differ
12   from the full score of your own songs?
13   A    Yes.
14   Q    What is omitted on the lead
15   sheets that -- from your songs, from the
16   full score?
17   A    As I said, the underlying song
18   involves the things that I have already
19   said.
20   Q    Do you possess --
21   A    The melody, the chords.
22           MR. KING: Please let her
23   finish.
24   Q    Okay.

12  (Pages 45 to 48)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 49

Sandra Wilbur

2    A    The melody, the chords, the
3  lyrics, the structure, and the rhythmic
4  elements, as in harmonic rhythm, melodic
5  rhythm, et cetera.
6    Q    Okay. Do you possess the lead
7  sheets that you have written that have been
8  deposited with the lead sheet as deposit
9  copies with the Copyright Office?
10    A    I believe so.
11    Q    Okay. So if we asked you to
12  produce those, you could?
13    A    I could.
14    Q    And do you have a list anywhere
15  of songs you have written or co-written?
16    A    Probably, not complete, but --
17    Q    But you have somewhat of a
18  list?
19    A    I do.
20    Q    Okay. And those -- that list
21  would be available for production to us if
22  we ask for it?
23    A    Sure.
24    Q    You are not an expert, are you,
25  on what must be submitted to the Copyright

Page 50

Sandra Wilbur

2  Office with respect to lead sheets or
3  deposit copies; are you?
4    MR. KING: Objection. Vague
5    and ambiguous.
6    A    I don't know what you are
7  asking.
8    Q    Okay. As I said -- as you said
9  before, you have not been retained as an
10  expert witness on the issue of -- strike
11  the question.
12    You have never been hired by a
13  third party as you said to create lead
14  sheets or deposit copies, correct? Didn't
15  you just say that earlier?
16    A    I did, but I might in cases
17  where somebody is trying to do a trademark,
18  for instance. I have certainly done lead
19  sheets to indicate what those notes are.
20  So if that's what you are asking, that's
21  what I have done.
22    Q    Okay. Have you ever been
23  engaged by anyone to determine whether the
24  deposit copy lead sheet that's been
25  deposited with the Copyright Office is the

Page 51

Sandra Wilbur

2  composition as opposed to the actual
3  recording?
4    MR. KING: Object to the form
5    of the question.
6    A    Can you rephrase.
7    Q    Let me rephrase the question.
8    Do you know that in 1978 the
9  Copyright Act was amended to allow for the
10  deposit of the recording to be the
11  composition?
12    A    I am well aware of that.
13    Q    Okay. Do you know why that
14  occurred?
15    A    Because before that time, it
16  had to be a written out piece of music.
17    Q    Do you know why was it -- was
18  it amended because it was determined that
19  the actual recording was more comprehensive
20  as far as -- and reflective of the
21  composition than a lead sheet might be?
22    A    If they are trying to copyright
23  the recording, then obviously those
24  elements are important.
25    Q    That's not what I am asking

Page 52

Sandra Wilbur

2  you.
3    The -- do you recognize that in
4  1978 the Copyright Act was amended to allow
5  for a recording to be deposited with the
6  Copyright Office as the deposit copy of the
7  composition?
8    You understand that, correct?
9    A    Right.
10    Q    Okay. Was that because it was
11  determined that the recording would be a
12  more thorough and complete representation
13  of the composition than the lead sheet
14  might be?
15    MR. KING: I am going to
16    object. Argumentative. It's beyond
17    the scope of the expertise.
18    Q    Go ahead.
19    A    And I can't answer that
20  question.
21    Q    Do you know why it would be
22  that the Copyright Office would allow from
23  1978 onward for the deposit of a recording
24  to be the composition deposit copy if for
25  any other reason than that?

Page 57

Sandra Wilbur

1  times, the lead sheet is all that's
2  necessary because it's an issue of, you
3  know, melody, harmony, and lyrics. Other
4  times, I do more.
5
6      Q   Do you listen to the recording?
7      A   Yes.
8      Q   Okay. Do you transcribe every
9  element you analyze in your reports?
10     A   I oversee the transcriptions if
11 I don't do them myself.
12     Q   Do you direct others within
13 your organization to transcribe every --
14 every element that has been analyzed in
15 your reports?
16     A   Only, only when it is
17 appropriate.
18     Q   When is it appropriate?
19     A   If there is an issue about, you
20 know, sound alike, or something of that
21 sort.
22     Q   What do you mean by that?
23     A   Well, simply, I mean that you
24 look at the arrangement elements if those
25 are part of what is involved in the case.

Page 58

Sandra Wilbur

1
2      Q   Okay. Ms. Wilbur, when you are
3  engaged to analyze an infringement case,
4  whether one song is infringing on another,
5  and it's a composition, and the issue is
6  compositional similarities, do you do your
7  analysis based on the lead sheets or based
8  upon the recordings of the two songs?
9      A   Generally, the lead sheet.
10     Q   Why?
11     A   Because you want to have the
12 elements of the song that you can --
13     Q   Isn't it true that lead
14 sheets --
15         MR. KING: Let her finish your
16     question before you start shaking your
17     head and interrupting.
18     Q   Isn't it true that lead sheets
19 are oftentimes --
20         MR. KING: Are you going to ask
21     her if she finished the question
22     because she didn't?
23         MR. BUSCH: How do you know?
24         MR. KING: Because she was in
25     mid sentence when you started talking.

Page 59

Sandra Wilbur

1
2      Q   Go ahead. Anything else?
3      A   If it's an infringement case
4  and I am looking at the song itself, a lead
5  sheet is often perfectly appropriate.
6      Q   Ms. Wilbur, in this case, is
7  there a lead sheet for "Blurred Lines"?
8      A   I certainly did one.
9      Q   Listen to my question.
10         Was there a lead sheet for
11 "Blurred Lines" that was created by either
12 the writers or the publishers of "Blurred
13 Lines" at the time of its creation, yes or
14 no?
15     A   I don't know.
16     Q   In fact, you did not see one;
17 one was not provided to you correct?
18     A   I did download sheet music.
19     Q   You did not -- you just said
20 you didn't know if there was a lead sheet
21 that was prepared for "Blurred Lines"?
22         MR. KING: Objection. You are
23     being argumentative.
24     Q   Go ahead.
25         MR. KING: Ask more questions.

Page 60

Sandra Wilbur

1
2  Ask them.
3      Q   Go ahead.
4      A   I downloaded sheet music. It
5  was not provided by the publisher. I did
6  download the sheet music.
7      Q   Who -- who --
8      A   It was a piano arrangement of
9  the song.
10     Q   Who created that sheet music
11 that you downloaded?
12     A   I don't remember.
13     Q   Where did you download it from?
14     A   Music Notes, I think it was.
15 It's in my -- it's in my report.
16     Q   Music Notes?
17     A   There is a download site, sheet
18 music -- sheet music downloads are -- you
19 know, there are several services, and you
20 just have to put the song in and see if
21 there is sheet music on it.
22     Q   Do you know if the -- how
23 "Blurred Lines" was created?
24     A   No.
25     Q   Was it created in the studio by

15 (Pages 57 to 60)

Page 61

1     Sandra Wilbur
2   a recording, or was it written out and
3   transcribed by the writers of "Blurred
4   Lines"?
5     A    I don't know.
6         MR. KING: Objection. Lacks
7   foundation.
8     Q    Okay. Isn't it true, ma'am,
9   that, in fact, "Blurred Lines" was created
10  in the studio, and there was no written
11  transcription of "Blurred Lines" prior to
12  its creation in the studio?
13        MR. KING: Objection. Lacks
14  foundation.
15    Q    Go ahead.
16        MR. KING: She has already told
17  you she has no idea.
18    A    I don't know.
19    Q    So and --
20        (There was a discussion off the
21  record.)
22    A    I don't know the answer.
23        MR. KING: Let's slow down.
24  Let's have the question. Let's have
25  the answer. After she pauses for me

Page 62

1     Sandra Wilbur
2   to object, let's have my objection,
3   and you can ask the next question.
4         MR. BUSCH: And if you keep
5   making speaking objections, I am going
6   to raise it with the court. You have
7   a right to say, "Objection to the
8   form," and that's it. And you
9   continue making speaking objection,
10  and I want you to stop.
11        MR. KING: I have the right to
12  tell you to stop stepping on the
13  witness's comment. If you don't, I
14  will bring it up with the court.
15    Q    Ms. Wilbur -- fine.
16  Ms. Wilbur, when you did your
17  analysis, are you saying that you compared
18  sheet music that was deposited with the
19  Copyright Office with respect to "Got To
20  Give It Up" with the recording of "Blurred
21  Lines" or with sheet music that you
22  downloaded from some third party web site?
23    A    I didn't use the sheet music.
24  I looked at it briefly. I transcribed the
25  song elements in lead sheet fashion from

Page 63

1     Sandra Wilbur
2   the recordings.
3     Q    Okay. Did you do the same
4   thing with respect to "Got To Give It Up"?
5   Did you transcribe yourself from the
6   recording of "Got To Give It Up"?
7     A    Yes.
8     Q    Now, you are doing what
9   Mr. King has accused me of doing, which is
10  speaking over you.
11        MR. KING: I don't mind if she
12  does it.
13        MR. BUSCH: I'm sure you don't.
14        MR. KING: Excuse me. You have
15  notes flying from both of your
16  experts.
17        MR. BUSCH: Stop.
18        MR. KING: I am being --
19        MR. BUSCH: Stop.
20        MR. KING: Well, I am being
21  distracted --
22        MR. BUSCH: Stop.
23        MR. KING: -- by the flurry of
24  notes being passed to you.
25        MR. BUSCH: You need to stop

Page 64

1     Sandra Wilbur
2   immediately.
3         MR. KING: Or what, Richard?
4         MR. BUSCH: Well, I am going to
5   raise it with the court. You are
6   continuing to --
7         MR. KING: Go ahead.
8         MR. BUSCH: Fine, believe me, I
9   will submit the entire transcript to
10  the court.
11        MR. KING: Good.
12        MR. BUSCH: Stop doing it.
13    Q    Ms. Wilbur, so with respect to
14  "Blurred Lines" and "Got To Give It Up,"
15  you transcribed from the recording of "Got
16  To Give It Up"; is that right?
17    A    Yes.
18    Q    And you took your transcription
19  from the recording of "Got To Give It Up"
20  and compared it to your transcription of
21  the recording of "Blurred Lines"; is that
22  correct?
23    A    That's correct.
24    Q    Okay. You did not just rely on
25  the sheet music that was deposited with the

16  (Pages 61 to 64)

Page 65

1          Sandra Wilbur
2     Copyright Office for "Got To Give It Up" in
3     doing your analysis; is that correct?
4          A    That's correct.
5          Q    Okay.
6          A    I --
7               MR. KING: Just leave it there.
8               MR. BUSCH: Stop interrupting
9     her.
10              MR. KING: I didn't interrupt.
11              MR. BUSCH: You just did. You
12    told her to stop answering my
13    question.
14              MR. KING: She'd answered your
15    question. It was a yes or no
16    question.
17              MR. BUSCH: Please do not stop
18    the witness from answering the
19    question, again.
20              MR. KING: Richard, just,
21    please, let's not do this.
22              MR. BUSCH: We're going to --
23    I'm going to do my deposition without
24    your interference. Whatever it is,
25    I'm going to do my best --

Page 66

1          Sandra Wilbur
2               MR. KING: I am just asking
3     you -- you have asked me to not
4     interrupt her. I am asking you not to
5     interrupt her. And I am telling
6     you --
7               MR. BUSCH: I am not --
8               MR. KING: Richard, can I --
9     don't interrupt me. Can I finish what
10    I am saying.
11              MR. BUSCH: Mr. King, we are
12    going to be very long and for a long
13    time if you continue to do this. I am
14    letting you know it is inappropriate.
15    Your behavior is sanctionable.
16              MR. KING: Richard, you are not
17    the judge. I'm sorry.
18              MR. BUSCH: I am going to move
19    to have you sanctioned, and there will
20    be a judge that will determine that.
21    Stop it.
22              MR. KING: Richard, I am asking
23    you to please wait for the witness --
24    would you let me give -- can I speak,
25    and then you can speak? And then I

Page 67

1          Sandra Wilbur
2     can --
3               MR. BUSCH: I didn't say a
4     word.
5               MR. KING: But you are sitting
6     there waving your hand.
7               MR. BUSCH: Because you're
8     about to say the same thing that you
9     said five minutes ago. We are not
10    speaking over each other. You are
11    just going to repeat the same thing
12    you just said. And I want you to stop
13    interfering with my deposition.
14              MR. KING: Richard.
15              MR. BUSCH: You are making
16    comments about notes being passed to
17    me from my -- from people sitting next
18    to me.
19              MR. KING: Yes.
20              MR. BUSCH: It doesn't matter
21    if it distracts you if notes are being
22    -- if notes are being passed. Stop.
23              MR. KING: It distracts the
24    witness.
25              MR. BUSCH: She has not said it

Page 68

1          Sandra Wilbur
2     distracts anybody.
3               MR. KING: Richard, I am her
4     lawyer. I am watching her. I am
5     watching you. I am watching your two
6     experts hand you notes. I am telling
7     you that I believe it's distracting to
8     the witness and interfering with her
9     giving her best testimony. That's
10    what I was about to say that you kept
11    cutting me off about. So, please, I
12    don't care if they pass you notes.
13              MR. BUSCH: It probably will
14    interfere with her giving her
15    testimony because it's going to show
16    that her testimony is not valid.
17              But it doesn't matter whether
18    it interferes or not. Passing notes
19    is not distracting.
20         Q    Ms. Wilbur, if you are
21    distracted by a note being passed to me,
22    please let me know. Would you?
23         A    I will.
24         Q    Thank you.
25              Does commercially sold sheet

17 (Pages 65 to 68)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 69

1       Sandra Wilbur
2   music for general public normally represent
3   the most official form of the musical
4   composition?
5       A   No.
6       Q   When in the process did you
7   review the deposit copy lead sheet for "Got
8   To Give It Up"?
9       A   Only recently.
10      Q   When is recently?
11      A   Before the declaration.
12      Q   So when you did your
13  preliminary analysis, for example, your
14  preliminary report, you did that based upon
15  transcribing the recording of "Got To Give
16  It Up" and transcribing the recording of
17  "Blurred Lines," correct?
18      A   Correct.
19      Q   Okay. Have you produced your
20  transcription in this case?
21      MR. KING: We haven't produced
22  anything from her in this case.
23      Q   So there is no transcription
24  that you provided as part of your
25  declaration, correct?

Page 70

1       Sandra Wilbur
2       A   There were some transcriptions
3   in the declaration.
4       Q   Okay. What transcriptions did
5   you choose to include in the declaration?
6       A   There were transcriptions of,
7   you know, the melodies side-by-side along
8   with prior art examples to illustrate
9   points that I was trying to make. You
10  know, there were -- you know, basically
11  comparing lead sheets with -- with chords,
12  melodies, lyrics.
13      Q   What lead sheets?
14      A   In the declaration, there were
15  snippets that were used.
16      Q   Snippets of what?
17      A   Of the things and actually they
18  were --
19      Q   Of "the things"?
20      A   -- in response to the Finell
21  report.
22      Q   The "things"? What do you mean
23  by the "things"? There were "snippets of
24  the things"?
25      A   There were snippets of music

Page 71

1       Sandra Wilbur
2   that I compared.
3       Q   Okay. What I want to know is:
4       Did you include transcriptions,
5   your transcriptions from the recordings of
6   "Got To Give It Up" versus your
7   transcription of the recordings of "Blurred
8   Lines," or did you include transcriptions
9   from the lead sheet that was deposited with
10  the Copyright Office of "Got To Give It Up"
11  in your affidavit, declaration?
12      MR. KING: Objection to the
13  form.
14      Q   Go ahead.
15      A   I used the ones that I had
16  already created. It turns out that they
17  were substantially the same as the
18  copyright deposits.
19      Q   In your declaration, why did
20  you use Ms. Finell's transcriptions from
21  her preliminary report instead of your
22  transcription?
23      A   It was used in part of the
24  declaration. It was in answer to some of
25  the things that had been said in the Finell

Page 72

1       Sandra Wilbur
2   report.
3       Q   Okay. Were there parts of your
4   transcriptions that you did not include in
5   your declaration?
6       A   Yes.
7       Q   In cases you have handled of
8   music composed after 1980, do you generally
9   transcribe the two recordings that are at
10  issue yourself, or do you rely on lead
11  sheets?
12      A   I always transcribe or oversee
13  the transcriptions myself.
14      Q   Okay. Why do you do that?
15      A   Because I want it to be as
16  accurate as possible.
17      Q   Okay. All right. And who is
18  involved with actually doing the
19  transcriptions when you are engaged as a
20  musicologist?
21      A   You mean who helps me?
22      Q   Yes.
23      A   My assistant, Greg Chudik.
24      Q   How do you spell that?
25      A   G-r-e-g C-h-u-d-i-k.

18   (Pages 69 to 72)

Page 73

1           Sandra Wilbur
2      Q    Okay. How do you analyze
3    transcriptions prepared by other
4    musicologists, for example, transcriptions
5    included in the report by an expert
6    retained by opposing counsel?
7           Do you check the accuracy of --
8    how do you go about -- how --
9      A    Of course.
10     Q    Tell me your methodology, how
11   you about checking for -- analyzing those
12   transcriptions.
13     A    The first thing I do is look to
14   see if they are accurate.
15     Q    And how do you do that?
16     A    I look at the transcriptions
17   and see if they are accurately transcribed,
18   and that's the first thing. And then I
19   compare them to the transcriptions that I
20   have done.
21     Q    Okay. If you find portions of
22   two songs that you are analyzing that you
23   believe are similar, in your methodology,
24   what do you do next?
25     A    I show how the elements are

Page 74

1           Sandra Wilbur
2    similar. It could be notes plus chords
3    plus lyrics plus whatever. And then
4    whether it's on the plaintiff's side or the
5    defendant's side, I look to see if there is
6    prior art that would preexist before the
7    two compositions in question.
8      Q    Are there normally lead sheets
9    in existence of popular music composed
10   after 1980?
11     A    Yes. Well, again, I don't
12   know. You are asking a question that I
13   really haven't done any research on.
14     Q    Okay. Do you know how your
15   methodology, if it does, compares to any
16   standard practices of other musicologists?
17     A    Yes.
18     Q    Do you believe it conforms to
19   the standard practice of other
20   musicologists?
21     A    Yes.
22     Q    What is your basis for saying
23   that?
24     A    I have had an opportunity to
25   review other expert reports, and -- and I

Page 75

1           Sandra Wilbur
2    know that it's consistent.
3      Q    Okay. Did you take a
4    transcription course at UCLA?
5      A    At Berkeley, I did.
6      Q    At Berkeley, but not at UCLA
7    where you got your master's?
8      A    No.
9      Q    Okay. As an ethnomusicologist,
10   when you analyze two songs, do you select
11   some elements as more important than
12   others, or do you consider everything
13   equally in both songs when you analyze the
14   two songs?
15     A    I don't understand your
16   question, really.
17     Q    Do you -- do you believe that
18   some parts of the composition are more
19   important than others when determining
20   whether two songs are similar, or do you
21   generally review the songs in total to
22   determine all of the different
23   similarities?
24          MR. KING: I object to the
25   form.

Page 76

1           Sandra Wilbur
2      Q    Go ahead.
3      A    I review the whole song.
4      Q    Okay. Have you ever been
5    employed as a music transcriber?
6      A    No.
7      Q    As a copyist?
8      A    No.
9      Q    In your report you stated:
10          "In comparing two works for"
11   music -- "for substantial similarity, I
12   look for any similarities between the
13   melodies, harmonies, rhythm, lyrics, and
14   structure of the two works and compare and
15   contrast those similar elements."
16     A    Correct.
17     Q    Are those the only things you
18   compare?
19     A    It depends on the nature of the
20   case.
21     Q    Okay. In this case, were those
22   the only two -- strike the question.
23          In this case, were those the
24   only elements that you compared?
25     A    Initially, they were.

19  (Pages 73 to 76)

Page 77

Sandra Wilbur

1  Q   And then later?
2
3  A   And, later, in response to some
4  of the Finell report, I responded by
5  looking more closely at things that I did
6  not think were part of the song.
7  Q   When you prepare a report, do
8  you include all of the similarities and the
9  differences that you find?
10  A   Generally, yes.
11  Q   Okay.  And as you mentioned,
12  after you find some similarities, you do
13  look at prior art; is that right?
14  A   Correct.
15  Q   Okay.  And how do you select
16  the prior art you use in your comparison?
17  How do you go about doing your prior art
18  study?
19  A   There are lots of resources
20  available.  There are thematic guides.
21  There are books.  But I rely heavily on
22  people, consultants who also are familiar
23  with the particular genre.
24  Q   Okay.  So can you tell me
25  specifically the resources you used in this

Page 78

Sandra Wilbur

1  case for your prior art investigation?
2
3  A   Well, I might -- I might say
4  that it was difficult to do prior art when
5  there was so little similarity.  So I found
6  things that were similar to one, or similar
7  to the other.  But since I did not believe
8  they were particularly similar --
9  Q   Now, are we talking about the
10  "Blurred Lines" --
11  MR. KING:  Please let her
12  finish.
13  MR. BUSCH:  Stop --
14  MR. KING:  When she says "but"
15  and then you start talking, she's
16  clearly not done with her answer.
17  Q   I want to be clear with your
18  answer.
19  Are you talking about both
20  songs that are at issue in this case or
21  one?  So I just want to have you clarify
22  your answer, and you are free to go forward
23  and give whatever other explanation it was.
24  But it was a bad question, because, as you
25  know, there are two claims involved in the

Page 79

Sandra Wilbur

1  case.  There's the "Love After War"/"After
2  The Dance" case; and there is the "Got To
3  Give It Up"/"Blurred Lines" case.
4  So tell me for each what you
5  did to determine or to do an analysis of
6  prior art.  And I'll -- you can answer as
7  fully as you like.
8
9  A   I looked for other melodies
10  that had similarity to one or the other of
11  the hooks, melodies, and other elements in
12  the song.  And I found quite a few of them,
13  so that this was a way of determining
14  that -- that Marvin Gaye did not come up
15  with these -- with these elements.
16  Q   Okay.  Let's -- I again -- I
17  want you to focus on both songs.  I don't
18  know which song you are talking about now.
19  A   I see.
20  Q   So we have -- we have "After
21  The Dance"?
22  A   Right.
23  Q   And we have "Got To Give It
24  Up."  So start with "Got To Give It Up."
25  A   Okay.

Page 80

Sandra Wilbur

1  Q   Tell me what you did to do an
2
3  analysis of prior art for "Got To Give It
4  Up"; tell me everything you did.
5  A   Okay.  Because, initially, I
6  didn't think there was any substantial
7  similarity, I didn't think it was necessary
8  to do prior art research.  After reviewing
9  the Finell report, after I did my own
10  report, I used prior art as a way to
11  illustrate the points that I was trying to
12  make.
13  And I found many examples that
14  were closer to one or the other of these
15  than the two were to each other -- the two
16  songs were the "Got To Give It Up" and the
17  "Blurred Lines" were to one another.
18  Q   Again, I am asking you, ma'am,
19  to please tell me, not your conclusions at
20  the end --
21  A   Okay.
22  Q   -- at the end of your analysis.
23  What I want to know is everything you did
24  to find prior art.  Let's start with "Got
25  To Give It Up."

20  (Pages 77 to 80)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 81

Sandra Wilbur

1
2    A    Okay. I asked two people who
3    were expert in that -- in that time frame
4    to come up with other songs that had --
5    that had similarities.
6        Q    Who -- who were these people?
7        A    One was Alan Friedman. One was
8    Richard Arico, both musicians.
9        Q    They don't work for you?
10       A    They -- I consult with them.
11       Q    They are third parties?
12       A    They are.
13       Q    They are not employed by you?
14       A    They are not.
15       Q    Did you pay them?
16       A    I did.
17       Q    Okay.
18       A    The others, the others -- the
19   others came out of my own head.
20       Q    All right. But tell me --
21   other than going to these third parties who
22   I don't -- strike the question.
23           Other than going to these third
24   parties and asking them to provide you with
25   other songs that they believed are similar

Page 82

Sandra Wilbur

1
2    to "Got To Give It Up," did you do anything
3    else yourself?
4        A    I looked at theme indexes to
5    look at one melody line or the other. As I
6    said since they weren't similar, I looked
7    for -- at both of them.
8        Q    I don't know what you are
9    talking about when you say "they weren't
10   similar." What I want to know is what you
11   did to find -- to conclude that "Got To
12   Give It Up," that there is prior art that
13   is similar to "Got To Give It Up."
14           You said you spoke to these two
15   people you just identified. What else did
16   you do?
17           MR. KING: Every time she tries
18       to answer, you cut her off.
19           MR. BUSCH: No, I don't cut her
20       off. She said, "I concluded they
21       aren't similar."
22       Q    But the point -- I'm not asking
23   you for your conclusion about "Got To Give
24   It Up" versus "Blurred Lines."
25       A    I listened to a lot of material

Page 83

Sandra Wilbur

1
2    that was in the early 1970s --
3        Q    Okay.
4        A    -- that was popular at the
5    time, that was -- that had similarities.
6    Curtis Mayfield was one. Lipps was another
7    one that actually was from 1980. I looked
8    at War. I looked at other examples of funk
9    and groove kinds of pieces that shared
10   similarities, melodically, harmonically, or
11   in other ways.
12       Q    With "Got To Give It Up"?
13       A    Yes, with "Got To Give It Up."
14       Q    Okay. And so the -- after --
15   and tell me how did you find the catalog.
16   When you say you "listened to," how did you
17   find the music in order to be able to
18   listen to these other songs?
19       A    How did I find these songs?
20       Q    Yes, what did you -- I mean,
21   did you just go on the radio? Did you --
22   do you have a collection?
23       A    No.
24       Q    Do you have an album
25   collection?

Page 84

Sandra Wilbur

1
2    A    No.
3        Q    What did you do?
4        A    I do have a collection, but I
5    certainly looked at popular songs from that
6    era. I am well versed in that era. I know
7    a lot about popular music from that period.
8    I was writing heavily songs myself at that
9    time, so I was pretty familiar with a lot
10   of the material that was coming out at the
11   time.
12           And that -- so I was already
13   familiar with people, who, like Marvin
14   Gaye, were combining elements in different
15   ways, and, you know, were kind of at the
16   top of their game.
17       Q    Okay. So -- and the examples
18   that you gave of prior art were the best
19   you could come up with as far as being
20   close to the "Got To Give It Up" song; is
21   that right?
22           That was the best you could
23   come up with?
24       A    I used the prior art to
25   illustrate points that I was trying to

Page 85

1          Sandra Wilbur
2    make.
3        Q    Answer my question.  Was that
4    the best you could come up with?
5        A    I don't know.  I stopped doing
6    the research.
7        Q    Okay.  So as long as you had
8    done the research, the -- the songs that
9    you have identified in your report, in your
10   declaration, at that point in time, that
11   was the best you could come up with, right?
12             MR. KING:  Objection.
13        Misstates her prior testimony.
14        Q    Go ahead.
15             MR. KING:  Asked and answered.
16        Q    Go ahead.  That's the best you
17   could come up with.  There wasn't some
18   better song that you just decided not to
19   identify?
20        A    There might be many other
21   songs.
22        Q    Listen to my question, ma'am.
23             MR. KING:  You keep
24        interrupting her.
25             MR. BUSCH:  No, I'm not

Page 86

1          Sandra Wilbur
2    interrupting her.  You keep saying
3    that.  I'm not.
4             MR. KING:  Well, you know what?
5        We have a video so I'm sure there's
6        not going to be any kind of --
7             (There was a discussion off the
8        record.)
9        Q    Answer my question.  Are the
10   songs that you identified as prior art the
11   best you could come up with at the time
12   that you did your declaration, yes or no?
13             MR. KING:  Objection.  Asked
14        and answered.
15        A    That is what I found that I
16   felt would illustrate the points that I was
17   trying to make.
18        Q    And that was your -- that was
19   the best you could come up with, right?
20        A    I am sure if I had more time I
21   would have found many other --
22        Q    Answer my question.
23             MR. KING:  She answered.
24        Excuse me.
25        Q    I am not asking -- I am not

Page 87

1          Sandra Wilbur
2    asking you if you had more time because you
3    have been at this since 2013.  I am not
4    asking you if you had more time would you
5    come up with better examples.  What I am
6    asking you is:
7             Would you agree that, at the
8    time you did your declaration, the examples
9    of prior art that you identified were the
10   best that you had come up with; is that
11   right, yes or no?
12             MR. KING:  Objection.  Asked
13        and answered multiple times.
14        Q    Go ahead.
15             MR. KING:  And argumentative.
16        Q    Go ahead.  Yes or no?
17        A    I don't know.
18             MR. KING:  There we go.
19        Q    You don't know if those were
20   the best you could come up with?
21             MR. KING:  Okay.  Don't answer.
22        Q    Did you choose --
23             MR. KING:  Don't answer the
24        question.
25        Q    Did you choose -- did you

Page 88

1          Sandra Wilbur
2    choose -- did you find other examples that
3    you believed were better than you simply
4    didn't identify?
5             MR. KING:  That question you
6        can answer.
7        A    No.
8        Q    Okay.  Is it your belief,
9    ma'am, that Marvin Gaye's song "Got To Give
10   It Up" is not original?
11             MR. KING:  Objection.  Lacks
12        foundation.
13        A    I think it's original.
14        Q    All right.  Did you find any
15   prior art containing all eight of the
16   similarities between "Got To Give It Up"
17   and "Blurred Lines" that Judith Finell
18   identified in her report?
19        A    I did not find that they were
20   similar, so the answer is no.
21        Q    Which song had most of them?
22        A    Certainly War, the song by War
23   had quite a lot of them.
24        Q    Anything else?
25        A    "Superfly," some of the things

22  (Pages 85 to 88)

Page 89

1    Sandra Wilbur
2    that were brought up in her report.
3    Q    Which -- so you said War had
4    most of them, and "Superfly" had some of
5    them. Which were the ones -- which
6    similarities that Ms. Finell brought up in
7    her report were in War, and which ones were
8    in "Superfly"?
9    A    I think they both had repeating
10   first notes of the melody. I think they
11   both had melodic contours that went up and
12   down. I believe they had phrases that went
13   three sharp two three in a chromatic
14   pattern similar to what was found. I
15   believe that they had similar bass parts.
16       In terms of similar, I mean,
17   you know, since they're not similar, but
18   that they used similar ingredients, if you
19   will, from one to flat seven in bass parts.
20   I'd have -- I'd have to look at my report.
21   Q    Okay. But it's in your report?
22   A    It is.
23   Q    Okay. All right. What
24   criteria did you -- other than -- let me
25   rephrase the question.

Page 90

1    Sandra Wilbur
2       Did you use the same criteria
3    for selecting prior art examples for
4    after -- "Love After War" and "After The
5    Dance" as you did for "Got To Give It Up"
6    and "Blurred Lines"?
7    A    I found so little similar
8    between those two songs that it was
9    really -- it was really not an intensive,
10   an intensive search, I would say.
11   Q    Did you -- did you find the
12   chorus of the two songs at all similar?
13   A    I explained in my report what I
14   found similar in those two.
15   Q    Did you find the chorus of the
16   songs to be similar?
17   A    They had similarities, but they
18   were not substantially similar to one
19   another.
20   Q    What's the what's the
21   difference between "similarities" and
22   "substantial similarities" in your view?
23   A    "Similarities" are common
24   elements that happen to be similar that
25   anybody is entitled to use.

Page 91

1    Sandra Wilbur
2    Q    Do you make that determination
3    about anybody being entitled to use other
4    people's works?
5    A    I don't think that this was
6    used. I don't think that song was used.
7    Q    I don't understand the answer.
8       MR. BUSCH: Can I just look
9    back at her answer? Go back.
10   Q    Okay. Yes. So what were the
11   similarities that -- between the choruses
12   of "Love After War" and "After The Dance"
13   that you believed did not rise to
14   substantial similarities?
15   A    They both had a final chord --
16   if I remember correctly, it was an E major
17   seventh. They both had four phrases in an
18   eight-measure section, all very common.
19       The melodic elements were not
20   particularly similar, but they both did end
21   on the same note, but not at the same time
22   in the measure. There was one instance
23   where there was -- I think it was a B
24   minor -- a flat five chord used of minor
25   four, minor five to a major. That -- that

Page 92

1    Sandra Wilbur
2    was one time in the chorus. None of these
3    to me rose to that level.
4       The lyrics were different. The
5    melodies were different. They happened to
6    hit the same -- the same chord at the end
7    of each phrase.
8    Q    So it's your opinion that --
9    A    It is my opinion.
10   Q    -- they are similar, but not
11   substantially similar?
12   A    As they contain similar
13   elements.
14   Q    So the answer to my question
15   is, "Yes, they are similar, but not
16   substantially similar"?
17       MR. KING: Objection. Asked
18   and answered.
19   A    That's not what I am saying.
20   Q    Okay. I thought that's what
21   you just said?
22   A    I do not feel -- I do not feel
23   that they are very similar. They have some
24   similarities.
25   Q    Didn't you just say earlier

23  (Pages 89 to 92)

Page 93

1          Sandra Wilbur
2   that they were similar, but not
3   substantially similar?
4        A    I gave you very specifically
5   what I found similar.
6        Q    Okay.
7        A    Four phrases in an
8   eight-measure pattern with a chord --
9   actually, I believe, a G note at the end of
10  each phrase. But it didn't happen
11  simultaneously or in the same position.
12         A chord that was the same in
13  both at the end of each phrase, but did not
14  happen simultaneously, or, you know, or for
15  the same amount of duration, except I think
16  in one example.
17         And those are the things that I
18  found similar.
19       Q    All right. And I believe you
20  just said a second ago that you found there
21  to be some similarities, but not very
22  similar. Is that the phrase you used,
23  "very similar"?
24         MR. KING: Objection.
25         Misstates her prior testimony. Asked

Page 94

1          Sandra Wilbur
2   and answered.
3        Q    Go ahead. But you said they
4   are similar, but not very similar?
5        A    I said that there were
6   similarities within them, but they were not
7   substantially similar.
8        Q    Okay. Who makes the decision
9   about whether something is -- rises to the
10  level of substantial similarity as opposed
11  to similarity? Is that for you to decide
12  or for the court?
13       A    Well, that certainly is a jury
14  decision.
15       Q    Okay. When you say they,
16  quote-unquote, "happened to hit the same
17  chord at the end," doesn't the choice of
18  the chord represent a choice of the artist
19  and an expression?
20         MR. KING: Objection to the
21  form.
22       A    I have no idea what you just
23  asked.
24       Q    Well, you said that they,
25  quote-unquote, "happened to hit the same

Page 95

1          Sandra Wilbur
2   chord at the end."
3        A    When they transposed the two.
4        Q    You have to wait. Once again,
5   you have to wait until I finish asking my
6   question, please.
7          You said they, quote-unquote,
8   "happened to hit the same chord at the
9   end," but isn't that a choice by the
10  composer, if the chord -- isn't that a
11  choice by the composer?
12       A    First of all --
13       Q    Yes or no, then you can
14  explain.
15       A    Certainly, chord choices are a
16  composer's choice.
17       Q    Okay.
18       A    But I will say that they are
19  not in the same key, and these were
20  transposed into the same key so that they
21  could be compared. So the same chord
22  really is not really the same chord in each
23  one, but simply after it was transposed.
24       Q    We are talking about "After The
25  Dance" and the "Love After War" right now,

Page 96

1          Sandra Wilbur
2   correct?
3        A    Correct.
4        Q    Are transposed chords
5   equivalent to one another?
6          MR. KING: Objection to the
7   form of the question.
8        A    It is a common practice to put
9   two pieces into the same key for
10  comparative purposes.
11       Q    Let's move on to -- I have a
12  question about "Got To Give It Up" and
13  "Blurred Lines," switching gears from the
14  other case, the other song that's involved
15  in this case.
16       A    Okay.
17       Q    Are the melodies "move it up"
18  in "Got To Give It Up," and "hey, hey, hey"
19  in "Blurred Lines" similar?
20       A    I don't know. I don't remember
21  that.
22       Q    Okay. How many hours did you
23  spend searching for prior art for the
24  "Blurred Lines"/"Got To Give It Up"
25  comparison?

24  (Pages 93 to 96)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 97

Sandra Wilbur

1
2     A    I'm sorry. Say that again. I
3  was just thinking about the other, and I am
4  trying to remember the two phrases that you
5  asked me about.
6     Q    Okay.
7     A    I do not think they're the
8  same. I believe one is three, four, five,
9  and the other is chromatic.
10    Q    I asked you if they were
11  similar.
12    A    I don't know the answer because
13  I didn't look at that.
14    Q    Okay. How many hours did you
15  spend searching for prior art for the
16  "Blurred Lines"/"Got To Give It Up"
17  comparison?
18        I know you spoke to two people,
19  but --
20    A    I -- I don't know.
21    Q    Okay. Do you know how many
22  total musical works you reviewed in your
23  search for prior art on the "Blurred
24  Lines"/"Got To Give It Up" case?
25    A    I'm sorry. I don't. I don't.

Page 98

Sandra Wilbur

1
2     Q    Okay. Did you transcribe any
3  of the prior art comparisons that you found
4  that you have cited?
5     A    I did examples of them in the
6  declaration, the parts that again were
7  similar to one or to the other and
8  illustrated my point that they were not
9  unique.
10    Q    Did you do other transcriptions
11  other than what you have submitted in your
12  declaration on the prior art?
13    A    I might have done one or two.
14    Q    Okay. And you have those?
15    A    Probably.
16    Q    Okay.
17    A    But I am not. I'm not sure. I
18  can't recall.
19    Q    Okay. Did you dismiss prior
20  art that was too dissimilar in your view?
21        MR. KING: Objection to the
22  form of the question.
23    Q    Too dissimilar from "Got To
24  Give It Up" and "Love After War" -- I'm
25  sorry "After The Dance."

Page 99

Sandra Wilbur

1
2     A    Okay. Can you say that again.
3     Q    Yes.
4        Did you listen to songs that
5  you decided were not similar enough to "Got
6  To Give It Up" and dismiss those?
7     A    As I said before, the two songs
8  in my opinion were not similar to one
9  another. So in selecting prior art, I was
10 showing, illustrating points about one and
11 the other.
12    Q    Tell me exactly what your
13 criteria was for accepting or dismissing
14 prior art. What exactly -- what elements
15 of "Got To Give It Up" were you
16 specifically focused on when looking for
17 prior art related to "Got To Give It Up"?
18        MR. KING: I will object to the
19 form the question, questions.
20    A    It's a difficult -- it's an
21 impossible question to answer. I listened
22 to a lot of things. I took notes. I
23 transcribed in my own notes.
24    Q    So you can't tell me what
25 specific parts of prior art songs you were

Page 100

Sandra Wilbur

1
2  focusing on as it relates to "Got To Give
3  It Up" to determine similarities to "Got To
4  Give It Up"?
5     A    As I said, I did not consider
6  these elements similar.
7        MR. BUSCH: I'm going to move
8  to strike every -- I'm going to move
9  to strike that testimony now because
10 it's not my question. My question is
11 simply:
12    Q    You cannot tell me what parts
13 of "Got To Give It Up" you were focused on
14 with respect to prior art in doing your
15 analysis; is that right?
16    A    No.
17    Q    I may have asked this question.
18 Forgive me if I did.
19        But in drafting your affidavit,
20 your declaration that was submitted, did
21 you -- and did -- tell me everyone you
22 spoke to or communicated with concerning
23 that declaration and the contents of it.
24        MR. KING: Let's start with who
25 you spoke to before we get to the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**Page 105**

```
 1           Sandra Wilbur
 2   actually, she promises not to spill
 3   her whatever, can she have a break at
 4   an appropriate time?  Take your time.
 5           MR. BUSCH:  Do you feel like
 6   taking a break now?
 7           MR. KING:  She's going to take
 8   a break once an hour.  That's my rule.
 9   She's going to clear her head once an
10   hour just to --
11           MR. BUSCH:  I have an hour and
12   five minutes, hour and ten minutes,
13   hour and five minutes.
14           MR. KING:  I don't care.
15           MR. BUSCH:  I agree.  It's not
16   a problem.  Let me just see where we
17   are here.
18           Is as good as any.
19           MR. KING:  Good, thank you.
20           (There was a discussion off the
21   record.)
22           THE VIDEOGRAPHER:  The time is
23   12:05 p.m., August 27, 2014.  This is
24   the end of tape number two.
25           (There was a break off the
```

**Page 106**

```
 1           Sandra Wilbur
 2   record.)
 3           THE VIDEOGRAPHER:  The time is
 4   12:22 p.m. on August 27th, 2014.  This
 5   is tape number three, back on the
 6   record.
 7   CONTINUED EXAMINATION
 8   BY MR. BUSCH:
 9       Q   Okay.  Ms. Wilbur, would you
10   agree with me that a lead sheet is a
11   simplified version of a composition that is
12   not really fleshed out?
13       A   It really depends.  It really
14   depends.  But the answer is, yes, it's
15   basically the song.
16       Q   Please answer my question.
17           Would you agree with me that a
18   lead sheet is a simplified, less fleshed
19   out version of a composition?
20           MR. KING:  Objection.  Asked
21   and answered.
22       A   No.  I said no.
23       Q   Have you ever written a cover
24   or an arrangement of a preexisting song?
25           MR. KING:  Objection to the
```

**Page 107**

```
 1           Sandra Wilbur
 2   form of the question.
 3       A   I don't know what you mean.
 4       Q   Have you ever done a -- have
 5   you ever written a new arrangement of a
 6   preexisting song?
 7       A   I don't think so.  I have
 8   certainly included public domain elements
 9   in songs that I have written.
10       Q   But you have never actually
11   done a new arrangement or a cover version
12   of a preexisting song?
13           MR. KING:  Those are -- I will
14   object.  It's compound.
15       Q   Okay.  As far as a new
16   arrangement, you don't believe you have
17   done a new arrangement of a preexisting
18   song?
19       A   When I was a folk singer and
20   performer, I often did guitar arrangements
21   of preexisting songs.
22       Q   Okay.  Did you ever compose --
23   write them, rather than play them, did you
24   write them, transcribe them?
25       A   Not generally.
```

**Page 108**

```
 1           Sandra Wilbur
 2       Q   Have you ever done a cover of a
 3   preexisting song?
 4           MR. KING:  Objection to the
 5   form of the question.
 6       A   What do you mean by a "cover"?
 7       Q   A replay of a song, but maybe
 8   change some elements of the composition.
 9           MR. KING:  Same objection.
10       A   As a performer?
11       Q   Yes, or as song writer, one or
12   the other.
13       A   Not as a song writer.
14       Q   What about as a performer?
15       A   As a performer, certainly.
16       Q   Did you shift or vary the
17   original rhythms in the -- from the
18   original song?
19           MR. KING:  As a performer?
20           MR. BUSCH:  As anything.
21       Q   Answer the question.
22           MR. KING:  Object.  Vague and
23   ambiguous.
24       Q   Answer the question, please.
25       A   I would have to listen to -- I
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 109

Sandra Wilbur

1 mean, this was a lot of years ago, and I
2
3 don't recall.
4     Q    Okay.  In your declaration --
5 strike the question.
6          For your report you listed in
7 your declaration -- I want to just ask you
8 some things about what you did to prepare
9 your affidavit.
10         Did you listen to the two sound
11 -- listen to all the sound recordings that
12 are involved in the case?
13    A    Yes.
14    Q    And you attempted to listen to
15 the prior art; is that correct?
16    A    Yes.
17    Q    And you made transcriptions of
18 all four songs?
19    A    Yes.
20    Q    Do you consider yourself an
21 expert in transcribing -- in transcribing
22 songs?
23    A    I am extremely good.
24    Q    Okay.  But you don't
25 consider -- I asked you if you considered

Page 110

Sandra Wilbur

1
2 yourself an expert.
3    A    I would say that I'm an expert.
4    Q    But as I understood your
5 testimony earlier, you have not taken
6 even one course at UCLA in transcription;
7 is that right?
8          MR. KING:  Objection.
9    Misstates her prior testimony.
10    Q    What education do you have in
11 transcribing songs?
12    A    Transcribing is a skill that
13 doesn't relate to course work.
14    Q    Okay.
15    A    It relates to accuracy.
16    Q    Is it possible to take a melody
17 in four, four and arrange it to be played
18 in three?
19          MR. KING:  Objection to the
20    form of the question.
21    A    It depends on the song, but
22 it's possible.
23    Q    Can the melodies be recognized
24 in both as coming from one another, as
25 coming from the earlier song?

Page 111

Sandra Wilbur

1
2          MR. KING:  Objection.  Lacks
3    foundation.
4    A    You are asking a hypothetical
5 question without a specific.  I can't
6 answer the question.
7    Q    Would the -- so you are telling
8 me it's impossible for you to answer
9 whether you can take a melody in four, four
10 and arrange it to be played in three and
11 then whether the two melodies would be
12 recognized as being similar?
13          You are telling me that's
14 impossible?
15          MR. KING:  Objection.
16    Incomplete hypothetical.
17    A    Hypothetically, you should be
18 able to do that in some cases.
19    Q    How about "Happy Birthday"?
20 Could you do it with "Happy Birthday"?
21    A    It would be pretty hard.
22    Q    Really.
23          Can you change "Jingle Bells"
24 from four, four to a waltz?
25    A    Yes.

Page 112

Sandra Wilbur

1
2    Q    In your declaration -- okay.
3 Let me back up one second.
4          We were talking about things
5 that you listened to or did as part of
6 preparing your declaration.  You
7 transcribed -- you -- the four songs.  You
8 did -- you listened to some prior art.  You
9 listened to the sound recordings.
10         You looked at lead sheet when
11 available, correct?
12    A    Correct.
13    Q    Did you review any depositions
14 of anyone?
15    A    I did review the deposition of
16 Judith Finell.
17    Q    Anyone else?
18    A    No.
19    Q    Okay.  Did you review the
20 deposition of Robin Thicke?
21    A    No.
22    Q    Did you look at any statements
23 that Robin Thicke had made about the
24 creation of "Blurred Lines"?
25    A    No.

Page 113

Sandra Wilbur

1
2    Q    Did you review any textbooks or
3  other authorities?
4    A    On what?
5    Q    Glossary of commonly used
6  musical terms.
7    A    Oh, you mean for my glossary?
8    Q    Yes.
9    A    I certainly consulted different
10  texts on that, yes.
11    Q    Did you look at any legal
12  authority in the Ninth Circuit in
13  California, which is where we are, where
14  the case is located?
15    A    No.
16    Q    Do you believe there was
17  anything else you needed to review that you
18  didn't review in order to prepare your
19  declaration?
20    A    No.
21    Q    Okay.  In your declaration,
22  when you listed groups of works by other
23  artists such as Stevie Wonder and The
24  Beatles, et cetera, did you analyze their
25  works, and, if so, which specific works by

Page 114

Sandra Wilbur

1
2  them did you review?
3    A    Well, I think The Beatles song
4  where I tried to indicate what a melisma
5  was for the non-musical -- anybody without
6  a music background, I did that.
7    Q    Anything else?
8    A    I listened to a lot of Stevie
9  Wonder songs.  But, again, I listened to
10  them because he, like Curtis Mayfield and
11  Marvin Gaye -- were -- were very similar in
12  terms of their approach to song writing.
13    Q    What specific works of Stevie
14  Wonder did you review?
15    A    I went through a bunch of them.
16  I can't tell you.
17    Q    Why did you exclude the works
18  themselves as substantiation in your
19  declaration?
20    A    I didn't find that they -- they
21  illustrated the point I was trying to make.
22    Q    Okay.  In paragraph 312 of your
23  declaration, you refer to songs that have a
24  similar rhythmic groove, and you quote "use
25  of jazz influenced chords," of "After The

Page 115

Sandra Wilbur

1
2  Dance," citing "I'm Still In Love With
3  You," "Let's Stay Together," et cetera, by
4  Al Green, and "Suavecito" by Malo.
5    Are you familiar with that
6  portion of your affidavit, declaration?
7    A    I am.
8    Q    Okay.  Did you review these
9  specific works, and can you identify
10  precisely their exact rhythms and harmonies
11  that are similar to "After The Dance"?
12    A    Not -- not off the top of my
13  head, I can't.
14    Q    Okay.  Are these rhythms and
15  harmonies more similar to "After The Dance"
16  than they are to "Blurred Lines"?
17    A    They are two different songs,
18  so, yes.
19    Q    Are these -- let me -- let me
20  rephrase the question.
21    MR. KING:  She answered it.
22    MR. BUSCH:  Okay.  I don't
23  think I asked it correctly.
24    Q    At what point in your analysis
25  did you review Judith Fennel's preliminary

Page 116

Sandra Wilbur

1
2  report?
3    A    Well, after I did my own
4  analysis.
5    Q    Okay.  When you do your general
6  work that you have been doing for many
7  years, do you consider statements made by
8  the alleged infringers when creating their
9  work at all relevant?
10    A    I look at the musical facts.  I
11  mean, not generally statements.
12    Q    Well, so are you telling me
13  that, for example, if an alleged infringer
14  were to say, "I was attempting to copy X
15  song," that that would not be relevant to
16  your analysis?
17    MR. KING:  Objection.
18  Incomplete hypothetical.
19    Q    Go ahead.
20    A    I will say, in the Bourne music
21  case, the composer kept insisting that he
22  was being pushed to sound too close to the
23  other song.
24    Q    That's not my question.
25    A    But, I mean, I am just using it

29  (Pages 113 to 116)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 117

Sandra Wilbur

1          Sandra Wilbur
2   as an example. It wasn't relevant, so I
3   don't generally. I look at the musical
4   facts.
5       Q    So you are telling me that, for
6   purposes of determining things like access,
7   independent creation, substantial
8   similarity, you do not believe that an
9   alleged infringer's statement about intent
10  to copy is at all relevant?
11         MR. KING: Object. The
12     question is compound. Form.
13      Q    Go ahead.
14      A    I never read anything like
15  that.
16      Q    That's not my question, ma'am.
17  Just answer my question. My question is
18  that:
19         For any purpose that is
20  involved in an infringement analysis such
21  as access, independent creation, or intent
22  to copy, or substantial similarity, one or
23  all of those issues or others that might be
24  involved in the analysis, are you saying
25  that statements by the alleged infringer

Page 118

Sandra Wilbur

1          Sandra Wilbur
2   about intent to copy is not relevant to
3   your analysis?
4         MR. KING: I am going to object
5     to the form of the question. It
6     assumes many areas of expertise for
7     which this witness is not going to be
8     an expert, nor has she opined in her
9     declaration.
10      Q    Go ahead.
11      A    Rephrase it for me.
12      Q    Okay. Let's just say
13  substantial similarity.
14         MR. KING: Perfect.
15      Q    With respect to substantial
16  similarity, do you -- is it your position
17  that statements by the alleged infringer
18  about intent to copy has no relevance to
19  your analysis, yes or no?
20      A    I would say intent to license a
21  song -- I mean, you know, you are asking me
22  a question that I just can't answer.
23      Q    Ma'am, I am asking you a very
24  simple question. Do you view statements by
25  an alleged infringer --

Page 119

Sandra Wilbur

1          Sandra Wilbur
2       A    It almost never happens.
3       Q    You -- are you going to refuse
4   to answer my question?
5         MR. KING: Just ask the
6     question, Richard. Don't harass here.
7         MR. BUSCH: I'm not harassing.
8   I am asking a very simple question.
9       Q    Yes or no?
10         MR. KING: Ask it again.
11      Q    Is it your position that a
12  statement by an alleged infringer about
13  infringe -- about intent to copy what
14  this -- what he was trying to create when
15  creating the allegedly infringing song, has
16  absolutely no relevance in your analysis,
17  yes or no, please?
18      A    No.
19      Q    Do you understand that -- have
20  you ever been advised that the Ninth
21  Circuit applies what is called the "inverse
22  ratio rule"? Have you ever heard of that?
23      A    I have, but I have forgotten
24  what it is.
25      Q    Do you know that the inverse

Page 120

Sandra Wilbur

1          Sandra Wilbur
2   ratio rule -- have you ever heard -- let me
3   refresh your recollection -- the inverse
4   ratio rule states that the more evidence
5   there is of access and intent to copy, the
6   less substantially similar two works need
7   to be.
8         Have you been advised of that?
9         MR. KING: Okay. I am going to
10     object to the extent you believe you
11     are giving her an accurate statement
12     of the law. This is -- is there a
13     question that you're going to ask --
14         MR. BUSCH: I just did.
15      Q    Have you ever been advised
16  that, in the Ninth Circuit, which is
17  California court where we are, that courts
18  apply what is called the inverse ratio
19  rule? Let's start there.
20         MR. KING: Okay. You can
21     exclude from your answer anything you
22     may have learned from my office.
23         MR. BUSCH: That's absolutely
24     not true. She's an expert witness.
25         MR. KING: Excuse me. What do

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 121

Sandra Wilbur

1       Sandra Wilbur
2   you mean that's not true? Our legal
3   advice to her as to -- is work
4   product. You know that.
5       Q    Have you ever heard in the
6   Ninth Circuit California courts that the
7   courts apply what is called the inverse
8   ratio rule?
9       A    I think it was brought up with
10  this law firm. But I don't -- I don't
11  know.
12      Q    You don't know?
13      A    I --
14          MR. KING: She's not going to
15      answer questions --
16      A    -- am vaguely familiar with the
17  concept.
18      Q    Okay. Do you understand
19  that -- did you take into account -- well,
20  since -- okay.
21          I understand from your last two
22  answers that -- that, one, you have never
23  examined or know about any statements made
24  by Robin Thicke about what he was trying to
25  capture when creating "Blurred Lines,"

Page 122

Sandra Wilbur

1       Sandra Wilbur
2   correct?
3       A    Correct.
4       Q    And I understand from your
5   testimony that -- just a second ago, that,
6   even if you were aware of comments made by
7   Mr. Thicke and even if Mr. Thicke talked
8   about "Got To Give It Up," his
9   consideration of "Got To Give It Up" in
10  creating "Blurred Lines," that you would
11  not find those statements to be relevant.
12          That's what you just said a
13  moment ago.
14          MR. KING: That misstates her
15      prior testimony. I will object to the
16      form.
17      Q    Didn't you just say statements
18  by a composer about what he was trying --
19  about alleged intent to copy is not
20  relevant to you? Didn't you just say that,
21  yes or no?
22      A    I would say that there is a
23  difference between influence and
24  infringement.
25      Q    You have to answer my question,

Page 123

Sandra Wilbur

1       Sandra Wilbur
2   ma'am.
3       A    I don't know --
4       Q    You are not -- are you going to
5   refuse to answer my question?
6          MR. KING: Richard, why do you
7      insist, when you don't like what she
8      is saying, to cut her off and tell her
9      to stop.
10         MR. BUSCH: I don't --
11         MR. KING: It's not only
12     impolite. It's just not good
13     practice.
14         MR. BUSCH: Sir --
15         MR. KING: Let her answer the
16     question; and, if you think she
17     answered it improperly, then harass
18     her.
19         MR. BUSCH: Sir, stop using the
20     word "harassment." Stop making a
21     false record. What I am trying to do
22     is get her to answer my question
23     directly, and I am having a hard time
24     doing that.
25         So if I ask the question three

Page 124

Sandra Wilbur

1       Sandra Wilbur
2   or four times and she won't answer my
3   question directly, I am asking her to
4   please listen to my question and
5   answer my question directly.
6       Q    Can you do that?
7          MR. KING: That's perfectly
8      fine, but do it after she answers as
9      opposed to mid-answer, please --
10      Q    Can you -- can you do that --
11         MR. KING: -- as a favor to me.
12      Q    Can you do that?
13      A    Yes.
14      Q    You are not trying to be
15  evasive; are you?
16      A    No.
17      Q    Okay. And so you are listening
18  to my question?
19      A    Right.
20      Q    Are you having problems
21  listening to my question?
22      A    I am having problems because I
23  don't know what these people said. So I
24  don't know.
25      Q    It shouldn't matter, though, if

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 125

Sandra Wilbur

1          Sandra Wilbur
2  you don't think any statements made by an
3  alleged infringer are relevant -- it
4  shouldn't matter, then, what these people
5  said; isn't that right?
6       MR. KING: There you go again,
7  cutting her off mid -- mid-answer.
8       MR. BUSCH: I don't think I
9  did.
10    A   I think a lot of people don't
11  know, you know, what extent what they say
12  has any impact on public opinion. That
13  doesn't really have a lot of weight in
14  terms of how I analyze the two pieces of
15  music.
16    Q   Are you prepared to answer my
17  questions directly?
18    A   I just did.
19    Q   Listen to my question again. I
20  want to just make sure that we are stating
21  the same things for the record because I
22  don't believe you did answer my question
23  directly.
24       Is it your testimony that you
25  never heard any comments made by Robin

Page 126

1          Sandra Wilbur
2  Thicke about what he was trying to capture
3  when creating "Blurred Lines"? I believe
4  you said that three or four times now;
5  isn't that correct?
6    A   That I heard? You are asking
7  me if I heard statements that he made?
8    Q   Heard -- heard, read, anything.
9       Didn't you say that you were
10  not aware of any statements or comments
11  made by Mr. Thicke?
12    A   I think that I read that he --
13  that he was a great admirer of Marvin Gaye
14  and that he was influenced by Marvin Gaye
15  as were a lot of artists and composers, and
16  as -- there is a wonderful statement that
17  applies to music creation: There are no
18  virgin births in the creation of music.
19       Influence is a part of
20  creation.
21       MR. BUSCH: I am going to move
22  to strike that as not responsive to my
23  question.
24    Q   Are you prepared to answer my
25  questions?

Page 127

1          Sandra Wilbur
2       MR. KING: Richard, stop.
3  That's argumentative. Don't answer
4  that question. Just ask her the
5  questions. If you don't like the
6  answer, ask another question.
7       MR. BUSCH: Well, we are going
8  to be here all day --
9       MR. KING: I don't care. I
10  don't care.
11       MR. BUSCH: I can't be here
12  tomorrow because we have a mediation
13  tomorrow.
14       MR. KING: And you need to be
15  more precise about timing because --
16    Q   Yes or no, ma'am, yes or no,
17  ma'am. I didn't ask you about whether
18  Robin Thicke in the past said that he was
19  influenced by Marvin Gaye in some generic
20  way.
21       I asked you several times in
22  this deposition whether you were aware of
23  any statements made by Robin Thicke about
24  his attempt to copy or evoke or create
25  something like "Got To Give It Up" when

Page 128

1          Sandra Wilbur
2  specifically creating "Blurred Lines"; and
3  I believe your testimony was you were not
4  aware of any such comments?
5    A   That's correct.
6    Q   Okay. And I believe it's your
7  testimony, is it not, that, even if you
8  were aware of comments by a composer about
9  an intent to copy a particular song when
10  creating his song, that you do not believe
11  that is relevant to your analysis; isn't
12  that what you also just said a moment ago?
13    A   That's correct.
14    Q   And I am going to ask you --
15  again, then I asked you about whether you
16  were aware of the inverse ratio rule.
17       MR. KING: She answered that.
18  She answered all of those questions.
19    Q   And with respect to the inverse
20  ratio rule, are you aware or did you take
21  into consideration -- strike the question.
22       I take it then, based upon the
23  answers to my first two questions, that you
24  did not take into account the inverse ratio
25  rule in your analysis.

32  (Pages 125 to 128)

Page 129

```
 1              Sandra Wilbur
 2       In other words, you did not
 3   take into account the fact that California
 4   courts state that the more evidence there
 5   is of access or intent to copy, the less
 6   substantial similarity need be shown?
 7            You did not take that theory or
 8   that rule of law into account in your
 9   analysis; did you?
10       A    No.
11       Q    Okay.  You are aware in this
12   case -- have you read the motion for
13   summary judgment filed by the plaintiff,
14   Pharrell Williams and Robin Thicke and the
15   other plaintiffs in this case?
16       A    I did.
17       Q    You read it from front to back?
18       A    I scanned it.  I will say I
19   scanned it.
20       Q    Okay.  And you saw in your --
21   in your review of the motion for summary
22   judgment, that there are a few different
23   arguments that Mr. Williams and Thicke are
24   making in moving for summary judgment in
25   this case, correct?
```

Page 130

```
 1              Sandra Wilbur
 2       A    Correct.
 3       Q    You saw that one argument is
 4   that the court should focus on the lead
 5   sheet as being the composition in the case,
 6   correct?
 7       A    Yes.
 8       Q    Okay.  And your testimony in
 9   this case that you have come into this
10   deposition here today to give has not been
11   influenced by those arguments, correct?
12       A    The first time I heard about
13   them was when I read the motion.
14       Q    Okay.  My point is that you
15   read the motion before your deposition;
16   and, now, you have come in here to testify.
17   And you're telling the truth here today.
18   You are not trying to give testimony --
19       A    No.
20       Q    -- that you believe would be
21   helpful to their motion for summary
22   judgment, correct?
23       A    Absolutely not.
24       Q    Okay.
25       A    Absolutely not.
```

Page 131

```
 1              Sandra Wilbur
 2       Q    And you would not come in here
 3   and give false testimony under oath,
 4   correct?
 5       A    No way.
 6       Q    Do you remember a moment ago I
 7   asked you whether a -- exact phrase -- I
 8   asked you whether a lead sheet in general
 9   reflected a simplified, less fleshed out
10   reflection of the composition?
11            Do you remember I asked you
12   that question?
13       A    I do.
14       Q    Okay.  And do you recall saying
15   a moment ago the answer was no?
16       A    That's correct.
17       Q    Did you give an affidavit or
18   declaration in the case of Bourne Company
19   versus Twentieth Century Fox?
20       A    I did.
21       Q    And did you declare, under the
22   penalty of perjury, that the statements
23   that you made in that declaration were true
24   and complete and correct?
25       A    I did.
```

Page 132

```
 1              Sandra Wilbur
 2       Q    Okay.
 3            MR. BUSCH:  Let's mark as the
 4   next exhibit, the declaration of Sandy
 5   Wilbur.
 6            (Exhibit No. 503, Declaration
 7   of Sandy Wilbur in case of Bourne
 8   against Twentieth Century Fox, is
 9   marked by the reporter for
10   identification.)
11       Q    Ms. Wilbur --
12            MR. KING:  503.
13            MR. BUSCH:  Yes, 503.
14       Q    Ms. Wilbur, take a look at what
15   I am marking as 503, and tell me if that is
16   your declaration that you gave in that
17   case.
18       A    It looks like that, yes.
19       Q    Okay.  And if you turn to --
20   and is that your signature at the end?
21       A    Yes.
22       Q    And you say that you "declare
23   under penalty of perjury the foregoing is
24   true and correct"?
25       A    Yes.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 133

Sandra Wilbur

1
2      Q    If you turn to paragraph 59 of
3  your declaration, you will see a statement.
4  That first sentence in paragraph 59:
5          "Most of the differences in the
6  lead sheet reflect a simplified, less
7  fleshed out chord pattern."
8          Do you see that?
9      A    Right. That's why I was
10  explaining to you that it has to be
11  specific to a particular piece.
12     Q    In the -- you made that
13  statement, correct? That is your
14  statement?
15     A    In this particular case, it was
16  clearly less. Yes.
17     Q    Okay. So in this particular
18  case, the case that you submitted a
19  declaration under the penalty of perjury,
20  you agreed that the lead sheet in that case
21  was less than the entire composition, and
22  reflected a simplified, less fleshed out
23  version of the composition, correct?
24     A    I must have.
25     Q    Thank you.

Page 134

Sandra Wilbur

1
2          MR. KING: Give it to the court
3  reporter.
4          MR. BUSCH: Yes.
5          MR. KING: I'm still waiting
6  for some of your exhibits from the
7  Pharrell and Robin Thicke depositions
8  that you took with you.
9          MR. BUSCH: Okay.
10     Q    Did you create anything for
11  this report, for your declaration, such as
12  audio samples or comparisons that were not
13  attached to your report?
14         MR. KING: Are you talking
15  about her declaration?
16         MR. BUSCH: Yes.
17     Q    Did you create audio samples?
18         MR. KING: Because she did a
19  report, too, so I just wanted to make
20  sure --
21         MR. BUSCH: You didn't produce
22  the report because that's the
23  preliminary report.
24         MR. KING: I understand. I
25  just want to make sure you are asking

Page 135

Sandra Wilbur

1
2  the question that she understands.
3      Q    I am asking -- yes.
4          Did you create anything for
5  your declaration, any audio samples for
6  your declaration?
7      A    No.
8      Q    Ms. Wilbur, let me ask you -- I
9  am going to ask you a few -- a few -- I am
10  going to ask you whether you agree with a
11  few different statements. Do you agree
12  with the following statement:
13         "That a thorough comparison of
14  two or more pieces of music which examines
15  all pertinent music and vocal elements,
16  including melody, harmony, rhythm,
17  instrumentation, lyrics, musical style,
18  samples, vocal sound, and style, et cetera,
19  in order to determine if there are
20  problematic similarities between the works
21  is required"?
22         MR. KING: Object to the form
23  of the question.
24     A    I don't know what that was
25  related to. But if it was a sound-alike

Page 136

Sandra Wilbur

1
2  case, that's a different -- that's a very
3  different kind of examination than a
4  copyright infringement.
5      Q    Okay. And so with respect to
6  copyright infringement where litigation is
7  being considered or it's been initiated, or
8  just copyright infringement litigation,
9  then you would not agree with that
10  statement?
11         MR. KING: Object to the form
12  of the question.
13     A    I think it really depends,
14  again, on the circumstances in the case.
15     Q    Well, you said sound-alike is
16  different. So what I'm asking you is:
17         Would you agree with this
18  statement that, quote:
19         "A thorough comparison of two
20  or more pieces of work -- music which
21  examines all pertinent music and vocal
22  elements including melody, harmony, rhythm,
23  instrumentation, lyrics, musical style,
24  samples, vocal sound, and style, et cetera,
25  is required in order to determine if there

34 (Pages 133 to 136)

Page 137

Sandra Wilbur

1
2   are problematic similarities between the
3   works"?
4          MR. KING: Object to the form
5   of the question.
6      Q    Do you agree with that in a
7   copyright infringement case like this?
8      A    No, because it --
9          MR. KING: You answered.  He
10   will ask you for an explanation if he
11   wants.
12      Q    Do you agree with the following
13   statement:
14          "Works that sound very similar
15   might only share permissible stylistic
16   similarities with many other works, while
17   works that sound different may have
18   borrowed copyrighted material in ways that
19   are not at first obvious"?
20      A    I agree with that.
21      Q    Do you agree with the following
22   statement:
23          "It is the unique combination
24   of elements, some of which can be common or
25   generic, that defines originality"?

Page 138

Sandra Wilbur

1
2          MR. KING: Objection to the
3   form of the question.  Incomplete
4   hypothetical.
5      A    Can you read that again.
6      Q    "It is the unique combination
7   of elements, some of which can be common or
8   generic, that defines originality."
9          Would you agree with that
10   statement?
11      A    That's very vague.  I don't
12   know the context, so I can't answer that
13   question.
14          MR. BUSCH: Let's mark as
15   Exhibit Number 504, a printout from
16   Ms. Wilbur's web site.
17          (Exhibit No. 504, Printout from
18   Ms. Wilbur's web site is marked by the
19   reporter for identification.)
20      Q    Ms. Wilbur, is this a printout
21   from your web site that I have handed you,
22   Exhibit Number 504?
23      A    Correct.
24      Q    If you will turn to the second
25   block of "Musicological Analysis," do you

Page 139

Sandra Wilbur

1
2   see where the first thing I read to you is
3   stated by you on your web site, quote:
4          "A thorough comparison of two
5   or more pieces of music which examines all
6   pertinent music and vocal elements,
7   including melody, harmony, rhythm,
8   instrumentation, lyrics, musical style,
9   samples, vocal sound, and style, et cetera,
10   in order to determine if there are
11   problematic similarities between the works;
12   an analysis is often called for if the work
13   is reminiscent of another work, the
14   composer has been asked to create a work
15   that sounds like another, or in cases where
16   litigation is being considered or has been
17   initiated."
18          Is that a statement that
19   appears on your --
20      A    Yes.
21      Q    -- web site?
22      A    Um-hum.  I can explain.
23          MR. KING: Really, you don't
24   have to.
25          THE WITNESS: Okay.

Page 140

Sandra Wilbur

1
2      Q    There are no limitations, are
3   there, in your -- in that first sentence
4   that appears in your web site; is there?
5          MR. KING: Objection.  The
6   document speaks for itself.  You can
7   answer.
8      Q    Is there?
9      A    Is there any limitation?
10      Q    It doesn't say that this
11   only -- that this analysis only applies in
12   certain circumstances; does it?
13      A    It's just a list of things to
14   consider depending on what the similarities
15   are between works.
16      Q    I see.
17          Similarities in classical
18   music, are you familiar with,
19   quote-unquote, "theme," and, quote-unquote,
20   "variation form"?
21          MR. KING: Object to the form
22   of the question.
23      Q    Go ahead.
24      A    Yes.
25      Q    Okay.  Do you agree that, in a

35  (Pages 137 to 140)

Page 141

Sandra Wilbur

1   theme and variation, a composer changes the
2   rhythms and placement of pitches from the
3   original theme?
4       A    In some cases, I am sure that's
5   true.
6           THE VIDEOGRAPHER: Your
7   microphone. I didn't hear that last
8   question.
9           MR. KING: You didn't hear the
10  last question or the last answer?
11          THE VIDEOGRAPHER: The answer.
12      A    Can you just ask the question
13  again.
14          MR. KING: I believe your
15  answer was, "In some cases," but we
16  can have the court reporter read her
17  answer.
18      Q    What she said exactly -- tell
19  me if I'm putting words in your mouth,
20  please:
21          "In some cases, I am sure that
22  is true"?
23      A    What was the question?
24      Q    Do you agree that in class --

Page 142

Sandra Wilbur

1   do you agree that, in a theme and
2   variation, a composer changes the rhythms
3   and placement of -- or pitches from the
4   original theme?
5       A    Very general. I mean, you
6   know, again, it depends on the variation.
7   It depends on the theme, and it depends on
8   the composer.
9       Q    Did you not just answer that --
10      A    In some cases -- in some cases,
11  I am sure that's true.
12      Q    Okay. Is the variation still
13  recognizable as similar to the original?
14          MR. KING: Objection.
15  Incomplete hypothetical.
16      A    Again, I can't answer that
17  question.
18          MR. BUSCH: You can put that --
19  the web site statement away, the page
20  away.
21          Let's mark as the next exhibit.
22          (Exhibit No. 505, Printout from
23  Ms. Wilbur's web site, is marked by
24  the reporter for identification.)

Page 143

Sandra Wilbur

1           MR. BUSCH: Let me mark as the
2   next exhibit, another printout from
3   your web site, Ms. Wilbur, Exhibit
4   505.
5       Q    And if you remember a few
6   questions ago, I asked you whether you
7   agreed with the statement:
8           "It is the unique combination
9   of elements, some of which can be common or
10  generic, that defines originality."
11          Do you remember me asking that
12  question?
13      A    Um-hum.
14      Q    If you will turn to the last
15  block on your -- by the way, is this your
16  printout from your web site?
17      A    It is.
18      Q    Okay. If you will turn to the
19  last block on this first page, under
20  "Original Music Clearance."
21      A    Um-hum.
22      Q    And look at the second
23  sentence. Do you see where it says, quote:
24          "It is the unique combination

Page 144

Sandra Wilbur

1   of elements, some of which can be common or
2   generic, that defines originality."
3           Do you see that?
4       A    Yes.
5       Q    Okay. That's something that
6   you wrote on your web site?
7       A    I did.
8       Q    Okay. You have not had legal
9   training in copyright law, correct?
10      A    I did go to law school
11  previously.
12      Q    I went to law school, too.
13  That's not my question. My question is:
14          Did you have training in
15  copyright law? Do you have -- would you
16  agree you do not have training in copyright
17  law?
18      A    I have had a lot of years of
19  experience working with copyright
20  attorneys; so, yes, I have a lot of
21  experience.
22      Q    Okay. Well, you didn't know
23  about the inverse ratio rule; did you?
24          MR. KING: It assumes there is

36  (Pages 141 to 144)

Page 145

Sandra Wilbur

1  Sandra Wilbur
2  such a rule, Richard.
3       MR. BUSCH: There is.
4       MR. KING: You are being
5  argumentative.
6       Q   You didn't know about the
7  inverse ratio rule; did you?
8       A   No.
9       Q   Have you studied Ninth Circuit
10 law on what elements courts look at to
11 determine substantial similarity?
12      A   Not specifically, no.
13      Q   Do you know whether there is a
14 difference under the Ninth Circuit, which
15 is California law, about what constitutes a
16 composition in the musical sense versus in
17 the legal sense, under California law?
18      A   I am not aware of it.
19      Q   Okay. You have never worked in
20 the Copyright Office; have you?
21      A   No.
22      Q   All right. Do you know what
23 the difference is between a musical idea
24 and expression?
25      A   Yes.

Page 146

Sandra Wilbur

1  Sandra Wilbur
2       Q   What is the difference?
3       A   An idea is not protectable, and
4  an expression of an idea is protectable.
5       Q   Give an example from "Happy
6  Birthday."
7       MR. KING: I object to the form
8  of the question.
9       A   Give an example of what?
10      Q   Of difference in idea and
11 expression from "Happy Birthday."
12      A   A birthday song and a specific
13 song.
14      Q   Okay. Howard, let's -- what
15 makes the specific song in "Happy
16 Birthday"?
17      A   I'm sorry.
18      Q   What makes the specific song in
19 "Happy Birthday"?
20      A   The melody, the lyric, the
21 music from what I understand is the public
22 domain work. So in -- the chords, the
23 structure, the rhythms.
24      Q   All right. I want to ask you
25 some just general questions about

Page 147

Sandra Wilbur

1  Sandra Wilbur
2  composition, if I may.
3       Is pitch part of a composition?
4       A   A specific pitch?
5       Q   Yes, just pitch. Is --
6  similarity in pitch, would that be
7  something that you would look at to
8  determine substantial similarity?
9       A   Again, it would depend. You
10 know, pitch can be a relative thing. It
11 has to be within a pattern. It has to have
12 a context.
13      Q   Is pitch part of a
14 composition -- let me just ask that
15 question -- in your view?
16      A   Notes.
17      Q   Pitch, I am asking you a
18 specific question. Yes or no, is pitch
19 part of a composition, yes or no?
20      A   Not necessarily.
21      Q   So is that no?
22      MR. KING: She answered the
23 question, Richard. It depends. You
24 know, you are asking --
25      Q   Go ahead. Is it no or yes?

Page 148

Sandra Wilbur

1  Sandra Wilbur
2       A   It is not necessarily.
3       Q   Okay. Is tempo part of a
4  composition?
5       A   Not necessarily.
6       Q   Phrasing?
7       A   In the abstract.
8       Q   Is phrasing part of a
9  composition?
10      A   Not necessarily.
11      Q   What do you mean by "not
12 necessarily"?
13      A   It depends on the context. It
14 depends. I mean, all songs will have
15 phrases. All songs will have pitches.
16 Whether they are relevant to the
17 composition is something that depends on
18 the context.
19      Q   Is chord progression part of a
20 composition?
21      A   It is part of the composition.
22      Q   Is tone part of the
23 composition?
24      A   Not necessarily.
25      Q   Spatial organization?

37 (Pages 145 to 148)

Page 149

Sandra Wilbur

1
2     A    What do you mean by "spatial"?
3     Q    I am just asking you whether
4  spatial organization is part --
5     A    In other words, spatial
6  organization on the page, how far apart the
7  notes are?
8     Q    S-p-a-t-i-a-l, spatial
9  organization.
10       MR. KING: Object.
11    A    I don't understand your
12  question.
13    Q    Okay.  Is consonance part of a
14  composition?
15    A    Not necessarily.
16    Q    Is dissonance part of a
17  composition?
18    A    It could be, or it might not
19  be.
20    Q    Is accent part of a
21  composition?
22    A    Yes.
23    Q    Note choice?
24    A    Yes.
25    Q    Combinations?

Page 150

Sandra Wilbur

1
2        MR. KING: Objection. Object
3  to the form.
4     A    I don't know what you mean.
5  That's very vague.
6     Q    Okay.  Interplay of
7  instruments?
8     A    Not necessarily.
9     Q    Bass lines?
10    A    No.  I would say no to the
11  previous question as well.
12    Q    So you said "not necessarily"
13  to -- do you know if the Ninth Circuit
14  California courts have recognized those
15  elements as actually parts of a composition
16  that can be considered?  Do you know
17  whether they have or not?
18    A    I don't know the answer.
19    Q    Okay.  And if -- since as you
20  said to many of my questions, "it depends
21  on the context," doesn't that mean that you
22  must consider the combination of elements
23  in determining whether two songs are
24  compositionally similar?
25    A    Absolutely.

Page 151

Sandra Wilbur

1
2     Q    Aren't the elements that you
3  just said make the specific song in "Happy
4  Birthday" the same category of elements
5  that make up "Got To Give It Up"?
6        MR. KING: Object to the form
7  of the question.
8     A    I did say that melody, harmony,
9  chords, lyrics, and structure were part of
10  that song, and those same elements are true
11  for songs.
12    Q    How important is the groove or
13  overall rhythmic feel of a composition in
14  contemporary popular music?
15        MR. KING: Object to the form
16  of the question.
17    A    I think that that's a stylistic
18  element that is not part of the song.
19    Q    What defines a "groove"?  Does
20  rhythm define a groove?
21    A    The combination of elements, it
22  can be -- it can be part of tempo and
23  rhythm, yes.
24    Q    So that could be part of the
25  composition?

Page 152

Sandra Wilbur

1
2     A    No.
3     Q    What -- what is your authority
4  for saying it's not?
5     A    I would say that that's part of
6  the arrangement or production.
7     Q    What is your authority for
8  that?
9     A    My experience.
10    Q    You can't cite anything besides
11  that, right?
12    A    I don't know what you are
13  alluding to.
14    Q    I am asking you if you have any
15  basis for saying that other than your
16  experience.
17    A    And other expert reports.
18    Q    Anything other than that, are
19  there any -- anything other than your
20  experience and other unknown expert
21  reports, yes or no?
22    A    I think the idea that you could
23  copyright a groove or a feel is very
24  dangerous.
25    Q    I didn't say a "feel."  What I

38  (Pages 149 to 152)

Page 153

```
 1              Sandra Wilbur
 2    said was:
 3           Is rhythm part of a
 4    composition?
 5        A    Rhythmic elements are part of a
 6    composition, melodic rhythm, harmonic
 7    rhythm.
 8        Q    Would that include the
 9    bass line?
10        A    If it's a solo bass playing a
11    melody, maybe so.
12        Q    Isn't it true, Ms. Wilbur, that
13    popular music created today in studios
14    often begins with the groove, the groove or
15    rhythm track first, and then lyrics and
16    vocal parts are later added?
17        A    That's correct.
18        Q    In your report, you say that
19    substantial similarity is determined by
20    comparing melody, rhythm, harmony,
21    structure, and lyrics. You agree with that
22    statement?
23        A    I do.
24        Q    In comparing melodies, would
25    you agree that it is critical to look at
```

Page 154

```
 1              Sandra Wilbur
 2    their harmonic context?
 3        A    Yes, I do.
 4        Q    The relationship of a note or
 5    pitch to the chords over which it is
 6    played, harmony can significantly alter the
 7    melodic impact of that note?
 8        A    That's correct.
 9        Q    Going back to the question a
10    moment ago about how modern popular music
11    is created, which we spoke about, and the
12    fact that the rhythm track is laid down
13    first and the vocals are added after, would
14    you agree that that means that the rhythm
15    tracks or groove can drive the other
16    musical content, including, structure,
17    melody, and rhythms?
18          MR. KING: Object to the form.
19        A    It certainly can have something
20    to do with structure. But I think, again,
21    it depends on the context.
22        Q    Okay. When you consider
23    substantial similarity, do you examine how
24    often an element appears in the work?
25        A    I certainly look at how
```

Page 155

```
 1              Sandra Wilbur
 2    important an element is in the work.
 3        Q    Can that be gathered in some
 4    circumstances by how often it appears?
 5        A    That's true.
 6        Q    Okay. If, in comparing two
 7    musical works from a copyright infringement
 8    perspective, they are found to have a
 9    similar element containing a series of
10    similar pitches and rhythms, would they be
11    less similar to one another if the same
12    series was found within prior art?
13          MR. KING: I am going to object
14    to the form of the question.
15        Q    In other words, they are not
16    going to be less similar just because you
17    might be able to find a prior piece of art
18    that also has the same similarities; would
19    they?
20        A    It would certainly show that
21    the song did not -- that that element did
22    not originate with the composer of the
23    song.
24        Q    You don't know that to be true
25    because it may be that an alleged infringer
```

Page 156

```
 1              Sandra Wilbur
 2    attempted to copy a specific song, but was
 3    unaware of the fact that there was some
 4    prior art that was also similar; that is
 5    also a possibility, correct?
 6        A    I am sure that happens all of
 7    the time.
 8          THE VIDEOGRAPHER: We have five
 9    minutes.
10          MR. BUSCH: Okay.
11        Q    Do you consider originality and
12    similarity separately in assessing
13    substantial similarity?
14        A    Originality and similarity?
15        Q    Do you consider originality
16    separately in your "substantial similarity"
17    analysis, or do you combine the analysis
18    into one?
19        A    Certainly, you are looking for
20    unique elements when you look at things
21    that are similar. If they have come before
22    in terms of prior art, then those are not
23    things that originated in that composition.
24        Q    What criteria do you use to
25    determine how important an element is in a
```

39 (Pages 153 to 156)

Page 161

1        Sandra Wilbur
2   Up"?
3        A    Let me see. I really can't --
4   I can't answer the question without looking
5   over the music.
6        Q    Okay. What is a genre of
7   music?
8        A    It's a bigger category, like
9   disco music. A genre defines general
10  stylistic similarities between works, that
11  can include groove -- groove, feel.
12       Q    What is -- what genre is "Got
13  To Give It Up"?
14       A    Unhappily, for Marvin Gaye, it
15  was classified as disco.
16       Q    And what genre is "Blurred
17  Lines"?
18       A    I would call it pop, hip hop.
19       Q    Since you said that the
20  expression is the combination of the
21  individual building blocks, if similar
22  building blocks are used in two works,
23  would they be substantially similar in
24  their expression?
25       MR. KING: Objection to form.

Page 162

1        Sandra Wilbur
2        A    No.
3        Q    "Why not?
4        A    In this particular case, I
5   think my declaration stands on its own.
6   They -- they use similar intervals, but
7   they didn't have them in the same position
8   in the -- in the measure. They were not --
9   I do not consider those similarities.
10       Q    Okay. Do you have any
11  knowledge of how the lead sheet that you
12  reviewed for "Got To Give It Up" was
13  prepared?
14       A    No.
15       Q    Do you know if it was prepared
16  before or after "Got To Give It Up" was
17  recorded?
18       A    No.
19       THE VIDEOGRAPHER: Can you
20  raise your microphone, please, a
21  little higher.
22       Q    And you don't know if it was
23  prepared by somebody other than Marvin
24  Gaye; do you?
25       A    No.

Page 163

1        Sandra Wilbur
2        Q    Are you familiar with the role
3   of music copyists?
4        A    Yes.
5        Q    Are you familiar with the role
6   of music transcribers in the popular music
7   realm in the '70s?
8        A    No.
9        Q    Okay. Do you know whether it
10  was common for writers of popular music,
11  especially of popular music in the 1970s,
12  to not know how to read or notate music
13  themselves?
14       A    I believe that was reasonably
15  common.
16       Q    Do you know if Marvin Gaye was
17  able to read musical notation?
18       A    I believe he was.
19       Q    Do you know if he was able to
20  write musical notation?
21       A    I believe he was.
22       Q    What is your basis of that?
23       A    I believe I read that. But I
24  don't know.
25       Q    You don't know.

Page 164

1        Sandra Wilbur
2        Okay. Do you know if recording
3   musicians for "Got To Give It Up" used the
4   lead sheet to perform the song, to record
5   the song?
6        A    I have no idea.
7        Q    I am going to play you a Mozart
8   variation on "Twinkle Twinkle Little Star."
9        (Music playing.)
10       MR. KING: Mozart created it?
11       MS. FINELL: He didn't create
12  the original.
13       MR. KING: Oh, I'm sorry. He
14  said there was a Mozart creation.
15       MR. BUSCH: Variation.
16       MS. FINELL: Yes.
17       MR. KING: I didn't know the
18  song existed when Mozart was alive.
19       MS. FINELL: It did.
20       MR. KING: I don't have a Ph.D.
21       Q    Were you able to recognize that
22  variation as "Twinkle Twinkle Little Star"?
23       A    I was.
24       Q    Did you hear intervening notes
25  that are not in the original "Twinkle

41 (Pages 161 to 164)

Page 165

Sandra Wilbur

1  Twinkle Little Star"?
2
3      A    Well, there were certainly a
4  lot of passing notes in the left hand of
5  the piano part.
6      Q    Okay. So the answer is, yes,
7  you heard additional notes, correct?
8      A    I did hear, in the arrangement
9  of the song.
10     Q    Did you hear rhythmic change
11  and position as well?
12     A    No, I mean. In the melody, the
13  melody is as we know it. And I think that
14  that speaks to the important weighted notes
15  as they relate to the beats.
16     Q    Don't the intervening notes
17  displace the rhythm of the original notes?
18     A    Intervening notes in the left
19  hand? No --
20         MS. FINELL: Right hand.
21     Q    Do you want to hear it again?
22     A    The melody is played in the
23  right hand. And then there are many notes
24  played in the left -- maybe I have it
25  backwards. Let me listen to it again.

Page 166

Sandra Wilbur

1
2         (Music playing.)
3      Q    Did the intervening notes
4  change the rhythmic emphasis?
5      A    No. There was definitely one
6  part where "dum pum dum pum" -- and that
7  certainly changed the rhythm of the melody.
8  But --
9      Q    Okay. As we talked about
10  earlier, on your web site, as I showed you
11  before, you state that, quote:
12         " It is the unique combination
13  of elements, some of which can be common or
14  generic, that defines originality."
15         Strike that.
16         Have you previously testified
17  that you look at the entire piece when
18  examining a work?
19         MR. KING: I am going to object
20     to the form.
21     A    I don't know.
22     Q    Do you look at the entire -- is
23  it important to look at the entire piece in
24  total when examining a work for
25  infringement?

Page 167

Sandra Wilbur

1
2      A    Yes.
3      Q    Okay. Do you agree that it's
4  important to look at the work in totality
5  when examining two works for infringement?
6      A    Yes.
7      Q    Okay. And in your declaration,
8  you state at paragraph 23:
9         "All five elements must be
10  compared in order to fully and accurately
11  analyze whether any substantial similarity
12  exists. The degree and importance of the
13  similar elements also must be taken into
14  consideration."
15         Is that a correct statement?
16     A    It is.
17     Q    And you agree with that
18  statement?
19     A    I do.
20     Q    Okay. Would this also include
21  comparing the elements collectively?
22     A    The elements?
23     Q    The five elements that you say
24  must be compared in order to fully and
25  accurately analyze whether any substantial

Page 168

Sandra Wilbur

1
2  similarity exists, would you agree that
3  it's important to compare those elements
4  collectively as a collective in the entire
5  work?
6         MR. KING: Object to the form
7     of the question.
8      Q    As opposed to individually?
9      A    Well, you know, structure in
10  itself has to deal with the entire work, so
11  you are looking at the entire work and
12  putting it into a structure. That's one of
13  the first things that you do.
14     Q    Okay. Have you ever compared
15  compositions and found similarities in two
16  melodies where the pitch and rhythm had
17  different placements?
18     A    It's too vague a question. I
19  really --
20     Q    You can't answer that question?
21     A    No.
22     Q    Have you ever compared
23  compositions and found similarities in two
24  melodies where the pitches had different
25  placements?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 169

Sandra Wilbur

1
2     MR. KING: Object to the form.
3     A     I just can't answer that.  I
4  mean, it's specific to the context.
5     Q     Okay.  But I am asking if you
6  have ever compared compositions and found
7  similarities in two melodies where the
8  pitches had different placements.  Have you
9  ever done that before?
10     A     Well, you can show where they
11  line up.  I mean, there is a common
12  practice for musicologists to show notes
13  that are the same and then related notes
14  that might have an angled line as opposed
15  to an up-and-down line.  It's very common.
16          But, certainly, you know, the
17  ones that happen in the same place in the
18  measures are what you look for similar.
19     Q     Would you agree that melody is
20  pitch and rhythm, pitch plus rhythm?
21     A     Again, that's a relative
22  question because pitch can be transposed.
23  So pitch -- you are talking about a
24  specific series of waves for pitch.  You
25  can say notes or steps of the scale.  And

Page 170

Sandra Wilbur

1
2  that's more comprehendible to me.
3     Q     Okay.  Would you agree that
4  musicologists weigh the factors of similar
5  series of pitches, similar series of
6  durations within similar pitches, and
7  similar rhythmic placement positioning
8  within similar series of pitches and
9  durations?
10          MR. KING:  I am going to object
11  to the form of the question.
12     Q     Go ahead.
13     A     I think that that's fair.
14     Q     Okay.  Did you give all of
15  those elements equal weight?
16          MR. KING: Object to the form
17  of the question.
18     A     Again, really depends on the
19  circumstances.
20     Q     Okay.  Would you agree that two
21  melodies can be substantially similar if
22  they have a similar series of pitches and a
23  similar series of durations within similar
24  pitches, even if they do not have similar
25  rhythmic placement?

Page 171

Sandra Wilbur

1
2          MR. KING: Object to the form
3  of the question.
4     A     No.
5     Q     Why not?
6     A     Because they happen at
7  different times, and that means the
8  emphasis and the important weighted notes,
9  you know, are going to be more important.
10  What are the important weighted notes?  If
11  you just simply take something and you move
12  it over an eighth note, it's not the same
13  thing.
14     Q     I am not asking you if it's the
15  same thing.  I am asking you if it's
16  similar, or would you -- would -- let's --
17  let's back up for one second.
18          Would you agree that two
19  melodies can be -- would be similar if they
20  have a similar series of pitches, a similar
21  series of durations, within similar
22  pitches, even if they do not have similar
23  rhythmic placements?
24     A     No.
25     Q     Not even similar?

Page 172

Sandra Wilbur

1
2     A     No.
3     Q     Would you agree that -- have
4  you handled any sampling cases?
5     A     Many.
6     Q     Okay.  Would you agree that, in
7  sampling cases, the placement is not the
8  same, but you can recognize the sample as
9  coming from an original -- a different
10  composition, even if the placement is not
11  the same?
12     A     It's a different analysis.
13  It's a completely different thing.
14     Q     Answer my question.
15          Would you agree that, in those
16  circumstances, the rhythmic placement would
17  not be the same, but you still would
18  recognize the sample as coming from the
19  original song?
20     A     In some cases, yes.
21     Q     And can two similar melodies be
22  recognized in two composed works --
23  compared works -- I'm sorry.  Strike the
24  question.
25          Can two similar melodies be

43   (Pages 169 to 172)

Page 177

Sandra Wilbur

1  that without hearing the context?
2  A   So you are saying, "I Want to
3  Hold your Hand" -- "I Want to Hold your
4  Hand" -- and starting it on the third beat
5  as opposed to the first?
6  Q   That was my question.
7  A   I think, if you had the same
8  lyric and the same melody and you started
9  it on the third beat, you would probably be
10 able to identify that because it had the
11 same lyric and the same melody.
12 Q   Do you pay attention to where
13 in the song structure a particular melodic
14 phrase appears?
15 A   Yes.
16 Q   Okay.  And what emphasis do you
17 put on that?
18       MR. KING: Object to the form
19    of the question.
20 Q   In your overall analysis?
21 A   It depends on the case.
22 Q   So, for example, if one phrase
23 contained a similar series of pitches,
24 individual rhythms, and rhythmic placement,

Page 178

Sandra Wilbur

1  but occurred in the chorus of one song and
2  the verse of another -- and the verse of
3  another, would the individual phrase still
4  be considered as similar by you?
5  A   Yes.
6  Q   In paragraph 27 in your report,
7  you say, quote:
8       "There is no substantial
9  similarity between the melodies of "Blurred
10 Lines" and "Got To Give It Up."
11       However, in paragraph 58, you
12 say that:
13       "The eight similarities are
14 primary melodic."
15 A   "Primarily."
16 Q   "Primarily melodic."
17       Can you explain what you mean
18 when you said that, "The eight similarities
19 are primarily melodic"?
20 A   They lacked harmonic context.
21 The chords were evidently not looked at,
22 from what I could gather.  And similar
23 notes, though not in the same position,
24 were being considered similar.

Page 179

Sandra Wilbur

1  Q   Okay.  I am going to ask you:
2       Anything else that you can
3  explain as far as why you were saying the
4  "eight similarities are primarily melodic"?
5  A   Because I found that the
6  preliminary report was dealing with
7  sequences of notes primarily, not -- not in
8  the context of the harmony.  The harmonies
9  were not listed.
10 Q   Okay.  I want to ask you some
11 questions about your declaration --
12 A   Okay.
13 Q   -- so let's get it out in front
14 of you.
15 A   Okay.
16 Q   Exhibit Number 506.
17       (Exhibit No. 506, Declaration
18    of Sandy Wilbur in this case, is
19    marked by the reporter for
20    identification.)
21 Q   All right.  I would like to
22 direct your attention to paragraph 99 of
23 your report.
24       MR. KING: For the record, it's

Page 180

Sandra Wilbur

1  a declaration.
2       MR. BUSCH: Declaration.  What
3    did I call it, a "report"?
4       MR. KING: Yes.
5  Q   Are you at paragraph 99, ma'am?
6  A   Um-hum.
7  Q   Okay.  And in music example one
8  A and one B, what does element B stand for?
9  A   The notes five, six, one, which
10 do not occur in the same place in either --
11 in these two examples.
12 Q   Would you agree that the
13 series -- that this displays a series of
14 six tones of which five are identical and
15 only one differs?
16 A   Six, pardon me.  Which tones
17 are you referring to?
18 Q   Because -- you should probably
19 get Judith's preliminary report in front of
20 you as well.  Well, what I am asking --
21 A   The example is here.  What six
22 notes are you --
23 Q   Let me -- let me back up.
24 Let's not talk over each other.

45  (Pages 177 to 180)

Page 201

1        Sandra Wilbur
2    A    Yes, I did do that, but it was
3  consistently all through the entire song as
4  one of a variation.
5    Q    Okay.
6    A    It was a very different
7  scenario here.
8    Q    Okay.  You state that, quote:
9        "The degree and importance of
10  the similar elements also must be taken
11  into consideration."
12        That's at paragraph 23 --
13    A    Right.
14    Q    -- of your -- of your
15  affidavit.  If elements --
16    A    Declaration.
17    Q    Declaration.
18        If elements have similar
19  functions in the two songs, do you take
20  that into consideration?
21    A    As an example, what do you
22  mean?
23    Q    Well, you said:
24        "The degree and importance of
25  similar elements" all must be taken --

Page 202

1        Sandra Wilbur
2  "also must be taken into consideration."
3    A    Right.
4    Q    If elements have similar
5  functions in two songs, do you take that
6  into consideration as a general
7  proposition?
8        MR. KING:  Object to the form
9    of the question.
10    A    I don't know what you are
11  referring to.
12    Q    You state -- well, let me ask
13  the question this way.
14        Would you agree that, in both
15  "Got To Give It Up" and "Blurred Lines,"
16  the signature phrase heralds a new primary
17  section of the song, for example,
18  introducing the first vocal phrase in "Got
19  To Give It Up" and introducing the chorus
20  and hook in "Blurred Lines," that those are
21  the pivotal elements of the song?
22        MR. KING:  Object to the form.
23    A    Well, they are not in the same
24  structural sections of the song.  No.
25    Q    Are you -- would you agree that

Page 203

1        Sandra Wilbur
2  they are -- they are pivotal elements of
3  the song, yes or no?
4    A    Yes.
5    Q    You state that there is no
6  melodic phrase in "Got To Give It Up" that
7  also appears in "Blurred Lines"?
8    A    Correct.
9    Q    Okay.  In the trans -- in the
10  transcription in paragraph 183 of your
11  declaration, what are the scaled degrees
12  for quote-unquote "dancing ladies" in "Got
13  To Give It Up" under four A?
14    A    183.
15        Three, three sharp, two, one.
16    Q    Isn't it three, three sharp,
17  two, three?
18    A    Oh, did I say something
19  different?
20    Q    You said "three, three sharp,
21  two, one."
22    A    I'm sorry.  Three, three sharp,
23  two, three.
24    Q    Is it correct that all of the
25  same scaled degrees in "Got To Give It Up"

Page 204

1        Sandra Wilbur
2  are also found in "Blurred in "theme X,"
3  and, in both songs, the scaled degrees are
4  in -- are in identical eighth note rhythms?
5    A    They are completely different.
6    Q    Can you answer my question
7  first, yes or no?
8    A    The same notes might be used in
9  a different order in a different way with
10  different accent patterns.
11    Q    I -- you are going -- I'm going
12  to let you explain your answer however you
13  want.  But you have to answer my question
14  first.
15        Can we agree that you will do
16  that from now on?
17        MR. KING:  Just ask -- that's
18    not an appropriate question.
19        MR. BUSCH:  The problem is that
20    she doesn't want to answer my
21    question.  She wants to be evasive.
22        MR. KING:  So what?  Use it to
23    impeach her, to show how great of an
24    examination you took, and ask her the
25    question.

Page 205

Sandra Wilbur

1
2     MR. BUSCH: I'm not -- I'm
3     not -- I'm just asking questions here,
4     Howard.
5           MR. KING: Well, then ask them.
6     Then don't give her instructions. Ask
7     them.
8     Q     Well, I am going to ask you,
9     ma'am:
10          Can you agree with me that you
11    will try to answer my question directly?
12          MR. KING: Don't answer that
13    question.
14    Q     Can you?
15          MR. KING: That's an insulting,
16    argumentative question. I instruct
17    her not to answer.
18          MR. BUSCH: The record will
19    speak -- the record will speak for
20    itself.
21          MR. KING: Just answer the
22    questions how you best see fit. Just
23    tell the truth.
24    Q     Well, I am going to move to
25    strike everything that you do that doesn't

Page 206

Sandra Wilbur

1
2     answer my question directly, and we will
3     just have the same question asked over and
4     over again until you just decide that you
5     are going to answer my question.
6           MR. KING: Break a leg.
7           MR. BUSCH: Okay. Fine. Thank
8     you.
9     Q     Now, I am going to ask you
10    again, Ms. Wilbur:
11          In the transcription in
12    paragraph 183 of your declaration, you said
13    that the scaled degrees for "dancing lady"
14    in "Got To Give It Up" are three, three
15    sharp, two, three, correct?
16    A     Correct.
17    Q     Would you agree with me, yes or
18    no, that all of the same scaled degrees in
19    "Got To Give It Up" are also found in
20    "Blurred" in "theme X"?
21          Would you agree with that
22    statement, yes or no?
23    A     Yes, but not in the same
24    position.
25    Q     Okay. And would you agree that

Page 207

Sandra Wilbur

1
2     in both songs these scaled degrees are in
3     identical eighth note rhythms, yes or no?
4     A     No.
5     Q     Tell me why they are -- why
6     what I said about them being -- the scaled
7     degrees being in identical eighth note
8     rhythms is not correct?
9     A     Because, if you look at
10    "Blurred" four B, you will see that you
11    have three eighth notes followed by an
12    eighth rest plus a quarter note.
13          You have -- in "Give It Up"
14    four A, you have four eighth notes. You
15    have -- the first one, there is the only
16    one that is similar -- different octave,
17    but the same scale degree. And that is the
18    only one that is similar.
19    Q     Are the notes C sharp, C sharp,
20    B sharp, C sharp?
21    A     Yes. That's -- that's for four
22    A.
23    Q     Okay. And four B?
24    A     C sharp, B sharp, C sharp, C
25    sharp, but different rhythms, the last two

Page 208

Sandra Wilbur

1
2     notes.
3     Q     Okay. Is four C and four D,
4     C sharp, C sharp, B sharp, C sharp?
5     A     Yes, but, if you notice where
6     those -- those B sharps fall -- I think
7     this is really a critical issue -- they
8     actually fall on the second half of beat
9     two in all of the "Blurred" examples,
10    including the "Working" -- "Working on a
11    Coal Mine." They fall on the and of the
12    beat.
13          In "dancing ladies," the B
14    sharp falls on an important weighted note,
15    the third beat. That's a very different
16    thing. "Dancing ladies" -- "if you can't
17    hear" -- those are very different phrases.
18          MR. KING: Whenever you are
19    done with whatever you -- see the
20    break, let me know.
21          MR. BUSCH: Okay. About two or
22    three minutes.
23          MR. KING: Okay.
24    Q     Isn't your example of working
25    prior art more different than both -- in

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 209

Sandra Wilbur

1    the differences that you point out in "Got
2    To Give It Up" and "Blurred"?
3    A    If you look at "Working in a
4    Coal Mine," you will see that the last four
5    notes, three sharp, two, three, three, are
6    right underneath. If you can't hear, they
7    use the three, the sharp two on the and of
8    the beat. They use the next three on the
9    third beat. And then the fourth beat is a
10   three.
11        That's the same rhythm and the
12   same notes in the same location in the
13   measure. Those are very similar.
14   Q    But doesn't it start "working"
15   with a sharp two and a three that you are
16   leaving out, in "working," yes or no?
17   A    Yes.
18   Q    Okay. Thank you.
19        In the transcription in
20   paragraph 183 of your report, of your
21   declaration, what are the scaled degrees
22   for "okay, now he was close," in "Blurred
23   Lines" under four C?
24   A    Three, three, sharp two, three,

Page 210

Sandra Wilbur

1    sharp two, three.
2    Q    Okay. And do you acknowledge
3    that the last repetition of sharp two,
4    three is immaterial to the comparison of
5    the identical scaled degrees and rhythms in
6    "dancing lady"?
7    A    They are not the same. They
8    are not the same note. They happen in
9    different parts of the measure, as I said
10   before.
11   Q    Okay. Would you agree that
12   there are other times in "Blurred Lines"
13   when the identical scaled degrees and
14   rhythms occur without the repetition that
15   you just described and only contain three,
16   three, sharp two, three?
17   A    I don't know. I don't know.
18   Q    Well, look at musical example
19   four D, for the lyrics -- "and that" --
20   "and that why I'm" in "Blurred Lines"?
21        MR. KING: What paragraph are
22   you in?
23        MS. FINELL: 183.
24        MR. BUSCH: 183.

Page 211

Sandra Wilbur

1    Q    So look at -- just answer my
2    question, ma'am.
3        Is it correct that, in that --
4    in that example that I just asked you to
5    look at, there is a -- it contains a three,
6    three, sharp two, three?
7    A    It does.
8    Q    Yes or no?
9    A    Yes.
10   Q    Okay. And in musical example
11   four A in "Got To Give It Up," it also
12   contains a three, three, sharp two, three,
13   correct?
14   A    It does in a different place in
15   the measure.
16   Q    Okay. The answer to the
17   question is, yes, it does contain that,
18   right?
19   A    Yes.
20   Q    Okay. A few more questions,
21   then we will take a break.
22        In the transcription in
23   paragraph 183 of your report, what are the
24   scaled degrees for, quote, "and that's what

Page 212

Sandra Wilbur

1    I'm" in "Blurred Lines" under four D?
2    A    "And that's where I'm"?
3    Q    Yes.
4    A    Three, three, sharp two, three,
5    in a different part of the measure.
6    Q    I got it. It's a three, three,
7    sharp two, three. Correct?
8    A    Correct.
9    Q    Okay. By the way, there is an
10   error there. It should be "that's why
11   I'm" -- you put "that's where," but I think
12   it should be "why."
13   A    Okay.
14   Q    Okay. You state in paragraph
15   59 of your report that, quote:
16        "There are no two consecutive
17   notes in any of the melodic examples in the
18   Finell report that have the same pitch, the
19   same duration, and the same placement in
20   the measure."
21        Correct?
22   A    That is correct.
23   Q    Okay. There are, however,
24   identical scaled degrees and rhythms in the

53  (Pages 209 to 212)

Page 213

1        Sandra Wilbur
2  transcription in paragraph 183 in the
3  report; are there not?
4        MR. KING: I will object to the
5  question.
6     A   I've already answered that
7  question. If they don't line up
8  identically, they are not the same.
9     Q   Do you admit -- would you
10  agree -- I don't want to say that. Let me
11  strike the question.
12        Would you agree that the octave
13  placement of example four A is immaterial
14  to the comparison to the octave placement
15  in four B?
16        In other words, you show the
17  compared lines as being an octave part, but
18  they are considered musicologically to be
19  the same pitches, correct?
20     A   They' in different octaves, but
21  they are the same pitch and the scale.
22     Q   Okay.
23     A   Degree of the scale.
24     Q   Would you agree that it's
25  appropriate to compare the songs in the

Page 214

1        Sandra Wilbur
2  same octave?
3     A   This was transcribed as heard.
4     Q   Would you agree that it's
5  appropriate to compare the songs in the
6  same octave, yes or no?
7     A   No.
8        THE VIDEOGRAPHER: Counselor,
9  five minutes.
10        MR. BUSCH: Okay. Now is a
11  fine time to take a break.
12        MR. KING: Okay.
13        THE VIDEOGRAPHER: The time is
14  3:15 p.m. on August 27, 2014. This is
15  the end of tape number four.
16        (A break is taken.)
17        THE VIDEOGRAPHER: The time is
18  3:32 p.m. on August 27, 2014. This is
19  tape number five. Back on the record.
20  CONTINUED EXAMINATION
21  BY MR. BUSCH:
22     Q   Ms. Wilbur, I previously showed
23  you your declaration that you gave in the
24  case of Bourne versus Twentieth Century Fox
25  correct?

Page 215

1        Sandra Wilbur
2     A   Correct.
3     Q   And I asked you, during this
4  deposition, whether your analysis and
5  considerations stay the same from case to
6  case and do not depend on what will most
7  benefit your -- the person that has engaged
8  you. And you said that's absolutely
9  correct, right?
10     A   Correct.
11        MR. KING: Objection. That
12  misstates her prior testimony.
13        (There was a discussion off the
14  record.)
15     A   Correct.
16     Q   And you gave your declaration
17  in the Bourne case under the penalty of
18  perjury just like you took that oath here
19  today correct?
20        MR. KING: Objection. Asked
21  and answered.
22     A   Yes.
23     Q   Would you please turn to your
24  Bourne declaration that I showed you
25  before?

Page 216

1        Sandra Wilbur
2     A   I don't remember.
3     Q   It's in front of you or it was
4  in front of you. Here it is right here.
5  And I am -- I am referencing Exhibit
6  Number 503. And would you please turn to
7  paragraph 28 in your declaration. And in
8  paragraph 28, I am going to read it for the
9  record; and I want you to tell me if I have
10  read it correctly. You say, quote:
11        "The chords of the first bar
12  and the first beat of the second bar of
13  both "Star" and "Jew" are nearly identical.
14  The sheet music contains an A-A-U-G chord
15  in the third beat of bar one that is not
16  present in the C-E arrangement or in "Jew";
17  but the difference is insignificant because
18  the A-A-U-G chord is simply the A seven
19  chord that follows it, A, C sharp, E, G,
20  with the addition of the melody note F. To
21  the average listener, the differences
22  between those two chords when the melody is
23  played is practically imperceptible. The
24  same is true for the difference between the
25  A seven chord, A, C sharp, E, G in "Star,"

54  (Pages 213 to 216)

Page 217

1        Sandra Wilbur
2    and the C sharp D-I-M chord, C sharp, E, G
3    in "Jew."
4        Did I read that correctly?
5    A    You did.
6    Q    Okay. So in paragraph 28, you
7    said that the changes in the chords were
8    immaterial; did you not?
9    A    Again, a very different
10   context.
11   Q    Yes or no, did you say it?
12   A    I did.
13   Q    Okay. And, in fact, you said
14   that, to the average listener, the
15   differences between these two chords, when
16   the melody is played, is practically
17   imperceptible, correct?
18   A    Because the melody is
19   so strong, yes.
20   Q    Okay. The answer to my
21   question is, yes, you are referencing how a
22   lay listener would hear it, correct?
23   A    Yes.
24   Q    Now, let's turn -- isn't it --
25   isn't paragraph 28 of your declaration that

Page 218

1        Sandra Wilbur
2    we just went over and the differences
3    similar -- a similar comparison to the
4    keyboard content in "Blurred" and "Got To
5    Give It Up"?
6        Aren't the differences that you
7    identify there in paragraph 28 of your
8    report similar to the differences in the
9    keyboard content in "Blurred" and "Got To
10   Give It Up"?
11       MR. KING: Object to the form
12   of the question.
13   Q    Yes or no?
14   A    It's not -- no, no.
15   Q    Isn't in "Blurred" and "Got To
16   Give It Up" a triad compared to an A seven
17   chord?
18   A    An A triad?
19   Q    An A triad compared to an A
20   seven chord?
21   A    Yes.
22   Q    All right. Let's go to
23   paragraph 40 of your declaration, please,
24   in the Bourne case.
25   A    Oh, I don't seem to have a 40,

Page 219

1        Sandra Wilbur
2    page 40 or paragraph 40 --
3    Q    Paragraph 40.
4    A    Paragraph 40.
5    Q    Are you with me?
6    A    Um-hum.
7    Q    I am going to read paragraph 40
8    for the record, and you tell me if I have
9    read it correctly. "Other" -- quote:
10       "Other musical elements of the
11   two songs are also remarkably similar.
12   Some of the similarities" of "Jew" -- "in
13   `Jew' are with certain of the performance
14   elements in the C-E arrangement of `Star,'
15   while others are with the underlying song
16   `Star' as set out in the sheet music."
17       Did I read that correctly?
18   A    Um-hum.
19   Q    Okay. So in identifying
20   similarities, you identified both
21   arrangement and performance elements,
22   correct?
23   A    Correct.
24   Q    Okay.
25   A    That was because --

Page 220

1        Sandra Wilbur
2        MR. KING: Wait, wait, you
3    don't have to explain it to him.
4        THE WITNESS: Okay.
5        MR. KING: He'll ask you if he
6    really wants the explanation. But he
7    won't.
8        MR. BUSCH: Mr. King, I am
9    going to ask you once again, for at
10   least the fourth or fifth time,
11   probably more like ten times, to
12   refrain from extraneous comments on
13   this record.
14       MR. KING: Do you want to know?
15       MR. BUSCH: Sir, I will ask my
16   questions.
17       MR. KING: I just thought you
18   might want to know.
19       MR. BUSCH: I am sure there is
20   a lot of things that you would want to
21   know as well, but I am not going to
22   tell you in advance.
23       MR. KING: Okay.
24   Q    Ma'am, why is it that you
25   reference the performance and the

55 (Pages 217 to 220)

Page 221

1          Sandra Wilbur
2   arrangement elements in this case?
3       A    It's very simple. This was a
4   completely different case. This was a fair
5   use case. That was a question of whether
6   they should have licensed the song. They
7   tried to license the song. They were
8   denied, and then they got too close to it.
9          And I was showing that -- I was
10  comparing both the sheet music and the
11  performance in this case to show that the
12  average listener, in combination with the
13  very strong melody line, would be very much
14  reminded of the song.
15      Q    This was -- hold on a second.
16         You said that this was a,
17  quote-unquote, fair use case -- let's start
18  with that -- and that that made a
19  difference in why you were mentioning the
20  arrangement and performance similarities.
21         But it was also a question of
22  whether it was infringement or whether it
23  was fair use, correct? Yes or no?
24      A    It was --
25      Q    It was a question of

Page 222

1          Sandra Wilbur
2   infringement versus fair use; isn't that
3   right? The plaintiff was saying it was
4   infringement?
5       A    Correct.
6       Q    The defendant was saying it was
7   fair use; isn't that right?
8       A    Right.
9       Q    Okay. And so in deciding
10  whether it was infringement or not, you --
11  in your analysis, you considered the
12  similarities in what you described as
13  performance and arrangement; did you not,
14  yes or no?
15      A    Yes.
16      Q    Okay. And you said the other
17  difference was that, in that case, it was a
18  question of whether they should license it
19  or not or whether they got too close to be
20  infringement, right?
21      A    No, no, that's not what I
22  meant.
23      Q    But that's what you said; isn't
24  it?
25      A    No.

Page 223

1          Sandra Wilbur
2       Q    You didn't say that?
3       A    What I meant to say --
4       Q    Did you say it, though?
5          MR. KING: You know, whatever,
6   Richard, she said or didn't say, you
7   have a fine record of.
8       Q    Did you say --
9          MR. KING: So you are --
10  objection. Argumentative. Bordering
11  on harassment.
12         MR. BUSCH: I am not going to
13  argue with you.
14      A    In fair use, the question is
15  whether or not they have taken more than
16  enough to remind the listener. In this
17  case, I felt they took more than they
18  should have; and, therefore, they have
19  should taken -- licensed the song.
20         And I looked at all the
21  different elements because the average
22  listener would be -- would be hearing all
23  of those things.
24      Q    Ma'am, it was an infringement
25  case where there was a question about

Page 224

1          Sandra Wilbur
2   whether they had created something or that
3   they should have licensed it or whether it
4   was infringement. That was the question in
5   the case.
6          One of the defenses was fair
7   use, right?
8       A    Right.
9       Q    And in the -- in this case
10  which involved the question of whether it
11  was infringement or not, you decided to
12  include in your report in determining
13  whether it was infringement or not, the
14  similarities in the performance and in the
15  arrangement; did you not?
16         MR. KING: Objection.
17      Q    Yes or no?
18         MR. KING: To the form of the
19  question.
20      Q    Did you, yes or no?
21      A    I did.
22      Q    Okay. Okay. Let's go to
23  paragraph 44 of your declaration in the
24  Bourne case. And I am going to read it,
25  and you tell me if it is correct, if I have

56  (Pages 221 to 224)

Page 225

Sandra Wilbur

1  read it correctly. Quote:
2  "Harmonically, the pieces are
3  also quite related. As I stated previously
4  in paragraph 36, 18 measures of `Jew' use
5  one or more of the same basic chords as
6  found in `Star.' There are 58 chords in
7  `Star' and 65 chords in `Jew,' including
8  the last four that occur after the last
9  word is sung. Of these 65 chords from
10 `Jew,' 25 use the same basic corresponding
11 chord in `Star'; 34 share three of the same
12 chord tones in `Star'; and 15 share two of
13 the same chord tones with `Star.' In other
14 words, 49 of the 65 chords from `Jew' are
15 made of the same basic notes as the
16 corresponding chord in `Star.' This is the
17 case for both the C-E arrangement and the
18 sheet music."
19      Did I read that correctly?
20  A   You did.
21  Q   Okay. So is it true that you
22 found in your analysis that only 25 out of
23 the 65 chords were the same?
24  A   You know, I -- this was several

Page 226

Sandra Wilbur

1  years ago. And I don't recall all of the
2  reasons I would have had to review this.
3  You have obviously reviewed it, but I
4  haven't. So I really can't speak to a lot
5  of these things. I just don't recall.
6  Q   Isn't it true you found like in
7  25 -- according to paragraph 44 of your
8  aff -- of your declaration, isn't it true
9  that you found only 25 out of 65 chords the
10 same, yes or no?
11  A   This is what it says.
12  Q   Okay. And isn't it true that
13 in that case you accepted similar chord
14 tones even if the chord names were
15 different?
16  A   In this case, I did.
17  Q   Okay.
18  A   Again, the context is
19 important.
20  Q   And isn't it true that you
21 dismissed identical pitches in "theme X" in
22 this case because of differing chords, yes
23 or no?
24      Isn't it true that in this case

Page 227

Sandra Wilbur

1  you dismissed identical pitches in "theme
2  X" because of differing chords, yes or no?
3  A   No.
4  Q   All right. Let's go to
5  paragraph 45 of your report, of your
6  declaration in the Bourne case. You write
7  in paragraph 45:
8      "Indeed, except for measures 21
9  and 22 in the B section of `Jew,' all of
10 `Star' can be sung using the chords found
11 in `Jew' and vice versa."
12      Did you say that?
13  A   I did.
14  Q   So you accepted the overlay of
15 chords from one song with the melody of
16 another song mashed up as an acceptable
17 manner of determining substantial
18 similarity; did you not?
19      MR. KING: Object to the form.
20  A   That's not true.
21  Q   Isn't that what you are saying
22 here?
23  A   Again, I'd have to review --
24  Q   Yes or no? Isn't what you are

Page 228

Sandra Wilbur

1  saying that you are accepting the overlay
2  of chords from one song with the melody of
3  the other song to show the substantial
4  similarity?
5      That's what you are saying
6  there; isn't it?
7  A   Again, I would have to review
8  the facts.
9  Q   Isn't that what you are saying,
10 yes or no?
11      MR. KING: Objection. Asked
12 and answered.
13  Q   Are you saying that here?
14  A   I don't know what the context
15 is. I have to --
16  Q   Yes or no, are you saying that
17 you're accepting a mash-up?
18      MR. KING: Richard, excuse me.
19  A   I am not accepting this.
20      MR. KING: Just stop. She's
21 answered. You are being
22 argumentative. You can't do it,
23 Richard. You know, you have got a
24 video. You can't do it.

57 (Pages 225 to 228)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 229

Sandra Wilbur

1 Ask the questions. If you
2 don't like the answer, ask it again.
3 But you can't raise your voice --
4 MR. BUSCH: I'm not doing
5 anything like that. I'm asking --
6 good luck -- good luck with that. We
7 are on video. I got it. That's
8 right. Stop making speaking
9 objections. I understand what you're
10 doing.
11 MR. KING: You haven't heard a
12 speaking objection yet today.
13 MR. BUSCH: Really? I want the
14 judge to make the decision on that.
15 MR. KING: Yeah, we will.
16 MR. BUSCH: Okay. Be
17 dismissive or not. I will be
18 submitting this transcript to the
19 court.
20 MR. KING: Good.
21 MR. BUSCH: Good.
22 Q This is your affidavit, right,
23 declaration that you gave under oath,
24 penalty -- subject to penalty of perjury?

Page 230

Sandra Wilbur

1 MR. KING: Asked and answered
2 three times. Objection.
3 Q Did you not?
4 A I did.
5 Q Okay. You say here, except for
6 measures 21 and 22 in the B section of
7 "Jew," all of "Star" can be sung using the
8 chords found in "Jew" and vice versa.
9 This is your declaration,
10 ma'am. Aren't you saying that you are
11 accepting or using as a basis for your
12 opinion the overlay -- the overlay of
13 chords from one song with the melody of the
14 other song --
15 A No.
16 Q -- to prove they are similar?
17 A No.
18 Q What are you saying there?
19 A Because -- because there are
20 enough similarities in the melody plus the
21 chords, and the combination of those two
22 things -- so I am speaking about the chords
23 which occur in the same places with the
24 same harmonic rhythm and in the same places

Page 231

Sandra Wilbur

1 as the other song in combination with the
2 melody notes.
3 Q Okay. What do you mean -- what
4 do you mean when you say, quote:
5 "All of 'Star' can be sung
6 using the chords found in 'Jew' and vice
7 versa"?
8 What's your point?
9 A My point is that the
10 combination of melody notes and the chords
11 that were used were so similar that the
12 average person would hear the other song in
13 it. And that's a combination of melody,
14 notes, and chords. It's not one or the
15 other.
16 Q That's what you are saying?
17 A That's what I'm saying.
18 (There was a discussion off the
19 record.)
20 Q That is what you are saying in
21 this phrase:
22 "All of 'Star' can be sung
23 using the chords found in 'Jew' and vice
24 versa"?

Page 232

Sandra Wilbur

1 What are you saying by that
2 phrase?
3 MR. KING: Objection. Asked
4 and answered. Argumentative.
5 Harassing.
6 MR. BUSCH: I'm doing my very
7 best.
8 A I think I have already answered
9 that.
10 MR. KING: Yes, she has
11 answered it. Move on.
12 Q So that phrase -- I just want
13 to get this for the record.
14 MR. KING: You've got it four
15 times for the record now.
16 Q That phrase, "All of 'Star' can
17 be sung using the chords found in 'Jew' and
18 vice versa," you are not saying that that
19 is one way to show that the songs are
20 substantially similar?
21 A That is part of the context.
22 The melody part is included in this.
23 Q Okay. All right. Let's go to
24 paragraph 46 of your declaration, please.

58 (Pages 229 to 232)

Page 237

```
 1              Sandra Wilbur
 2   So you can have your own unique arrangement
 3   of a public domain song, and that would
 4   certainly qualify as one of the examples
 5   that you are talking about.
 6        Q    Have you ever done that in
 7   advertising, in your advertising work?
 8        A    You mean in terms of advising
 9   people to change the chord?
10        Q    Yes.
11        A    And keep the melody?
12        Q    Yes.
13        A    It was a copyrighted melody,
14   never.
15        Q    All right.  If you would go to
16   your declaration in this case, Ms. Wilbur,
17   please, and go to paragraphs 140 to 152.
18             MR. KING:  Sorry.  What did you
19   start with -- Richard.
20             MR. BUSCH:  Paragraph 140.
21        Q    All right.  Are you there,
22   ma'am, at paragraph 140?
23        A    Um-hum.
24        Q    All right.  Would you agree
25   that the hook of "Blurred Lines" is "take a
```

Page 238

```
 1              Sandra Wilbur
 2   good girl"?
 3        A    That's one of the hooks, yes.
 4        Q    Okay.  And would you read the
 5   hook -- a hook in "Got To Give It Up" is
 6   "keep on dancing"?
 7        A    It's a background part, but
 8   it's a hook.
 9        Q    Okay.  Would you agree that,
10   with respect to those two hooks, "take a
11   good girl" and "keep on dancing," that
12   three of the four pitches are the same,
13   that the identical scale degrees for the
14   pitches are six, one, two, one in "Got To
15   Give It Up" and six, one, one, one in
16   "Blurred"?
17        A    They are not the same because
18   they are not the same rhythm.  They do not
19   occur in the same place.  And my -- this is
20   my same objection.
21             If you look at number 143, I
22   put them into context, and with the melisma
23   that occurs at the end of "take a good
24   girl."  And you will see very clearly that,
25   even though the notes are the same, they do
```

Page 239

```
 1              Sandra Wilbur
 2   not have the same rhythm.  They are not in
 3   the same place in the measure, and they are
 4   very different important weighted notes.
 5        Q    Okay.  I am going to ask you --
 6   and move to strike as non-responsive to my
 7   question.  I am going to ask the question
 8   again.
 9             Would you agree that three of
10   the four pitches are the same that in --
11   and I understand your -- that the placement
12   is different and all of the things that you
13   said.
14             But would you agree that, in
15   "Got To Give It Up," there is a six, one,
16   two, one; and in "Blurred" we have six,
17   one, one, one; would you agree with that?
18        A    Those are the numbers that go
19   above those notes, though it's not
20   relevant.
21             MR. BUSCH:  Move to strike the
22   last gratuitous comment.
23        Q    The -- is there always a
24   tail-type melisma in "Blurred"'s hook "take
25   a good girl," yes or no?
```

Page 240

```
 1              Sandra Wilbur
 2        A    I think -- I don't remember.
 3   But I think there -- I don't remember.  I'd
 4   have to go back.
 5        Q    Would you agree that, in the
 6   hooks that we have just discussed for "Got
 7   To Give It Up" and "Blurred Lines," the
 8   pitches are F sharp, A, and A?
 9        A    In "Blurred Lines," F sharp, A,
10   and A, yes.
11        Q    And the same in "Got To Give It
12   Up," F sharp, A, and A?
13        A    F sharp, A, and B, which is
14   different.
15        Q    It's not F sharp, A, and A?
16        A    No, it's not.
17        Q    How many times does the hook
18   that we just talked about occur in "Blurred
19   Lines"?
20        A    "Take a good girl"?
21        Q    Yes.
22        A    I don't recall, several.
23        Q    And how many times does the
24   hook that we just talked about in "Got To
25   Give It Up" "keep on dancing" occur?
```

60  (Pages 237 to 240)

Page 241

1          Sandra Wilbur
2     A    I don't recall that either.
3     Q    Several?
4     A    Several.
5     Q    Okay.  In those two hooks that
6  we have been talking about, is it true that
7  the first two identical scaled degrees six,
8  one are placed immediately before the bar
9  line, and the final identical scaled degree
10 one enters in beat two in both songs?
11    A    No, that is absolutely
12 incorrect.
13    Q    What is incorrect about it?
14    A    The one occurs after the beat
15 only in "Blurred."  It's not the second
16 scaled degree in "Give It Up"; and,
17 moreover, the first measure uses different
18 chords.
19    Q    Would you go to paragraph 142
20 of your declaration.
21         MR. KING:  I think that's what
22    we are looking at.
23         MR. BUSCH:  I know.  I was
24    looking at 142.
25    Q    Look at musical example two A

Page 242

1          Sandra Wilbur
2  and musical example two B, the hooks from
3  "Give It Up" and "Blurred."  You are saying
4  that the second half of beat two in hook
5  is -- in "Give It Up" -- the -- sorry.  Let
6  me start over again.  That -- start, strike
7  the -- strike the question.
8          Would you agree that, in
9  musical examples two A and two B that are
10 identified at paragraph 142 of your
11 declaration, that that's an A and it occurs
12 on the second half of beat two?
13         MR. KING:  Object to the form
14    of the question.
15    Q    And I'm --
16    A    The -- in "Give It Up" the
17 second half of beat two is a one.
18    Q    Okay.
19    A    This is not my transcription.
20 This is out -- stripped -- copied from the
21 Finell report, and so I didn't do this
22 transcription.  I did the one on the
23 following page, which shows it in context.
24         The one on the second half of
25 the second beat in "give" is not the same

Page 243

1          Sandra Wilbur
2  as the one on the second beat, "girl," in
3  the music example of "Blurred."
4          And the two, which is on the
5  first note of "give," is not the same as
6  the one in "Blurred."
7          And the relationship between
8  the six and the one before the bar line is
9  very different in that "keep on" is twice
10 as long as the eighth notes take up, which
11 occurs only on the fourth beat, instead of
12 the third and fourth beat.
13    Q    Would you agree, ma'am, that
14 both -- in both "Blurred" and "Got To Give
15 It Up," that both use an identical pitch A,
16 scale degree one, on beat two; and in
17 "give," it's on the second half of beat
18 two; and in "Blurred," it's on the first
19 half of beat two, yes or no?
20    A    Yes.
21    Q    All right.  Let's go to your
22 affidavit -- declaration at paragraph 153,
23 please.  Are you there with me?
24    A    Um-hum.
25    Q    How did you transcribe the

Page 244

1          Sandra Wilbur
2  hooks' backup vocals?
3     A    By listening to the recording.
4     Q    And how did you determine which
5  chords were in the backup hooks.
6     A    By listening to the recording.
7     Q    Even if an element like a vocal
8  backup is a common device, can it still be
9  expressed in a unique way?
10    A    I'm sorry.  Say that again.
11    Q    Even if an element like a vocal
12 backup is a common device, can it still be
13 expressed in a unique way?
14    A    Yes, and both of these are
15 expressed in a unique way.
16    Q    Okay.  Is there more than one
17 way to express both backup -- I'm sorry --
18 strike the question.
19         Do you believe that, by
20 shifting suddenly from a single vocal line
21 to a choral texture by adding backup
22 vocals, that that would emphasize and
23 strengthen the portion of the line with
24 added choral texture?
25         MR. KING:  Object to the form

61  (Pages 241 to 244)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 245

1          Sandra Wilbur
2    of the question.
3        A    Completely depends on the
4    context and the song.
5        Q    So sometimes yes and sometimes
6    no?
7        A    Right.
8        Q    Okay. All right. Let's go to
9    your declaration at paragraphs 196 to 220.
10   Is there a specific bass line that is used
11   in the funk or soul genre?
12       A    Very often, they emphasize the
13   one and the flats, the flat seven in funk
14   music, yes.
15       Q    Do you have any specific
16   examples of that?
17       A    I think I gave them.
18       Q    Okay. So what's in your
19   report is the examples that you gave?
20       A    Yes.
21       Q    Do the funk or sole genres
22   dictate a descending bass melody?
23       A    Dictate?
24       Q    Let's look at your --
25       A    It's -- again, it's a choice.

Page 246

1          Sandra Wilbur
2    The descending bass melody in these two are
3    completely different from one another if
4    you're referring to --
5        Q    I am just asking a question:
6    Do the funk or soul genres
7    dictate a descending bass melody?
8            MR. KING: Object to the form.
9        A    I don't know the answer to
10   that.
11       Q    Okay. In bars one -- strike
12   the question. What is the rhythm of a funk
13   bass line?
14           MR. KING: Object to the form.
15       A    There are many.
16       Q    Okay. Identify all different
17   rhythms of a funk bass line, please.
18           MR. KING: Object to the form.
19       Q    Can you identify what you mean?
20   When you say there are "many," I want to
21   know every --
22       A    Well, I mean, if you look at
23   this particular example, you can see very
24   clearly what is similar and what isn't. In
25   every case except the first measure, you

Page 247

1          Sandra Wilbur
2    have -- you have the one, if you will, on
3    the and of the four -- in the and of the
4    four -- actually, in the three -- in the
5    three measures in which they occur, measure
6    one, two, and three in "Give It Up," you
7    have the one on the and of the four, in the
8    second measure of the and of the four, and
9    the third measure on the and of the four.
10           In "Blurred," the -- it occurs
11   once in measure one on the and of the four.
12   But it really accents the first beat. And
13   in every subsequent case of those same
14   first three measures, the one occurs on the
15   one beat. Those are very different.
16       Q    Okay.
17       A    One is more syncopated than the
18   other.
19       Q    In bars one to three of musical
20   example six A at paragraph 204 of your
21   declaration, what are the scaled degrees
22   found in "Got to Give it Up"'s bass line
23   melody?
24       A    Again, this is not my
25   transcription. This is Judith Finell's

Page 248

1          Sandra Wilbur
2    report copied into this. You have one flat
3    seven one flat seven one flat seven one
4    four three flat one.
5        Q    In bars one to three of musical
6    example six A --
7        A    Oh, measure one -- one through
8    three. I'm sorry. I kept going.
9        Q    Yeah.
10       A    You have one, flat seven one,
11   flat seven one in two, and flat seven one
12   in three.
13       Q    Okay. In bars one to three of
14   musical example six B, what are the scaled
15   degrees on beats one and four in the first
16   three bars of "Blurred Lines"'s bass line?
17       A    One, one one, one one, and then
18   there is flat seven.
19       Q    Are these the same scaled
20   degrees used in each of the bass lines?
21       A    They are, but not the same --
22   they are not used in the same way.
23       Q    Okay. How are they used in a
24   different way?
25       A    As I explained earlier, there

Page 249

Sandra Wilbur

1  Sandra Wilbur
2  is much more emphasis on the downbeat of
3  measure -- of the two and the three bars,
4  whereas you don't have anything on the
5  downbeat in measure two and three of "Give
6  It Up."
7        You also have a flat seven one
8  on the four and the and, whereas you have a
9  five and a flat seven on the four and the
10 and of Blurred.  Those are really
11 significantly different.
12       Q    Okay.  Would you agree that it
13 is -- in soul bass lines, it is more
14 typical to have off-beat syncopations in
15 the middle or continuous ostinato as bass
16 line?
17            MR. KING: Object to the form.
18       A    I haven't done a study of that.
19       Q    Is it -- is it -- would you
20 agree that, in funk bass lines, it's more
21 typical to have off-beat syncopations in
22 the middle of the bar?
23       A    No.  I don't know the answer to
24 that.
25       Q    Okay.  All right.  Let's go to

Page 250

1        Sandra Wilbur
2  the keyboard parts, tab five -- I'm
3  sorry -- your declaration at paragraphs 221
4  to 229.
5        In "Blurred" and "Got To Give
6  It Up," would you agree that they both
7  begin and end in the same place in their
8  descending bass melodies?
9            MR. KING: Object to the form.
10       A    Are you talking about 213?
11       Q    I am talking about the bass
12 melodies that we were just talking about.
13       Do they begin and end in the
14 same place in the descending bass melodies
15 in "Blurred" and "Got To Give It Up"?
16       A    The descending bass melodies, I
17 don't -- they are not -- they are not
18 descending in this.  Are you talking about
19 the second half, which is on page 39 at the
20 top of the page?
21       Q    213 of your report.
22       A    These are completely different
23 patterns, needless to say.
24       Q    So the answer is, no, they
25 don't begin and end in the same place in

Page 251

1        Sandra Wilbur
2  their descending bass melodies?
3        A    They do not.
4            MR. BUSCH: Let's take five
5  minutes, Howard.
6            MR. KING: Okay.
7            THE VIDEOGRAPHER:  The time is
8  4:09 p.m.; we are going off the
9  record.
10       (There was a discussion off the
11 record.)
12            THE VIDEOGRAPHER:  The time is
13 4:10 p.m. on August 27, 2014.  This is
14 the end of tape number five.
15       (There was a discussion off the
16 record.)
17       (A break was taken.)
18            THE VIDEOGRAPHER:  The time is
19 4:30 p.m. on August 27, 2014.  This is
20 tape number six.  Back on the record.
21 CONTINUED EXAMINATION
22 BY MR. BUSCH:
23       Q    I am going to take you now to
24 your declaration where you were talking
25 about the keyboard similarities.

Page 252

1        Sandra Wilbur
2        A    Okay.  Can I just correct one
3  thing in the last question that you asked
4  me.  You said about the bass -- do they
5  start and end at the same place.  They
6  actually end on the downbeat on the same
7  one, and very generic.
8        Q    Okay.  And they begin the same
9  place as well?
10       A    No, they do not.
11       Q    Do they begin and end on the
12 same pitch, yes or no?
13       A    I'd have to go back, and let me
14 see.  Well, there is a grace note in "Give
15 It Up," which is a D.
16       Q    Do they begin on five and end
17 on one?
18       A    They do, but not in the same
19 place in the measure, not by a long shot.
20 And they have very different patterns.
21 Just by looking at it, you can see that.
22            MR. BUSCH: Move to strike the
23 remainder of her speech as
24 non-responsive.  I had a very simple
25 question for you.

63  (Pages 249 to 252)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 253

1          Sandra Wilbur
2      Q    Do the pitches begin and end in
3   the same place?
4      A    No.
5      Q    They do -- they don't begin on
6   five and end on one?
7          (There was a discussion off the
8      record.)
9      A    They didn't not -- they do not
10  begin at the same place. They end on the
11  one, but they do not have the same
12  duration.
13     Q    So the pitches do not begin on
14  five; is that correct?
15     A    They do not begin at the same
16  time. One begins on the one beat. The
17  next one begins on the and of the two.
18     Q    I am not asking you about
19  placement, ma'am. I asked you about the
20  pitch.
21         Do they begin at five on the
22  pitch and end on one, yes or no?
23     A    Yes.
24     Q    Okay. Now, I am going to take
25  you to the keyboard, which is at tab -- I'm

Page 254

1          Sandra Wilbur
2   sorry -- which is at paragraph 221 of your
3   declaration.
4      A    Um-hum.
5      Q    Are you there?
6      A    Yes.
7      Q    In bars one to two of "Blurred
8   Lines," does the keyboard play on the beat
9   or on the off-beat?
10     A    On the off-beat.
11     Q    Other than the first beat in
12  bars one to two of "Got To Give It Up,"
13  does the keyboard play on the beat or on
14  the off-beat?
15     A    It plays on the beat for the
16  first two beats.
17     Q    Okay. Ma'am, I am going to
18  interrupt you --
19     A    Okay.
20     Q    -- because I asked you a
21  specific question.
22     A    Say it, again.
23     Q    I said to you:
24         Other than bars one and two of
25  "Got To Give It Up," does the keyboard play

Page 255

1          Sandra Wilbur
2   on the beat or on the off-beat?
3      A    But that's not a correct
4   question.
5      Q    Okay. I'm sorry.
6          Other than the first beat in
7   bars one to two of "Got To Give It Up,"
8   does the keyboard play on the beat or on
9   the off-beat?
10     A    It plays on the beat on the
11  second beat of measure one, and on the
12  first beat -- you said except for the first
13  beat.
14     Q    Yes.
15     A    It does play on the beat on
16  beat two.
17     Q    Does it play on the off-beat at
18  all?
19     A    It plays on the off-beats.
20     Q    Other than beats one and two of
21  bars one and two, it plays on the off-beat,
22  correct?
23     A    Correct.
24     Q    Okay. Are you purposely not
25  trying to answer my question directly?

Page 256

1          Sandra Wilbur
2      A    I just want to be sure you are
3   asking the right question.
4      Q    I'm asking the right question.
5   And I want to make sure you are listening
6   to my question, and you're not trying to
7   speak evasively and not answer my question
8   directly.
9          Are you trying to do that?
10         MR. KING: Don't answer that
11     question. Richard, you are being
12     abusive to the witness.
13         MR. BUSCH: I'm not.
14         MR. KING: Please stop it.
15         MR. BUSCH: For the last five
16     or six hours I have been in a
17     situation where the witness, with all
18     due respect, does not answer my
19     question directly. She answers what
20     she wants to say, and she doesn't --
21     and I have to repeat the question.
22     And I have to focus her and ask her to
23     answer my question directly.
24         And we are toward the end.
25         MR. KING: Okay.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 257

| | |
|---|---|
| 1 | Sandra Wilbur |
| 2 | MR. BUSCH: And so it is what |
| 3 | it is, and the record will be what it |
| 4 | will be. And I will make use of it |
| 5 | for whatever I can. |
| 6 | MR. KING: I mean, really, part |
| 7 | of it is it's a complex area. You and |
| 8 | I really have no idea what we're |
| 9 | talking about. |
| 10 | MR. BUSCH: Well, we do -- we |
| 11 | do have an idea what we are talking |
| 12 | about. I am asking the questions, and |
| 13 | I am asking direct questions that |
| 14 | should be able to answered directly by |
| 15 | this witness. |
| 16 | MR. KING: Well, we just |
| 17 | respectfully disagree, but, if we are |
| 18 | near the end, let's just keep on |
| 19 | going. |
| 20 | MR. BUSCH: We are. |
| 21 | Q   According to your analysis, |
| 22 | Ms. Wilbur, does the keyboard play on the |
| 23 | fourth beat of bar two in "Blurred Lines"? |
| 24 | A   No. |
| 25 | Q   Okay. What are the pitches in |

Page 258

| | |
|---|---|
| 1 | Sandra Wilbur |
| 2 | each of the chords that you transcribed in |
| 3 | "Blurred Lines"? |
| 4 | A   A, C sharp, E. |
| 5 | Q   Okay. Are all three of these |
| 6 | pitches, A, C sharp, and E also found with |
| 7 | one extra pitch in "Got To Give It Up" in |
| 8 | musical example seven A? |
| 9 | A   Yes. |
| 10 | Q   Okay. In your declaration, you |
| 11 | say the keyboard chords are different |
| 12 | because "Blurred Lines" uses chord A major, |
| 13 | and "Got To Give It Up" uses A major seven; |
| 14 | is that correct? |
| 15 | A   A seventh. |
| 16 | Q   A seventh. Okay. What is the |
| 17 | difference between these two chords? |
| 18 | A   One of them is a three-note |
| 19 | triad. The other one is a seventh chord |
| 20 | using four notes. |
| 21 | Q   And do they have any |
| 22 | similarities? |
| 23 | A   They do. |
| 24 | Q   What are the similarities? |
| 25 | A   They share three of the notes. |

Page 259

| | |
|---|---|
| 1 | Sandra Wilbur |
| 2 | Q   What are -- okay. They share |
| 3 | three of the notes. |
| 4 | Let's go to your declaration at |
| 5 | paragraph 230, please. We can pass that |
| 6 | up. I want to talk to you now about some |
| 7 | of the prior ones. |
| 8 | MR. KING: Okay. Go ahead. |
| 9 | MR. BUSCH: Yes. |
| 10 | Q   I want to talk to you about |
| 11 | "Low Rider" -- |
| 12 | A   Okay. |
| 13 | Q   -- which is at paragraphs 73 to |
| 14 | 75 of your report. You also mention it in |
| 15 | paragraph 121 and several other places. |
| 16 | Where is your documentation to |
| 17 | support your statement that "Low Rider" is |
| 18 | substantially similar to "Got To Give It |
| 19 | Up"? |
| 20 | A   I never said in here that it |
| 21 | was substantially similar to "Got To Give |
| 22 | It Up," I don't believe. Where did you see |
| 23 | that? |
| 24 | Q   Okay. |
| 25 | A   I said it uses many of the same |

Page 260

| | |
|---|---|
| 1 | Sandra Wilbur |
| 2 | constellation of things that were in the |
| 3 | Finell report. |
| 4 | Q   Okay. Does "Low Rider" have an |
| 5 | open high hat rhythm? |
| 6 | A   I'd have to review. |
| 7 | Q   You can't answer? |
| 8 | A   I believe -- I don't recall. I |
| 9 | don't -- I don't recall. |
| 10 | Q   Okay. Let's talk about |
| 11 | "Superfly" for a moment. |
| 12 | A   Okay. |
| 13 | Q   You discussed that at |
| 14 | paragraphs 76, 210, and 211 -- |
| 15 | A   That is the one that does have |
| 16 | the high hat. |
| 17 | Q   -- 239 and 244 of your |
| 18 | declaration. |
| 19 | Does "Superfly" contain the |
| 20 | vocal melodic material that is similar to |
| 21 | "Got To Give It Up"? |
| 22 | A   I don't believe so. |
| 23 | Q   Does "Superfly" contain a |
| 24 | descending bass line? |
| 25 | A   I don't think so. |

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 261

Sandra Wilbur

1   
2   Q   Does "Superfly" contain similar
3   keyboard parts to "Got To Give It Up"?
4   A   Yes, it does.
5   Q   Are you certain of that?
6   A   I believe they play on the ands
7   of the beats. Certainly, "Low Rider" does.
8   Q   I am not asking you about "Low
9   Rider" now. I am asking you about
10  "Superfly."
11  A   I think my number 76 answers
12  what -- what it uses. It uses a cow bell,
13  falsetto vocals, an open high hat on the
14  and of the fourth beat, and a bass pattern.
15  Then it plays the root of the chord on the
16  downbeat. All that is in "Blurred."
17  Q   I didn't -- I asked -- I am
18  asking you a specific question, ma'am.
19      Does "Superfly" contain a
20  similar keyboard to "Got To Give It Up"?
21  You said yes a moment ago. Are you certain
22  of that? That's not one of the things you
23  identified, I don't think, in your
24  declaration.
25  A   No, I did not.

Page 262

Sandra Wilbur

1   
2   Q   So are you just making stuff up
3   on the fly?
4       MR. KING: Objection.
5   Argumentative. Don't answer that. I
6   direct her not to answer. You're
7   harassing her.
8       MR. BUSCH: I'm not harassing
9   anybody.
10      MR. KING: You asked her the
11  question, is she making stuff up.
12  That's by definition harassment.
13  Q   No. Why did you -- why did you
14  say yes on the key --
15  A   The score --
16      (There was a discussion off the
17  record.)
18  Q   Let me finish asking my
19  question.
20      Why did you just say yes, that
21  they have similar keyboards, "Superfly" and
22  "Got To Give It Up," when they don't?
23  A   One of the things that I point
24  out in the score here is that the piano
25  part is played higher, but it's also on the

Page 263

Sandra Wilbur

1   
2   ands of the beats, the and of the one, and
3   of the three, and of the one.
4   Q   Are the -- are the same chords
5   used in the keyboard, the keyboards
6   sections of those two songs?
7   A   Yes.
8   Q   Okay. From what section of
9   "Superfly" did you take your drum beat.
10  Strike the question. Let me -- let me
11  strike that question. I am going to ask a
12  different question, and I will come back to
13  that.
14      You are saying that there is --
15  the same chord is in "Superfly" as in
16  "Blurred Lines" and "Got To Give It Up"?
17  A   I believe this is the beginning
18  of the song where the cow bell comes in.
19  And in measure five, you are using the
20  same -- you are using an -- an A sharp and
21  an E on the and of the one. And that's --
22  and it's not the same all the way through.
23      And the -- and in measure
24  three, it's also the interval of C sharp,
25  E; but, otherwise, although it's being

Page 264

Sandra Wilbur

1   
2   played on some of the ands, it's similar
3   only in the and of the first beat of
4   measure one and three.
5   Q   Let's talk about the drum
6   beats. From what section of "Superfly" did
7   you take your drum beat?
8   A   From measures five through
9   eight, where they start, I believe.
10  Q   So it's the drum entrance?
11  A   There is a timbale that enters
12  on four, but the drum's pattern -- let me
13  see. The drum set enters on five.
14  Q   Okay. Are drum beats sometimes
15  different in the introduction to pieces
16  than in the main body of the work?
17  A   Sometimes.
18  Q   Is this true in "Superfly"?
19  A   I honestly don't recall.
20  Q   Okay. Where should the
21  comparison of beats be made, in the
22  introduction or main body of the piece?
23  A   Where you find similarity.
24  Q   Okay. So either place?
25  A   It could be any place.

66  (Pages 261 to 264)

Page 265

Sandra Wilbur

1
2     Q    Is the high hat on beat four of
3  the measure beginning at 17 seconds on an
4  open or closed high hat?
5     A    Measure 17?
6     Q    Beginning at 17.
7          MS. FINELL:  Seconds.
8     Q    Seconds, right, that's what I
9  said.
10    A    I don't see the 17 seconds.
11  Where is that?
12    Q    Well, you don't see it in
13  the --
14    A    I don't see it here.
15         (There was a discussion off the
16  record.)
17    Q    Okay.  Do you know if -- do you
18  have in front of you -- or I guess you
19  don't know whether the high hat on beat
20  four of the measure beginning at 17 seconds
21  in the song is on an open or closed high
22  hat based on what you have in your
23  declaration?
24    A    I can't tell.  I know that it
25  was in part of the song.

Page 266

Sandra Wilbur

1
2     Q    Is that -- do you know -- I am
3  going to assume you don't know this.
4          But is the high hat in the
5  second measure after 17 seconds on beat
6  four?
7     A    I have no idea.  I don't see it
8  here, so I can't -- I can't answer the
9  question.
10    Q    Is the two-bar phrase in the
11  drum set beginning at 17 seconds an example
12  of a disco beat?
13    A    Well, if I saw where 17 seconds
14  was, I would be able to answer the
15  question.
16    Q    Without -- without having that
17  in front of you, you can't answer it right
18  now?
19    A    No.
20    Q    Okay.  All right.  Let's talk
21  about "Funky Town" if we could.
22    A    Okay.
23    Q    And that's at paragraphs 77 and
24  218 of your report.
25    A    77 and 218.

Page 267

Sandra Wilbur

1
2     Q    Of your -- I keep saying of
3  your "report," but of your declaration.
4          MR. KING:  What paragraph is
5  it.
6     A    77 and 218, you said?
7     Q    Yes.
8          Does "Funky Town" contain the
9  hook and accompanying backup vocals found
10  in "Got To Give It Up" or "Blurred Lines"?
11    A    No.
12    Q    Does "Funky Town" contain the
13  signature phrase found in "Got To Give It
14  Up" or "Blurred Lines"?
15    A    Which one?
16         MR. KING:  Yes.  Thank you.
17    Q    Any of the signature phrases
18  that we have been discussing here today?
19    A    I don't think so.
20    Q    Does "Funky Town" contain the
21  keyboard parts found in "Got To Give It Up"
22  or "Blurred Lines"?
23    A    I think I have indicated in
24  number 77 what is included.
25    Q    Okay.  So it's not, correct?

Page 268

Sandra Wilbur

1
2     A    Correct.
3     Q    Does "Funky Town" contain the
4  open high hat found in "Got To Give It Up"
5  or "Blurred Lines"?
6     A    No.
7     Q    Does the cow bell in "Funky
8  Town" have a syncopated Latin rhythm?
9     A    I would have to look back at
10  the -- at my transcription.  I don't have
11  it here.
12    Q    Okay.  Isn't it true that the
13  cow bell on "Funky Town" plays continuous
14  sixteenth notes rather than a Latin
15  time-keeping rhythm?
16    A    Again, I'd have to look at my
17  transcription.
18    Q    Okay.  Let's talk about
19  "Working in a Coal Mine."  And this is
20  paragraphs 180 to 183 of your declaration.
21  Are you with me?
22    A    I am.
23    Q    Do you -- would you agree with
24  that both "Got To Give It Up" and "Blurred
25  Lines" begin with a rest?

67 (Pages 265 to 268)

Page 269

1    Sandra Wilbur
2    A    They do.
3    Q    Would you agree that -- does
4  "Working in a Coal Mine" begin with a rest?
5    A    No.
6    Q    Okay.  Is the melody in the
7  same contour of S-S-D-U of "Got To Give It
8  Up" and "Blurred Lines"?
9         MR. KING:  Object to the form.
10   A    S-U --
11   Q    S-S-D-U?
12   A    Where are you?  Where are you
13  talking about?
14   Q    Look at four C and four D in
15  40.  And I guess let me ask a more pointed
16  question.
17        In "Working in a Coal Mine,"
18  doesn't the contour go U-S-D-U, and not
19  S-S-D-U?
20   A    Well, first of all --
21   Q    Yes or no?
22   A    It's -- that's not correct, if
23  you are looking at C and D.  It's S for the
24  first -- it's the -- from one to the next.
25  And then it's D.  And then it's U, not S-S.

Page 270

1    Sandra Wilbur
2    Q    And that's in "Got To Give It
3  Up" and "Blurred Lines"?  That's "Got To
4  Give It Up" and "Blurred Lines," right?
5    A    That's "Blurred" -- that's just
6  the "Blurred Lines," I think.
7    Q    For "Working in a Coal Mine,"
8  isn't it U-S-D-U?
9    A    Yes.
10   Q    Okay.  All right.  Let's -- I
11  have a few questions for you about "Love
12  After War" and "After The Dance."
13        Did you use the same techniques
14  comparing "Love After War" to "After The
15  Dance" as you did "Blurred Lines" and "Got
16  To Give It Up"?
17   A    Again, the --
18   Q    I am just asking a very general
19  question.
20   A    I identify the similarities, so
21  I use the same methodology in terms of
22  identifying similarities and focusing on
23  those similarities.
24   Q    Okay.  How many vocal melodies
25  does the deposit sheet reflect on "After

Page 271

1    Sandra Wilbur
2  The Dance"?
3    A    Can you show me where that is
4  in my declaration?
5    Q    Did you review the deposit
6  sheet for -- or the lead sheet for "After
7  The Dance"?
8    A    I am sure I did.
9    Q    And do you know how many vocal
10  melodies the lead sheet reflected?
11   A    I did not find -- as I said,
12  the only thing I found similar was in the
13  choral -- the chorus sections, and those
14  melodies were not the same.
15   Q    Okay.  My question is:
16        How many vocal melodies does
17  the deposit sheet --
18        MR. BUSCH:  I am going to move
19  to strike that as non-responsive to
20  my --
21   A    I don't -- I don't -- I
22  don't --
23        MR. BUSCH:  -- my question.
24   A    I don't recall.  I don't
25  recall.

Page 272

1    Sandra Wilbur
2    Q    Okay.  What is an inversion in
3  a musical relationship?
4    A    An inversion?
5    Q    What is an inversion in a
6  musical relationship?
7    A    I think as if I am -- I am
8  guessing at this.
9         MR. KING:  Well, he doesn't
10  want you to guess; do you, Richard?
11   Q    Do you -- do you have any -- do
12  you know what an inversion in a musical
13  relationship is?
14        (There was a discussion off the
15  record.)
16   Q    What is an inversion in a
17  musical melody?
18        MR. KING:  That's not what you
19  wrote.
20   A    It's -- it's going backwards.
21  It's a device, a compositional device, I
22  think.  I might be completely wrong --
23  inversion?
24   Q    Yes.
25   A    I don't remember.

Page 277

```
1              Sandra Wilbur
2    in "War"?
3              MR. KING: Object to the form.
4       Q    "Functionally," so let me
5    rephrase the question.
6              So if the melody to "War" can
7    be sung to the accompaniment of "Dance,"
8    isn't the harmonic progression functionally
9    equivalent to the progression of "War"?
10             MR. KING: Object to the form
11    of the question. Assumes facts not in
12    evidence. Lack of foundation.
13      Q    Yes or no?
14      A    There are some harmonic
15    similarities. They are not identical. The
16    melody in "After The Dance" is
17    significantly different. And the fact that
18    you can put one melody into, into -- you
19    know, these chords, doesn't mean that they
20    are the same.
21      Q    Isn't it true that the harmony
22    of "Dance" works well as an accompaniment
23    to the melody of "War"?
24      A    Works well? That's a
25    subjective kind of thing.
```

Page 278

```
1              Sandra Wilbur
2       Q    Well, in Bourne, didn't you say
3    that --
4       A    Completely different case.
5       Q    Well, hold on one second. You
6    have to -- I know what you want to say. I
7    know you think you know what I am going to
8    say. But for the 35th time, please wait
9    until I finish asking my question before
10    you respond. Please wait and answer my
11    question, and not just blurt out what you
12    want to say.
13             Is that okay?
14             MR. KING: Please don't lecture
15    her like she's a child. Just ask her
16    the question.
17      Q    Is that okay?
18             MR. KING: You don't have to
19    answer that. Wait for his next real
20    question.
21             MR. BUSCH: Well, I just don't
22    seem --
23             MR. KING: It's 5:15. It's not
24    going to change. Just ask your
25    questions.
```

Page 279

```
1              Sandra Wilbur
2       Q    In Bourne, didn't you say
3    that -- that the superimposing of the
4    melody of one with the harmony of another
5    showed copying?
6       A    No, that's not what I said.
7    That's taken out of context.
8       Q    You didn't say that the ability
9    to superimpose a melody of one with the
10    harmony of another was one of the things
11    you might look at to show a copying? You
12    didn't say that? Did you -- did you not
13    say that at all?
14      A    No.
15             MR. KING: Richard, how many
16    questions you want to ask her before
17    you give her a chance to answer?
18             THE REPORTER: You said "no"?
19      A    No.
20             MR. KING: Meaning, yes, she
21    said, "No."
22      Q    Wouldn't it be better to spell
23    the chord on bar one of "War" as F sharp
24    minus --
25             MS. MONSON: "Minor."
```

Page 280

```
1              Sandra Wilbur
2       Q    -- minor seven?
3              MR. KING: Why don't you just
4    have her ask the questions. This is
5    annoying.
6              THE WITNESS: It's very hard.
7              MR. KING: And it's hard for
8    the witness. I have already discussed
9    it with her. She feels like it's a
10    firing squad. You have two people
11    handing you questions. And, now,
12    she's asking the question. Just let
13    her ask the questions. Just give her
14    the microphone and let her ask the
15    questions.
16             MR. BUSCH: Are you finished?
17    Tell me when you are finished.
18             MR. KING: I'm not sure. I
19    think I am done.
20             MR. BUSCH: Okay. That is,
21    again, another example of what I
22    consider to be an interference with
23    this deposition that I am going to
24    raise with the judge.
25             MR. KING: Well, fine. Then
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 281

1          Sandra Wilbur
2    tell your expert that she is not
3    entitled to utter words on the record.
4    Okay.  She can pass you -- as annoying
5    as it is, she can pass all of the
6    notes she wants to pass you.  But she
7    can't speak.
8          Q    Wouldn't it be better to spell
9    the chord on bar one of "War" as F sharp
10   minor seven rather than -- I'm sorry.  Hold
11   on a second.
12         MR. KING:  Are we still on the
13   record?  Is the tape running?  Okay.
14   Good.
15         THE VIDEOGRAPHER:  Yes.
16         Q    Wouldn't it be better to spell
17   the chord on bar one of "War" as F sharp
18   minor seven sus four rather than E sus four
19   over F sharp?
20         A    I transcribed the chord as best
21   as I could.  I would have to look at the
22   notes and listen to it again to answer that
23   question.
24         Q    So you can't answer that
25   question right now?

Page 282

1          Sandra Wilbur
2          A    No.
3          Q    Okay.  Isn't it a two, five,
4    one progression in E?
5          A    Again, I would like to listen
6    to it again.
7          Q    So you can't answer that
8    question right now?
9          A    I can't answer that.
10         Q    And you are telling -- you are
11   stating for the record that it is
12   irrelevant in your view that the melody of
13   "Love After War" can be played with the
14   harmony of "After The Dance" as
15   accompaniment for purposes of analyzing the
16   similarity between the choruses?
17         MR. KING:  Object to the form
18   of the question.
19         Q    Is that correct?  Yes or no?
20         A    No.
21         Q    No, it's not relevant?
22         A    It's --
23         Q    Not relevant?
24         A    It's not relevant because the
25   melodies are so different.

Page 283

1          Sandra Wilbur
2          Q    Okay.
3          A    And the chords are actually
4    different except in one -- one place.
5          Q    All right.  I have another bit
6    of music to play for you.
7          (There was a discussion off the
8    record.)
9          (Music playing.)
10         Q    All right.  I am going to play
11   another bit of music for you, and then I am
12   going to have some questions for you after
13   this.
14         (Music playing.)
15         A    I have no idea what that was.
16         Q    You have no idea what that was?
17         A    No.
18         Q    And you have no idea if --
19   which bit of which song was playing
20   musically?
21         A    I can identify that if I heard
22   it again.  I mean, it's a mash-up of some
23   kind.
24         Q    Okay.  Before I play it again
25   for you, I want to go back to "After The

Page 284

1          Sandra Wilbur
2    Dance" and "Love After War" that I played
3    for you a moment ago.  What is it that you
4    recognize that you heard?
5          A    I recognized the melody of
6    "War" over the chords of "Dance."
7          Q    And did they sound -- did they
8    mesh well together in your view?
9          MR. KING:  Object to the form
10   of the question.
11         A    Many songs could mesh well.
12         Q    That's not my question.
13         A    It has similar chord structure.
14         Q    Did the harmony and the melody
15   that you heard, did they mesh well together
16   in this instance, yes or no?
17         A    I can't answer that question.
18   I would have to listen to it again, and I
19   would have to really study it.
20         Q    What would you have to do to
21   really study it?
22         A    I would want to know whether
23   it's being played in the same key as the
24   original.  I would want to here it louder.
25   Obviously, it was played very softly.  One

71  (Pages 281 to 284)

Page 289

```
 1              Sandra Wilbur
 2    Seth Miller.
 3        Q    You heard what from Seth
 4    Miller?
 5        A    That it was a Coke bottle hit
 6    with a --
 7        Q    I thought you just said a
 8    second ago you read about it.
 9              MR. KING:  Okay.  Richard, just
10    don't argue with her.
11        A    I don't know.  But it doesn't
12    matter.  I mean, I certainly would agree
13    that it sounds like a cow bell.
14        Q    Okay.  Is the cow bell that is
15    used in "Blurred Lines" and "Got To Give It
16    Up," would you agree that it's taken from
17    rhythms associated with Latin music genres
18    known as salsa or Salmontuno?
19        A    I don't know.  I don't know the
20    answer to that.
21        Q    All right.  I want to go back a
22    second.
23              So a second ago you said under
24    oath that you read that a musician said
25    that he hit -- that they were hitting a
```

Page 290

```
 1              Sandra Wilbur
 2    Coke bottle with a stick, and then you
 3    changed that, just to be clear.  And, now,
 4    you say you heard it from Seth Miller, a
 5    lawyer from Mr. King; is that right?
 6        A    I believe that's how it
 7    happened.
 8        Q    Okay.
 9        A    I heard that.  I heard that.  I
10    didn't read it.  I heard it from Seth
11    Miller.  I was mistaken.
12        Q    All right.  Why did you omit
13    the second hand percussion part in your
14    transcription of the "Blurred Lines"?
15        A    Second hand?  What part are we
16    talking about?
17        Q    With respect to percussion
18    choices, you talked about the cow bell, but
19    you didn't -- are you aware of whether
20    there is a second hand percussion part in
21    "Blurred Lines"?
22        A    I think there were other
23    percussion parts in there.  I would have to
24    review it again.  I'm sorry.  I don't
25    remember.
```

Page 291

```
 1              Sandra Wilbur
 2        Q    Okay.
 3              MR. BUSCH:  All right.  That's
 4    all I have for you at this time.  If
 5    you submit anything else, you know, we
 6    will reserve our right, if we have to,
 7    to depose you.  But that's all we have
 8    for now.  Thank you.
 9              MR. KING:  Thank you.  No
10    questions.
11              THE VIDEOGRAPHER:  The time is
12    5:36 p.m. on August 27, 2014.  This is
13    the end of tape number six.  This
14    completes the videotaped deposition of
15    Sandra Wilbur.
16              (Deposition adjourned, 5:36 p.m.)
17
18
19
20
21
22
23
24
25
```

Page 292

```
 1
 2                   J U R A T
 3
 4         I DO HEREBY CERTIFY that I have
 5    read the foregoing transcript of my
 6    deposition testimony.
 7
 8
 9
10
11    SWORN TO AND SUBSCRIBED
12    BEFORE ME THIS
13    DAY OF 2014
14    - - - - - - - - - -
15
16
17
18
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022