## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | | Date | October 30, 2014 |
|---|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**  **(IN CHAMBERS) ORDER RE PLAINTIFFS' AND COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (DKT. 89)**

### I.    Introduction and Procedural Background

Pharrell Williams, Robin Thicke, and Clifford Harris, Jr. ("Plaintiffs") composed the hit song "Blurred Lines." Compl., Dkt. 1, ¶ 6. Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III ("Defendants") claim an ownership interest in two compositions by Marvin Gaye: "Got to Give It Up" and "After the Dance." Answer of Frankie Christian Gaye and Nona Marvisa Gaye, Dkt. 12, ¶ 11; Answer of Marvin Gaye III, Dkt. 35, ¶ 11. On August 15, 2013, Plaintiffs filed this action seeking a finding under the Declaratory Judgment Act, 28 U.S.C. § 2201, that "Blurred Lines" does not infringe on the copyright in "Got to Give It Up" or otherwise violate Defendants' rights. Compl., Dkt. 1 at ¶ 4, p. 6. Plaintiffs also sought costs and attorney's fees, and such other and further relief as the court deemed just and proper. *Id.* On October 30, 2013, Nona Marvisa Gaye and Frankie Christian Gaye filed several counterclaims. Dkt. 14. On November 19, 2013, Marvin Gaye III separately filed counterclaims that are substantially similar to those of Nona Marvisa Gaye and Frankie Christian Gaye. Dkt. 36.

The first counterclaim alleges that Plaintiffs, Star Trak Entertainment, Interscope Records, UMG Recordings, Inc., and Universal Music Distribution infringed the copyright to "Got to Give It Up" through their involvement in the recording, reproduction, performance, or sale of "Blurred Lines." *Id.* ¶¶ 72-91. The second counterclaim alleges that Thicke, Paula Patton, Star Trak, Geffen Records, UMG and Universal Music Distribution, all of whom were involved in the recording, reproduction, performance, or sale of another Thicke song, "Love After War," infringed the copyright to "After the Dance." *Id.* ¶¶ 92-112. The remaining counterclaims of Nona Marvisa Gaye and Frankie Christian Gaye concerned Sony/ATV Music Publishing Acquisition, Inc., and its subsidiaries EMI April Music, Inc. and Jobete Music Co., Inc., with whom they have since reached a settlement. Dkt. 57. On January 14, 2014, the Court dismissed the claims against these counterclaim-defendants with prejudice. Dkts. 57-1, 59.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

On July 22, 2014, Plaintiffs filed a Motion for Summary Judgment ("Motion" (Dkt. 89)) as to both their request for declaratory relief and Defendants' counterclaims.[1] Dkt. 89. On September 8, 2014, Defendants filed an opposition (Dkt. 108), which they subsequently amended ("Opposition" (Dkt. 120)).[2] On September 22, 2014, Plaintiffs filed a reply ("Reply" (Dkt. 125)). After a hearing on the Motion on October 20, 2014, the matter was taken under submission. Dkt. 129. For the reasons stated in this Order, the Motion is DENIED.

II.    **Factual Background**

   A.    **The Gaye Compositions**

Marvin Gaye was an influential American singer-songwriter. He composed and recorded dozens of hit songs. Counterclaims, Dkt. 14, ¶ 3; Plaintiffs' Answer, Dkt. 49, ¶ 3. Gaye received a Grammy Lifetime Achievement Award and was inducted into the Rock and Roll Hall of Fame posthumously in 1984. *Id.*

In 1976, Gaye recorded the song "Got to Give It Up" at his studio. Janis Gaye Decl., Dkt. 117, ¶ 3. Gaye's widow, Janis Gaye, was present when the song was recorded. *Id.* ¶ 4. She declares that "Got to Give It Up" was not composed prior to the recording sessions, and that Marvin Gaye did not write sheet music of his songs; indeed he did not fluently read sheet music. *Id.* ¶¶ 5-6. In 1977, the musical composition "Got to Give It Up (Part 1 and 2)" was registered with the United States Copyright Office, Registration Number EP 366-530. The copyright has since been renewed as RE 910-939. Dkt. 110, ¶ 1; Dkt. 91, Ex. A. Defendants assert these registered copyrights as a basis for their counterclaims. Dkt. 14, ¶ 30; Dkt. 36, ¶ 6. When the registration was filed initially, Gaye deposited with the Copyright Office sheet music representing the lyrics and some of the melodic, harmonic, and rhythmic features that appear in the recorded work. Dkt. 110, ¶ 2; Dkt. 91, Ex. C. "Got to Give It Up" was released on or about March 15, 1977 on the album *Live at the London Palladium*; the single of the recording reached number one on the U.S. Billboard Hot 100 charts. Dkt. 14, ¶ 31.

"After the Dance" was written, composed, recorded and released by Marvin Gaye in 1976 on the album *I Want You.* That album reached number one on the Billboard Soul Albums chart. Counterclaims, Dkt. 14, ¶¶ 47-48. In 1976, the musical composition "After the Dance" was registered with the United States Copyright Office and received Registration Number EP 351-582 & PA 002-617. This copyright has been renewed as RE 903-945. Dkt. 110, ¶ 77; Dkt. 91, Ex. B. Defendants also assert these registered copyrights as a basis for their counterclaims. Dkt. 14, ¶ 47; Dkt. 36, ¶ 7. When the registration was filed initially, Gaye deposited with the Copyright Office sheet music representing the lyrics and some of the melodic, harmonic and rhythmic features that appear in the recorded work. Dkt. 110, ¶ 78; Dkt. 91, Ex. D.

---

[1] Counterclaim-defendants joined Plaintiffs in filing the Motion. For ease of reference, this Order refers to the movants as "Plaintiffs."
[2] The amendments incorporated materials that had been redacted prior to the order granting in part Defendants' application to file documents under seal. Dkt. 119.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Defendants state that ownership of each song reverted to the Gaye family by operation of law following Gaye's death in 1984. Counterclaims, Dkt. 14, ¶¶ 32, 49.

### B.    "Blurred Lines" and "Love After War"

Plaintiffs are the composers of the song "Blurred Lines," which was released on or about March 26, 2013. Plaintiffs' Answ., Dkt. 49, ¶ 35. "Blurred Lines" has sold more than six million digital copies, and the music video for the song has been viewed over 250 million times on the websites YouTube and Vevo. Counterclaims, Dkt. 14, ¶ 36; Plaintiffs' Answ., Dkt. 49, ¶ 36.

Plaintiff Robin Thicke and counterclaim-defendant Paula Patton are the writers and composers of "Love After War," which was released on or about October 11, 2011. *Id.* ¶ 55. "Love After War" reached number 22 on the Billboard 200 charts. *Id.* ¶ 56.

Plaintiffs concede that they had access to "Got to Give It Up" and "After the Dance" when "Blurred Lines" and "Love After War" were composed. *See* Reply, Dkt. 125 at 10; Thicke Dep., Dkt. 122, Ex. 6 at 88.

### C.    The Expert Reports

#### 1.    The Preliminary Report of Finell

Judith Finell is a musicologist. She has been retained by Defendants as an expert. On October 17, 2013, she completed an 18-page Preliminary Report comparing "Got to Give It Up" and "Blurred Lines." Dkt. 91, Ex. B.[3] Finell based her preliminary analysis on recordings and sheet music of "Got to Give It Up" and "Blurred Lines," and prepared transcriptions of portions of both songs as part of the comparison. *Id.* ¶¶ 1-3. She concluded, "[a] preliminary review comparing 'Give It Up' and 'Blurred' has revealed a constellation of eight substantially similar features thus far," and that these similarities "surpass the realm of generic coincidence, reaching to the very essence of each work." *Id.* ¶¶ 6-7. The following are the eight features identified by Finell:

1)    Signature phrase in main vocal melodies, *id.* ¶¶ 13-17;
2)    Hooks, *id.* ¶¶ 18-19;
3)    Hooks with backup vocals, *id.* ¶ 20;
4)    Core theme, or "Theme X," *id.* ¶¶ 21-27;
5)    Backup hooks, *id.* ¶ 28;
6)    Bass melodies, *id.* ¶¶ 29-31;
7)    Keyboard parts, *id.* ¶ 32; and
8)    Unusual percussion choices, *id.* ¶ 33.

---

[3] The parties have filed voluminous evidentiary objections with respect to the reports of their competing experts. Dkts. 111, 126. The rulings on these objections are set forth in separate orders. Dkts. 137, 138.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Finell opined that "[i]t is improbable that a single third-party work could be found that would contain all of these similar features coinciding in a similar 'constellation' as described above." *Id.* ¶ 47.

2.    The Wilbur Declaration

Sandy Wilbur is a musicologist who has been retained by Plaintiffs as an expert. She prepared a 55-page Declaration containing a comparative analysis of "Got to Give It Up" and "Blurred Lines" as well as one about "After the Dance" and "Love After War." Dkt. 91-1. Wilbur found no substantial similarity between the melodies, rhythms, harmonies, structures and lyrics of "Blurred Lines" and "Got to Give It Up," and concluded that the songs were not substantially similar. *Id.* ¶¶ 24-55. She critiqued Finell's preliminary report on a number of grounds and responded in detail to each of the purported similarities set forth by Finell. *Id.* ¶¶ 81-253. Among Wilbur's key opinions are that Finell's "eight similarities are primarily melodic," but "[t]here are *no two consecutive notes* in any of the melodic examples in the Finell Report that have the same pitch, the same duration, and the same placement in the measure." *Id.* ¶¶ 58-59 (emphasis in the original). In addition, Wilbur opines that many of the purported similarities are unoriginal. She asserts that many comprise "the basic building blocks of musical composition that are present, if not inevitable, in many songs" or were found in prior art, which she describes. *Id.* ¶¶ 69, 72.

Wilbur also opined that there is no substantial similarity between "After the Dance" and "Love After War." This opinion was based on a similar, although less comprehensive, comparative analysis of the two works. *Id.* ¶¶ 254-313.

3.    The Monson Declaration

Ingrid Monson is the Quincy Jones Professor of African American Music at Harvard University. Defendants retained her as an additional expert. Dkt. 112-3 at 105. She prepared a 30-page Declaration containing her musicological analysis of the similarities and differences between "Got to Give It Up" and "Blurred Lines" as well as those between "After the Dance" and "Love After War." *Id.* at 71. Although Monson reviewed sheet music for each work, she opined that to limit the composition of each song "to its copyright deposit is musically misleading." *Id.* ¶¶ 3.a, 15, 80. She also prepared and then analyzed transcriptions of selected passages from the recordings of each song. *Id.* ¶¶ 4. Monson found at least seven similarities between "Got to Give It Up" and "Blurred Lines." These parallel those identified by Finell, but also addressed other elements: (i) cowbell/hand percussion; (ii) bass lines; (iii) harmony; (iv) drum set parts; (v) form; (vi) melodic connections; and (vii) keyboard parts. *Id.* ¶¶ 24, 30, 36, 40, 45, 48, 53. Monson also found that "Love After War" and "After the Dance" had substantially similar "hooks," choruses, melodies and harmonies. *Id.* ¶¶ 81-100.

Monson disagrees with several of the opinions expressed by Wilbur. Monson also compared "Got to Give It Up" with several works that Wilbur claims are prior art: "Low Rider," "Superfly," and "Funkytown." *Id.* ¶¶ 64-79. She found that "[n]one of the examples has more than one part of the ensemble texture in common" with "Got to Give It Up." *Id.* ¶ 78. Monson concluded that Plaintiffs' works are substantially similar to Defendants', and that the similarities are so pronounced that "direct copying" seems likely. *Id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

¶¶ 100, 104.[4]

### 4.    The Finell Declaration

Finell prepared a 41-page Declaration that expanded on her opinions in the Preliminary Report. Dkt. 112-3. First, Finell criticized in detail the conclusions and methodology used by Wilbur in her Declaration. FInell described these opinions as "deconstruct[ing] and microscopically dissect[ing] the individual similar features in isolation, outside the context of the entire work." *Id.* ¶ 11. Second, Finell reviewed for the first time the Copyright Office deposit copies for "Got to Give It Up" and "After the Dance." *Id.* ¶¶ 1.d, 40. Finell declares that "nothing stated in the . . . deposit copies changed my findings or conclusions as stated in my preliminary report of October 17, 2013," although she also acknowledges that "[a]s a musicologist, I rarely if ever find that a deposit copy fully defines the entire composition." *Id.* ¶¶ 6, 41, 117.  Third, Finell elaborated on the analysis in the Preliminary Report of the "constellation" of eight substantially similar features in "Got to Give It Up" and "After the Dance," and addressed certain criticisms raised in the Motion and the Wilbur Declaration. *Id.* ¶¶ 49-99. Fourth, Finell added a brief comparison of "After the Dance" and "Love After War." Based on that analysis, she opines that there is substantial similarity in these works. However, she cautions that this opinion is based on a preliminary review, and that she would "be able to explain these similarities in more depth after conducting a full review." *Id.* ¶ 121.

### III.    Analysis

#### A.    Legal Standard

A motion for summary judgment will be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. In an action seeking a declaration of non-infringement, the party who owns the work as to which infringement is claimed bears the burden on summary judgment. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*,

---

[4] Attached to Monson's declaration are several audio files prepared by sound engineer Thomas Court and sound editor and studio musician Ron Aston. Dkt. 109. These files contain "mashup tracks" that juxtapose parts of "Blurred Lines" with parts of "Got to Give It Up." *Id.* Monson declares that these accurately reflect the music of each song and that they highlight some of the similarities discussed in her report. Dkt. 112-3, ¶¶ 56-61. Monson also prepared a track containing a piano melody played over "After the Dance." Dkt. 109. These tracks seek to isolate aspects of the works relevant to the "analytical dissection" performed on a motion for summary judgment in a copyright infringement case. *See Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004). However, to determine whether the works are substantially similar based on their sound is a subjective assessment that is the function of the factfinder at the time of trial. It is not to be performed by a court at the summary judgment phase. *Id.* Therefore, these tracks are not considered for purposes of this Motion.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

134 S. Ct. 843, 849 (2014). Where the non-moving party will have the burden of proof on an issue, the movant need only demonstrate that there is an absence of evidence to support such claims. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

Only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(e). However, in considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. All inferences are to be drawn in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

B.    **Application**

1.    Copyright Infringement: Inquiry on Motion for Summary Judgment

To establish copyright infringement, two matters must be established: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "Because direct evidence of copying is not available in most cases, [a] plaintiff may establish copying by showing that defendant had access to plaintiff's work and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). Plaintiffs and counterclaim-defendants acknowledge that they had access to the relevant works. Further, for purposes of this Motion, they do not contest Defendants' ownership of valid copyrights in "Got to Give It Up" or "Love After War." Dkt. 110, ¶¶ 1, 77; Reply, Dkt. 125 at 10. Therefore, at issue are the scope and originality of what Defendants own, and the extent, if any, of any copying by Plaintiffs and counterclaim-defendants.

A motion for summary judgment in a copyright infringement suit necessarily fails when there is "a genuine issue regarding whether the ideas and expressive elements of the works are substantially similar." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992). "A 'genuine issue' exists when the plaintiff provides indicia of 'a sufficient disagreement' concerning the substantial similarity of two works 'to require submission to a jury.'" *Id.* (citations omitted). In determining whether two works are substantially similar, the Ninth Circuit employs a two-part analysis: "an objective extrinsic test and a subjective intrinsic test. For the purposes of summary judgment, only the extrinsic test is important because the subjective question whether works are intrinsically similar must be left to the jury." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004). If there is not sufficient evidence to permit a trier of fact reasonably to find that extrinsic similarity exists, summary judgment of non-infringement must be granted because "a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003) (citation omitted).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

In general, in applying the extrinsic test, a court considers expert testimony in order to perform what is called "analytical dissection" of a work. "'Analytical dissection' requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity.' Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Swirsky*, 376 F.3d at 845 (citations omitted). "To the extent a plaintiff's work is unprotected or unprotectable under copyright, the scope of the copyright must be limited" prior to conducting this analysis. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992) (quotation marks omitted). However, "[a]lthough copyright protection is not afforded to certain elements of a work, such limitations must not obscure the general proposition that copyright may inhere, under appropriate circumstances, in the selection and arrangement of unprotected components." *Id.* at 1476 n.4 (quotation marks omitted).

        2.    <u>Scope of Defendants' Copyrights</u>

Defendants assert that they own the copyrights in the musical compositions "Got to Give It Up" and "After the Dance." Dkt. 110, ¶¶ 1, 77.[5] The Court must first determine what elements of these works "are protected by [their] copyright[s] in the musical composition . . . and 'filter out'" elements not protected by the copyright. *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), *aff'd in amended opinion*, 388 F.3d 1189 (9th Cir. 2004).

Defendants registered the challenged works with the Copyright Office in 1977 and 1976, respectively. Upon registration, they submitted to the Copyright Office "lead sheets," or sheet music representing the lyrics and some of the melodic, harmonic, and rhythmic features that appear in the recorded works. Stockett Decl., Dkt. 91. "The 1909 [Copyright] Act is the applicable law in cases in which creation and publication of a work occurred before January 1, 1978, the effective date of the 1976 [Copyright] Act," *Dolman v. Agee*, 157 F.3d 708, 712 n.1 (9th Cir. 1998), and so the publication and registration of these works are governed by the 1909 Act.[6] Defendants do not dispute this conclusion. Opp'n, Dkt. 120 at 29.

        a)    The  Positions of the Parties

Plaintiffs assert that the only subject matter protected by Defendants' copyright in the compositions is what is contained in the sheet music that was deposited with the Copyright Office. Thus, they argue that other features of the songs that appear in the recordings are to be disregarded. Mot., Dkt. 89 at

---

[5] Plaintiffs' arguments as to the originality of the protected works also concern the scope of the copyrights. However, these issues are considered below in the discussion of "Analytic Dissection."

[6] Defendants' copyrights were renewed after 1978. Consequently these renewals are governed by the 1976 Act. *See Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 971 (9th Cir. 2008) ("[T]o analyze questions arising from events that occurred before January 1, 1978, such as who is the author of the [work], the 1909 Act applies; for events that occurred after that date, such as registration of the renewal copyright, the 1976 Act applies."). Defendants offer no evidence or argument in support of the position that the renewal registrations expanded or otherwise affected the scope of the initial registrations.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

14-16. "Musical elements of GIVE that are not contained in the composition [as limited to the deposit]—such as the 'groove' of the sound recording, the sounds of the instruments, or other recording or performance elements (e.g., falsetto singing, party noise)—simply have no bearing on the infringement claim here." *Id.* at 14-15. Because Defendants' experts consulted the recordings when they prepared their reports on the similarity between the two pairs of songs, Plaintiffs argue that their analyses are fundamentally flawed.

Defendants contend that their claims are not restricted to the elements in each copyright deposit. Janis Gaye, the widow of Marvin Gaye, declares that "Got to Give It Up" was not composed prior to the recording sessions, and that Marvin Gaye did not write sheet music to accompany his songs; indeed, she states that he did not fluently read sheet music. Janis Gaye Decl., Dkt. 117, ¶¶ 5-6.[7] Consequently, Defendants argue that their copyrights extend to the compositions as presented in Gaye's studio recordings of the songs rather than what is reflected in the copyright deposits. Opp'n, Dkt. 120 at 27. They also contend that, prior to 1978, the Copyright Office refused to accept recordings as deposits. *Id.* at 29. Therefore, Marvin Gaye and his publisher, Jobete Music, submitted sheet music rather than recordings as their copyright deposits. The Copyright Office has since changed its position on this process. 37 C.F.R. §§ 202.3, 202.20.

Defendants cite *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000), to support their position. They contend that *Three Boys* concerned a composition registered under the 1909 Copyright Act, but held that the factfinder may review -- as part of the "composition" -- elements that appear only in the recorded version of the song, and not in the sheet music deposited with the Copyright Office. *Id.* at 486-87; Opp'n, Dkt. 120 at 28-31. Finally, Defendants rely on the opinions of their experts, Finell and Monson, that a deposit copy is "not intended to represent fully the composition. At best, it is a skeletal representation or sketch, and usually shows only the most basic vocal melodies, typically only a single iteration of the beginning sections, some beginning lyrics, and chord indications." *Id.* at 28 (quoting Finell Decl., Dkt. 112-3, ¶ 41). Finell notes that "lead sheets were notated after the composition was completed and recorded, in order to fulfill music copyright registration requirements. They were often notated by music copyists employed by the music publishers rather than by the artists themselves." *Id.* ¶ 42. Defendants claim that this was true of the lead sheet to "Got to Give It Up," which was "created by an unknown third party after the composition was recorded." Dkt. 121, ¶ 99.

        b)      Material Protected by the Copyrights in "Got to Give It Up" and "After the Dance"

Because both "Got to Give It Up" and "After the Dance" were created and registered prior to the effective date of the 1976 Copyright Act, publication and registration issues as to both are governed by the 1909 Copyright Act. *Dolman v. Agee*, 157 F.3d 708, 712 n.1 (9th Cir. 1998). The general rule under the 1909 Act was that the publication of a work with proper notice was necessary to obtain statutory copyright protection.[8] *See Stewart v. Abend*, 495 U.S. 207, 233 (1990). Deposit of a copy of the

---

[7] An appropriate inference from these statements is that Gaye also did not write sheet music for "After the Dance."
[8] The 1909 Act also recognized common law copyright protection. *See* 17 U.S.C. § 301; *Batjac Prods. Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1226 (9th Cir. 1998).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

published work with the Copyright Office was not necessary to obtain statutory protection. However, no copyright infringement action could be brought before the deposit was made and the work was registered. Act of March 4, 1909 ("1909 Act"), ch. 320, § 12, 35 Stat. 1075, 1078.[9]

"Publication" is not expressly defined in the 1909 Act. However, the "date of publication" is defined "in the case of a work of which copies are reproduced for sale or distribution [as] the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority." 1909 Act, § 62, 35 Stat. 1075, 1087-88. An unpublished composition could be protected under the statutory scheme if its owner "deposit[ed] a manuscript copy of the music as an unpublished work prior to the sale of records." *See* M. Nimmer & D. Nimmer, 1 Nimmer on Copyright ("Nimmer") § 4.05[B][4] at 4-35; *see also id.* § 7.16[A][2][c][ii] at 7.151 ("statutory copyright protection for unpublished works could be claimed under the 1909 Act only by registration and deposit under Section 12."); 1909 Act, §§ 11-12, 35 Stat. 1075, 1078. This regime contrasts markedly with that currently in effect under the 1976 Act. Under this legislation, copyright protection automatically applies to original works of authorship when they are "fixed in any tangible medium of expression," although prompt registration grants additional benefits and protections. 17 U.S.C. § 102; *see id.* §§ 410-12 (containing some of these benefits).

For these reasons, under the relevant provisions of the 1909 Act, Defendants could have obtained statutory copyright protection for their works in one of two ways: (i) publishing them with the proper notices; or (ii) composing, but not publishing them, and making the necessary deposits with the Copyright Office. Contrary to Plaintiffs' assertions,[10] in neither case would the copyright deposit necessarily limit the scope of the material protected. However, it could bear on the copyright owner's ability to bring a civil action. *See Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1342 (9th Cir. 1981) ("[T]he deposit requirement is merely a limitation on the ability to bring an action for infringement at a particular time. It has no effect whatsoever on the validity or enforceability of a copyright."); Nimmer § 7.17[A] at 7-190.23 (deposit requirement has archival rather than substantive function). Therefore, the scope of Defendants' copyrights is not, as a matter of law, limited to the lead sheets deposited with the Copyright Office in 1976 and 1977.

Notwithstanding this conclusion, Defendants offer no evidence that, prior to the registration of the copyrights, "Got to Give It Up" or "After the Dance" was published or reduced to a manuscript form that was more complete than what is included in the lead sheets. Defendants argue that the copyrighted compositions consist of "the recorded work as performed by Marvin Gaye." Opp'n, Dkt. 120 at 27. This argument misapplies a 1976 Act standard to compositions governed by the 1909 Act. Under the 1976

---

[9] Copyright protection could be forfeited for failure to provide deposit copies of the work to the Copyright Office, but only if the Register of Copyrights "upon actual notice" demanded deposit and the copyright holder failed to comply. 1909 Act, § 13, 35 Stat. 1075, 1078.

[10] Plaintiffs' assertions are based on their interpretations of sections 408 and 411(a) of the 1976 Copyright Act. Mot., Dkt. 89 at 15-16 (discussing at length *Shady Records, Inc. v. Source Enterprises, Inc.*, 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005), a case concerning compositions registered under the 1976 Act). Even if Plaintiffs correctly interpret the deposit requirements under the 1976 Act, those principles do not apply to the registration of a work under the 1909 Act. *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 971 (9th Cir. 2008).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Act, compositions are eligible for protection when they are fixed in "phonorecords," which include master recordings. 17 U.S.C. §§ 101, 102. Under the 1909 Act, the act of recording or distributing recordings does not constitute the publishing of a composition. Instead, "in order to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form." Nimmer § 2.05[A] at 2-55. In 1997, Congress amended the 1976 Copyright Act to provide that "[t]he distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of the musical work embodied therein." 17 U.S.C. 303(b) (1997) (superseding *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995)). The Ninth Circuit has since held that this amendment has retroactive effect because it "was a 'statement of what [the 1909 Copyright Act] has meant all along.'" *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 691 (9th Cir. 2000) (bracketed text in original).

Apart from the recordings themselves, which are not protectable publications under the 1909 Act, Defendants do not offer evidence that the copyrighted compositions encompass subject matter beyond the lead sheets. Indeed, Janis Gaye's testimony suggests that the lead sheets are the only sheet music or manuscripts for "Got to Give It Up" and "After the Dance" that existed at the time of copyright registration. Janis Gaye Decl., Dkt. 117.[11] Finell opines that "[a]s a musicologist, I rarely if ever find that a deposit copy fully defines the entire composition." Finell Decl., Dkt. 112-3, ¶ 41. Similarly, Monson opines that "[t]o limit the composition of 'Got to Give It Up' to its copyright deposit is musically misleading." Monson Decl., Dkt. 112-3, ¶ 15. However, these opinions are not admissible as to the legal issue that is presented. Thus, how musicologists define "composition" or make use of copyright deposits cannot be used to determine the meaning of the term "composition" as it us used in the 1909 Act.

As noted, Defendants rely on *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). They assert that it supports the proposition that the factfinder in a music copyright infringement action may consider elements that appear in the recorded version of the song as part of the "composition" even if they do not appear in sheet music deposited with the Copyright Office in accordance with the 1909 Act. Their reading of *Three Boys Music* is not convincing. There, a jury found that the Michael Bolton song "Love Is a Wonderful Thing" infringed on the Isley Brothers' copyright in a song with the same name. *Id.* at 480. On appeal, Bolton argued that the Isley Brothers' 1964 deposit copy of sheet music differed from the recorded version of the song. Consequently, he argued that there was no subject matter jurisdiction in the trial court. *Id.* at 486. The Ninth Circuit rejected this argument: "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, our definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Id.* (citation omitted). These statements address only subject matter jurisdiction, not the material actually protected by the copyright. Applying this standard, the Ninth Circuit refused to disturb the determination by the jury that a complete copy had been deposited. Instead, the decision stated that "[a]t trial, the Isley Brothers' expert, Dr. Eskelin, testified that the deposit copy included all of the song's essential elements

---

[11] The copyright registration forms show "Date[s] of Publication" of March 10, 1977 for "Got to Give It Up" and March 6, 1976 for "After the Dance." Stockett Decl., Dkt. 91, Exs. A & B. However, it is unclear to what publications these refer, or whether they erroneously designate as "publications" the phonorecords sold shortly after each of these dates.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

such as the title hook, chorus, and pitches. Dr. Eskelin even played the deposit copy for the jury on the keyboard." *Id.* This analysis supports, rather than contradicts, the conclusion that the recording of a pre-1978 work does not add to the subject matter protected by the copyright in the published work.[12] Thus, the deposit copy or a comparable writing defines the scope of what is protected.

No more persuasive is the Defendants' reliance on *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984) and *KnowledgePlex, Inc. v. Placebase, Inc.*, 2008 WL 5245484, at *10 (N.D. Cal. Dec. 17, 2008). These decisions also concern the jurisdictional effect of incomplete or inaccurate copyright deposits and do not address what material is actually protected by the copyright. Defendants also cite *Scentsy, Inc. v. B.R. Chase, LLC.*, 942 F. Supp. 2d 1045, 1051 (D. Idaho 2013). But, that case does not apply here; it concerns works registered under the 1976 Copyright Act, and deposit adequacy rather than publication.

More significant is *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267(6th Cir. 2009). There, a jury found that a music publisher had infringed the copyrighted work "Atomic Dog," a 1982 song that was governed by the 1976 Act. On appeal, the defendants argued that the jury had improperly considered elements present in the sound recording, but not in the sheet music, including the musical punctuation of the word "dog" and rhythmic, doglike panting. *Id.* at 275-76. The Sixth Circuit held that it was proper for the jury to consider this evidence because "[u]ncontroverted testimony at trial established that the song was composed and recorded in the studio simultaneously and, therefore, that the composition was embedded in the sound recording." *Id.* at 276. However, this could not have occurred under the 1909 Act -- a sound recording is not a publication under the earlier legislation.

Defendants have the burden to prove infringement at trial as to both Plaintiffs' claim for a declaration of non-infringement and their own counterclaims. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1976 (2014) (copyright plaintiff bears the burden of proving infringement); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014) (when plaintiff seeks declaration that defendant patentee's patent was not infringed under the Declaratory Judgment Act, "the burden of persuasion is with the patentee, just as it would be had the patentee brought an infringement suit"). Thus, Defendants have the burden to prove that they own the material Plaintiffs allegedly infringed. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977). Defendants have failed to produce evidence that creates a genuine issue as to whether the copyrights in "Got to Give It Up" and "After the Dance" encompass material other than that reflected in the lead sheets deposited with the Copyright Office. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, for purposes of the analytic dissection performed in connection with this Motion, the lead

---

[12] At the motion hearing, Defendants argued that the *Three Boys* holding concerned the admission at trial of evidence contained in the sound recording as well as jurisdiction. Dkt. 131 at 30. Even if the opinion is so interpreted, it does not suggest that this material is protected by the copyright in a composition under the 1909 Act. Instead, *Three Boys* suggests that this material was *not* protected by the copyright. Nevertheless, the consideration by the jury of the sound recording was deemed harmless error in light of the sufficiency of other trial evidence, including the testimony of Dr. Eskelin, which supported the determination of infringement by the jury. *Three Boys Music*, 212 F.3d at 485-86; *see also Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005) (discussing harmless error standard in civil cases).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|----------|--------------------------|------|------------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

sheets are deemed to define the scope of Defendants' copyrighted compositions.

        3.      <u>Plaintiffs' Access to the Works</u>

Defendants have presented deposition testimony and copies of media interviews in which Plaintiffs made statements concerning whether Marvin Gaye and "Got to Give It Up" had an influence on their work. *See* Busch Decl., Dkt. 122, Exs. 1-9, 16. Plaintiff Thicke gave a number of media interviews in which he stated that he was influenced by "Got to Give It Up" and Marvin Gaye when he composed "Blurred Lines." However, at his subsequent deposition, he claimed that he was intoxicated when he made these statements. *Id.* at 6-7. Defendants claim that these are admissions of direct copying, and warrant the denial of the Motion without an inquiry into the substantial similarity of the works. Opp'n, Dkt. 120 at 6-7, 21.

Thicke told *GQ* Magazine that, shortly before "Blurred Lines" was composed, he told Plaintiff Williams that "Got to Give It Up" was one of his "favorite songs of all time," and he wanted to "make something like that, something with that groove." Dkt. 121, ¶ 107. He told similar stories to Oprah Winfrey, Billboard.com, Hot 97, Twitter Take Over, Fuse TV, and VH1. *Id.* ¶¶ 109-14. In a subsequent media interview, after this action was filed, Thicke denied that he was thinking of Marvin Gaye when "Blurred Lines" was written, *id.* ¶ 116. In addition, at his deposition, Thicke denied that he was present when Williams started composing the song, contrary to these media interviews and to an earlier interrogatory response that he later amended. Dkt. 121, Exs. 104-105; Ex. 122 at 85.

Thicke's inconsistent statements do not constitute direct evidence of copying. In *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989), the Ninth Circuit affirmed a summary judgment in a copyright infringement action despite the deposition testimony of the alleged infringer that she took certain "language" from another author's book. This testimony was held not to be direct evidence of copying because the defendant did not specify that she copied protected elements of the book. *Id.* Direct evidence of copying is only found in "rare cases," and a "finding that a defendant copied a plaintiff's work, without application of a substantial similarity analysis, has been made only when the defendant has engaged in virtual duplication of a plaintiff's entire work." *Id.*; *see also Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (the "rare scenario where there is direct evidence of copying" was presented when artist gave a copy of a photograph to artisans "with the explicit instruction that the work be copied"). Construing Thicke's statements in the light most favorable to Defendants, they are not admissions that Thicke or Plaintiffs copied protected elements of Defendants' compositions, or that they engaged in virtual duplication of "Got to Give It Up."

Even if Thicke's statements are not direct admissions of copying, Defendants argue that this evidence of access is "critical in the infringement analysis" because of the so-called "inverse-ratio rule." Thus, it "requires 'a lesser showing of substantial similarity if there is a strong showing of access.'" Opp'n, Dkt. 120 at 20 (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000)). The scope and force of this rule has been placed at issue in some recent Ninth Circuit decisions. *See, e.g.*, *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 625 (9th Cir. 2010) ("[W]e assume without deciding that the inverse ratio rule applies to lower the burden on the [plaintiffs] to show similarity."); *Novak v. Warner Bros Pictures, LLC*, 387 F. App'x 747, 749 (9th Cir. 2010) ("The Producers rely on the 'inverse ratio' rule, which *ostensibly* lessens the quantum of proof required to show copying when the plaintiff can show

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

that the defendant had a 'high degree of access' to the protected work") (emphasis added). Where, as here, the alleged infringers concede access, *see* Reply, Dkt. 125 at 10; Thicke Dep., Dkt. 122, Ex. 6 at 88, this additional evidence does not affect the analysis in the summary judgment setting. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1081 (9th Cir. 2006) ("No amount of proof of access will suffice to show copying if there are no similarities.") (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977)).[13]

        4.    <u>Analytic Dissection</u>

              a)      "Got to Give It Up" / "Blurred Lines"

                    (1)      The Finell Report and Declaration

Defendants' expert Judith Finell identified a "constellation" of eight alleged similarities between "Got to Give It Up" and "Blurred Lines." Preliminary Report, Dkt. 112-3, ¶¶ 13-34; Finell Decl., Dkt. 112-3, ¶ 10. These features are: (1) signature phrase in main vocal melodies; (2) hooks; (3) hooks with backup vocals; (4) core theme, or "Theme X;" (5) backup hooks; (6) bass melodies; (7) keyboard parts; and (8) unusual percussion choices. Defendants refer to these in their Counterclaims and Opposition, and Plaintiffs' expert, Sandy Wilbur, criticizes them in her Declaration. Counterclaims, Dkt. 14, ¶ 38; Opp'n, Dkt. 120, at 10-14; Wilbur Decl., Dkt. 91-1. As noted, although some of these features do not appear in the copyrighted composition, which Finell calls a "partial and incomplete sketch of the fuller work as embodied in the recording," she testifies that she did not change her preliminary findings or conclusions after reviewing the copyright deposit. Finell Decl., Dkt. 112-3, ¶¶ 40, 43. Plaintiffs effectively concede that the signature phrase (Similarity 1), hooks (Similarity 2), and one of the two bass melodies (Similarity 6A) are contained in the "Got to Give It Up" copyright deposit. Reply, Dkt. 125 at 3 ("alleged Similarities 3, 4, 5, 6C, 7, and 8 are *not* contained in the GIVE Copyright Deposit").

                      *(a)*      *Signature Phrase*

Finell explains, "[a] phrase is a passage within a longer melody, similar to a sentence within a paragraph or a line within a poem. In vocal music, phrases are often determined by the pauses between lyric lines as the singer takes a breath. The signature phrase is a primary identifying feature of a song and one of its most memorable elements." Preliminary Report, Dkt. 112-3, ¶ 13 n.4. Finell adds that the signature phrase in "Blurred Lines" is sung to the lyrics, "and that's why I'm gon' take a good girl," and that the signature phrase in "Got to Give It Up" is sung to the lyrics, "I used to go out to parties." *Id.* ¶ 13. Finell finds the following five similarities with respect to these similar phrases:

      a.  Both repeat their starting tone several times;
      b.  Both contain the identical scale degree sequence of 5-6-1 followed by 1-5. Finell
          defines a "scale degree" as "the position in a particular scale of each tone," and states

---

[13] If at trial the factfinder were to determine that infringement occurred, such statements could be admissible as to willfulness, which could affect the determination of statutory damages and attorney's fees. *See* 17 U.S.C. §§ 504(c), 505; *Historical Research v. Cabral*, 80 F.3d 377, 379 (9th Cir. 1996).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

that "[t]wo melodies containing a similar series of scale degrees with similar rhythms usually sound similar";

c.   Both contain identical rhythms for the first six tones;

d.   Both use the same device of a melodic "tail" (melisma) on their last lyric, beginning with the scale degrees 1-5. Finell defines a "melisma" as "a vocal melody in which one syllable or lyric is held while sung with several successive pitches, rather than a single pitch for each syllable";

e.   Both contain substantially similar melodic contours (melodic outlines/design).

*Id.* ¶ 14 & nn. 5, 7. Finell provides the following musical example to illustrate her opinions. "Blurred Lines" is transposed to the key of "Got to Give It Up," and the score for "Got to Give It Up" is based on Finell's transcription of the recording rather than the copyright deposit:





*Id.* ¶ 14 & n.9.

Wilbur finds no substantial similarity. She claims that the melody, harmony, and rhythm of the songs are different. She highlights the one note in her transcription that appears "in both Signature Phrases that has the same pitch and placement (but not the same duration) in both songs. No other notes in the Signature Phrases have the same pitch and placement." Wilbur Decl., Dkt. 91-1, ¶ 84:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |



In addition to the difference in notes, which Wilbur describes in technical terms, *id.* ¶¶ 86-93, she opines that the harmonies are different in that both measures of the "Got to Give It Up" signature phrase are A7, whereas the first measure of "Blurred Lines" is E and the second measure is A. *Id.* ¶ 94. She also contends that the rhythms are different. *Id.* ¶ 95.

Wilbur presents competing opinions as to the five similarities that Finell identifies. First, Wilbur states that the starting tones are different in each song, and are played over different chords. *Id.* ¶¶ 103-105. To the extent the tones are the same or similar, Wilbur states that "[r]epeating a starting tone several times in a row is a commonplace musical idea or device," and notes that the 1957 Perry Cuomo number one hit song "Catch a Falling Star" used this device. *Id.* ¶¶ 107-108. Second, Wilbur claims that Finell's analysis of the scale degree sequence is incomplete, and that a complete comparison of the melodic phrases and harmonies shows that there are substantial differences. *Id.* ¶¶ 109-117. Third, Wilbur dismisses the identical rhythm of the first six notes of each signature phrase as a "common musical idea or device." She provides examples: The 1958 Chuck Berry song "Johnny B. Goode," the 1964 Beatles song "Hard Day's Night," and the 1975 War song "Low Rider" each contains six or more eighth notes in a row. *Id.* ¶¶ 120-21. Fourth, Wilbur opines that a melisma at the end of a melodic phrase is a common musical device, and that those in "Got to Give It Up" and "Blurred Lines" differ based on the pitches, rhythm, placement and melodic contour of the sustained lyric. *Id.* ¶¶ 128-32. Finally, Wilbur claims that the melodic contours are substantially different. *Id.* ¶¶ 133-38. Representing upward movements in pitch as "U," downward movements as "D," and no movement as "S," or "same," Wilbur states that the melodic contour of "Got to Give It Up" is S-S-S-U-U-U-D-D-U, and that of "Blurred Lines" is "S-D-U-U-U-U-S-S-D-D-D." *Id.* ¶¶ 136-37. Although she acknowledges that both signature phrases overall move up and then down in pitch, she states that "there is nothing original about that overall contour, which is commonplace." *Id.* ¶ 139.

In her Declaration, Finell disputes Wilbur's methodology and conclusions. "The methodology is built on requiring absolute identity in all 3 melodic comparison factors of (A) pitch or scale degree, (B) duration, and (C) rhythmic placement for every single note in order to be similar." Finell Decl., Dkt. 112-3, ¶ 50. Finell also states that Wilbur's opinion is deficient because it fails to consider the overall role of the signature phrases in the songs, "microscopically analyzing each compositional element in isolation, rather than evaluating the full combination of all 5 component elements within the same phrase," and emphasizing individual differences while ignoring similarities. *Id.* ¶¶ 52-55.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | | Date | October 30, 2014 |
|---|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | | |

(b)     *Hooks*

Finell defines a "hook" as "the term used in popular and commercial music for the most important melodic material of the work, that which becomes the memorable melody by which the song is recognized. . . . [i]t is usually the passage in the chorus in which the title lyrics are sung." Preliminary Report, Dkt. 112-3, ¶ 9 n.3. Finell contends that three of the four notes of the songs' hooks are identical in scale degree, as illustrated by arrows in the following diagram:





*Id.* ¶ 19. Wilbur argues that Finell fails to space the hooks correctly within the measure, and that she omits the subsequent melisma to give a misleading impression of similarity:



Wilbur Decl., Dkt. 91-1, ¶ 143. Wilbur also states that the highlighted note -- which Finell concedes is different in "Got to Give It Up" and "Blurred Lines" -- significantly changes the effect of each hook. "In GIVE, the note is the 2nd scale degree (b), which creates tension. In BLURRED, the note is the 1st scale degree (a), the most stable note." *Id.* ¶ 150. Wilbur also contends that certain harmonic and rhythmic differences make the hooks unalike one another. *Id.* ¶¶ 151-52. Finell criticizes Wilbur's opinion because, she claims, its conclusions are based on differences, ignore similarities and require an overly high bar for similarity. Finell Decl., Dkt. 112-3, ¶¶ 56-57.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

*(c)      Hooks with Backup Vocals*

Finell states that the backup vocals in "Got to Give It Up" accentuate and harmonize with the hook, and "amplify the primary message of the lyrics." Finell Decl., Dkt. 112-3, ¶¶ 58, 61. However, Wilbur points out that the copyright deposit for "Got to Give It Up" does not contain the backup vocals, which she highlighted in the following diagram:



Wilbur Decl., Dkt. 91-1, ¶¶ 156, 163. Although she transcribes them differently, Finell also represents the backup vocals as tones that are "stacked vertically above tones that are sung simultaneously." Preliminary Report, Dkt. 112-3, ¶ 20. These or similar stacked notes do not appear in the deposit copy:



Dkt. 91-2, Ex. C.

Thus, for purposes of this Motion, the backup vocals to the hooks are deemed unprotected by Defendants' copyright in "Got to Give It Up," and this alleged similarity is not considered.

*(d)      "Theme X"*

Finell refers to backup vocals, sung to the lyrics "dancin' lady," as the "Theme X," or core theme, of "Got to Give It Up." These appear in "Got to Give It Up" 28 times beginning at the 3:13 mark:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | | Date | October 30, 2014 |
|---|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | | |



Preliminary Report, Dkt. 112, ¶¶ 21-27. Finell states that these are copied in the verse and signature phrase of "Blurred Lines." *Id.* Wilbur notes that these do not appear in the deposit copy. Wilbur Decl., Dkt. 91-1, ¶ 166. In the recording, "Theme X" begins after the lyric, "think I'm gon-na let you do it":



Dkt. 91-2, Ex. C.

Thus, for purposes of this Motion, "Theme X" is deemed unprotected by Defendants' copyright in "Got to Give It Up," and this alleged similarity is not considered.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(e)     *Backup Vocals*

Finell contends that the backup hook in "Blurred Lines," sung to the lyrics "hey, hey, hey," also copies the "Theme X" to "Got to Give It Up," as sung to the lyrics "dancin' lady." Preliminary Report, Dkt. 112-3, ¶ 28; Finell Decl., Dkt. 112-3, ¶¶ 70-71. As noted, because for purposes of this motion, this "Theme X" is deemed unprotected by Defendants' copyright in "Got to Give It Up," this alleged similarity is not considered.

(f)     *Bass Melodies*

(i)     The Opening Bass Line

Finell contends that the bass line that begins in bars 1-4 of "Blurred Lines" and is repeated throughout the song is similar to the bass line in bars 1-4 of "Got to Give It Up," which appears on the lead sheet. Preliminary Report, Dkt. 112-3, ¶ 29. In the following diagram, she marks what she calls identical rhythms for both pitches and rests with an "x," and identical scale degrees with arrows:





*Id.*

Wilbur disputes the claim that these bass lines are similar. She asserts that the four bars of each song have only three notes in common -- both notes in the first bar and the last note in the second bar. Wilbur Decl., Dkt. 91-1, ¶¶ 199-200. She also argues that the differences between the bass lines outweigh the similarities. For example, "[b]y playing the root (a) on the '+' of the fourth beat, but not on the downbeat, the GIVE bass pattern has a more syncopated rhythm than BLURRED, which plays the root note squarely on the first beat (strongest beat) of each measure." *Id.* ¶ 203. Wilbur claims that the only similarity between the bass patterns is that "the bass play[s] the root of the chord," which she dismisses as a "commonplace idea" and "the most fundamental role of the bass in popular music." *Id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

¶¶ 205, 209. She points to the 1972 Curtis Mayfield song "Superfly" as prior art that expresses this commonplace idea. *Id.* ¶¶ 210-11.

Once again, Finell criticizes the basis for Wilbur's opinions. She asserts that Wilbur applies an unduly narrow methodology that "results in an erroneous dismissal of nearly all of the . . . similar features, literally because all three factors of melodic similarity do not occur on every single note." Finell Decl., Dkt. 112-3, ¶ 73. She identifies seven distinct similarities between the bass lines: (i) the "idiosyncrasy" of the bass playing "one note, followed by rests, then 2 notes, then 2-3 notes . . . followed by rests, then 2-3 notes"; (ii) the use of the root as an anchoring tone; (iii) that both play scale degree 1 on the first downbeat as well as on the second half of beat 4 in the first and second bars, with identical rhythm; (iv) that "both depart from scale degree 1, moving to scale degree flat (lowered) 7 and returning to 1, as well as to scale degree 4, then returning to 1"; (v) scale degree flat (lowered) 7 occurs in beat 4 of both songs; (vi) identical rhythms in 3 out of four beats in bars 1-3; and (vii) both contain a quarter rest on beat 2 in all 4 bars. *Id.* ¶ 72. In addition, she claims that Finell and Plaintiffs overlook similar choices in pitch, syncopation, and rests that appear in "Blurred Lines" and "Got to Give It Up," but not in "Superfly." *Id.* ¶ 78. Ingrid Monson, Defendants' other expert, also opines about the substantial similarity in the bass lines, and disputes Wilbur's claim that the "Got to Give It Up" bass line is generic. "R&B and Funk bass lines tend to be generically syncopated throughout a two bar phrase. That the 'Got to Give it Up' and 'Blurred Lines' bass lines both leave space where they do[] points to the conclusion that 'Got to Give it Up' was used as the model for the 'Blurred Lines' bass line, and was not a coincidence dictated by a specific genre." Monson Decl., Dkt. 112-3, ¶ 35.

(ii)     The Descending Bass Line

Finell also contends that a descending bass melody that appears at every eighth bar in "Blurred Lines" is substantially similar to a bass melody that recurs intermittently throughout the verse of "Got to Give It Up." Preliminary Report, Dkt. 112-3, ¶ 31. This melody does not appear in the deposit sheet. Wilbur Decl., Dkt. 91-1, ¶ 212. For purposes of this Motion, this alleged similarity is deemed unprotected and is not considered.

*(g)     Keyboard Parts*

Finell argues that the keyboard parts in "Blurred Lines" are very similar to those that appear in "Got to Give It Up," beginning at the first two bars of each song. Finell Decl., Dkt. 112-3, ¶¶ 87-92; Preliminary Report, Dkt. 112-3, ¶¶ 31-32. These keyboard parts consist of chords with similar pitches played to a rhythm in which "the keyboard stops playing on beat 4, creating a rhythmic suspension until the following bar." *Id.* Wilbur claims that the "keyboard part in GIVE . . . is not contained in the GIVE Copyright Deposit." Wilbur Decl., Dkt. 91-1, ¶ 223. This claim has some force. Thus, the particular rhythm transcribed by Finell does not appear in the copyright deposit. The copyright deposit also does not designate this part as one played on a keyboard. However, the chord, or group of three or more notes played at the same time, does appear in the deposit. It is not as transcribed musical notes, but as the notation "A7," which is shorthand used by musicians to refer to the set of notes that comprise the chord. Dkt. 91-2, Ex. C. Under the 1909 Act, this form of notation was sufficient publication to claim copyright protection. *See* Nimmer § 2.05[A] at 2-55 n.14 (under the 1909 Act, a "musical composition might . . . have claimed copyright if reduced to a visibly intelligible form using a system other than our

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

conventional system of musical notes."). The copyright deposit does not, however, indicate what instrument would play these chords.

For these reasons, the analysis of the similarity in keyboard pitches may be considered, but that as to similar keyboard rhythms may not. The relevant keyboard chord in "Got to Give It Up" is an A7 chord, and consists of the pitches A, C#, E, and G. Finell Decl., Dkt. 112-3, ¶ 87 & n.31. The relevant keyboard chord in "Blurred Lines" is an A chord, and consists of the pitches A, C#, and E; *i.e.*, it is an A7 chord with the G omitted. *Id.* By itself, the repetition of a single, common chord is not a sufficiently original expression to merit copyright protection. *See, e.g., VMG Salsoul, LLC v. Ciccone*, 2013 WL 8600435 (C.D. Cal. Nov. 18, 2013). However, this individually unprotected element may be considered in combination with other features for purposes of analytic dissection. See *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004).

### *(h)   Percussion Choices*

Finell contends that there are substantial similarities between the percussion parts in "Blurred Lines" and "Got to Give It Up." These prominently feature cowbells and open hi-hats playing in what she describes as an unusual and distinct rhythm. Preliminary Report, Dkt. 112-3, ¶¶ 33-34; Finell Decl., Dkt. 112-3, ¶¶ 93-94. As Wilbur observes, neither this rhythm nor these instruments appears in the copyright deposit. Wilbur Decl., Dkt. 91-1, ¶ 232. Thus, for purposes of this Motion, the percussion choices are deemed unprotected by Defendants' copyright in "Got to Give It Up," and this alleged similarity is not considered.

### *(i)   Other Alleged Similarities*

Finell identifies three other notable similarities between "Blurred Lines" and "Got to Give It Up": (i) the use of falsetto in the vocal parts; (ii) the use of party noises as accompanying sound; and (iii) the omission of a guitar from the instrumental scoring. Preliminary Report, Dkt. 112-3, ¶¶ 36-40; Finell Decl., Dkt. 112-3, ¶¶ 96-99. None of these alleged similarities is reflected in the "Got to Give It Up" copyright deposit. Therefore, for purposes of this Motion they are deemed unprotected and are not considered.

### (2)   The Monson Declaration

Defendants' other expert, Dr. Monson, also testified about several similarities between "Blurred Lines" and "Got to Give It Up." Many of these, including cowbell/hand percussion, drum set parts, background vocals, and keyboard parts, concern material that is deemed unprotected by the copyright in "Got to Give It Up" for purposes of this Motion for the reasons stated above. Monson Decl., Dkt. 112-3, ¶¶ 24-29, 40-44, 48, 51-52, 53. However, Monson describes two alleged similarities that appear in the copyright deposit and are distinct from those analyzed by Finell.[14]

---

[14] Monson opines that "[t]o limit the composition of 'Got to Give it Up' to its copyright deposit is musically misleading," but she does not state expressly that her conclusions would be the same had she not considered the musical recording. Monson Decl., Dkt. 112-3, ¶ 15. However, Monson also reviewed the 1977 sheet music to "Got

---

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(a)     *Harmonic Similarity*

Monson acknowledges certain harmonic differences between the songs, but contends that "the
resemblance of the melodies is so strong that the chord progression on 'Got to Give It Up' can serve as
a substitute progression for 'Blurred Lines.'" *Id.* ¶ 38. It is not clear whether she is referring to the
protected melodies in the deposit sheet or the unprotected -- for purposes of this Motion --  melodies in
the sound recording. "The 16 bar verse in 'Got to Give it Up' is comprised of A7 for 8 bars followed by
the progression D7|E7|E7[15]|B7/D7/E7/A7/B7 (beginning on the words 'But my body'). In functional
terms this progression is IV / V of V/ V/ IV/ V/ I/ V of V." *Id.* ¶ 36. "The harmonic progression in 'Blurred
Lines' for the 16 bar verse is A/ A/ A / A/ E/ E/ E/ E repeated twice, in functional terms I-V-I-V-I-V-I-V."
*Id.* Although the chords and tones differ, Monson contends that "[i]n effect the harmonic progression in
'Blurred Lines' reduces the 'Got to Give it Up' progression to an alternation from tonic (I) to dominant
(V) – in a longer structural sense it prolongs the tonic." *Id.* ¶ 37.

Wilbur's declaration pre-dates Monson's, and does not respond to this analysis. However, she
concluded that there was no substantial similarity in the harmonies of the songs. In support of this
conclusion, she opines that "[t]here is no sequence of two chords played in the same order and for the
same number of measures (duration) in GIVE and BLURRED," "[t]here are no three chords in common
in GIVE and BLURRED," and GIVE has "a minor or bluesy sound" where "BLURRED has a major
sound," among other points. Wilbur Decl., Dkt. 91-1, ¶¶ 37-38, 44-45. Monson disputes the
characterization of "Got to Give It Up" as having minor sound. Monson Decl., Dkt. 112-3, ¶ 39.

(b)     *Melodic Similarity*

Monson contends that there is a substantial similarity between a portion of the lead vocal melody of
"Got to Give It Up" and a melodic line in "Blurred Lines":

> In "Got to Give it Up," Marvin Gaye's lead vocal melody on the words "move it up" and
> "turn it round[]" chromatically ascend from the pitch G to A. Specifically, from the 7th of a
> dominant seventh on A chord to the root of the chord A . . . The comparable melodic line
> in "Blurred Lines" is on the words "hey, hey, hey," and occurs on the V chord. The pitch
> sequence consequently ascends chromatically from the pitch D to E, that is, from the
> seventh of a dominant chord on E to the root of the chord. . . . Although the chromatic
> ascent is on a V chord rather than a I chord, the repeated melodic profile and harmonic
> function is recognizably related to the passage on "move it up" in "Got to Give it Up."

*Id.* ¶ 49. Monson's transcription of this portion of the "Got to Give It Up" melody is the same as that

to Give It Up," *id.* ¶ 3.a, and, with a few minor discrepancies that do not appear to be material, the elements she
transcribes appear in the copyright deposit.
[15] The copyright deposit places an A7 here. Dkt. 91-2, Ex. C.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

contained in the copyright deposit. *Compare id.* ¶ 49, Ex. 11 (tenor solo), *with* Dkt. 91, Ex. C at 11.[16] She claims that this similarity "cannot be accidental." *Id.* ¶ 50.

Monson also opines about several melodic similarities between the songs based on their respective background vocals. However, for purposes of this Motion, these cannot be considered for the reasons stated above. Thus, they are based on background vocals not present in the sheet music of "Got to Give It Up."

(3)    Filtering of Unprotected Elements

"[T]he unprotectable elements have to be identified, or filtered, before the works can be considered as a whole." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994). Plaintiffs contend that the alleged similarities identified by Defendants are "commonplace and generic building blocks of musical composition." Mot., Dkt. 89 at 11. Plaintiffs argue that these alleged similarities are insufficient to create triable issues of fact as to the alleged copying of the works.

Although a work must be original to be protected by copyright under the relevant statutes and under the Constitution, only a "modicum of creativity" is required for copyright eligibility. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346-47 (1991) (discussing this requirement under both the 1909 and 1976 Acts). Further, copyright law protects only "an author's expression; facts and ideas within a work are not protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990). Where music is concerned, fundamental building blocks, such as individual notes and chords, do not warrant copyright. *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004). For example, Defendants' use of an A7 chord is not protected by copyright.

The Ninth Circuit has cautioned that the creativity requirement should not be applied too stringently, and that a very limited arrangement of notes may be sufficiently original to warrant copyright protection. *Id.* at 851-52 (declining to hold that a seven-note melody is too short to have copyright protection, and citing with approval a district court decision finding that four notes were enough to be accorded copyright protection); *see also Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.").

Commonplace expressions within a genre, which are called "*scenes a faire*," are not protected by copyright because the "expressions are indispensable and naturally associated with the treatment of a given idea." *Swirsky*, 376 F.3d at 850. However, "[i]t is inappropriate to grant summary judgment on the basis of scenes a faire without independent evidence, unless the allegation of scenes a faire is uncontested." *Id.*

---

[16] The second and sixth notes of this portion are marked as sharps in Monson's transcription; they do not have this feature in the deposit. However, some transcribers follow the convention that such markings alter the pitch of the note to which they are attached and to the later times that the same note appears in the same measure. *See* Accidentals, Virginia Tech Multimedia Music Dictionary, http://www.music.vt.edu/musicdictionary/appendix/accidentals/accidentals.html (last visited Oct. 27, 2014).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Defendants have offered sufficient evidence to create triable issues as to whether their 11-note signature phrase, four-note hook, four-bar bass line, 16-bar harmonic structure and four-note vocal melody are protectable expressions. Wilbur's testimony that these are commonplace in the genre or anticipated by earlier works is insufficient to show that there is not a triable issue because they are "*scenes a faire.*" *See id.* at 850-51 (expert's testimony not sufficient for this purpose where she failed to introduce independent evidence that copyrighted work was more similar to work that allegedly anticipated it than to work that allegedly infringed upon it, and triable issue of fact existed as to whether differences between copyrighted work and allegedly anticipating work had "merely trivial differences"). Finally, to the extent that any of these elements is itself not protectable, the combination and selection of these elements may be considered under the extrinsic test because "the over-all impact and effect indicate substantial appropriation." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (citations omitted). *See also Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992) ("Although copyright protection is not afforded to certain elements of a work, such limitations 'must not obscure the general proposition that copyright may inhere, under appropriate circumstances, in the selection and arrangement of unprotected components.'") (citation omitted).

(4)     Genuine Issues of Material Fact Exist

The separate analyses of Finell, Wilbur, and Monson of "Got to Give It Up" and "Blurred Lines" provide indicia of "a sufficient disagreement" concerning their substantial similarity to present a genuine issue of material fact. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). There are disputes, supported by competing expert analyses, as to the similarity of individual elements of each song. These include disputes as to the signature phrases, hooks, bass lines, keyboard chords, harmonic structures and vocal melodies. Plaintiffs attempt to disqualify or impeach Finell by pointing to alleged inconsistencies between her report and declaration in this case, her deposition testimony and her testimony in prior cases. Dkt. 91, Exs. D, E, F. Defendants attempt to do the same as to Wilbur. Dkt. 112, Ex. 8; Dkt. 116. This evidence does not warrant the exclusion of either expert's testimony. "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted). Moreover, these arguments go the weight, not the admissibility of the evidence.

Defendants have made a sufficient showing that elements of "Blurred Lines" may be substantially similar to protected, original elements of "Got to Give It Up." Defendants have identified these with particularity for purposes of analytic dissection. Thus, genuine issues of material fact are present as to the extrinsic similarity of the works. The intrinsic similarity of the works is a jury question. *Swirsky*, 376 F.3d at 845. Therefore, summary judgment is DENIED as to Plaintiffs' declaratory claim and Defendants' counterclaim concerning the alleged infringement of "Got to Give It Up" by "Blurred Lines."

b)     "After the Dance" / "Love After War"

The Parties' analysis of the alleged similarities between "After the Dance" and "Love After War" is less extensive. Finell's Preliminary Report did not discuss "After the Dance" and "Love After War", and her Declaration focuses primarily on backup vocal melodies and harmonies that she acknowledges do not

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

appear in the deposit copy. Finell Decl., Dkt. 112-3, ¶¶ 117-24. Finell does identify "a distinctive identical rhythm on the last note of each phrase iteration" and "melodic structure shared in repeating the similar phrase 4 times consecutively (with some variation) to create the entire chorus section." *Id.* ¶ 122. Finell acknowledges that this is only a "preliminary review," and does not elaborate on either observation. *Id.*

Monson reviewed the two songs in greater detail, and concluded that there are similarities in hook, melody, harmony, and structure. Wilbur drew different conclusions in her Declaration.

(1)     Alleged Similarities

(a)     *Hook and Melody*

Monson describes the "Love After War" hook as "an inversion of the 'After the Dance' hook melody." Monson Decl., Dkt. 112-3, ¶ 81. She provides the following diagram, in which her transcription of the voice part and chords of "After the Dance" is similar, though not identical, to what appears in the deposit copy:[17]

///

///

///

---

[17] The bass line in this diagram is not considered for purposes of this Motion because it does not appear in the deposit copy. Dkt. 91-2, Ex. D.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |





*Id.* Monson contends that "the governing gesture [in 'Love After War'] is a descent from B-A-G#, an inversion of the 'After the Dance' gesture," and that these melodic gestures interact similarly with the harmonic progression. *Id.* ¶¶ 82-83.

Wilbur states that the melodies of the songs are not substantially similar: "The only melodic similarity in the two songs appears in the chorus of each song and consists of one note with the same pitch and placement in the measure, which is repeated four times in the chorus," and "the melodic rhythm, the melodic contour, and the duration (with one exception) of that final note are different in each song." Wilbur Decl., Dkt. 91-1, ¶ 265. Monson opines that, as a matter of music theory, an exact identity of notes is unimportant because the inversion of the melodic gesture and the substitution of chords produce a melody to "Love After War" that can be "sung along to the chorus of 'After the Dance.'"

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Monson Decl., Dkt. 112-3, ¶ 84.[18]

*(b)*     *Harmony and Structure*

Monson acknowledges differences in the harmony and form of "After the Dance" and "Love After War,"
but claims that "the two seemingly different progressions are functionally equivalent." *Id.* ¶ 86. She
states that "'Love After War' uses a II-V7-I progression in E major (F#-7 B7/Emaj7)," and "'After the
Dance uses an altered II-V-I progression (Am7 Bm7 /Emaj7 Bb7#5)." *Id.* Monson's transcription of the
chord progression in "After the Dance" is similar, but not identical, to the chord progression represented
in the copyright deposit. *Id.* ¶¶ 86-89; Dkt. 91-2, Ex. D. Monson provides a detailed technical analysis in
support of her conclusion. There, she asserts that "After the Dance" makes certain modulations and
substitutions for creative reasons, but that as a functional matter, "'Love After War' uses the simplest
version of a II-V-I progression in E," and "'After the Dance uses a substitute II-V-I to heighten the
contrast of its modulation from C#minor to E major." *Id.* ¶¶ 88-92. Monson also states that "the basic
organization of the arrangements is very similar," notwithstanding the longer verse sections and
irregular phrasing of "After the Dance." *Id.* ¶ 94.

It is not clear to what extent Monson's testimony about the similarities in the  harmony and structure of
the two songs relies on protected elements of "After the Dance" that appear in the copyright deposit.
Thus some of her views may be based on elements that are unique to her transcription of the sound
recording. Some of her testimony refers to aspects which are, for purpose of this Motion, deemed to be
clearly unprotected, such as a bass line that does not appear in the deposit sheet. *Id.* ¶ 91. Elsewhere,
her statements are ambiguous. For example, she claims that "After the Dance" effectively substitutes
an Am7 chord for an expected F#m7 chord, and that "[d]elaying the arrival of the pitch C to the hook
creates a more startling shift into the new key when Am7 arrives." *Id.* ¶ 90. The relevant portion of the
copyright deposit shows an Am chord, not an Am7. However, an Am also contains the pitch C. Dkt.
91-2, Ex. D. Monson's conclusion about the effect of this substitution may have been the same if she
analyzed the Am instead of the Am7, but that is not clear. On a motion for summary judgment,
ambiguous expert testimony is to be construed in the light most favorable to the non-moving party.
*Smith v. Jackson*, 84 F.3d 1213, 1220 n.8 (9th Cir. 1996). Under this standard, Monson's testimony is
construed to rely on elements that appear in the copyright deposit.

Wilbur found little harmonic or structural similarity between the two songs. She declares that the only
harmonic similarity is the use of an E major 7 chord, which is repeated four times in the chorus, and a B
minor 7 chord "that appears once in the chorus of WAR but four times in the chorus of DANCE." Wilbur
Decl., Dkt. 91-1, ¶ 289. She adds that the use of two of the same chords is "commonplace," and that
the placement and rhythm with which these chords are used gives them a different character within
each song. *Id.* ¶¶ 290-302.  She also states that four songs released prior to the creation of "After the
Dance" "include similar harmonic elements to DANCE, including the use of jazz influenced chords": "I'm

---

[18] Monson has created a sound file that illustrates this alleged similarity, in which she plays the melody to "Love
After War" on a MIDI keyboard over the sound recording of the "After the Dance" chorus. Dkt. 109. This sound file
is not considered because it requires a subjective assessment. That step in the analysis is reserved for the jury
through its consideration of the intrinsic step of the substantial similarity analysis.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | October 30, 2014 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Still in Love with You," "Let's Stay Together," and "Love and Happiness," by Al Green, and "Suavecito" by Malo. *Id.* ¶ 312. Wilbur does not provide any transcriptions or other analysis to support this claimed similarity, which Finell contests. Finell Decl., Dkt. 112-3, ¶ 125. Wilbur's proffered prior art for the harmony of "After the Dance" is not supported by sufficient evidence to establish for purposes of summary judgment that the "After the Dance" harmony is an unprotected *scene a faire*. *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004).

(2)     Genuine Issues of Material Fact Exist

These expert analyses show "a sufficient disagreement" concerning the extrinsic similarity of "After the Dance" and "Love After War" to present a genuine issue of material fact. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Defendants offer evidence that "Love After War" contains melodic and harmonic features substantially similar to those in "After the Dance," notwithstanding the inversion of the melody in the choruses and the substitutions and modulation in the harmony.

Plaintiffs argue that Defendants' claim must fail because the only extrinsic similarity is the alleged copying of "a single note" and a "couple of chords," none of which is protected. Mot., Dkt. 89 at 33. Plaintiffs also argue that Defendants' allegations go to *intrinsic* similarity, which is not to be considered on summary judgment and must be accompanied by *extrinsic* similarity to support a claim of infringement. Reply, Dkt. 125 at 11. However, "[o]bjective analysis of music under the extrinsic test cannot mean that a court may simply compare the numerical representations of pitch sequences and the visual representations of notes to determine that two choruses are not substantially similar, without regard to other elements of the compositions." *Swirsky*, 376 F.3d at 847-48. Extrinsic analysis "is an objective comparison of specific expressive elements'; it focuses on the 'articulable similarities' between the two works." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012), *as amended on denial of reh'g and reh'g en banc* (June 13, 2012). The Ninth Circuit has declined to narrow the "large array of elements" of which music is comprised to a "uniform set of factors" whose similarity must be shown on summary judgment. *Swirsky*, 376 F.3d at 849. What is needed is "expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was 'substantial' and to 'protected elements' of the copyrighted work." *Id.* Defendants have met this burden.

**IV.     Conclusion**

For the foregoing reasons, the Motion is DENIED.

**IT IS SO ORDERED.**

_____  :  _____

Initials of Preparer   ak_____