Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
KING & BALLOW
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000
Fax: (858) 597-6008
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and
Nona Marvisa Gaye

Richard S. Busch (TN BPR 014594)
(*pro hac vice*)
E-Mail: rbusch@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN  37201
(615) 259-3456  Fax:  (615) 726-5417
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and Nona
Marvisa Gaye

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East; Suite 1520
Los Angeles, CA  90067
(310) 853-6355 Fax: (310) 853-6333
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and
Nona Marvisa Gaye

Paul N. Philips (SBN 18792)
E-Mail: pnp@pnplegal.com
The Law Offices of Paul N. Philips
9255 West Sunset Boulevard
West Hollywood, CA  90069
(323)813-1126 Fax:  (323) 854-6902
Attorney for Defendant and Counter-Claimant
Marvin Gaye III

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>─────────────────────<br><br>AND RELATED COUNTERCLAIMS | Case No. CV13-06004-JAK (AGRx)<br><br>Hon. John A. Kronstadt<br><br>**COUNTER-CLAIMANTS' JOINT MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Date: January 26, 2015<br>Time: 3:00 p.m.<br>Ctrm: 750<br><br>Action Commenced: August 15, 2013<br>Pre-Trial Conference: January 26, 2015<br>Trial Date: February 10, 2015 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

I.      INTRODUCTION ................................................................ 1

II.     THE PARTIES' CLAIMS AND DEFENSES .......................... 8

  A.  Plaintiffs' Claim ........................................................ 8

  B.  Counter-Claimants' Claims ........................................ 8

  C.  Plaintiffs' & Counter-Defendants' Affirmative Defenses ......... 12

  D.  Counter-Claimants' Affirmative Defenses ................. 24

  E.  Anticipated Evidentiary Issues ................................. 28

  F.  Issues of Law ........................................................ 31

III.   BIFURCATION OF ISSUES ........................................... 37

IV.   JURY TRIAL ................................................................ 37

V.    ATTORNEY'S FEES .................................................... 37

VI.   ABANDONMENT OF ISSUES ....................................... 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Apple Computer, Inc. v. Microsoft Corp.*, 779 F. Supp. 133 (N.D. Cal. 1991). ............21, 33

*Arnstein v. Porter*, 154 F.2d 46 (2d Cir. 1946) .................................................................34

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001). ...............................................14

*Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009)...................32

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211 (9th Cir. 1997). ...........................................................................................................................28

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)........................................20

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986).....................................................................17

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ...................................................................28

*Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002) .......................................................................................................................35

*Los Angeles News Serv. v. Reuters Television Intern., Ltd.*, 149 F.3d 987 (9th Cir. 1998). .........................................................................................................................24

*Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002) .............................................................31

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...................................................................................................16, 26

*N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393 (S.D.N.Y. 1952)... 35, 36, 37

*Navara v. M. Witmark & Sons*, 185 N.Y.S.2d 560 (Sup. Ct. 1959) ...............................34

*Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002) ..........................................33

*Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2004). ........................................ 16, 19, 27

*Ory v. Country Joe McDonald*, No. CV 01-8177 NM (A), 2003 WL 22909286 (C.D. Cal. Aug. 5, 2003)..........................................................................................14

*Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378 (C.D. Cal. 1993) ..........................................................................................................................22

1  *Pasillas v. McDonald's Corp.*, 927 F.2d 440 (9th Cir. 1991)..............................................32

2  *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990) ........................22

3  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014). ..............................14, 15

4  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004)...........................13

5  *Radin v. Hunt*, LA CV10-08838 JAK (SSx) (C.D. Cal. Dec. 15, 2011)..............................35

6  *Repp v. Webber*, 892 F. Supp. 552 (S.D.N.Y. 1995)..........................................................34

7  *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029 (C.D. Cal. 2001). .....................................32

8  *Rich v. Paramount Pictures*, 279 P.2d 782 (1955) ............................................................34

9  *Rodesh v. Disctronics, Inc.*, 8 F.3d 29 (9th Cir. 1993). ......................................................20

10  *Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045 (D. Idaho 2013) .................................33

11  *Selle v. Gibb*, 741 F.2d 89 (7th Cir. 1984) ........................................................... 34, 35, 36

12  *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ............................................................31

13  *Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1209 (D. Nev. 2008) ................36

14  *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978)...................................23

15  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th
16      Cir. 1977).........................................................................................................31, 32

17  *Survivor Prods. LLC v. Fox Broad. Co.*, 2001 WL 35829270 (C.D. Cal. June 12,
18      2001). ....................................................................................................................16, 26

19  *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004). ....................................................... passim

20  *Tritek Technologies, Inc. v. United States*, 67 Fed. Cl. 727 (2005) ...................................36

21  *Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409 (S.D.N.Y.
22      2004). .........................................................................................................................20

23  *United States v. Bao*, 189 F.3d 860 (9th Cir. 1999)..........................................................30

24  *United States v. King Features Entm't, Inc.*, 843 F.2d 394 (9th Cir. 1988)....................15

25  *United States v. Monroe*, 943 F.2d 1007 (9th Cir. 1991) ..................................................30

26

27

28

**Statutes**

17 U.S.C. § 107 ................................................................................................21

17 U.S.C. § 501 ........................................................................................ passim

17 U.S.C. § 504 ........................................................................................22, 24

17 U.S.C. § 505 ................................................................................................37

17 U.S.C. § 507(b) ..........................................................................................13

**Rules**

Fed. R. Civ. P. 8 ........................................................................................12, 25

**Treatises**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright. ...............19, 27

6 Patry on Copyright ........................................................................................15

Paul Goldstein, Goldstein on Copyright (2013). .............................................33

**Other Authorities**

Ninth Circuit Manual Of Model Civil Jury Instructions (2007). ................ passim

S. Comm. on the Judiciary, 86th Cong., Copyright Law Revision 36 (Comm. Print
        1960) ....................................................................................................34

# I.     INTRODUCTION

Robin Thicke, Pharrell Williams, and Clifford Harris, Jr., commenced this action as Plaintiffs against Marvin Gaye's children, Nona Gaye, Frankie Gaye, and Marvin Gaye III, claiming and asking the Court to declare that the composition "Blurred Lines" does not infringe upon the copyright of Marvin Gaye's composition, "Got to Give it Up," and, in their Answer, that the song composition, "Love After War" does not infringe upon the copyright of Marvin Gaye's composition, "After the Dance." The Gaye children, as Counter-Claimants, responded to Plaintiffs' lawsuit by filing counterclaims, in which they assert direct, contributory, and vicarious copyright infringement and inducement of copyright infringement against Thicke, Williams, and others. Marvin Gaye's children own the United States copyrights of both compositions, "Got to Give it Up" and "After the Dance" by operation of law, and will provide, among other things, documentary evidence of valid United States Copyright registrations and their Administration Agreements and Settlement Agreement with EMI which reflect their legal standing to sue for infringement of the copyrights in their father's original compositions, "Got to Give it Up" and "Love After War."

## A.     "Blurred Lines" & "Got to Give it Up."

Marvin Gaye was a legendary Grammy Award-winning singer-songwriter known worldwide for his classic Motown hits. Marvin Gaye has appeared on the Billboard charts 67 times, including 41 top-forty hits, 18 top-ten hits, and more than a dozen number-one hits.  He is well known for his social commentary, including the concept album *What's Going On* and the song "Save The Children," which he used in 1971 to launch the Save The Children Foundation.  Marvin Gaye died in 1984 at age 44 and was posthumously honored with a Grammy Lifetime Achievement Award and induction into the Rock and Roll Hall of Fame.

"Got to Give it Up" was written, composed and recorded by Marvin Gaye in 1976 and released on or about March 15, 1977 on the album entitled *Live at the London Palladium*.  *Live at the London Palladium* reached No. 1 on the Billboard Soul Albums

chart and No. 3 on the Pop Albums chart. The "Got to Give it Up" single reached No. 1 on three charts, including the Billboard Hot 100.

Robin Thicke is a singer-songwriter under contract with Pharrell Williams' company, Star Trak Entertainment and UMG Recordings Inc. Thicke has released seven albums as an artist, the most successful of which was his 2013 album entitled *Blurred Lines*. Pharrell Williams is a successful songwriter and producer. Clifford Harris, Jr. is a successful songwriter and rapper. Together, in 2013, Thicke, Williams, and Harris wrote and composed the song "Blurred Lines," which was performed and recorded by Thicke, Williams, and Harris, and produced by Williams. Counter-Defendants released the single "Blurred Lines" and accompanying music video on or about March 26, 2013, and the album entitled *Blurred Lines* both in the United States and internationally on or about July 30, 2013. Together, they, in the creation, production and release of "Blurred Lines" without authorization and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gaye family, created an infringing derivative work of "Got to Give it Up" and reproduced, distributed, displayed, publicly performed and otherwise exploited "Blurred Lines," which earned them substantial revenue, profit, and notoriety.

Counter-Defendants Star Trak Entertainment, LLC, Interscope Records (an unincorporated division of UMG Recordings, Inc.), and UMG Recordings, Inc. through its subsidiaries, are the record labels that released the album *Blurred Lines*. Universal Music Distribution, a division of Universal Music Group Distribution Corp., has manufactured and distributed the album *Blurred Lines*. More Water From Nazareth Publishing, Inc. is Williams' publishing company. Collectively, they were involved with the commercial release, reproduction, distribution, exploitation, licensing, and public performance of "Blurred Lines."

The Gaye children instantly recognized that "Blurred Lines" was substantially similar to their father's composition, "Got to Give it Up." Upon learning that Counter-Defendants had neither requested nor obtained permission or a license to copy and incorporate "Got to Give it Up" into "Blurred Lines," the Gayes sent Notice of

- 2 -

Infringement to Counter-Defendants on or about July 24, 2013, prior to the United States release of the album *Blurred Lines*. The Gayes will present testimonial and documentary evidence that, despite notice: (1) "Blurred Lines" was reproduced, distributed, displayed, publicly performed, and otherwise exploited by the Counter-Defendants, even after receiving Notice of Infringement; (2) Plaintiffs and Counter-Defendants materially contributed to the reproduction, distribution, display, public performance, and exploitation of "Blurred Lines;" and (3) Plaintiffs and Counter-Defendants had the ability to control and have profited from the domestic and foreign exploitation of "Blurred Lines." Documentary evidence and expert testimony will be presented as to the amount of Plaintiffs and Counter-Defendants' profits and Counter-Claimants' damages, the amounts and other consideration "Got to Give it Up" would have been licensed for had proper authorization been sought, and the impact which  of the use of "Got to Give it Up" and Marvin Gaye's name and image had on the sale of "Blurred Lines."

The Gayes' musicologists Judith Finell and Dr. Ingrid Monson will testify that they have identified at least 14 substantial similarities between "Blurred Lines" and "Got to Give it Up." Documentary evidence through the use of visual and audio media, including comparison media, will demonstrate these substantial similarities. This evidence will clearly show, as Ms. Finell and Dr. Monson have stated, that the link between the songs is "undeniable" and "'Got to Give it Up' served as the specific model for 'Blurred Lines.'" In addition to the eight substantial similarities initially identified in a preliminary analysis,[1] through further analysis Ms. Finell and Dr. Monson have identified additional substantial similarities in:[2] the "musical fingerprints" through the utilization of a vocal "woo;" shared

---

[1] (1) The signature phrase in the main vocal melodies; (2) the hooks; (3) the hooks with backup vocals; (4) the core theme in "Blurred Lines" and backup hook in "Got to Give it Up"; (5) the backup hooks; (6) the bass melodies; (7) the keyboard parts; and (8) the unusual percussion choices.

[2] Plaintiffs and Counter-Defendants filed a Motion for Summary Judgment prior to the time expert disclosures were due. Therefore, it was only those similarities identified in Ms. Finell's preliminary report attached to the Counter-Complaint in this action that were analyzed in the Motion for Summary Judgment and the Court's Order on that

hand clap rhythms; lyrics and story line; the bass melody in "Blurred Lines" as compared to the tom-tom in "Got to Give it Up;" the structure and design templates; additional substantial similarities in the back-up vocals; and the roots of backup hook "Hey, Hey, Hey" in "Blurred Lines" as expressed in "Got to Give It Up."[3]

These findings are corroborated by the statements made by Thicke and Williams both inside and outside of litigation. Prior to this litigation,[4] Thicke stated in an interview with *GQ*,

> Pharrell and I were in the studio and I told him that one of my favorite songs of all time was Marvin Gaye's 'Got to Give it up.' I was like, 'Damn, we should make something like that, something with that groove.' Then he started playing a little something and we literally wrote the song in about a half hour and recorded it. . . .

In a radio interview with Hot 97 Thicke stated,

> I went in and I was like you know Pharrell I'd love to make something like this, you know feel like "Got to Give it Up" and he started with the percussion you know trying to get that rhythm and then the song actually happened we did the whole record in about an hour.

In the same radio interview he admitted that "Blurred Lines" "feels" like "Got to Give it Up" part 2. These are but a few examples of the many admissions Thicke has made, all of which will be introduced as evidence. Williams also admitted in an interview with *XXL* that

_____

motion. On October 31, 2014, Ms. Finell and Dr. Monson submitted thier Rule 26 reports consistent with the Court's scheduling Order, in which they now identified a constellation of at least 14 substantial similarities.

[3] Ms. Finell and Dr. Monson will also testify that a lead sheet cannot fully capture all of the elements of "Got to Give it Up," and that to have an accurate comparison with "Blurred Lines," the jury must hear and consider the sound recording in which the musical composition is embodied. Plaintiffs' expert, Sandy Wilbur, in fact, admitted in her deposition that she listened to the commercially released recordings in order to compare the compositions.

[4] Employees of Counter-Defendant UMG Recordings Inc. were present during several of Thicke's interviews in which he discussed "Got to Give it Up."

when he created "Blurred Lines" he "was trying to pretend that [he] was Marvin Gaye" and stated in an interview promoting *Despicable Me 2* that he was inspired by Marvin Gaye and he "tried to take the feeling that "Got to Give it Up" gave [him]."

Even after he commenced this litigation, but before his deposition, Thicke echoed these statements in his verified sworn interrogatory, stating:

> The track was created from scratch in about an hour and a half. Robin Thicke told Pharrell Williams that Thicke would love to create a song that evoked the musical era of "Got to Give It Up." Williams created the instrumental track and the first verse, and then Thicke and Williams created the rest of the verses, improvising four lines at a time.

Documentary evidence will also show that both lay observers and musicians, such as Smokey Robinson, have recognized the overall substantial similarities between the works. *The New York Times*' Rob Hoerburger commented, "[w]hat I keep coming back to is ['Blurred Lines']'s choice DNA . . . that bass line came right from Marvin Gaye's No. 1 hit from the Summer of '77, 'Got to Give it Up.'" Additionally, David Ritz, the author of a Marvin Gaye biography, stated in *Rolling Stone*, "When I first heard Robin Thicke's 'Blurred Lines,' my reaction was the same as millions of other R&B fans: *'Hey, that's Marvin Gaye's 'Got to Give it Up.'*'" Smokey Robinson, in an interview with Howard Stern, stated "when you hear the track to "Blurred Lines" it's "Got to Give it Up," the melody is "in there," and it was "absolutely a rip-off." The Gayes have numerous blogs and articles echoing similar comments. The Gayes will present these through documentary and testimonial evidence via their marketing expert, Dr. Michael Aleyne that UMG Recordings, Inc. marketed "Blurred Lines" through public blogs, websites, and magazines, as evoking "Got to Give it Up" and Universal Music Group's own Vice President of A&R for Universal Music Enterprises, Harry Weinger, publicly and internally commented that "Blurred Lines" was "sampled/borrowed from" "Got to Give it Up."

Despite Thicke and Williams's prior statements, they changed their tune when it was time for them to be deposed. Williams testified that all of Thicke's statements about

the creation of "Blurred Lines" were "embellished" and that neither Marvin Gaye nor "Got to Give it Up" ever crossed his mind while he created "Blurred Lines." Additionally, Thicke now claims he made all of his statements while drunk or on drugs, none of them were true, he was not an honest person, and he only mentioned Marvin Gaye in interviews to sell records. He now claims, in his deposition testimony, to have made absolutely no suggestions to Williams before or during the creation of Blurred Lines about anything related to "Blurred Lines," including denying he asked Williams to "evoke" anything in creating "Blurred Lines." Thicke has never explained his absolutely contradictory sworn and verified interrogatory responses served in this case.

Counter-Claimants allege Plaintiffs and Counter-Defendants have violated section 106 of the Copyright Act. Plaintiffs and Counter-Defendants without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gayes, created a derivative work of "Got to Give it Up" and reproduced, distributed, displayed, publicly performed and otherwise exploited "Blurred Lines" which constitutes, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement.

**B.    "Love After War" & "After the Dance."**

The musical composition "After the Dance," was written, composed and recorded by Marvin Gaye, and released in 1976 on the album *I Want You*. *I Want You* reached No. 1 on the Billboard Soul Albums chart and No. 4 on the Pop Albums chart. "After The Dance" reached No. 10 on the Billboard Hot Dance/Disco Chart, No. 14 on the Soul Singles Chart, and No. 74 on the Pop Singles Chart. Testimonial evidence will show that Counter-Defendant Robin Thicke is not only familiar with, and had access to, "After the Dance," but considers it a classic.

Counter-Defendants released the single for "Love After War" on or about October 11, 2011, and the album entitled *Love After War* in both the United States and internationally on or about December 6, 2011.

Counter-Defendants Robin Thicke and Paula Patton (the writers, composers, and performers of "Love After War") without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gaye Family, created a derivative work of "After the Dance" and reproduced, distributed, displayed, publicly performed and otherwise exploited "Love After War."

Counter-Defendants Star Trak Entertainment, LLC, Geffen Records (d/b/a Interscope Records and an unincorporated division of UMG Recordings, Inc.), and UMG Recordings, Inc. through its subsidiaries, are the record labels that released the album *Love After War*. Universal Music Distribution, a division of Universal Music Group Distribution Corp., has manufactured and distributed the album *Love After War*. Collectively, they were involved with the commercial release, reproduction, distribution, exploitation, licensing, and public performance of "Love After War."

Ms. Finell and Dr. Monson will provide testimonial and documentary evidence that "Love After War" and "After the Dance" are substantially similar. Documentary evidence though the use of visual and audio media will demonstrate these substantial similarities.

Counter-Defendants received notice of their infringement of "After the Dance" on or about October 30, 2013. Counter-Claimants will present testimonial and documentary evidence that, despite notice: (1) "Love After War" continued to be reproduced, distributed, displayed, publicly performed, and otherwise exploited, even after being put on notice of the infringement; (2) Counter-Defendants materially contributed to the reproduction, distribution, display, public performance, and exploitation of "Love After War;" and (3) Counter-Defendants had the ability to control and have profited from the domestic and foreign exploitation of "Love After War." Documentary and testimonial expert will be presented as to the amount of Plaintiffs and Counter-Defendants' profits and Counter-Claimants' damages.

Counter-Claimants allege Plaintiffs and Counter-Defendants have violated section 106 of the Copyright Act. Plaintiffs and Counter-Defendants without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gaye

- 7 -

Family, created a derivative work of "After the Dance" and reproduced, distributed, displayed, publicly performed and otherwise exploited "Love After War" which constitutes, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement.

## II. THE PARTIES' CLAIMS AND DEFENSES

### A. Plaintiffs' Claim

#### 1. Claim 1: Declaratory Relief for Non-Infringement

##### a) Elements Required to Establish Plaintiffs' Claims

This issue will be decided by the resolution of Counter-Claimants' infringement claim. Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Counter-Claimants are the owners of a valid copyright; and

2. Plaintiffs and Counter-Defendants copied original elements from the copyrighted work.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.4 (2007); 17 U.S.C. § 501(a)-(b).

##### b) Key Evidence in Opposition to Each Claim

Counter-Claimants incorporate by reference the evidence described in Section I.A., which shows that Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works.

### B. Counter-Claimants' Claims

Counter-Claimants have alleged infringement of "Got to Give it Up" by "Blurred Lines" and infringement of "After the Dance" by "Love After War." Counter-Claimants incorporate, with respect to all items discussed below, the evidence described in Section I.A. and I.B., all information and arguments set forth in their Response to the Motion for Summary Judgment, and all testimony and disclosures made by their expert witnesses Ms. Finell and Dr. Monson.

#### 1. Counterclaim 1: Direct, Contributory, and Vicarious Copyright

- 8 -

**Infringement of "Got to Give it Up" by Thicke, Williams, Harris, Star Trak, Interscope, Universal, and UMD, collectively the "Blurred Lines Defendants"). 17 U.S.C. § 101,** *et seq.*

**a)      Elements Required to Establish Direct Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Counter-Claimants are the owners of a valid copyright; and

2. Plaintiffs and Counter-Defendants copied original elements from the copyrighted work.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.4 (2007); 17 U.S.C. § 501(a)-(b).

**b)      Key Evidence in Support of Direct Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.A., which shows that Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works.

**c)      Elements Required to Establish Contributory Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Plaintiffs or Counter-Defendants knew or had reason to know of the infringing activity of Plaintiffs; and

2. Plaintiffs or Counter-Defendants intentionally induced or materially contributed to Plaintiffs' infringing activity.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.21 (2007).

**d)      Key Evidence in Support of Contributory Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.A., which shows that Counter-Claimants are the owners of the works in suit, and that Plaintiffs and Counter-Defendants induced or materially contributed to the infringement of the works in suit.

e)   **Elements Required to Establish Vicarious Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Plaintiffs or Counter-Defendants profited directly from the infringing activity;

2. Plaintiffs or Counter-Defendants had the right and ability to supervise or control the infringing activity of Plaintiffs;

3. Plaintiffs or Counter-Defendants failed to exercise that right and ability.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.20 (2007).

f)   **Key Evidence in Support of Vicarious Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.A., which shows that Counter-Claimants are the owners of the works in suit, and that Plaintiffs and Counter-Defendants profited directly from the infringing activity, had the right and ability to supervise or control the infringing activity, and failed to exercise that right and ability.

**2.   Counterclaim 2: Direct, Contributory, and Vicarious Copyright Infringement of "After the Dance" by Thicke, Patton, Star Trak, Geffen, Universal, and UMD (the "Love After War Defendants") 17 U.S.C. § 101,** *et seq.*

a)   **Elements Required to Establish Direct Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Counter-Claimants are the owners of a valid copyright; and

2. Plaintiffs and Counter-Defendants copied original elements from the copyrighted work.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.4 (2007).

b)   **Key Evidence in Support of Direct Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.B., which shows that Counter- Claimants are the owners of the works at issue in this suit, and

- 10 -

that Plaintiffs and Counter-Defendants engaged in the infringement of those works.

**c)      Elements Required to Establish Contributory Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Plaintiffs or Counter-Defendants knew or had reason to know of the infringing activity of Plaintiff; and

2. Plaintiffs or Counter-Defendants intentionally induced or materially contributed to Plaintiffs' infringing activity.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.21 (2007).

**d)      Key Evidence in Support of Contributory Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.B., which shows that Counter- Claimants are the owners of the works in suit, and that Plaintiffs and Counter-Defendants induced or materially contributed to the infringement of the works in suit.

**e)      Elements Required to Establish Vicarious Infringement**

Counter-Claimants have the burden of proving both of the following by a preponderance of the evidence:

1. Plaintiffs or Counter-Defendants profited directly from the infringing activity;

2. Plaintiffs or Counter-Defendants had the right and ability to supervise or control the infringing activity of Plaintiffs;

3. Plaintiffs or Counter-Defendants failed to exercise that right and ability.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.20 (2007).

**f)      Key Evidence in Support of Vicarious Infringement**

Counter-Claimants incorporate by reference the evidence described in Section I.B., which shows that Counter-Claimants are the owners of the works in suit, and that Plaintiffs and Counter-Defendants profited directly from the infringing activity, had the right and ability to supervise or control the infringing activity, and failed to exercise that right and ability.

**C.    Plaintiffs' & Counter-Defendants' Affirmative Defenses**

   **1.    First Affirmative Defense: Plaintiffs and Counter-Defendants allege the Counterclaims, in whole or in part, fail to state a claim upon which relief may be granted.**

      **a)    Elements required to establish First Affirmative Defense**

A pleading that states a claim for relief must contain:

1. A short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

2. A short and plain statement of the claim showing that the pleader is entitled to relief; and

3. A demand for the relief sought, which may include relief in the alternative or different types of relief.

*See* Fed. R. Civ. P. 8.

      **b)    Key Evidence in Opposition**

Plaintiffs and Counter-Defendants have not articulated a reason Counter-Claimants' complaint fails to state a claim for relief.

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

   **2.    Second Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants lack standing to pursue some or all of their claims.**

      **a)    Elements required to establish Second Affirmative Defense**

Counter-Claimants have standing to sue if they prove by a preponderance of the evidence that:

- 12 -

1.  Counter-Claimants' work is original;

2.  Counter-Claimants are the legal or beneficial owners, by authorship, transfer, or other operation of law, of an exclusive right under the Copyright Act; and

3.  The work has been registered with the Copyright Office.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.05 (2007); 17 U.S.C. § 501(b).

### b)   Key Evidence in Opposition

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which, along with other evidence to be presented at trial, establishes Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

### 3.   Third Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants claims for relief are barred by the applicable statutes of limitations, including the statute of limitations set forth in 17 U.S.C. § 507(b).

### a)   Elements required to establish Third Affirmative Defense

Plaintiffs and Counter-Defendants must establish by a preponderance of the evidence:

1.  Counter-Claimants discovered the infringement or should have discovered the infringement more than three (3) years before filing their claims.

*See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 705-06 (9th Cir. 2004).

### b)   Key Evidence in Opposition

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes the Counterclaims were filed less than three (3) years after the release of the infringing works and accordingly well within the three-year statute of limitations. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

**4.     Fourth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants claims for relief are barred, in whole or in part, by the doctrine of laches.**

**a)     Elements required to establish Fourth Affirmative Defense**

Plaintiffs and Counter-Defendants must establish by a preponderance of the evidence:

1. Counter-Claimants had full knowledge of the infringing acts alleged in the suit;

2. Counter-Claimants intentionally delayed filing the lawsuit;

3. That delay in filing was for an unreasonably long and inexcusable period of time, and

4. Plaintiffs and Counter-Defendants have been or will be prejudiced in a significant way due to Counter-Claimants' delay.

*See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001). A laches defense is not available for willful infringement. *Ory v. Country Joe McDonald*, No. CV 01-8177 NM (A), 2003 WL 22909286, at *10 (C.D. Cal. Aug. 5, 2003) *aff'd sub nom. Ory v. McDonald*, 141 F. App'x 581 (9th Cir. 2005).

**b)     Key Evidence in Opposition**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Counter-Claimants filed suit within the limitations period set by 17 U.S.C. § 507, and without any unreasonable delay or delay causing prejudice to Plaintiffs or Counter-Defendants. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1972-74 (2014).

**5.     Fifth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants claims for relief are barred, in whole or in part, by the doctrine of waiver.**

**a)     Elements required to establish Fifth Affirmative Defense**

- 14 -

Plaintiffs and Counter-Defendants must establish by a preponderance of the evidence:

1. Counter-Claimants intentionally relinquished a known right with knowledge of its existence.

*United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).

### b)      Key Evidence in Opposition.

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Counter-Claimants have always treated their copyrights as valuable intellectual property through thier licenses with EMI, and have not relinquished any rights, much less intentionally. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

### 6.      Sixth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants claims for relief are barred, in whole or in part, by the doctrine of estoppel.

### a)      Elements required to establish Sixth Affirmative Defense

Plaintiffs and Counter-Defendants must establish by a preponderance of the evidence:

1. A misleading representation by the Counter-Claimants;

2. Plaintiffs and Counter-Defendants relied on the representation to their detriment.

*See Petrella v. Metro-Goldwyn-Mayer, Inc*., 134 S. Ct. 1962, 1985 (2014) (citing 6 Patry on Copyright § 20:58).

### b)      Key Evidence in Opposition.

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Counter-Claimants have made no misrepresentations to Plaintiffs and Counter-Defendants, and, in any event, Plaintiffs and Counter-Defendants have not relied on any representations to their detriment. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

7. **Seventh Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, by the doctrine of unclean hands.**

   a) **Elements required to establish Seventh Affirmative Defense**

Plaintiffs and Counter-Defendants must establish by a preponderance of the evidence:

1. Inequitable conduct by Counter-Claimants;

2. Counter-Claimants' conduct directly relates to the claim which it has asserted against Plaintiffs and Counter-Defendants; and

3. Counter-Claimants conduct injured Plaintiffs and Counter-Defendants.

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007) (citing *Survivor Prods. LLC v. Fox Broad. Co.*, 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001)).

   b) **Key Evidence in Opposition**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Counter-Claimants have engaged in no inequitable conduct. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

8. **Eighth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because any alleged use or copying of the alleged copyrighted material or sound recording is de minimis.**

   a) **Elements required to establish Eight Affirmative Defense**

1. The average audience would not recognize the appropriation.

*See Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004).

   b) **Key Evidence in Opposition**

"[A] use is de minimis only if the average audience would not recognize the

- 16 -

appropriation." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004) (citing *Fisher v. Dees*, 794 F.2d 432, 434 n.2 (9th Cir. 1986)).

Plaintiffs and Counter-Defendants have averred that any copying is de minimis and in an attempt to prove their claim, unilaterally focus on an inappropriate note-by-note comparison of the works. This is inappropriate and ignores the numerous compositional similarities between "Blurred Lines" and "Got to Give it Up" and between "Love After War" and "After the Dance," not only outlined by the reports and testimony of Ms. Finell and Dr. Monson, but is also obvious to the lay observer.

Counter-Claimants also incorporate by reference the evidence described in Section I.A. and I.B., which establishes the copying by Plaintiffs and Counter-Defendants far exceeds the de minimis threshold. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

9. **Ninth Affirmative Defense: Plaintiffs and Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because the alleged Copyrights at allegedly held by Counter-Claimants are not valid and enforceable.**

a) **Elements required to establish Ninth Affirmative Defense**

Counter-Claimants are the owners of a valid copyright in the works if Counter-Claimants proves by a preponderance of the evidence that:

1. Counter-Claimants' work is original; and

2. Counter-Claimants' are the legal or beneficial owner, by authorship, transfer, or other operation of law, of an exclusive right under the Copyright Act; and

3. The work has been registered with the Copyright Office.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.5 (2007); 17 U.S.C. § 501(b).

b) **Key Evidence in Opposition**

- 17 -

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

10. **Tenth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because Counter-Claimants are not the owners of the alleged copyrights and/or sound recordings at issue.**

a) **Elements required to establish Tenth Affirmative Defense.**

Counter-Claimants are the owners of a valid copyright in the works if Counter-Claimants prove by a preponderance of the evidence that:

1. Counter-Claimants' work is original; and

2. Counter-Claimants' are the legal or beneficial owner, by authorship, transfer, or other operation of law, of an exclusive right under the Copyright Act; and

3. The work has been registered with the Copyright Office.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.5 (2007); 17 U.S.C. § 501(b).

b) **Key Evidence in Opposition**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which, along with other evidence to be presented at trial, establishes that Counter-Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Counter-Claimants do not allege ownership of the sound recordings. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

11. **Eleventh Affirmative Defense: Plaintiffs and Counter-Defendants allege Counter-Claimants' claims for relief, and each of them,**

**are barred, in whole or in part, because the alleged copyrighted work is not substantially similar to any allegedly infringing work.**

    **a)**    **Elements required to establish Eleventh Affirmative Defense**

This is not an affirmative defense. Plaintiffs and Counter-Defendants must prove:

1. Plaintiffs and Counter-Defendants, in creating the work, did not use the Counter-Claimants material; and

2. An ordinary observer would detect the similarity as coming from the original copyrighted source.

*See Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B], at 13-8, 13-9. "There is no one magical combination of [] factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique." *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004).

    **b)**    **Key Evidence in Opposition**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., and expert disclosures and testimony of Ms. Finell and Dr. Monson which establishes that "Blurred Lines" is substantially similar to "Got to Give it Up" and "Love After War" is substantially similar to "After the Dance."

    **12.**    **Twelfth Affirmative Defense: Plaintiffs and Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because the alleged copyrighted material that Counter-Claimants allege was infringed is not subject to copyright protection, including that it is not sufficiently original and/or is generic or "scènes à faire."**

    **a)**    **Elements required to establish Twelfth Affirmative Defense**

Anyone who copies original elements of a copyrighted work during the term of the copyright without the owner's permission infringes the copyright. Plaintiffs and

- 19 -

Counter-Defendants must prove:

1. Counter-Claimants works were not independently created by the work's author, that is, the author copied it from another work; and

2. Does not meet the threshold of minimal creativity.

In copyright law, the "original element" of a work need not be new or novel. *See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.12 (2007).

### b) Key Evidence in Opposition

Plaintiffs and Counter-Defendants argue that the original elements in "Got to Give it Up" are *scènes à faire*—which are elements so "commonplace" and "indispensible" that they must be included in the work. *Swirsky*, 376 F.3d at 849-50. They are wrong.

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., and in their Response to the Motion for Summary Judgment. Additionally, testimonial and documentary evidence from Ms. Finell and Dr. Monson will establish the elements of Counter-Claimants' works are expressed and function in ways that are distinctive and original. To be original, a work only needs a "modicum of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991). "A work's originality can stem as much from an author's arrangement of component pieces as from the originality of the pieces themselves." *Rodesh v. Disctronics, Inc.,* 8 F.3d 29 (9th Cir. 1993). Moreover, "the similarity of the [infringed work] to other musical works in the public domain [is] not relevant in an originality inquiry where . . . copying is conceded." *Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 414 n.6 (S.D.N.Y. 2004).

For example, Plaintiffs and Counter-Defendants aver that the similarities between the "Blurred Lines" and "Got to Give it Up"'s bass lines relate merely to commonplace ideas. However, Ms. Finell will testify that the bass melodies' significant similarities in concrete content and function disprove their mischaracterizations as ideas. Rather, the bass melodies of the two songs represent a series of shared creative choices, resulting in similar expressive content. Even if they could be classified as *scènes à faire*, which they cannot, it is inappropriate to exclude these elements in the extrinsic analysis. *Apple Computer, Inc. v.*

- 20 -

*Microsoft Corp.*, 779 F. Supp. 133, 136 (N.D. Cal. 1991) *aff'd*, 35 F.3d 1435 (9th Cir. 1994).

**13.**   **Thirteenth Affirmative Defense: Plaintiffs and Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because any use or copying of the alleged copyrighted work constitutes fair use.**

**a)**   **Elements required to establish Thirteenth Affirmative Defense**

Plaintiffs and Counter-Defendants have the burden of proving Fair Use by a preponderance of the evidence. In determining whether the use made of the work was fair, the following factors are considered:

1. The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2. The nature of the copyrighted work;

3. The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. The effect of the use upon the potential market for or value of the copyrighted work.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.18 (2007); 17 U.S.C. § 107.

**b)**   **Key Evidence in Opposition**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Plaintiffs and Counter-Defendants use of these works was entirely commercial. Moreover, Plaintiffs and Counter-Defendants have produced no evidence regarding the effect of their use of Counter-Claimants' copyrighted works on the potential market for and value of the copyrighted works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

**14.**   **Fourteenth Affirmative Defense: Plaintiffs & Counter-Defendants allege Counter-Claimants' claims for relief, and each of them, are barred, in whole or in part, because Counter-**

- 21 -

**Defendants acted with innocent intent.**

    **a)**    **Elements required to establish Fourteenth Affirmative Defense**

This is not an affirmative defense. Innocence and non-willful intent are relevant to the range of statutory damages under 17 U.S.C. § 504(c). An infringement is considered innocent when Plaintiffs and Counter-Defendants have proved both of the following elements by a preponderance of the evidence:

1. Plaintiffs or Counter-Defendants were not aware that his, her, or its acts constituted infringement of the copyright; and

2. Plaintiffs or Counter-Defendants had no reason to believe that his, her, or its acts constituted an infringement of the copyright.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 17.26 (2007); 17 U.S.C. § 504(c)(2).

    **b)**    **Key Evidence in Opposition**

To the extent innocent intent is an affirmative defense separate from the analysis of willfulness for the purposes of statutory damages, Counter-Claimants incorporate by reference the evidence described in Sections I.A. and I.B., which establishes Plaintiffs and Counter-Defendants intentionally infringed Counter-Claimants' copyrights. Even after receiving notice, Plaintiffs and Counter-Defendants reproduced, distributed, displayed, publicly performed, and otherwise exploited "Blurred Lines" and "Love After War." The continued exploitation of a copyright after receiving notice is willful infringement. *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335-36 (9th Cir. 1990). Any "member of the distribution chain" may be liable for infringement. *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1384 (C.D. Cal. 1993).

    **15.**    **Fifteenth Affirmative Defense: Plaintiffs and Counter-Defendants deny that Counter-Claimants have suffered any damages, but to the extent Counter-Claimants have, their claims for damages are barred, in whole or in part, because Counter-**

**Claimants allegedly failed to take reasonable steps to mitigate their damages.**

**a)      Elements required to establish Fifteenth Affirmative Defense**

Counter-Claimants are unaware of the failure to mitigate damages ever being applied to statutory damages. In other contexts, not applicable here, the failure to mitigate requires Plaintiffs and Counter-Defendants to prove by a preponderance of the evidence:

1. The damages suffered by Counter-Claimants could have been avoided;

2. Counter-Claimants failed to use reasonable care and diligence in avoiding the damages; and

3. The amount by which damages would have been mitigated.

*See* Ninth Circuit Manual of Model Civil Jury Instruction § 5.3 (2007); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696-97 (9th Cir. 1978).

**b)      Key Evidence in Opposition**

To the extent the failure to mitigate damages is a defense to an award of damages, Counter-Claimants incorporate by reference the evidence described in Sections I.A. and I.B., which establishes that they acted expeditiously in brining suit when they learned of Plaintiffs and Counter-Defendants infringements. Additionally, Counter-Defendants took reasonable efforts to prevent unauthorized use of "Got to Give it Up" by notifying Plaintiffs and Counter-Defendants of the infringement prior to the United States release of the album *Blurred Lines*.

**16.      Sixteenth Affirmative Defense: Plaintiffs and Counter-Defendants deny that Counter-Claimants have suffered any damages, but to the extent Counter-Claimants have, their claims for damages for alleged copyright infringement occurring outside of the United States are barred, in whole or in part, because the United States Copyright Act has no extraterritorial application.**

- 23 -

### a) Elements required to establish Sixteenth Affirmative Defense

This is not an affirmative defense. Extraterritorial damages are relevant to the calculation of damages under 17 U.S.C. § 504(a)-(b). Counter-Claimants may recover extraterritorial damages when:

1. An infringing act was completed within the United States;

2. The infringing act enabled extraterritorial exploitation; and

3. Damages flowed into the United States from the extraterritorial exploitation.

*Los Angeles News Serv. v. Reuters Television Intern., Ltd.*, 149 F.3d 987, 990-92 (9th Cir. 1998).

### b) Key Evidence in Opposition

To the extent that this may be considered for the purposes of calculating damages, Counter-Claimants incorporate by reference the evidence described in Sections I.A. and I.B., which establishes that Plaintiffs and Counter-Defendants engaged in the infringement of the works at issue in this suit, Plaintiffs and Counter-Defendants acts were completed within the United States, the infringing work was exploited extraterritorially, and Plaintiffs and Counter-Defendants profited from those exploitations.

## D. Counter-Claimants' Affirmative Defenses

### 1. First Affirmative Defense: The Complaint fails to set forth facts sufficient to state a claim for relief, in law or equity, against Counter-Claimants.

#### a) Elements required to establish the Complaint fails to set forth facts sufficient to state a claim for relief, in law or equity, against Counter-Claimants.

A pleading that states a claim for relief must contain:

1. A short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

- 24 -

2.  A short and plain statement of the claim showing that the pleader is entitled to relief; and

3.  A demand for the relief sought, which may include relief in the alternative or different types of relief.

*See* Fed. R. Civ. P. 8.

### b)      Key Evidence in Support of Affirmative Defense

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that Counter- Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

### 2.      Second Affirmative Defense: The Complaint is ambiguous and uncertain, and thus fails to state a claim for relief, in law or equity, against Defendants.

#### a)      Elements required to establish the Complaint is ambiguous and uncertain, and thus fails to state a claim for relief, in law or equity, against Defendants.

A pleading that states a claim for relief must contain:

1.  A short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

2.  A short and plain statement of the claim showing that the pleader is entitled to relief; and

3.  A demand for the relief sought, which may include relief in the alternative or different types of relief.

*See* Fed. R. Civ. P. 8.

### b)      Key Evidence in Support of Affirmative Defense

Counter-Claimants incorporate by reference the evidence described in Section I.A.

- 25 -

and I.B., which establishes that Counter- Claimants are the owners of the works at issue in this suit, and that Plaintiffs and Counter-Defendants engaged in the infringement of those works. Thus, Counter-Claimants are entitled to judgment as a matter of law on this defense.

      **3.   Third Affirmative Defense: Plaintiffs' action is barred under the doctrine of unclean hands.**

          **a)   Elements required to establish Plaintiffs' action is barred under the doctrine of unclean hands.**

Counter-Claimants must establish by a preponderance of the evidence:

1. Inequitable conduct by Plaintiffs and Counter-Defendants;

2. That Plaintiffs and Counter-Defendants conduct directly relates to the claim which it has asserted against Counter-Claimants; and

3. That Plaintiffs and Counter-Defendants conduct injured Counter-Claimants.

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007) (citing *Survivor Prods. LLC v. Fox Broad. Co*., 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001)).

          **a)   Key Evidence in Support of Affirmative Defense**

      Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes Plaintiffs Robin Thicke and Pharrell Williams publicly admitted their willful intent to copy "Got to Give it Up" when creating "Blurred Lines," then subsequently filed this action in bad faith.

      **4.   Fourth Affirmative Defense: Plaintiffs' action is barred as "Blurred Lines" copies "Got to Give it Up" and is substantially similar in many qualitative and quantitative ways.**

          **a)   Elements required to establish Plaintiffs' action is barred as "Blurred Lines" copies "Got to Give it Up" and is substantially similar in many qualitative and quantitative ways.**

- 26 -

1.      Plaintiffs and Counter-Defendants, in creating their work, used the Counter-Claimants' material; and

2.      An ordinary observer would detect the similarity as coming from the original copyrighted source.

*See Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B], at 13-8, 13-9. "There is no one magical combination of [] factors that will automatically substantiate a musical infringement suit; each allegation of infringement will be unique." *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004).

### b)      Key Evidence in Support of Affirmative Defense

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that "Blurred Lines" is substantially similar to "Got to Give it Up" and "Love After War" is substantially similar to "After the Dance."

**5.      Fifth Affirmative Defense: Plaintiffs' claims are barred as the ordinary observer would recognize that "Blurred Lines" copies "Got to Give it Up."**

**a)      Elements required to establish Plaintiffs' claims are barred as the ordinary observer would recognize that "Blurred Lines" copies "Got to Give it Up."**

1. The ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000).

### b)      Key Evidence in Support of Affirmative Defense

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that ordinary observers would recognize and have recognized that "Blurred Lines" is substantially similar to "Got to Give it Up" and "Love After War" is substantially similar to "After the Dance."

**6.      Sixth Affirmative Defense: Plaintiffs are not entitled to attorneys'**

fees.

      **a)**      **Elements required to establish Plaintiffs are not entitled to attorneys' fees.**

1. The degree of success obtained by the prevailing party;

2. Frivolousness of the action;

3. Motivation of the parties;

4. Objective unreasonableness of the legal and factual arguments in the case;

5. The need for compensation and deterrence to serve the purposes of the Copyright Act.

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n.19 (1994); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1229 (9th Cir. 1997).

      **b)**      **Key Evidence in Support of Affirmative Defense**

Counter-Claimants incorporate by reference the evidence described in Section I.A. and I.B., which establishes that "Blurred Lines" infringes "Got to Give it Up" and "Love After War" infringes "After the Dance," and that Plaintiffs' action was filed in bad faith.

**E.**      **Anticipated Evidentiary Issues**

The anticipated evidentiary issues are contained within the parties' motions in limine.

Counter-Claimants will file eight motions in limine:

1. To exclude any reference to EMI's position, opinions, evidence, testimony, and communications with Counter-Claimants pursuant to Federal Rules of Evidence 401, 402, and 403. This is not relevant, no probative value, prejudicial, distracting to the jury, and they have a conflict of interest because "Blurred Lines," which they own, is their "golden goose" and Williams is one of their writers.

2. To exclude testimony of or reference to the opinions of EMI's consulting musicologist Peter Oxendale pursuant to Federal Rules of Evidence 401, 402, 403, 801, 802, 803, 804 and Federal Rule of Civil Procedure 26. His alleged consulting report has never been produced and he has never been deposed.

3. To exclude testimony or opinions of Bruce Scavuzzo pursuant to Federal Rules of Evidence 401, 402, 403, and 702. Mr. Scavuzzo is not qualified as an expert and his opinions are not relevant.

4. To exclude testimony or opinions of Dr. Lawrence Ferrara pursuant to Federal Rule of Civil Procedure 26(b)(4)(D). Ferrara is Counter-Claimants consulting expert and his testimony is protected under Rule 26.

5. To exclude testimony or evidence of any dispute between Anthony Kyser and the Gayes regarding ATMG/Bravado pursuant to Federal Rules of Evidence 401 and 403.

6. To exclude expert testimony or evidence of Jason Gallien, Nicole Bilzerian, and Chris Knight pursuant to Federal Rules of Evidence 403, 701, and 702 and Federal Rules of Civil Procedure 26(a)(2)(C) and 37(c)(1).

7. To exclude and mashups created by Sandy Wilbur which contain songs other than "Blurred Lines," "Got to Give it Up," "Love After War," and "After the Dance" pursuant to Federal Rules of Evidence 401, 402, and 403.

8. The descending bass line of "Got to Get it Up" is in the deposit copy of "Got to Give it Up," as admitted by Plaintiffs' expert Sandy Wilbur.

Additionally, Plaintiffs and Counter-Defendants had an opportunity to provide rebuttal reports addressing Counter-Claimants' October 31, 2014 disclosures regarding, among other things, musicological analysis, calculation of damages, and marketing of "Blurred Lines," but failed to do so. As such, Plaintiffs and Counter-Defendants should be restricted to the opinions asserted in their original October 31, 2014 reports. While Counter-Claimants are not filing a motion *in liminie* to exclude rebuttal testimony and evidence, Counter-Claimants intend to object at trial.

Plaintiffs have indicated that they will file multiple motions in limine. Counter-Claimants will fully discuss their opposition in their motion in liminie responses. Plaintiffs have indicated they will file motions with respect to:

1. To exclude the Marvin Gaye sound recordings;

2.  To exclude expert testimony of Judith Finell and Dr. Ingrid Monson as it pertains to the Marvin Gaye sound recordings, the lyrics of "Blurred Lines" and "Got to Give it Up," whether the Plaintiffs and Counter-Defendants' songs infringed or copied Counter-Claimants' songs; the opinion of the lay listener;

3. To exclude Counter-Claimants' Mashups and Audio Examples;

4.  To exclude press articles and public opinions on whether "Blurred Lines" copies "Got to Give it Up";

5. To exclude Robin Thicke tour income damages testimony;

6.  To exclude evidence of Marvin Gaye's fame, name, & likeness as it relates to the success of "Blurred Lines" or whether it was used for marketing in an improper way;

7. To exclude the expert testimony of Mike Alleyne, Ron Aston, Tom Court, and Nancie Stern;

8.  To exclude the testimony of Harry Weinger, Vice President of A&R for Universal Music Enterprises ("UMe"), the catalog reissue arm of Universal Music Group; and

9.  To exclude the Robin Thicke/Pharrell Williams press statements regarding being inspired by or wanting to create something like "Got to Give it Up." Counter-Claimants contend these statements are all admissible for multiple reasons, including, but not limited to the following: (1) they are admissions by a party; (2) they are prior inconsistent statements; (3) they are probative of credibility; (4) they are relevant in connection with the Ninth Circuit inverse-ratio analysis; (5) they are probative of intent, and specifically willfulness in the copying of "Got to Give it Up;" (6) they are relevant to profits attributable to infringement analysis since these statements were made in connection with the marketing of "Blurred Lines" and tying "Blurred Lines" to Marvin Gaye's "Got to Give it Up;" and (7) these statements are otherwise central to the issues in this case, including how "Blurred Lines" was created. *See United States v. Bao*, 189 F.3d 860, 865-66 (9th Cir. 1999) (citing *United States v. Monroe*, 943 F.2d 1007, 1012 (9th Cir. 1991)) ("A basic rule of evidence provides that prior inconsistent statements

may be used to impeach the credibility of a witness."). These points, and others, will be discussed more fully in the Gaye's responses to the motions in limine filed by the Plaintiffs and Counter-Defendants.

Counter-Claimants oppose each of Plaintiffs and Counter-Defendants' motions in limine.

## F.    Issues of Law

Other than the issues identified in the Motions in Liminie and Counter-Claimants' Response to Plaintiffs and Counter-Defendants' Motion for Summary Judgment, there remain several related, disputed issues as to the scope of copyright protection, the scope of the infringement inquiry, and the evidence that should be considered by the trier of fact.

### 1.    Inverse Ratio Rule

This evidence of access, and admission of copying, is also critical in the infringement analysis because the Ninth Circuit uses an inverse-ratio rule that requires "a lesser showing of substantial similarity if there is a strong showing of access." *Three Boys Music Corp.*, 212 F.3d at 486 (citing Smith, 84 F.3d at 1218). Specifically, a high "degree of access justifies a lower standard of proof to show substantial similarity." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977); *see also Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990) (Admission of access "is a factor to be considered in favor of" the copyright owner.). This means that, with significant evidence of access, the jury may infer that copying, as opposed to coincidence, was the reason for substantial similarity. *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002). The Gayes will propose jury instructions on this Ninth Circuit legal principle.

### 2.    Intrinsic/Extrinsic Test

"Proof of the substantial similarity is satisfied by a two-part test of extrinsic similarity and intrinsic similarity." *Three Boys Music Corp.*, 212 F.3d at 485 (quoting *Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d at 1164. "Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria" and

- 31 -

"often requires analytical dissection of a work and expert testimony." *Three Boys Music Corp. v. Bolton*, 212 F.3d at 485 (citations omitted). "'Analytical dissection' requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity.'" *Swirsky*, 376 F.3d at 845 (quoting *Rice v. Fox Broad. Co*., 148 F. Supp. 2d 1029, 1051 (C.D. Cal. 2001), *reversed on other grounds*, 330 F.3d 1170 (9th Cir. 2003)). "The intrinsic test is subjective and asks 'whether the ordinary, reasonable person would find the total *concept and feel* of the works to be substantially similar.'" *Three Boys Music Corp.*, 212 F.3d at 485 (quoting *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991)).

"The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Swirsky*, 376 F.3d at 845. "It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because 'the over-all impact and effect indicate substantial appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485 (9th Cir. 2000) (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp*., 562 F.2d at 1169). "To allow the possibility of such a finding, the jury must be allowed to see the complete work." *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 988 (9th Cir. 2009).

Once the extrinsic test is satisfied, the factfinder applies the intrinsic test. *See Three Boys Music Corp.*, 212 F.3d at 485. The Ninth Circuit Court of Appeals has held that the trier of fact is best suited for this analysis and, thus, has not thoroughly analyzed its application. *Three Boys Music Corp.*, 212 F.3d at 485.

The test is called "subjective" because it measures "whether the ordinary reasonable person would find the 'total concept and feel' of the works' substantially similar." *Pasillas*, 927 F.2d at 442. "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator." *Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d at 1164.

Unlike the extrinsic test, analytic dissection is not allowed in this analysis; the work is intended to be viewed as a whole. *Id.* This is to be done without expert assistance. *Apple Computer, Inc.*, 35 F.3d at 1442.

Infringement may also exist where a portion copied is individually qualitatively or quantitatively important to the allegedly infringed work. *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1257 (C.D. Cal. 2002). The portion copied is said to be qualitatively important if Plaintiffs and Counter-Defendants incorporated elements of a specific part of Counter-Claimants' work that, even though small in size, is important to those compositions *Swirsky*, 376 F.3d at 852. Quantitative importance is said to exist if Plaintiffs and Counter-Defendants copied an individually large portion of "Got to Give it Up" into "Blurred Lines" or "After the Dance" into "Love After War." *Newton*, 204 F. Supp. 2d 1257 (C.D. Cal. 2002). A finding of both quantitative and qualitative importance is not required in order to find infringement, copying of either a qualitative or quantitative portion of the allegedly infringed work will suffice. *Swirsky*, 376 F.3d at 852.

### 3.  The "Got to Give it Up" Recording, which contains the entire musical composition, is Relevant in Assessing Substantial Similarity Because the Infringement Claim is not Limited to the Elements in the Deposit Copy

As this Court has recognized, "the scope of Defendants' copyrights is not, as a matter of law, limited to the lead sheets deposited with the Copyright Office." (Dkt. No. 139 at 8). The purpose of the deposit requirement under 17 U.S.C. § 408(b) is not to define the scope of an infringement claim, but instead "is to identify the copyrighted work for the purposes of registration." *Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013); Paul Goldstein, Goldstein on Copyright § 3.8 (2013).

The musical composition "Got to Give it Up" was created simultaneously as it was being recorded. Thus, the musical composition of "Got to Give it Up" in total is embodied in the sound recording. Therefore, the sound recording is the best evidence for what is

included under the intrinsic test. The sound recording on which the lead sheet is based is the best evidence of what is included in the composition for the purposes of the intrinsic test. This has been long recognized. Congress' subcommittee on Patents, Trademarks, and Copyrights recognized that under the 1909 Act, "[t]he deposit requirements of the present law may also be too rigid. . . .  A sound recording is not now acceptable for deposit, though in the case of so-called 'concrete' or 'electronic music' of recent innovation, the work is composed and reproduced by the use of sound recordings and its transcription into written notation may be difficult and of dubious clarity." S. Comm. on the Judiciary, 86th Cong., Copyright Law Revision 36 (Comm. Print 1960).[5]  In fact, Plaintiff's own expert Ms. Wilbur, who listened to the sound recordings and deemed them important to her analysis, admitted that a lead sheet is a "simplified, less fleshed-out" version of the composition.

Multiple courts have allowed recordings of allegedly infringed musical compositions, registered under the 1909 Act, to be played to determine substantial or striking similarity between the works.[6] *See*, *e.g.*, *Selle v. Gibb*, 741 F.2d 896, 903 n.3 (7th Cir. 1984) ("[B]oth songs were played on numerous occasions in open court for the jury to hear . . ."); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) ("After listening to the compositions as played in the phonograph recordings submitted by defendant . . ."); *Repp v. Webber*, 892 F. Supp. 552, 558 (S.D.N.Y. 1995) ("Having listened to the two songs at issue, however, the Court

---

[5] "Whatever may be the appropriate provisions to take care of these particular instances-and other special situations are likely to arise in the future-it may be desirable to provide for some flexibility in the statutory prescription of the deposit requirements, perhaps by authorizing some modification of the statutory prescription by administrative regulation." S. Comm. on the Judiciary, 86th Cong., Copyright Law Revision 37 (Comm. Print 1960).

[6] State courts, including California, have also allowed sound recordings of musical compositions to be played when examining similarity for copyright infringement. *Navara v. M. Witmark & Sons*, 185 N.Y.S.2d 560, 561-62 (Sup. Ct. 1959) ("[T]he jury requested to hear once more recordings of the two musical compositions involved. The jury's request was granted and they were returned to the court room where the two recordings were played and then again returned to deliberate."); *Rich v. Paramount Pictures*, 279 P.2d 782, 784 (1955) ("The jury heard the accusing and accused compositions played on the piano and on phonograph records.").

cannot say as a matter of law that they do not share any substantial similarities. In making this determination, the Court considered the 'total concept and feel' of the works in question."); *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 398 (S.D.N.Y. 1952) ("We have suffered through the playing of the commercial recordings."); *see generally Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002); *see also Three Boys Music Corp.*, 212 F.3d 477, Trial Tr. at 7:21-25, 337:13-18, 524:6-12, 789:17-24 (**Exhibit 1**). In all of these cases, the alleged infringed copyright was registered, before sound recordings were allowed to be used as deposit copies. However, in each case the court allowed the sound recordings to be played either for the trier of fact or to determine whether the case should proceed to the trier of fact. Moreover, in *Selle v. Gibb*, the Seventh Circuit specifically referred to recordings played for the district court to "more concretely" support its determination of whether the works at issue were strikingly similar. 741 F.2d at 905.

"It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because 'the over-all impact and effect indicate substantial appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485; *see also Radin v. Hunt*, LA CV10-08838 JAK (SSx), at 4 (C.D. Cal. Dec. 15, 2011). "To pull [compositional] elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis." *Swirsky*, 376 F.3d at 848. Likewise, the intrinsic test considers the "total concept and feel" of the works. *Three Boys Music Corp.*, 212 F.3d at 485. Accordingly, under Ninth Circuit law, the sound recordings embodying the compositions necessarily should be heard as it would be impossible to make a determination of "total concept and feel" without them. Even if the Court finds that elements not in the lead sheet are unprotectible, (a point on which the Gayes would disagree) a copying of a combination of such unprotectible elements still may support a

finding of infringement.[7] *Id.*

Counter-Claimants are aware of no case in which a court has prevented the jury from hearing the commercially released recordings of the underlying compositions. The cases above demonstrate that not only is it proper for the jury to hear the recordings of the infringed work, but that it is essential that they be allowed to so for all of the reasons above.

## 4.    Demonstrative Comparison Recordings

"[D]emonstrative evidence used to explain or illustrate other evidence that is already in the record may be admissible." *Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1209 (D. Nev. 2008) (citing *Tritek Technologies, Inc. v. United States*, 67 Fed. Cl. 727, 729 (2005)).

Courts have previously allowed audio examples, other than the commercially released recordings, to serve as demonstrative evidence in copyright infringement cases. *See*, *e.g., Selle* , 741 F.2d at 905 ("The tape has recorded on it segments of both themes from both the Selle and the Gibb songs interspersed with segments of other compositions. . . ."); *N. Music Corp.*, 105 F. Supp. at 398 ("At trial, we have had eleven specially prepared recordings introduced by the plaintiff prepared to demonstrate similarity between the two songs with respect to melody and harmony. Thus, we have had the first 16 measures of each song played consecutively on the piano without harmony . . . *and then played simultaneously*.") (emphasis added).

These similarities between the songs at issue in the instant case are demonstrated in part by the comparison media prepared under the experts' supervision in the form of comparison recordings of "Got to Give it Up" and "Blurred Lines"[8] and an audio overlay of

---

[7] In addition, the copying of the unprotectible elements in "Got to Give it Up" is, at minimum, circumstantial evidence that copying of the protectable elements was the result of copying and not the result of coincidence.

[8] Example 1 plays the vocal material of "Blurred Lines" over the instrumental material of "Got to Give it Up," Example 2 plays the vocal material of "Got to Give it Up" over the instrumental material of "Blurred Lines," and Example 3 merges the vocals in the hook of "Got to Give it Up" with the instrumental accompaniment of "Blurred Lines."

the melody of "Love After War" over the recording of "After the Dance." Indeed, the court in *Northern Music Corp*. found this sort of comparison media useful; in determining whether the harmonic patterns of the songs at issue were similar it referenced an audio exhibit in which "both songs were played simultaneously against a common harmony." *N. Music Corp.*, 105 F. Supp. at 397.

The demonstrative comparison recordings here are fair and accurate representations of the original commercial recordings. In Example 1, the only change was to transpose "Got to Give it Up" to the key of "Blurred Lines," and a less than 1 percent adjustment of tempo. Plaintiffs' expert, Ms. Wilbur, testified in her deposition that not only was it common to transpose a work for the purpose of comparison, but did so in her own analysis in this case. Examples 2 and 3 use no transposing at all, and the only adjustment was a less than 1 percent change in tempo. As in *Northern Music Corp*., the mash-ups and comparison media in the case at bar will be similarly useful for the trier of fact in making its determination of substantial similarity.

## III.   BIFURCATION OF ISSUES

No request has been made to bifurcate issues for trial in this matter.

## IV.   JURY TRIAL

Counter-Claimants made a timely request for a trial by jury upon the initial filing of their Answer and Counter-Complaint. Counter-Claimants seek a jury trial on all claims.

## V.   ATTORNEY'S FEES

The Copyright Act provides attorney's fees to the prevailing party in an action for copyright infringement. 17 U.S.C. § 505. Counter-Claimants will seek attorney's fees upon prevailing at trial.

## VI.   ABANDONMENT OF ISSUES

Counter-Claimants do not abandon any issues.

[signatures on following page]

- 37 -

Dated: January 5, 2015                   Respectfully submitted,

                                         KING & BALLOW

                                         By: /s/ Richard S. Busch
                                         RICHARD S. BUSCH
                                         PAUL H. DUVALL

                                         WARGO & FRENCH, LLP

                                         By: /s/ Mark L. Block
                                         MARK L. BLOCK

                                         *Attorneys for Defendants and Counter-Claimants Nona and Frankie Gaye*

                                         THE LAW OFFICES OF PAUL N. PHILIPS

                                         By: /s/ Paul N. Philips
                                         PAUL N. PHILIPS

                                         *Attorney for Defendant and Counter-Claimant Marvin Gaye III*

- 38 -