**EXHIBIT J**
**TAB 1**

1            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                  WESTERN DIVISION
3   PHARRELL WILLIAMS, an individual;)
    ROBIN THICKE, an individual; and )
4   CLIFFORD HARRIS, JR., an          )
    individual,                       )
5                                     )
                 Plaintiffs,          )
6                                     )
                vs.                   )
7                            CV13-06004-JAK
                                      )
8   BRIDGEPORT MUSIC, INC., a         )
    Michigan corporation; FRANKIE     )
9   CHRISTIAN GAYE, an individual;    )
    MARVIN GAYE III, an individual;   )
10  NONA MARVISA GAYE, an individual;)
    and DOES 1 through 10, inclusive,)
11                                    )
                 Defendants.          )
12  --------------------------------)
13
14
15     VIDEOTAPED DEPOSITION OF JUDITH FINELL
16              New York, New York
17            Friday, April 18, 2014
18
19
20
21
22
23
    Reported by:
24  Philip Rizzuti
    Job No. 72812
25

Page 6

1    MR. COHEN:  Brad Cohen,
2  in-house counsel at Universal Music
3  Group.
4    MR. BUSCH:  Richard Busch on
5  behalf of Nona and Frankie Gaye.
6    THE VIDEOGRAPHER:  Will the
7  court reporter please swear in the
8  witness.
9  J U D I T H   F I N E L L, called as a
10    witness, having been duly sworn by a
11    Notary Public, was examined and
12    testified as follows:
13  EXAMINATION BY
14  MR. MILLER:
15    Q.  Good morning Ms. Finell.
16    A.  Good morning.
17    Q.  I represent the plaintiffs and
18  counter-defendants in this case which
19  includes Robin Thicke and Pharrell
20  Williams and various record label entities
21  associated with their two pieces that are
22  in dispute in this case.
23    I gather from doing a little
24  Internet research that you have probably
25  been deposed many, many, many times and

Page 7

1  you know the procedure.  If there is
2  anything that you would like me to go over
3  with you about the process of the
4  deposition please let me know.
5    A.  Thank you.
6    Q.  You understand that you are
7  under oath?
8    A.  Yes.
9    Q.  Is there any reason that you
10  can't give your best testimony today?
11    A.  No.
12    Q.  Let me start out by marking as
13  Exhibit 1 something I pulled off the
14  Internet which appears to be a resume for
15  you and I think maybe we can short circuit
16  your background if this is an inaccurate
17  document.  So I will mark a document
18  entitled Judith Greenberg Finell, 2009
19  WestLaw 2048548 as Plaintiff's Exhibit 1.
20    (Plaintiff's Exhibit 1,
21    document entitled Judith Greenberg
22    Finell, 2009 WestLaw 2048548, marked
23    for identification, as of this
24    date.)
25    MR. BUSCH:  Do you have copies

Page 8

1  for me.
2    MR. MILLER:  I do not.
3    MR. BUSCH:  Do you have copies
4  for me for the other exhibits?
5    MR. MILLER:  Everything else,
6  this was a last minute one.
7    A.  This is an old resume, but it
8  appears to be accurate as of the date of
9  the resume.
10    Q.  Which is 2009; is that correct?
11    A.  I would think it is older than
12  that, I am not sure where you found it,
13  but I mean just from the years of articles
14  I have written and since.  But it appears
15  to be accurate up to the point that it was
16  written.
17    Q.  In looking at Exhibit 1 it
18  reflects that you have a masters in
19  musicology from U.C. Berkeley; is that
20  correct?
21    A.  Yes.
22    Q.  Have you had any formal
23  training in musicology since obtaining
24  your masters?
25    MR. BUSCH:  Objection to the

Page 9

1  form.       So from time to time
2  during the deposition you might hear
3  me say objection to form, that is
4  because I think there is something
5  wrong with the question.  But unless
6  I for some reason instruct you not to
7  answer the question, it is just for
8  me to preserve the record and you
9  still have to answer the question.
10  So don't be distracted if you hear me
11  say objection to form.
12    A.  Could you repeat the question.
13    Q.  Have you had any formal
14  training in musicology since receiving
15  your masters in musicology from U.C.
16  Berkeley?
17    A.  Yes.  The rest of my career
18  since my studies has been in musicology,
19  and I have written and done research in
20  musicology for all of the years since my
21  graduate work.
22    Q.  When did you obtain your
23  graduate degree?
24    A.  1970.
25    Q.  Have you had any actual formal

Page 66

1  meanings that I -- as I understand it.
2  One is is it important to either or both
3  of the songs, is it an important element
4  that could be seen as an identifying
5  feature or what you might consider a
6  signature feature of either or both songs.
7  And the other element is how often it
8  recurs. So does it take up a significant
9  proportion of either or both songs.
10      Q.   Does the quantity of the
11  similarity in terms of the number of notes
12  or whatever other factors are involved,
13  does that matter at all as to whether it
14  is a substantial similarity?
15          MR. BUSCH: Under the law or
16      under her analysis; I object to the
17      extend that you are asking her
18      whether that matters under the law.
19      Q.   Yeah, I am not asking for your
20  opinion under the law, I am asking for
21  your opinion as a musicologist when you
22  state in the report that there are
23  substantial similarities, or when you
24  testified today that something is a
25  substantial similarity, does it matter to

Page 67

1  you -- well does anything else matter to
2  you other than the two elements that you
3  just mentioned?
4          MR. BUSCH: Objection to the
5      form. This has been asked and
6      answered.
7      A.   I don't understand your
8  question.
9      Q.   So when you are deciding
10  whether something is a substantial
11  similarity one thing you look at is
12  whether it is an important element to
13  either song; is that correct?
14      A.   Yes.
15      Q.   And another thing you look at
16  is how often that element occurs in either
17  song?
18      A.   Yes.
19      Q.   Is there anything else you look
20  at in determining whether a similarity is
21  substantial or not?
22          MR. BUSCH: Objection to the
23      form. The report speaks for itself.
24      A.   Sometimes I look at if they
25  share a function, if it is an unusual

Page 68

1  feature like that is distinctive and they
2  both seem to share a certain kind of
3  function with that often goes along with
4  the other two that I have already
5  mentioned.
6      Q.   Is there anything else you look
7  at in determining whether a similarity is
8  substantial?
9      A.   Yes, it is the amount of
10  material that is similar in itself when
11  comparing song A to song B. Let's say I
12  am comparing a specific phrase, is the
13  higher proportion of material similar or
14  dissimilar is a question that I have to
15  answer.
16      Q.   And how much of a proportion of
17  material has to be similar before you
18  determine that it is a substantial
19  similarity?
20          MR. BUSCH: Objection to the
21      form of the question. Overbroad.
22      A.   There is no way for me to
23  answer that because it depends on the
24  exact matter at hand every time.
25      Q.   Now you say in your report the

Page 69

1  tonal center of "Got to Give It Up" is A;
2  correct?
3          MR. BUSCH: Can you tell me
4      where you are referencing?
5      Q.   It is on the first page, number
6  4.
7      A.   Did you ask me a question?
8      Q.   I am directing you to the first
9  page of the report, the very bottom,
10  paragraph 4?
11      A.   Uh-hum.
12      Q.   You say regarding key the tonal
13  center of "Got to Give It Up" is A. Do
14  you see that?
15      A.   Yes.
16      Q.   Is "Got to Give It Up" in the
17  key of A?
18      A.   Well "Got to Give It Up" is in
19  sort of a modified key of A I'd say
20  because it uses blue tones, which means
21  flats.
22      Q.   Is there a name for that
23  modified key of A?
24      A.   Yes, it is a modified key of A.
25      Q.   Would you use the phrase

Page 82

1   Q.  Let me ask you to turn to page
2  2 of your report, and in paragraph 6 you
3  talk about a constellation of eight
4  substantially similar features, do you see
5  that?
6   A.  I don't think -- oh yes, excuse
7  me, I see it.
8   Q.  And that is referring to the
9  similarities 1 through 8 that are
10  identified later in the report?
11   A.  Exactly.
12   Q.  When you say these similar
13  elements occur simultaneously in each
14  work, what do you mean by that?
15   A.  Well among those eight
16  elements, elements 1 through 5 which
17  are -- yes, I am sorry, elements 1
18  through -- excuse me a minute -- 1 through
19  6 contain melodic elements.
20   I am going to correct myself.
21  1 through 5, those elements are vocal in
22  nature and they are part of the key vocal
23  melodies in each of the two songs.  And
24  those are supported by the instrumental
25  accompaniment which are elements 6, 7 and

Page 83

1  8.  So they occur, the instrumental
2  accompaniment occurs simultaneously as
3  these various vocal themes and what I am
4  calling themes, hooks, et cetera, are
5  occurring.  So the elements 6, 7 and 8 are
6  going throughout both songs continuously
7  while the vocal part is sung and is heard.
8   Q.  You say in paragraph 7 the two
9  songs' substantial similarities surpass
10  the realm of generic coincidence reaching
11  to the very essence of each work.  Can you
12  explain what you mean by that?
13   A.  Yes.  The song "Blurred Lines"
14  has certain repeated musical themes and
15  phrases, and they are either the initial
16  what you call in musicological terms the
17  initial statement of that phrase such as
18  the first time you hear that particular
19  melody with the first time you hear those
20  particular words, like I talked about the
21  signature phrase.
22   Then what occurs in "Blurred
23  Lines" is that phrase sometimes is
24  repeated quite a bit.  In one case one
25  phrase is repeated 21 times for example,

Page 84

1  another one lengthier.  It is a song built
2  on repeats of material.  And if you would
3  think of it this way, they are basically
4  individual modules of melodies, and
5  those -- each one of those vocal melodies
6  I was able to find to be substantially
7  similar to an important melody in
8  Mr. Gaye's song.
9   And that is why I referred to
10  it in the way that I did in paragraph 7,
11  that it was not just an occasional
12  similarity, it was not a similarity that
13  could have occurred because they shared
14  certain underlying materials that are
15  common throughout the literature, they
16  were very specific and that is why I used
17  the words that I did.
18   Q.  And again you are referring to
19  the eight similarities that are identified
20  in the report; correct?
21   A.  Yes.
22   Q.  And then in paragraph 8 you say
23  in listening to these two songs the
24  ordinary lay listener would likely
25  recognize substantial similarities between

Page 85

1  them.
2   Other than what is set out in
3  the report is there any basis for that
4  opinion?
5   A.  Some of the similarities to me
6  are obvious enough that a lay listener
7  would hear them immediately, such as the
8  bass line, the cowbells, the keyboard
9  parts, and some would take guidance from
10  an expert like myself in terms of
11  understanding how to isolate the similar
12  materials and understanding how to listen
13  in a way where they would be able to hear
14  the similarities more easily.
15   Q.  Is there anything other than
16  the bass line and the cowbell that you
17  think are obvious to a lay listener?
18   A.  Depends on the sophistication
19  level of the listener to be honest with
20  you.  But I did say the keyboard also.
21   Q.  And the keyboard, okay.
22   A.  I would just add one point
23  there, that each of those three elements
24  that I mentioned, bass line, cowbell and
25  keyboard recur constantly through both

Page 86

songs, and especially in the case of "Blurred Lines" the bass line and the cowbell become what I would consider the musical glue of the song. For example when it changes into a rap section the only thing holding it together musically is that bass line that is substantially similar to Mr. Gaye's song, and the cowbell, and at times the keyboard, and that becomes the glue of the song and holds together all the various sections within "Blurred Lines", and I see it as substantially similar to Mr. Gaye's song.

MR. BUSCH: Give me one second before you ask the next question please.

Q. Your report does not make any reference to copying. Is it your opinion that you would be adding later to the report or is it your -- is it your opinion that "Got to Give It Up" copied "Blurred Lines"?

MR. BUSCH: I believe you are mischaracterizing her report within that question. I object to the form

Page 87

of the question.

A. I think you meant is it my opinion that "Blurred Lines" copied "Got to Give It Up", not the other way around.

Q. That is correct.

A. Thank you. So --

MR. BUSCH: I object however to the extent that you have misrepresented her report, a more basic level by suggesting she doesn't suggest that there is copying when she does. Go ahead.

A. Could you please repeat the question.

Q. Sure. The word copying does not appear in your report, so what I am asking is is it your opinion that "Blurred Lines" copied elements of "Got to Give It Up"?

MR. BUSCH: And my objection is you are completely mischaracterizing the report by suggesting that.

A. As I understand the role of a musicologist in this kind of proceeding, it is to give objective analysis and

Page 88

compare two musical works, and so in doing that I pointed out the similarities. But because there are so many prevalent similarities that really are woven into the fabric of "Blurred Lines" that affect its whole identity, I would say that I do believe that "Blurred Lines" did copy Mr. Gaye's song. But I didn't use that word, you are correct.

Q. And that is based upon what is stated in your report?

MR. BUSCH: Objection to the form.

Q. Your opinion that there has been copying is based upon what has been put forth in your preliminary report?

MR. BUSCH: And in addition to her testimony today about what she might add to her report, or just the report?

MR. MILLER: I would appreciate just a regular objection.

Q. You can answer it however you like, but --

MR. BUSCH: Here is the issue.

Page 89

You wanted to know what she would add to her report earlier. I could have objected and said you could find out when she does her report. I agreed to allow her to testify about what else she as she sits here today might add. So I think it is fair if you are going to ask her a question about her conclusion about copying to say is that based upon what you have analyzed up until now which might include what she has already testified at length she would add. So I think it is fair.

Q. Let me ask it very openly. What is your opinion that there is copying based on?

MR. BUSCH: Asked and answered.

A. I would say it is a couple of things. Musically it is the similarities I found so far, and the knowledge that I will find more that are also quite significant and very substantial just because of the way the composition has been organized and written by the writers

**EXHIBIT J**
**TAB 2**

Page 1

1            UNITED STATES DISTRICT COURT

2    CENTAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3    ------------------------------x

     PHARRELL WILLIAMS, an                )
4    individual,                          )
                                          )
5                    Plaintiff,           )
                                          )
6            vs.                          )CV13-06004-JAK (AGRx)
                                          )
7    BRIDGEPORT MUSIC, a Michigan,        )
     corporation; FRANKIE CHRISTIAN       )
8    GAYE, an individual; NONA            )
     MARVISA GAYE, an individual;         )
9    and DOES 1 through 10,               )
     inclusive,                           )
10                                        )
                     Defendants.          )
11   ------------------------------)

12

13                    VIDEOTAPED

14           DEPOSITION OF JUDITH FINELL

15             New York, New York

16          Friday, December 5, 2014

17

18

19

20

21

22

23

     Reported by:
24   FRANCIS X. FREDERICK, CSR, RPR, RMR
     JOB NO. 87797

25

Page 6

1    THE VIDEOGRAPHER: Will the court
2  reporter please swear in the witness
3       * * *
4  JUDITH  FINELL, called as a
5    witness, having been duly sworn by a
6    Notary Public, was examined and
7    testified as follows:
8  EXAMINATION BY
9  MR. MILLER:
10   Q.  Good morning, Ms. Finell.
11   A.  Good morning.
12   Q.  You were previously deposed in
13  this case by me, correct?
14   A.  Yes.
15   Q.  And you've submitted a number of
16  expert reports and a declaration in this case
17  to date, right?
18   A.  I did.
19   Q.  In the deposition today, I'm going
20  to use the abbreviations that have become
21  somewhat common in the discussions between the
22  musicologists in their various reports, et
23  cetera, like "Give" for Marvin Gaye's "Got To
24  Give It Up" and Theme X for certain grammatic
25  material you've identified in your report by

Page 7

1  that name, et cetera.
2       If -- and I assume -- well, let me
3  ask you this.  If I do that will that be clear
4  to you what I'm referring to?
5   A.  Yes.
6   Q.  And if at any point I'm using
7  loose references to the things that we have
8  discussed before or that are in the reports
9  and you're not sure what I'm referring to,
10  please just clarify your answer or tell me
11  you're not sure what I'm asking about, okay?
12   A.  Okay.
13   Q.  So you initially created or
14  prepared a preliminary report that's dated
15  October 17th, 2013, right?
16   A.  Yes.
17   Q.  And then you submitted a
18  declaration in connection with a summary
19  judgment motion and that was dated September
20  7th, 2014, right?
21   A.  I thought it was dated September
22  8th, actually.
23   Q.  Okay.  Whatever the date, it was
24  early September 2014, right?
25   A.  Um-hum.

Page 8

1   Q.  And then -- I'm just trying to get
2  a clear record of what we have so we can refer
3  to it going forward.
4   A.  Um-hum.
5   Q.  And then you did an initial formal
6  expert report on October 31 of this year,
7  right?
8   A.  Yes.
9   Q.  And then you did a -- I suppose --
10  I don't know if it's a rebuttal report or
11  supplemental report on November 4th of 2014,
12  right?
13   A.  I think you missed one.
14   Q.  Let me see what I've got here.  I
15  don't think so.
16       MS. ELLIS:  There was a rebuttal
17    and then supplemental rebuttal if that
18    helps.
19       MR. MILLER:  Right.
20   Q.  Well, there were two reports in
21  November.
22   A.  That's right.  In the same week,
23  yes.
24   Q.  And the two reports in November
25  were responding to Sandy Wilbur's expert

Page 9

1  report, right?
2   A.  Yes.
3   Q.  Do you have any opinions
4  concerning the subject matter of this lawsuit
5  that you intend to express at trial in this
6  case that have not previously been expressed
7  in writing in one of your prior reports or the
8  summary judgment declaration?
9       MS. ELLIS:  Objection, vague.
10   A.  No.
11   Q.  Did you see the deposition notice
12  for today's deposition?
13   A.  No, I didn't.  I think I received
14  one with the wrong date on it.
15   Q.  Okay.  Did you look at the
16  document requests in that deposition notice?
17   A.  Yes.
18   Q.  And do you have any documents to
19  provide today in response to that notice?
20   A.  Yes.  I sent a packet of them to
21  Sara Ellis last week.
22       MS. ELLIS:  We have them for you.
23       MR. MILLER:  Oh, okay.  Are you
24    planning to give them to me before the
25    end of the deposition?

Page 10

1    MS. ELLIS: I apologize about
2  that. We can take a quick break.
3    MR. MILLER: I mean, I'm not going
4  to look at them at this moment. At the
5  first break why don't you give it to me.
6    MS. ELLIS: There's not much to it
7  but, yes.
8    MR. MILLER: Okay.
9  BY MR. MILLER:
10   Q.   And other than the documents you
11 gave to Ms. Ellis, do you have any other
12 documents that are called for by the request?
13   A.   No.
14   MS. ELLIS: Objection, privileged.
15   A.   No.
16   THE WITNESS: Oh, sorry.
17   MR. MILLER: And, Sara, are you
18 representing to me that other than
19 documents in which you assert a
20 privilege you are going to provide me at
21 the break with whatever additional
22 responsive documents Ms. Finell has that
23 haven't previously been produced to me
24 in this lawsuit?
25   MS. ELLIS: Yes. I believe

Page 11

1  everything has been previously produced
2  but, yes. Other than what's privileged,
3  yes.
4    MR. MILLER: Okay. So you have a
5  few documents to produce but you think
6  it's all been previously produced.
7    MS. ELLIS: I'll have to
8  double-check but I'm fairly certain that
9  you have it all already.
10   MR. MILLER: Okay.
11 BY MR. MILLER:
12   Q.   Forgive me if I asked this at the
13 last deposition but -- I probably didn't,
14 actually.
15   Do you intend to express any
16 opinions in this case as to whether any of my
17 clients -- either of the two songs by my
18 clients at issue infringe either of the two
19 songs by Marvin Gaye?
20   MS. ELLIS: Objection. Calls for
21 a legal conclusion.
22   A.   I'm qualified to discuss
23 similarities -- substantial similarities
24 between the works. But I'm really not
25 qualified to give a legal opinion on the word

Page 12

1  "infringe."
2    Q.   So is it correct that you will not
3  express any opinions at trial as to whether
4  either of the songs at issue infringes either
5  of the Marvin Gaye songs; is that a correct
6  statement?
7    MS. ELLIS: Same objection.
8    A.   From a legal standpoint I will
9  not. But from a musical standpoint I guess my
10 opinion could probably substantiate the legal
11 opinion. But I'm not a lawyer so I would not
12 cross that line.
13   Q.   Okay. I'm not trying to trick you
14 and stop you somehow from being able to
15 testify at trial as to whether music in one
16 song is similar or substantially similar to
17 another song. I'm trying to find out if you
18 intend to express as an opinion at trial that
19 "Blurred Lines" infringes "Got To Give It Up."
20   Is that an opinion you intend to
21 discuss?
22   MS. ELLIS: Objection.
23   A.   As I say, I will express the
24 musical similarities that I have found and
25 believe are there so that a legal conclusion

Page 13

1  could be drawn from that. But I'm not a
2  lawyer. So I'm not in a position to give
3  legal opinions.
4    Q.   Will you be using the word
5  "infringe" in your testimony at trial?
6    A.   I don't know.
7    Q.   Okay. So you can't give me a
8  clear answer that you will not be testifying
9  at trial as to whether the songs infringe or
10 don't infringe?
11   MS. ELLIS: Asked and answered.
12   A.   Yeah, I've answered to the best of
13 my ability at this moment.
14   Q.   Do you understand the difference
15 between infringement and evidence that
16 something may or may not be similar to
17 something else?
18   MS. ELLIS: Calls for a legal
19 conclusion.
20   A.   No, I don't. I don't know what
21 you mean.
22   Q.   Okay. In your experience as a
23 musicologist testifying in these kinds of
24 cases, have you developed any understanding of
25 the concept of copyright infringement, which

Page 46

1    A.   I think I do, yes.
2    Q.   Okay.  And -- okay.
3        You were present at the
4  depositions of Pharrell Williams and Robin
5  Thicke, as I recall; is that correct?
6    A.   Yes.
7    Q.   Did anything you learned at those
8  depositions form a basis for any of your
9  opinions in this case?
10       MS. ELLIS: Objection, vague.
11    A.   Well, I learned a little bit about
12  their creative process and a little bit --
13  pardon me -- excuse me -- about -- one moment,
14  please.
15        (Pause on the record.)
16    A.   Pardon me.  A little bit about
17  their musical education and background that
18  would inform the way in which they could
19  compose music together or individually.
20    Q.   All right.  And how did anything
21  you learned -- well, strike that.
22        Before we go any further, do you
23  recall at at least Robin Thicke's deposition
24  there were a lot of interviews and press
25  articles that were introduced at the

Page 47

1  deposition and he was questioned about them.
2  Do you recall that?
3    A.   Yes.
4    Q.   Okay.  So when I'm referring to
5  the two depositions of Mr. Thicke and Mr.
6  Williams, I'm including within it, you know,
7  the various press articles that were discussed
8  really at some length in those depositions.
9  Do you understand that?
10    A.   Yes.
11    Q.   Okay.  To what extent -- what
12  opinions in this case, if any, do you base in
13  part on anything you learned at those
14  depositions?
15       MS. ELLIS:  Objection, vague.
16    A.   None of my analysis -- my own
17  musical analysis would have been affected at
18  all by their statements at their depositions.
19  But I did learn something about how -- you
20  know, how they used the resources they had
21  available to them to construct a musical work.
22    Q.   Okay.
23    A.   But that is -- as I say, that's
24  more construction of it.  I analyzed the music
25  as it's finally presented rather than how it

Page 48

1  happened to come to that level.
2    Q.   Okay.  So your musicological
3  opinions as to similarity are not based in any
4  way on what they happened to testify about how
5  they worked in creating the song; is that
6  correct?
7    A.   That's correct.
8    Q.   Okay.  Do you intend to opine at
9  trial in this case that Pharrell Williams and
10  Robin Thicke copied "Got To Give It Up" when
11  they created "Blurred Lines"?
12       MS. ELLIS:  Objection,
13  speculation.
14    A.   Well, it's the only explanation
15  for all the similarities that are there, yes.
16    Q.   And so your opinion as to
17  whether -- well, let me ask you.  Is it your
18  opinion that Robin Thicke and Pharrell
19  Williams copied "Got To Give It Up" when they
20  created "Blurred Lines"?
21    A.   Yes.  With the caveat that I
22  wasn't in the studio so I didn't witness it
23  with, you know, them doing it.  But musically
24  there's no other explanation for so many
25  similarities.

Page 49

1    Q.   And when you say -- well, what do
2  you mean by musically there's no other
3  explanation for so many similarities?
4    A.   The nature of the similarities,
5  the level of detail of the similarities, and
6  the multitude of them that they occupy all but
7  three measures of "Blurred Lines" in one form
8  or in a coinciding form, I would find it
9  impossible that that level of similarity could
10  exist accidentally.
11    Q.   Is it your opinion that it is not
12  possible that Pharrell Williams, without any
13  reference to "Got To Give It Up" sat down in
14  the recording studio and came up with a song
15  that had what you are calling various
16  similarities to "Got To Give It Up"?
17    A.   I think it's highly unlikely.  And
18  I've seen no other song that contains anywhere
19  near that many after many hours of Ms.
20  Wilbur's research.
21        Excuse me.
22    Q.   And -- okay.
23        Is it your opinion that Pharrell
24  Williams and Robin Thicke must have listened
25  to "Got To Give It Up" in the process of

Page 50

1  creating "Blurred Lines" in order to create
2  the similarities?
3      A.   Well, as I say, it's really
4  impossible for a musicologist to know why
5  another artist would somehow have his own
6  music imbued with the music of another or
7  infused with it.  It could be by listening.
8  It could be any number of reasons.  I don't
9  have a way of knowing how they more or less
10 implanted many identifying elements in
11 "Blurred Lines" that I can only find combined
12 in "Got To Give It Up."
13     I don't know -- artists have
14 various levels of capabilities.  I don't know
15 if listening to it was enough.  Or if they
16 used some of the electronic facilities they
17 had available to do more than listen and
18 actually use it as a template.
19     But I wasn't in the studio.  All I
20 know is that in the end you have two songs
21 that have a lot of very identifying, very
22 individualistic details that are in common.
23     Q.   What do you mean by doing some
24 sort of digital process that uses it as a
25 template?  I didn't quite quote you correctly,

Page 51

1  but what do you mean by that?
2      A.   I'm not a recording engineer but I
3  found it pretty telling that the exact
4  location of the rap section in "Got To Give
5  It" -- or I'm sorry -- in "Blurred Lines" is
6  two minutes, 26 seconds into it and that's
7  exactly where the deviation occurs in the
8  other song -- or bar 73, whichever way you
9  want to describe it -- and that ends in
10 exactly the same place.  And in both songs
11 it's a deviation from what comes before and
12 after it.  And in both songs it's pre -- in
13 one song it's preceded -- it's book-ended by
14 an eight-bar lead-in into and the other song
15 is book-ended by an eight-bar lead-out from
16 it.
17     It's just I haven't seen that kind
18 of coincidence and I've been doing this for 25
19 years.  That's very suspicious.
20     Q.   Is it your opinion that that could
21 only have happened by them digitally analyzing
22 or timing "Got To Give It Up" to find out
23 where the parlando section, as you call, it
24 starts?
25     A.   No.  Again, I don't -- I am not an

Page 52

1  expert in recording engineering.  But that was
2  pretty much of a red flag for me.  I mean, so
3  are a lot of the other similarities, but that
4  was -- that was beyond that.
5      Q.   Do you believe in -- well, you
6  heard Mr. Williams' testimony that he
7  basically created the whole song before Robin
8  Thicke came to the studio.  Do you recall
9  that?
10     A.   Um-hum, yes.
11     Q.   Do you have any basis to dispute
12 that that's how the song was created?
13     A.   No.
14     Q.   Do you believe -- having heard Mr.
15 Williams testify at his deposition about his
16 musical background and training and how he
17 works, do you believe that it would have been
18 impossible or highly unlikely for him to
19 create -- well, you know, let me not load it
20 with adjectives.  Let me just ask you this.
21     Knowing what you know from the
22 deposition about how Pharrell Williams works
23 as a musician, do you believe it's possible
24 that he created the song in the manner he
25 testified to without having "Got To Give It

Page 53

1  Up" in the studio as some kind of reference
2  for him?
3      MS. ELLIS:  Objection, vague.
4  Speculation.  Incomplete hypothetical.
5      A.   You know, he didn't really give
6  very -- what I would consider kind of
7  hard-core descriptions of how he worked.  And
8  I'm not sure if he's aware of what he produces
9  until he sort of spontaneously does it in the
10 studio.  He doesn't have musical training.  He
11 doesn't read music.  He doesn't seem to create
12 a record in that way of his work or have a
13 systematic process.  He says he picks up the
14 vibe from the artists and he imbues the music
15 with -- I mean, that was one of his -- I'm
16 paraphrasing -- one of his ways of producing
17 his recordings.
18     So he said things like that that
19 don't have any -- any concrete basis for
20 understanding how he actually comes up with
21 them.  So it's a little bit difficult for me
22 to assess what he could have done and what Mr.
23 Thicke could have done, you know.
24     Q.   Do you find that you don't
25 understand how he works creatively as a

Page 54

1 musician after hearing his testimony?
2        MS. ELLIS:  Objection, vague.
3    A.    I think he works on a very
4 intuitive level, on a level that doesn't
5 involve a lot of formal or rigorous training.
6 But he's intuitively talented and he
7 understands the audio atmosphere in which He
8 works quite will.  And he uses that as his
9 tool box.
10        But describing on a concrete level
11 afterwards or before is something that he
12 was -- he did not appear to be capable of
13 doing.
14    Q.    Let me just go back to my question
15 because I think I didn't really get an answer
16 to it.  And I'm not blaming you but we sort of
17 went off on a tangent here.
18        Do you believe it's possible that
19 Mr. Williams, in creating the music in the
20 intuitive way he did, simply came up with
21 something that has the various qualities
22 you claim exist with "Got To Give It Up"
23 without attempting to copy "Got To Give It
24 Up"?
25        MS. ELLIS:  Vague, speculation,

Page 55

1 incomplete hypothetical.
2    A.    Well, I do remember him saying
3 that he was thinking of Marvin Gaye.  So I
4 don't know how far that thinking went, if it
5 went into his musical choices or not.  But
6 given an array of any choice that he could
7 have made with any of the melodies that are
8 similar, he could have chosen different notes.
9 He could have chosen different harmonies.
10        But a large proportion of the
11 choices that were made down to the hi-hat on
12 exactly the same half beat of the fourth beat,
13 the second half of the fourth beat, he made a
14 lot of really specific choices that were more
15 or less the recipe to Marvin Gaye's song.
16        So I don't know if it was
17 deliberate or not, but in the end he has a
18 song that's very similar because of the
19 artistic choices he made.
20    Q.    And so how likely -- well, I mean,
21 do you have an opinion then, as to whether he
22 copied it or not?
23    A.    I don't know why or how he copied
24 it, but, yes, I think he did copy it.
25    Q.    Other than the parlando section or

Page 56

1 the timing of the parlando section that you
2 mentioned earlier, what other similarities
3 stand out for you as being important as a
4 basis for your opinion that Pharrell Williams
5 copied "Got To Give It Up" when he created
6 "Blurred Lines;" in other words, tried to copy
7 it?
8        MS. ELLIS:  Misstates testimony
9 and vague.
10    A.    Well, I'd need my reports in front
11 of me to be very specific.  So I need my
12 preliminary and my full report.
13    Q.    Let me make it easy for you.
14        Is the cow bell one of the reasons
15 that you -- that stands out to you as a red
16 flag for why he copied it?
17        Actually, you know what?  Maybe
18 this is too hard.  I was going to just read
19 through the various pieces, but let me give
20 you your report and then we'll -- you want the
21 preliminary report?
22    A.    Please.
23    Q.    Okay.
24    A.    And the full one.
25        MR. MILLER:  All right.  Why don't

Page 57

1 we mark as 1751 the preliminary report.
2        (Deposition Exhibit 1751,
3        Preliminary Report of Judith Finell,
4        marked for identification as of this
5        date.)
6        (Deposition Exhibit 1752, Expert
7        Report of Judith Finell, marked for
8        identification as of this date.)
9 BY MR. MILLER:
10    Q.    All right.  So I have marked 1751
11 as your preliminary report.  1752 is the full
12 report.  And I will put in front of you your
13 Exhibit A and the guide to Exhibit A of which
14 I only have one copy so --
15    A.    Thank you.
16    Q.    -- that's all I got.
17        Actually, you know what?  Why
18 don't we mark those as Exhibit 1753, which
19 will be Exhibit A, 1754 is the guide to
20 Exhibit A, and then we'll have it all in the
21 record.
22        (Deposition Exhibit 1753, Exhibit
23        A: "Blurred Lines" -- Constellation of
24        8 Similarities with "Got To Give It Up,"
25        marked for identification as of this

Page 58

1    date.)
2        (Deposition Exhibit 1754, Guide to
3        Exhibit A, marked for identification as
4        of this date.)
5    BY MR. MILLER:
6        Q.   Okay.  So with your reports in
7    front of you, and I'd like you to take as much
8    time as you need, this is not a rush test
9    here, my question is please go through the
10   reports and tell me what, besides the timing
11   of the parlando section that you previously
12   mentioned, stands out to you as a similarity
13   that forms the basis for your opinion that
14   Pharrell Williams must have copied "Got To
15   Give It Up."
16       MS. ELLIS:  Objection.  The
17       document speaks for itself.
18       A.   Okay.  So I -- number one, I found
19   the most compelling was the collection of the
20   similar elements.  But each of the similar
21   elements is also very substantially similar.
22   But did you want me to now go through and talk
23   about every similarity in my report?
24       Q.   Okay.  So you find each of the
25   similarities individually substantially

Page 59

1    similar, the ones you've identified in your
2    reports, correct?
3        A.   That's right.
4        Q.   And you find the collection of all
5    of them or the combination of all of them
6    substantially similar, correct?
7        A.   As a collection itself.  Yes,
8    um-hum.
9        Q.   Okay.  You testified a minute ago
10   that the timing of what you called the
11   parlando section struck you as particularly
12   suspicious in leading you to conclude that
13   Pharrell Williams must have intentionally
14   copied "Got To Give It Up."  I'm asking you if
15   other than that timing of the parlando
16   section, are there any other similarities that
17   stand out to you as being particular red flags
18   for you that Pharrell Williams must have
19   copied "Got To Give It Up"?
20       MS. ELLIS:  Objection.  Misstates
21       testimony.
22       A.   My answer is still the same, that
23   it's because of all of these individual
24   elements, almost every vocal line in "Blurred
25   Lines" can be traced back to "Got To Give It

Page 60

1    Up."  And you also have -- it's more than just
2    the timing of the parlando section.  There are
3    similarities within it of lyrics.  There are
4    similarities within it of rhythm.  And then
5    it's a deviation from the rest of the song in
6    the same way.  I mean, it's more than just the
7    timing.  The timing suggests that it was a
8    template somehow.
9        But even during the parlando and
10   the rap section in Pharrell Williams' song,
11   the other similarities continue playing.  The
12   baseline.  The keyboards.  The hi-hat.  All of
13   that is still going on during those sections.
14       So even if there weren't a
15   parlando section, you still have this ongoing
16   constant similarity.  And I rarely see -- I
17   rarely see that quantity.
18       Q.   And you said almost every vocal
19   line in "Blurred" can be traced back to
20   "Give."  What do you mean by that?
21       A.   Well, you've got the main vocal
22   line of the verse which itself is repetitive.
23   I mean, that's the nature of "Blurred Lines."
24   So you've got the verse, which can be traced
25   immediately back to a melody in "Got To Give

Page 61

1    It Up."  You've got the hook.  You've got what
2    I call the back-up hook, which is the "hey,
3    hey, hey" sections which occurred 21 times in
4    "Blurred Lines."  That's a lot of one piece of
5    material.  And much else.  The instrumental
6    support, meaning the base, and the keyboard
7    and aspects of the percussion.  And almost all
8    of the vocal lines.  Plus some of the lyrics
9    and some of the story line.  It's almost
10   leaked into every aspect of "Blurred Lines."
11   That's why I made this Exhibit A.  I wanted to
12   see -- this for me was to see the roadmap of
13   "Blurred Lines."  Does it all -- is it so
14   constant?  And on the bottom of each of -- in
15   my exhibit here is the black line.  That's the
16   composite of what's above it.  That means that
17   the only places that aren't black are three
18   places -- three or four places, like these
19   aren't even entire measures, meaning that
20   everything else has at least one but usually
21   multiple versions of material that come from
22   "Got To Give It Up."  That's just -- as I say,
23   I haven't seen that kind of quantity of
24   similar material very often.  And I've been
25   involved in many cases.

1    Q.   So it's all of what you just
2  testified that leads you to conclude that
3  Pharrell Williams must have copied "Got To
4  Give It Up."
5        MS. ELLIS: Objection. Misstates
6  testimony.
7    Q.   Maybe I'm confusing you. I'm
8  trying to see if there's specific things.
9  Maybe I got off on a misunderstanding because
10  of the way you talked about the timing of the
11  parlando section.
12        Is it -- are there specific things
13  that stand out for you as more suspicious than
14  others of copying? Or is it just everything
15  all together equally to you is just
16  overwhelming evidence he must have copied it?
17    A.   Well, there are a few specifics
18  but that wasn't what turned the tide. But as
19  I said before, I considered the "woo" to be
20  almost a fingerprint. You know, that in a
21  sense the elephant in the room while this song
22  was being produced, "Blurred Lines," had to be
23  the Marvin Gaye song. I mean, because it's
24  just an unlikely -- it's an unlikely
25  duplication.

1    Q.   Okay. You mentioned the vocal
2  "woo" and just so we have a record on it I
3  assume -- are you referring to the "woo" that
4  in your report you describe as occurring on
5  the end of three -- a little less than two
6  minutes into the "Give" sound recording?
7    A.   I give the timing in my report.
8  I'd have to look it up.
9    Q.   I was trying to avoid looking it
10  up. Is that what you're referring to, the
11  vocal "woo" that occurs --
12    A.   It occurred I believe three times
13  in Marvin Gaye's song but I'd have to look
14  that up. But it's very similar and it's
15  exactly in the same rhythmic position, yeah.
16    Q.   Okay. So the vocal "woo." The
17  timing of the section you called parlando
18  starts. Is there anything else that jumped
19  out to you as being, you know, indicative of
20  the elephant in the room that "Give" was
21  copied when they created "Blurred Lines"?
22    A.   Yes. The other section that's
23  very similar is this section that occurred
24  before the parlando section in "Got To Give It
25  Up" and immediately after the rap section in

1  "Blurred Lines." And they are -- in a very
2  short section, which is a bridge in each case,
3  there are four identical lyrics. They share
4  three of the same notes. They serve totally
5  the same function and they do the same word
6  painting. By that I mean the lyrics are "up,"
7  "down," "round," and "shake." So word
8  painting in music means that you illustrate
9  the meaning of the word with something that
10  you do musically. In this case "up" ascends
11  to same place in both songs. And "down"
12  descends in the same way in both songs -- both
13  those words I mean, et cetera.
14        And they have the lot in common.
15  And they both buy bookend these sections,
16  these semi-spoken sections. That was
17  something new I discovered that wasn't
18  discussed in my first report but that was
19  pretty stunning.
20    Q.   Okay. And along -- I want to talk
21  about that because I didn't know anything
22  about that. But -- so before I go back to
23  explore that and go through your report on
24  that, is there anything else in addition to
25  the parlando, the vocal "woo," this up/down,

1  whatever it was that you just mentioned, is
2  there anything else that, again, was sort of
3  like really stood out to you as being a reason
4  why they must have copied "Got To Give It Up"?
5    A.   Those are compelling reasons. I
6  would have to go through all of the others to
7  answer you the most fully.
8    Q.   Okay. So those are the three most
9  compelling reasons as you sit here today
10  anyway.
11        MS. ELLIS: Objection. Misstates
12  testimony.
13    A.   No. It's really the multitude.
14  What I call the constellation. It's the way
15  they interact and intersect in the same way
16  and that they're the same within themselves or
17  very similar. But those are some high points
18  that I noticed. You know, that have to do
19  more with -- somewhat with structural
20  similarities. And that's what made me think
21  that the "Blurred Lines" was somehow formatted
22  or used the other song as almost a template.
23    Q.   Okay. And I'm the attorney for
24  the side that is opposing the side that has
25  retained you. I'm not your friend. I'm

Page 70

1    defendants claim to own a copyright?
2         MS. ELLIS:  Speculation.
3         A.  I don't understand.  I mean --
4         MS. ELLIS:  Calls for a legal
5    conclusion, as well.
6         Q.  The copyright deposit sheet music
7    reflects some, but not all, of the
8    compositional elements of "Got To Give It Up"
9    that appear in the sound recording.  Do you
10   agree with that?
11        A.  Yes.
12        MS. ELLIS:  Objection, vague.
13        Q.  Do you intend to express an
14   opinion in this case as to what elements are
15   contained in the composition that the
16   defendants claim to own?
17        MS. ELLIS:  Objection,
18   speculation.  Calls for speculation.
19        A.  Well, I mean, I'm not qualified to
20   know, other than gathering from the sheet
21   music and all, and what the attorneys have
22   said to me about owning music -- I mean,
23   that's really a legal concept, who owns it.
24        Q.  I agree with you.  Maybe you're
25   suspecting that I'm expecting you to have an

Page 71

1    opinion on that.  I'm just trying to find out
2    how your attorneys intend to use you in this
3    case so I'm not expecting you actually to have
4    an opinion on this.  But I'm just trying to
5    make sure that I know whether or not you will
6    have an opinion.
7         A.  Oh.
8         Q.  So other than your musicological
9    testimony as to what compositional elements
10   are in the sheet deposit and what
11   compositional elements you believe are
12   reflected in the sound recording, are you
13   planning to express any opinion, separate and
14   apart from that, as to the scope of the
15   compositional material that the defendants own
16   a copyright in?
17        MS. ELLIS:  Objection, vague.
18   Speculation.  Calls for a legal
19   conclusion.
20        A.  I don't know the answer right now.
21        Q.  You don't have any opinion on that
22   right now, do you?
23        MS. ELLIS:  Objection, vague.
24   Calls for a legal conclusion.
25        Q.  Well, let me just ask you.  Do you

Page 72

1    know what composition the defendants own a
2    copyright in?
3         MS. ELLIS:  Objection.  Calls for
4    a legal conclusion and vague.
5         A.  I mean, from the sheet -- from the
6    way it looks on the sheet music it looks
7    like -- and from what the attorneys here in
8    the room have told me, I believe it's -- the
9    defendant owns the underlying song, the
10   copyright in the underlying song.
11        Q.  And as reflected in the copyright
12   deposit sheet music?
13        MS. ELLIS:  Objection.  Calls for
14   a legal conclusion and vague.
15        A.  Yeah.  I don't know exactly --
16   they own, I think, beyond that from what I
17   understand because deposit copy is so sparse.
18   But I believe that the composer of the song
19   was Marvin Gaye and that he and his heirs own
20   that.
21        THE VIDEOGRAPHER:  Sorry to
22   interrupt, but I need to switch the
23   tape.
24        MR. MILLER:  Okay.  That's fine.
25        MS. ELLIS:  The time is 12:07 p.m.

Page 73

1    We're going off the record.
2         (Recess taken.)
3         THE VIDEOGRAPHER:  The time is
4    12:19 p.m.  We're back on the record.
5    Video number two.
6    BY MR. MILLER:
7         Q.  I have just a couple of questions
8    kind of out of order for stuff I forgot to go
9    over earlier because we got sidetracked.  The
10   couple hundred hours, 300 to 500 hours you
11   spent working on this case, how much of that
12   time was spent prior to September 8th, 2014
13   when you submitted your declaration in the
14   summary judgment proceeding?
15        A.  I don't know.
16        Q.  Can you ballpark it?  Half, a
17   third, two-thirds, you know.
18        A.  You mean prior -- prior to the
19   declaration with the motion for summary
20   judgment?
21        Q.  Right.  How many hours would you
22   estimate you spent working on this case from
23   inception until September 8th, 2014?
24        A.  I really don't know.
25        Q.  You think it's more than half of

Page 86

1  relating to this Exhibit A?
2       MS. ELLIS: Objection, vague.
3       A.   I mean, it's in my report. It's
4  in my full report. This is a companion to the
5  full report but...
6       Q.   Okay. And so what is your opinion
7  that's expressed in your report in that
8  regard?
9       MS. ELLIS: Objection, vague.
10      A.   My opinion is --
11      MS. ELLIS: And the document
12 speaks for itself. You can continue.
13      A.   My opinion is that "Blurred Lines"
14 is bleeding with "Got To Give It Up."
15      Q.   Bleeding with it?
16      A.   Um-hum.
17      Q.   What does that mean?
18      A.   It's in every -- three bars out of
19 124 bars, only three bars contain nothing.
20 It's just too much. It's not believable that
21 it was an accident.
22      Q.   Okay. Do you have any opinion --
23 you know, strike that.
24      Now, when you say "Got To Give It
25 Up" is -- well, let me use your words.

Page 87

1       When you say "Blurred Lines" is
2  bleeding with "Got To Give It Up," are you
3  referring to the composition of "Got To Give
4  It Up"?
5       MS. ELLIS: Objection, vague.
6       A.   Yes.
7       Q.   And are you referring to the
8  composition as it is found in your opinion in
9  the "Give" sound recording?
10      MS. ELLIS: Objection, vague.
11      A.   I think the composition is
12 enhanced in the deposit copy and the sound
13 recording and to a lesser extent in the
14 publicly-available sheet music. It's all of
15 those combined that represent to me what the
16 sound -- what the composition is and what the
17 composer intended.
18      Q.   Did you -- in forming all of your
19 opinions in your expert reports that you
20 intend to express at trial, did you consider
21 the "Give" composition to be the compositional
22 elements that are found in the composition of
23 the "Give" sound recording, the published
24 sheet music, and the deposit copy?
25      MS. ELLIS: Objection, vague.

Page 88

1       A.   Could you repeat the question,
2  please?
3       MR. MILLER: Why don't you just
4  read it back.
5       (Record read.)
6       MS. ELLIS: Same objection.
7       A.   Yes. But to be clear, as my
8  reports say, I didn't rely heavily on the
9  published sheet music.
10      Q.   Okay.
11      A.   That was a reference.
12      Q.   But in your opinions in this case,
13 as they're expressed in the reports and as you
14 intend to express them at trial, as I
15 understand it, and tell me if I'm wrong, your
16 opinions are, as you refer to the "Give"
17 composition -- sorry. Strike that. After I'm
18 on the third clause it's just a terrible
19 question.
20      So in your opinions when you're
21 expressing your opinions about the "Give"
22 composition, what you mean by that is the
23 composition as it is found in the combination
24 of the "Give" sound recording and the "Give"
25 copyright deposit; is that right?

Page 89

1       MS. ELLIS: Objection, vague.
2       A.   Yes. That's right.
3       Q.   Were you told by the attorneys
4  that the Gayes owned the composition as it's
5  embodied in the sound recording?
6       MS. ELLIS: Objection, Rule 26,
7       and the witnesses is instructed not to
8       answer.
9       Q.   Well, you testified earlier that
10 you were told by your attorneys that the Gayes
11 owned the composition -- I believe you said in
12 the sound recording. I don't want to put
13 words in your mouth.
14      MS. ELLIS: Objection. Misstates
15      the testimony. I didn't mean to
16      interrupt. Hearsay.
17      Q.   Why don't you tell me what your
18 attorneys told you about the composition that
19 the Gayes owned as it pertains to the work you
20 did in comparing that.
21      MS. ELLIS: Objection, Rule 26.
22      And the witness is instructed not to
23      answer.
24      MR. MILLER: She has already said
25      that you told her what the composition

Page 98

1     And so you tell them I've looked
2  at the copyright deposit and the extent of the
3  copyright is limited to this part of the
4  composition and there either is or is not
5  additional material in the recording you gave
6  me that you should clear separately.
7     A.   Half of the time it's the
8  copyright deposit and the other half of the
9  time it's an early edition of a song -- of a
10 song or the musical work that is in the public
11 domain because it's that old.
12    Q.   Oh, okay.
13    A.   And so I'm comparing it -- I'm
14 comparing it to a version that either doesn't
15 need any clearance or if it's still under
16 copyright protection, it's -- I'm comparing
17 what new elements have been brought to this
18 old song.
19    Q.   Got it.  Okay.
20    MS. ELLIS:  Seth, if we can take a
21 break in about five minutes or break for
22 lunch in about five minutes.
23    MR. MILLER:  Okay.  Boy, it's that
24 time.  Okay.
25

Page 99

1  BY MR. MILLER:
2     Q.   Who prepared, if you know, the
3  publisher sheet music that you relied upon for
4  your opinions?
5     A.   I didn't rely on the publisher
6  sheet music.
7     Q.   Oh, okay.  So you looked at it but
8  it really doesn't form the basis for your
9  opinions.
10    A.   It was just reference.  No.
11    Q.   Okay.  It does not.
12    Sorry that was a terrible question
13 and answer.  Let me just ask it the 14th time.
14    You looked at publisher sheet
15 music in the context of doing your work but
16 you did not rely upon publisher sheet music
17 for any of your opinions; is that correct?
18    A.   That's correct.
19    Q.   And did you ever do any analysis
20 of substantial similarity that's limited only
21 to comparing the deposit copy sheet music of
22 "Give" to "Blurred Lines"?
23    A.   Could you repeat that question,
24 please?
25    (Record read.)

Page 100

1     MS. ELLIS:  Objection, vague.
2     A.   Not exactly.
3     Q.   What do you mean by not exactly?
4     A.   When I was shown the deposit copy
5  fairly late in this process I had not yet seen
6  it until -- I think I saw it during -- I think
7  it was during the motion for summary judgment
8  process if I'm not mistaken.  I'd never been
9  exposed to it before then.  The Stockett
10 declaration, I think.
11    So at that point I compared it to
12 my analysis of "Got To Give It Up" to see if
13 the same elements were in it.  So it was more
14 of a comparison to "Got To Give It Up" itself.
15    Q.   Okay.  So you did an analysis
16 initially based on the composition as found in
17 the "Give" sound recording and you compared
18 that to "Blurred Lines" and that resulted in
19 your preliminary report.
20    A.   That's right.
21    Q.   And then later when you received
22 the copyright deposit sheet music you compared
23 it to your opinion thus far to see if the
24 deposit sheet music for "Give" was different
25 in any material respect from the composition

Page 101

1  you found in the sound recording; is that
2  correct?
3     A.   Yes.
4     Q.   Okay.  But you didn't do any sort
5  of separate comparison of taking the deposit
6  copy sheet music standing alone excluding the
7  recording and making any sort of comparison on
8  that basis only to "Blurred Lines;" is that
9  right?
10    MS. ELLIS:  Objection.  Misstates
11 the testimony.
12    A.   It's more just that I used the
13 deposit copy to verify whether or not certain
14 elements were there and if any new ones were
15 there.  So I guess indirectly I did compare it
16 to "Blurred Lines" but it wasn't a focused
17 study that I wrote a report on.  It was more,
18 as I say, a verification process.
19    Q.   Right.  Okay.  I think I
20 understand.  So you didn't do anything
21 standing alone with the deposit copy.  You
22 just looked at it to see if it added or
23 subtracted anything you had in your prior
24 opinion.
25    A.   Well, no.  I mean.  I did analyze

Page 102

1   the deposit copy and it's in my full report.
2   It describes exactly how many bars contain the
3   signature phrase and all of the other
4   similarities.  And I think it even points out
5   some new ones.  Even the parlando section is
6   there, et cetera.  So I mean, I verified what
7   I found and looked to see if there was
8   anything new or different from "Got To Give It
9   Up."  But my basis of my main comparison was
10  with the recording.
11      Q.  Okay.  Great.
12          MR. MILLER:  I wanted to get that
13  down so you can get out.  Why don't we
14  go off the record.
15          THE VIDEOGRAPHER:  The time is
16  12:54 p.m.  We're going off the record.
17          (Luncheon recess taken at 12:54
18  p.m.)
19
20
21
22
23
24
25

Page 103

1        A F T E R N O O N   S E S S I O N
2       (Time noted:     2:24 p.m.)
3          THE VIDEOGRAPHER:  The time is
4   2:24 p.m.  We're back on the record.
5              * * *
6   J U D I T H   F I N E L L,   resumed and
7       testified as follows:
8   EXAMINATION BY (Cont'd.)
9   MR. MILLER:
10      Q.  Ms. Finell, have you read Ingrid
11  Monson's two expert reports in this case?
12      A.  Yes.
13      Q.  And have you read her declaration
14  she submitted in connection with the summary
15  judgment motion?
16      A.  Yes.
17      Q.  Are there any opinions of Ms.
18  Monson's that you disagree with?
19      A.  No.
20      Q.  In your testimony or opinions, at
21  least, in your reports, you use the phrase
22  "substantial similarity" a lot.
23          When you use the phrase
24  substantial similarity are you using that as a
25  legal term or a musicological term?

Page 104

1       A.  I think I'm using it
2   musicologically.  That's what I mean it to be.
3       Q.  Well, I'm asking it because the
4   term substantial similarity is found in case
5   law.  It's part of the legal doctrine.  And so
6   I just want to make clear if it's the case
7   that when you use that term in your opinions
8   you are not using it with the meaning it has
9   in legal doctrine.  You're using it with the
10  meaning it has to you as a musicologist; is
11  that correct?
12          MS. ELLIS:  Objection.  Calls for
13      a legal conclusion.
14      A.  I mean, those reports are written
15  in response to a copyright dispute.  So I
16  guess in that respect I'm using it -- I'm
17  finding the music to be similar enough to rise
18  to what I would consider to be substantially
19  similar.  But, as I said, I'm not a lawyer.
20  It's not coming from a legal perspective.
21      Q.  Okay.  And so what do you mean,
22  then, when something is substantially similar?
23      A.  As I've come to understand it over
24  the years and apply it, it means -- it refers
25  to the quantitative and qualitative

Page 105

1   similarities between two musical works, for
2   example.  And if I find that the materials
3   that resemble one another between the works
4   are significant to the works or are important
5   aspects of the works and that they are used
6   often enough, in a significant proportion of
7   the newer work, that's when I would call it
8   substantially similar.
9       Q.  And you've come to this approach
10  to calling something substantially similar
11  through your experience doing this type of
12  analysis of work in copyright infringement
13  disputes over the years; is that correct?
14      A.  That's correct.
15      Q.  Okay.  Other than your hands-on
16  experience in doing it over the years, is
17  there any training you have received specific
18  to the question of when two works can be said
19  to be substantially similar as that question
20  comes up in a copyright infringement dispute?
21          MS. ELLIS:  Objection, vague.
22      A.  You mean course work when you say
23  training?
24      Q.  Correct.
25      A.  Well, there is no course work that

Page 118

1   something I would look at.  Does it have the
2   same function in the two songs.
3       Q.   Okay.  Now, why do you say rhythm
4   is secondary to pitch in importance?
5       MS. ELLIS:  Objection.  Misstates
6   testimony.
7       Q.   Did I misstate what you said about
8   how you go through this analysis?
9       A.   No.  You did not.
10          The reason is because -- two
11  reasons, I think.  One is with the exception
12  of music that doesn't contain pitch, such as
13  unpitched drum sounds, for example, or other
14  kinds of percussion instruments like, say,
15  wood blocks that don't really have a pitch --
16  I mean, they actually do have -- you know,
17  they're either high sounding or medium
18  sounding or low so we can kind of classify
19  them, but they don't really have tone the way
20  tonal music does.
21          So aside from those, then music
22  that use tones, I would say that the tone
23  would be the driving force as to why the two
24  melodies would sound alike much more than
25  rhythm because if you had two of the same

Page 119

1   rhythms without the same tones or a very
2   similar series of the same tones, you wouldn't
3   perceive of a similarity.  Somebody like me
4   would analyze it and say, Oh, they have the
5   same rhythms but they're using different
6   tones.  Somebody who's got my training could
7   isolate it and tell you why they have a
8   connection.  But your ordinary listener I
9   think would miss it entirely if all they had
10  in common were rhythms.
11      Q.   Okay.
12      A.   And that would change if the
13  rhythm were very, very distinctive in some
14  way.  But for your ordinary rhythms, rhythm
15  would not be enough to be determinative.
16      Q.   Let me read you a statement from
17  Your Using an Expert Witness article.  You're
18  familiar with that, correct?
19      A.   Um-hum.
20      Q.   I got this off your Web site.
21          And -- all right.  Let me read it
22  to you.  So you say with regard to melody:
23  "If a large percentage of the same pitches are
24  the same rhythmically and occur in the same
25  sequence, then I consider the melodies to be

Page 120

1   substantially similar."
2           Is that the same thing you just
3   talked about?  I mean I read that as treating
4   them equally but maybe I'm misunderstanding.
5       A.   No.  If you look earlier in that
6   article -- I think I wrote that in about 1979
7   or something so I may be off --
8       Q.   Yeah, it's pretty old.
9       A.   Yeah.  Well, I've been around a
10  while.
11          You'll see that I talk about what
12  are the most important factors when I compare
13  music, and I start with pitch.  I start with
14  melody.  Melody really means pitch plus
15  rhythm.  But, yes, it's more similar if it has
16  both pitch and rhythm and a high number of the
17  same ones.  There's no question it's a higher
18  degree of similarity.
19          But without any pitch that's the
20  same, I would never start with just the naked
21  rhythm, so to speak.  It's got to have pitches
22  that are related.
23      Q.   So you start by looking for a
24  series of pitches that are the same and then
25  you look for rhythmic similarity as the

Page 121

1   second --
2       A.   It's not -- I mean, it depends.
3       Q.   Or is it not that --
4       A.   You know, I try to get to the
5   truth.  If they sound related I determine why.
6   Such as it could just be that they have
7   similar rhythms.
8           What I'm saying is the
9   dissimilarity of rhythms would not outweigh
10  the similarity of pitches.  The pitches -- you
11  know, I talked about it in my report, the
12  factors.  The first factor is pitch.  Or scale
13  degrees.
14      Q.   Okay.  I may have misunderstood
15  your approach entirely.
16          Are you saying that what you do is
17  you listen to it, hear what sounds similar,
18  and then investigate in the compositional
19  elements, itself, what it is among rhythm and
20  pitch and harmony and structure and so on that
21  might be causing it to sound similar to you
22  when you hear it?
23      A.   Yes.  I don't have to hear it.  I
24  can look at it on a page and hear it.  I mean,
25  I don't have to actually hear it.

31

Page 122

```
 1      Q.   Well, when you look down at a page
 2  with pitch you hear it in your head, right?
 3      A.   Yes, I hear everything in my head.
 4      Q.   Okay.  So you don't have to play a
 5  song --
 6      A.   No.
 7      Q.   -- but you sort of sight read it
 8  to yourself and hear it in your head.
 9      A.   Um-hum.
10      Q.   And you say why did that sound
11  similar and then you look at the compositional
12  elements and try and figure out, Oh, it must
13  be that these pitches are the same or that
14  it's the same rhythm or some of the same
15  pitches or whatever you --
16      A.   I don't usually say it must be,
17  but I do remember whether or not it is.  I'm
18  not trying to be difficult.  But I just -- I
19  don't -- I mean, by the time I'm done I'm
20  pretty certain as to why they sound similar.
21  It's not like a mystery to me.
22      Q.   Okay.  So when you decide the
23  two -- in our hypothetical -- two phrases
24  sound substantially similar, or are
25  substantially similar I should say, is that
```

Page 123

```
 1  because they sound substantially similar to
 2  you and you're finding material in the
 3  composition that bears that out?
 4      A.   I don't understand your question.
 5      Q.   I am wrestling in this case with
 6  how guys, you musicologists, go from saying,
 7  you know, yeah, there's some pitches and
 8  there's some rhythms in the same place or
 9  whatever.  I mean, we can all -- we can all
10  sit down, look at two pieces of music written
11  out in sheet music and if we know how to read
12  sheet music and say, yeah, those are the same
13  notes, those aren't the same notes, that's the
14  same rhythm, it's the rhythm shifted over.
15  You know, we can all do that analysis.  That's
16  just black and white if you understand how to
17  read music notations.
18      A.   Um-hum.
19      Q.   And virtually any two songs you
20  compare in the same key and in the same genre.
21  I mean, undoubtedly there'll be a few of the
22  same pitches and a few of the same notes,
23  right?  Take a pop song written in a typical
24  eight-bar verse, eight-bar chorus kind of
25  structure and it's got typical pop chords and
```

Page 124

```
 1  it's an eight-note rhythm, you know, somewhere
 2  in the song if they're transposed in the same
 3  key you'll find the same pitch somewhere,
 4  you'll find some rhythms in common if it were
 5  the normal case wouldn't you?
 6          MS. ELLIS:  Objection.
 7      A.   You may find fragments.
 8      Q.   Fragments, yeah.
 9      A.   But you're not going to find
10  sequence.
11      Q.   It's the sequence of the pitches
12  that's important to you.
13      A.   Absolutely.
14      Q.   Okay.  All right.  Right, you may
15  not find more than one or two in a sequence if
16  you're just picking songs at random, right?
17      A.   Right.
18      Q.   In songs that are substantially
19  similar, it's usually a lot more notes in a
20  series.
21      A.   Exactly.
22      Q.   Okay, fine.  Somewhere in that
23  spectrum of finding, you know, just a couple
24  of notes here and there in common and finding
25  a bunch of notes in a series in common, with
```

Page 125

```
 1  all the other factors you've discussed,
 2  somewhere in that spectrum this you say this is not
 3  just some similarities.  This is substantially
 4  similar, right?
 5      A.   Right.
 6      Q.   How do you know when you have
 7  crossed that line into substantially similar?
 8      A.   It's on a case-by-case basis but
 9  it has to do with quantity and quality as I
10  said originally.  It has to be similar enough
11  and meaning -- significant enough to the
12  initial song, the first song, let's call it
13  song A, the earlier song, to warrant, you
14  know, that label, if you will, substantial
15  similarity.
16          It has to do with, as I say,
17  amount, as well as quality of the material.
18  Quality meaning the significance of the
19  material to the expression.
20      Q.   Okay.  And so now my question, and
21  it's going to be a very nice one, so please
22  listen carefully.
23          Is it the case in your approach to
24  this that when something crosses the line for
25  you into being substantially similar it's
```

Page 126

1  because you hear it to be substantially
2  similar and you verify that by seeing a bunch
3  of notes and rhythms in common; or is it
4  because you look at a bunch of notes and
5  rhythms in common and at a certain point
6  there's so much of a percentage of that that
7  without reference to how it sounds to you, you
8  say it's substantially similar; or is it
9  something else?
10      A.   When I look at music I hear it.
11  There's not a disconnect.  It's not do I
12  hear it -- does it sound one way or does it
13  look one way.  It's the same thing to me.
14      Q.   Okay.
15      A.   It's one gesture.
16      Q.   So --
17      A.   And the same if I hear it.  Just
18  on an audio level.  I -- you know, I could
19  write down the music.  I mean, there is no
20  separation.
21      Q.   So when you hear it, when you look
22  at the sheet music and you hear it, do you
23  know sort of right off the bat, yes, that's
24  substantially similar?
25      A.   No.  I have to do a lot of

Page 127

1  analysis.  But there's no disconnect between
2  either the hearing process or the seeing
3  process.  I can look at music and know what it
4  sounds like.  I can hear music and know what
5  it looks like.
6      Q.   All right.  So you look at a
7  two-bar phrase.  You hear it in your head in
8  both songs.  At that point have you concluded
9  that it's substantially similar?
10      A.   It depends.  I mean, because
11  there's another factor you're not bringing in
12  know, which could be the performance of it,
13  which could be a recording or a live
14  performance of it.  That's the other element
15  that we're not talking about.
16      Q.   Okay.  Let's assume for this
17  hypothetical we're talking about a
18  composition.  So we're not talking about
19  whether someone's recording of it similar to
20  someone else's recording.  We're talking about
21  whether the abstract compositions are similar.
22          Is that a concept that you are
23  aware of, an abstract composition as opposed
24  to a sound recording of it?
25          MS. ELLIS:  Objection, vague.

Page 128

1      A.   I'm aware of it.  But I think that
2  there's been a merging of the two.  Certainly,
3  you know, in the copyright area.  So, I mean,
4  sometimes the recording is the composition.
5  But you're talking about it as if it's just,
6  you know --
7      Q.   Well, what do you mean by
8  sometimes the recording is the composition?
9      A.   If that is the composer's vision
10  of the piece, that is the composition.  And
11  that's how I consider it.  I don't consider
12  just what's written on the paper.  Especially
13  if the composer doesn't read music or doesn't
14  write down that him- or herself.
15      Q.   Have you had cases in the past
16  where you felt that the -- or you -- your
17  opinion has been based on the notion that the
18  sound recording is in its entirety the
19  composition because that's the composer's
20  vision of it?
21      A.   Absolutely.  Every day.  Not every
22  day.  I'm sorry.  That was a little
23  over-stated.  But many, many calls that I get,
24  that is the issue, yes.
25      Q.   Is that the approach you took in

Page 129

1  this case?
2      A.   I think it's the right approach,
3  yes.
4      Q.   Okay.  I would like to show you --
5  by the way, I read you a little bit from this
6  Using an Expert Witness article.  You said
7  it's very old.  I really don't want to go
8  through reading you all the statements in here
9  onto the record of what's of interest to me.
10  Are there things that you said in here that
11  you no longer stand by in terms of how you do
12  your musicological process or is it still up
13  to date?
14          MS. ELLIS:  Objection.  If you
15      want her to opine on it then she'll need
16      a copy of it.
17      A.   Thank you.  It's been a long time
18  since I wrote that so I should look at it.
19      Q.   Okay.  Let me just read the ones
20  that interest me.  I think that'll be quicker
21  than you reading the whole thing and deciding
22  whether it's up to date.
23          MS. ELLIS:  Is it possible for her
24      to have a copy in front of her as you do
25      it?

## Page 130

1      MR. MILLER: It's completely
2  possible except I only printed out one
3  because it cost me $15 at the hotel so
4  --
5      THE WITNESS: I'm surprised my
6  article cost that much.
7      MR. MILLER: Your article was free
8  on the Internet but putting it on paper
9  cost me a lot of money.
10     THE WITNESS: I didn't get paid
11 $15 for it.
12     MS. ELLIS: Can we break long
13 enough to make a copy for her?
14     MR. MILLER: I only have one with
15 my notes on it. So I don't have that
16 ability.
17     MS. ELLIS: I could print it from
18 Web site.
19     THE WITNESS: It's on my Web site.
20     MS. ELLIS: If it's on her Web
21 site.
22     MR. MILLER: All right. I don't
23 mind doing that on a break.
24     THE WITNESS: It's a three-part
25 article, though. Right? I don't know

## Page 131

1  which part you're reading from.
2      MR. MILLER: Well, you will see it
3  in a minute when we print it.
4      THE WITNESS: All right. I just
5  think when you print it you'll need all
6  three parts.
7  BY MR. MILLER:
8      Q.  Let me put in front of you as
9  Exhibits 1755 and 1756 respectively, the two
10 sheet music deposit copies of "Got To Give It
11 Up."
12         (Deposition Exhibit 1755, sheet
13 music deposit copies of "Got To Give It
14 Up," marked for identification as of
15 this date.)
16         (Deposition Exhibit 1756, sheet
17 music deposit copies of "Got To Give It
18 Up," marked for identification as of
19 this date.)
20 BY MR. MILLER:
21     Q.  I would like to go through
22 these -- you've seen these before and you've
23 paid some attention to them, right?
24     A.  Yes.
25     Q.  Okay. I'm a little -- there's

## Page 132

1  some statements in your report that I wasn't
2  really sure what you were saying about the
3  sheet music. So what I want to do is just go
4  through the various elements of similarity
5  that you've claimed in this case -- or you've
6  opined, I should say -- and ask you to just
7  tell me yes or no whether it's in the deposit
8  copy, reflected in the notation in the deposit
9  copy. And some of these may be obvious but
10 I'm just trying to make sure I understand and
11 there are no surprises at trial for me.
12     So the fact --
13     MS. ELLIS: Seth, just to clarify,
14 do you mean one or both of the lead
15 sheets?
16     MR. MILLER: In either one.
17     Q.  I would consider -- I'll allow to
18 you consider "Got To Give It Up" part 1 and
19 part 2 as a composite copy combined for
20 purposes of these questions.
21     A.  Thank you.
22     MS. ELLIS: Okay.
23     Q.  Are the backup vocals that are
24 described as a similarity in your report
25 contained in the deposit copy? The harmonies

## Page 133

1  to the lead vocals is what I mean.
2      A.  Oh, because the backup vocal --
3  there's something -- what I call Theme X which
4  is a backup vocal.
5      Q.  That's right. We'll get to that.
6  That came up with Ms. Monson yesterday.
7      What I mean by the backup vocals
8  is you said there are backup vocals to the
9  hook in your preliminary report. So my
10 question is are those backup vocals to the
11 hook found in the "Give" sheet music?
12     A.  Only the harmonies that the backup
13 vocals were singing, but not the actual vocal
14 part that they sang.
15     Q.  Oh. Show me where the harmonies
16 are reflected in the sheet music.
17     A.  Okay. On page 4 of part 1 where
18 stave 3 means three like staff line 3 where it
19 says "keep on dancing," for example. See the
20 harmonies above it, there's a B7 and A7.
21 Those are chords. Those are chord indications
22 and the backup vocalists sing those harmonies.
23     Q.  You're talking about on the third
24 stave at the double line where it says "keep
25 on dancing" there's an A7 chord above the A7?

Page 134

1    A.   Right.  But it starts before the
2 double line.  It states with the words "keep
3 on."
4    Q.   Where it says -- oh, under a B7
5 chord.
6    A.   That's correct.
7    Q.   Okay.  Why -- okay.
8        I mean, I don't want to belabor
9 this point.  The backup notes themselves are
10 not in there.  In the sheet music.
11    A.   You're correct.  They are not.
12    Q.   Right.  And there's no indication
13 in the deposit copy that there even should be
14 backup vocals, right?
15    A.   There's no indication.  But the
16 harmonies that they sing on the recording are
17 these chords.
18    Q.   Right.  Those are the chords of
19 the song.
20    A.   But those the harmonies they're
21 harmonizing with.  So the content of what the
22 backup vocalists --
23    Q.   Is it your position that there is
24 any notation in the deposit copy of the backup
25 vocal itself?

Page 135

1        MS. ELLIS:  Objection, vague.
2    A.   Other than their harmony there is
3 not.
4    Q.   Okay.  And the harmony -- you're
5 referring to the chord symbols.
6    A.   That's right.
7    Q.   Okay.  And the deposit copy has a
8 melody and it has chord symbols throughout and
9 it has a few other things here and there,
10 right?
11    A.   Well, it has a lot of other things
12 here and there.
13        MS. ELLIS:  The document speaks
14    for itself.
15    A.   It does include what you said but
16 it has other things, too.
17    Q.   All right.  Let me think of the
18 simplest way to do it.
19        The chord pattern of "Got To Give
20 It Up" that's notated in the sheet music does
21 not contain any indication one way or the
22 other as to what instruments or voices should
23 play any notes in the song other than the
24 actual melody that's notated there; is that
25 correct?

Page 136

1    A.   I don't understand your question.
2    Q.   Is it your position that there is
3 a trumpet part notated in the sheet music?
4    A.   No.  But there is -- there are
5 instrumental parts notated in part 2.
6    Q.   Okay.  But stick with my question.
7 There's no trumpet -- there's no tuba in the
8 sheet music, is there?
9    A.   No.
10    Q.   Now, someone could place play this
11 song and do a tuba and have it play notes in
12 the A7 chord, right, if they wanted to?
13        MS. ELLIS:  Objection.
14    Speculation.
15    A.   If they wanted to I guess so.
16 Although there is a sax line in here.  I mean,
17 there are instrumental indications in the lead
18 sheet.  I mean in the deposit copy.
19    Q.   Okay.  But, I mean, is it your
20 position that the -- if someone did that that
21 the tuba part would be notated in the sheet
22 music because there's an A7 chord?
23    A.   It could be.  It certainly is on
24 some.
25    Q.   So your position is that because

Page 137

1 there's an A7 chord symbol in the sheet music,
2 any instrument that plays any notes of an A7
3 chord on any recording of this song, that
4 instrumental part is notated in the sheet
5 music?  That's your position.
6    A.   No.  A portion of that
7 instrumental content is.  If the instrument is
8 staying true to this deposit copy, then it
9 would be an A7 chord.  It would be at least
10 the notes that are contained in the A7 chord.
11 But the instrument could change like you're
12 saying.  It's not saying that it has to be
13 played on a tuba or any other instrument.  But
14 the content of that instrument that that
15 instrument plays at that point if it's going
16 to be true to the song and going blend with
17 the vocal part, it will have to be an A7
18 content.
19    Q.   Let me give you a different
20 hypothetical.  I come to you.  I'm an ad
21 agency.  I've licensed a performance of "Got
22 To Give It Up" that contains a tuba part
23 playing notes from the A7 chord over the A7
24 bar.
25    A.   Um-hum.

Page 138

1    Q.   Significant notes, you know.
2  Significant melody, let's say.
3        The Gaye family comes to you in
4  some alternate universe and they say "Our
5  composition copyright is in this deposit
6  copy."  And so, you know, there's no dispute.
7  You understand that this deposit copy is what
8  they own.  The ad agency says to you "I have a
9  license from the Gayes to do that to 'Give It
10 Up.'  Do I need a separate license for this
11 improvised very important tube part because
12 it's playing an A7 chord?"
13       MS. ELLIS:  Objection.  Incomplete
14   hypothetical.
15    A.   I don't know.
16    Q.   You can't answer that.
17    A.   No.  I don't understand it.
18    Q.   Okay.  Is the Theme X in the
19 deposit copy?
20    A.   It's there but it's not identical
21 to the way it is in the recording.
22    Q.   And are you referring to the
23 "fancy lady" phrase in "Got To Give It Up,"
24 part 2?
25    A.   Right.  And all the repetitions of

Page 139

1  "fancy lady."  And also notice -- and this is
2  not in my report -- but if you look down four
3  staves you'll see "dancing baby."  And it's
4  descending also.  But, yeah, "fancy lady" is
5  the closest sort of --
6    Q.   Well, are you saying that there's
7  some connection between the pitches of
8  "dancing baby" and the Theme X pitches?
9        MS. ELLIS:  Objection.  Misstates
10   the testimony.
11    A.   Yeah.  I need to look at my Theme
12 X.  May I do that?  It's in my report.
13    Q.   Sure.  Your preliminary report is
14 in front of you.
15       (Document review.)
16    A.   No.  It's the closest to "fancy
17 lady."
18    Q.   Yeah, okay.  And "fancy lady" is
19 not the same pitches as the Theme X pitch,
20 correct?
21    A.   No, it isn't.  But on the
22 recording the harmonization to that is closer.
23    Q.   Okay.  But what's reflected in the
24 deposit copy is not the same pitches as the
25 Theme X in your report, right?

Page 140

1    A.   That's correct.
2    Q.   And it's not even the same rhythm
3  or melodic contour as Theme X in your report,
4  right?
5        MS. ELLIS:  Objection.  The
6    documents speak for themselves.
7    A.   The first two notes are the same
8  rhythm but the second two notes are not in the
9  deposit copy.
10    Q.   Right.  And the contours go the
11 opposite direction, right?
12       MS. ELLIS:  Object.  The documents
13   speak for themselves.
14    A.   Yeah, they do.
15    Q.   Are the "doo-wop" -- you know, the
16 "bop, bop, doo-wop" thing, is that in the -- I
17 guess I should have a real name for that,
18 whatever it is, "hop, fop, fop, doo-wop," is
19 that -- is the "doo-wop" vocals what calling
20 that -- are the "doo-wop" vocals in the "Give"
21 deposit copy?
22    A.   Could you give me a minute,
23 please?
24    Q.   Sure.
25       THE VIDEOGRAPHER:  One minute.

Page 141

1    Q.   You got one minute exactly.
2        (Document review.)
3    A.   No.  They're not here.
4    Q.   Okay.  Is the hi-hat -- well,
5  actually, I forgot about that.  Is the base in
6  the deposit copy other than in the first eight
7  measures with the indication base simile
8  meaning to play in a similar style throughout
9  the song?
10    A.   Is there a question?
11    Q.   Yeah.  Is it in the deposit copy
12 other than what's reflected in the first eight
13 measures including the words "base simile"?
14    A.   Base simile means to continue that
15 way throughout until it stops saying base
16 simile.
17    Q.   I understand what base simile
18 means --
19       THE VIDEOGRAPHER:  Sorry to
20 interrupt but we're out of tape.
21       MR. MILLER:  Okay.
22       THE VIDEOGRAPHER:  The time is
23 3:11 p.m.  We're going off the record.
24       (Videotape changed.)
25       THE VIDEOGRAPHER:  The time is

Page 142

1    3:13 p.m.  We're back on the record.
2    Video number three.
3    BY MR. MILLER:
4    Q.    In the first eight measures of
5    "Give" part 1 deposit copy there is a notated
6    base intro that ends with the words "base
7    simile."
8        Do you see that?
9    A.    Yes.
10   Q.    Is there any notation in that
11   deposit copy that indicates any base in "Got
12   To Give It Up" other than those first eight
13   measures?
14   A.    Well, base simile means that you
15   keep doing that.
16   Q.    Well, I'm asking -- listen, what
17   I'm trying to get from you is clarity as to
18   what you contend is in the sheet music
19   deposit.  Base simile means continue in a
20   similar fashion, right?
21   A.    Yes.
22   Q.    Okay.  I acknowledge it says base
23   simile right there after the eight measures of
24   annotated base music.  Is there any notation
25   anywhere else in the "Give" deposit copy that

Page 143

1    indicates a base part?
2    A.    No.  It's not necessary.
3    Q.    So that's the only notation of it
4    in the deposit copy, right?
5    A.    As I say, base simile is a clear
6    instruction that it's -- it's as if it were
7    notated.  If there were more than one stave in
8    this particular format it would include the
9    baseline.
10   Q.    I only have the actual music here
11   and they chose, rather than to notate the base
12   throughout the song, to use the words "base
13   simile" to indicate continue playing in a
14   similar manner, right?
15   A.    That's what that means.
16   Q.    That's what that means.  There are
17   no other notations in the entire deposit copy
18   of what the base should play and other than
19   what's contained in the first two staves of
20   the deposit copy, right?
21       MS. ELLIS:  Asked and answered,
22   Seth.
23   Q.    Is that right?
24   A.    A base player would keep playing
25   it.  That's what a base player would

Page 144

1    understand this score to mean.
2    Q.    Okay.  And on the third stave
3    where it says A7, there is no indication in
4    that chord symbol of what any instrument
5    should play.
6    A.    No.  The A7 is meant for other
7    instruments.  It has no importance to the
8    vocalist.
9    Q.    What instrument does the A7 notate
10   there?
11   A.    Any instruments playing should be
12   playing in the harmony of A7.
13   Q.    What instrumentation has the
14   composer directed to be played based on that
15   A7?
16       MS. ELLIS:  Asked and answered.
17   A.    It's whatever instruments are
18   playing.  I mean, on the recording, of course,
19   it's the keyboard.  But I don't know what else
20   to say.  That's the harmony they are expected
21   to play there.
22   Q.    Right.  The chord A7 simply means
23   that whoever is playing this song on whatever
24   instrument they choose to play it on at this
25   point in the song, they should play something

Page 145

1    consistent with an A7 chord, right?
2        MS. ELLIS:  Asked and answered.
3    A.    Yeah.  I mean, I'm sure that the
4    composer thought of certain instruments.  I
5    mean, it's -- I mean, if you were to buy this
6    as a piece of sheet music it would say with
7    guitar chords or something like that.  Or
8    piano chords.  Those are the accompanying
9    instruments and that was the harmony that they
10   were directed to play.
11   Q.    Is the hi-hat in the sheet music?
12   A.    The hi-hat is a single -- is a
13   single -- per measure is a single beat which
14   is on the second half of the 4, B4, and there
15   are many indications within what's here, not
16   as hi-hats, but there are other precursors
17   that duplicate that in the baseline, for
18   example, and other places where the second
19   half of the fourth beat is struck.
20   Q.    Can you answer yes or no to this
21   question?  You don't have to.  I'm not telling
22   you you must.  I'm just saying can you answer
23   yes or no to the question is the hi-hat
24   notated in the sheet music in front of you in
25   the deposit copy?

Page 146

1      MS. ELLIS:  Asked and answered.
2      A.   I'm sorry.  But I lost my -- half
3  of my glasses on the way here today so I'm a
4  little --
5      Q.   Take your time.
6      (Document review.)
7      A.   No.  There's no indication of
8  hi-hat.
9      Q.   Okay.  Is there any percussion
10  indicated in the "Give" sheet music?
11      A.   Could you repeat that, please?
12      Q.   Actually, let me not.  I've got a
13  problem with the word "percussion."
14      Is the tom-tom part in "Give It
15  Up" notated anywhere in the deposit copy?
16      A.   No.
17      Q.   Is the cow bell indicated anywhere
18  in the deposit copy?
19      A.   The part for the cow bell?
20      Q.   The cow bell.
21      A.   No.
22      Q.   Do you make a distinction between
23  the cow bell and the cow bell part?
24      A.   The reason I asked that is because
25  I realize that the tom-tom actually shadows

Page 147

1  the base rhythms.  Actually, it's the same as
2  the base rhythm in "Blurred Lines."  But I
3  think it's also quite close to the base rhythm
4  here in "Got To Give It Up."  So there is no
5  tom-tom indicated but I think the rhythm's
6  here.
7      Q.   Okay.
8      A.   Because the tom-tom doesn't have a
9  pitch.
10      Q.   But the tom-tom is not in the
11  deposit copy.
12      A.   It doesn't say tom-tom on the face
13  of the deposit copy.
14      Q.   Does the deposit copy have any
15  notation for a tom-tom?
16      MS. ELLIS:  Asked and answered.
17      Q.   It has not been answered.
18      Does the deposit copy have any
19  notation for a tom-tom?
20      A.   I think the rhythms of the tom-tom
21  are indicated here.  And the tom-tom shadows
22  the rhythms that are already here and has no
23  pitch by itself.
24      Q.   Is it your opinion that the
25  deposit copy contains a tom-tom?

Page 148

1      MS. ELLIS:  Seth, she's given you
2  her answer.
3      MR. MILLER:  She has not given me
4  an answer.  She has evaded the answer.
5  I don't have the judge to call to
6  instruct her to answer.
7      A.   I would say that the tom-tom
8  content is shown here, but the tom-tom in
9  terms of indication of the instrument itself
10  is not here.
11      Q.   So when you're -- when the Gayes'
12  attorneys argue to the judge that the tom-tom
13  and the hi-hat and the keyboard and all those
14  parts are contained in the deposit copy, do
15  you opine that the composition in the deposit
16  copy contains a tom-tom?
17      A.   No.
18      Q.   Do you opine that the composition
19  in the deposit copy contains a cow bell?
20      A.   No.
21      Q.   Do you opine that the composition
22  in the deposit copy contains backup vocals?
23      A.   Well, actually, it does contain
24  some backup vocals.
25      Q.   Does it contain the backup vocals

Page 149

1  for the hook?
2      A.   No.  Not for the hook.
3      Q.   Okay.  Where does it contain
4  backup vocals, by the way?  You know what, I
5  don't care.  I'll find it.
6      Does the deposit copy for "Give"
7  contain the keyboard part?
8      A.   Again, it contains the content of
9  the keyboard part which is the chords.  The
10  keyboard part consists of repeated chords on
11  the off beats then that shift to another
12  repeated chord, et cetera.  And it re -- and
13  those chords comprise the harmonies that are
14  shown here.  So if the keyboard were played
15  and played anything other than the harmonies
16  shown here it would clash with the song
17  embodied here.
18      Q.   Are the chords played on the
19  keyboard in the Marvin Gaye sound recording of
20  "Got To Give It Up" notated anywhere in the
21  deposit copy?
22      MS. ELLIS:  Asked and answered.
23      Q.   It's a different question and you
24  may answer.
25      A.   There are two aspects of the

Page 150

```
 1   keyboard.  One is the keyboard's content,
 2   which is the harmonies that it's playing.  And
 3   the other part is the rhythms that those
 4   harmonies are playing in.  The harmonies are
 5   indicated here.
 6       Q.   Where in the deposit copy is the
 7   voicing flat 7, third, fifth, with the fifth
 8   on top, notated in the deposit copy?
 9       A.   Are you just -- that's called
10   voicing in terms of a chord.
11       Q.   That is correct.
12       A.   If -- it has to conform to the
13   chord indications in order for it to be
14   consonant with the vocal part.
15       Q.   Look, you're very experienced.  I
16   don't want to, you know, tire you out.  I'm
17   just asking you if the voicing of the Marvin
18   Gaye keyboard part is reflected in the deposit
19   copy anywhere.
20       A.   You're divorcing the voicing from
21   the harmony?
22       Q.   That was my question.
23       A.   No.  The voicing's not shown
24   there.
25            And the rhythm of the keyboard
```

Page 151

```
 1   part on the Marvin Gaye sound recording is not
 2   reflected anywhere in the deposit copy, is it?
 3       A.   No.
 4       Q.   Okay.  And, therefore, the only --
 5   actually, forget that.
 6            Is the -- so is the crowd noise on
 7   the Marvin Gaye -- the party noise as you
 8   called it -- sound recording notated anywhere
 9   in the deposit copy?
10       A.   I think I did see some in part 2.
11   It will take me a minute to find it.
12       Q.   Okay.
13            (Document review.)
14       A.   Yeah.  I'm sorry.  I'm a little --
15   my eyeglasses are not serving me right now
16   because, as I say, I lost a lens on my way
17   here.
18            But if you look on part 2 at the
19   bottom on page 2 -- it's a single page but the
20   second part of the single page where it says
21   page 2.
22       Q.   Yeah.
23       A.   It says "let's dance, let's shout,
24   gettin' funky," et cetera.  And I think there
25   were some others like that.  But that's one
```

Page 152

```
 1   place.
 2       Q.   Well, let's stop there for a
 3   minute.  Is it your opinion that the "let's
 4   dance, let's shout, gettin' funky's what it's
 5   all about" is intended to be voiced to the
 6   rhythm indicated in the X -- X marks that are
 7   on the top line of the stave directly above
 8   it?
 9       A.   Right.  And it sounds background.
10       Q.   Okay.  So that's a chanted or
11   spoken series of words to those rhythms as you
12   understand it?
13       A.   Right.  And then it says "ad lib"
14   at the end of that, meaning sort of keep on
15   going that way.  I guess ad lib -- or just
16   improvise there I guess is another meaning for
17   ad lib.
18       Q.   You're referring to "ad lib - long
19   fade"?
20       A.   Right.
21       Q.   Meaning the ending of "Got To Give
22   It Up," part 2, the 11-minute version on the
23   recording, correct?
24       A.   Yes.
25       Q.   Okay.  Other than that -- and you
```

Page 153

```
 1   believe that's the same party noise that's on
 2   the first four minutes of the "Give" sounding
 3   recording?
 4       A.   I don't know.
 5       Q.   Okay.
 6       A.   I didn't focus on that.
 7       Q.   And then if you look on -- I'm
 8   just going to help you out because I had this
 9   with Ms. Monson -- well, we don't even have to
10   search for it.
11            Somewhere within "Give" part 1
12   there's a notation of "we heard that;" is that
13   correct?
14       A.   Yep.  There is.  I'd have to find
15   it.
16            MS. ELLIS:  I believe it's page 3.
17       A.   Um-hum.
18       Q.   Okay.  So other than the "we heard
19   that" and the other couple of phrases we
20   talked about a second ago, is there any other
21   notation of the party noise in the deposit
22   copy?
23       A.   No.  I don't think so.
24       Q.   Is the falsetto vocal used by
25   Marvin Gaye on the sound recording notated in
```

Page 154

1  any fashion in the sound recording -- in the
2  deposit copy?
3       A.   In the selection of the use of the
4  falsetto voice?
5       Q.   Yes.
6       A.   No. It's not.
7       Q.   Is the vocal "woo" that you
8  referred to as a musical fingerprint, is that
9  notated in the deposit copy?
10      A.   No.
11      Q.   Are the hand claps on 2 and 4 or
12  on 2 and 4N that you talk about in your
13  report notated on the deposit copy?
14      A.   No.
15      Q.   Is the descending base that is
16  your musical example 6C in your preliminary
17  report notated in the deposit copy?
18      A.   Yes.
19      Q.   And show me where that's notated.
20      A.   It's in bar 4. And 7 in part 1.
21      Q.   Oh, so in bar 4 you're talking
22  about in the second half of the measure where
23  it goes from a D to a C natural to a G
24  natural; is that correct?
25      A.   That's right.

Page 155

1       Q.   And in bar 7 you're talking about
2  where it goes from a D to a C natural to an A,
3  right?
4       A.   Right. The G -- oh, excuse me.
5  The G natural goes up to an A in bar 5. I
6  just want to point that out. That's part of
7  that same melodic line.
8       Q.   And you still consider it to be an
9  descending base line even though the last
10 pitch actually ascends to the next measure.
11      A.   Well, yes. Because that ended on
12 the tonic of the scale. So it's not
13 descending right that moment but it's part of
14 that gesture.
15      Q.   Okay. And I asked you this in
16 your deposition and as I recall you -- well, I
17 won't summarize your deposition. But let me
18 ask you again, is that a very commonplace use
19 of a base to descend down to the root note of
20 the chord in the next measure ending on the
21 first beat of the next measure?
22      A.   I think when you become that
23 specific about the rhythms, I don't know
24 without researching it. A descending base in
25 itself has been seen in other literature but I

Page 156

1  don't know about the positioning of the rhythm
2  without researching it.
3       Q.   Well, okay. You're aware that a
4  descending base line is a commonplace device
5  or a gesture for a base to make in popular
6  music, right?
7            MS. ELLIS: Objection, vague.
8       A.   Yes. It is by itself. But these
9  are very alike in a lot of specific ways.
10 But, yes, it is by itself.
11      Q.   Okay. And you're aware that it's
12 common to use a descending base line at the
13 end of a phrase to transition to the first
14 chord of the next phrase, right?
15           MS. ELLIS: Objection, vague.
16      A.   Again, I haven't done the research
17 but I would say that there is -- there are
18 examples in the literature, yes.
19      Q.   Okay. And you're aware that it's
20 common in popular music to descend from the
21 fifth note of the chord down to the root of
22 the next chord, right?
23           MS. ELLIS: Objection, vague.
24 Assumes facts not in evidence.
25      Q.   Let me make it easier.

Page 157

1       A.   Your question isn't accurate.
2       Q.   Isn't it true that it's common for
3  the base to play both the root and the fifth
4  frequently in a base line? That's a common
5  use of a base?
6            MS. ELLIS: Objection, vague.
7  Assumes facts not in evidence.
8       A.   You mean without descending?
9  Just --
10      Q.   Yeah.
11      A.   Okay. Yes.
12      Q.   Okay. And so as a result of that
13 being common, it's quite frequent for a base
14 player in popular music to go from the fifth,
15 somewhere in the middle of the measure, and
16 walk on down to the root in the next measure;
17 that's common, right?
18           MS. ELLIS: Objection, vague.
19 Assumes facts not in evidence.
20      A.   It's not the root. It's the
21 tonic. The root means the root of a chord.
22 And it doesn't mean the tonic. I think you
23 mean the tonic.
24      Q.   I believe they are identical in
25 this case. Is the root of an A7 an A?

Page 158

```
1       A.  Yes.  Oh, I see.  You're talking
2   about it that way.  Okay.  I misunderstood.
3       Q.  Okay.
4           All right.  So your position,
5   without belaboring it, is that even though the
6   descending base figure in your example 6C has
7   somewhat different pitches and rhythms than
8   what's notated in the deposit copy.  It's all
9   the same thing for purposes of your analysis?
10      A.  I think I found three out of the
11  four notes the same.  I think it's definitely
12  closely related.
13      Q.  It didn't change your analysis
14  that what's in the deposit copy is different
15  from what you had notated in your example 6C?
16      A.  It's not different enough to
17  change my analysis.  It's not material.
18      Q.  Okay.
19          MS. ELLIS:  Seth, before you go on
20  can we take a break?
21          MR. MILLER:  I'm trying to wrap
22  this up and I don't really like taking
23  breaks anymore because you guys
24  disappear for a long time.  We're trying
25  to get out of here, too.  We have a
```

Page 159

```
1   plane issue, too.  So how long a break
2   do you need?
3           MS. ELLIS:  Five minutes.  Just
4   enough to grab some coffee and refresh.
5           MR. MILLER:  Okay.
6           THE VIDEOGRAPHER:  The time is
7   3:32 p.m.  We're going off the record.
8           (Recess taken.)
9           THE VIDEOGRAPHER:  The time is
10  3:41 p.m.  We're back on the record.
11  BY MR. MILLER:
12      Q.  Can you tell me what experience
13  you have specifically in whatever style of
14  music you would consider "Give" and "Blurred
15  Lines" to be, whatever the labels, R&B or soul
16  or whatever you want to call it.  What
17  specific expertise -- not expertise -- what
18  specific experience and training do you have
19  in that type of music?
20      A.  My training really applies -- the
21  kind of music I analyze is really immaterial.
22  I've analyzed and opined literally from all
23  over the world from all different cultures.
24  If it's got tones and pitches, I'm there.  I'm
25  capable --
```

Page 160

```
1       Q.  I am not --
2       A.  But, I'm not -- well, I'll just
3   finish.
4           But as far R&B, I mean, a lot of
5   the cases over the years that I've been asked
6   to be involved with do involve music of that
7   era.
8       Q.  Other than whatever cases you've
9   worked on over the years involving music of
10  the same style as these two songs, have you
11  had any formal training of any sort
12  specifically in that style?
13      A.  You mean did I take courses in R&B
14  music?  Is that what --
15      Q.  Exactly.
16      A.  No.
17      Q.  Okay.  Have you ever -- are you a
18  musician?  Do you play?
19      A.  Um-hum.
20      Q.  Have you ever played in any group
21  that plays that style of music?
22      A.  Oh, sure.  Yeah.
23      Q.  What sorts of groups did you play
24  in?
25      A.  Well, I mean, I changed to become,
```

Page 161

```
1   so to speak, a musicologist through my
2   graduate years and really didn't continue
3   actively performing.  But before then, yes, I
4   played all kinds of popular music and played
5   on the radio a great deal, actually, as a
6   child.  And as a young adult.
7       Q.  Did you play in bands that played
8   R&B and soul music similar to the style we
9   have in this case?
10      A.  I did.  I mean, I wasn't in an
11  official band but part of just my musical
12  activities did involve that, yeah.  As part of
13  my, you know, musical training and background.
14      Q.  Can you just tell me what that
15  was.  You played in a group in college or --
16      A.  Yeah, in college.
17      Q.  Okay.  So over the years when you
18  were younger you, from time to time, played in
19  bands that did this kind of music?
20      A.  I was -- I wouldn't call it a band
21  but I accompanied singers who were singing
22  this kind of music or I was in a group.  I
23  wasn't in a fixed banked.  But it was just --
24      Q.  Did you ever -- I'm sorry.
25      A.  I'm sorry.  It was just an
```

Page 166

```
1    "woo" in "Blurred Lines." I mean, it's a
2    repeated song. Anything that's similar is
3    similar often.
4        Q.   Well, I guess what I'm getting
5    at -- I mean, the hi-hat part in "Got To Give
6    It Up" does not repeat the end of 4 in that
7    same, you know, repeated way throughout the
8    song.
9        So why is that so unusual that
10   somewhere in "Got To Give It Up" there's one
11   or two hi-hats on the end of 4? How do you
12   pick that out as being so unusual?
13       A.   It's unusual that it's in "Blurred
14   Lines." It's not unusual in "Got To Give It
15   Up." That exact quality was found in "Blurred
16   Lines" also.
17       Q.   Having an open high on the end of
18   4.
19       A.   Yeah. It's such a specific
20   location.
21       Q.   Okay.
22       A.   And, you know, "Blurred Lines" --
23   I mean, excuse me -- "Got To Give It Up" is a
24   much more varied and frankly more
25   sophisticated song. It's got a lot more
```

Page 167

```
1    variation. It's not repetitive in the same
2    way as "Blurred Lines." It's not as heavily
3    structured and as predictable.
4        Q.   Have you ever used mashups in any
5    opinion you've done before this case?
6        A.   I've used the equivalent of
7    mashups, which is superimposing of music upon
8    other music to show similarities. But I've
9    never produced a mashup before for a case, no.
10       Q.   When you did it in other cases
11   were you taking a sound recording of a portion
12   of one song and playing it on a sound
13   recording of the other song.
14       A.   Yes. I've done that. But I've
15   also visually superimposed them, which is
16   another form of that.
17       Q.   Okay. And in the prior cases --
18   well, when you visually superimposed them, do
19   you take the same parts from each song and
20   superimpose them visually?
21       A.   It depends on what I'm trying to
22   demonstrate. But I've done both combining
23   parts and superimposing the same -- the
24   related parts.
25       Q.   And what is the standard
```

Page 168

```
1    musicological practice, if there is one, as to
2    using mashups in this kind of an analysis?
3        A.   You know, I don't -- it takes a
4    while for something to become a so-called
5    practice. Mashups are a pretty new form. I
6    can't answer that.
7        Q.   In the other cases where you did
8    mashups were you taking a portion of one song
9    and putting it on the allegedly similar
10   portion of the other song; or were you doing
11   what you did here where you take a portion of
12   one song and put it on a different portion of
13   another song?
14       A.   I answered that earlier.
15       Q.   You asked me that earlier?
16       A.   No. I answered you earlier with
17   that question.
18       Q.   Well, would you do me the favor of
19   answering me again.
20       A.   This is the first time I've done
21   an official mashup in the present context of
22   that word. But I've done what you would
23   consider sort of a precursor to mashups in
24   superimposing music either by tape or CDs with
25   one another to illustrate something.
```

Page 169

```
1        Q.   Okay. Have you ever done
2    something where you were superimposing pieces
3    of music by tape or CD where you took a vocal
4    part from one song and superimposed it over
5    the sound recording of the instrumental part
6    of the other song?
7        A.   I haven't but I've been in cases
8    where that's been done.
9        Q.   It's been done by you?
10       A.   No. I mean, I wasn't the person
11   who generated it. But, yes, I've seen it
12   done.
13       Q.   Was it done under your direction
14   as part of your report?
15       A.   No. I don't think so.
16       Q.   Okay. So this case is the first
17   time it's ever been done under your direction
18   to create an audio mashup like this, right?
19       A.   Well, as I say, because of the
20   technology changing, I've done super
21   impositions before. But not an audio level.
22   More on a visual level.
23       Q.   And by visual level you mean in a
24   transcription.
25       A.   Right. Showing the notes are the
```

Page 170

```
1    same.
2        Q.   So this is the first time you've
3    done it an audio format; is that correct?
4        A.   No.  It's the first time that I've
5    superimposed in an audio format.  I've done
6    lots of audio exhibits in earlier cases where
7    I'm showing similar sections superimposed.
8        Q.   Okay.
9        A.   But not in the same way that this
10   has been done.
11       Q.   Now, the three mashups here,
12   combine -- two of them combine the vocals of
13   "Got To Give It Up" over "Blurred Lines," one
14   for about a minute and a half, and the other
15   for a shorter period, like 20 seconds or
16   something, right?
17       A.   I remember that there's one that's
18   a minute and 20 seconds.  And I don't remember
19   how short the one you're referring to is.
20       Q.   It's 16 bars, though, so it's
21   short, right?
22       A.   I don't remember the length.  I'd
23   have to look at my report.
24       Q.   Okay.  I'm not worried about the
25   length.  You remember it was a short one as
```

Page 171

```
1    opposed to a longer one?
2        A.   I don't remember that.
3        Q.   Okay.
4        A.   It's been a while.
5        Q.   It has been at least a week or
6    two.
7             And then the third mashup is the
8    opposite.  It's the vocal of "Blurred Lines"
9    over the instrumentals of "Got To Give It Up,"
10   right?
11       A.   I think that's right.
12       Q.   And that one --
13       A.   But if I could look at my report I
14   spelled it out in a chart and I could look at
15   the chart.
16       Q.   If you honestly don't remember
17   things well enough to --
18       A.   Well, I don't remember the order
19   so I'd have to look at my chart.
20       Q.   I'm not going to be talking about
21   them in any specificity --
22       A.   Oh, all right.
23       Q.   You're not going to need which one
24   is which and how long they are.
25       A.   Okay.
```

Page 172

```
1        Q.   I was just trying to set a
2    framework.
3        A.   All right.
4        Q.   All right.  What is it that you
5    believe those mashups show, if anything, with
6    respect to similarity of the two songs?
7             MS. ELLIS:  Objection, vague.
8        A.   Sorry.  I'm getting distracted.
9             MS. ELLIS:  Actually, could she
10       wait to answer until Mr. King is done?
11            MR. MILLER:  Sure.
12       Q.   What is it that you believe the
13   mashups show, if anything, in terms of
14   similarity of the two songs?
15       A.   It shows that they blend together
16   sonically and that they're very congruent.
17   And it's used as a -- really I see it as sort
18   of a teaching mechanism to show that.
19       Q.   What does -- let's just say the
20   mashup of the "Blurred Lines" vocal over the
21   "Give It Up" instrumental.  Let's assume we're
22   talking about that one.  Let's actually talk
23   about that one.
24       A.   Um-hum.
25       Q.   In that mashup, what elements of
```

Page 173

```
1    "Blurred Lines" does it show, if any, are
2    similar to elements in "Give It Up"?
3        A.   I'd like to look at my section in
4    my report so I can answer you accurately.
5        Q.   Yeah, go ahead.
6        A.   Is that okay?
7        Q.   Go ahead.
8        A.   Can you tell me which page you're
9    on, please?
10       Q.   I'm not on any page.  I'm not
11   looking at your report.  I'm just going
12   loosely on memory.
13       A.   Oh, okay.  Just a minute then.
14            Okay.  It must have been in my
15   declaration.
16       Q.   I imagine it's in your -- I
17   believe there's a section in your 10/31 report
18   towards the end.
19       A.   I had a chart, though.  I thought
20   that was in my declaration.
21       Q.   There is no chart of mashups that
22   I'm aware of.  You mean a chart just
23   identifying what was in it?
24       A.   Each example, yeah.  Here it is.
25       Q.   Where you are?
```

Page 174

1    A.   I'm on page 37.
2    Q.   Oh, I see.  Okay.  So that
3  portion.  All right.  So --
4    A.   Okay.  Now I can answer you
5  better.
6    Q.   All right.  So the question was
7  what does the mashup example number 1, which
8  you have in front of you, which has vocals of
9  "Blurred Lines" over instrumentals of "Got To
10  Give It Up," what does that show as to any
11  similarities between elements of "Blurred
12  Lines" and elements of "Got To Give It Up"?
13    A.   Well, the idea --
14    MS. ELLIS:  Objection.
15    A.   The idea of this was -- so
16  similarity 6, 7 and 8 on the chart, examples
17  of the one referred to the base, the keyboard,
18  and some of the other instrumentation that is
19  in the accompany section --
20    Q.   Okay.
21    A.   -- of "Got To Give It Up."  And
22  that has an ongoing harmony and phrasing and
23  all as it continues for I believe it was one
24  minute and 20 seconds.
25    And then the part that blending

Page 175

1  with it in "Blurred Lines" is the vocal parts.
2  The signature phrase, the hook, et cetera.
3  The verse parts.  And the backup hooks.
4    And the idea is that they blend
5  very beautifully and what you'd consider
6  consonantly, meaning there wasn't a lot of
7  dissonance to them.  And I don't think they
8  would -- I'm sure they wouldn't blend so well
9  unless they were quite similar to one another
10  so -- because they wouldn't mesh like that.
11    Q.   Unless what were quite similar to
12  each other?
13    A.   The two songs.  So you were to
14  take the vocal lines that were with written
15  for "Got To Give It Up" instead of from
16  "Blurred Lines" it, of course, meshed because
17  that was a single song, but instead replace it
18  with the vocal lines from "Blurred Lines," it
19  meshes so well with "Got To Give It Up" that
20  it demonstrates that in a way they're
21  interchangeable.
22    Q.   Similarity number 1 is in example
23  number 1.  I'm looking on page 37, right?
24  Similarity number 1 of "Blurred Lines," right?
25    A.   Yes.

Page 176

1    Q.   And similarity 1 of "Blurred
2  Lines" is the signature phrase of "Blurred
3  Lines."
4    A.   That's right, um-hum.
5    Q.   Which is claimed to be similar to
6  the signature phrase in "Got To Give It Up,"
7  right?
8    A.   Yes.
9    Q.   Okay.  How does audio example
10  number 1 show that a signature phrase in
11  "Blurred" lines has any similarity, meaningful
12  similarity, to the signature phrase in "Got To
13  Give It Up"?
14    MS. ELLIS:  Objection and vague.
15    A.   Because it -- it does because it
16  would not blend with the instrumental portion
17  of "Got To Give It Up" if it weren't similar.
18    Q.   So is it your testimony that if I
19  took a melody and put it on "Got To Give It
20  Up" in the same two-measure, four-measure
21  phrasing -- actually, strike that.
22    Is it your testimony because the
23  vocal line in "Blurred Lines" fits over the
24  "Got To Give It Up" instrumental track, it
25  necessarily has notes and rhythms in common

Page 177

1  with the notes and rhythms in the signature
2  phrase of "Give"?
3    A.   Well, you have to realize that
4  it's not just the signature phrase.  It's the
5  signature phrase, the hook, et cetera.  In
6  "Blurred Lines" it's five of the similarities
7  in a row.
8    Q.   I see that here.  I'm starting
9  with similarity 1.
10    A.   Okay.
11    Q.   And I'm asking you why is it that
12  your audio example tends to show, one way or
13  the other, that the sequence of notes and
14  rhythms that constitutes the signature phrase
15  of "Blurred Lines" is similar in any
16  meaningful way to the sequence of notes and
17  rhythms that make up the signature phrase in
18  "Got To Give It Up"?
19    MS. ELLIS:  Objection, vague.
20    A.   Only because of the constant.  The
21  constant in this case is the instrumental
22  accompaniment that would normally accompany
23  the same song works very well with the other
24  song.
25    Q.   Is it your opinion, as a

Page 178

musicologist, as you sit here today, that because the melody contained in similarity number 1 in "Blurred Lines," meaning the signature phrase, because that fits in your opinion relatively consonantly over the instrumental track of "Got To Give It Up," therefore, it is necessarily more likely than not that the notes of that signature phrase are substantially similar to the notes of the signature phrase in "Got To Give It Up"?

A.   You're looking at it in an isolated way. It's not --

Q.   That's correct.

A.   Well, it's not a question that -- I can't answer it in that isolated way because that's not how this was designed.

Q.   Well, in that isolated way it doesn't show that, right?

A.   No, that's not true. It just wouldn't show it enough to persuade me that the songs are substantially similar alone.

Q.   Because it doesn't show you that any notes are the same.

A.   No. It would be too short.

Q.   It would be too short?

Page 179

A.   Yeah. You need consecutive time to pass where this coincides to understand that.

Q.   Suppose I create a recording where I play a -- well, I can't do that. Suppose I get a saxophone player to come in -- sorry, I didn't mean to make you lose your professional demeanor.

A.   Excuse me.

Q.   I get a saxophone player to come in and improvise a sax line over the instrumental track to "Got To Give It Up" and I tell him just whatever you do -- well, I just tell him to improvise a sax line over "Got To Give It Up." So plays a minute and 20 seconds' worth of tooting on his sax over o the chords of "Got To Give It Up."

Does that sax line which fits beautifully with the instrumental track of "Got To Give It Up" necessarily copy any notes of the signature phrase in "Got To Give It Up"?

MS. ELLIS: Incomplete hypothetical and vague.

A.   There are a lot of factors that

Page 180

would have to be in play. It's not just the chords. You could do that easily with just chords. But I'm talking about at least three -- actually a multiple --

Q.   Wait, wait, wait. Let me stop you because you didn't hear my hypothetical.

MS. ELLIS: She needs to finish her answer, Seth.

Q.   All right. Finish answer and then tell you why you didn't understand the hypothetical.

A.   In the instrumental track, for example, of "Got To Give It Up" you're talking about a lot of simultaneous material going at once. It's not just chords.

Sure, I mean, in a lot of music the chords -- the chord pattern is the same and you could superimpose a melody above it. You're talking about a keyboard part going, drums and other kinds of percussion going, a keyboard going, base going, et cetera, et cetera. All of that going at once and still blending with over -- with over a quarter of the length of the other song. It's over a minute.

Page 181

Q.   Okay.

A.   That's persuasive.

Q.   Okay. And let me ask you my hypothetical now so you understand it.

My hypothetical is you do the exact same mashup of audio example number 1 that you did in this case. You take your "Got To Give It Up" --

A.   Excuse me. I'm sorry.

Q.   You take your "Got To Give It Up" instrumental track, the same one you used in audio example number 1; bring in Mr. Sax player, tell him improvise a melody over this minute and 20 seconds over the "Got To Give It Up" instrumental track with all these complex parts that you talked about.

Does that one-minute-and-20-second improvisation of the melody by the sax player necessarily copy any series of notes in the signature phrase of "Got To Give It Up"?

MS. ELLIS: Vague. Incomplete hypothetical.

A.   I don't know. I'd really have to hear it to analyze it. Certainly it would have certain notes in common. It would have

## Page 182

```
 1   harmonies in common.  I don't know.  I'd have
 2   to hear it.  You know, I can't just --
 3       Q.   Well, I'm not asking you -- this
 4   hasn't happened.  This is a hypothetical.
 5       A.   I know, but I'm just saying, I
 6   really can't -- I would need to know -- hear
 7   the specific music to tell.
 8       Q.   Let me ask you a different way.
 9            Isn't it quite possible that the
10   sax player could come into the studio,
11   improvise a melody over the instrumental track
12   of "Got To Give It Up," the very same one you
13   used here, do a minute 20 seconds of
14   improvising melodies, and never copy any
15   meaningful sequence of notes of the signature
16   phrase of "Give;" isn't that possible?
17       MS. ELLIS:  Objection, vague.
18       A.   Again, I don't know because I
19   haven't heard it.  But the bottom line is that
20   this contains all these similarities.  You
21   know, if the sax -- I'd have to hear the
22   music.  It's just impossible for me to guess.
23       Q.   So you can't answer my question in
24   that sense.
25       A.   No.  No, I can't.
```

## Page 183

```
 1       Q.   Okay.  And you can't answer my
 2   question whether the fact that a signature
 3   phrase of "Blurred Lines" fits consonantly in
 4   your opinion over the instrumental track of
 5   "Got To Give It Up" tends to be prove or
 6   disprove that the actual notes of the
 7   signature phrase are substantially similar to
 8   the actual notes of the -- ah, I screwed that
 9   up, didn't I?
10            Isn't the -- the hand claps you
11   identified, that's commonplace; isn't that
12   right?  You're not saying that there's
13   anything unusual about having hand claps on 2
14   and 4 in a pop song, are you?
15       MS. ELLIS:  Objection.  Misstates
16   testimony.
17       A.   I haven't done prior art research
18   in this case, but I found two hand claps A and
19   B and they're both there in the other song.
20   That's a little more usual than just finding
21   one pattern.
22       Q.   You don't have any knowledge as
23   you sit here today one way or the other as to
24   whether those hand clap patterns are
25   commonplace in popular music.
```

## Page 184

```
 1       A.   I'm sorry.  I didn't hear the last
 2   part.
 3       Q.   Do you have any knowledge as you
 4   sit here today as to whether those hand clap
 5   patterns are commonplace in popular music?
 6       MS. ELLIS:  Objection, vague.
 7       A.   No.  I'm sure hand claps on 2 and
 8   4 are somewhat common.  But I would have to do
 9   more research to find out whether or not they
10   plus a hand clip on the -- you know, a quarter
11   note of 2 and 2/8ths on 4 combined are found
12   in the same composition.  That I don't know.
13       Q.   Okay.  Tell me why you believe the
14   lyrics of the two songs are substantially
15   similar.
16       A.   I said some lyrics are
17   substantially similar.  Not every single
18   lyric.  I pointed out the ones that were.
19       Q.   Okay.  So it's not all the lyrics;
20   it's only the lyrics you've actually quoted in
21   your report; is that correct?
22       A.   Thus far those are the
23   similarities that I found.
24       Q.   Okay.  Tell me why you think those
25   lyrics are similar?
```

## Page 185

```
 1       A.   Well, in some cases they're the
 2   same word.  In other cases they're the same
 3   meaning.
 4       Q.   So which words are the same?
 5       A.   The same?
 6       Q.   Yeah.
 7       A.   "Up," "down," "shake," "round,"
 8   for example.  I mean, I'd have to go through
 9   my report.  Then there's the section
10   "liberate" as opposed to "free."  There are
11   other things -- there's one, "you wanted" and
12   "you wanna" something or other.  They're very
13   close.  I'd have to go through my report to
14   give you more examples.
15       Q.   Can you give me a phrase -- you
16   know, a series of more than one or two words
17   that appears in both songs?
18       A.   The four words that are in
19   sequence are in four tiny little phrases one
20   after another.  "Up," "down," "shake,"
21   "round."  That's a lot of similarity in a row.
22   And they're both bridges.
23       Q.   Is the lyric "up," "down,"
24   "shake," "round"?
25       A.   No.  There are other words in
```

Page 186

1   between.  But very -- you know,
2   single-syllable words in between.  Very
3   little.  I mean, that's the concept of that.
4       Q.   Are there three words in a row in
5   the "Give" lyric that appear in the same
6   sequence in the "Blurred Lines" lyric?
7       A.   Well, other than "hey, hey, hey"?
8       Q.   Does "hey, hey, hey" appear in
9   "Give" in your opinion?
10      A.   Yes.
11      Q.   Those three words in a row?
12      A.   Well, it appears at least twice in
13  a row and at times with some intervening
14  words.
15      Q.   Okay.  If they're intervening
16  words it's not in a row, is it?
17      A.   I don't know.  But at least twice.
18      Q.   You'll grant me that, won't you?
19  Come on.
20      A.   I think twice is more than once.
21  So I'd say at least twice.
22      Q.   So you got the "hey, hey, heys."
23  Is there any other series of three words in a
24  row that you believe appears in the lyrics of
25  both songs?

Page 187

1       A.   In a row would nothing
2   intervening, I'd really have to look.  I don't
3   -- I'm really not sure.  There are some that
4   are very close.
5       Q.   But you can't identify any as you
6   sit here today?
7       A.   Not without going back over my
8   report.
9       Q.   And the lyrics you've identified
10  in your report, at least to date, are the
11  similarities you've been able to find.
12      A.   Yes.
13      Q.   And do you have any background in
14  literary analysis or any kind of skill that's
15  relevant to analyzing story line and meaning
16  and so forth?
17      A.   Oh, no.  But I do have expertise
18  in the setting of words to music.
19      Q.   Okay.  But it says in your Web
20  site, if I'm remembering correctly, that if
21  there's a sort of story line similarity
22  between lyrics, you will recommend it being
23  sent out to a poetry expert.  I don't know if
24  that's --
25          MS. ELLIS:  Objection.  The

Page 188

1   document speaks for itself.
2       A.   It doesn't say that on my Web site
3   but -- but if it's of a literary nature rather
4   than a musical nature, yes.
5       Q.   Okay, fine.
6          So you have no training or
7   expertise specifically, do you, in looking at
8   themes and lyrics and, you know, underlying
9   meanings as opposed to just comparing the
10  words themselves?
11      A.   No.  I mean, I've opined on music
12  involving literary themes in opera, for
13  example, and many other musical forms for many
14  years and have been hired and accepted as an
15  expert in that way.  But, no, I'm not a
16  literary expert.  You're right.
17      Q.   And you have no formal training in
18  that type of analysis, right?
19      A.   Well, as I say, my training is as
20  it relates to music, yes.
21      Q.   Okay.
22          MR. MILLER:  I'm going to catch a
23  plane, too, unless you have questions.
24          MS. ELLIS:  No.  Can we go off the
25  record for a minute and a half and just

Page 189

1   make sure we don't have anything?
2          MR. MILLER:  Sure.
3          (Discussion held off the record.)
4          (Time Noted:    4:13 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18                  _____
19                  JUDITH FINELL
20
21  Subscribed and sworn to before me
22  this ____ day of _____, 2014.
23
24  _____
25

48