| | |
|---|---|
| Paul H. Duvall (SBN 73699)<br>E-Mail: pduvall@kingballow.com<br>KING & BALLOW<br>6540 Lusk Blvd., Suite 250<br>San Diego, CA 92121<br>(858) 597-6000<br>Fax: (858) 597-6008<br>Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye | Richard S. Busch (TN BPR 014594)<br>(*pro hac vice*)<br>E-Mail: rbusch@kingballow.com<br>KING & BALLOW<br>315 Union Street, Suite 1100<br>Nashville, TN 37201<br>(615) 259-3456  Fax: (615) 726-5417<br>Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye |
| Mark L. Block (SBN 115457)<br>E-Mail: mblock@wargofrench.com<br>WARGO & FRENCH LLP<br>1888 Century Park East; Suite 1520<br>Los Angeles, CA 90067<br>(310) 853-6355 Fax: (310) 853-6333<br>Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye | Paul N. Philips (SBN 18792)<br>E-Mail: pnp@pnplegal.com<br>The Law Offices of Paul N. Philips<br>9255 West Sunset Boulevard<br>West Hollywood, CA 90069<br>(323)813-1126 Fax: (323) 854-6902<br>Attorney for Defendant and Counter-Claimant Marvin Gaye III |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. CV13-06004-JAK (AGRx)<br><br>Hon. John A. Kronstadt<br><br>**COUNTER-CLAIMANTS' JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 5 TO EXCLUDE CERTAIN TESTIMONY FROM PLAINTIFFS' EXPERT, GARY COHEN**<br><br>Date: January 26, 2015<br>Time: 3:00 p.m.<br>Ctrm: 750<br><br>Action Commenced: August 15, 2013<br>Trial Date: February 10, 2015 |

## I. INTRODUCTION

Counter-Claimants Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III (collectively, "Counter-Claimants" or "the Gayes"), by and through counsel, respectfully request that this Honorable Court deny Plaintiffs' Motion in Limine No 5. Plaintiffs' Motion seeks to exclude a portion of Gary Cohen's expert testimony related to millions Plaintiffs' earned based on the popularity of their infringing work.

Plaintiffs, Pharrell Williams, Robin Thicke, and Clifford Harris Jr., initiated this lawsuit against Marvin Gaye's children, asking the Court for a declaration that "Blurred Lines" does not infringe on the musical composition "Got to Give it Up." Plaintiffs' filed this suit in order to attempt to protect the millions upon millions of dollars they earned by exploiting the infringing work.  In response, the Gayes filed a Counterclaim, asserted ownership in Marvin Gaye's copyrighted works, "Got to Give it Up" and "After the Dance," and asked for a finding of copyright infringement and damages from Plaintiffs. Plaintiffs now seek to keep millions of the dollars they earned, even if they are determined to have infringed on "Got to Give it Up" and "After the Dance," by excluding tour and live performance revenue related to the infringing works, "Blurred Lines" And "After the Dance."

## II. STATEMENT OF FACTS

The Gaye children own the copyrights in the musical compositions "Got to Give it Up" and "After the Dance," (Attached to Busch Decl. as **Exhibits 1, 2, 9, 45, 47;** Dkt. No. 91-2). Marvin Gaye created the musical composition of "Got to Give it Up" contemporaneously with his recording of the song. (Dkt. No. 117 at 10 ¶¶ 5-6). Plaintiffs subsequently infringed these works and reaped millions of dollars in profits. (*See* Cohen Initial Report, attached to Busch Decl. as **Exhibit 30**). The Gayes retained an academic expert to show how the marketing and success of the song "Blurred Lines" has financially benefitted Robin Thicke and Pharrell Williams. (*See* Alleyne Expert Report, attached to Busch Decl. as **Exhibit 25**).  As the Gayes' expert opined, the marketing of the infringing works was designed to allow Thicke to "rid[e] . . . the coattails of Marvin Gaye's legendary

status." (Busch Decl. 25 at Ex. C, at 3). The Gayes' expert showed that Thicke's popularity stems almost entirely from his association with the infringing works. For instance, Dr. Alleyne noted "[n]one of Robin Thicke's singles prior to 'Blurred Lines' had achieved remotely comparable sales success." (*See id.* at 20). Prior to "Blurred Lines," Thicke was a marginal artist with very little commercial success. In 2006, Thicke sold almost a million copies of the single "Lost Without U" which peaked at number 14 on the Billboard Hot 100 Chart. (*Id*. at 24). In the nearly seven years between that release and the release of "Blurred Lines," Thicke never again even came close to having a hit single. During this period he released 8 singles, five of which never even sold well enough to make the Billboard top 100 singles, and none of which cracked the top 50 of Billboard's weekly chart. Not only did he not have a hit during this period, but "[s]ales of each of Thicke's three albums preceding *Blurred Lines* (from 2008 to 2011) showed progressive commercial decline." (*Id*. at 25). At the beginning of 2013, Thicke's career was at a standstill and he was virtually unknown outside his limited fan base.

Thicke's career was changed entirely by his association with Marvin Gaye through the release of the infringing "Blurred Lines." Thicke's "Blurred Lines" set the all-time record for radio audience, reaching 229 million listeners in a single week. (*Id.* at 20). Further, "Blurred Lines" was the worldwide best selling single of 2013. (*Id.* at 20-21). "Blurred Lines," as of April 2014 was the most downloaded track of all time in the United Kingdom and its video has been viewed more than 346,000,000 times on YouTube. (*Id.* at 23). Based on this information, Dr. Alleyne was able to opine that Robin Thicke's "alignment with and utilization of Marvin Gaye's number one hit 'Got to Give it Up' . . . was pivotal in creating this unprecedented" rise to fame. (*Id*). In fact, "[s]ales of each of Thicke's three album preceding *Blurred Lines* . . . showed progressive commercial decline, as did his post-*Blurred Lines* album. (*Id.* at 25). It is only when Thicke was associated with Gaye that he achieved success. Following "Blurred Lines," Thicke's next single release "Give It 2 U" was relatively well received as his association with Gaye continued in the culture. However, following that single, Thicke's sales performance continued into steady

decline with his most recent single, "Get Her Back," peaking at number 82 on the Billboard Hot 100. (*Id*. at 24).

The clear evidence shows nearly the entirety of Thicke's popularity and commercial appeal arises from the infringement of Gaye's works. As such, it is obvious that there is a causal connection between the infringing work and Thicke's touring income following the release of the infringing works. When Thicke is associated with the music of Marvin Gaye he has commercial appeal. When forced to stand on his own work, he does not. There is simply no basis to deny the Gayes' right to Thicke's touring profits which can only be found to arise from his association with the infringing works.

## III. ARGUMENT

### A. There Is A Causal Nexus Between Plaintiffs' Touring And Live Performance Income And Their Infringement And The Gayes Are Entitled To A Portion Of This Revenue.

One does not have to be a music industry expert to recognize that at least some fans attended Robin Thicke concerts because the infringing work was the 2013 song of the summer. The Gayes will put forth evidence showing a causal nexus between the unprecedented international popularity of the infringing works and Robin Thicke's touring and live performance income and the Gayes have hired a music industry financial expert to value the revenue generated from fans attending Robin Thicke's concerts based on the popularity of the infringing work.

A copyright owner is entitled to recover "any profits of the infringer that are attributable to the infringement." 17 U.S.C. 504(b)(1976). Under Ninth Circuit law, profits attributable do not have to be direct profits. *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710 (9th Cir. 2004). In order to recover profits attributable, a copyright owner need only show a causal link. *Id*. at 710-11 (citing *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). In proving such indirect profits attributable, a copyright owner is tasked with two burdens: (1) showing a causal nexus; and (2) apportioning the profits. *Id*. at 711.

- 3 -

The proof provided in Exhibit 25 attached to the Busch Declaration and at trial will show the causal nexus between the infringing works and Robin Thicke's touring and live performance income. As discussed above, there is overwhelming proof that Robin Thicke's popularity was driven, at least in part, by the infringing works. First, there can be no doubt that "Blurred Lines" was the song of the summer in 2013. This composition drove millions and millions of fans to listen to Thicke's music. Many of these fans clearly came to Thicke's concerts based on the infringing works and his connection to Marvin Gaye. This is clear because Thicke's popularity sky rocketed with the release of the infringing works and then almost immediately dissipated after these infringing works ran their course and Thicke was forced to release new original material. Thicke has never been an elite performer or earner, except during the time when he was closely associated with Marvin Gaye by virtue of infringing upon Gaye's intellectual property. This proof more than shows the necessary causal nexus.

In order to meet the second part of their burden, the Gayes' retained a well-respected music industry accountant, Gary Cohen, as an expert to testify as to the apportionment of the touring and live performance profits attributable to Plaintiffs' infringement. (*See* Busch Decl. Exs. A, B). Plaintiffs' Motion admits that Cohen is an accounting expert. (Dkt. No. 168 at 7). In fact, Mr. Cohen has testified as a music industry accounting expert in a number of jurisdictions and his testimony has been universally accepted. (*See* Cohen CV, attached to Busch Decl. as **Exhibit 31**).

While it is certainly arguable that nearly all of Robin Thicke's touring and live performance income came from the popularity of the infringing works based on Thicke's career arc as laid out by Dr. Alleyne, Mr. Cohen took a more conservative approach to apportioning this revenue. Instead of simply calculating 100% of this revenue, Mr. Cohen conservatively apportioned the revenue and estimated that Thicke's touring and live performance income was attributable to the performance of specifically identified compositions during Thicke's concert performances. Plaintiffs attack this methodology as

unreliable, but offer no proof to contradict any of the facts or the methodology relied on by Mr. Cohen.

This sort of general technical complaint, without proof of unreliability, goes to the weight accorded to expert testimony and not to its admissibility. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (citing *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982)). The Ninth Circuit has been clear that even "[s]haky" evidence "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Under the protocol for the allowance of expert testimony in federal courts, courts are to act as gatekeepers, not fact finders. *Id*. at 565 (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).

Mr. Cohen's methodology is a conservative attempt to apportion profits that are obviously attributable to the infringing works. The evidence will show that Robin Thicke's touring and live performance income is attributable, at least in part, to the infringing works. Mr. Cohen's report sets forth his methodology in a precise manner. While Plaintiffs certainly have the right to attack Mr. Cohen's methodology at trial, there is no basis for excluding this testimony and thereby entirely depriving the Gayes of profits which rightfully belong to them.

**B. Plaintiffs' Second Argument Is Incorrect And Unsupportable On Its Face.**

Finally, Plaintiffs seek to exclude Cohen's testimony by wrongly claiming that the Gayes would only be entitled to a nominal licensing fee for live performances of the infringing works. This is simply not true. The Gayes are entitled to seek direct damages relating to the infringing works, but they are also entitled to seek to recover indirect damages which resulted from fans attending Robin Thicke's concerts because of the great popularity of "Blurred Lines." *See generally Polar Bear Prods., Inc.*, 384 F.3d 700. Plaintiffs are well aware of this distinction, as their Motion repeatedly relies on principles

related to indirect profits. This secondary argument is simply an attempt to confuse the Court and exclude reliable and relevant evidence.

## IV. CONCLUSION

For the reasons stated above, Counter-Claimants respectfully request that the Court deny Plaintiffs' Motion *in Limine* No. 5 as requested above.

Dated: January 13, 2015                Respectfully submitted,

                                       KING & BALLOW

                                       By: /s/ Richard S. Busch
                                       RICHARD S. BUSCH
                                       PAUL H. DUVALL

                                       WARGO & FRENCH, LLP

                                       By: /s/ Mark L. Block
                                       MARK L. BLOCK

                                       *Attorneys for Defendants and Counter-Claimants Nona and Frankie Gaye*

                                       THE LAW OFFICES OF PAUL N. PHILIPS

                                       By: /s/ Paul N. Philips
                                       PAUL N. PHILIPS

                                       *Attorney for Defendant and Counter-Claimant Marvin Gaye III*