Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
KING & BALLOW
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000
Fax: (858) 597-6008
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Richard S. Busch (TN BPR 014594)
(*pro hac vice*)
E-Mail: rbusch@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 Fax: (615) 726-5417
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East; Suite 1520
Los Angeles, CA 90067
(310) 853-6355 Fax: (310) 853-6333
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Paul N. Philips (SBN 18792)
E-Mail: pnp@pnplegal.com
The Law Offices of Paul N. Philips
9255 West Sunset Boulevard
West Hollywood, CA 90069
(323)813-1126 Fax: (323) 854-6902
Attorney for Defendant and Counter-Claimant Marvin Gaye III

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,

Plaintiffs,

vs.

BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,

Defendants.

AND RELATED COUNTERCLAIMS

Case No. CV13-06004-JAK (AGRx)

Hon. John A. Kronstadt

**COUNTER-CLAIMANTS' JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE OF MARVIN GAYE SOUND RECORDINGS**

Date: January 26, 2015
Time: 3:00 p.m.
Ctrm: 750

Action Commenced: August 15, 2013
Trial Date: February 10, 2015

## I. INTRODUCTION

Counter-Claimants Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III (collectively, "the Gayes"), by and through counsel, respectfully request that this Honorable Court deny Plaintiffs' Motion in Limine No 1. Marvin Gaye's commercially available sound recordings of "Got to Give it Up" and "After the Dance," as well as those of Robin Thicke's "Blurred Lines" and "Love After War," and related expert testimony, are essential evidence in the action and admissible under Federal Rules of Evidence 401 and 403 and Ninth Circuit precedent. Not only are the entire compositions at issue embodied within those recordings, but the recordings are also the best and most complete examples of the expression of the underlying compositions. Listening to the recordings is the only way a jury can possibly determine whether an "ordinary observer" would recognize the appropriation under the intrinsic test; it is also the only way a jury can make a determination with respect to "the total concept and feel" of the songs. They are relevant to the jury's finding of substantial similarity under both the extrinsic and intrinsic tests. Excluding the recordings would be highly prejudicial to the Gayes, and would be the only time a court would have precluded a jury from listening to the commercial recordings at issue in a case like this. Plaintiffs do not cite a single case supporting this motion.

## II. STATEMENT OF FACTS

The Gaye children own the copyrights in the musical compositions "Got to Give it Up" and "After the Dance." (Dkt. No. 91-2, Ex. A-B). Marvin Gaye created the musical composition of "Got to Give it Up" contemporaneously with his recording of the song. (Dkt. No. 117 at 10 ¶¶ 5-6). Shortly thereafter, an unknown person created a lead sheet for the composition "Got to Give it Up" and filed it with the U.S. Copyright Office in 1977. (Dkt. No. 139 at 8). In fact, two separate and very different lead sheets for "Got to Give it Up" were filed with the Copyright Office. (Attached to Busch Decl. as **Exhibits 1** and **2**).

Plaintiffs and the Gayes have retained experts who have provided in-depth reports analyzing the substantial similarities between the works at issue in this case. While Plaintiffs and the Gayes' experts disagree on exactly which elements of the compositions are included

in the lead sheet, (Dkt. No. 173, at 3-11; Finell Decl. at ¶ 13-16, attached to Busch Decl. as **Exhibit 3**; Monson Decl. at ¶¶ 15-18, attached to Busch Decl. as **Exhibit 45**) all experts agree that a full composition is embodied within a sound recording and that lead sheets do not fully encompass the composition. (*See* Wilbur Dep. 403:19-404:-10, 416:25-417:8, Dec. 4, 2014, attached to Busch Decl. as **Exhibit 4** ("[T]he song is embedded in the recording."); Monson Dep. 16:16-20, 25:22-26:4, Dec. 3, 2014, attached to Busch Decl. as **Exhibit 5** ("[T]he lead sheet is not the full composition."); Busch Decl. Ex. 3 at Ex. C ¶ 40). Plaintiffs' own expert admitted that a lead sheet is a "simplified, less fleshed-out" version of the composition. (*See* Wilbur Dep. 106:9-15, 131:6-133:24, Aug. 27, 2014, attached to Busch Decl. as **Exhibit 6**). Most importantly, all experts, including Plaintiffs' expert, Sandy Wilbur, listened to Marvin Gaye's and Robin Thicke's commercially available recordings to prepare their expert reports concerning the infringement. (*See* Wilber Musicological Analysis, attached to Busch Decl. as **Exhibit 7** at ¶ 2; Ex. 4 at 493:5-8; Ex. 3 at Ex. D; Ex. 45 at B).

## III. ARGUMENT

### A. The Lead Sheet Cannot Reflect the Entire Composition.

Plaintiffs assert that the lead sheets deposited with the Copyright Office are the full compositions of "Got to Give it Up" and "After the Dance," and that the jury should be permitted to consider only the lead sheets in this copyright infringement case. That is incorrect as a matter of law. While "Got to Give it Up" and "After the Dance" were created prior to 1978, and are subject to the requirements of the Copyright Act of 1909, whereby unpublished works required the deposit of a visually perceptible copy along with an application for copyright registration, Plaintiffs have cited no legal authority which states that the composition *is limited to* what is deposited with the Copyright Office.[1] (Dkt. No. 165 at

[1] Plaintiffs also cite Nimmer on Copyright, stating, "In order to *claim* a copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form." (Dkt. No. 165 at 7) (emphasis added). However, nothing in Nimmer's comment limits the scope of the composition to that which was deposited with the Copyright Office.

6). Rather, the deposit copy requirement under 17 U.S.C. § 408(b) is simply "to identify the copyrighted work for the purposes of registration." *Scentsy, Inc. v. B.R.* Chase, 942 F. Supp. 2d 1045, 1050 (D. Idaho) *aff'd in part, den'd in part* 585 F. App'x. 621 (9th Cir. 2014); Paul Goldstein, Goldstein on Copyright § 3.8 (2013).

While Plaintiffs cite to a large excerpt of *ABCKO Music Inc. v. LeVere*, discussing the history of the 1909 Act, the cited language provides no basis for limiting the scope of the musical compositions "Got to Give it Up" and "Love After War" to the lead sheet provided with the copyright application, which only identifies the works for purposes of registration. 217 F. 3d 684, 691 (9th Cir. 2000). While Plaintiffs also cite 17 U.S.C. § 303 and over-extend *ABKCO* to imply that all provisions the Copyright Act of 1976 have retroactive effect, (Dkt. No. 165 at 6-7), by specific language included in the 1976 Act, and not case law, the Act limited the retroactive effect *only* to distribution prior to 1978; *ABKCO* simply reiterated the language of 17 U.S.C. § 303.

In Plaintiffs' Motion for Summary Judgment, the Court rejected Plaintiffs allegations that "the scope of a registered copyright is limited to what is set forth in the copyright deposit," because the requirement that the entire copyrightable content be deposited with the Copyright Office was implemented under the 1976 Act, not the 1909 Act. (Dkt. No. 120 at 29; Dkt. No. 139 at 9). Relying on the court's holding in *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338 (9th Cir. 1981), that the deposit requirement has "no effect whatsoever on the validity or enforceability of a copyright," this Court stated, "[c]ontrary to Plaintiffs' assertions, in neither case would the copyright deposit necessarily limit the scope of the material protected" (internal citation omitted). Had Congress desired such retroactivity, as it did with the distribution/publication distinction, the current statute would so read and it does not. *See* 17 U.S.C. § 101 *et seq.* Neither the 1909 Act, nor the 1976 Act require the entire copyrighted work to be deposited with the Copyright Office prior to January 1, 1978. *Id.*; 35 Stat. 1075.

Plaintiffs infer, but cite no applicable legal authority, that the Gayes bear the burden of proving the scope of their copyrights. (Dkt. No. 165 at 8).[2] The language of the Copyright Act of 1909 imposes no such burden. Rather, the Gayes must prove ownership of copyrights in "Got to Give it Up" and "After the Dance," subject to the registration requirements of the 1909 Act, which the Gayes have satisfied. (*See* Dkt. No. 165 at 7); *Three Boys Music Corp.*, 212 F.3d 477, 481 (9th Cir. 2000).[3] Based on the foregoing, the scope of the musical

---

[2] Plaintiffs quote *Petrella v. Metro-Goldwyn-Mayer, Inc.*, in an attempt to invoke a burden on Plaintiffs to prove the scope of their copyright. (Dkt. No. 165 at 8). *Petrella* states that "both the certificate and original work must be on file with Copyright Office before a copyright owner can sue for infringement." 134 S. Ct.1962, 1977 (2014) (citing 17 U.S.C. §§ 408(b), 411(a)). This quote implicates no burden. Instead, it states that the deposit requirement of the 1909 Act must be fulfilled. The Court does not discuss, nor does it require the entire work be deposited with the Copyright Office under the 1909 Act. Further, *Petrella* states that "the registration mechanism . . . *reduces* the need for extrinsic evidence." *Id.* However, *Petralla* does not *eliminate* the need for extrinsic evidence, implying that such extrinsic evidence remains significant. *Petrella* also indicates that the certificate, deposited work and alleged infringing work are "key evidence" in litigation, but does not indicate that they are the only forms of evidence that matter in litigation. *Id.*

[3] Plaintiffs are wrong that proof of ownership has not been produced. Plaintiffs, in their Motion for Summary Judgment and during discovery, produced "true and correct" copies of the originally deposited lead sheets and registrations of "Got to Give it Up" and "After the Dance," with the copyright office, which name Jobete Music Company Inc. as the copyright claimant. (Dkt. No. 91-2). *See Bank of Am., NT & SA*, 285 F. 35 764, 776 (9th Cir. 2002) ("Once evidence offered against one party is deemed authentic, its authenticity is established as against all other parties as well.") (internal citations omitted). Plaintiffs represented to the Court in their Motion for Summary Judgment that the lead sheets were those filed with the original copyright registrations. Documents produced during discovery are deemed authentic and representations by counsel in a brief to the court as to their authenticity are the "functional equivalent of 'admissions on file.'" *See Kesey LLC v.* Francis, No. CV 06-540 AC, 2009 WL 909530, at *46, *aff'd,* 433 F. A'ppx. 565 (9th Cir. 2011); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F. 2d 244, 226 (9th Cir. 1988). Documents have been produced, including the administrative agreements between Jobete and the

compositions of "Got to Give it Up" and "After the Dance" are not, and cannot, by virtue of the absence of such obligation under the 1909 and 1976 Acts, be limited to what is in the lead sheets deposited with the Copyright Office.

**B. Commercially Available Sound Recordings and Comparative Demonstration Recordings Were Presented to the Jury in *Three Boys Music Corp. v. Bolton.***

*Three Boys Music Corp. v. Bolton* involved facts nearly *identical* to the ones at issue in this action: a popular post-1978 composition infringed upon a copyright granted under the 1909 Copyright Act. 212 F. 3d at 480-81. The Court allowed the jury to hear and analyze the compositions, as expressed in the respective artists' commercially available sound recordings, even though the recordings contain elements not in the deposited lead sheet. *Id.* at Trial Tr. 7:21-25, 337:13-18, 524:6-12, 789:17-24 (attached to the Busch Decl. as **Exhibit 8**). Thereafter, comparative demonstration recordings were also presented to the jury for analysis. *Id.* at Trial Tr. 1140:10-1142:3. The jury, in finding infringement had occurred, determined that, among other things, a unique combination of unprotectible elements in both works made the works substantially similar. *Id.* at 486. Compositional elements not in the lead sheets were part of the infringement finding. *Id.* at Trial Tr. 760:18-761:15.

**C. The Ninth Circuit Affirmed in *Three Boys Music Inc.* and Found No Error Had Occurred, Setting a Precedent Other Courts Have Followed.**

After hearing the composition as embodied in the respective artists' commercially

---

*See Siniouguine v. Mediachase Ltd.*, No. CV 11-6113-JFW AGRX, 2012 WL 2317364, at *4 (C.D. Cal. June 11, 2012) (declaring copyright ownership as the employment agreement "clearly provide[d]"). The renewal copyright registrations listing the Gayes as owners have also been produced, and a print-out from the copyright office website (attached to Busch Decl. as **Exhibit 47**) confirming the same, is sufficient to prove ownership and admissible at trial. *Eagle Rock Entm't, Inc. v. Coming Home Prods.*, Inc., No. CV03571FMCAJWX, 2004 WL 5642002, at *11 n.13 (C.D. Cal. Sept. 1, 2004)

available sound recordings and comparative demonstration recordings, "[t]he jury…'found infringement based on a unique compilation of those elements. We refuse to interfere with the jury's credibility determination, nor do we find that the jury's finding of substantial similarity was clearly erroneous.'"[4] *Id.* at 485-86. The Court noted it is "well-settled" that a combination of unprotectible elements can be protected and infringed upon. *Id.* at 485. The Ninth Circuit expanded this ruling in *Swirsky v. Carey*, 376 F. 3d 841, 848 (finding infringement based on a combination of individually unprotectible elements, listing examples including genre, and citing additional cases that have allowed a combination of unprotectible elements to be protected).

**D. The Compositions as Expressed in the Respective Artists' Commercially Available Sound Recordings are Necessary for the Jury to Determine Substantial Similarity.**

The respective artists' commercially available sound recordings of "Got to Give it Up" and "After the Dance" are relevant in that they will assist the jury in performing the intrinsic test and have the tendency to make the fact at issue in the case—copyright infringement—more or less probable. Fed. R. Evid. 401. Further, the sound recordings have a high probative value in determining the ultimate fact at issue and their exclusion will unduly prejudice the Gayes.

As discussed in Section A above, the scope of the composition is not limited to what is contained in the deposit copy. Rather, as the experts noted, the expression of the entire musical compositions are embodied in Marvin Gaye's sound recordings of "Got to Give it

---

[4] While this Court has stated that the jury's consideration of sound recordings in *Three Boys Music Corp.*, was harmless error, the Gayes respectfully disagree. The Gayes read the Ninth Circuit's affirmation of the jury's finding of infringement, based in part on elements not contained within a pre-1978 Act musical composition deposit copy, after listening to the sound recordings, was reviewed on a clearly erroneous standard, and the court would not reverse absent such a finding. The appellate court did not discuss a finding of a lower threshold of error, or state there was "harmless error". *Three Boys Music Corp.*, 212 F. 3d at 485-86.

Up" and "After the Dance." (Dkt. No. 112-3 at 11, ¶¶ 40-41; Busch Decl. Ex. 5 at 16:16-20). In ultimately determining whether infringement exists, the jury must analyze the works under both the extrinsic and intrinsic tests. *Three Boys Music Corp.*, 212 F.3d at 485. Indeed, there would be no way for the jury to determine whether the ordinary observer would recognize the appropriation or be able to compare the works total concept and feel, without listening to the entirety of the works, and, as described below, every court has admitted the artists' commercially available recordings as evidence in every similar case.

**i. The Sound Recordings are Necessary for Determining Whether a Combination of Unprotectible Elements is Protectible Under the Extrinsic Test.**

The extrinsic test requires analytic dissection of the works, in which the jury breaks the works "down into their constituent elements, and compar[es] those elements for proof of copying as measured by substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). In denying Plaintiffs' Motion for Summary Judgment, the Court analyzed only the deposited lead sheets of the works. (Dkt. No. 139). Nonetheless, in doing so, the Court noted, at least eleven times, that its decision not to analyze elements allegedly not contained in the lead sheet at that time was for the purpose *of that Motion only*. *Id.*

It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because 'the over-all impact and effect indicate substantial appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485; *see also Radin v. Hunt*, LA CV10-08838 JAK (SSx), at 4 (C.D. Cal. Dec. 15, 2011). In order to find such a combination protectible, "the jury must be allowed to see the complete work." *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 988 (9th Cir. 2009). "To pull [compositional] elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis." *Swirsky*, 376 F.3d at 848.

In a case referenced in the Court's Order denying Plaintiff's Motion for Summary Judgment, Counter-Defendant UMG Recordings, Inc. put forth a similar argument in order to preclude presentation of the sound recording to the jury in *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, another case involving infringement of a composition and not the sound

recording, which was successfully opposed by the Gayes' counsel, Mr. Busch. 585 F. 3d 267 (2009), Trial Tr. at 8:8-11:5, attached to the Busch Decl. as **Exhibit 11**; (Dkt. No, 139 at 11).

Like in *Three Boys*, the Gaye's experts have testified that Plaintiffs copying was not limited to elements only in the lead sheets. Therefore, the evidence of Plaintiffs' copying of the compositions may be found in the commercially available sound recordings, in addition to being in the lead sheets. Moreover, the fact that both lead sheet and non lead sheet elements of "Got to Give it Up" are embodied in "Blurred Lines" is probative and is circumstantial evidence of the copying of "Got to Give it Up," since the copying of these so called nonprotecable elements is at minimum circumstantial evidence that the "protectible" elements were copied. *Three Boys Music Corp.*, 212 F.3d at 481 ("Proof of copyright infringement is often highly circumstantial, particularly in cases involving music.").

The full compositions as embodied in the respective artists' commercially available recordings were presented to the jury in *Three Boys Music Corp.* and should be presented to the jury in this case. Exclusion of the recordings would be error for multiple reasons: (1) It would exclude the entire "Got to Give it Up" composition; (2) it would prevent comparison of protectible and nonprotectible elements; (3) It would exclude direct and circumstantial evidence of copying; and (4) It would prevent analysis under the ordinary observer, concept and feel, and extrinsic/intrinsic test, generally.

**ii. Proper Analysis Under the Intrinsic Test is Impossible Without Listening to the Compositions as Expressed in the Sound Recordings**

The jury must also perform the intrinsic test and decide, in viewing the works as a whole, "whether the ordinary, reasonable person, would find the total concept and feel of the work to be substantially similar." *Three Boys Music. Corp.*, 212 F.3d at 485 (citations omitted)." "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator." *Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The perspective of the audience that the product was intended for is the relevant perspective. *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 734 (4th Cir. 1990). Listening to

the recordings is also the only way for the jury to determine qualitative importance or the ordinary observer test.

Multiple courts have allowed recordings of allegedly infringed musical compositions, registered under the 1909 Act, to be analyzed by a jury in determining substantial or striking similarity between the works.[5] In the cases listed in the footnote 5 below, the alleged infringed copyright was registered before sound recordings were allowed to be used as deposit copies. Nonetheless, in each case the court allowed the full sound recordings to be played either for the trier of fact or to determine whether the case should proceed to the trier of fact. Moreover, in *Selle v. Gibb*, the Seventh Circuit specifically referred to recordings played for the district court to "more concretely" support its determination of striking similarity. 741 F.2d at 905. Plaintiffs have cited not a single case to the contrary.

For purposes of the intrinsic test, the sound recordings are the best evidence to satisfy the law's requirement that the jury review the whole works. All experts significantly relied on the commercially available Marvin Gaye and Robin Thicke sound recordings in rendering their musicological opinions. (Busch Decl. Ex. 8 at ¶ 2; Ex. 4 at 493:5-8; Ex. 4 at Ex. B, ¶ 1;

---

[5] *See, e.g., Selle v. Gibb*, 741 F.2d 896, 903 n.3 (7th Cir. 1984) ("[B]oth songs were played on numerous occasions in open court for the jury to hear . . ."); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) ("After listening to the compositions as played in the phonograph recordings submitted by defendant . . ."); *Repp v. Webber*, 892 F. Supp. 552, 558 (S.D.N.Y. 1995) ("Having listened to the two songs at issue, however, the Court cannot say as a matter of law that they do not share any substantial similarities. In making this determination, the Court considered the 'total concept and feel' of the works in question."); *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 398 (S.D.N.Y. 1952) ("We have suffered through the playing of the commercial recordings."); *see generally Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002); *see also Three Boys Music Corp.*, 212 F.3d 477, Busch Decl. Ex. 8 at Trial Tr. at 7:21-25, 337:13-18, 524:6-12, 789:17-24,; *Navara v. M. Witmark & Sons*, 185 N.Y.S.2d 560, 561-62 (Sup. Ct. 1959) ("[T]he jury requested to hear once more recordings of the two musical compositions involved. The jury's request was granted and they were returned to the court room where the two recordings were played and then again retired to deliberate."); *Rich v. Paramount Pictures*, 279 P.2d 782, 784 (1955) ("The jury heard the accusing and accused compositions played on the piano and on phonograph records.").

Ex. 45 at Ex. B, ¶4). As Judith Finell stated, "The recording of 'Got to Give it Up' represents the composition in its most complete form." (Busch Decl. Ex. 3 at Ex. C ¶ 40). "It is important to compare not only musical notation but also the sound of the recordings. Resemblances that may not be apparent in the details of measure-by-measure transcription may be perceived in relationship to a larger musical context." (*See* Busch. Decl. Ex. 45 at Ex. B). Further, as this is a case involving music, the perspective audience is the listening public; the average listeners are people who generally do not read sheet music.

**E. Admission of the Sound Recordings Are Necessary to Prevent Confusing the Jury and Confusing the Issues.**

Plaintiffs assert that the musicologists are capable of playing the compositions on the piano.[6] While the experts may play the keyboard at times during trial, because this is not the manner in which the commercially released works are either heard or expressed, relegation of the musical evidence to only keyboard playing will be more prejudicial and confusing to the jury than probative of the similarities between the works. The experts may also play the keyboard differently; therefore, accuracy is far from assured. Finally, the Gayes are alleging lyrical similarities in relation to the musical expression, and the jury would not be able to properly make all of the required determinations discussed above, without, among other things, hearing the lyrics as they were originally expressed. (*See* Busch. Decl. Ex. 7 at 8-32; Ex. 3 at ¶¶ 13-16; Ex. 45).[7]

## IV. CONCLUSION

For the reasons stated above, the Gayes respectfully request that the Court deny Plaintiffs' Motion *in Limine* No. 1 as requested above.

---

[6] Should the Court ultimately determine that there are elements of the sound recordings that are not protectible (a point on which the Gayes' would disagree), it would be far more prejudicial to the Gayes to exclude the sound recordings, which fully embody the compositions at issue, entirely, than to simply provide a limiting instruction as to those elements. *See Scentsy, Inc.*, 585 F. App'x. at 622.

[7] The admissibility of expert testimony is set forth in Counter-Claimants' Oppositions to Plaintiffs Motions in Limine No. 2 and No. 7, which are fully incorporated herein.

Dated: January 13, 2015

Respectfully submitted,

KING & BALLOW

By: /s/ Richard S. Busch
RICHARD S. BUSCH
PAUL H. DUVALL

WARGO & FRENCH, LLP

By: /s/ Mark L. Block
MARK L. BLOCK

*Attorneys for Defendants and Counter-Claimants Nona and Frankie Gaye*

THE LAW OFFICES OF PAUL N. PHILIPS

By: /s/ Paul N. Philips
PAUL N. PHILIPS

*Attorney for Defendant and Counter-Claimant Marvin Gaye III*