1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4               THE HONORABLE JOHN A. KRONSTADT

5            UNITED STATES DISTRICT JUDGE PRESIDING

6

7    Pharrell Williams,                    )

8                        Plaintiff,        )

9                                          )

10   vs.                                   )   Case No.

11                                         )   CV 13-6004-JAK(AGRx)

12   Bridgeport Music, Inc., et al.,       )

13                        Defendants.       )

14   _____       )

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                  Final Pretrial Conference

19                   Los Angeles, California

20                 Monday, January 26, 2015

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
 1    APPEARANCES:

 2

 3      FOR PLAINTIFFS AND      KING, HOLMES, PATERNO & BERLINER, LLP

 4      CROSS-DEFENDANTS:       BY:  HOWARD E. KING

 5                                   SETH A. MILLER

 6                              1900 AVENUE OF THE STARS

 7                              25TH FLOOR

 8                              LOS ANGELES, CA 90067

 9

10      FOR DEFENDANTS AND      KING & BALLOW

11      COUNTER CLAIMANTS       BY:  RICHARD S. BUSCH

12      NONA GAYE AND FRANKIE        SARA R. ELLIS

13      GAYE:                   315 UNION STREET, SUITE 1100

14                              NASHVILLE, TN 37201

15

16                              KING & BALLOW

17                              BY:  PAUL H. DUVALL

18                              6540 LUSK BOULEVARD, SUITE 250

19                              SAN DIEGO, CA  92121

20

21      FOR DEFENDANT AND       LAW OFFICES OF PAUL  N. PHILIPS

22      COUNTER CLAIMANT        BY:  PAUL N. PHILIPS

23      MARVIN GAYE, III:       9255 WEST SUNSET BOULEVARD, SUITE 920

24                              WEST HOLLYWOOD, CA  90069

25
```

1           <u>Los Angeles, California, Monday, January 26, 2015</u>

2                              <u>2:47 p.m.</u>

3                              -oOo-

4           THE COURT:  Good afternoon.  CV 13-6004, *Williams vs.*

5  *Bridgeport.*

6                Would you state your appearances, please.

7           MR. KING:  Howard King for plaintiffs and

8  cross-defendants.

9           THE COURT:  Good afternoon, Mr. King.

10          MR. MILLER:  Seth Miller for plaintiffs and

11 cross-defendants.

12          THE COURT:  Good afternoon, Mr. Miller.

13          MR. BUSCH:  Richard Busch on behalf of Nona and

14 Frankie Gaye.

15          THE COURT:  Good afternoon, Mr. --

16          MS. ELLIS:  Sara Ellis on behalf of Nona and Frankie

17 Gaye.

18          THE COURT:  Good afternoon.

19          MR. DUVALL:  Paul Duvall on behalf of Nona and Frankie

20 Gaye.

21          MR. PHILLIPS:  Paul Phillips, your Honor, on behalf of

22 Marvin Gaye, III.

23          THE COURT:  Good afternoon.

24          We are here for the Final Pretrial Conference.  I was

25 just handed now some new submission from the defendants.

4

```
 1          MR. BUSCH:  Your Honor, there are a few pages from the
 2   Three Boys trial transcript that I was going to reference today
 3   that I just wanted your Honor to have.
 4          THE COURT:  Why were they first submitted now?
 5          MR. BUSCH:  To be honest, your Honor, we just -- they
 6   are further support for the statements that we made in our
 7   motion in limine, but they were overlooked when we went through
 8   the Three Boys transcript, but they are relevant and important,
 9   your Honor.
10          THE COURT:  I think I've already ruled on this.  I'm
11   not going to revisit issues that were addressed in the motion
12   for summary judgement.  Both sides are trying to renew issues.
13   I'm not going to do that.
14          I already addressed, I think in that order, how I read
15   the Three Boys Ninth Circuit decision.  It was not error to have
16   admitted this.
17          Do you think this transcript shows something other
18   than that?
19          MR. BUSCH:  I think that this transcript shows several
20   things, your Honor.
21          First, I think this transcript shows very clearly that
22   in Three Boys, the Court allowed the jury to hear, and it went
23   to the jury, all of the elements of the composition, not just
24   those that were in the lead sheet, and that two of the five
25   findings of copyright infringement were based upon elements that
```

1   were not in the lead sheet.

2         Also the transcript shows as well that with respect to

3   certain of the things that were in the lead sheet, the pitches

4   in the sound recording do not match the lead sheet exactly.

5   There was variations and that was allowed to be submitted as

6   well.  And the Ninth Circuit affirmed the finding of --

7         THE COURT:  Without discussing any of that; right?

8         MR. BUSCH:  Well, they did discuss it.  There were

9   five -- the Ninth Circuit --

10        THE COURT:  They said they have jurisdiction

11  notwithstanding the argument that there was no jurisdiction;

12  right?  And then they said there was no error.

13        MR. BUSCH:  They said that they -- let me say this,

14  your Honor.

15        They said that they review jury decisions on a clearly

16  erroneous standard.  If in fact as a matter of law only those

17  items that in a lead sheet are allowed to be submitted to the

18  jury, that seems to me to be a clear, erroneous error of law

19  that would have been reversed by the Ninth Circuit.

20        THE COURT:  Okay.  I think I have to read the Ninth

21  Circuit decision on its face.  I don't think I do a legislative

22  history review of how the Ninth Circuit might have gotten to its

23  conclusion, do I?

24        MR. BUSCH:  Well, the Ninth Circuit affirmed the jury

25  decision allowing finding of copyright infringement to stand

1    based upon the elements that were in and were not in the lead

2    sheet, and two of the five were not in the lead sheet.

3             THE COURT:  Okay.  I'll look at this.

4             A couple of things.  Just so we -- my expectation is

5    if you have something to submit, submit it timely and not the

6    afternoon of the hearing so that I get a chance to glance at it.

7             With respect to these -- the Library of Congress, is

8    this to address just authentication?

9             MR. BUSCH:  Your Honor, well, we have been discussing

10   with opposing counsel getting this, and we have received it, and

11   so Ms. Ellis handed it up, but that was not even supposed to be

12   handed up, your Honor, but, yes.  It deals with several issues.

13            THE COURT:  What are the issues?

14            MR. BUSCH:  Well, I don't believe ownership should be

15   an issue for trial.  I think that the issue of ownership should

16   be resolved and that there is no legal issue on ownership or

17   compliance with the Copyright Act and so therefore it's one of

18   those issues.

19            THE COURT:  Is there an issue about that?

20            MR. MILLER:  Yes, your Honor.

21            THE COURT:  Could you stand when you speak, please.

22            What's the issue?

23            MR. MILLER:  The issue is we do not have evidence that

24   the deposit copies that we submitted, admissible evidence for

25   the trial that the deposit copies submitted on summary judgement

1    necessarily are the ones that were submitted with the copyright

2    registrations because we were unable to obtain any kind of

3    certification prior to the summary judgement motion from the

4    Library of Congress.

5           We had a vendor give a declaration that said she was

6    handed this from the Library of Congress and was told that's

7    what it was, but we don't have any direct certification of that

8    from the --

9           THE COURT:  Well, do you have the certification from

10   the Library of Congress signed by Deidra Scott?

11          MR. MILLER:  What you are holding in your hand,

12   your Honor, was handed to me two minutes ago.  I haven't had a

13   chance to look at it.

14          THE COURT:  Okay.  So that's the issue, is whether

15   this is an authenticated government record of what was filed in

16   the copyright deposit?

17          MR. MILLER:  Correct.  If we -- after the hearing,

18   we'll look at this.  If we agree that there's no authentication

19   issue, fine.  If we think there is one, then we'll --

20          THE COURT:  Okay.  Is there any other issue being

21   addressed by the --

22          MR. BUSCH:  It all relates to the ownership and the

23   registration, and my view is that there's no issue for trial on

24   that.

25          THE COURT:  Okay.  Just a minute.

1          You filed quite a few motions in limine, and although

2    on some occasions I might have simply sent them back to you and

3    said *give me the three that are most important to you,* I've

4    looked at all of these.

5          Similarly, you filed collectively more than a hundred

6    proposed voir dire questions, and I was attempted to do the same

7    thing.  We're not going to ask each juror 150 voir dire

8    questions, and I was attempted to do the same, but instead I've

9    been through all of those.

10         Third, you've -- in your witness list, the total

11   number of hours that you estimate is about 70, independent of

12   jury selection, opening and closing arguments.  Seventy hours

13   would itself be about 12 days.  This trial is not going take

14   that long.

15         So after I finish with the motions in limine, that's

16   going to reduce some of these hours given that I think some of

17   these witnesses won't testify, but I'll reflect on -- I'll make

18   a final decision later, but my present view is that each of you

19   should have 18 hours, including opening and closing.  So anytime

20   a witness is on and you're examining the witness, whether

21   direct, redirect, cross, anytime you're speaking to the jury,

22   you're on the clock.

23         That's my present thinking.  There have been very few

24   occasions where I've found counsel needed more time than I told

25   them they would have.  But I started where I did -- when I get

1   150 voir dire questions and lots of motions in limine, I think

2   you need to be warned, cautioned, that if I hear witnesses being

3   asked the same questions over and over, if I hear that kind of

4   time -- that's how you're spending your time and then we get to

5   the end of the -- you know, your allotted time and you say you

6   need more time, I'm going to say no, you don't.  Okay?  Just so

7   we're all clear going in what my expectations are.

8          Now, with respect to the motions in limine, starting

9   with plaintiffs' motions in limine, No. 1, to exclude the Marvin

10  Gaye sound recordings, my tentative view, I would grant the

11  motion.  I've already addressed this.  I don't think these are

12  part of the protected things.  I don't think the *Three Boys* case

13  persuades me otherwise.  I've just been handed something new.

14  I'll take a look at it.

15         If the plaintiffs have something new based on the

16  transcript of the *Three Boys* case, get me that by Wednesday of

17  this week.

18         But his -- it's a pre-'76 Copyright Act case.  His

19  voice is not part of what was registered and --

20         MR. BUSCH:  Can I be heard on that, your Honor, for a

21  brief second?  This is essential to this case --

22         THE COURT:  It may be, but what's different than when

23  we discussed it at the summary judgement?

24         MR. BUSCH:  Well, two or three things.

25         No. 1, we're talking about the extrinsic or the

1    intrinsic test here and -- two things.

2            No. 1, the compositional elements that were taken in

3    this case were not taken -- they didn't go to the lead sheet,

4    Robin Thicke and Pharrell Williams did not go to the lead sheet

5    and copy from the lead sheet.  They copied from the recording

6    that they listened to.

7            Elements that they copied, both lead-sheet items and

8    non-lead-sheet items, were copied.  The fact that non-lead-sheet

9    items were copied from the recording, compositional elements, is

10   at least, at minimum, circumstantial evidence that the

11   lead-sheet items were also copied because there's a copying of

12   both.

13           THE COURT:  Okay.

14           MR. BUSCH:  So to -- to not -- to disallow the

15   recordings from being listened to would prevent us from putting

16   on evidence of the totality of what was copied.

17           THE COURT:  Okay.  I think that that -- I think I've

18   addressed this before.  As I said, I'll look at the *Three Boys*,

19   and I think the argument you're making is a 403 issue.

20           MR. BUSCH:  Well, we're not going to be able to put on

21   our case, your Honor, in any way, shape, or form without

22   listening to the recordings --

23           THE COURT:  That's a choice you can make.

24           MR. BUSCH:  Well --

25           THE COURT:  That's a choice for you to make.  I don't

1    agree with you.

2              MR. BUSCH:  Every single court that has --

3              THE COURT:  I think what you need to do is to listen

4    to what I'm saying.  I've already addressed --

5              MR. BUSCH:  I did, your Honor --

6              THE COURT:  Excuse me.  Now you're interrupting me.

7    Is that really what you want to do?

8              MR. BUSCH:  No, sir.

9              THE COURT:  I've addressed this before.  We can agree

10   to disagree.  I'm not inclined to admit the recordings.  And I'm

11   not inclined to do so with the mash-ups either.

12             I think there are other ways for you and your experts

13   to present precisely the things you're talking about through

14   keyboards.  And I'm not inclined to have a piano here either.

15   You can use keyboards.

16             MR. BUSCH:  Your Honor, may I say something?

17             THE COURT:  Sure.

18             MR. BUSCH:  We have cited to your Honor at least seven

19   or eight cases that have almost exactly the same facts where

20   they are pre-'76 recordings, and in every case, the court

21   allowed the recordings played.

22             In *Three Boys*, your Honor, just for the record --

23             THE COURT:  I think we've already discussed *Three*

24   *Boys*.  What else?

25             MR. BUSCH:  The sound recordings were played at least

seven different times throughout the trial.

In addition, in every case we've cited to your Honor and to the Court, recordings were played.  I don't see -- and I understand on summary judgement your Honor was looking at a different test.  Your Honor was looking at the extrinsic test.

In the intrinsic test, the jury has to make a determination of the concept and feel, of the overall concept and feel, how -- would a lay listener recognize the appropriation.  All of those things.  That would be impossible to do if you can't play the recording.

THE COURT:  I think you can play them with a keyboard. I'll look at this transcript, but I'm not persuaded at this point.

Motion in Limine No. 2 from the plaintiffs, to exclude the testimony of Judith Finell and Ingrid Monson.  My tentative view is I would deny the motion, provided, however, I don't think either of these experts needs to use the words *substantial similarity* in part of his or her opinion.

That's the legal test.  That's the ultimate issue.

Excuse me.  If you're going to shake your head while I'm speaking, that's not going to be considered polite.  I'm not going to shake my head when you're speaking, so I expect the same from you.

Now, the ultimate -- is there something on your mind? The ultimate issue in this case -- it's not uncommon for an

 1   expert witness not to give -- to opine with respect to the

 2   ultimate issue that a jury is to address.  And that's the

 3   substantial similarity issue.

 4        My point is that I don't know that the word

 5   *substantially similar* is something that the expert has to say in

 6   terms of framing his or her opinion because that is the ultimate

 7   issue in the case, as opposed to describing based on the

 8   expert's analysis what the similarities are and why they're

 9   material.

10        MR. BUSCH:  We have cited cases where I believe the

11   courts have allowed experts to offer the opinion on substantial

12   similarity, and one of the issues is is it qualitatively

13   important to the original song and how -- and the issue of

14   substantial similarity goes to the qualitative --

15        THE COURT:  Well, again, qualitative -- I'm talking

16   about the word *substantial*, the words *substantial similarity*.

17        *In your opinion, is this recording substantially*

18   *similar to this sheet,* is the ultimate issue in the case for the

19   jury.  Do you agree with that?

20        MR. BUSCH:  I agree -- I do agree that substantial

21   similarity is what the Court -- ultimately the jury needs to

22   conclude.  But I also believe that it is a function of listening

23   to the music and determining, as experts would, whether they are

24   in fact substantially similar and not just similar.  I believe

25   it will guide the jury in that regard.

 1          THE COURT:  I think where we're disagreeing is whether

 2     the words *substantially similar*, those two words can be used,

 3     which is what the jury is going to be instructed it needs to

 4     decide.  And I think there are other ways for the experts to

 5     give exactly the same opinions without using those specific

 6     words, the ultimate issue for the jury.  That's my point.  So

 7     I'm not persuaded that the testimony should be excluded.

 8          Similarly, in terms of the -- well, that's where I am.

 9          Is there something you want to address?

10          MR. MILLER:  Yes.  There are a couple of sub-issues in

11     the motion I just want to make sure I'm clear on the Court's

12     ruling.

13          We had -- there was a new issue of -- let me start

14     with the first one.  The first one was limiting their opinions

15     to elements of similarity that are found in the actual deposit

16     copy as opposed to elements of the sound recording that are not

17     in the deposit copy, not owned by the Gayes, and therefore not

18     relevant to whether there is any copying of protectable

19     material.

20          THE COURT:  Well, the basis for their -- as of now,

21     the sound recordings are not going to be admitted for this

22     trial, but, you know, experts can listen to sound recordings as

23     part of their analysis.  They simply can't opine that *the sound*

24     *recording that I've listened* -- if I've concluded that the sound

25     recording is not admissible, then they can't opine that it's

1    because of listening to the sound recording that they've

2    concluded that there's some -- you know, the material

3    similarity.  But I don't think they're precluded because they

4    listened to the sound recording.

5               MR. MILLER:  Okay.  I think that's what I was trying

6    to clarify.  It's the testimony about *this is similar to that*

7    when *this* is not part of the deposit copy, as opposed to --

8               THE COURT:  Well, I think their testimony is going to

9    have to be based on the deposit copy.  It's not to say they

10   can't have listened to the sound recording as part of their

11   analysis.  They simply can't present to the jury an opinion that

12   says, *Because I listened to the sound recording, I've reached*

13   *this conclusion.*

14              MR. MILLER:  And then the other sub-issue I had was

15   there were some new issues with lyrics that came up in the

16   expert reports, and the opinion -- the argument in the motion

17   was simply that basically this is the idea that -- some kind of

18   thematic similarity alone and none of the lyrics were the same

19   is something that should go before the jury.  It just seems to

20   me to be --

21              THE COURT:  Are you talking about the story lines?

22              MR. MILLER:  The story lines, yes.

23              THE COURT:  Well, I didn't find that particularly

24   compelling.  I didn't think that had to be excluded.

25              What's your position?

16

```
 1              MR. BUSCH:  My position is I agree with you on that

 2   one.

 3              I did want to say one thing, your Honor, that I think

 4   is very important that -- what Mr. Miller just said that needs

 5   to be addressed.

 6              Mr. Miller said that if the compositional elements are

 7   not in the lead sheet, then the Gayes do not own those

 8   compositional elements.  That is incorrect.

 9              THE COURT:  I understand.

10              MR. BUSCH:  And the composition -- the lead sheets

11   registered with the Copyright Office as a matter of law beside

12   the case is for identification for registration only.  The

13   compositional elements -- the entire composition is owned by the

14   Gayes and that is just another point that I -- and I -- I --

15   this case is very important to my clients.

16              THE COURT:  Every case that's here is important to

17   everyone.

18              MR. BUSCH:  It is.  And we put -- and I -- I do

19   believe, with all due respect --

20              THE COURT:  Don't say that.  Again, that's an error

21   lawyers make.

22              MR. BUSCH:  Well --

23              THE COURT:  I don't want to hear *due respect*.  I

24   assume there's respect.

25              Go ahead.  We can agree to disagree.  You don't offend
```

1    me.

2              MR. BUSCH:  The composition is whether it's in the

3    deposit lead sheet or not -- the composition as it is embodied

4    within the sound recording.  There are compositional elements

5    that are identified and recognized as part of a composition.

6    They are in the sound recording.

7              The fact that they are not -- some may be a little

8    varied, some may not be in the lead sheet.  It does not restrict

9    the copyright infringement claim.

10             And by making the ruling that your Honor is doing, it

11   is in some way suggesting that the lead sheet is the entirety of

12   the composition and that the compositional elements in the sound

13   recording are not either owned by the Gayes or relevant to this

14   case, and I respectfully disagree.

15             THE COURT:  That's fine.  Thank you.

16             Motion in Limine No. 3, to exclude the audio examples.

17   This is the same issue.  I don't think that these mash-ups that

18   have been created using Marvin Gaye's voice are appropriate for

19   the reasons that we've agreed to disagree on.

20             I believe that the same experts can create the same

21   mash-ups without his voice.  They can use a keyboard or other

22   device to do it.

23             MR. BUSCH:  And may -- I just very briefly want to say

24   so there is -- it is not that we're saying his performance is

25   part of this claim.  It is the composition as embodied in the

1   sound recording that is the claim.

2          The fact that Marvin Gaye's voice appears in the sound

3   recording, it's not -- just for the record, it is not his

4   performance that's being --

5          THE COURT:  Okay.  I understand.  402, 403.

6          A, I'm not persuaded that it's relevant, but if it

7   were relevant, I think 403, prejudicial effect outweighs the

8   probative value given that you should be able to capture what

9   you contend to be the appropriate elements beyond what's -- the

10  appropriate interpretation of the sheet by using something other

11  than his voice.

12         MR. BUSCH:  How would we do that?

13         THE COURT:  With a keyboard.

14         MR. BUSCH:  The keyboard is not the way the ordinary

15  observer hears the song and the keyboard cannot reflect the

16  entirety of the compositions together in unison.  It's not going

17  to present the jury or this Court with a fair representation of

18  the actual composition as they are commingled within the

19  recording.

20         THE COURT:  Okay.  I understand.

21         Is there something you wish to add on this?

22         MR. MILLER:  I mean, I would just repeat that I would

23  like to know that we have a clear playing field for trial, and

24  part of the -- Section 9 of the 1909 Act says you secure the

25  copyright by publishing it with notice.  Presumably we will

1  either stipulate that what they just handed me today is the

2  deposit copy or they will prove it some other way.

3  　　　　　THE COURT:  Well, what is your position with respect

4  to what I have said?  Why couldn't the mash-ups include

5  something other than Mr. Gaye's voice?

6  　　　　　MR. MILLER:  Well, the mash-ups that were created do

7  not include something other than Mr. Gaye's --

8  　　　　　THE COURT:  That's not what I asked you.  Why couldn't

9  the mash-ups include something other than his voice?  What I'm

10 excluding is his voice because under 403, I think its

11 prejudicial effect outweighs its probative value because they

12 can be presented in another way.  I'm not ruling that they can't

13 be presented.

14 　　　　　MR. MILLER:  Well, if someone were to play the piano

15 part, they play the vocal melody of *Got to Give It Up* on their

16 piano over the commercial recording of *Blurred Lines*, that would

17 eliminate at least the issue of bringing the sound recording

18 into it.

19 　　　　　The problem is it still is not relevant to show in any

20 way extrinsic similarity for the reasons we've discussed in the

21 motion.

22 　　　　　THE COURT:  Okay.  All right.

23 　　　　　MR. BUSCH:  Your Honor, can I get one point of

24 clarification?

25 　　　　　THE COURT:  Yes.

1          MR. BUSCH:  Can we play the recordings without Marvin

2    Gaye's voice?

3          THE COURT:  I don't know.  I haven't heard them.  I

4    haven't seen them.  I haven't considered them.

5          MR. BUSCH:  Okay.  So can --

6          THE COURT:  You can meet and confer about that.

7          What I'm saying is my expectation is -- I'm addressing

8    what's the record now.  Okay?  That's -- and the answer to my --

9    the answer is I've said I don't expect Marvin Gaye's voice to be

10   part of this case.

11         However, the mash-ups, which can, I think, be redone

12   in some other fashion, and until you do it, until defense --

13   plaintiffs' counsel has an opportunity to listen to it, I don't

14   know if there's a disagreement.

15         MR. BUSCH:  So we've agreed that technically the

16   demonstrative exhibits are due to be exchanged on Friday of this

17   coming week.  In light of a couple of these rulings -- well,

18   even before your Honor's rulings, I spoke to Mr. Miller outside

19   the courtroom before today's hearing and asked whether we could

20   agree to at least put it off until Monday of next week, and

21   we've agreed to do that.

22         THE COURT:  That's fine.  The more you can do

23   collaboratively, the better.

24         MR. MILLER:  I want to make crystal clear for the

25   record that there is nothing in the instrumental portion of the

1  sound recording that is reflected in the deposit copy, and we

2  certainly would object to any playing --

3            THE COURT:  Okay.

4            MR. MILLER:  -- of the sound recording or --

5            THE COURT:  I don't know that I agree with that

6  interpretation.  I think there's a distinction between deposit

7  copy being a written document and what that means.  What that --

8  how that music can -- what that music means when played.  And I

9  don't know that I -- I don't think I agree with you that it's

10 only the deposit copy.

11           It depends on how -- how it's being -- it depends on

12 what the evidence is that's being offered.  As I stated, I don't

13 plan to have any voice for Marvin Gaye, but I don't know what

14 else is being contemplated until I know and you've seen it.  I

15 can't address the issue, but if I agreed with you now, I

16 wouldn't, as I say -- don't bother to meet and confer.  So there

17 we'll agree to disagree.

18           MR. BUSCH:  Can I say one thing about what Mr. Miller

19 just said?  I want to say something for the record on something

20 that he said about the registration requirement because I just

21 want to be very -- I think it's very important to note.

22           And that is with respect to the registration

23 requirements, the Ninth Circuit has ruled that it is -- that the

24 copyright plaintiff only need file the copyright registration

25 and then the burden is on the defendant to show some conformity

```
 1    with that registration.  So we have done that.
 2              THE COURT:  Frankly, it would surprise me if you're
 3    not able to agree on the authenticity of the deposit copy and
 4    that's how each of you wants to spend some of your time at
 5    trial.  But if that happens, it happens.
 6              Just a minute.
 7              Motion in Limine No. 4, to exclude evidence of lay
 8    opinions regarding similarity of the sound recordings, I would
 9    grant this motion.
10              Articles in the popular press, blog posts, interviews
11    with musicians, this is all hearsay and 403.
12              MR. BUSCH:  May I --
13              THE COURT:  Briefly.
14              MR. BUSCH:  Briefly?
15              So the Universal Music Group launched a marketing
16    campaign where they solicited blogs to promote Blurred Lines.
17    Within -- those blogs then reported about the similarity between
18    Blurred Lines and Got to Give It Up.
19              One of the damages that we are entitled to obtained is
20    profits attributable to the infringement.  We have a marketing
21    expert, who -- and -- who will testify, unless you want to
22    exclude him -- will testify that the marketing campaign
23    inextricably linked Got to Give It Up and Blurred Lines so that
24    the profits, the sales --
25              THE COURT:  Yes.  I understand.
```

1        MR. BUSCH:  So we're not offering it for the truth of

2   matter asserted is my point, your Honor.

3        THE COURT:  Okay.  Well, at this point, I'm going to

4   grant the motion, and I will come to that next one in a minute.

5        Motion in Limine No. 5, to exclude evidence of the

6   touring income.  I would grant this motion.  I'm not persuaded

7   that Mr. Cohen, who is an accountant, even a contended respected

8   music accountant, has established a foundational basis for an

9   expert opinion as to how this is a proper means of valuing the

10  use of these recordings at concerts and other presentations.

11       It's an arithmetic -- as I understand it, he's saying

12  there were this many songs performed and this was among them and

13  we're going to calculate a percentage and based on that, come up

14  with a formula for value.  But I don't think he -- he's an

15  accountant, and I don't think there is any -- I'm persuaded that

16  there is a substantial expert -- underlying expert basis for

17  that approach.

18       MR. BUSCH:  Actually, your Honor, to respond briefly

19  to that, Dr. Alleyne went through in great detail the popularity

20  of Mr. Thicke --

21       THE COURT:  That's a different motion.  That's No. 7.

22       MR. BUSCH:  It's tied into this.

23       THE COURT:  I'm not persuaded by that testimony

24  either.  Go ahead.

25       MR. BUSCH:  Well, that his touring income dramatically

1    increased --

2            THE COURT:  I understand.

3            MR. BUSCH:  -- during the time that *Blurred Lines* was

4    being sold and so therefore a logical -- a reasonable conclusion

5    can be reached that *Blurred Lines* drove his touring revenue.

6            THE COURT:  But I'm not persuaded -- is there a

7    dispute, factual dispute, as to the amount of touring income?

8            MR. BUSCH:  There is not a factual dispute about the

9    total amount.  I will note --

10           THE COURT:  Is there a factual dispute as to the

11   chronology of that income?

12           MR. BUSCH:  There is not.

13           THE COURT:  Is there a factual dispute as to the

14   success or non -- less the -- the success of the plaintiffs'

15   recordings prior to the release of the recordings that are the

16   subject of this case?

17           MR. KING:  May I address that, your Honor, since

18   that's my -- there is a dispute.  It may be a dispute of

19   magnitude, but there's a significant dispute given we believe

20   that the plaintiffs were quite successful before, during, and

21   after the recording.

22           THE COURT:  Well, I'll come back to this.

23           MR. KING:  But what your Honor originally said is

24   really the issue, which is it's some guy saying he went on tour

25   and sang the song.

1          THE COURT:  I'm not persuaded that there's a

2    sufficient basis for an expert to opine about -- based on this

3    methodology.  You know, there are times where, for example --

4    there are models that say how to value a company and they can be

5    done in various ways.  And the accountant gathers data and then

6    an expert who's familiar with methodologies of valuing companies

7    applies the data to evaluation.

8          And what I think is missing here is not the data; it's

9    the process.  Discount -- I mean, as an example, in valuing a

10   company, you may look at its revenues and you may then project

11   what the revenues would be over a certain time period, and you

12   may then discount those revenues to present value to determine a

13   value or you may look at stock or you may look at a lot of

14   factors in determining business valuation.  And I don't think

15   that's what I have here.

16         I have an accountant who says *here is some data and

17   I'm going to apply some basic arithmetic to the data.*

18         MR. BUSCH:  Your Honor, just for the record, in

19   *Primiano vs. Cook*, 598 F.3d 558, 564 (9th Circuit 2010), the

20   Ninth Circuit said that in issues like this, which they called

21   *shaky evidence*, is to be attacked by cross-examination and

22   admitted -- and attention to burden of proof non-exclusion.

23         But I would also remark, your Honor, that I'm not sure

24   how else in a scenario like this where you have a

25   dramatically -- a dramatic increase in touring revenue that

1    coincides with the release of the most popular, by far, song in

2    an artist's career and you have a significant drop-off after the

3    song and a -- nothing close before the song, I'm not sure what

4    else you would need, other than those facts, to draw the causal

5    connection that the increase in touring revenue was at least in

6    part based upon on the --

7              THE COURT:  Well, I think that's an argument that you

8    can make based on the evidence.  What I'm not persuaded about is

9    that the expert can opine in a manner that says *this is the*

10   *appropriate method of valuing it.*

11             MR. BUSCH:  Okay.  So just so that I'm understanding,

12   what your Honor is ruling is that the touring income, the amount

13   and these facts, can be presented to the jury --

14             THE COURT:  Probably.  And similarly -- I'll jump --

15   I'll come -- I'll get to Motion in Limine No. 7 in a moment

16   because I have a similar view there.

17             Motion in Limine No. 6 about motion to exclude Marvin

18   Gaye's rights of publicity, I would deny this motion in part in

19   that I believe that it's overbroad.  Any admission by Mr. Thicke

20   concerning the creation of *Blurred Lines* I think is admissible.

21             And I don't -- but that's -- and that's not -- that's

22   the limited element of this that I think can be -- could be

23   admitted because I think that's relevant to some of the issues

24   here about the copying as well as potentially substantial

25   similarity.

```
 1            And I don't think that's likeness, fame, legacy,
 2   reputation.  I'm talking about statements made by the plaintiff
 3   that are admissions such as Got to Give It Up and references to
 4   it in the media interviews.  So that's my view.
 5            MR. MILLER:  Your Honor, it was not my intention in
 6   that motion to include what you just mentioned as part of the
 7   motion, so if it came off that that was --
 8            THE COURT:  Well, my view is what I said.  If
 9   Mr. Thicke -- if there are statements attributed to Mr. Thicke
10   which could be deemed admissions or adverse statements by a
11   party, statements by a party adverse to a party, I think they
12   can be admitted for the purpose -- for the limited purpose of --
13   going to the substantial similarity and then there would be
14   other issues as to the -- related to damages as to what he did,
15   and both parties can argue as to what these things meant -- what
16   he meant when he said them.
17            MR. MILLER:  Right.  And I understand that to be a
18   discrete and separate issue from the use of a name and legacy
19   and --
20            THE COURT:  That's correct.  It's focused on admission
21   for the limited purpose of establishing substantial similarity,
22   as well as any appropriate remedies that would arise from
23   copying.
24            MR. BUSCH:  Right.  So just so that I'm -- I think I
25   understand.
```

1          And when -- it's the latter half that I want to -- one

2    of our arguments in our motions in limine was that in light of

3    the marketing blitz that Universal, Mr. Thicke, went on to link

4    *Got to Give It Up* and *Blurred Lines* and promote this as a *Got to*

5    *Give It Up*, Part 2, Marvin Gaye's *Got to Give It Up*, Part 2 and

6    *Blurred Lines* and take advantage of Marvin Gaye's fan base and

7    his legacy, our argument is going to be that we should be --

8    that therefore the sales and the profits they derived are

9    attributable to that --

10          THE COURT:  And what I'm distinguishing there is -- in

11   terms of Motion in Limine No. 4 is evidence that the plaintiffs

12   or -- decided -- allegedly decided to use the similarity in

13   these songs to promote the plaintiffs' recordings is distinct

14   from a blog where the blogger says *I think these recordings*

15   *sound alike.*

16          MR. BUSCH:  I understand that.  And I would just be

17   repeating what I said before.  My -- just --

18          THE COURT:  If you call -- if you call a witness

19   and -- who is -- give me an example of a witness who you contend

20   was acting on behalf of plaintiffs in developing a marketing

21   strategy.

22          MR. BUSCH:  So there are several -- I deposed --

23          THE COURT:  Just give me one.

24          MR. BUSCH:  The name -- I don't have one -- there's

25   several blogs that UMG pitched and said, *Would you please go to*

*report on Blurred Lines*.  The blog then --

1

2          THE COURT:  Is there a witness from UMG whom you've

3  deposed --

4          MR. BUSCH:  Yes.

5          THE COURT:  -- about that issue?

6          MR. BUSCH:  Yes.

7          THE COURT:  All right.

8          And do you agree with that, a UMG witness has said

9  that?

10          MR. MILLER:  No, not in that way.

11          There is a UMG witness named Nicole Bilzerian who

12  testified to the marketing efforts of UMG.  They did not involve

13  soliciting any discussion from blogs whatsoever regarding Marvin

14  Gaye or *Got to Give It Up*.  And what we're trying to exclude

15  here is any kind of argument that seeks damages or somehow links

16  the jury's award in this case to whether a right of publicity, a

17  name, a legacy, etc. --

18          THE COURT:  No.  I agree with that.  But I think we're

19  now in a slightly different question and I don't have the data.

20          MR. MILLER:  Maybe I missed the question.

21          THE COURT:  Let me ask you this.  Suppose

22  hypothetically that Mr. Thicke decided that the best way to

23  promote this song was to go to a friend of his who was a blogger

24  and asked the blogger to write a lot of blogs saying these two

25  songs are similar.  Do you have that in mind?

1          MR. MILLER:  Okay.

2          THE COURT:  Then during the defendants' examination of

3    Mr. Thicke, I think they could appropriately inquire, *As part of*

4    *your promotional efforts for your song, did you go to this*

5    *blogger and ask the blogger to write that these two songs are*

6    *similar as part of your effort to make your song popular.*  And

7    Mr. Thicke might say *yes*, he might says *no*, I don't know.

8          But I don't think that's inadmissible.

9          MR. MILLER:  Sure.  And that would be admissible to go

10   to the point of whether in fact he copied the --

11         THE COURT:  Correct.  I understand.

12         Similarly, if -- depending on what I see as the

13   foundational basis for this, if a UMG witness, who is -- who

14   is -- was engaged to promote the music of Mr. Thicke did the --

15   did it on behalf of Mr. Thicke, then I think that these similar

16   questions might -- could well be appropriate for the same

17   reason, but I don't -- but that's different than saying I'm

18   admitting the blog because there's no foundation if -- we're not

19   going -- that's the distinction.

20         MR. BUSCH:  So to answer your Honor's question, there

21   is a Universal executive who is the subject of another motion in

22   limine that you might be getting to, Harry Weinger, who Tweeted

23   out and -- and repeated David Ritz's statements about *Got to*

24   *Give It Up* and *Blurred Lines*.

25         THE COURT:  I see.  I understand.

```
 1              But to be clear, Motion No. 6, my view is that
 2   admissions by Mr. Thicke or admissions or adverse statements
 3   made by those who are deemed under the Federal Rules of Evidence
 4   to have been acting for Mr. Thicke for purposes of making a
 5   statement against interests or an admission are not excluded,
 6   but the rights of publicity and the legacy and the reputation
 7   and publicity rights are not.  That's different.  I think what
 8   I'm focusing on is the musical works.
 9              By the way, most of the motions in limine and your
10   other discussions and these final pretrial documents concern *Got
11   to Give It Up* and *Blurred Lines*.  Do you plan to -- have you
12   considered -- are you going to present all three songs or are
13   you going to focus on those two?
14              MR. BUSCH:  The *After the Dance* and *Love After* --
15   *After the Dance* and *Love After War* is still an issue.
16              THE COURT:  I understand that, but have you --
17              MR. BUSCH:  Yes.
18              THE COURT:  Because there wasn't much discussion of
19   either in the case -- in your papers.
20              MR. BUSCH:  Just for a point of clarification,
21   your Honor, on this -- what your Honor just said, one of the
22   things that we will be arguing or that I was going to plan to
23   argue to the jury on the issue of damages was that the
24   plaintiffs in this case took advantage of Marvin Gaye's legacy
25   and reputation and his fan base in promoting the songs as *Got to
```

1    *Give It Up* and Marvin Gaye, and so the point is that to not

2    allow us to introduce evidence about who Marvin Gaye was to

3    establish this -- that these drove -- this drove sales, in light

4    of the fact that this is their marketing plan and Robin Thicke

5    gave 13 different interviews taking advantage of Marvin Gaye's

6    legacy and then to exclude it seems --

7              THE COURT:  Well, it's a fine point, but at this

8    point, the claim here is for copyright infringement and the

9    appropriate resulting damages, and it's not a right of publicity

10   case.  And I think you're going to have to show a nexus between

11   the alleged conduct of the plaintiff and/or persons acting on

12   plaintiffs' behalf and the alleged damages.

13             MR. BUSCH:  Right.  I agree with that, your Honor.

14             THE COURT:  And I think at most, some of this might

15   come in indirectly as -- as a -- for a limited purpose with a

16   limiting instruction.

17             But it's not about diminishing Mr. Gaye's rights of

18   publicity or reputation or anything else.  It's about

19   promoting -- the plaintiffs' promotion of the plaintiffs' song

20   and the resulting sales.  And I -- I may have to see it question

21   by question, but at this point, I'm going to deny the motion

22   with respect to any admissions.  And as I've also explained

23   today, deny the motion with respect to statements made by those

24   acting on behalf of the plaintiffs in connection with the

25   promotion of the song, but the trial is not about the rights of

1    publicity, legacy, and reputation.  It's about the alleged

2    infringement and the alleged resulting damages.  Okay?

3            MR. BUSCH:  Yes.

4            THE COURT:  Now -- yes?

5            MR. BUSCH:  I was just going to say but part of that

6    is profits and because the profits were driven by sales of --

7            THE COURT:  I heard your argument, but I'm not

8    going -- it doesn't change what I just said.

9            MR. BUSCH:  Okay.

10           THE COURT:  Motion in Limine No. 7, to exclude the

11   testimony of Mr. Alleyne -- Professor Alleyne -- Alleyne, or do

12   you know how he says it?

13           MR. BUSCH:  Alleyne.

14           THE COURT:  Alleyne.  Sorry.

15           I'm not persuaded that Mr. Alleyne has expertise with

16   respect to many of the opinions he offers, many of which are

17   repeating what other experts have said and many of which go to

18   ultimate issues in the case such as *creative choices made by*

19   *Robin Thicke and Pharrell Williams...led to the creation of a*

20   *composition...which copies important elements of Got to Give It*

21   *Up...*

22           There are a lot of things here that are re-stating.

23   Some of them are ultimate issues for the jury.  Some are

24   paralleling opinions of others, and I'm just not persuaded that

25   they're -- that, A, that he's qualified, or, B, that they're

1    appropriate matters on which to opine.

2            However, this report, the report of this proffered

3    expert, contains a lot of facts, what is presented as facts.

4    For example, the sales history of prior songs of the plaintiffs,

5    the placement of various songs on charts, the -- the success --

6    there are a lot of facts here.  Year-end chart ranking in terms

7    of singles.  A lot of data here.

8            And the Document 175-7, for example, page 24 of the

9    document, internal page 23 through 24, U.S. chart singles for

10   Robin Thicke starting from 2005 through 2014, there is a lot of

11   data here, and I think -- I think a lot of this data itself may

12   be admissible.

13           I don't -- however, I don't think he is opining as to

14   the data.  He's gathered the data, but I don't think it's

15   going -- I don't -- so my point is that although I don't

16   think -- I don't think he's qualified as an expert on the topics

17   that he's addressed.  The data that he's gathered I think could

18   be admitted.

19           And I think what I want the lawyers to do, if I adhere

20   to that view, is see if you can either stipulate to the data or

21   find another means in which this data can be presented because I

22   think it can be relevant.

23           So if it's a simple matter, as I gave that one

24   example, as to where Mr. Thicke's songs ranked on the music

25   charts during those relevant years, a demonstrative exhibit can

1    be displayed, then I think it would be appropriate.

2         If you can't come to some agreement, then I might

3    permit the expert to testify, not opining, but simply *this is*

4    *the data that I gathered*.

5         MR. MILLER:  Yes.  I think that's fine.  If it's just

6    sales history and so forth, it should be pretty nuts and bolts.

7         MR. BUSCH:  Your Honor, just for the record,

8    Dr. Alleyne is a recording industry professor at one of the top

9    recording industry programs in the country.  His classes relate

10   to marketing in the recording industry and the history of the

11   recording industry focusing on marketing and specifically how

12   marketing efforts drive sales.

13        And the point being that all of the marketing efforts

14   of UMG in this case and Robin Thicke, as Robin Thicke said

15   himself in an interview, was to sell records.  And by linking

16   Marvin Gaye and *Got to Give It Up* with *Blurred Lines*, the intent

17   was to sell records, and that -- he is absolutely qualified to

18   testify about how that marketing effort linked *Got to Give It Up*

19   and *Blurred Lines* and drove sales for purposes of profits

20   attributable to --

21        THE COURT:  Well, I've read his report, and based on

22   what he's described as his experience in areas of teaching, I'm

23   not persuaded that he's an expert on these marketing issues as

24   opposed to he gathered data and relied on information presented

25   by other experts to say how important this was, and I think that

1    you can present -- the data can be -- if it's disputed, you'll

2    put in your respective testimony or exhibits as to the data and

3    then you can make your respective arguments that based on that

4    data, what it means.

5              And I don't think the jury needs an interpreter of

6    this data in the form of this offered expert because I'm not

7    persuaded it's -- that he is sufficiently expert on that.

8              We can again agree to disagree, but my expectation --

9    but, as I say, to be clear, he has assembled substantial data on

10   various topics, and if the most efficient way to have that data

11   admitted is his testimony about the data that he gathered, I

12   would likely permit him to do that, in the same way as somebody

13   who gathers data and puts it in a compilation and then the

14   compilation can be admitted and the cross-examination of the

15   person who made the compilation as to its accuracy and

16   reliability can occur.

17             But I'm not persuaded.  As I say, many of his opinions

18   don't go to that.  They say the same thing.  They get to

19   ultimate issues in the case and they talk about affirming, he

20   agrees with other experts' opinions.

21             Okay.  So that's my view on that.

22             Motion in Limine No. 8, to exclude the testimony of

23   Mr. Weinger.

24             MR. MILLER:  Your Honor, sorry to interrupt.

25             There were three other experts at issue in No. 7 --

1    Stern, Court and Aston.

2          THE COURT:  Well, Aston and Court are the audio

3    engineers who did the mash-ups, so I think we've discussed that.

4    And I don't think that their testimony would be needed, absent

5    creating mash-ups that are consistent with my order.

6          MR. BUSCH:  Your Honor, and we -- we may very well

7    create mash-ups and exchange them in our -- consistent with your

8    order.

9          I did want to just take a second and get some

10   clarification on one of -- on that particular order as it

11   relates to the sound recordings and the mash-ups because it's so

12   important to this case.

13         One of our -- one of the substantial similarities

14   that's been identified are -- there are lyrical similarities.

15   So what we have done is the -- our expert, Ms. Finell and

16   Dr. Monson, have prepared comparisons and have cut specifically

17   the portion of *Got to Give It Up* or *Blurred Lines* that contains

18   the comparison lyrical similarities.

19         Are we -- I don't see how I can demonstrate the melody

20   that relates to the lyrical similarities, so, in other words,

21   there is melody, the melodic -- the melody that underlies these

22   lyrics.

23         THE COURT:  Why can't you play the sheet music?  Why

24   can't someone play the sheet music?

25         MR. BUSCH:  It would --

```
 1              THE COURT:  Along with showing what the lyrics are.
 2         I think we're -- you're re-arguing the same thing.
 3    I'm not saying that the words -- the lyrics can't be shown.  I'm
 4    saying that Marvin Gaye's voice as the lyrics is not what I
 5    think is admissible.
 6              MR. MILLER:  And I just wanted to remind you of Nancie
 7    Stern, who is the licensing fee expert in Motion No. 7.
 8              THE COURT:  Just a minute.  Just a second.
 9         I'm not persuaded by the Stern testimony either.
10         Whether a hypothetical client asking her to obtain a
11    license to use the composition Got to Give It Up before
12    releasing Blurred Lines, she would have told him a license was
13    necessary -- I'm not persuaded.  It's the ultimate issue in the
14    matter.
15              MR. BUSCH:  That's not testimony, with all due
16    respect.  I'm sorry I said that.
17              THE COURT:  You can say it.  If lawyers think that's a
18    good thing to say to judges, I think they should rethink it.
19              MR. BUSCH:  The testimony is not that a license would
20    have been required.  The testimony was that given the facts that
21    are presented, the musicology reports, her listening to the
22    songs after 20 years of doing this, the quote would have been 50
23    percent of the composition pre-release, and it would be as much
24    as 75 to 100 percent post-release after clearing thousands of
25    similar -- similar types of situations over the course of 20
```

1  years, literally thousands, putting a price tag on it, putting a

2  percentage on it.  That's the testimony that is important for

3  apportionment and profits attributable to --

4       THE COURT:  Well, I will have to see her testimony

5  with respect to the financial analysis, but with respect to her

6  saying *this is how I would have advised a client and this is*

7  *what I think is the appropriate outcome here,* I'm not persuaded.

8  That's the issue that's being tried in this case.

9       MR. BUSCH:  Well, one thing that's being tried is for

10  the jury to determine, if it finds infringement, what is the

11  percent or the apportionment, and this witness would assist with

12  that because she is an industry leader in doing just that.

13       THE COURT:  Well, as I've just -- I don't think that

14  this witness should be -- I think you've got musicologists who

15  are testifying as to the -- that support your position that

16  there's a substantial similarity in the music, and now you'd

17  have -- I don't think this witness should be testifying

18  concerning how this witness evaluated what your experts are

19  evaluating in terms of whether there is substantial

20  similarities.

21       That's different than as I just stated, if this

22  witness has opined concerning how to value the use, that's

23  different.  But that's different than her saying *I base -- if I*

24  *were the advisor here, I would advise you to get a license*

25  *because I think there's substantial similarity.*  That's not

1  admissible.

2        MR. BUSCH:  And the latter part that your Honor said

3  you believe is -- may be admissible, that is what we would offer

4  her for.

5        THE COURT:  I don't have that framed so you're going

6  to need to frame that and see if there is a disagreement.

7        MR. MILLER:  That was not part of her expert report.

8  It was not part of the deposition.  I think it's a little late.

9        THE COURT:  Well, I'll have to see.  I'll have to see.

10  Meet and confer on that, present to me your respective positions

11  as to whether she was -- whether within her report it talked

12  about the value and how to value the alleged infringement.

13  Okay.

14        Motion in Limine No. 8, Mr. Weinger.  I don't think

15  that these are admissions, and I would exclude them under 403.

16  I don't think -- that's the short of it.  I don't think he's --

17  I don't think they're admissions by the plaintiffs, and it's

18  similar to what I just said.  It's another person comments to

19  third parties that in his opinion, *Blurred Lines* is similar to

20  *Got to Give It Up.*

21        MR. BUSCH:  Your Honor, just very briefly?

22        THE COURT:  Yes.

23        MR. BUSCH:  He is an office executive at UMG

24  Recordings, division of UMG Recordings, so it is a party

25  admission.  As a result of that, as a status, it comes from his

 1    work e-mails, so it's admission as matter of law.

 2            There is a Ninth Circuit case that says that

 3    statements by someone from a division of --

 4            THE COURT:  What is your position as to whether he

 5    is -- what -- what is your position as to his relationship to

 6    the plaintiffs, business relationship to plaintiffs?

 7            MR. MILLER:  He has no relationships to the divisions

 8    and the entities that have been sued in this case.  He works for

 9    a division that manages the old -- among other things, the old

10    catalog of Marvin Gaye.  He has nothing to do with Interscope.

11    He has no job duties related to *Blurred Lines* or assessing

12    infringement claims or anything like that.  This was kind of his

13    personal view of things.

14            THE COURT:  Do you agree that he is -- part of his

15    responsibilities included the Marvin Gaye catalog?

16            MR. BUSCH:  Part of his responsibilities include the

17    Marvin Gaye catalog and part of his responsibilities included --

18    part of his responsibilities were driving sales of that catalog,

19    and furthermore, he is an employee of a defendant in this case,

20    UMG Recordings, Inc.

21            THE COURT:  Okay.  I'm not persuaded for the same

22    reasons that he's -- he was speaking for the plaintiffs in this

23    case when he made the statements or sent the e-mails.  I'm not

24    persuaded of that because his job, as I understand it, was

25    promoting the defendants' portfolio, not the plaintiffs'

portfolio.

MR. BUSCH:  No, that's not correct.  *Got to Give It Up*, the master recording of *Got to Give It Up*, is owned by UMG.

THE COURT:  Was is role -- what was his role?

MR. BUSCH:  His role is two things.  One, contacting the marketing people and the other people within UMG to try to link *Got to Give It Up* with *Blurred Lines* to assist the plaintiff in this case with making money by driving sales of *Got to Give It Up* because it's their master recording.

THE COURT:  What's your response to that?

MR. MILLER:  His job was to manage the catalog of Marvin Gaye.  He had a personal interest in this because he was friendly with Janis Gaye.  He sent some of these Tweets because Janis raised the issue with him.

When he thought he saw there was a similarity, he thought *maybe I can* --

THE COURT:  All right.  Then I want you each to submit -- he was deposed; correct?

MR. MILLER:  Yes.

THE COURT:  Then I want the deposition pages each of you contends supports your competing positions as to his role.  I'll review them, and if necessary, I'll have a hearing pre -- pretrial hearing where I'll make a determination as to whether or not he was speaking on behalf of the plaintiffs in these alleged statements.

1          But to the extent that he was -- as I -- if the

2     defendant is right, that his role included benefiting the

3     plaintiffs, then there will be -- I would tentatively say that

4     his statements would be admissions and admissible.  If his role,

5     however, is promoting the Marvin Gaye library, then I don't

6     think so.  Okay.

7          Motion in Limine No. 9, to exclude evidence of the

8     plaintiffs' press statements, I would deny this for the same

9     reasons that I would deny -- the same as in Motion in Limine

10    No. 6.

11         The inspiration for *Blurred Lines*, other statements, I

12    think these are admissions and they go to the issue of

13    substantial similarity.

14         Do you want to be heard on that, Mr. Miller?

15         MR. MILLER:  I guess I just want -- a little -- I just

16    want to be clear because the blogs and so forth we excluded, as

17    I understand the Court's ruling.  So we are talking about

18    Thicke's statements?

19         THE COURT:  Correct.  Press statements by the

20    plaintiffs.  Primarily Thicke and -- Mr. Thicke and

21    Mr. Williams.  Or press statements made by those representing

22    them.  That's different than the blogging.  That's a different

23    issue.

24         I'm saying that if they made a statement in connection

25    with the promotion of the plaintiffs' music that said, *My*

1  *inspiration for doing this was Marvin Gaye,* I think that's an

2  admissible admission.

3            If a blogger who is -- we've already been over the

4  bloggers.

5            Defendants' motions.

6            One, to exclude -- Motion No. 1, to exclude the

7  testimony of Lawrence Ferrara.  I would grant this motion.  I

8  think this issue was previously addressed in this case in the

9  Southern District of New York, and I think it's the law of the

10 case, that this -- this report was sought and access to it was

11 denied, and I don't think -- I think it's been determined that

12 it's not available and therefore inadmissible, and I would agree

13 with the substance, in any event.

14           MR. MILLER:  I would just like to clarify, as we think

15 we did in the opposition, that the report -- Mr. Ferrara's

16 testimony is not coming in.

17           There is an exchange that's in some of the deposition

18 transcripts that were submitted to you between the Gayes and EMI

19 Publishing where the Gayes said, *We hired Mr. Ferrara to give us

20 a favorable report,* and he didn't ask for it, he didn't give it

21 to it.

22           All of that we believe should be admissible, at least

23 insofar as this motion goes, in that it's not privileged, it's

24 been disclosed to a third party.  It's not Mr. Ferrara's

25 opinions.  It's the facts and what were done with them.

```
 1              THE COURT:  Okay.  I understand.  I would exclude it.
 2    It's hearsay, among other things.  We don't have the report, and
 3    access to the report was denied by the decision of the Southern
 4    District of New York.  So if you're saying --
 5              MR. MILLER:  Well, the Southern District of New York
 6    did not have any discussion or involvement in this EMI stuff,
 7    which came up later in discovery.
 8              What the Southern District of New York case held was
 9    that because Mr. Ferrara's report was not obtained by the Gayes
10    themselves or their lawyer, but rather by their mother and by
11    this fellow, Anthony Kyser, who was sort of a related company,
12    what the ruling was on that motion was that those people were
13    enough within the scope of being parties that work product
14    applied to the actual report that we had subpoenaed from Larry
15    Ferrara.  The EMI stuff had not come out in discovery yet or at
16    least it wasn't before the Court on that motion.
17              THE COURT:  But what's the relationship -- what do you
18    contend is the relationship, if any, between what you just
19    called the EMI stuff and the contents of the report?  How do --
20    did they overlap?
21              MR. MILLER:  They do not overlap because EMI is the
22    publisher for the Gayes.  EMI was approached by the Gayes and
23    was asked to file the same lawsuit that we're defending now.
24              EMI looked at the allegations that we're defending
25    now, said they had no merit.  The Gayes said, We have this
```

*report from Larry Ferrara.*

THE COURT:  But the evidence you're seeking to admit
is that they have a report and haven't disclosed it?

MR. MILLER:  Correct.  And that EMI was not willing to
file this lawsuit --

THE COURT:  I grant the motion.  If you don't get the
report, I don't think you get the inferences to be drawn from
its non-disclosure.  It wasn't -- it was ruled that it's not
disclosable.  We'll agree to disagree.

Plaintiffs' Motion in Limine No. 2 wasn't opposed;
correct?

MR. MILLER:  Correct.

THE COURT:  Okay.  So it's granted.

Plaintiffs' Motion in Limine No. 3, to exclude the
testimony of Sandy Wilbur, I would deny this motion.  This is
the plaintiffs' expert musicologist about songs other than the
four identified songs, and I'm just not -- I think this is
admissible.  It goes to the weight, not admissibility.

MR. BUSCH:  Your Honor, she is comparing songs that
aren't at issue in this case, and we've cited cases that that's
not relevant to this case, and if the songs -- if the actual
song *Got to Give It Up* cannot be played, I don't see how we can
listen to a song that isn't involved in the case.

THE COURT:  Well, are you planning to play the music
or have her opine about it?

```
 1              MR. MILLER:  I think it depends at this point.  We do
 2    have some recordings of it.  Some of these were addressed --
 3    first of all, Ms. Wilbur covered in her report both the deposit
 4    copy, which we contend is the composition at issue, and the
 5    sound recording because, of course, the Court hadn't ruled at
 6    the time of her report on that.  So a lot of this probably will
 7    not be necessary because it's the mash-ups or whatever.  But
 8    others are just going to show prior art and we either show a
 9    snippet of it or not.
10              THE COURT:  Well --
11              MR. MILLER:  Have her just discuss it, depending on
12    what makes sense.
13              THE COURT:  Be efficient in the use of your time, and
14    to the extent that -- I will see.  I'm not -- I would deny the
15    motion because I think it's part of her expert testimony, but if
16    I -- if based on what -- it's a *she*; correct?
17              MR. MILLER:  It's a *she*.
18              THE COURT:  If I'm persuaded -- if I'm persuaded as we
19    go through the testimony that it goes beyond -- it's not
20    relevant or it's tangential or it's cumulative or something
21    else, when you get to this issue about other songs, then I may
22    exclude it.  But at this point, I'm not persuaded to grant the
23    motion in its entirety.
24              Motion -- plaintiffs' -- defendants' Motion in Limine
25    No. 4, to allow experts to testify and present evidence that the
```

1    descending base line is in the deposit copy of *Got to Give It

2    Up*, I would -- I would deny this motion.  I think this is, I

3    think, consistent with what I said in the summary judgement

4    order.  This should be denied.

5              MR. BUSCH:  Can I be heard --

6              THE COURT:  Yes.  Go ahead.

7              MR. BUSCH:  The summary judgement motion was decided

8    before expert reports were disclosed in this case.  Since

9    experts reports were disclosed in this case, plaintiffs' own

10   expert, Sandy Wilbur, has admitted that the descending base line

11   is in the deposit copies.  Our two experts have testified that

12   they are in the deposit copy.

13             I would suggest, your Honor, that fairness and

14   getting -- getting this correct would cause the Court to at

15   least hear why it's in the deposit copy before your Honor rules

16   that it's not when their own expert admits it is.

17             THE COURT:  Wasn't it your experts who say it is in

18   the deposit copy?

19             MR. BUSCH:  No, no.  Our experts say it's in the

20   deposit copy --

21             THE COURT:  That's what I just said.

22             MR. BUSCH:  -- and Ms. Wilbur, their expert, admits

23   it's in the deposit copy.  In her deposition, she admitted --

24             THE COURT:  I thought she said at the time of the

25   summary judgement it was not.

```
 1              MR. BUSCH:  She did, but then she was deposed in this
 2    case after that because the experts had not been deposed, expert
 3    reports had not been submitted.  And she admitted in her
 4    deposition that the descending base line is in the deposit copy.
 5              THE COURT:  Okay.
 6              MR. MILLER:  She never admitted that the descending
 7    base line, as Ms. Finell identifies it in her report, is in the
 8    deposit copy.
 9              THE COURT:  Well, I think that based on the new -- the
10    additional evidence since the time of the summary judgement
11    ruling, including the clarification from the defendants'
12    experts -- I deny this motion, provided, however, that again
13    we'll have to see what -- I'll have to take it in the context of
14    what's presented.  But at this point, I'm not persuaded that the
15    motion is appropriate.
16              MR. BUSCH:  So I understand -- I'm not sure I
17    understand.  Your Honor said in light of the additional
18    evidence, your Honor is going to allow us to present some
19    evidence that the descending base line is in the lead sheet?
20              THE COURT:  In light of the evidence -- yes.  Your
21    experts have now said that there is an overlap.
22              MR. BUSCH:  Yes.
23              THE COURT:  And I think that the plaintiffs' expert --
24    Ms. --
25              MR. BUSCH:  Wilbur.
```

THE COURT:   -- Ms. Wilbur agrees with that; is that
correct?

MR. MILLER:   That is misleading.   It is not correct.

There is in the deposit copy in two measures some base
notes that go from a higher pitch to a lower pitch.   No one
disputes those.   Those notes are what they are in the deposit
copy.   We all agree to that.

What Ms. Finell calls a descending base line are other
versions of that that are only in the sound recording and that's
what the dispute is.

THE COURT:   Well, I think that's likely to go to the
weight, not admissibility, of the evidence.   I'm going to deny
Motion in Limine No. 4.

Motion in Limine No. 5, to exclude the expert
testimony of Gallien, Bilzerian and Knight.   Are these -- are
you still -- these are -- these are lay -- these are lay experts
whose -- are you planning to use these persons?

MR. MILLER:   Yes.   Gallien and Bilzerian work for UMG.
Primarily they're percipient witnesses.

THE COURT:   Well --

MR. MILLER:   Primarily any opinion testimony would be
lay opinion from their jobs at UMG.

THE COURT:   Are their opinions cumulative of what your
experts are going to say?

MR. MILLER:   No, they are not.   And I'm not sure that

1    anything they offer will actually be an expert opinion.  In an

2    abundance of caution, we put them on our expert disclosure.

3         THE COURT:  All right.  Well, my view would be this.

4    I would -- if the opinions are not cumulative, they may -- may

5    be -- may be admitted.  If they're cumulative, I wouldn't see

6    any reason for their admission, given that there is a process

7    for identifying experts and so on.

8         To the extent that expert opinions of Knight are going

9    to be offered, then I would -- Knight has not been deposed; is

10   that correct?

11        MR. MILLER:  That is correct.

12        THE COURT:  Then before Knight -- after the -- I would

13   just then, for efficiency in the trial -- I would say that

14   Mr. -- it's Mr. Knight?

15        MR. MILLER:  Correct.

16        THE COURT:  Mr. Knight should be deposed with respect

17   to those lay opinions that he would be offering at trial.  But I

18   understand.  You don't think it's likely you'll be offering any

19   expert opinions from any of these witnesses.

20        MR. BUSCH:  I have to go back, your Honor, to

21   motion -- the last motion in limine just because your Honor said

22   *denied*.

23        THE COURT:  I denied.

24        MR. BUSCH:  But your Honor said in light of the

25   additional evidence, your Honor is going to allow us to present

```
 1    evidence about the descending base lines, so it's actually -- I

 2    think it's -- it was our motion in limine to allow us, so I

 3    think it's actually granted then.  I just wanted to make sure

 4    there's no misunderstanding on the --

 5             THE COURT:  Just a minute.

 6             I think the evidence should be admitted.  The evidence

 7    on the descending base line should be admitted.  You have your

 8    experts saying it and you have -- and your expert may agree or

 9    disagree.

10             MR. BUSCH:  That's all I wanted clarification, because

11    it was our motion --

12             MR. MILLER:  Then I completely misunderstood your

13    ruling on the last motion.  I mean -- I'm sorry to drag this

14    out, but --

15             THE COURT:  At the -- after the summary judgement,

16    defendants' experts, Finell and Monson, both testified.  Do you

17    agree with that?

18             MR. MILLER:  Correct.

19             THE COURT:  Okay.  And they both testified that a

20    particular descending base line was embodied in the deposit

21    copy.  Do you agree with that?

22             MR. MILLER:  They were different descending base

23    lines.  The deposit copy speaks for itself.  Ms. Wilbur

24    testified to --

25             THE COURT:  No.  I'm talking about Finell and Monson.
```

 1              MR. MILLER:  Oh, I'm sorry.  I misheard.  Yes.

 2              THE COURT:  And Monson said the notes aren't exactly

 3    the same.

 4              MR. MILLER:  Correct.

 5              THE COURT:  Okay.  And there was also testimony by

 6    Wilbur that parts of the base line were descending, although

 7    there's a dispute as to whether that was a reference to the

 8    parts specified by Finell in her report.  You agree with that?

 9              MR. MILLER:  That is correct.

10              THE COURT:  Okay.  I think you're competing evidence

11    with respect to the descending base line could be offered.

12    That's my view.  So --

13              MR. MILLER:  And that competing evidence would be what

14    are the notes in the deposit copy.

15              THE COURT:  Correct.  By your competing experts.

16    Because that's what I understand has changed since the time of

17    the hearing and the decision on the summary judgement.  Your

18    experts have clarified their opinions.  Your expert -- there was

19    some uncertainty as to whether her opinion referred to -- what

20    portions of the base line her opinion addressed.  And I think

21    that's also been clarified; is that correct?

22              MR. MILLER:  I think there's either some confusion on

23    the Gayes' side or I don't understand what's going on because

24    Ms. Wilbur has been crystal clear from day one because there's

25    no way you can possibly be confused as to what the notes are

```
 1    that are written down in black and white in the deposit copy.

 2            And the defendants are attempting to say that other

 3    versions of the base line, which clearly are not those notes,

 4    somehow are written down in the deposit copy.

 5            THE COURT:  Well --

 6            MR. MILLER:  I'm happy to have an argument over what

 7    the notes are in the deposit copy.

 8            THE COURT:  We will see.  But at this point, my

 9    present view is these experts can offer their competing opinions

10    as to what the deposit copy shows as to the descending base

11    line.  And you can cross-examine each other's witnesses and then

12    make arguments based on that.  That's my view.

13            MR. BUSCH:  Thank you, your Honor.

14            On Bilzerian and the other two witnesses, they -- our

15    motion was based on the fact that they did not designate them

16    properly as experts.  They were not designated as experts.

17            THE COURT:  I read your papers.  I'm aware of your

18    arguments.

19            First of all, again, let's not spend -- overly spend

20    time here.  Why don't you meet and confer, certainly before the

21    trial begins, as to what your plan is on these.

22            There were disclosures made at the time, I believe, as

23    to some matters on which these individuals might opine, but I've

24    already stated if it's cumulative, it's not coming in.  If it's

25    not cumulative and it's offered by Mr. Knight, he's going to be
```

 1    deposed before he can testify on direct.  And I think you can

 2    work this out.  I just don't think this is the core of this

 3    case.

 4             MR. BUSCH:  It's not, your Honor, but the issue is

 5    Dr. Alleyne was excluded from offering his opinion on what drove

 6    sales of *Blurred Lines* and now it appears that they -- these lay

 7    witnesses, who are not professors who haven't written books,

 8    aren't experts at all, are being -- are going to be offered for

 9    that same purpose.

10             THE COURT:  That's not what I interpreted I was told.

11    They were going to be offering percipient testimony and that's

12    the core of what their testimony is.  That's the representation

13    that was made.

14             MR. MILLER:  That is correct.  They're going to

15    testify about their job duties, what they saw happen with this

16    song.  To the extent any of it spills into expert opinion,

17    that's why we gave --

18             THE COURT:  Okay.  Then let's move on.

19             Defendants' Motion in Limine No. 6, to exclude the

20    testimony of Peter Oxendale and any opinion offered by Oxendale.

21    I would grant the motion.  He has not been deposed.  He is not

22    going to testify.  It's similar to what I said earlier.  I think

23    it's hearsay.  Inadmissible.

24             Plaintiffs -- Defendants' Motion in Limine No. 7, to

25    exclude the testimony of Bruce Scavuzzo.  I would grant the

1   motion.

2           Just a minute.  And the plaintiffs are proposing not

3   to offer the testimony about the lack of similarity between the

4   songs, but 20 minutes of his deposition, why he recommended

5   against bringing an infringement claim, it's similar to what

6   I've said earlier.  I don't think -- I think it's 403, 402,

7   hearsay.  I don't think it comes in.  I don't think it's an

8   admission.

9           MR. MILLER:  Well, perhaps we just agree to disagree

10  on this.  It seems to me that -- just for the record, it goes to

11  what -- what the Gayes' own publisher did with the same claim

12  that was presented to the plaintiffs, and the argument at trial

13  will be the plaintiffs were presented with this claim and

14  continued to exploit *Blurred Lines*; therefore, they knew they

15  had infringed because they didn't consider the claim and realize

16  it was infringement when the Gayes' own publisher considered the

17  claim and realized or at least concluded, rightly or wrongly, it

18  was not infringement.  I think it goes to reckless disregard or

19  knowledge of whether two songs infringe each other.

20          THE COURT:  I think this in some ways parallel to the

21  ruling on the Weinger testimony.  Okay.  So I'm going to grant

22  7.

23          With respect to defendants' Motion in Limine No. 8, to

24  exclude evidence of testimony referring to EMI and its

25  representatives' positions, opinions, and communications with

 1   the Gayes, which is similar to what I think we've just

 2   discussed, similar to 7, I would grant it for the same reasons.

 3            MR. MILLER:  I would just, for the record, make the

 4   point that EMI was the exclusive agent to bring suit.  That's

 5   why it went to them.  They are acting on behalf of the Gayes --

 6            THE COURT:  I understand.

 7            Now, what I want you to do, in light of these rulings

 8   on your collective motions in limine, I want you to go back and

 9   determine what issues remain as to your disputes on exhibits

10   because I think your hundreds of exhibits disputes should be

11   narrowed in light of these rulings.  So I want you to do that.

12            Second, on your -- I've already spoken -- your joint

13   witness list could be adjusted according to my rulings here as

14   to those who will or will not be witnesses, and I think that

15   should be part of your respective -- respective thinking about

16   how to use your time, because if witnesses will not appear and

17   you have 18 -- the amount of time that I said earlier, including

18   your openings and closings, you should -- each side should

19   reexamine that in light of that.  But how you use your time is

20   up to you.  If you want to use all of your time on a single

21   witness, you're free to do that.

22            With respect to your joint proposed verdict form, do I

23   have a red line here or do I just have your competing --

24            MR. KING:  Competing ones.

25            THE COURT:  I would like a red line created.  Let's

1    have the plaintiffs please make a red line that shows how

2    their -- how they would -- whichever is easier.  Just give me a

3    red line that shows the comparison of A and B.  Can you do that?

4            MR. KING:  We can do it, your Honor.  I'm not sure how

5    useful it's going to be.  The verdict forms differ

6    significantly.

7            THE COURT:  Did either of you, when you created your

8    verdict forms, look at the form verdict forms?

9            MR. BUSCH:  We did.  We looked at the verdict form

10   that was used in *Three Boys*.  We looked --

11           THE COURT:  How about any verdict forms that are

12   published by the Ninth Circuit or others?

13           MR. BUSCH:  Yes, we did.

14           And we believe our verdict form is the type of basic

15   verdict form, general verdict form that the Ninth Circuit

16   encourages.  We have case law that we can cite to, your Honor.

17           Their verdict form, for a lot of different reasons, is

18   improper.

19           THE COURT:  All right.  Well, give me a red line.

20   Start with that.

21           MR. KING:  Sure.

22           THE COURT:  The trial exhibits I just addressed.

23           Now, the proposed jury instructions, again, you have

24   many disputes.  Here is what I want to know.  Here is what I

25   want you to do.

1          First, consider whether any of this has been addressed

2    by today's rulings on the motions in limine.

3          Second, I want to have a distinction in terms of the

4    disputed jury instructions.  I would like a list of the disputed

5    instructions and I would like those disputed instructions where

6    one or the other side is seeking to change the form adopted by

7    the Ninth Circuit in its form instructions -- I would like to

8    have those in one group and then in the other group would be

9    what either side is presenting as special instructions, i.e.,

10   ones that are not part of the Ninth Circuit proposed jury

11   instructions.

12         Can you do that?

13         MR. BUSCH:  Yes, your Honor.

14         THE COURT:  Okay.  And perhaps if there's any -- and

15   I'll address that.  We're not going to be dealing with jury

16   instructions on day one of the trial.

17         So when can you get me that?  Today is Monday.

18         MR. MILLER:  I think we can get that on Wednesday.

19         MR. BUSCH:  Thursday I think would be better.

20         THE COURT:  Thursday is fine.

21         I want you to present it in a way that is easy for me

22   to follow.  In other words, I don't want a lot -- I want here

23   are the Ninth Circuit -- here are the instructions that are

24   based on the Ninth Circuit's model instructions, 1 through --

25   I'll make it up.  There's 10 instructions we dispute.  Here's

1    the plaintiffs' version.  Here's the defendants' version of

2    Instruction No. 1.  Same as to 2 through 10.  Can you do that?

3              MR. MILLER:  I would be happy to do that.  Just so you

4    know, the reason they were grouped the way they were is a lot of

5    the instructions, one side, usually our side, had a model

6    instruction and they had a special, so we were trying to do it

7    by topic as opposed to --

8              THE COURT:  Well, in the specials what I want to know

9    from the special -- from you about any special instructions that

10   either side is offering is why is it needed in light of the form

11   instructions.  I'm going to look at -- if there's a special

12   instruction that either side is seeking, I want to know why it's

13   not covered by the form instructions.

14             MR. MILLER:  Okay.

15             THE COURT:  So in your list -- and you give me the

16   group of special instructions.  Please link them, tell me to

17   which, if they do -- to which form instruction they relate.  Can

18   you do that?

19             MR. MILLER:  Yes, I can.

20             THE COURT:  Can you do that?

21             MR. BUSCH:  Yes, sir.

22             THE COURT:  Okay.  Thanks.

23             MR. BUSCH:  Your Honor, I've just been thinking about

24   one thing we discussed that obviously is greatly on my mind and

25   that's dealing with the recordings.

1          One thing that struck me that I would go back and have

2     done is have, for example, *Got to Give It Up* played with Marvin

3     Gaye's voice muted out and prepare some --

4          THE COURT:  I think that is what you've already

5     discussed.

6          MR. BUSCH:  Yes.

7          THE COURT:  You already said that.  And you were --

8     you were going to produce that and you are going to listen to

9     it.

10          MR. MILLER:  I will listen to it, but I would

11     completely object because none of that is in the deposit copies.

12          THE COURT:  Why don't you wait until you get what they

13     propose.  And then what you should also do is to present an

14     alternative to that recording in terms of how you would present

15     the evidence of what the sound -- what the sound recording --

16     excuse me -- what the deposit music sounds like.

17          MR. BUSCH:  And --

18          THE COURT:  And that way we can simplify this in terms

19     of I'll have what I need for resolving a dispute.

20          MR. BUSCH:  We'll do our best.  We are going to work

21     very hard on doing just that.  The expression of the composition

22     is the recording.  I'm not sure how --

23          THE COURT:  I think we've been over this.

24          MR. BUSCH:  Yes, sir.

25          THE COURT:  You don't have to call me *sir*.

 1              Now, just a minute.

 2              All right.  At this time, there are two criminal

 3      matters set for trial the week after your trial is set to

 4      commence.  I do not presently know and will not know

 5      definitively, probably until February 5th, whether one or both

 6      will be continued.

 7              However, if either is going to proceed on the schedule

 8      one week after your trial is set to begin, in as much as these

 9      parties have constitutional right to a speedy trial, if they

10      elect not to waive it, their trial has to commence on those

11      dates.

12              Given that I've given each of you what I said was 18

13      hours, which is approximately three days in total, and plus the

14      time to instruct the jury and other things, I don't think this

15      trial -- and given that we're not in session on Monday and for

16      at least a couple of hours on Thursday, I don't think that even

17      if we started on the current date, Tuesday, that the trial would

18      be completed before the following Tuesday when the criminal

19      trials are presently set.

20              I'm presently disinclined to have this trial commence

21      and then have the jurors be excused for what could be two weeks

22      or more to come back to complete the trial.  I'd rather have

23      this trial conducted in one continuous sequence of days.

24              Does either of you see it differently?

25              MR. KING:  No, not at all.  Not unexpected.  I know

what the criminal caseload is.  Obviously we all have witnesses

coming from across the country and our clients have touring

commitments, so we would have to work cooperatively --

THE COURT:  You need to do that.

What's your view?

MR. BUSCH:  I'm not going to disagree with that.

THE COURT:  Well, no.  I expect that anyway.  We'll

have to see.  I don't know.  As I say, I don't know what's going

to happen with these two criminal matters.  They may both go

away, they may both be delayed.  It may not be as an issue.  As

soon as I know more, we will let you know for your planning

purposes.

To the extent -- well, I'm very disinclined to start a

trial and then excuse a jury for weeks.  It's just -- I would

prefer -- it's not that I couldn't do it.  I just prefer not to

do it.  It complicates jury selection, it complicates things in

many ways, and, frankly, it doesn't necessarily make it easier

for you because your witnesses are now coming at different

potential weeks.  I just don't think that is the most efficient

way to do this.

What I want you to do -- but what I expect of you is

that you would work collaboratively on the issues that have been

discussed today that remain open, and if we get to a point where

we now -- whether it's the existing trial date or a new one and

a particular witness or witnesses have scheduling issues, my

1    expectation is you would work collaboratively and have them

2    called out of order, if necessary, so the witnesses can be

3    heard.

4           It's not an invitation for one side or the other to be

5    strategic and say, *Oh, my witness is only available on this*

6    *date,* which you think is a strategic advantage.  This happens

7    all the time.  My expectation is you could work that out.

8           What I would like you to do is work collaboratively in

9    this sense.  Talk about the issues I have raised today,

10   including there is a couple that relate to the motions in

11   limine.  Some relate to jury instructions.  Some relate to your

12   exhibits.  Work collaboratively on that to see what makes the

13   most -- how you can most efficiently narrow the issues in

14   dispute.

15          And meanwhile, we'll let you know as soon as we have

16   further information as to either of the criminal matters.  I may

17   have more information as to one of them later this week.  As to

18   the other, I don't presently expect to know more until

19   February 5th.

20          I recognize that puts a burden on you because you have

21   to tell witnesses, *Well, I can't tell you until February 5th if*

22   *you will be needed the next week.*  I recognize that creates

23   challenges, but you can meet them.  And your witness -- by doing

24   what I said earlier.

25          As I say, if we learn sooner that these -- that both

1    criminal trials are off and that you will be going forward, that

2    your trial will go as scheduled, we'll let you know that.

3                But that's what I want you to do.  And when I started

4    today -- oh, I didn't go through the voir dire.  Just a minute.

5                I'm not going to go through -- the purpose of

6    voir dire is to confirm that we have eight jurors who can be

7    fair and impartial in this case.  The purpose of voir dire is

8    not to go beyond that, and there are many questions here,

9    looking at defendants' proposed -- and the purpose -- excuse me.

10               Given the purpose of voir dire and the number of times

11   that I've done it, I think I can do it efficiently with your

12   assistance.  But as I suggested when we started, that doesn't

13   mean hundreds of questions being asked, whether collectively or

14   individually.

15               So in defendants' proposed questions about hobbies and

16   clubs or organizations and *ever retained a lawyer* and *do you*

17   *think lawyers are more truthful than others,* and you have people

18   who are trained in the law and showing the *Blurred Line* videos

19   and *what channels do you subscribe to* and so on and *what's your*

20   *favorite song and your favorite artist and your favorite*

21   *television show,* and so many of these others -- and some of

22   these are -- questions to the jurors are instructions that I'm

23   going to read about *even if you disagree with the law, you have*

24   *to follow it* -- I don't think many of these are necessary as

25   voir dire.

1           Similarly, on the plaintiffs' -- defendants' list,

2    questions such as 5 through 13 about *if you're not employed and*

3    *do you have -- what's your level of education, are you divorced*

4    *recently or separated, do you have a substance abuse problem,*

5    *have you ever -- have you ever inherited a home or other*

6    *tangible property, have you ever heard the term 'royalties',*

7    asking people about what their view is -- *whether you listen to*

8    *R&B, soul, rap, disco, funk music, do you think Mr. Williams*

9    *acts the same way in the studio or his private life as he does*

10   *on The Voice.*

11          There's just so many here that I think have very

12   little to do -- *do jury panels generally believe celebrities are*

13   *honest?  Do you read gossip blogs like Perez Hilton?*  On and on.

14          These are not questions I'm going to ask.  I'm going

15   to ask the jurors questions -- the basic questions, *where do you*

16   *live, what do you do, what other adults live at your residence,*

17   *do you have adult children, what do they do, do you -- have you*

18   *been a juror before, was it a civil or criminal case.*  The basic

19   questions.

20          I don't ask jurors whether they're married.  I ask

21   whether there are other adults living at their residences and

22   explore that.

23          I will ask many -- you know, plenty of questions among

24   the questions that you've presented which go to this case and be

25   able to be fair and impartial in this case, but I'm not going to

1  ask, as I just indicated, many of the questions each side has

2  proposed.

3        During the voir dire process, as I think I've told

4  you, after I've conducted the voir dire of the eight who are

5  seated, we'll go to the side and I'll hear from each side as to

6  whether each either side or both sides think any follow-up

7  questions are appropriate as to any of those eight.  And having

8  heard you on that, I will then determine whether to ask more

9  questions of one or more of the eight.

10        After I've completed that, we'll go to the side --

11  well, after I've completed that, we'll then go to if either side

12  has a cause issue with any of the eight.  And if I excuse any of

13  the eight for cause, we'll re-seat others until we have -- until

14  we have eight where I have -- either there has been no cause

15  challenge or -- any cause challenge has been denied.  At that

16  point you can exercise your peremptory challenges and each --

17  any time a peremptory is exercised, then we'll fill that spot

18  with an eighth juror before -- eighth prospective juror before

19  the other side is asked whether it exercises a peremptory.

20        Once again, when the new jurors are seated, new

21  prospective jurors are seated, we'll do the same voir dire

22  process and the same discussion at the side.  So if there's some

23  matter that's among the things that you've raised in your voir

24  dire questions here and that either side believes is very

25  important to ensure that one or more jurors can be fair and

1    impartial, you'll tell me at the side and I will evaluate your

2    position.  Similarly, I will evaluate your position on cause

3    challenges.

4         I will also be telling the jurors, prospective jurors,

5    to please listen as I examine those in the box, those in the

6    audience to listen, and I will then be asking any newly-seated

7    juror *have you been following along with the voir dire of those*

8    *who have been seated.*  So I don't necessarily re-ask every

9    single question to every new juror if he or she tells me, having

10   been sworn, that he or she has been listening and he or she has

11   not heard anything that raises an issue for him or her.

12        Again, we'll be at the side after that.  But I just

13   want to be clear how I do this.  And it's -- I find it efficient

14   and we can gather the information needed.  But I don't need

15   hundreds of questions to get there.  I would tell both of you

16   the following.  If based on the questions you've presented, if

17   there are 10 or less of those that either side thinks is

18   particularly important, then re-file your current versions of

19   your proposed voir dire with those 10 identified.  Okay.

20        Why don't you file your amended -- you've proposed

21   earlier to file any additional -- supplemental pleadings this

22   Thursday -- Thursday, I believe.

23        MR. KING:  Yes.

24        THE COURT:  Get me those next Monday.  That's the

25   day --

1          MR. KING:  I think we're back here next Monday.

2          THE COURT:  I don't need you back on the exhibit

3    conference until I see what exhibits are in dispute.  My

4    expectation is you can substantially narrow that.  Focus,

5    please, on what truly matters and what exhibits -- not only what

6    exhibits matter, but what each of you reasonably expects to be

7    an exhibit each side will offer.

8          If you give me 500 exhibits to rule on and 50 of them

9    really are only at issue, then I would like to know why I have

10   to deal with 500 when it's only 50.  So that's what I'd like you

11   to do on that.

12         And then that way we can be closer to knowing when

13   we'll start.

14         What other question did you have?

15         MR. KING:  Your Honor, I have a logistic question.  We

16   have agreed that the defendants will go first because we believe

17   the declaratory relief claim in our Complaint is ruled on by

18   you.  I have just a logistic question.

19         Should we change places as we proceed to trial?  That

20   will just govern how we frame instructions.  We have been having

21   some issues about do we call them *plaintiffs*, do we call them by

22   their names?  Does the jury get to know there is a declaratory

23   relief action, who sued whom?

24         THE COURT:  I understand.

25         MR. KING:  I am seeking guidance.

1          MR. BUSCH:  They are the plaintiffs.  They filed this

2    lawsuit.  They should sit where the plaintiffs sit.

3          THE COURT:  Okay.  Well, just a minute.

4          MR. KING:  Well, then -- I'm sorry.

5          Then it would appear we should go first, even though

6    we have suggested it's more appropriate for us to go second, but

7    if we are going to be named as the plaintiff and we are sitting

8    on this side, I guess we'll go first.  Again, the burden of

9    proof is on the defendants to show that there is a copyright

10   infringement.  It gets a little confusing.  We are flexible.

11   I'm sure we can --

12         THE COURT:  Let me ask you this.  With respect -- let

13   me ask you this.  What do you see as the overlap, if any,

14   between the declaratory relief claims and the defendants'

15   counterclaims?

16         MR. BUSCH:  They are -- thinking out loud, they are

17   suing for a declaration of non-infringement.  We're asking the

18   jury to find that there was copyright infringement.

19         THE COURT:  Right.  So the claims overlap.  Do you

20   agree with that?

21         MR. BUSCH:  Yes.

22         THE COURT:  Do you agree with that?

23         MR. KING:  I do.

24         THE COURT:  I'll reflect further on this.  There are

25   times where in a declaratory relief action -- let me ask you

1  this.

2          Are the witnesses going to be different in the

3  declaratory relief claims as opposed to the counterclaims?

4          MR. KING:  No.

5          THE COURT:  Do you agree with that?

6          MR. BUSCH:  There will be -- no.  They will be

7  basically the same.

8          THE COURT:  Well, then I don't see any reason to sever

9  the declaratory relief claim because that would be inefficient.

10  We would be trying the case -- well, I suppose that if I severed

11  the declaratory relief claim -- well, I'm not going to sever the

12  declaratory relief claim.  That's not -- I don't think that's

13  going to be efficient.

14          And I don't say that because I have any view as to the

15  outcome on the merits.  I just don't think we want to have two

16  different trials.  It doesn't make any sense.

17          What I will reflect on is whether I will ask the jury

18  for an advisory verdict on the declaratory relief issue to the

19  extent that it's any different than the verdict they would be

20  rendering on the counterclaims.

21          MR. KING:  I don't believe -- I believe we could

22  probably agree you need not do that.  That we'll both live with

23  the jury verdict.  But --

24          THE COURT:  I want you to be realistic and just

25  efficient.

1          MR. BUSCH:  We had stipulated -- Mr. Miller and I had

2     stipulated that we would go first.

3          THE COURT:  Well, it's -- what the confusion would be

4     is this.  All of these form instructions and the verdict forms

5     refer to *plaintiffs* and *the plaintiffs have a burden of proof*

6     and all that.  And it's -- it's -- it's not that we can't

7     explain it to the jurors, but it does create potential for

8     confusion if the plaintiffs don't have the burden of proof on

9     the issues that the jury is deciding.  So I just --

10          MR. MILLER:  Your Honor, if I may make a suggestion

11     that we've had in our proposed instructions.  I think if we just

12     refer to them as the *Gaye parties* and the *Thicke parties*, it

13     will be easier for the jury to follow along with who is who as

14     opposed to technicals titles which are reversed.

15          THE COURT:  What do you think about that?

16          MR. BUSCH:  I think the Thicke parties and the Gaye

17     parties are okay with me.

18          THE COURT:  See if you can work that out.  Keep in

19     mind -- when do you that, keep in mind the general instructions

20     that are at the outset where I talk about burdens of proof and

21     this is different than in a criminal case.  We have all those

22     forms.

23          Now, I -- so look at those, too, just to make sure

24     that using -- I'm not opposed to what you've suggested.  I'm

25     just saying please look at the jury instructions with that in

```
 1    mind to make sure you both agree that that will work.

 2              MR. KING:  My point was far more basic.  Not strategy.

 3    Just logistics.  I'm used to doing it a certain way.  If we are

 4    going to agree we will call them the Thicke parties and the Gaye

 5    parties -- but it's more complicated because the Thickes, like

 6    Mr. Williams, is not a defendant on some of the claims.  He has

 7    nothing to do with the Love After War song.

 8              We can work it out.  It's just to going to be

 9    cumbersome.

10              THE COURT:  Well, I don't think where you sit is

11    particularly significant.

12              MR. KING:  Nor do I.

13              THE COURT:  I don't think many jurors are aware that

14    the moving -- the plaintiff usually sits closer to the jury than

15    the defendant.

16              MR. BUSCH:  I just think that -- if we're going to be

17    clear, I think Mr. King is raising this because he wants

18    Mr. Williams, a big star, to be looking at the jury --

19              MR. KING:  I could care less.

20              MR. BUSCH:  Maybe that's not true.  That's my --

21              THE COURT:  Okay.  I'm not going to go there.

22              What I'm after is efficiency.  I don't want to have to

23    spend a lot of time, particularly during the trial, having to

24    reformulate an instruction or respond to a question because I'm

25    fearful that the juror or jurors maybe have been confused by how
```

1    we proceeded.  So make it easy for them.  Where you sit is not

2    the issue.

3           MR. KING:  I'm more concerned about the logistics.

4    Does the jury learn there was a declaratory relief action?  Do

5    they need to know what that meant?  Those are --

6           THE COURT:  I don't --

7           MR. KING:  I don't think so either.

8           THE COURT:  I don't think the jury needs to know that.

9           MR. BUSCH:  I do, your Honor, and I will tell you why.

10          THE COURT:  Why?

11          MR. BUSCH:  Mr. King and his clients have made a big

12   deal about calling the Gayes opportunists, that they saw this as

13   a chance to make a lot of money, and that yet it was Mr. Thicke

14   and Mr. Williams who actually filed this lawsuit.  I think that

15   is an important factor for the jury to understand.

16          It was not us who filed this lawsuit.  It was --

17          THE COURT:  I'll think about it, but I don't think the

18   jury should -- I am not inclined to tell the jury there is a

19   declaratory relief action because then I'd have to explain what

20   that is and how that relates to what they're doing.  And if I'm

21   not going to do that, then I'm not inclined to get in -- to take

22   the half step toward that, which is to say who started the

23   litigation because we then have to explain that.

24          And, again, I think you ought to focus on sort of the

25   core issues here.

1          MR. BUSCH:  I agree, your Honor, as far as that is

2    concerned.

3          I do have one or two questions I want to ask.

4          THE COURT:  Go ahead.

5          Have you agreed on a joint statement of the case or

6    are you going to make mini openings?

7          MR. KING:  I believe we have agreed we are making mini

8    openings.

9          MR. BUSCH:  Mini openings.

10          THE COURT:  Remember, those are not arguments and

11    they're mini.  Short.

12          Yes?

13          MR. BUSCH:  Two things.

14          Number one, I would just ask -- I know your Honor has

15    stated that your Honor would read the transcript pages from

16    *Three Boys* that we did submit.

17          THE COURT:  Yes.

18          MR. BUSCH:  They relate to a couple of the issues --

19          THE COURT:  I don't want to re-argue.

20          MR. BUSCH:  I'm not re-arguing.  For clarification.

21    We are going to be doing a lot of work now to prepare new

22    revised demonstratives.  So I heard what your Honor said about

23    that Marvin Gaye's voice was not going to be played.

24          Some of the comparisons that we're preparing from the

25    recordings will combine -- have, just because that's the way the

1    recording is, elements of the recording that's in the lead sheet

2    and it might include an element that's not in the lead sheet,

3    but that's how the recording is.  That's how it is both combined

4    and impossible to separate and so that's how it's heard.  And so

5    that's complicated, given your Honor's ruling.

6           No. 2, as I mentioned, there are many things that --

7    there is 14, 15 as many as 19 similarities that were identified

8    by Ms. Finell and Dr. Monson as having been copied.  And the --

9    I would like to and I would intend to point out or question

10   witnesses like Mr. Thicke or Mr. Williams about things that are

11   not in the lead sheets on the theory that having copied those

12   things, it is evidence that they -- that they had the recording

13   and that they had that in mind and they were copying the

14   compositional elements of the song.

15          And so these are things that are difficult in light of

16   your Honor's ruling.  I'm going to do my best --

17          THE COURT:  Do your best.

18          MR. BUSCH:  -- to put together demonstratives and then

19   I guess we'll discuss them.

20          THE COURT:  That's what I think we already discussed.

21          Thanks.  Anything else?

22          Oh, I have your joint report on your efforts to --

23   your settlement positions.  Just -- it's procedural.  I don't

24   have any data concerning your respective positions, just a

25   statement.

```
 1              I think that you mutually agree that further

 2     discussions with Judge Matz would not be productive.  Does that

 3     remain your view?

 4              MR. KING:  It does, your Honor.

 5              THE COURT:  Does that remain your view as well?

 6              MR. BUSCH:  It does, I think, at this point.

 7              THE COURT:  Does either of you think there is any

 8     process that would be productive in terms of getting closer to

 9     trying to resolve this matter?

10              MR. KING:  Without revealing any substance, we do not

11     believe there is any way, shape, or form that we --

12              THE COURT:  What do you think?

13              MR. BUSCH:  To be perfectly honest, your Honor, I felt

14     and I feel very good about this case if I'm able to try the case

15     and put my evidence on.

16              Your Honor has made a couple of rulings here today

17     that I do not believe are correct, and we'll try the case and I

18     think they -- the other side may be emboldened because of the

19     rulings, and we may end up somewhere else.  But I don't think we

20     can settle the case.

21              THE COURT:  Okay.  Well, keep thinking about it.  As

22     you talk about -- in your collaborative efforts on these other

23     issues, don't give it up, and if there is some other -- don't

24     give up the opportunity, and if there is some other thing that

25     you both think would be productive in terms of trying to resolve
```

1    the matter, whether it's discussion of a particular issue with

2    Judge Matz or a -- or some other person, please let me know.

3    Don't -- never stop considering it.  Okay.  Thanks.

4              MR. KING:  Thank you, your Honor.

5              MR. BUSCH:  Thank you, your Honor.

6                   (Proceedings adjourned at 4:41 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
*                      )*
*STATE OF CALIFORNIA   )*


*        I, Pamela A. Batalo, Federal Official Realtime Court*

*Reporter, Registered Professional Reporter, in and for the*

*United States District Court for the Central District of*

*California, do hereby certify that pursuant to Section 753,*

*Title 18, United States Code, that the foregoing is a true and*

*correct transcript of the stenographically reported proceedings*

*held in the above-entitled matter and that the transcript page*

*format is in conformance with the regulations of the Judicial*

*Conference of the United States.*


*Date:  January 27, 2015*


*/s/ Pamela A. Batalo*
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*