Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
KING & BALLOW
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000
Fax: (858) 597-6008
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Richard S. Busch (TN BPR 014594) (*pro hac vice*)
E-Mail: rbusch@kingballow.com
Sara R. Ellis (TN BPR 030760) (*pro hac vice*)
E-Mail: sellis@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 Fax: (615) 726-5417
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East; Suite 1520
Los Angeles, CA 90067
(310) 853-6355 Fax: (310) 853-6333
Attorneys for Defendants and Counter-Claimants Frankie Christian Gaye and Nona Marvisa Gaye

Paul N. Philips (SBN 18792)
E-Mail: pnp@pnplegal.com
The Law Offices of Paul N. Philips
9255 West Sunset Boulevard
West Hollywood, CA 90069
(323)813-1126 Fax: (323) 854-6902
Attorney for Defendant and Counter-Claimant Marvin Gaye III

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>———————————<br><br>AND RELATED COUNTERCLAIMS | Case No. CV13-06004-JAK (AGRx)<br><br>Hon. John A. Kronstadt<br><br>**COUNTER-CLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR EX PARTE APPLICATION FOR CONTINUANCE OF TRIAL, RECONSIDERATION OF GRANTING MOTION IN LIMINE NO. 1-3 AND CERTIFICATION OF QUESTION FOR INTERLOCUTORY APPEAL**<br><br>Action Commenced: August 15, 2013<br>Trial Date: February 10, 2015 |

# **TABLE OF CONTENTS**

A. REQUEST FOR TRIAL POSTPONEMENT ……………………………………....3

B. MOTION FOR RECONSIDERATION ……………………………………………5

    1. Standard of Review for a Motion for Reconsideration ...………………………...5

    2. The Protected Compositional Elements are Not Limited to the

        Deposit Copy …………………………………………………………………6

    3. The Gayes Must Be Allowed to Play Marvin Gaye's Commercially

        Released Sound Recordings and Excerpts of Those Recordings at Trial……….12

    4. An Ordinary Observer Cannot Accurately Apply the Concept and

        Feel Test Without the Benefit of Hearing the Sound Recording that

        is the Most Accurate and Complete Expression of the Underlying

        Composition ………………………………………………………………...14

    5. The Intrinsic Test Requires the Playing of the Entire Sound Recordings ………15

    6. The Sound Recordings Provide Highly Probative Evidence of Copying ………17

C. SHOULD THE COURT ULTIMATELY DECIDE THE SCOPE
   OF THE  PROTECTED WORKS IS LIMITED ONLY TO ELEMENTS
   INCLUDED IN THE DEPOSIT COPIES, THE GAYES REQUEST
   THAT THE QUESTION OF WHETHER A COPYRIGHT PLAINTIFF'S
   WORK IS LIMITED ONLY TO COMPOSITIONAL ELEMENTS IN
   PUBLISHED VERSIONS OF THE WORK BE CERTIFIED FOR AN
   INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. 1292(B)……………...20

    1. Standard Of Review for an Interlocutory Appeal …………………………21

    2. An Interlocutory Appeal is Proper under the Instant Scenario ………………21

    3. The Current Trial Setting Should be Postponed …………………………………23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) ........................................19

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946) ...................................14, 19

*Couch v. Telescope Inc.,* 611 F.3d 629 (9th Cir. 2010) ...............................21

*Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009) ...................16

*Flynn v. Surnow*, No. CV 02-9058-JFW PLAX, 2003 WL 23411877 (C.D. Cal. Dec. 9, 2003) ..................................................19

*Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984) ...........................7

*JB Oxford & Co. v. First Tennessee Bank Nat. Ass'n*, 427 F. Supp. 2d 784 (M.D. Tenn. 2006) ..............................................18

*Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002) ..................................................14

*Johnson v. Gordon*, 409 F.3d 12 (1st Cir. 2005) ...............................20

*Johnson v. Salomon*, 197 U.S.P.Q. 801 (D. Minn. 1977) ...............................8

*Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1159 (S.D.N.Y. 1986) ...............11

*KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS), 2008 WL 5245484 (N.D. Cal. Dec. 17, 2008) ...............................7, 9, 10, 11

*Maggio v. Liztech Jewelry*, 912 F. Supp. 216 (E.D. La. 1996) ........................20

*Milliken & Co. v. Shaw Indus., Inc.*, 978 F. Supp. 1155 (N.D. Ga. 1997) ....................7

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, No. 14-CV-02361-RS, 2014 WL 6655844 (N.D. Cal. Nov. 24, 2014) ...............................19

*N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393 (S.D.N.Y. 1952) ..........14, 19

*National Comics Pubs. v. Fawcett Pubs.*, 191 F.2d 594 (2d Cir. 1951) ...........................7

*Navara v. M. Witmark & Sons*, 185 N.Y.S.2d 560 (Sup. Ct. 1959) ........................14

*Prunte v. Universal Music Grp.*, 563 F. Supp. 2d 41 (D.D.C. 2008) ........................20

*Radin v. Hunt*, LA CV10-08838 JAK (SSx) (C.D. Cal. Dec. 15, 2011).............................16

*Repp v. Webber*, 892 F. Supp. 552 (S.D.N.Y. 1995).....................................................14, 19

*Rich v. Paramount Pictures*, 279 P.2d 782 (1955) ...........................................................15

*Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045 (D. Idaho 2013) ....................................7

*Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014) ......................7

*Sch. Dist. No. 1J, Multnomah Cnty, Oregon v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993) ...............................................................................................................................6

*Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) ...............................................................14, 19

*Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990)...............................................................2

*Shoptalk, Ltd. v. Concorde-New Horizon Corp.*, 168 F.3d 586 (2d. Cir. 1999) ...............8

*Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347 (9th Cir. 1988) ......................22

*Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d 1157 (9th Cir. 1977)........................16

*Swirsky v. Carey*, 376 F.3d 84 (9th Cir. 2004)...........................................................9, 15

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000)...........................*passim*

*Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338 (9th Cir. 1981) ...........6

*Walker v. Viacom Int'l, Inc.*, No. C 06-4931 SI, 2008 WL 2050964 (N.D. Cal. May 13, 2008) ...............................................................................................................20

*Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25 (1st Cir. 2001).........20

**Statutes**

17 U.S.C. § 408 ....................................................................................................................7

17 U.S.C. § 505 ..................................................................................................................23

28 U.S.C. § 1292 ................................................................................................................21

**Rules**

Fed. R. Evid. 401 .........................................................................................................18, 19

Fed. R. Evid. 403 ................................................................................................................19

**Treatises**

4 Nimmer Copyright § 13.02 (2006) .................................................................18, 20

Paul Goldstein, Goldstein on Copyright § 3.8 (2013) ...........................................7

**Other Authorities**

Fed. R. Evid. 403 advisory committee's note (1972) ........................................19

Fed. R. Evid. 404 advisory committee's note (1972) ........................................19

Defendants and Counter-Claimants Nona Marvisa Gaye, Frankie Christian Gaye, and Marvin Gaye III (the "Gayes"), hereby submit this Application for Ex Parte Relief in light of the impending trial date and the immediate need for relief.  For the reasons discussed below, the Gayes request that this Court:  (1) postpone the trial date in this matter; and (2) reconsider a ruling that would not only severely impact the trial of this action, and is not supported by law, but would create dangerous precedent, or, in the alternative; (3) grant permission for the Gaye parties to file an interlocutory appeal, since the finding that the non-lead sheet compositional elements embodied in Marvin Gaye's commercially released sound recording are not part of this action is directly at odds with every decision the Gayes' counsel can locate on the topic, and the Court cited no law to support its conclusion.

As explained more fully below, the law is clear that a plaintiff suing for copyright infringement under the 1909 Copyright Act need only produce a copyright registration identifying a work as published.  As long as the work is properly registered, the registration covers not only the composition as reflected by the deposit copy, but also other versions of the composition that existed at the time of registration.  The Court's Orders seem to reflect this position.  (*See, e.g.*, Dkt. No. 139 at 9; Dkt. No. 231).  However, the Court's Order then takes a leap of logic that is not supported by the law.  (Dkt. No. 139).  The Order reasons that because the composition as embodied in the sound recording could not have been a "published" copy under the 1909 Copyright Act, the version of the composition embodied on the sound recording is not protected under the 1909 Copyright Act.  Not only is there no support for this proposition in the case law, but adopting such a position would create dangerous and potentially devastating precedent to the owners of such intellectual property.

Specifically, as discussed further below, the Court's ruling would have a devastating impact on the rights of owners of pre-1978 musical compositions by allowing wholesale copying of compositional elements not found in pre-registration published versions of the works or within the deposit copies themselves.  For example,

1

under this Court's ruling, a clever infringer would be able to compare sheet music or deposit copy lead sheets of the works of the Beatles, The Rolling Stones, Elvis Presley, and, of course, Marvin Gaye, with the composition as embodied in the recordings of those icons, and take with impunity all compositional elements not found within the sheet music or deposit copies.  It would create a situation where the compositions in the recordings are derivative works incapable of copyright protection because, as pre-1978 works, the recordings could not be submitted as the musical compositions.  That is not and cannot be the law.  Instead, the Copyright Act required publication and registration, but once these statutory formalities are met, all versions of the composition fairly identified by the deposit copy were protected.  This would and must include the musical composition embodied in the distributed sound recording.  This decision must either be reconsidered or an interlocutory appeal should be allowed.

In addition, the Court's decision not to allow the complete recordings to be played, and only edited versions that surgically carve out the allegedly non-protected elements not found within the lead sheets, would be the only case in history that the Gayes' counsel can locate where two complete commercial recordings at issue in a music copyright infringement action were not allowed to be played to compare the expression of the compositional elements embodied in those recordings.[1] The prejudice to the Gayes in this regard, as explained below, far outweighs any prejudice to the Thicke parties, and requires reconsideration of this ruling.

All of the requirements for the granting of an interlocutory appeal are present, and the Court should allow that appeal to be taken now, since this action is prohibitively expensive to the Gayes to try once, let alone twice, and judicial economy and resources, as well as the resources of the parties, will be conserved by allowing these issues to be

---

[1] The Court cites *Shaw v. Lindheim* in support of this finding.  However, that case dealt with a claim of copyright infringement regarding a pilot television script which was written prior to and not as a part of filming.  919 F.2d 1353 (9th Cir. 1990).

resolved now.  The potential consequences to the Gayes of not being able to try their full and complete case are enormous and justify the relief requested.

## A.  REQUEST FOR TRIAL POSTPONEMENT

Having been through more than a year of discovery and preparation, this case is now set for trial in thirteen days.  All parties in this action deserve to present their best case and have this matter decided on its merits.  However, the Gayes are now unsure of the potential scope of the evidence that may be permitted to be presented at trial, leaving them in an untenable position from which they cannot move forward in an equitable or efficient manner.

This case involves a large number of fact and expert witnesses, the testimony of each of whom will be influenced by this Court's rulings on the parties' seventeen Motions *in Limine*.  This is especially true for expert witnesses, who are now preparing their testimony and demonstrative exhibits without knowing whether and to what extent these materials will be allowed to be played.

For instance, as noted by the Court in its January 28, 2015 Order (the "January 28 Order"), there was confusion at the Pretrial Conference regarding the scope of the evidence the Court would allow to be presented at trial.  (Dkt. No. 231 at 1).  The January 28 Order changed a prior ruling, but still leaves significant doubt as to exactly what will be allowed at trial.  (*Id*.).

The January 28 Order states that the Gayes may play edited recordings in which all unprotected elements have been eliminated.  (Dkt. No. 231 at 5).  While the Gayes dispute this ruling is fair or a correct application of the law, even if this were to be the Court's final ruling, it would not provide clarification of what exactly can be played.  More specifically, one of the greatest expenses the Gayes have incurred to date is borne of the hiring of renowned musicological experts expected to opine regarding the similarities between the Gayes' works and the Plaintiffs' works.  These experts have spent considerable time and energy to provide a rational and analytical comparison of the compositions at issue.  (Decl. of Ingrid Monson at ¶ 3; Decl. of Judith Finell at ¶ 3).

While the Gayes are uncertain of the exact metes and bounds of the January 28 Order, it is possible that as much as forty percent of the similarities found by the experts may have been excluded based on this Court's pretrial rulings.  (Finell Decl. at ¶ 16).  Thus, while the experts are prepared to testify based on their complete reports, all of which have previously been submitted to the Court.  (Monson Decl. at ¶¶ 4, 5; Finell Decl. at ¶ 4; Dkt. Nos. 196-1, 196-2, 196-3, 196-4, 196-15), the January 28 Order will require them to completely re-tool their testimony and the demonstrative exhibits they have spent months developing.  (Monson Decl. at ¶ 6; Finell Decl. at ¶¶ 13-14).

For instance, Ms. Finell has created a draft PowerPoint exhibit that is approximately 40 pages in length.  (Finell Decl. at ¶ 13).  This draft demonstrative exhibit, which was due to be exchanged with Plaintiffs' within a few days, will take a substantial amount of time to modify in order to comply with any rulings that drastically limit Ms. Finell's testimony.  Further, the Court indicated at the Pretrial Hearing and in its January 28 Order that the Gayes' experts would have to create new demonstrative exhibits including additional comparative demonstration recordings.  (Ex. A to Decl. of Richard S. Busch at 20:11-14; Dkt. No. 231 at 5).  Not only will it take considerable time to create these comparative demonstration recordings, but the parties will then need to meet and confer regarding the comparative demonstration recordings, and likely further litigate disputes over them before the Court, as Plaintiffs have made it clear to the Gayes' counsel that they will fight to prevent any use of Marvin Gaye's recordings.  (Busch Decl. at ¶ 3; Monson Decl. at ¶ 6; Finell Decl. at ¶ 14).

The Court has ordered the parties to produce these new exhibits by noon February 2, 2015.  (Dkt. No. 231 at 6).  Such a deadline makes sense based on a trial date of February 10, 2015.  However, that leaves the Gayes with only four full days to create these new works.  The Gayes' experts estimate that it could take as much as thirty hours to create one new recording even without the time necessary to confer with the musicologists and counsel in order to determine the proper scope of those recordings.

(Decl. of Ron Aston at ¶ 8; Decl. of Thomas Court at ¶ 5). Thus, a continuance of the trial is necessary to allow both parties to put on their best case.

The Court's Order states that the Gayes should have been on notice of this potentiality since October 30, 2014, when the Court made its Summary Judgment Ruling. (Dkt. No. 231 at 5). However, in denying Plaintiffs' Motion for Summary Judgment, the Court noted, at least eleven times, that its decision not to analyze elements allegedly not contained in the lead sheet at that time was for the purpose *of that Motion*. (Dkt. No. 139). The Court also noted that the submitted comparative demonstration recordings go to the intrinsic test, and that the Court was only performing the extrinsic test on that motion. (*Id*.). Therefore, by the Court's own language, repeated 11 times in the Order, that decision related to only the extrinsic test and the Gayes reasonably interpreted it as only related to the extrinsic test.

As such, the Gayes must request a postponement of the current trial. This request results in no prejudice to any of the parties. Indeed, at the pre-trial conference, the Court stated the trial may need to be postponed because of two criminal matters that are scheduled to be tried in the middle of this trial. All parties agreed that the beginning of the trial should be postponed, rather than begun and then interrupted by the criminal trials, and would work cooperatively to reschedule. (Ex. A to Busch Decl. at 62:2-64:7). Nonetheless, at a meet and confer session on January 27, 2014, counsel for Plaintiffs would not agree to a continuance. As a result, and in light of the foregoing, the Gayes respectfully request a postponement of the February 10, 2015 trial date.

**B. MOTION FOR RECONSIDERATION**

The Gaye parties respectfully request the Court to reconsider its decision granting in part the Plaintiffs' Motion *in Limine*, No. 1-3.

**1. <u>Standard of Review for a Motion for Reconsideration</u>**

A Motion for Reconsideration is appropriate "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. There may

also be other, highly unusual circumstances warranting reconsideration." *Sch. Dist. No. 1J, Multnomah Cnty, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

### 2.  <u>The Protected Compositional Elements are Not Limited to the Deposit Copy</u>

The Gayes seek reconsideration of the January 28 Order, in which the Court stated that the copyrighted works at issue are limited to the deposit copy lead sheets submitted with the copyright registration. As discussed in full below, the deposit copy lead sheet with the registration only serves to identify the copyrighted work, but the work that is protected is the best version of the composition that existed at the time of registration.

As this Court has noted, contrary to Plaintiffs' assertions "the scope of Defendants' copyrights is not, as a matter of law, limited to the lead sheets deposited with the Copyright Office." (Dkt. No. 139 at 8) (relying on the Ninth Circuit's holding in *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338 (9th Cir. 1981), that the deposit requirement has "no effect whatsoever on the validity or enforceability of a copyright"). While, the Court's Opinion correctly finds the deposit copy lead sheets do not, as a matter of law, limit the scope of the protected work, the Court's Opinion goes on to find that the protected works must be published.  (Dkt. No. 231 at 3).

There is no dispute that in order to receive protection under the 1909 Copyright Act, a composition had to be published.  Further, there is no dispute, in this action, that the compositions at issue were registered as published works.  (*See e.g.* Dkt. No. 231 at 4 n.2).  The Court, however, followed those principles to leap over a chasm never before crossed, finding the Gayes had the burden to produce sheet music published prior to registration that identifies the elements of the published work, and that the consequences of failing to do so restricts the composition to those compositional elements found within the lead sheet deposited with the registration.  (Dkt. No. 139 at 10).  The Gayes are aware of no authority supporting the proposition that the version of the composition protected must have been "published" in the form of sheet music prior to registration, and the Court cited no authority to support this conclusion.  Instead, registration protects all versions of the composition that existed prior to registration.

The Gayes have produced substantial evidence to show that the composition, "Got to Give it Up" was written through the recording process and that the version of the composition included on Marvin Gaye's original commercially released recording was a complete version of the composition that existed prior to registration. (Dkt. No. 139 at 9-10; *see also* Decl. of Janis Gaye at ¶¶ 5, 8). That proof establishes the scope of the copyright and cannot be challenged by an infringer who was actually on notice of the copyright. *See Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745 (2d Cir. 1962) ("Even if, as defendants urge, the copyright notice might not be sufficient for some purposes . . . the defendants, as willful infringers wholly aware of the existence of the copyright, are in no position to assert the insufficiency of the notice."); *see also National Comics Pubs. v. Fawcett Pubs.*, 191 F.2d 594, 603 (2d Cir. 1951).

The purpose of the deposit requirement under 17 U.S.C. § 408(b) is not to define the scope of an infringement claim, but instead "is to identify the copyrighted work for the purposes of registration." *Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (rev'd and remanded, in part, on other grounds)[2]; Paul Goldstein, Goldstein on Copyright § 3.8 (2013); *see also Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000); *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS), 2008 WL 5245484, at *10 (N.D. Cal. Dec. 17, 2008); *Milliken & Co. v. Shaw Indus., Inc.*, 978 F. Supp. 1155, 1158 (N.D. Ga. 1997). "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, [the Ninth Circuit's] definition of a 'complete copy' is *broad and deferential*: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Three Boys Music Corp.*, 212 F.3d at 486 (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984)). Under the 1909 Act, registration of a work is proper even

---

[2] In reversing the lower Court, the Ninth Circuit did not squarely address this issue, but implicitly noted its agreement by stating: "We agree with the district court's conclusion regarding the extrinsic test that the designs at issue are subject to broad copyright protection." *Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621, 622 (9th Cir. 2014).

where the deposit copies do not reflect the entirety of the work protected.  *See* 2 Nimmer on Copyright § 7.17[E][2][b] at n.72 (citing *Johnson v. Salomon*, 197 U.S.P.Q. 801 (D. Minn. 1977)).  In fact, such a rule is necessary because it is virtually impossible for sheet music to encompass every compositional element of a work and under the 1909 Act, and the Copyright Office would not accept sound recordings as deposit copies.  (Dkt. No. 139 at 10).

The Court's conclusion that only the portions of the composition which were published, as defined by the Copyright Act, are protected is not supported at all by the 1909 Copyright Act or case law interpreting it.  In fact, the publication of a composition and subsequent registration protects the entirety of the composition, as long as the published version, whether complete or not, identifies the full composition as it existed at the time of publication.  *See Shoptalk, Ltd. v. Concorde-New Horizon Corp.*, 168 F.3d 586, 592 (2d. Cir. 1999) (holding a previously unpublished work is "published" when a derivative work of the prior work is published if the previously unpublished work is disclosed in the derivative work).

This was exactly the finding of the Ninth Circuit in *Three Boys*.  While this Court has stated that it reads *Three Boys* as involving a question of jurisdiction, that is only part of the decision.  *Three Boys* involved facts nearly identical to the ones at issue in this action: a popular post-1978 composition infringed upon a copyright granted under the 1909 Copyright Act. 212 F.3d at 480-81. The *Three Boys* Court allowed the jury to hear and analyze the compositions, as expressed in the respective artists' commercially available sound recordings, even though the recordings contained two elements not contained in the deposited lead sheet and an additional element that was different from the element contained in the lead sheet. (Trial Tr. at 7:21-25, 101:20-102:3; 337:13-18, 524:6-12; 525:7; 789:17-24; 791:1-793:2; 889:21-890:4; 1140:10-1142:3, attached as Ex. B to Busch Decl.). Thereafter, comparative demonstration recordings were also presented to the jury for analysis. (*Id.* at Trial Tr. 1140:10-1142:3).  The jury, in finding infringement had occurred, determined that, among other things, a unique combination of unprotectible elements in both

works made the works substantially similar.  (*Id*. at 486).  Two compositional elements not in the deposit copy, as well as a compositional element which was different from what was contained in the deposit copy, were part of the finding of infringement, meaning that three out of the five elements that resulted in the infringement finding were either not in the deposit copy or different from what was in the lead sheet (*Id.* at Trial Tr. 760:18-761:15).

The Ninth Circuit held, after hearing the complete compositions as embodied in the respective artists' commercially available sound recordings and comparative demonstration recordings, that "[t]he jury . . . 'found infringement based on a unique compilation of those elements. We refuse to interfere with the jury's credibility determination, nor do we find that the jury's finding of substantial similarity was clearly erroneous." *Three Boys Music Corp.*, 212 F.3d at 485-86. The Court noted it is "well-settled" that a combination of unprotectible elements can be protected and infringed upon. *Id.* at 485. The Ninth Circuit expanded this ruling in *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004) (finding infringement based on a combination of individually unprotectible elements such as genre, and citing additional cases that have allowed a combination of unprotectible elements to be protected).

Certainly, it is unbelievable that the Ninth Circuit would not find error with a verdict relying on three compositional elements which were not protected when the jury could only consider a total of five elements.  Instead, *Three Boys* must be understood as holding that the deposit copy only identifies the copyright at issue of which the most complete version may be found in the composition as embodied on a sound recording.[3]

This reading of *Three Boys* has been recognized by other Courts in the Ninth Circuit.  In *KnowledgePlex, Inc. v. Placebase, Inc.*, the Court determined there was "no authority" for finding a court's jurisdiction was limited to the material "deposited with the Copyright Office."  2008 WL 5245484, at *10.  The Court went on to hold, "the Ninth Circuit in *Three Boys* explicitly rejected an argument that the district court lacked subject matter jurisdiction over a copyright infringement claim where the plaintiff had

---

[3] This ruling must also mean that the jury can hear the commercially released sound recording, even if that recording contains arguably unprotected or unprotectible elements.

'failed to register a complete copy of the song upon which the lawsuit was based,' in that "the deposit copy [did] not include the majority of the musical elements that were part of the infringement claim.'" *Id.* (citing *Three Boys Music Corp.*, 212 F.3d at 486). These Courts are explicitly reading *Three Boys* for the proposition that the incomplete lead sheet at issue in that case protected the best version of the composition that existed at the time of registration, the composition as embodied on the sound recording.

In this case, the Gayes' have put on eye-witness proof that Marvin Gaye composed the compositions in the studio as part of the recording process. (Gaye Decl. at ¶¶ 5, 6). These compositions were not immediately transcribed to sheet music, but were instead recorded. (*Id.* at ¶ 8). It is this recording that evidences the entirety of the composition and the Gayes have put on proof showing ownership of the entirety of this composition. Of course, as the Court has stated, the composition as embodied on the sound recording was not protected under the 1909 Copyright Act until it was published and no suit for infringement could have been brought before a deposit and registration was made, (Dkt. No. 139 at 9), but that is a wholly different principle from the Court's next leap, that the composition as embodied in the recording, as the most complete version of the composition, is not protected and does not define the scope of the copyrighted work. Indeed, this statement is inconsistent with this Court's other conclusion, that it is not the deposit that limits the scope of the composition, but is instead the composition as it existed at the time of registration. (*Id.*). The Court is simply incorrect in ruling that only the published portions of the composition could be protected. There is no authority for that position. Instead, just as the Ninth Circuit affirmed in *Three Boys*, once a composition is registered, the entire composition is protected.

The musical composition "Got to Give it Up" was created simultaneously as it was being recorded. (Gaye Decl. at ¶ 6). Thus, the musical composition of "Got to Give it Up" in total is embodied in the sound recording. The lead sheet submitted to the Copyright Office was only created *after* the recording. (*Id.* at ¶ 8). The sound recording on which the

10

lead sheet is based is the best evidence of what comprises or constitutes the composition for the purposes of the intrinsic test and it must be admitted at trial.

Such a rule is necessary as, "musical compositions often go through numerous revisions. Compelling the owner of the copyright to deposit each revision pursuant to [The Copyright Act] would be unwise and unmanageable." *Jones v. Virgin Records, Ltd*., 643 F. Supp. 1153, 1159 n.13 (S.D.N.Y. 1986). Instead of such an unworkable regime, it is the deposit copy's job to identify the composition, not to define it. Thus, the contents of the lead sheet are for the purpose of identifying the work that has been registered and *not* to identify each any every claimed element of the registered work. *See KnowledgePlex, Inc.*, 2008 WL 5245484, at *9.

Finally, adopting the theory put forth by the Plaintiffs, and contained in the Court's January 28 Order, would have drastic and devastating consequences for intellectual property. Such an interpretation of the law would essentially legalize wholesale copyright infringement of pre-1978 compositions. It would allow individuals to copy every single compositional element of a song as long as those compositional elements were not particularly set forth in published sheet music or the lead sheet deposit copy submitted with a registration. Not only would this greatly weaken copyright protections overall, but it would have a particularly harsh effect on individuals who may be great composers of songs, but do not read or write music. Such a rule would unfairly disadvantage composers who could not afford to or did not have access to the musical education needed to properly employ musical notations. That an individual does not know the meaning of the word "parlando" or how to notate percussion should not mean that individual's work is so devalued as to receive a lesser degree of copyright protection. Such a rule would harm every creator, but would be especially harsh for the poor and disenfranchised.

The Court's ruling would allow infringers to steal classic portions of the songs by Marvin Gaye, the Beatles, the Rolling Stones, Elvis Presley, and every other iconic artist whose works were created before 1978, when the law was amended to permit the deposit of sound recordings as evidence of the author's composition, so long as the

compositional elements embodied in their pre-1978 sound recording were not present or different than the compositional elements in the deposited lead sheets or published sheet music.  It would mean that the compositions embodied in recordings of pre-1978 works could not be copyrighted, since recordings could not be submitted, and would in affect constitute uncopyrightable derivative works of the published sheet music.  The differences between the sheet music and the entire recorded composition would be free to be stolen with complete impunity.  That is not and cannot be the law.

Based on the foregoing, the Gayes submit that any Order which determines that the scope of the protected works, in this case, are fully delineated by the deposit copy lead sheet is contrary to the law and in direct conflict with binding Ninth Circuit authority.  Such a decision must be reversed.

### 3. The Gayes Must Be Allowed to Play Marvin Gaye's Commercially Released Sound Recordings and Excerpts of Those Recordings at Trial

While, as discussed above, the Court's ruling leaves questions regarding the scope of the sound recordings that may be introduced at trial, it is clear that the entire sound recordings will not be admitted under the Court's current Order.[4]  The Gayes disagree with the Court and assert that such a ruling is a clear error of law and should be reversed. Because such a ruling, as discussed below, has such broad ranging consequences, the Gayes request the Court to order a Hearing at which the Gayes' expert witnesses may present testimony and specific audio examples setting forth the importance and value of Marvin Gaye's sound recordings, and how those sound recordings, both in whole and in part, are important to an accurate analytical analysis of the compositions, and to a jury's ability to apply the ordinary observer test.  Allowing the jury to hear Plaintiffs' commercially released sound recordings and voices, without relying solely upon a lead

---

[4] While the Gayes believe that the law dictates that the entirety of the sound recordings be played, the Gayes do understand the Court has discretion to manage a trial and such discretion could well be used to limit the length of the recordings to be played. However, that discretion is not so broad as to allow for the limiting of the sound recordings to only certain elements within portions being played.

sheet edition of Plaintiffs' works, while excluding all, but a few elements of the sound recordings which embody Marvin Gaye's compositions, and limiting the jury's analysis only to what is reflected on a lead sheet for Marvin Gaye's works, is incongruous and patently unfair, and deprives the Gayes of the opportunity to prove the copying of the compositional elements of their protected compositions.

As discussed above, the compositions as embodied in the sound recordings are the compositions at issue in this action. The Gayes have not alleged ownership of Marvin Gaye's sound recording copyrights, and have not alleged infringement of those sound recording copyrights. However, as owners of their father's composition copyrights, the Gayes have alleged infringement of those works and point to the best manifestation of their father's compositions (which subsists within his commercially released recordings) as the "apples to apples" basis for comparison against the Plaintiffs' compositions. The Court's ruling would have the jury compare an apple to an apple seed.

However, even if the infringement claims were limited to the elements in the respective deposit copy, which they should not be, the Gayes must be allowed to play the sound recordings as (1) this would be the only music copyright infringement case ever that the Gayes' counsel can locate where commercial sound recordings of the songs at issue were not allowed to be played, since the commercially released sound recordings are the best evidence of the expression of a composition in the manner in which an ordinary observer would experience the composition; and (2) the sound recordings in this case provide direct and circumstantial evidence of copying of the underlying composition, since the copying of elements found in Marvin Gaye's recordings would be probative evidence of the copying of the undisputedly protected elements found in the lead sheets, and the Ninth Circuit has specifically found that copying is often proven in copyright infringement cases by circumstantial evidence.

Refusal to allow the playing of Marvin Gaye's sound recordings would be an error of law unsupported by any authority.

**4. An Ordinary Observer Cannot Accurately Apply the Concept and Feel Test Without the Benefit of Hearing the Sound Recording that is the Most Accurate and Complete Expression of the Underlying Composition**

In music copyright cases, courts have consistently permitted the jury to hear the sound recordings of compositions at issue that were registered prior to the 1978 Copyright Act, even though lead sheets were deposited with the Copyright Office to satisfy the deposit requirement. For instance, in *Selle v. Gibb*, 741 F.2d 896, 903 n.3 (7th Cir. 1984), the court, in overruling the jury's finding of infringement due to lack of access, noted that "Plaintiff relies on the fact that both songs were played on numerous occasions in open court for the jury to hear . . . ." The Seventh Circuit specifically referred to recordings played for the district court to "more concretely" support its determination of striking similarity. *Id.* Likewise, in *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946), the court specifically stated that it listened to "the compositions as played in the phonograph recordings submitted by defendant . . ." to determine if infringement did exist. In *Repp v. Webber*, 892 F. Supp. 552, 558 (S.D.N.Y. 1995), the court noted that, "[h]aving listened to the two songs at issue, however, the [c]ourt cannot say as a matter of law that they do not share any substantial similarities. In making this determination, the Court considered the 'total concept and feel' of the works in question." A Southern District of New York court, in *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 398 (S.D.N.Y. 1952), complained "[w]e have suffered through the playing of the commercial recordings." The court dealt with a copyright originally registered in 1970 and discussed the playing time of the song, as well as how the recording began and ended, in *Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002). *See also Three Boys Music Corp.*, 212 F.3d 477 (Ex. B to Busch Decl. at Trial Tr. at 7:21-25, 101:20-102:3; 337:13-18, 524:6-12; 525:7; 789:17-24; 791:1-793:2; 889:21-890:4; 1140:10-1142:3); *Navara v. M. Witmark & Sons*, 185 N.Y.S.2d 560, 561-62 (Sup. Ct. 1959) ("[T]he jury requested to hear once more recordings of the two musical compositions involved. The jury's request was granted and they were returned to the court room where the two recordings were

played and then again retired to deliberate."); *Rich v. Paramount Pictures*, 279 P.2d 782, 784 (1955) ("The jury heard the accusing and accused compositions played on the piano and on phonograph records.").[5]  In *Three Boys*, the jury heard the sound recordings played at least four times.  (Ex. B to Busch Decl. at 7:21-25, 101:20-102:3; 337:13-18, 524:6-12; 525:7; 789:17-24; 791:1-793:2; 889:21-890:4; 1140:10-1142:3).

Plaintiffs have not put forth a single case or persuasive authority that would permit a court to preclude the jury from hearing the commercial sound recordings of the alleged infringed songs at issue and the Gayes are unaware of any legal authority that would support the Court's decision to exclude the commercial sound recordings in light of the law of the Ninth Circuit and other Circuits and Districts.

### 5.   The Intrinsic Test Requires the Playing of the Entire Sound Recordings

The jury in this case will be tasked with determining whether an ordinary observer would find the total concept and feel of the works at issue is substantially similar.  The only way to determine whether the ordinary listener would find this substantial similarity is to let the jury hear the Marvin Gaye compositions as Thick and Williams heard them and as an ordinary person in the world would hear them: through the sound recordings on which they are embodied.  It would be totally unfair and prejudicial for the jury to attempt to apply this test while hearing a heavily edited version of the Gaye compositions while hearing the entirety of the Plaintiffs' compositions, as commercially recorded.

In determining whether two works are substantially similar, the Ninth Circuit employs a two-part analysis: an objective extrinsic test and a subjective intrinsic test. *Swirsky*, 376 F.3d at 845 (9th Cir. 2004).  The intrinsic test asks whether "the ordinary, reasonable person, would find the *total concept and feel* of the work to be substantially similar." *Three Boys Music. Corp.*, 212 F.3d at 485) (emphasis added).  "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the

---

[5] All of the aforementioned cases involved musical composition copyrights registered under the Copyright Act of 1909.

observations and impressions of the average reasonable reader and spectator." *Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d 1157, 1164 (9th Cir. 1977).  A jury may find a combination of unprotectible elements to be protectible under the extrinsic test because 'the over-all impact and effect indicate substantial appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485; *see also Radin v. Hunt*, LA CV10-08838 JAK (SSx), at 4 (C.D. Cal. Dec. 15, 2011).  In order to find such a combination protectible, "the jury must be allowed to see the complete work." *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 988 (9th Cir. 2009).  This requires the jury to have access to the full composition, as it exists embodied in the sound recording, even if it contains unprotected elements.

Parceling out portions of the composition is prohibited under the intrinsic test as it precludes the jury from viewing the work as a whole to determine the "total concept and feel."  Lay listeners simply do not have the ability to listen to abstract edited portions of a composition and then compare those edited portions of the composition with a fully fledged, commercially polished recording.  It would not be fruitful for a jury to listen only to a Marvin Gaye bass line without any of the other accompanying music and then attempt to compare that bass line to a fully formed composition as embedded in a commercially released sound recording.  As the Second Circuit has ruled in applying the 1909 Copyright Act:

> [T]he proper criterion on [copying] is not an analytic or other comparison of the respective musical compositions as they appear on paper or in the judgment of trained musicians. The plaintiff's legally protected interest is . . . his interest in the potential financial returns from his compositions which derive from the lay public's approbation of his efforts. The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such popular music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff.

*Arnstein*, 154 F.2d at 472-73. Thus, that Court went on to find that "[a]t the trial, plaintiff may play, or cause to be played, the pieces in such manner that they may seem to a jury to be inexcusably alike, in terms of the way in which lay listeners of such music would be likely to react. *Id*. at 473. That is exactly the manner in which the Gayes seek to prosecute their case.

The Marvin Gaye composition "Got to Give it Up", which was created as it was being recorded, is not and should not be limited to only a few compositional elements from the total number of elements present on the sound recording, since an average observer cannot discern the total concept and feel of "Got to Give it Up" by listening only to only a fragment of the composition as it is normally played, especially when, in comparison, the composition "Blurred Lines" will be presented to the jury in the form of the commercially released recording. While trained musicians might be able to follow such a broken down version of a composition, neither an ordinary observer nor an average juror can. It would be far easier, more efficient, and entirely consistent with long-established copyright jurisprudence, for the parties' expert musicologists and the Court's instructions to guide the jury in filtering out of consideration any allegedly unprotected elements, than to have the jury consider surgically altered musical examples which sound dissimilar even to commercially released recordings of those very same works.

In Plaintiffs' Motion *in Limine* to exclude the sound recordings, Plaintiffs cited no legal basis for exclusion, as none exists. Based on the Gayes' research, if this ruling stands, this case will be the first case in the history of United States copyright law that precludes the jury from hearing the commercial sound recordings of songs at issue in copyright infringement litigation.

### 6.  The Sound Recordings Provide Highly Probative Evidence of Copying

Excluding the commercially released sound recording prevents the Gayes from putting on evidence of the totality of what was copied. Neither Robin Thicke nor Pharrell Williams can read music. (Thicke Dep. at 58:2-12, April 23, 2014, attached to Busch Decl. as Exhibit C; Williams Dep. at 55:4-59:17, April 21, 2014, attached to

Busch Decl. as Exhibit D).   However, it is undisputed that they have heard Marvin Gayes' music.   (Busch Decl. Ex. C at 18:3-6, 154:11-16; Busch Decl. Ex. D at 60:3-5). It is in fact the very hearing of the commercially released sound recording of "Got to Give it Up" that allowed Thicke and Williams to copy Marvin Gaye's work.   That is evident from the fact that many compositional elements of "Got to Give it Up", as well as some non-protectible elements from Marvin Gaye's recording, are included in "Blurred Lines."

There is no dispute that at least some of these compositional elements exist only in the composition as embodied in the sound recording and not on the lead sheet.   (Finell Decl. at ¶ 7).   And while the Gayes dispute that the composition at issue is limited to the lead sheet, even if it were, the copying of these other compositional elements is circumstantial evidence of copying.   (*Id.* at ¶ 17).   While these elements seem complex when described in a Declaration or through testimony, the listening to the sound recording that embodies these elements makes it possible for an ordinary observer to hear them without any music training.   (*Id.* at ¶¶ 17-19).

When the jury hears these similarities, it will conclude they could only have resulted from copying.   This is strong circumstantial evidence.   When similarities are striking, "as a matter of logic, the only explanation for the similarities between the two works must be 'copying rather than . . .   coincidence, independent creation, or prior common source.'" *JB Oxford & Co. v. First Tennessee Bank Nat. Ass'n.*, 427 F. Supp. 2d 784, 796 (M.D. Tenn. 2006) (citing 4 Nimmer Copyright § 13.02[B], at 13-26 (2006)).

In copyright infringement cases, the party bringing suit is almost always forced to rely solely on circumstantial evidence, and excluding such evidence is error that requires this Court to reconsider its decision.

As can be agreed, "[e]vidence is relevant if (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.   "The standard of probability

18

under the rule is 'more . . . probable than it would be without the evidence' . . . it is not
to be supposed that every witness can make a home run.'" *Id.* "The fact to be proved
may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of
consequence in the determination of the action."   Fed. R. Evid. 401 advisory
committee's note (1972).   Relevant evidence may be excluded if its probative value is
"*substantially outweighed*" by a danger of unfair prejudice. Fed. R. Evid. 403 (emphasis
added).   In this case, the probative weight of the evidence is great, as discussed in detail
below, as evidence of copying, whether lawful or not, is extremely strong evidence in
showing unlawful copying.   In order to exclude this evidence, the Court would have to
find that the unfair prejudicial effect of the evidence was substantially greater than the
quite high probative value.   Even then, "in reaching a decision whether to exclude on
grounds of unfair prejudice, consideration should be given to the probable effectiveness
or lack of effectiveness of a limiting instruction . . . ."   Fed. R. Evid. 403 advisory
committee's note (1972).   In fact, the January 28 Order found that a limiting instruction
would serve to prevent unfair prejudice in regard to Marvin Gaye's voice. (Dkt. No. 231
at 5).   The same is true for any other portion of the composition embodied on the sound
recording.   In fact, for many decades since the passage of the 1909 Copyright Act juries
have been allowed to listen to unprotected sound recordings in order to determine
whether the compositions embodied on those sound recordings had been infringed.   *See,
e.g.*, *Repp v. Webber*, 892 F. Supp. at 558; *Selle*, 741 F.2d at 903 n.3; *Arnstein*, 154 F.2d at
469; *N. Music Corp.*, 105 F. Supp. at 398; Finell Decl. at ¶ 20.

One of the most important reasons for allowing such evidence is that proof of
copyright infringement is often highly circumstantial, particularly in cases involving
music. *Three Boys Music Corp.*, 212 F.3d at 481.   "[W]here circumstantial evidence is
presented, however, the Court may consider the plausibility and reasonableness of
inferences arising therefrom." *See Flynn v. Surnow*, No. CV 02-9058-JFW PLAX, 2003
WL 23411877, at *2 (C.D. Cal. Dec. 9, 2003) (quoting *Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 249-50 (1986)); *see also Mil-Spec Monkey, Inc. v. Activision Blizzard,*

*Inc.*, No. 14-CV-02361-RS, 2014 WL 6655844, at *3 (N.D. Cal. Nov. 24, 2014). "In all cases, the task is to apply logic and experience to determine if copying is the only realistic basis for the similarities at hand." *Walker v. Viacom Int'l, Inc.*, No. C 06-4931 SI, 2008 WL 2050964, at *7 (N.D. Cal. May 13, 2008) *aff'd sub nom. Walker v. Viacom Int'l, Inc.*, 362 F. App'x 858 (9th Cir. 2010) (citing 4 Nimmer on Copyright § 13.02[B] at 13-28.1). "Probative similarities are similarities that 'would not be expected to arise independently' in the normal course of events, Nimmer § 13.01[B] at 13–13, and thus 'give rise to an inference of actual copying' on the part of the defendant." *Prunte v. Universal Music Grp.*, 563 F. Supp. 2d 41, 43 (D.D.C. 2008) (quoting *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005)).

In this case, the copying of non-lead sheet compositional elements is, at a minimum, circumstantial proof that the Thicke Parties had "Got To Give It Up" in their mind and that other portions, acknowledged to be protected under the Copyright Act by the Court, were copied and were not the result of coincidence. *See Maggio v. Liztech Jewelry*, 912 F. Supp. 216, 222 (E.D. La. 1996) (noting that the silhouettes, at issue, are not alone protected expression, but finding infringement based on access and on "other common aspects of expression, such as the shape of the silhouettes"). The prejudice to the Gayes of disallowing this evidence far exceeds any prejudice to the Thicke parties, since this type of evidence is directly relevant to the main issue in the case:  whether the Plaintiffs had "Got To Give It Up" in their mind when creating "Blurred Lines."

One of the ultimate issues in a copyright infringement claim and perhaps, the threshold question, is whether copying occurred. *See Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 33 (1st Cir. 2001).  The presence of both protected elements and non-protected elements establishes that "Blurred Lines" actually copied portions, including protected elements, of "Got to Give it Up" and that "Love After War" actually copied portions of "After the Dance."

**C. SHOULD THE COURT ULTIMATELY DECIDE THE SCOPE OF THE PROTECTED WORKS IS LIMITED ONLY TO ELEMENTS INCLUDED IN THE DEPOSIT COPIES, THE GAYES REQUEST THAT THE QUESTION**

**OF WHETHER A COPYRIGHT PLAINTIFF'S WORK IS LIMITED ONLY TO COMPOSITIONAL ELEMENTS IN PUBLISHED VERSIONS OF THE WORK BE CERTIFIED FOR AN INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. 1292(B)**

In the alternative, the Gayes request permission to take an Interlocutory Appeal to resolve this pure question of law and bring this matter to an efficient resolution.

### 1. <u>Standard of Review for an Interlocutory Appeal</u>

Under 28 U.S.C. § 1292(b), a party may move a district court to certify an "otherwise unappealable" order for interlocutory review. In order to certify the order, the court must find that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." The moving party bears the burden of demonstrating these prerequisites. *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010).

### 2. <u>An Interlocutory Appeal is Proper under the Instant Scenario</u>

A party seeking interlocutory review must show (1) a controlling question of law; (2) a substantial ground for a difference of opinion; and, (3) that such review will materially advance the ultimate termination of the litigation. The Gayes can show all three prerequisites.

First, the question the Gayes seek to certify is purely a question of law: whether a copyright plaintiff's work is limited to compositional elements found in published versions of the work. That is a question of statutory interpretation under the 1909 Copyright Act.

Second, there is substantial ground for a difference of opinion on this question. As discussed in great detail above, there is ample case law, and the Gayes contend uniform case law, supporting a finding that the deposit requirement of the 1909 Copyright Act is for identification purposes only and does not limit in any way the scope of a copyright infringement claim. It is publication and registration that allows for a suit to be filed, but the versions of the works protected are not limited to the published

works, but instead are limited only to the best versions of the works that are identified in the deposit copy.  This case law comes from not only the Ninth Circuit, but other Circuits and District Courts inside and outside this Circuit.  Additionally, Plaintiffs have been unable to point to a single on-point case showing the law requires a finding that a copyright is limited to the elements contained in published versions of the work, and the Court has also not cited any authority for this proposition.

Finally, allowing interlocutory review will lead to a more efficient resolution of this matter.  Such review will conserve the Court's limited resources and the limited resources of the Gayes.  The law is clear that an interlocutory appeal should be certified only when doing so would avoid protracted and expensive litigation. *Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347, 1348 (9th Cir. 1988).  In this case, it is clear that as much as forty percent of the similarities between "Blurred Lines" and "Got to Give it Up" are contained in elements of the "Got to Give it Up" composition embodied in the commercially available sound recording.  (Finell Decl. at ¶ 16).  Allowing this matter to proceed to trial with such a diluted theory and body of evidence for the Gayes will so hamper the Gayes' ability to prevail as to potentially make the trial a waste of time for the Court and the parties.  This means the Court and parties will have to prepare for a massive trial, with the Gayes' musicologists substantially re-working demonstrative exhibits and attempting to create new ones, while hampered by unclear guidelines, and will spend two weeks in a trial, that is unlikely to ultimately resolve the dispute between the parties.  Instead, that dispute will continue on to the appellate court for a ruling that may well require a second trial of this matter.  While in every case there is the possibility of an appeal and retrial, that possibility will be made exponentially greater under the current facts and in light of this precise legal issue, which should be resolved before the trial.  This is true because the Gayes will be prohibited from putting forth their strongest evidence or provide the jury with an "apples-to-apples" comparison, while simultaneously holding a strong appellate issue on the law.  Indeed, the Gayes believe

that the Court's ruling is directly contrary to Ninth Circuit precedent, and should be resolved before a trial occurs.

Such a scenario has real consequences for this Court as rehearing a lengthy trial will eat into the Court's limited time to hear other matters. More drastically, such a scenario could be potentially financially ruinous for both parties. Not even including attorney time, this litigation has been incredibly expensive. (Gaye Decl., at ¶¶ 10-12). The expected trial expenses will also be dramatic. Further, the Copyright Act gives courts discretion to award attorney's fees to prevailing parties. 17 U.S.C. § 505. Should the Gayes lose a trial in which they are unable to put forth their strongest evidence, the Gayes would have many defenses to the awarding of such fees and do not believe it would be appropriate to award fees against them. However, the Gayes must move forward with the assumption that, should Plaintiffs prevail, they will aggressively seek to recover astronomical fees. Facing a potential adverse award in excess of $1 million creates a scenario in which it could be difficult if not impossible for the Gayes to be able to post a bond, and they would face the prospect of having their source of income, royalties from Marvin Gaye's works, garnished, while an appeal is pending.

By obtaining an early appellate ruling on such issues, all the parties will have a better sense of the case before them and will be able to act in more financially reasonable manner. Without such appellate guidance, the parties will each be spending thousands and thousands of dollars daily in order to continue to put their case forward. Such expenses may be easy to bear for major corporations and superstars such as the Plaintiffs, but they are crushing for the Gayes. (Gaye Decl., at ¶ 12).

The Gayes request for interlocutory review meets each of the three prerequisites for certification. Granting certification will allow this matter to resolve itself in the most efficient manner while ensuring that the parties have a correct understanding of the scope of the dispute.

### 3.  **The Current Trial Setting Should be Postponed**

The Court should, for the reasons discussed above, postpone the trial date and grant the Gayes the right to take an interlocutory appeal on this overarchingly important legal issue.  Based on the statements of the Court at the Pretrial Hearing and in its Minute Order, such a postponement will be convenient for the Court as the Court currently has two criminal trials set for February 17, 2015 and a continuance may be necessary to allow those cases to proceed in any event.  (Dkt. No. 226 at 4).  Such a postponement will further the interests of justice and allow the parties to both comply with the Court's Orders and put forth their best respective case in order to have this matter decided on the merits.

Dated: January 29, 2015                    Respectfully submitted,

                                           KING & BALLOW

                                           By: /s/ Richard S. Busch
                                           RICHARD S. BUSCH
                                           PAUL H. DUVALL
                                           SARA R. ELLIS

                                           WARGO & FRENCH, LLP

                                           By: /s/ Mark L. Block
                                           MARK L. BLOCK

                                           *Attorneys for Defendants and Counter-Claimants Nona and Frankie Gaye*

                                           THE LAW OFFICES OF PAUL N. PHILIPS

                                           By: /s/ Paul N. Philips
                                           PAUL N. PHILIPS

                                           *Attorney for Defendant and Counter-Claimant Marvin Gaye III*