KING, HOLMES, PATERNO & BERLINER, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
ROTHSCHILD@KHPBLAW.COM
SETH MILLER, ESQ., STATE BAR NO. 175130
MILLER@KHPBLAW.COM
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE:  (310) 282-8903

Attorneys for Plaintiffs and Counter-
Defendants PHARRELL WILLIAMS,
ROBIN THICKE and CLIFFORD
HARRIS, JR. and Counter-Defendants
MORE WATER FROM NAZARETH
PUBLISHING, INC., PAULA MAXINE
PATTON individually and d/b/a
HADDINGTON MUSIC, STAR TRAK
ENTERTAINMENT, GEFFEN
RECORDS, INTERSCOPE RECORDS,
UMG RECORDINGS, INC., and
UNIVERSAL MUSIC DISTRIBUTION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO. CV13-06004-JAK (AGRx)<br>Hon. John A. Kronstadt, Ctrm 750<br><br>**PLAINTIFFS' OPPOSITION TO COUNTER-CLAIMANTS' *EX PARTE* APPLICATION FOR CONTINUANCE OF TRIAL, RECONSIDERATION OF GRANTING MOTION IN LIMINE NO. 1-3 AND CERTIFICATION OF QUESTION FOR INTERLOCUTORY APPEAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SETH MILLER**<br><br>Action Commenced: August 15, 2013<br>Trial Date:           February 10, 2015 |

/ / /

/ / /

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ................................................................................................ 1

II. THE MOTION FOR RECONSIDERATION SHOULD BE DENIED ................ 3

    A.    THE COMPOSITION IS LIMITED TO THE DEPOSIT COPY LEAD SHEET ........................................................................................ 3

    B.    THE CREATION OF THE SOUND RECORDING HAS NO RELEVANCE HERE ........................................................................ 11

    C.    THE COURT'S RULING WILL NOT "LEGALIZE WHOLESALE COPYRIGHT INFRINGEMENT" ............................ 12

    D.    EXCLUDING THE GIVE AND DANCE SOUND RECORDINGS IS PROPER HERE ...................................................... 15

III. THE MOTION TO CONTINUE TRIAL SHOULD BE DENIED ................... 21

IV. THE MOTION FOR INTERLOCUTORY APPEAL SHOULD BE DENIED ............................................................................................................. 22

V. CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Dan Kasoff, Inc. v. Novelty Jewelry Co.,*
    309 F.2d 745 (2d Cir. 1962) ................................................................... 6

*Harper House, Inc. v. Thomas Nelson, Inc.,*
    889 F.2d 197 (9th Cir. 1989) .................................................................. 17

*Jones v. Virgin Records, Ltd.,*
    643 F.Supp. 1153 (S.D.N.Y. 1986) ......................................................... 15

*Knowledgeplex, Inc.,*
    942 F.Supp.2d 1045 (D. Idaho 2013) ...................................................... 6

*Milliken & Co. v. Shaw Indus., Inc.,*
    978 F.Supp. 1155 (N.D. Ga. 1997) ......................................................... 6

*National Comics Pub., v. Fawcett Pubs.,*
    191 F.2d 594 (2d Cir. 1951) ................................................................... 6

*Newton v. Diamond,*
    204 F.Supp.2d 1244 (C.D.Cal. 2002) ................................................. 14, 19

*Scentsy, Inc. v. B.R. Chase, LLC,*
    942 F.Supp.2d 1045 (D. Idaho 2013) ...................................................... 5

*Scentsy, Inc. v. Harmony Brands, LLC,*
    585 Fed.Appx. 621 (9th Cir. 2014) .......................................................... 6

*Sch. Dist. No. 1J v. ACandS, Inc.,*
    5 F.3d 11255 (9th Cir. 1999) ................................................................... 3

*Shoptalk, Ltd. v. Concorde New Horizon Corp.,*
    168 F.3d 586 (2d Cir. 1999) ............................................................... 9, 10

*Stewart v. Abend,*
    495 U.S. 207, 233 (1991) ..................................................................... 2, 4

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000) ............................................................ 7, 8, 9

## STATUTES

17 U.S.C. § 303 .................................................................................. 4, 10

28 U.S.C. § 1292 ............................................................................... 22, 23

Copyright Act of March 4, 1909 ......................................................... passim

KING, HOLMES,
PATERNO &
BERLINER, LLP

1

**OTHER AUTHORITIES**

2

M. Nimmer & D. Nimmer, 1 Nimmer on Copyright § 2.05 .....................................11

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

King, Holmes,
Paterno &
Berliner, LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Defendants *ex parte* application ("Application") is desperate to avoid a trial because—as the evidence will show—the songs at issue here are not the same.[1]

There is no basis for the Application.  Not only are there <u>no</u> new facts or law—indeed, the Court has now ruled on these issues twice—but the Court's ruling on the copyright issue is correct and fully consistent with the clear language of Section 9 of the 1909 Act.  There is no manifest error, no basis for reconsideration, and no reason for interlocutory appeal.  Under the 1909 Act, copyright is "secured" by publication with notice.  The only material published with notice here is the deposit copy.  That is the only copyright that was "secured" here.

Defendants do not and cannot explain how they, as heirs of Marvin Gaye, own a copyright in any other composition.  Marvin Gaye's performance of other musical elements on a sound recording is not publication with notice.  No manuscript copy of the composition was published other than the deposit copy.  No copyright was "secured" in any composition other than the deposit copy lead sheet.

**Marvin Gaye never owned a copyright in "Got to Give It Up.**"  His publisher, Jobete, owned the copyright.  The copyright notice at the bottom of each deposit copy states:  "© [year] Jobete Music Company, Inc."  The copyright only descended to his heirs after his death because the renewal rights vested in his heirs as a matter of law when Marvin Gaye died.  It was never Marvin Gaye's song.

/ / /

---

[1] Hopefully, the Application was not filed as part of a plan to try this case in the press.  Defendants filed their Application at **3:02 p.m**.  At **3:15 p.m**., *The Hollywood Reporter* published a lengthy article about the Application. [Declaration of Seth Miller ("Miller Decl"), Exhs. A, B.]  Clearly, Defendants sent the Application to the press <u>before</u> they filed it with the Court.  Jury selection is less than two weeks away.

1    Whatever Marvin Gaye allegedly did in the recording studio to create other
2  musical elements, and for which there is no evidence, anyway, has no bearing on the
3  scope of any copyright under the 1909 Act, and certainly not on Jobete's copyright.

4    The 1909 Act is what it is.  There is nothing unfair or unjust about it.  There is
5  no reason for the Court to change its rulings because Defendants do not like them,
6  think they are unfair, or make hyperbolic claims about the supposed impact on the
7  music industry.  The simple fact is that, prior to 1978 (and after), compositions for
8  popular music were considered to be the melody, harmony, and lyrics—*i.e.*, the
9  song.  No songwriter considered a hi-hat part, vocal "woo," falsetto vocal style,
10 omission of a guitar, keyboard part, or other element of a sound recording of the
11 song to be the song itself.  And if they did, they included that element in the written
12 composition they published with notice—just as Jobete did hear with a "bass intro"
13 in "Got to Give It Up."  Defendants now are facing a jury trial and wish that they
14 owned something other than the published composition that is nothing like "Blurred
15 Lines."  Their desire to distract and mislead the jury is not basis for reconsideration.

16   Finally, the notion that Defendants need more time to prepare for trial should
17 be rejected out of hand.  Plaintiffs filed their summary judgment motion in July
18 2014 [Document 89], raising all these same issues regarding the deposit copy.  The
19 Court ruled on the summary judgment on October 30, 2014 and made clear that
20 copyright is determined under the 1909 Act by publication or deposit of an
21 unpublished copy [Document 139, 8-9 ("The general rule under the 1909 Act was
22 that the publication of a work with proper notice was necessary to obtain statutory
23 copyright protection" (citing *Stewart v. Abend*, 495 U.S. 207, 233 (1991))] .
24 Defendants' musicologists have had months to prepare any demonstratives based on
25 the Deposit Copy.  Plaintiffs have cleared their busy schedules for the February 10,
26 2015, trial and are eager to prove that they did not copy Marvin Gaye's songs.
27 Plaintiffs should not be deprived of their day in Court merely because Defendants
28 are unable to prove their claims.  The Application should be denied in its entirety.

## II.

## THE MOTION FOR RECONSIDERATION SHOULD BE DENIED

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

L.R. 7-18.

Defendants flagrantly violate the Local Rule.  There is no material difference in fact or law from the Court's rulings earlier this week—and certainly not one that in the exercise of reasonable diligence could not have been known to the Gayes earlier this week.  L.R. 7-18.  There has been no "emergence of new material facts or a change of law" since Monday of this week.  *Id.*  There is no "manifest showing of a failure to consider material facts presented to the Court" before it ruled earlier this week.  *Id.*  The Application repeats all of the arguments the Gayes made in the prior motions in limine, including at the oral argument on January 26, 2015.  *Id.*

The Gayes acknowledge that a motion for reconsideration must be based on: (1) newly discovered evidence; (2) intervening change in law; or (3) clear error by the district court or a manifestly unjust ruling.  [App. Memo, 5-6 (citing *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 11255, 1263 (9th Cir. 1999)).]  As set forth below, none of these factors apply here.  The Gayes' motion for reconsideration is just an unwarranted attempt to reargue points that they lost.  The motion should be denied.

### A.    The Composition Is Limited to the Deposit Copy Lead Sheet

Defendants contend that the Court took a "leap of logic that is not supported by the law" [App. Memo (Document 232-1), 1:18] in ruling that "the composition embodied on the sound recording is not protected under the 1909 Copyright Act." [*Id.*, 1:21-22.]  Defendants are incorrect.  The Court ruled that copyright under the

1  1909 Act could be secured only by: (a) publishing with notice; or (2) depositing

2  unpublished copies with the Copyright Office.  [Minute Order re Plaintiffs' Motion

3  for Summary Judgment Or, In the Alternative, Summary Adjudication (Document

4  139)("10/30/14 Order"), filed 10/30/14, p. 9.]  The Court further explained that

5  publication of a composition under the 1909 Act meant publication of a <u>manuscript</u>

6  <u>copy</u>, citing numerous authorities.  [10/30/14 Order, 8-10.]  The Court found that

7  "Defendants offer no evidence that prior to registration of the copyrights, 'Got to

8  Give It Up' or 'After the Dance' was published or reduced to a manuscript form that

9  was more complete than what is included in the lead sheets."  [10/30/14 Order, 9.]

10  Defendants still have no evidence of any other manuscript copy.  Section 9 of

11  the 1909 Act provides that "any person … may secure copyright for his work by

12  publication thereof with the notice of copyright required by this Act."  Act of

13  March 4, 1909 ("1909 Act"), ch. 320 § 9, 35 Stat. 1075, 1078.  Defendants'

14  copyright registrations state that the compositions were published.  [Miller Decl,

15  Exhs. C, D.]  A sound recording is not a publication of the underlying composition

16  under the 1909 Act.  17 U.S.C. § 303(b); *see also* 10/30/14 Order, 10.  Hence, the

17  only composition that was published with notice is the composition in the deposit

18  copy.  The Court has consistently ruled as much.  Its ruling is correct based on the

19  law and facts here.

20  Defendants arguments in the Application have been considered and rejected

21  by this Court both in the summary judgment motion and in the motions in limine.

22  Now, in their third attempt to make these *identical* arguments, Defendants

23  offer nothing new beyond wildly exaggerated rhetoric about the impact on the music

24  industry of the Court's correct interpretation of the law under the 1909 Act.

25  Tellingly, Defendants offer no legal authority for <u>how</u> a copyright allegedly

26  was secured in material contained only in the sound recordings.  Such material was

27  not published with notice.  1909 Act, § 9; *Stewart v. Abend*, 495 U.S. 207, 233

28  (1991).  The composition in the sound recording also was not deposited in written

1  form (or at all) unpublished, 1909 Act, § 11, nor is that even a possibility here since
2  the copyright registrations for "Got to Give It Up" ("GIVE") and "After the Dance"
3  ("DANCE") state that the works were published works.  [Miller Decl, Exhs. C, D.]

4      So how was copyright "secured" in the composition embodied only in the
5  sound recording?  Answer: it was not.  It could only be secured by publication.

6      Defendants' arguments to the contrary are disingenuous and incorrect.

7      Defendants argue (for yet a third time) that the deposit copy does not limit the
8  scope of the copyrighted work.  **But that is not the issue here**.  The Deposit Copies
9  of GIVE and DANCE are the _only published copies_ in evidence.  The Deposit
10 Copies are the copyrighted composition not because there are what was deposited
11 but rather because they are the only copies published with notice affixed so as to
12 secure a copyright.  Tellingly, despite moving for reconsideration, interlocutory
13 appeal, and to continue trial, Defendants cite no authority for their unfounded
14 assertion that a composition that was never published with notice affixed is subject
15 to copyright under the 1909 Act—_i.e._, which would be contrary to the plain terms of
16 the Act.  1909 Act, § 9 ("any person … may secure copyright for his work by
17 publication thereof with the notice of copyright required by this Act")(emphasis
18 added). Defendants also cite no authority for their claim that material contained not
19 in the written Deposit Copy but in an entirely separate sound recording—a recording
20 that also has nothing to with the copyright claimant (Jobete, see below)—somehow
21 obtains copyright registration because the lead sheet Deposit Copy was published.

22      Defendants' authority is inapposite and incorrectly cited.  Many of these cases
23 were addressed in prior motions in this case and are only briefly addressed below:

24  •  _Scentsy, Inc. v. B.R. Chase, LLC_, 942 F.Supp.2d 1045 (D. Idaho 2013)
25     was decided under the **1976 Act** and concerns whether the scope of the
26     copyright is limited by the **deposit copy** and turns on the special rules
27     for deposit copies of **sculptural works**—here, the issue is whether the

28

**published copy** of a **musical composition** that secured the copyright is the extent of the copyrighted material under the **1909 Act**;

- *Scentsy, Inc. v. Harmony Brands, LLC*, 585 Fed.Appx. 621 (9th Cir. 2014) is an unpublished Ninth Circuit case that is not citable under Ninth Circuit Rule 36-3, is decided under the **1976 Act**, and does not concern the scope of a copyright whatsoever but rather concerns the trial court's application of the extrinsic and intrinsic tests for copying;

- *Knowledgeplex, Inc.*, 942 F.Supp.2d 1045 (D. Idaho 2013) was decided under the **1976 Act** and concerns whether the court had **jurisdiction** over claims relating to material not contained in the deposit copy and turns on special rules for deposit copies of **computer code**—here, there is no jurisdictional issue, no computer code, and again, the issue is not that the Gayes lack a copyright because the <u>deposit</u> was incomplete but rather because the only published copy is the deposit copy lead sheet;

- *Milliken & Co. v. Shaw Indus., Inc.*, 978 F.Supp. 1155, 1158 (N.D. Ga. 1997) was decided under the **1976 Act** and concerns whether the court had **jurisdiction** over the copyright claim when the deposit copy of the copyrighted **carpet swatch** allegedly was an incomplete copy of the work—here, there is no jurisdictional issue, and the 1909 Act governs;

- *Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745 (2d Cir. 1962) concerned whether the copyright notice was defective because it used the plaintiff's trademark rather than the plaintiff's name—here, there is no issue that the name on the Deposit Copy notice is wrong;

- *National Comics Pub., v. Fawcett Pubs.*, 191 F.2d 594, 603 (2d Cir. 1951) concerned whether the copyright notice was defective because it used the name of the proprietor's affiliated corporation rather than the copyright proprietor's—here, there is no issue that the "Jobete Music Company" name on the Deposit Copy notice is not the true owner.

1   The cases cited by Defendants are inapposite.  And then there is *Three Boys*.

2   Yet again.  The Court has repeatedly ruled that *Three Boys* is inapposite because it is

3   a jurisdictional case.  The Court is correct.  Below is the entire relevant text:

4           The appellants argue that the district court did not have jurisdiction
        over this case because the Isley Brothers failed to register a complete
5       copy of the song upon which the lawsuit was based. Although the
        1909 Copyright Act requires the owner to deposit a "complete copy"
6       of the work with the copyright office, our definition of a "complete
        copy" is broad and deferential: "Absent intent to defraud and
7       prejudice, inaccuracies in copyright registrations do not bar actions
        for infringement." ... .

8       Bolton and Goldmark argue that in 1964 the Isley Brothers deposited
9       sheet music ("deposit copy") of "Love is a Wonderful Thing" that
        differed from the recorded version of the song. Furthermore, they
10      claimed that the deposit copy does not include the majority of the
        musical elements that were part of the infringement claim. At trial,
11      the Isley Brothers' expert, Dr. Eskelin, testified that the deposit copy
        included all of the song's essential elements such as the title hook,
12      chorus, and pitches. Dr. Eskelin even played the deposit copy for the
        jury on the keyboard. *We refuse to disturb the jury's finding that the*
13      *Isley Brothers deposited a "complete copy"* because (1) there was no
        intent to defraud and prejudice and (2) any inaccuracies *in the
14      deposit copy were minor and do not bar the infringement action.

15  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486-87 (9th Cir. 2000)(emphasis

16  added)(citation omitted).

17          The only issue in *Three Boys* was jurisdiction.  The jury finding that the court

18  upheld was only whether a complete copy was deposited *for purposes of complying*

19  *with the registration requirement of submitting a deposit copy so as to obtain the*

20  *right to sue for infringement.  See id.*  It was a jurisdictional issue, pure and simple.

21          There is no dicta (let alone any holding) in *Three Boys*—or any language in

22  the case whatsoever—that discusses whether a copyright secured by publishing the

23  work with notice affixed can include any material not found in the published copy.

24          Defendants argue that *Three Boys* upheld the jury's finding of substantial

25  similarity, but the entire relevant text of that portion of the opinion is as follows:

26          Bolton and Goldmark argue that there was insufficient evidence of
        substantial similarity because the Isley Brothers' expert
27      musicologist, Dr. Gerald Eskelin, failed to show that there was
        copying of a *combination* of unprotectible elements. On the contrary,
28      Eskelin testified that the two songs shared a combination of five

unprotectible elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending. Although the appellants presented testimony from their own expert musicologist, Anthony Ricigliano, he conceded that there were similarities between the two songs and that he had not found the combination of unprotectible elements in the Isley Brothers' song "anywhere in the prior art." The jury heard testimony from both of these experts and "found infringement based on a unique compilation of those elements." We refuse to interfere with the jury's credibility determination, nor do we find that the jury's finding of substantial similarity was clearly erroneous.

*Three Boys*, 212 F.3d at 485-86.

There is not a shred of indication in the foregoing passage that it ever crossed the Ninth Circuit's collective mind that the lead sheet deposit copy may have contained elements that were not subject to the plaintiff's copyright, whether because they were not found in the deposit copy or for any other reason. At a minimum, it is <u>crystal clear</u> that the defendant never raised that issue in the case.

Defendants' submission of trial transcripts from the *Three Boys* case also is unavailing. The precedential authority of *Three Boys* is **limited** to the four corners of the Ninth Circuit opinion. Defendants cite no authority for the implicit assertion that this Court can or should look "under the hood" of the Ninth Circuit opinion or analyze its "legislative history" (so to speak) to find a new meaning in the published opinion beyond what the Ninth Circuit justices wrote in plain English. This is a rather astonishing suggestion and flies in the face of established judicial procedure.

Even were the Court to consider the trial transcripts—and it should not—they demonstrate nothing other than that recordings of the plaintiff's song were played to the jury but *possibly* may have contained material not found in the deposit copy lead sheet. Whether the recording in fact *did* contain material not found in the lead sheet is *unknowable* based on the trial transcript excerpts. First, it may be that there was a published copy of the sheet music that in fact secured the copyright in the song and that *did* contain the potentially omitted material. Second, any omitted material was contained in an introduction, coda, and instrumental figure. [Declaration of Richard

1   S. Busch, Exh. B (trial tr.), 760:24-761:15.]  But the actual <u>melody</u> or other <u>musical</u>

2   <u>elements</u> claimed to be similar and contained in the introduction, coda section, or

3   instrumental figure in the sound recording also *may have been in the deposit copy*.

4   There is no way to know from the transcript.  Third, the defendant did not raise the

5   issue of whether any material in the sound recording but not in the deposit copy was

6   subject to the plaintiff's copyright (perhaps for one of the reasons stated above).

7       In short, *Three Boys* does not address ***in any way, shape, or form*** whether

8   material not found in the deposit copy was subject to copyright.  A case is not legal

9   authority for an issue it does not decide.  Even had *Three Boys* addressed that issue,

10  it would still be a *different issue* from the issue here, namely:  **whether material *not***

11  **contained in the published copies** of GIVE and DANCE is (somehow, for some

12  unstated reason) subject to copyright.  The 1909 Act says otherwise:  copyright is

13  "secured" by publication with notice.  1909 Act, § 9.  Defendants are the moving

14  party here.  They bear the burden.  The provide no authority for their assertions that

15  the composition in the Marvin Gaye recording falls within their statutory copyright.

16      Finally, *Shoptalk, Ltd. v. Concorde New Horizon Corp.*, 168 F.3d 586 (2d Cir.

17  1999) is inapposite and concerns whether, under the 1909 Act, a previously

18  unpublished work is published (*i.e.,* and hence becomes public domain) if a

19  derivative work is published.  The plaintiff in *Shoptalk* argued that the copyright in

20  the defendant's screenplay was published when the motion picture based on the

21  screenplay was published, and thus copyright was secured in the screenplay, but

22  when the copyright in the motion picture expired, so did the copyright in the

23  underlying screenplay.  The court held that <u>only those portions</u> of the unpublished

24  screenplay that were <u>contained in the motion picture</u> had been published:

25          We conclude in the present case, based on the statute and the
            principles underlying the scope of copyright protection, that if a
26          previously unpublished screenplay is embodied in a motion picture,
            ***so much of the screenplay as is disclosed in the motion picture is***
27          ***published*** when the motion picture is published.

28  / / /

1    *Shoptalk,* 168 F.3d at 592 (emphasis added). Here, at most, only "so much of the"

2    GIVE composition embodied in the sound recording "as is disclosed" in the

3    published Deposit Copy arguably was published by publication of the Deposit Copy.

4    *Id.* But then the reverse is also true: any compositional material in the recording that

5    is <u>not</u> contained in the Deposit Copy was not published. *Id.* Under *Shoptalk,* the

6    copyright here clearly is limited to only the material published in the Deposit Copy.

7         *Shoptalk* thus fully supports the Court's ruling. *Shoptalk* holds that the

8    publication of a derivative work (motion picture) publishes the underlying work

9    (screenplay) and thus secures a copyright in it <u>only to the extent the published</u>

10   <u>derivative work embodies the unpublished work.</u> In other words, under *Shoptalk,* it

11   is the published copy alone that limits and defines the scope of copyrighted material.

12        Defendants arguments are just stubborn insistence, unsupported by authority:

13        The Gayes are aware of no authority supporting the proposition that
     the version of the composition protected must have been "published"

14        in the form of sheet music prior to registration, and the Court cited
     no authority to support this conclusion. Instead, registration protects

15        all versions of the composition that existed prior to registration.

16   [App. Memo (Document 232-1), 6:24-28.]

17        Contrary to the Gaye's blunt assertion, the 1909 Act provides that copyright is

18   secured by publication with notice (§ 9), followed by registration (§ 10 )and deposit

19   of "the best edition thereof then published" (§ 12). 1909 Act, §§ 9,10, 12. The

20   version to be protected clearly must be published, registered, and deposited. *Id.* A

21   sound recording is not publication of a composition. 17 U.S.C. § 303(b). The Court

22   has cited these (and other) authorities for this proposition in the past. The Gayes

23   either refuse to acknowledge the law or seek to defy it through force of will alone.

24   As shown above, the Gayes cite no authority for any other interpretation of the Act.

25        Defendants fail to recognize the *radical* distinction between the 1976 Act and

26   the 1909 Act as it pertains to copyright in musical compositions. Under the 1976

27   Act, it is "possible to copyright a musical composition merely by recording it," but

28   as Nimmer point out, "[t]his represents a **<u>sweeping departure</u>** from the 1909 Act

1  and constitutes an intentional overruling of [the prior Supreme Court doctrine] that

2  in order to constitute a copy within the meaning of the then extant copyright law

3  [1909 Act], there must be a written or printed record in intelligible notation."

4  M. Nimmer & D. Nimmer, 1 Nimmer on Copyright § 2.05[A] (emphasis added).

5  This case arises under the 1909 Act.  A written copy, published with notice

6  affixed, is required in order to secure copyright in a composition.  The construction

7  of the law Defendants urge the Court to adopt would radically overturn the entire

8  logic of the 1909 Act.  Under the 1909 Act, if sheet music was published without

9  copyright notice, or if the notice was even <u>defective</u> in some material respect, no

10  copyright was secured, and the work was injected into the public domain.  It defies

11  common sense and legal precedent, not to mention the plain text of the 1909 Act, to

12  suggest that, while having a defectively worded "©" notice would work a forfeiture

13  of a copyright, publishing sheet music <u>that omits substantial portions of an alleged</u>

14  <u>composition embodied only in a sound recording</u> is nonetheless effective to secure a

15  copyright in a composition that has never been set forth in intelligible notation.

16  **B.**     **The Creation of the Sound Recording Has No Relevance Here**

17  Defendants' argument that GIVE was "written through the recording process"

18  and "that the version of the composition included on Marvin Gaye's original

19  commercially released recording was a complete version of the composition that

20  existed prior to registration" [App. Memo (Document 232-1, 7:2-4] is immaterial.

21  To argue that the composition in the sound recording is the "complete

22  version" of the composition is meaningless.  Nothing in the 1909 Act requires the

23  proprietor to copyright the "complete" version—or any version—of a composition.

24  Whatever the proprietor publishes with notice affixed secures a copyright.  In this

25  case, that version is the Deposit Copy.  Any material embodied in the sound

26  recording that is not found in the Deposit Copy is not subject to copyright.

27  The original <u>owner</u> of the GIVE and DANCE copyrights is <u>not Marvin Gaye</u>.

28  Marvin Gaye was the author, but the claimant (owner) of the copyright was his

1  publisher, Jobete.  [Miller Decl, Exh. C, D p. 1, § 1 (listing Jobete as copyright

2  claimant); Exhs. E-F, p. 1 (stating "© [year] Jobete Music Company, Inc.").]  The

3  Gayes only obtained copyright ownership after Marvin Gaye died as his heirs due to

4  the reversion provisions in the 1976 Copyright Act.  Jobete owned the Deposit Copy

5  compositions in GIVE and DANCE from the outset.  Marvin Gaye's creation of a

6  sound recording of GIVE or DANCE has no bearing on the Deposit Copy that

7  Jobete published with notice in order to secure its copyright for the composition.

8        Besides, there is no competent evidence of how Marvin Gaye created the

9  sound recording, let alone which portions at issue he supposedly created.  Janis

10 Gaye—Marvin Gaye's ex-wife—testifies only that she "was present when 'Got to

11 Give It Up' was recorded."  [Declaration of Janis Gaye ("Gaye Decl"), ¶ 5.]  This

12 testimony is immaterial and does not evidence whether any elements in the sound

13 recording were created by Marvin Gaye  To the contrary, Janis Gaye testified that

14 she did was not present on all days when GIVE was recorded—and that she does not

15 know if Marvin Gaye wrote sheet music or who created the Deposit Copy.  [Miller

16 Decl, Exh. G.]  Her testimony now in support of this Application that Marvin Gaye

17 did *not* write sheet music and that the lead sheet that became the deposit copy was

18 created *after* the song was recorded [Gaye Decl, ¶¶ 7-8] is not credible.  If, in fact,

19 Marvin Gaye did write the lead sheet, or if it was written before he recorded the

20 song, then the Deposit Copy arguably is the "complete version" of the composition.

21       None of the above matters, of course, since the compositional elements found

22 in the sound recording but not in the Deposit Copy were never published.  Absent

23 publication, no copyright was secured in same under the Act.  1909 Act, § 9.

24 **C.    The Court's Ruling Will Not "Legalize Wholesale Copyright**

25      **Infringement"**

26       Defendants argue that "the Court's ruling would have a devastating impact on

27 the rights of owners of pre-1978 musical compositions by allowing wholesale

28 copying of compositional elements not found in pre-registration published versions

1   of the works or within the deposit copies themselves" and thus "would create

2   dangerous and potentially devastating precedent to the owners of such intellectual

3   property."  [App. Memo (Document 232-1), 1.]

4        Defendants' dire warnings about the demise of the United States copyright

5   law as a result of this Court's pretrial rulings are greatly exaggerated.  Defendants

6   argue that if pre-1978 copyrights are <u>limited to the published compositions that were</u>

7   <u>copyrighted</u>, then anyone can copy composition al material in any pre-1978 sound

8   recordings that was not copyrighted.  Defendants are absolutely correct.  That is

9   how copyright works.

10       To obtain a copyright under the 1909 Act, the proprietor must publish with

11  notice a manuscript copy of the composition in which the proprietor claims a

12  copyright and must deposit "the best edition thereof then published" with the

13  Copyright Office.  1909 Act, §§ 9,10, 12.  If the proprietor did not include certain

14  material in the published copy, then it is not subject to statutory copyright.  If the

15  proprietor published without proper notice, the work is in the public domain, and

16  copyright is forfeited.  The 1909 Act had specific requirements.  Proprietors at the

17  time knew the rules and did what they did to obtain a copyright (or not).  That a

18  proprietor failed to publish a complete copy of his composition does not alter the

19  meaning of the 1909 Act—it shows merely the proprietor's failure to follow the Act.

20       Defendants (rather hysterically) argue that. "under this Court's ruling," a

21  "clever infringer" can "take with impunity" material embodied in sound recordings

22  by the Beatles, The Rolling Stones, Elvis Presley, or—yes—even Marvin Gaye

23  because it was not contained in the published sheet music.  [App. Memo, 2:1-5.]

24  This is wild-eyed speculation, since the Gayes have no idea what published sheet

25  music secured the copyrights in Elvis Presley, Beatles, or other artists' songs, and

26  what compositional elements of the sound recordings are not copyrighted in same.

27  / / /

28  / / /

1    More importantly, Defendants simply miss the <u>musical point</u> that the

2    composition of a popular song is contained the melody, harmony, and lyrics—the

3    very elements that are set forth even in a bare bones lead sheet version of a song.

4    A musical composition consists of rhythm, harmony, and melody,
     and it is from these elements that originality is to be determined.

5    3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*
     § 2.05[D].  A musical composition captures an artist's music in

6    written form. … A musical composition's copyright protects the
     ***generic sound*** that would necessarily result from ***any*** performance

7    of the piece.

8    *Newton v. Diamond*, 204 F.Supp.2d 1244, 1249 (C.D.Cal. 2002), *aff'd* 388 F.3d

9    1189 (9th Cir. 2003)(citing A. Dustin Mets, *Did Congress Protect the Recording*

10   *Industry Into Competition?  The Irony of the Digital Performance Right in Sound*

11   *Recordings Act*, 22 U. DAYTON L. REV. 371, 372-373 (1997)(emphasis added).

12   Defendants wrongly contend that every sound in a recording is part of the

13   "composition" (which in the case of GIVE includes vocal "woos," hand claps, open

14   hi-hat, falsetto, party noise, omission of a guitar, etc.).  This is not the case and was

15   not so during the era of the 1909 Act, *e.g.*, Tin Pan Alley, Brill Building, etc.

16   Rather, "[c]omposers in the 1970s notated the vocal melody, lyrics, and notes in

17   lead sheet fashion because **that was considered the composition of the song** (*i.e.*,

18   not how it was performed on any particular recording)."  [Miller Decl, Exh. H, 10,

19   ¶ 30 (emphasis added).]  Indeed, **<u>sound recordings themselves</u>** were not subject to

20   copyright under the 1909 Act prior to 1972.  Elvis Presley's famous sound

21   recordings from the 1950s and 1960s are <u>not subject to statutory copyright</u>.  There is

22   nothing unfair or wrong about that.  Congress provided the protection it provided.

23   Defendants argue that the Court's ruling "would create a situation where the

24   compositions in the recordings are derivative works incapable of copyright

25   protection because, as pre-1978 recordings, the recordings could not be submitted as

26   the musical compositions."  [App. Memo, 2:5-8.]  This assertion is <u>flat out wrong</u>.

27   Compositions in the sound recordings could always be fully protected—all that was

28   required was to publish sheet music with notice affixed that embodied all the

1  compositional elements in which copyright was claimed.  Any vocal or instrumental

2  part can be notated.  Lead sheets were common because songwriters generally did

3  not consider the performance elements (drums, bass, etc.) to be the composition: the

4  "song" was the melody, harmony, and lyrics.   Defendants' "notion that common

5  use of lead sheets somehow precluded a composer in the 1970s from submitting a

6  score indicating all instrumental or vocal elements in which the composter claimed a

7  copyright is without foundation."  [Miller Decl, Exh. H, 10, ¶ 29.]

8      *Jones v. Virgin Records, Ltd.*, 643 F.Supp. 1153 (S.D.N.Y. 1986) cited by

9  Defendants [App. Memo, 11:4-6] held that sales of phonorecords do <u>not</u> constitute

10  publication of the underlying composition under the 1909 Act.  *Id.* at 1158-1159.

11  That holding fully supports Plaintiffs' position here.  Footnote 13 of the *Jones*, cited

12  by Defendants, merely refers in dicta to the problems that might arise if each

13  recording of an unpublished song constituted publication under the 1909 Act and

14  thus would require the composition's owner to register a revised composition each

15  time or else forfeit ownership.  *Jones* has no bearing on the scope of copyright in a

16  published copy of a composition.  The scope clearly is only the published copy.

17      The Court's ruling will not "essentially legalize wholesale copyright

18  infringement of pre-1978 compositions."  [App. Memo, 11:13-14.]  By definition,

19  all pre-1978 copyrights have already been created.  The published works are what

20  they are, and anything that was not published is not copyrighted; that is the law.

21  The Court's ruling merely follows the law—it does not change the law one iota.

22  **D.     <u>Excluding the GIVE and DANCE Sound Recordings Is Proper Here</u>**

23      Defendants argue that, due to this Court's ruling, this "would be the ***only case***

24  ***in history*** that the Gayes' counsel can locate where two complete commercial

25  recordings at issue in a music copyright infringement action were not allowed to be

26  played to compare the expression of the compositional elements embodied in those

27  recordings."  [App. Memo 2:15-18 (emphasis added).]

28  / / /

1    Again, Defendants' hyperbole defies common sense.  The Gayes <u>cite no case</u>

2    where the sound recording contained elements claimed to be similar but that were

3    not subject to copyright.  In each case cited [App. Memo, 14-15], <u>there was no issue</u>

4    <u>that the sound recording differed from the copyrighted work</u>.  That is the significant

5    difference here and is the reason why the Court's ruling to exclude the GIVE and

6    DANCE sound recordings is correct.  In other cases, the issue was not raised,

7    perhaps either because there were no meaningful differences between the

8    composition and the sound recording or because any additional material only found

9    in the sound recording was not claimed to similar.  The cases do not address this

10   issue and are <u>not precedent</u> on it for that reason.  To draw any conclusions from

11   these cases that do not involve claimed similarities in the sound recording but not in

12   the composition would be sheer speculation.  <u>Defendants cite no apposite authority</u>.

13       To the contrary, there is significant danger of prejudice, confusing the issues,

14   and misleading the jury by playing Marvin Gaye sound recordings that contain

15   numerous elements **<u>not found in the Deposit Copy</u>** yet **<u>claimed by Defendants to</u>**

16   **<u>be substantially similar to "Blurred Lines" ("BLURRED")</u>**.  The sound

17   recording of GIVE contains numerous elements, including drums, keyboard, bass,

18   cowbell, backup vocals, additional vocal melodies, and other musical elements that

19   Defendants contend are similar to BLURRED, and that are <u>not</u> found in the GIVE

20   Deposit Copy.  The sound recording of DANCE similarly contains certain numerous

21   elements, including <u>all of its instrumental parts</u>, including the bass, and <u>all backup</u>

22   <u>vocals</u>, that are not found in WAR.  [Miller Decl, Exh. H, 2-10, ¶¶ 6-28.]

23       The GIVE Deposit Copy contains <u>no</u> instrumental parts whatsoever (other

24   than an eight bar "bass intro" that is not found on the GIVE sound recording).  The

25   DANCE Deposit Copy contains no instrumental parts whatsoever.  Neither Deposit

26   Copy contains backup (harmony) vocals.  Any interpretative, performance, or

27   arrangement aspects of how the songs are played on the sound recordings also are

28   not reflected in the Deposit Copies.  [Miller Decl, Exh. H, 2-10, ¶¶ 6-28.]

1    The <u>vast majority of alleged similarities</u> between BLURRED and GIVE exist

2  <u>only</u> in the GIVE sound recording.  [Miller Decl, Exh. H, 3-5, ¶ 8(a)-(aa).]  Clearly,

3  it would be unfair and prejudicial to have the jury hear all of these musical elements

4  on the GIVE sound recording that allegedly are similar but are not at issue here.

5    Defendants' musicologist, Judith Finell, testified that the only similarities

6  between GIVE and BLURRED that "are obvious enough that a lay listener would

7  hear them easily" and "without guidance from an expert like" Ms. Finell, are the

8  bass line, cowbell, and keyboard parts.  [Miller Decl, Exh. I, 84:22-86:13.]  In other

9  words, the <u>only similarities a lay juror might hear</u> are <u>not found in the Deposit Copy</u>.

10    It is patently obvious why Defendants want to play the sound recording:  they

11  do not own the music, but it is the only music they believe is similar to BLURRED.

12    Defendants **want the jury to base its copying decision on the *wrong song*.**

13  The vast majority—indeed, nearly all—of the similarities claimed by Defendants'

14  musicologists are <u>based on the recording only</u> and are not found in the Deposit

15  Copy.  [Miller Decl, Exh. H, 3-5, ¶ 8(a)-(aa).]  Defendants are desperate to have the

16  jury compare the sound recordings, but do so would invite error.  *Harper House,*

17  *Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207 (9th Cir. 1989) (reversing where

18  erroneous jury instruction failed to distinguish *protectable* material and made it

19  possible for the jury to find copying based on unprotectable elements). To do so

20  would also plainly cause a significant danger of prejudice, confusion, misleading the

21  jury, and significant waste of time by having four of Defendants' experts (Judith

22  Finell, Ingrid Monson, Thomas Court, Ron Aston) and Plaintiffs' expert, Sandy

23  Wilbur, testify about numerous alleged similarities not found in the Deposit Copy.

24  This is the precise reason FRE 403 exists:  to avoid prejudice, confusion, waste of

25  time, and to make sure the jury considers the correct evidence in reaching a verdict.

26  / / /

27  / / /

28  / / /

1    Defendants own the melodies, lyrics, and "bass intro" in the Deposit Copy.
2    Those three elements can easily be played for the jury on a newly made recording
3    that <u>only contains the elements in the Deposit Copy</u> and that does not contain any
4    additional elements of the GIVE sound recording not found in the Deposit Copy.
5    There is no reason to include any elements of the GIVE sound recording to do so.  A
6    neutral recording can be made by the musicologists—without Marvin Gaye's
7    signature voice or any elements of his sound recording—that fairly represents just
8    those compositional elements in the GIVE Deposit Copy claimed to be similar.  A
9    similar neutral recording can be fashioned for "After the Dance" ("DANCE").

10   <u>Plaintiffs are in the process of creating such recordings now pursuant to the</u>
11   <u>Court's rulings and will timely submit them on the schedule the Court has set</u>.  With
12   modern digital recording techniques, it is a simple and inexpensive process to create
13   a neutral rendition of the two Marvin Gaye songs that <u>fairly</u> represents all of the
14   material in the Deposit Copy and <u>nothing more</u>, let alone anything more that might
15   unfairly and prejudicially cause a jury to unknowingly hear similarities that are not
16   found in the Deposit Copy yet attribute them to Defendants' limited composition.

17   There is no need to play the Marvin Gaye recordings or any portions of them
18   to the jury.  They are not relevant to the intrinsic test.  The Marvin Gaye sound
19   recordings simply <u>are not Defendants' copyrighted compositions</u>.  The "total
20   concept and feel" of the Marvin Gaye sound recordings is <u>not</u> the "total concept and
21   feel" of the compositions in the Deposit Copies—it is something very different.

22   Defendants entire argument is misplaced and <u>ignores</u> the Court's rulings.
23   Defendants argue that "the compositions as embodied in the sound recordings are
24   the compositions at issue in this action."  [App. Memo, 13:6-7.]  That simply is not
25   the case, as discussed above.  The GIVE and DANCE sound recordings contain
26   numerous musical elements—including all instrumental and backup vocal parts—
27   that are not contained in the Deposit Copies.  [Miller Decl, Exh. H, 2-10, ¶¶ 6-28.]
28   The compositions in the sound recordings are not the compositions Defendants own.

1    Defendants' argument that alleged copying of sound recording elements <u>not</u>

2    <u>found in the Deposit Copy</u> somehow shows copying of other, unrelated elements

3    that are contained in the Deposit Copy lacks merit.  Even assuming arguendo that

4    Plaintiffs copied sound recording elements not found in the Deposit Copy, that does

5    not tend to show that any elements in the Deposit Copy are substantially similar.

6    This is particularly true where, as here, Plaintiffs concede access to the Marvin Gaye

7    songs.  Thicke and Williams admire Marvin Gaye and knew his two songs here.

8    On the other hand, the risk of prejudice, confusion, waste of time, and

9    misleading the jury by allowing evidence of elements in the recording that

10   Defendants do not own would be substantial.  It is clear that Defendants want to

11   confuse the jury by having them think that alleged similarity of sound recording

12   elements not contained in the Deposit Copy—many of which are commonplace

13   stylistic or performance elements, such as use of a cowbell, keyboard, hi-hat,

14   falsetto voice. etc.—are somehow evidence that the melody of BLURRED is similar

15   to the melody of GIVE found in the Deposit Copy.  The risk of confusing or

16   misleading the jury is substantial, and the logical inference does not follow that,

17   because unrelated elements allegedly are similar, the Deposit Copy was copied.

18   Furthermore, it is not necessary to use the Gaye sound recordings.  As the

19   Court has suggested, a recording of just those elements in the Deposit Copy can be

20   constructed without using Marvin Gaye's voice or elements of his recordings.

21   That Marvin Gaye was Defendants' father or Janis Gaye's his ex-husband is

22   irrelevant.  The copyright is in a composition.  Defendants have no more rights in

23   Marvin Gaye's performance of the composition, and it is no better an example of the

24   composition, than any other rendition.  To the contrary, it is misleading and

25   prejudicial and likely to confuse.  *Newton*, 204 F.Supp.2d at 1249 ("A musical

26   composition's copyright protects the ***generic sound*** that would necessarily result

27   from ***any*** performance of the piece")(emphasis added).

28   / / /

1    The jury can hear the "total concept and feel" of the Deposit Copy

2  compositions in a sound recording that <u>only contains</u> that composition and no other

3  elements.  The Marvin Gaye sound recordings are <u>not</u> the best evidence of the "total

4  concept and feel" of the Deposit Copies because they contain numerous elements

5  that are: (a) not in the Deposit Copies; and (b) likely to mislead or confuse the jury

6  because of alleged similarity to Plaintiffs' songs of those unprotected sound

7  recording elements.  Defendants cannot justify why a recording that contains

8  numerous irrelevant evidence is more fair than one based only on the Deposit Copy.

9    Defendants argue that the sound recording is necessary to show the alleged

10  "combination of unprotectable elements" that they claim were copied.  That begs the

11  question—if those unprotectable elements are <u>only found</u> in the sound recording and

12  not in the Deposit Copy, then those elements are not subject to the Gayes' copyright.

13    There is no need to have a hearing with musicologists (all of whom live on

14  the East Coast, Ms. Finell and Ms. Wilbur in New York, and Ms. Monson in

15  Boston) so that Defendants can have their experts plead for the use of a sound

16  recording that has very little bearing to the Deposit Copy compositions at issue.

17  Rather than waste their time attempting to explain why they based their opinions

18  *predominantly, if not entirely* on elements not found in the Deposit Copy, Ms. Finell

19  and Ms. Monson should set to work creating whatever demonstratives they need.

20    Any musicologist can easily can create (or hire musicians to create) a

21  recording of the song that: (a) only contains the elements in the Deposit Copy and

22  (b) does not contain any elements of the Marvin Gaye sound recordings that are not

23  found in the Deposit Copy.  The recording would have melody, lyrics, harmony, and

24  the "bass into" found in the GIVE Deposit Copy and the melody, lyrics, and

25  harmony found in the DANCE Deposit Copy.  The jury will hear what the <u>*actual*</u>

26  <u>*composition*</u> that Defendants own sounds like and can compare it to Plaintiffs' work.

27  / / /

28  / / /

KING, HOLMES,
PATERNO &
BERLINER, LLP

1  Plaintiffs will have a proposed version of the Marvin Gaye songs ready for

2  the jury to hear and will timely exchange same with Defendants, per the Court's

3  Order.  That approach is the fairest to all parties and insures a fair result at trial.

4  **III.**

5  **THE MOTION TO CONTINUE TRIAL SHOULD BE DENIED**

6  There is no reason to continue the trial.  The only reason asserted by

7  Defendants is that their experts purportedly need more time to prepare

8  demonstrative exhibits for trial.  This argument should be rejected out of hand.

9  Expert discovery is long since closed.  Defendants' musicologists have

10  produced reports and have been deposed.  They cannot change their opinions now.

11  The only alleged issue is retooling alleged demonstratives for trial.  This is

12  not an insoluble problem.  Whatever charts or demonstratives that Defendants'

13  musicologists have prepared that are based on <u>elements found only in the sound</u>

14  <u>recording</u> cannot be used.  Any charts or demonstratives based only on elements

15  found in the GIVE and DANCE deposit copies can be used at trial.  It is simple.

16  To the extent some demonstratives need reworking, there is time to do so.

17  The notion that it will take voluminous amounts of time to prepare new

18  demonstrative sound recordings is hugely exaggerated.  The Deposit Copies have

19  minimal elements—vocal melody, lyrics, harmony (chords), a "bass intro" in GIVE,

20  and vocal melody, lyrics, and harmony (chords) in DANCE.  A musicologist can

21  prepare a recording of those elements in an afternoon using digital recording

22  technology.  Defendants <u>have had since July 2014</u>, when Plaintiffs filed their

23  summary judgment motion and raised the Deposit Copy issue, and <u>since October</u>

24  <u>2014</u> when the Court limited the motion to elements in the Deposit Copy to prepare.

25  What were Defendants doing all this time?  Hoping that the Court's ruling on the

26  summary judgment motion would go away at trial?  Defendants knew that the

27  Deposit Copy limitation was an issue but chose—and still choose—to ignore it.

28  / / /

1    Furthermore, the Court's ruling on summary judgment and its rulings on the

2    motions in limine have been clear.  There is no reason for confusion, nor are

3    Defendants confused in any manner that would prevent them from preparing any

4    demonstrative exhibits.  Defendants just <u>refuse to accept the Court's rulings</u>.  Rather

5    than adjust their trial planning to the Court's Orders, Defendants balk and reargue.

6    Defendants seek almost **<u>$42 million</u>** in damages.  They have multiple lawyers

7    and experts working round the clock on this case.  Plaintiffs are busy, in-demand

8    musical artists who have cleared their schedules for the February 10, 2015, trial.

9    Plaintiffs want their day in Court to prove to the world that they did not infringe.

10    If Defendants are not ready for trial, they only have themselves to blame.

11    If the Court's criminal calendar prevents at a trial in February, that cannot be

12    helped.  But there is <u>no reason to continue the trial because Defendants are not</u>

13    <u>ready</u>.  The Court's rulings, after all, are not *carte blanche* for Defendants' experts

14    to come up with <u>new opinions</u> not contained in their reports and on which they have

15    not been deposed.  The issue, at most, is demonstrative evidence—charts, etc.—to

16    illustrate the opinions that the experts have already been deposed on.  There is no

17    reason why such demonstratives cannot be prepared on the schedule the Court set.

18    Indeed, Plaintiffs are prepared to exchange demonstratives based on the

19    Court's ruling—including demonstrative sound recordings of the Deposit Copies,

20    per the Court's rulings—in the timing that the Court has set in its recent Orders.

21    **IV.**

22    **<u>THE MOTION FOR INTERLOCUTORY APPEAL SHOULD BE DENIED</u>**

23    There is no basis for interlocutory appeal.  There is no "controlling issue of

24    law as to which there is substantial ground for difference of opinion." 28 U.S.C.

25    § 1292(b).  There is <u>no legal basis</u> for the Gayes' opinion that they have secured a

26    copyright in something other than the sheet music that was published with notice.

27    As discussed above, the Court's ruling adheres to Section 9 of the 1909 Act.

28    Defendants are unable to cite any authority that supports their claim to own a

KING, HOLMES,
PATERNO &
BERLINER, LLP

1  statutory copyright under the 1909 Act in a composition found only in a sound

2  recording and never published in manuscript form or registered as such.

3       The interlocutory appeal also will not "materially advance the ultimate

4  termination of the litigation."  28 U.S.C. § 1292(b).  The case will go to trial, now o

5  after the interlocutory appeal.  The appeal undoubtedly will fail, in which case it will

6  just delay the process.  Even if the appeal succeeds, the case will still go to trial.

7  The interlocutory appeal does not "materially advance" termination of the litigation.

8  The ordinary process should be followed here.  The Court has made its pretrial

9  rulings.  The case will go to trial.  After the judgment, either party can appeal.  The

10  Gayes fail to show any reason why this case is different from any other case in

11  which the trial court's rulings on evidentiary or other issues affect the scope of trial.

12       Finally, the Gayes' alleged costs, potential liability for legal fees, or supposed

13  inability to post an appeal bond have no bearing on the issue of interlocutory appeal.

14  Given that the Gayes seek almost **$42 million** from Plaintiffs—an outrageous

15  sum—it is hardly a basis for an interlocutory appeal that they are incurring litigation

16  costs.

17       Plaintiffs want their day in Court.  They did not copy Defendants' songs.

18  The Court should deny the Application in its entirety.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

V.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Application and should grant such other and further relief as the Court deems just and proper.

DATED:  January 30, 2015          KING, HOLMES, PATERNO & BERLINER, LLP

By: _____
                                       HOWARD E. KING
                                         SETH MILLER
                          Attorneys for Plaintiffs and Counter-Defendants
                          PHARRELL WILLIAMS, et al.

## DECLARATION OF SETH MILLER

I, Seth Miller, declare as follows:

1.      The facts set forth below are true of my personal knowledge unless otherwise indicated.  If called upon to testify, I could and would testify competently thereto.

2.      I am an attorney duly admitted to practice before this Court.  I am a partner with King, Holmes, Paterno & Berliner, LLP, attorneys of record for Plaintiffs and Counter-Defendants PHARRELL WILLIAMS, ROBIN THICKE and CLIFFORD HARRIS, JR. and Counter-Defendants MORE WATER FROM NAZARETH PUBLISHING, INC., PAULA MAXINE PATTON individually and d/b/a HADDINGTON MUSIC, STAR TRAK ENTERTAINMENT, GEFFEN RECORDS, INTERSCOPE RECORDS, UMG RECORDINGS, INC., and UNIVERSAL MUSIC DISTRIBUTION (collectively, "Plaintiffs").

3.      Attached hereto as **Exhibit A** is a true and correct copy of an email I received from the Court (cacd_ecfmail@cacd.uscourts.gov) at 3:03 pm on January 29, 2015, that reflects that Defendants filed their *Ex Parte* Application at 3:02 p.m.

4.      Attached hereto as **Exhibit B** is a true and correct copy of an article regarding Defendants' Application posted online by *The Hollywood Reporter* at 3:15 p.m. on January 29, 2015, at: http://www.hollywoodreporter.com/thr-esq/marvin-gaye-family-seeks-blurred-768223.

5.      Attached hereto as **Exhibits C** and **D**, respectively, are true and correct copies of copyright registrations for "Got to Give It Up" and "After the Dance" that were previously filed with the Court in Document 91-2, filed 7/22/2014, as exhibits to the Declaration of Donna Stockett ("Stockett Decl") filed in support of Plaintiffs' Motion for Summary Judgment Or, In the Alternative, Partial Summary Judgment.

6.      Attached hereto as **Exhibits E** and **F**, respectively, are true and correct copies of the deposit copies for "Got to Give It Up" and "After the Dance" that also were filed with the Court in the Stockett Decl (Document 91-2, filed 7/22/2014).

7.     Plaintiffs took the deposition of Janis Gaye on August 29, 2014. Attached hereto as **Exhibit G** is a true and correct copy of relevant excerpts from the transcript of the deposition of Ms. Gaye.

8.     Attached hereto as **Exhibit H** is a true and correct copy of relevant excerpts from the Declaration of Sandy Wilbur In Support of Plaintiffs' Motions *In Limine* filed on January 6, 2015 (Document 173).

9.     Plaintiffs took the deposition of Judith Finell on April 18, 2014. Attached hereto as **Exhibit I** is a true and correct copy of relevant excerpts from the transcript of the deposition of Ms. Finell.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 30, 2015, at Los Angeles, California.

_____

Seth Miller

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on January 30, 2015, I electronically filed the foregoing

3 **PLAINTIFFS' OPPOSITION TO COUNTER CLAIMANTS'** *EX PARTE*

4 **APPLICATION FOR CONTINUANCE OF TRIAL, RECONSIDERATION**

5 **OF GRANTING MOTION IN LIMINE NO. 1 3 AND CERTIFICATION OF**

6 **QUESTION FOR INTERLOCUTORY APPEAL; MEMORANDUM OF**

7 **POINTS AND AUTHORITIES; DECLARATION OF SETH MILLER** with the

8 Clerk of the Court by using the CM/ECF system.  I certify that all participants in the

9 case are registered CM/ECF users and that service will be accomplished by the

10 CM/ECF system.

11

12      _Joey S. Gossett_____

13      Joey S. Gossett

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

King, Holmes,
Paterno &
Berliner, LLP

4112.060/851747.1