Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
KING & BALLOW
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000
Fax: (858) 597-6008
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and
Nona Marvisa Gaye

Richard S. Busch (TN BPR 014594)
(pro hac vice)
E-Mail: rbusch@kingballow.com
Sara R. Ellis (TN BPR 030760) (pro hac vice)
E-Mail: sellis@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456  Fax:  (615) 726-5417
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and Nona
Marvisa Gaye

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East; Suite 1520
Los Angeles, CA  90067
(310) 853-6355 Fax: (310) 853-6333
Attorneys for Defendants and Counter-
Claimants Frankie Christian Gaye and
Nona Marvisa Gaye

Paul N. Philips (SBN 18792)
E-Mail: pnp@pnplegal.com
The Law Offices of Paul N. Philips
9255 West Sunset Boulevard
West Hollywood, CA  90069
(323)813-1126 Fax:  (323) 854-6902
Attorney for Defendant and Counter-Claimant
Marvin Gaye III

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive,<br><br>　　　　Defendants.<br><br>———————————————<br>AND RELATED COUNTERCLAIMS | Case No. CV13-06004-JAK (AGRx)<br><br>Hon. John A. Kronstadt, ctrm 750<br><br>**COUNTER-CLAIMANTS JOINT TRIAL BRIEF**<br><br>Action Commenced: August 15, 2013<br>Trial Date: February 10, 2015 |

# **TABLE OF CONTENTS**

I.   Introduction.................................................................................1

     A. "Got to Give it Up" & "Blurred Lines" ....................................1

     B. "After the Dance" & "Love After War".....................................2

     C. The Gayes Allegations ........................................................4

II.  The Gayes Response to Plaintiffs' Memorandum of Contentions of

     Fact and Law..............................................................................4

     A. Burden of Proof....................................................................4

     B. Applicability of the 1909 Act.................................................5

     C. Scope of Ownership in the Copyrights of "Got to Give it Up" And

     "After the Dance" .....................................................................6

     D. Proof of Plaintiffs' Copying of "Got to Give it Up" and

     "After the Dance"......................................................................9

          i.    Inverse Ratio Application ...........................................9

          ii.   Substantial Similarity ..............................................10

                a. Extrinsic Test .....................................................10

                b. Intrinsic Test .....................................................10

          iii.  Non-lead Sheet Elements as Circumstantial Evidence of

                Copying ..............................................................13

     E. Affirmative Defenses............................................................15

     F. Damages...............................................................................16

III. Issues Raised at Pretrial Conference...........................................18

     A. Marvin Gaye Legacy............................................................18

     B. Experts May Testify About Substantial Similarity ..................20

     C. Objections to Verdict Form ..................................................21

     D. Harry Weinger's Role as a Corporate Representative................22

     E. Inclusion of "Theme X" in Demonstrative Exhibits .................23

     F. Witnesses Disclosed After the Deadline .................................24

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986)……………………...…………13

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946)…………………………………………15

*Baxter* v. *MCA, Inc.,* 812 F.2d 421 (9th Cir. 1987) ……………………...……11, 12, 13

*Bridgeport Music, Inc.* v. *UMG Recordings, Inc.,* 585 F.3d 267
(6th Cir. 2009) ………………………………………………………………...…………12

*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) …………………...…………23

*Cream Records, Inc. v. Joseph Schlitz Brewing Co.*, 754 F.2d 826 (9th Cir. 1985)………17

*Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745 (2d Cir. 1962)………………6

*Del Amo v. Baccash*, No. CV-07-663 PSGJWJX, 2008 WL 2780978
(C.D. Cal. July 15, 2008)…………………………………. ………………………...…………19

*Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009)…………..10

*Feist  Publications, Inc.* v. *Rural Telephone Service Co., Inc.,* 499 U.S. 340
(1991) ………………………………………………………………….………...………21

*Fred Fisher, Inc.* v. *Dillingham*, 298 F. 145 (S.D.N.Y. 1924) …………………………12

*Flynn v. Surnow*, No. CV 02-9058-JFW PLAX, 2003 WL 23411877 (C.D. Cal. Dec. 9,
2003) …………………………………………………………………………………13

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,* 462 F.3d 1072
(9th Cir. 2006) ……………………………………………………………………22

*Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 835-36 (C.D. Cal. 2010) …………….20

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)………….10

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985)…………17

*Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984)………………………....7

*Heim* v. *Universal Pictures Co.,* 154 F.2d 480, 488 (2d. Cir. 1946)…………………12

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971)………....5

*Jackson v. Am. Family Mut. Ins. Co.*, No. 2:10-CV-01874-LRH, 2012 WL
845646 (D. Nev. Mar. 12, 2012) ………………………………………………25

1   *JB Oxford & Co. v. First Tennessee Bank Nat. Ass'n.*, 427 F. Supp. 2d 784

2   (M.D. Tenn. 2006) ………………………………………………… 15

3   *Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153, (S.D.N.Y. 1986) ………………………9

4   *Johnson v. Gordon*, 409 F.3d 12 (1st Cir. 2005)……………………………………...…13

5   *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS), 2008 WL

6   5245484 (N.D. Cal. Dec. 17, 2008)………………………………...……………….6, 8, 9

7   *Lockheed Martin Corp. v. Network Solutions, Inc.*, No. CV 96-7438 DDP ANX, 1997

8   WL 381967(C.D. Cal. Mar. 19, 1997) …………………………………………..…17

9   *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F,2d 718

10   (9th Cir. 1984) …………………………………………………………..……5

11   *Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002) …………………………………16

12   *Maggio v. Liztech Jewelry*, 912 F. Supp. 216 (E.D. La. 1996) …………………….......14

13   *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470 (9th Cir.1995))……………21

14   *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843 (2014)……………4

15   *Mendoza v. Marriott Hotel Services, Inc.*, No. CV 10-6384 FFMX,

16   2011 WL 4020940 (C.D. Cal. Sept. 9, 2011) …………………………………..……..23

17   *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002)…………………………………………9

18   *Milliken & Co. v. Shaw Indus., Inc.*, 978 F. Supp. 1155 (N.D. Ga. 1997)………………6

19   *Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053 (9th Cir.2002)…………………9

20   *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393 (S.D.N.Y 1952)…………15

21   *Nafal v. Carter*, 540 F. Supp. 2d 1128 (C.D. Cal. 2007)…………………………………5

22   *National Comics Pubs. v. Fawcett Pubs.*, 191 F.2d 594 (2d Cir. 1951)……………..…6

23   *Newton v. Diamond,* 388 F.3d 1189 (9th Cir. 2004)………………………..……11, 13

24   *Nintendo of America, Inc. v. Dragon Pacific Intern.*, 40 F.3d 1007

25   (9th Cir.1994)…………………………………………………………...………17

26   *NMB Air Operations Corp. v. McEvoy*, 194 F.3d 1317 (9th Cir. 1999)………………21

27   *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378

28   (C.D. Cal. 1993) ……………………………………………………………...…17

*Pasillas v. McDonald's Corp.*, 927 F.2d 440 (9th Cir. 1991)..............................11

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) ...................16

*Prunte v. Universal Music Grp.*, 563 F. Supp. 2d 41 (D.D.C. 2008) .....................13

*Repp v. Webber*, 892 F. Supp. 522 (S.D.N.Y. 1995) .........................................15

*Rice v. Fox Broadcasting Co.*, 330 F. 3d 1170 (9th Cir. 2003) ............................9

*Robertson v. Batten, Barton, Durstine & Osborne, Inc.,* 146 F. Supp. 795
(S.D. Cal. 1956) .............................................................................12

*Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045 (D. Idaho 2013) .......................6

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
206 F.3d 1322 (9th Cir. 2000) ...............................................................5

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,*
647 F.2d 200 (D.C. Cir. 1981) ..............................................................17

*Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) ................................................ 15

*Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49 (2d Cir. 1936) .....................12

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157
(9th Cir. 1977)................................................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984)............17

*Swirsky v. Carey*, 376 F. 3d 841 (9th Cir. 2004)............................................4

*Temple v. Synthes Corp.,* 498 U.S. 5 (1990) ...............................................18

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) .....................*passim*

*Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338
(9th Cir. 1981) .............................................................................6

*United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000) .................................21

*Universal Pictures v. Harold Lloyd,* 162 F.2d 354 (9th Cir. 1947) ....................... 12

*Walker v. Viacom Int'l, Inc.*, No. C 06-4931 SI, 2008 WL 2050964
(N.D. Cal. May 13, 2008) ....................................................................13

*Walt Disney Productions v. Air Pirates,* 581 F.2d 751 (9th Cir. 1978) ...................12

*Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25
(1st Cir. 2001)................................................................................................15

**Statutes**

17 U.S.C. §106..............................................................................................17
17 U.S.C. §504.......................................................................................*passim*

**Rules**

**Rules**

Fed. R. Civ. P. 26...........................................................................................25
Fed. R. Civ. P. 37...........................................................................................25
Fed. R. Evid. 401...........................................................................................13
Fed. R. Evid. 403...........................................................................................14
Fed. R. Evid. 704...........................................................................................10
Fed. R. Evid. 801...........................................................................................23

**Other Authorities**

Fed. R. Evid. 403 advisory committee's note (1972)......................................14

## IV.    Introduction

### A.    "Got to Give it Up" & "Blurred Lines."

Robin Thicke is a performer under contract with Star Trak Entertainment LLC which is a joint venture between Williams and UMG Recordings Inc. Of Thicke's seven albums, *Blurred Lines* is his most successful. Pharrell Williams is a successful songwriter, performer, and producer. Clifford Harris, Jr. is a successful performer. Counter-Defendants Star Trak Entertainment, LLC, Interscope Records (an unincorporated division of UMG Recordings, Inc.), and UMG Recordings, Inc. are the record labels that released the album *Blurred Lines*. Universal Music Distribution, a division of Universal Music Group Distribution Corp., manufactured and distributed the album *Blurred Lines*. More Water From Nazareth Publishing, Inc. is Williams' publishing company. Collectively, they were involved with the commercial release, reproduction, distribution, exploitation, licensing, and public performance of Thicke's songs and albums.

In 2013, Thicke, Williams, and Harris wrote, composed, recorded and performed "Blurred Lines," which Williams also produced. "Blurred Lines" is derivative work of "Got to Give it Up." Without seeking or obtaining authorization from the Gayes, Plaintiffs released the single "Blurred Lines" and accompanying music video on or about March 26, 2013, and the album entitled *Blurred Lines* both in the United States and internationally on or about July 30, 2013. Together, Plaintiffs and Counter-Defendants, in the creation and release of "Blurred Lines," reproduced, distributed, displayed, publicly performed and otherwise exploited an unauthorized derivative work of "Got to Give it Up," which earned Plaintiffs substantial profits and notoriety.

The Gayes instantly recognized "Blurred Lines" was substantially similar to "Got to Give it Up." Further, in promoting the song, Thicke repeatedly mentioned "Blurred Lines" connection to "Got to Give it Up." Upon learning that Counter-Defendants had neither requested nor obtained permission or a license to copy and incorporate "Got to

1  Give it Up" into "Blurred Lines," the Gayes sent Notice of Infringement to Counter-

2  Defendants, prior to the release of the album *Blurred Lines*.

3      The Gayes will present evidence that, despite notice: (1) "Blurred Lines" was

4  reproduced, distributed, displayed, publicly performed, and otherwise exploited by the

5  Counter-Defendants; (2) Plaintiffs and Counter-Defendants materially contributed to or

6  authorized the reproduction, distribution, display, public performance, and exploitation

7  of "Blurred Lines;" and (3) Plaintiffs and Counter-Defendants had the ability to control

8  and have profited from the exploitation of "Blurred Lines." Documentary evidence and

9  expert testimony will be presented as to the amount of Plaintiffs and Counter-

10  Defendants' profits and the Gayes' damages, the amounts and other consideration "Got

11  to Give it Up" would have been licensed for had proper authorization been sought, and

12  the impact of the use of "Got to Give it Up" and Marvin Gaye's name and image had on

13  the marketing of "Blurred Lines."

14      The Gayes' musicologists Judith Finell and Dr. Ingrid Monson will testify to at least

15  14 substantial similarities between "Blurred Lines" and "Got to Give it Up," which will be

16  demonstrated with documentary evidence including visual and audio media. This evidence

17  will prove the link between the songs is "undeniable" and that "'Got to Give it Up' served

18  as the specific model for 'Blurred Lines.'"

19      This expert testimony is supported by Thicke and Williams' public statements, prior

20  to thr litigation, about using "Got to Give it Up" as a framework for "Blurred Lines."

21  UMG's own Vice President of A&R for Universal Music Enterprises, an unincorporated

22  division of UMG, Harry Weinger, publicly and internally commented that "Blurred Lines"

23  was "sampled/borrowed from" "Got to Give it Up," and that "Blurred Lines" was "utterly

24  based on" "Got to Give it Up." Only after this litigation began did Thicke and Williams

25  deny that "Blurred Lines" was derivative of "Got to Give it Up."

26      **B. "After the Dance" & "Love After War."**

27      The musical composition "After the Dance," was simultaneously written,

28  composed and recorded by Marvin Gaye, and released in 1976 on the album *I Want*

*You. I Want You* reached No. 1 on the Billboard Soul Albums chart and No. 4 on the Pop Albums chart. "After The Dance" reached No. 10 on the Billboard Hot Dance/Disco Chart, No. 14 on the Soul Singles Chart, and No. 74 on the Pop Singles Chart. Testimonial evidence will show that Counter-Defendant Thicke is not only familiar with, and had access to, "After the Dance," but considers it a "classic."

Counter-Defendants released the single for "Love After War" on or about October 11, 2011, and the album entitled *Love After War* in both the United States and internationally on or about December 6, 2011. "Love After War" is a derivative work of "After the Dance." Counter-Defendants Star Trak Entertainment, LLC, Geffen Records (d/b/a Interscope Records and an unincorporated division of UMG Recordings, Inc.), and UMG Recordings, Inc. through its subsidiaries, are the record labels that released the album *Love After War*. Universal Music Distribution manufactured and distributed the album. Collectively, they were involved with the commercial release, reproduction, distribution, exploitation, licensing, and public performance of "Love After War."

Thicke and Patton (the writers, composers, and performers of "Love After War") without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gayes, reproduced, distributed, displayed, publicly performed and otherwise exploited "Love After War." Ms. Finell and Dr. Monson will provide testimonial and documentary evidence that "Love After War" and "After the Dance" are substantially similar. Documentary evidence though the use of visual and audio media will demonstrate these substantial similarities.

Counter-Defendants received notice of their infringement of "After the Dance" on or about October 30, 2013. The Gayes will prove through testimony and documentary evidence that, despite notice: (1) "Love After War" continued to be reproduced, distributed, displayed, publicly performed, and otherwise exploited, even after being put on notice of the infringement; (2) Counter-Defendants materially contributed to or authorized the reproduction, distribution, display, public performance, and exploitation of "Love After War;" and (3) Counter-Defendants had the ability to control and have

profited from the domestic and foreign exploitation of "Love After War." Documentary and testimonial expert will be presented as to the amount of Plaintiffs and Counter-Defendants' profits and the Gayes' damages.

### C. The Gayes Allegations

Plaintiffs and Counter-Defendants have violated section 106 of the Copyright Act in creating derivative works of "Got to Give it Up" and "After the Dance," respectively, and have reproduced, distributed, displayed, publicly performed and otherwise exploited (or authorized such exploitations of) "Blurred Lines" and "Love After War," respectively, without authorization, and without giving songwriter credit to Marvin Gaye or a copyright interest to the Gayes. Plaintiffs and Counter-Defendants actions constitute, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement.

## V.   The Gayes Response to Plaintiffs' Memorandum of Contentions of Fact and Law.

### A. Burden of Proof

The Gayes have the burden of proving, by a preponderance of the evidence, that they own the copyrighted compositions and that Plaintiffs copied original elements of their works. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014). The Gayes have produced copyright registrations, which are prima facie evidence of ownership as well as all facts therein. *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002); *see also United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (citation omitted). They have no burden to produce any other evidence of ownership, or compliance with the Copyright Act. *United Fabrics Int'l, Inc.* 630 F. 3d at 1258. The Gayes will show Plaintiffs and Counter-Defendants copied from their works, had access to the works, and that there are substantial similarities between the Plaintiffs and Counter-Defendants' works and original elements of the Gayes' copyrighted work. *See Swirsky v. Carey*, 376 F. 3d 841, 844 (9th Cir. 2004).

1   Once the Gayes show Plaintiffs and Counter-Defendants had access to the Gayes

2   work and that there is a substantial similarity between the works, a presumption of copying

3   arises, and  the burden shifts to Plaintiffs and Counter-Defendants to rebut or to show that

4   the alleged infringing work was independently created.   *Three Boys Music Corp. v.*

5   *Bolton*, 212 F.3d 477, 486 (9th Cir. 2000). If the Plaintiffs and Counter-Defendants show

6   proof of independent creation, that proof can be refuted by subconscious copying. *See*

7   *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971)

8   (internal citations omitted); *see also Three Boys Music Corp.*, 212 F.3d at 482

9   (specifically noting that George Harrison subconsciously copied The Chiffons' 'He's So

10   Fine,' in part, because he admitted hearing the song when it was a No. 1 hit).

11   **B. Applicability of the 1909 Act**

12   The Copyright Act of 1909 governs the validity of the initial copyrights if the

13   copied works were created before 1978. *Self-Realization Fellowship Church v. Ananda*

14   *Church of Self-Realization*, 206 F.3d 1322, 1325 (9th Cir. 2000) (internal citations

15   omitted).  In this action, the 1909 Act only governs the extent of what is copyrighted.

16   The 1976 Act applies to the Gayes remedies as the 1976 Act replaced the 1909 Act and

17   the complained of conduct occurred after the effective date of the 1976 Act.

18   Plaintiffs incorrectly cite *Nafal v. Carter* for the proposition that the 1909 Act

19   governs the rights and remedies of this action. (Dkt. No. 155 at 15). *Nafal v. Carter* and

20   the case it relies on, *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F,2d

21   718 (9th Cir. 1984), dealt only with the issue of a copyright license. *Nafal v. Carter*, 540

22   F. Supp. 2d 1128, 1136 (C.D. Cal. 2007) *aff'd,* 388 F. App'x 721 (9th Cir. 2010).  The

23   main issue of this case was whether the licensing provisions of the 1909 Act controlled.

24   *Id.*  The distinction between licenses and assignments involved the doctrine of

25   indivisibility and the policy concerns underlying the 1909 Act, neither of which have a

26   bearing on the outcome of this instant action. *Id.* Only the rights of bona fide copyright

27   owners are at issue in this litigation.  For the purposes of this action, the 1909 Act solely

28   governs the registration requirements for a valid copyright.

**C. Scope of Ownership in the Copyrights of "Got to Give it Up" And "After the Dance."**

The scope of a copyright is not, as a matter of law, limited to the lead sheets deposited with the Copyright Office. *See Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338 (9th Cir. 1981); (Dkt. No. 139 at 8) (the deposit requirement has "no effect whatsoever on the validity or enforceability of a copyright"). To receive protection under the 1909 Copyright Act, a composition had to be published. There is no dispute, in this action, that the compositions at issue were registered as published works. (*See, e.g.*, Dkt. No. 231 at 4 n.2). As noted above, the Gayes do not have and burden to do anything more. Registration protects all versions of the composition that existed prior to proper registration.

"Got to Give it Up" was written through the recording process and that the version of the composition included on Marvin Gaye's original commercially released recording was a complete version of the composition that existed prior to registration. (Dkt. No. 139 at 9-10; Dkt. No. 232-7 at ¶¶ 5, 8). That proof establishes the scope of the copyright and cannot be challenged by an infringer who was actually on notice of the copyright. *See Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745 (2d Cir. 1962) ("Even if, as defendants urge, the copyright notice might not be sufficient for some purposes . . . the defendants, as willful infringers wholly aware of the existence of the copyright, are in no position to assert the insufficiency of the notice."); *see also National Comics Pubs. v. Fawcett Pubs.*, 191 F.2d 594, 603 (2d Cir. 1951).

The purpose of the deposit requirement under 17 U.S.C. § 408(b) is not to define the scope of an infringement claim, but instead "is to identify the copyrighted work for the purposes of registration." *Scentsy, Inc. v. B.R. Chase*, 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013) (rev'd and remanded, in part, on other grounds); *see also* Paul Goldstein, Goldstein on Copyright § 3.8 (2013); *Three Boys Music Corp.*, 212 F.3d 477; *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS), 2008 WL 5245484, at *10 (N.D. Cal. Dec. 17, 2008); *Milliken & Co. v. Shaw Indus., Inc.*, 978 F. Supp. 1155,

1158 (N.D. Ga. 1997). "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the Copyright Office, [the Ninth Circuit's] definition of a 'complete copy' is *broad and deferential*: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Three Boys Music Corp.*, 212 F.3d at 486 (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984)). Under the 1909 Act, registration of a work is proper even where the deposit copies do not reflect the entirety of the work protected. *See* 2 Nimmer on Copyright § 7.17[E][2][b] at n.72 (citing *Johnson v. Salomon*, 197 U.S.P.Q. 801 (D. Minn. 1977)).

Publication of a composition and subsequent registration protects the entirety of the composition, as long as the published version, whether complete or not, identifies the full composition as it existed at the time of publication. This was exactly the finding of the Ninth Circuit in *Three Boys*. *Three Boys* involved facts nearly identical to the ones at issue in this action: a popular post-1978 composition infringed upon a copyright granted under the 1909 Copyright Act. 212 F.3d at 480-81. The *Three Boys* Court allowed the jury to hear and analyze the compositions, as expressed in the respective artists' commercially available sound recordings, even though the recordings contained two elements not contained in the deposited lead sheet and an additional element that was different from the element contained in the lead sheet. (*Id.* at Trial Tr. at 7:21-25, 101:20-102:3; 337:13-18, 524:6-12; 525:7; 789:17-24; 791:1-793:2; 889:21-890:4; 1140:10-1142:3, attached as Ex. A to Busch Decl.). Thereafter, comparative demonstration recordings were presented to the jury for analysis. (*Id.* at Trial Tr. 1140:10-1142:3). The jury found infringement based upon, among other things, a unique combination of unprotectible elements in both works made the works substantially similar. (*Id.* at 486).[1]

---

[1] Two compositional elements not in the deposit copy, as well as a compositional element which was different from what was contained in the deposit copy, were part of the finding of infringement, meaning that three out of the five elements that resulted in the infringement finding were either not in the deposit copy or different from what was in the lead sheet (Ex. A at Trial Tr. 760:18-761:15).

The Ninth Circuit held, after hearing the complete compositions as embodied in the respective artists' commercially available sound recordings and comparative demonstration recordings, that "[t]he jury . . . 'found infringement based on a unique compilation of those elements.' We refuse to interfere with the jury's credibility determination, nor do we find that the jury's finding of substantial similarity was clearly erroneous." *Three Boys Music Corp.*, 212 F.3d at 485-86. The Court noted it is "well-settled" that a combination of unprotectible elements can be protected and infringed upon. *Id.* at 485. The Ninth Circuit expanded this ruling in *Swirsky*, 376 F.3d at 848 (finding infringement based on a combination of individually unprotectible elements such as genre, and citing additional cases that have allowed a combination of unprotectible elements to be protected).

This reading of *Three Boys* has been recognized by other Courts in the Ninth Circuit. In *KnowledgePlex*, the Court determined there was "no authority" for finding a court's jurisdiction was limited to the material "deposited with the Copyright Office." 2008 WL 5245484, at *10. The Court went on to hold, "the Ninth Circuit in *Three Boys* explicitly . . . [found] copyright infringement . . . where the plaintiff had 'failed to register a complete copy of the song upon which the lawsuit was based,' even though "the deposit copy [did] not include the majority of the musical elements that were part of the infringement claim.'" *Id.* (citing *Three Boys Music Corp.*, 212 F.3d at 486). *Three Boys* stands for the proposition that the incomplete lead sheet at issue in that case protected the best version of the composition that existed at the time of registration— the composition as embodied on the sound recording.

The Gayes' have put on eye-witness proof that Marvin Gaye composed the compositions in the studio simultaneously as it was being recorded. (Dkt. No. 232-7 at ¶¶ 5, 6). These compositions were not immediately transcribed to sheet music, but were instead recorded. (*Id.* at ¶ 8). Thus, the musical compositions of "Got to Give it Up" and "After the Dance" in total are embodied in the sound recordings. The lead sheets submitted to the Copyright Office was only created *after* the recordings. (*Id.* at ¶ 8). The sound recording on which the lead sheet is based is the best evidence of what comprises or

constitutes the compositions for the purposes of the intrinsic test and it must be admitted at trial. It is these recordings that evidence the entirety of the respective compositions and the Gayes have put on proof showing ownership of the entirety of these compositions. As the Ninth Circuit affirmed in *Three Boys*, once a composition is registered, the entire composition is protected.

Such a rule is necessary as, "musical compositions often go through numerous revisions. Compelling the owner of the copyright to deposit each revision pursuant to [The Copyright Act] would be unwise and unmanageable." *Jones v. Virgin Records, Ltd.*, 643 F. Supp. 1153, 1159 n.13 (S.D.N.Y. 1986). Thus, the contents of the lead sheet are for the purpose of identifying the registered work and *not* identifying each any every claimed element of the registered work. *See KnowledgePlex, Inc.*, 2008 WL 5245484, at *9.

### D.   Proof of Plaintiffs' Copying of "Got to Give it Up" and "After the Dance."

"A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp.*, 212 F.3d at 481.

#### i.   Inverse Ratio Application

The Ninth Circuit uses an inverse-ratio rule that requires "a lesser showing of substantial similarity if there is a strong showing of access." Specifically, a high "degree of access justifies a lower standard of proof to show substantial similarity." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977). The inverse ratio rule applies whether or not Plaintiffs have admitted access.

*Rice v. Fox Broadcasting Co.* specifically allows for concessions of access in applying the inverse ratio rule. 330 F. 3d 1170, 1179, n.6 (9th Cir 2003) ("And even more important, our decision in *Metcalf* was based on a form of inverse ratio rule analysis: the plaintiff's case was 'strengthened considerably by [defendants'] concession of access to their works.'"). In applying the inverse ratio rule, upon a showing of significant evidence of access, the jury may "easily infer" that copying, as opposed to

1    "mere coincidence," was the reason for substantial similarity. *Metcalf v. Bochco*, 294 F.3d

2    1069, 1075 (9th Cir. 2002).

3                    ii.      **Substantial Similarity**

4            "Proof of substantial similarity is satisfied by a two-part test of extrinsic . . . and

5    intrinsic similarity." *Three Boys Music Corp.*, 212 F.3d at 485 (quoting *Sid & Marty*

6    *Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.

7    1977).

8                    a.  **Extrinsic Test**

9            "The extrinsic test considers whether two works share a similarity of ideas and

10   expression as measured by external, objective criteria" *Swirsky*, 376 F.3d at 845.

11   "'Analytical dissection' requires breaking the works 'down into their constituent

12   elements, and comparing those elements for proof of copying as measured by

13   substantial similarity.'" *Id.* (quoting *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029, 1051

14   (C.D. Cal. 2001), *reversed on other grounds*, 330 F.3d 1170 (9th Cir. 2003)). "It is well

15   settled that a jury may find a combination of unprotectible elements to be protectible

16   under the extrinsic test because 'the over-all impact and effect indicate substantial

17   appropriation.'" *Three Boys Music Corp.*, 212 F.3d at 485 (9th Cir. 2000) (quoting *Sid*

18   *& Marty Krofft Television Prods., Inc.*, 562 F.2d at 1169). "To allow the possibility of

19   such a finding, the jury must be allowed to see the complete work." *Dream Games of*

20   *Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 988 (9th Cir. 2009).

21           The extrinsic test "often requires analytical dissection of a work and expert

22   testimony." *Three Boys Music Corp.*, 212 F.3d at 485 (citations omitted). "'It is well-

23   established . . . that expert testimony concerning an ultimate issue is not per se

24   improper.' *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir.

25   2002). Expert testimony that is "'otherwise admissible is not objectionable because it

26   embraces an ultimate issue to be decided by the trier of fact.'" Fed. R. Evid. 704(a);

27   *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

28                   b.  **Intrinsic Test**

1    The Ninth Circuit Court of Appeals has held that the trier of fact is best suited for

2    the analysis in the intrinsic test and, thus, has not thoroughly analyzed its application.

3    *Three Boys Music Corp.*, 212 F.3d at 485. The test is "subjective" because it measures

4    "whether the ordinary reasonable person would find the 'total concept and feel' of the

5    works' substantially similar." *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir.

6    1991). "The two works . . . should be considered and tested, not hypercritically or with

7    meticulous scrutiny, but by the observations and impressions of the average reasonable

8    reader and spectator." *Sid & Marty Krofft Television Prods., Inc.*, 562 F.2d at 1164.

9    Further, under Ninth Circuit law, substantial similarity may exist where (1) the

10   total concept and feel of the two works are substantially similar or (2) the alleged

11   infringer copies an individually qualitatively or quantitatively important portion of the

12   allegedly infringed work. *Three Boys Music Corp.*, 212 F.3d at 485; *Baxter v. MCA,*

13   *Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in

14   proportion to the entire work, if qualitatively important, the fact finder may properly

15   find substantial similarity."); *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004).

16   Plaintiffs misstate the law when they assert the qualitative/quantitative inquiry

17   is a *de minimis* inquiry and not a substantial similarity inquiry. The law is clear that,

18   "'even if a copied portion be relatively small in proportion to the entire work, *if*

19   *qualitatively important, the finder of fact may properly find substantial similarity.*'"

20   *Swirsky*, 376 F.3d at 852 (emphasis added). Plaintiffs cite the district court's opinion in

21   *Newton* for their proposition. However, the language of the Ninth Circuit's opinion in

22   *Newton* does not support Plaintiffs' claims.

23   In *Newton*, the court first stated the standard for *de minimis* copying as "a taking .

24   . . so meager and fragmentary that the average audience would not recognize the

25   appropriation." *Id.* at 1193. The court then analyzed the infringing and infringed works

26   to determine if there was a "high enough degree of similarity between the works to

27   establish copying and whether that copying is substantial enough to constitute

28   infringement." *Id.* at 1194-95. In that case, copying was admitted because it was a

sampling case. *See generally id.* The court found that "no reasonable juror could find the sampled [copied] portion of the composition to be a qualitatively or quantitatively significant portion of the composition as a whole." *Id.* at 1195-96. Only *after* determining that the copied portion was not qualitatively or quantitatively important to the infringed work did the court find that an average listener would not recognize the appropriation (and therefore the copying was *de minimis*). *Id.* The court concluded "the copying was not significant enough to constitute infringement." *Id.*

The Ninth Circuit and other Circuits have long held that "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter*, 812 F.2d, 425 (citing *Walt Disney Prods.* v. *Air Pirates,* 581 F.2d 751 (9th Cir. 1978), *cert. denied,* 439 U.S. 1132 (1978); *Universal Pictures* v. *Harold Lloyd*, 162 F.2d 354 (9th Cir. 1947); *Heim* v. *Universal Pictures Co.,* 154 F.2d 480, 488 (single brief phrase so idiosyncratic as to preclude coincidence might suffice to show copying) (dictum); *Fred Fisher, Inc.* v. *Dillingham*, 298 F. 145 (S.D.N.Y. 1924) (L. Hand, J.) (eight note "ostinato" held to infringe copyright in song); *see also Meeropol* v. *Nizer*, 560 F.2d 1061 (2d Cir. 1977) (fair use defense inapplicable even where words copied amounted to less than one percent of defendant's entire work), *cert. denied,* 434 U.S. 1013 (1977); *Robertson* v. *Batten, Barton, Durstine & Osborne, Inc.,* 146 F. Supp. 795, 798 (S.D. Cal. 1956) (portions of song copied were the element upon which popular appeal and hence commercial success depended and thus constituted substantial copying); Nimmer § 13.03[A][2] at 16 13-36, and citations therein (notion that copying of three bars from musical work can never constitute infringement is without foundation)); *Bridgeport Music, Inc.* v. *UMG Recordings, Inc.,* 585 F.3d 267, 275 (6th Cir. 2009) ("Thus, the copying of a relatively small but qualitatively important or crucial element can be an appropriate basis upon which to find substantial similarity."); *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) ("[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work

1    he did not pirate.").

2    Under Ninth Circuit law, the jury may find substantial similarity under the

3    intrinsic test where either (1) the total concept and feel of the two works are

4    substantially similar or (2) an individually qualitatively or quantitatively important

5    portion of the allegedly infringed work is copied. *Three Boys Music Corp.*, 212 F.3d at

6    485; *Baxter*, 812 F.2d at 425; *Newton* v. *Diamond*, 388 F.3d at 1195 (internal citations

7    omitted). Plaintiffs' argument that a qualitative/quantitative inquiry is purely a *de*

8    *minimis* inquiry is contrary to and misstates the law.

9                          iii.    **Non-lead Sheet Elements as Circumstantial Evidence of**

10                                  **Copying**

11    In music copyright infringement cases, the party bringing suit is almost always

12    forced to rely solely on circumstantial evidence. *Three Boys Music Corp.*, 212 F. 3d at

13    481. "[W]here circumstantial evidence is presented, however, the Court may consider

14    the plausibility and reasonableness of inferences arising therefrom." *See Flynn v.*

15    *Surnow*, No. CV 02-9058-JFW PLAX, 2003 WL 23411877, at *2 (C.D. Cal. Dec. 9,

16    2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). "In all

17    cases, the task is to apply logic and experience to determine if copying is the only

18    realistic basis for the similarities at hand." *Walker v. Viacom Int'l, Inc.*, No. C 06-4931

19    SI, 2008 WL 2050964, at *7 (N.D. Cal. May 13, 2008) *aff'd sub nom. Walker v.*

20    *Viacom Int'l, Inc.*, 362 F. App'x 858 (9th Cir. 2010) (citing 4 Nimmer on Copyright §

21    13.02[B] at 13-28.1). "Probative similarities are similarities that 'would not be expected

22    to arise independently' in the normal course of events, Nimmer § 13.01[B] at 13–13,

23    and thus 'give rise to an inference of actual copying' on the part of the defendant."

24    *Prunte v. Universal Music Grp.*, 563 F. Supp. 2d 41, 43 (D.D.C. 2008) (quoting

25    *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005)).

26    Evidence is relevant if tends to make a fact more or less probable and that fact is

27    of consequence in determining the action. Fed. R. Evid. 401.  Relevant evidence may be

28

1    excluded only if its probative value is "*substantially outweighed*" by a danger of unfair

2    prejudice. Fed. R. Evid. 403 (emphasis added).

3         In this case, the probative weight of the evidence is great, as discussed in detail

4    below, as evidence of copying, whether lawful or not, is extremely strong evidence in

5    showing unlawful copying.  In order to exclude this evidence, the Court would have to

6    find that the unfair prejudicial effect of the evidence was substantially greater than the

7    quite high probative value.  Even then, "in reaching a decision whether to exclude on

8    grounds of unfair prejudice, consideration should be given to the probable effectiveness

9    or lack of effectiveness of a limiting instruction . . . ."  Fed. R. Evid. 403 advisory

10   committee's note (1972).

11        The presence of protectible and nonprotectible elements of "Got to Give it Up" in

12   the commercially released sound recording of "Blurred Lines" is probative evidence

13   that copying occurred. Neither Robin Thicke

14   (Thicke Dep. at 58:2-12, April 23, 2014, attached to Busch Decl. as Exhibit B

15

16

17                                                    It is in fact the very hearing of the

18   commercially released sound recording of "Got to Give it Up" that allowed Thicke and

19   Williams to copy Marvin Gaye's work.   That is evident from the fact that many

20   compositional elements of "Got to Give it Up," as well as various nonprotectible

21   elements from Marvin Gaye's recording, are included in "Blurred Lines."

22        There is no dispute that at least some of these compositional elements exist only

23   in the composition as embodied in the sound recording and not on the lead sheet.  (Dkt.

24   No. 232-3 at ¶ 7).  In this case, the copying of non-lead sheet compositional elements is,

25   at a minimum, circumstantial proof that the Thicke Parties had "Got To Give It Up" in

26   their mind and that other portions, acknowledged to be protected under the Copyright

27   Act by the Court, were copied and were not the result of coincidence.  *See Maggio v.*

28   *Liztech Jewelry*, 912 F. Supp. 216, 222 (E.D. La. 1996) (noting that the silhouettes, at

1    issue, are not alone protected expression, but finding infringement based on access and
2    on "other common aspects of expression, such as the shape of the silhouettes").   And
3    while the Gayes dispute that the composition at issue is limited to the lead sheet, even if
4    it were, the copying of these other compositional elements is circumstantial evidence of
5    copying.   (*Id.* at ¶ 17).   While these elements seem complex when described in a
6    Declaration or through testimony, the listening to the sound recording that embodies
7    these elements makes it possible for an ordinary observer to hear them without any
8    music training. (*Id.* at ¶¶ 17-19).

9           When the jury hears these similarities, it will conclude they could only have
10   resulted from copying.   This is strong circumstantial evidence.   When similarities are
11   striking, "as a matter of logic, the only explanation for the similarities between the two
12   works must be 'copying rather than . . . coincidence, independent creation, or prior
13   common source.'" *JB Oxford & Co. v. First Tennessee Bank Nat. Ass'n.*, 427 F. Supp.
14   2d 784, 796 (M.D. Tenn. 2006) (citing 4 Nimmer Copyright § 13.02[B], at 13-26
15   (2006)). In fact, for many decades since the passage of the 1909 Copyright Act, juries
16   have been allowed to listen to unprotected sound recordings to determine whether the
17   compositions embodied on those sound recordings had been infringed. *See, e.g., Repp*
18   *v. Webber*, 892 F. Supp. at 558; *Selle*, 741 F.2d at 903 n.3; *Arnstein*, 154 F.2d at 469; *N.*
19   *Music Corp.*, 105 F. Supp. at 398; (Dkt No. 232-3 at ¶ 20). The prejudice to the Gayes of
20   disallowing this evidence far exceeds any prejudice to Plaintiffs, since this type of
21   evidence is directly relevant to the main issue in the case:   whether the Plaintiffs had
22   "Got to Give it Up" in their mind when creating "Blurred Lines."

23          One of the ultimate issues in a copyright infringement claim and perhaps, the
24   threshold question, is whether copying occurred. *See Yankee Candle Co. v. Bridgewater*
25   *Candle Co., LLC*, 259 F.3d 25, 33 (1st Cir. 2001).   The presence of both protected
26   elements and non-protected elements makes it much more probable that the THicke
27   Parties had "Got to Give it Up" in mind when creating "Blurred Lines."

28          **E. Affirmative Defenses**

Plaintiffs and Counter-Defendants waived any Affirmative Defenses by not addressing them as required by Local Rule 16-4.1(e).

**G. Damages**

The Gayes are entitled to recover the actual damages suffered as a result of the infringement. Actual damages means the amount of money adequate to compensate the copyright owner for the reduction of the fair market value of the copyrighted work caused by the infringement. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708-09 (9th Cir. 2004). The reduction of the fair market value of the copyrighted work is the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by the Plaintiffs and Counter-Defendants of the Gayes' work. *Id.* at 708. That amount can be represented by the lost license fees the Gayes would have received for the unauthorized use of their work. *Id.* at 710.

The infringers' profits may be awarded if there is a causal nexus between the infringement and the profits generated indirectly from the infringement and/or defendant's gross revenue. *Id.* at 711. A causal nexus exists when there is a link between the infringement and Plaintiffs and Counter-Defendants' revenues. *Id.* (quoting *Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002)). The award of profits cannot include any amount taken into account in considering actual damages. 17 U.S.C. §504(b).

Infringers' profits are determined by deducting expenses from gross revenue. *Polar Bear Prods.*, 384 F.3d at 711, 714. The Gayes bear the burden of proving Plaintiffs and Counter-Defendants' total revenue, which includes all receipts from the sales and income of the products and exploitations containing or using the infringed work, by a preponderance of the evidence. 17 U.S.C. 504(b); *Polar Bear Prods.*, 384 F.3d at 711, n.8. Plaintiffs and Counter-Defendants' have the burden of proving their expenses, which are all operating and production costs incurred in producing their gross revenue by a preponderance of the evidence.[2] 17 U.S.C. § 504(b); *Polar Bear Prods.*, 384 F.3d at 711,

---

[2] Overhead expenses are deductible only where the overhead in question contributed to sales of the infringing product, which Plaintiffs bear the burden of proving. *Kamar Int'l,*

714 n.10. Unless a portion of the profits from the products or exploitations containing or using the copyrighted work is attributable to factors other than use of the copyrighted work, all of the profits are to be attributed to the infringement. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 567 (1985); *Nintendo of Am., Inc. v. Dragon Pacific Intern.*, 40 F.3d 1007, 1012 (9th Cir. 1994) (applying trademark law). Plaintiffs and Counter-Defendants' have the burden of proving the portion of the profits, if any, attributable to factors other than infringing the copyrighted work. 17 U.S.C. 504(b); *Three Boys Music Corp.*, 212 F.3d at 487 (citing *Cream Records, Inc. v. Joseph Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985).

Distribution of an infringing works subjects the distributor to liability.[3] *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1384 (C.D. Cal. 1993) "Courts have long held that in patent, trademark, literary property, and copyright infringement cases, any member of the *distribution chain* can be sued as an alleged joint tortfeasor." *Lockheed Martin Corp. v. Network Solutions, Inc.*, No. CV 96-7438 DDP ANX, 1997 WL 381967, at *3 (C.D. Cal. Mar. 19, 1997) (citing *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 207 (D.C. Cir.

---

*Inc. v. Russ Berrie & Co.*, 752 F.2d 1326,1331-32 (9th Cir. 8 1984). Further, a willful copyright infringer is not entitled to a deduction of overhead expenses. *FrankMusic Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 11 505, 515 (9th Cir. 1985). *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014); *Blizzard Entm't, Inc. v. Reeves*, 2010 WL 4054095, at * 1 (C.D. Cal. Aug. 10,2010).

[3] The Act affords a copyright owner certain exclusive rights:  (1) the right to reproduce or authorize reproductions of the copyrighted works in copies or phonorecords; (2) the right to prepare or authorize preparation of derivative works based on the copyrighted work; (3) the right to distribute or authorize distribution copies of phonorecords; (4) the right to perform or authorize performance of the works publicly; and (5) the right to display or authorize public display of the copyrighted work. 17 U.S.C. §106. Anyone who violates these exclusive rights is an infringer of the copyright. 17 U.S.C. §501. The infringer is "not merely one who uses a work without authorization, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984).

1   1981) (emphasis added)). It is a well-settled rule that a joint tortfeasor is not a necessary

2   party to an action against another party with like liability. *Temple v. Synthes Corp.,* 498

3   U.S. 5 (1990). Therefore, any party that is part of the distribution chain of the infringed

4   work can be held jointly and severally liable for infringement.

5         Plaintiffs and Counter-Defendants are all members of the distribution chain.

6   Thicke is a co-writer and artist for "Blurred Lines" and "Love After War." (Dkt. No.

7   155). Williams and Harris are co-writers of "Blurred Lines"; Patton is a co-writer of

8   "Love After War." *Id.*



15                                              As members of the distribution chain, each

16   of the foregoing is an individual tortfeasor who is joint and severally liable.

17   **VI.    Issues Raised at Pretrial Conference**

18         **A. Marvin Gaye Legacy**

19         At the January 26, 2015 pre-trial hearing, the Court stated that in order for the

20   Gayes to submit evidence that Plaintiffs and Counter-Defendants exploited Marvin

21   Gaye's legacy and sold their infringement in an effort to sell records, the Gayes must

22   "show a nexus between the alleged conduct of the plaintiff and/or persons acting on

23   plaintiffs' behalf and the alleged damages." (Pretrial Hearing Transcript at 32:10-12,

24   attached to Busch Decl. as Ex. E). The Court elaborated that the evidence would center

25   on "the plaintiffs' promotion of the plaintiffs' song and the resulting sales." (*Id.* at

26   32:18-20). Indeed, it is settled law that in order to pursue profits attributable to the

27   infringement, the infringed-upon-party must demonstrate a "sufficient causal nexus

28

1 | between the infringement" and the profits sought. *Del Amo v. Baccash*, No. CV-07-663

2 | PSGJWJX, 2008 WL 2780978, at *4 (C.D. Cal. July 15, 2008).

3 |     The Gayes can prove the required nexus.

8 | *Hip Hop Wired*, "Robin Thicke ft. Pharrell & T.I. 'Blurred Lines,' Mar.

9 | 30, 2013, attached to Busch Decl. as Ex. G; *High Snobiety*, "Robin Thicke Discusses

10 | Working with Pharrell, Kendrick Lamar, 2 Chainz, Michael Jordan & More, attached to

11 | Busch Decl. as Ex. H).

15 | On March 20, 2013, *Hip Hop Wired* wrote,

16 |     "Rather than going at a slower pace, Paul [sic] Patton's better half dropped

17 |     the song and video all in one swoop. . . . And of course, T.I. and Pharell [sic]

18 |     get in on the action, swaying heavily to the beat, which samples Marvin

19 |     Gaye's, 'Got To Give It Up.'"

20 | On July 29, 2013, Thicke gave an interview with *Highsnobiety*, stating,

21 |     [I] wanted to do something like Marvin Gaye's "Got To Give It Up" which

22 |     is one of my favorite songs. Pharrell started messing with the drums, and an

23 |     hour and a half later the whole record was done.

Plaintiffs and Counter-Defendants clearly sought to capitalize on the public's association of "Got to Give it Up" with "Blurred Lines." In doing so, Blurred Lines generated millions of dollars in revenue for Plaintiffs and Counter-Defendants. All of Robin Thicke's appearances were a part of the marketing plan.

The Gayes are entitled to "any profits of the infringer that are attributable to the infringement." See 17 U.S.C. § 504(b). Plaintiffs and Counter-Defendants must prove deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id. It is clear that while, Plaintiffs attempt to argue that the profits from "Blurred Lines" are the result of a successful marketing campaign, the truth behind that marketing campaign is that Plaintiffs and Counter-Defendants successfully capitalized on Plaintiffs' infringement of the Gayes' composition. Accordingly, all profits that stemmed from the so-called "success of the marketing plan" are directly attributable to the infringement. In order to prove that these profits are attributable to Plaintiffs' wrongful association with Marvin Gaye, the Gayes must be able to present evidence that demonstrates, as the blog articles do, that Plaintiffs and Counter-Defendants exploited Marvin Gaye's legacy to sell records. Any evidence supporting this exploitation is relevant that should be admitted at trial.

### B. Experts May Testify About Substantial Similarity

At the Pre-Trial Conference, the Court ruled that the musicologists in this case could not use the phrase "substantial similarity" in presenting their findings to the jury. However, court's in this Circuit have determined that such testimony is appropriate as it is not an ultimate issue of law.

Substantial similarity is not an "ultimate issue of law," and thus, is appropriate and permissible expert testimony. In Gable v. Nat'l Broad. Co., 727 F. Supp. 2d 815, 835-36 (C.D. Cal. 2010) aff'd sub nom. Gable v. Nat'l Broad. Co., 438 F. App'x 587 (9th Cir. 2011), the Ninth Circuit did not find that the expert's opinion on substantial similarity was an impermissible expert opinion on an ultimate conclusion of law.

1    Portions of expert David Nimmer's report and corresponding testimony that stated a

2    legal conclusion were excluded; however, the court did not exclude the portion of

3    Nimmer's expert report that opined on substantial similarity. *Id.* at 835. Accordingly,

4    expert testimony as to whether the infringing works are substantially similar to the

5    infringed work is proper.

6                       **C. Objections to Verdict Form**

7              While this matter involves a number of parties and a substantial sum of money, it is

8    simply a straightforward copyright infringement case.  In order to prove copyright

9    infringement, the Gayes are only obligated to prove Plaintiffs and Counter-Defendants own

10   the copyrights "Got to Give it Up" and "After the Dance" and that Plaintiffs and Counter-

11   Defendants copied their works. *See Feist  Publications, Inc.* v. *Rural Telephone Service*

12   *Co., Inc.,* 499 U.S. 340 (1991).  The Gayes verdict form is simple and asks the jury to

13   answer the ultimate question.

14             The verdict form submitted by Plaintiffs, on the other hand, attempts to ask these

15   two questions repeatedly, in different ways, before ultimately asking the jury to find

16   copyright infringement in order to create jury confusion and create the possibility of an

17   inconsistent verdict.  Such a form is unfair to the Gayes as it places an additional burden on

18   them and creates an opportunity for the jury to become confused and potentially reach a

19   verdict which cannot be enforced.

20             "'Taken as a whole, the instructions and interrogatories must fairly present the

21   issues to the jury.'" *NMB Air Operations Corp. v. McEvoy*, 194 F.3d 1317 (9th Cir.

22   1999) (citing *Mangold v. California Pub. Utils. Comm'n,* 67 F.3d 1470, 1475 (9th

23   Cir.1995)).  Only when determination of the ultimate issue is "confusing and difficult,"

24   does the Ninth Circuit "encourage[s] district courts to use special verdict forms that

25   query jurors as to the elements of the . . . defense." *United States v. Poehlman*, 217 F.3d

26   692, 698 (9th Cir. 2000)

27             In this case, there are no difficult or complicated factual questions to resolve.  The

28   only interrogatories in the verdict form necessary and relevant whether the Gayes own

                                          21

the copyrights and whether the Thicke parties infringed the songs. Interrogatories in the verdict form that parcel out the extrinsic and intrinsic test, and other subcategories, are redundant and confusing. The Plaintiffs' proposed verdict form asks the jury to find both of these elements and then many more. For instance, the Plaintiffs' proposed verdict form seeks an additional finding of substantial similarity. The jury cannot find substantial similarity without finding both extrinsic and intrinsic similarities. *See Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006), and therefore, it is unnecessary for the jury to answer each of these questions in addition to the ultimate infringement question.

### D. Harry Weinger's Role as a Corporate Representative



UMG, by virtue of Interscope Records, also owns the sound recording of "Blurred Lines." (See Copyright Catalog website printout, attached to Busch Decl. as Ex. K).

Mr. Weinger, in his role as an executive with Counter-Defendant UMG, reached out to *multiple* executives within UMG's marketing department and made repeated comments regarding the similarity of "Blurred Lines" and "Got to Give it Up," both publically and to current and former employees of UMG, including the Social Media Storyteller/Senior Director Digital Marketing and Strategy. (See WEINGER 00001-00013, attached to Busch Decl. as Ex. L). Mr. Weinger went so far as to write, "Robin Thicke's 'Blurred Lines' hit is utterly based on ['Got to Give it Up']." (Ex. L at

WEINGER000001)  Any such statements made in these communications directly relate to a matter within the scope of his employment, and were made in the attempt to market property UMG owns.

An admission by a party opponent is made when: "[t]he statement is offered against a party and is (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . . ." Fed. R. Evid. 801(d)(2). The employee need not possess "speaking authority"; it is sufficient under Rule 801(d)(2)(D) that the employee's statement relates to a matter within the scope of his employment or agency." *Mendoza v. Marriott Hotel Services, Inc.*, No. CV 10-6384 FFMX, 2011 WL 4020940, at *3 (C.D. Cal. Sept. 9, 2011) (internal citations omitted).



Therefore, his statements linking "Blurred Lines" and "Got to Give it Up" were clearly made within the scope of his employment. Mr. Weinger is ultimately an employee of UMG. Accordingly, his statements are non-hearsay admissions of a party opponent. *Coleman v. Wilson*, 912 F. Supp. 1282, 1295-96 (E.D. Cal. 1995).

### E. Inclusion of "Theme X" in Demonstrative Exhibits

In Ms. Finell's October 31 report, and in the demonstrative exhibits submitted for use at trial, Ms. Finell opines about a similarity she refers to as "Theme X." (Decl. of Judith Finell attached as Ex. A).  Ms. Finell reviewed the portion of the lead sheet included on page 18 of the Court's Summary Judgment Order.  (*Id.*). The "Theme X" described by the Court is wholly different from the "Theme X" referenced in her October 31 expert report that was submitted following the Court's ruling, and in the demonstratives she prepared for trial. (*Id.*).

The Court in its Summary Judgment Order stated that what it was referring to as "Theme X" begins after the lyrics "Think I'm Gon-na Let You Do It." (Dkt. 139 at 18). As shown on the deposit copy lead sheet, the lyrics that the Court cites are followed by the song's hook "Keep on Dancin." (Decl. of Judith Finell). There is no "Theme X" after the lyrics the Court cited, and Ms. Finell's October 31 report, issued following the Court's ruling, and her testimony, does not claim that it is. (*Id.*). The "Theme X" in her October 31 report is a four note vocal melody referred to at paragraphs 22-24 of such report. (*Id.*). It is the four note vocal melody sung with the lyrics "Dancin' Lady" which was mistranscribed in the lead sheet as "Fancy Lady" and repeated 14 times in 14 bars in the lead sheet. (*Id.*). This vocal melody appears on page 2 of Part 2 of the deposit copy immediately after the words "I've Got To Give It Up." It occupies nearly all of staves 2 and 3 on page 2 of the deposit copy. (*Id.*).

The Court ruled that the 4 note vocal melody was allowable at trial in its summary judgment ruling. (Dkt. 139 at 24). Ms. Finell believes this to be the same 4 note vocal melody she is referring to as "Theme X,: but because of the name she gave it in her October 31 report, and demonstratives, the Gayes wanted to clarify that Ms. Finell's "Theme X," the four note vocal melody represented in the deposit copy lead sheets, is not the same as the Theme X the Court ruled was not in the lead sheet. (Decl. of Judith Finell). It is a four-note vocal melody the Court ruled is part of the infringement claim. (Dkt. 139 at 24).

### F. Witnesses Disclosed After the Deadline

Plaintiffs and Counter-Defendants submitted their Initial Witness Disclosure on February 18, 2014 and Supplement Witness Disclosure on October 20, 2014. By Court Order, the non-expert discovery period closed on October 31, 2014, (Dkt. No. 78), the date on which Plaintiffs and Counter-Defendants further supplemented their Witness Disclosure by adding Art Stewart and Preston "Bugsy" Wilcox. Thereafter, on January 25, 2015, Plaintiffs included Stewart and Wilcox, along with two non-disclosed

witnesses—Carolyn Veazey and Peter Paterno[4]—on the Joint Witness List filed with the Court. (Dkt. No. 220).

The Federal Rules of Civil Procedure require parties to timely provide the names of individuals likely to have discoverable information. Fed. R. Civ. P. 26(a)(1)(A)(I); *see also* Fed. R. Civ. P. 26(e)(1)(A) (requiring a supplemental disclosure if new information becomes available). Failure to do so prevents "use [of] that information or witness to supply evidence . . . *at a trial*, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added). Disclosure of witnesses on the last day of discovery is untimely. *Jackson v. Am. Family Mut. Ins. Co.*, No. 2:10-CV-01874-LRH, 2012 WL 845646, at *3 (D. Nev. Mar. 12, 2012) (disclosure on the discovery deadline prohibits the other party from conducting discovery).

The Gayes were never able to conduct discovery on either Stewart or Wilcox because of they were disclosed the discovery deadline. Veazey and Paterno were initially disclosed to the Gayes as potential witnesses only sixteen days before the start of trial. Plaintiffs and Counter-Defendants have proffered no evidence as to why their failure to timely disclose these witnesses was "substantially justified or is harmless." It is the opposite of harmless. The Gayes never conducted any form of discovery on Stewart, Wilcox, Veazey or Paterno, and with little over two weeks prior to the start of trial, the Gayes must now attempt to anticipate Veazey and Paterno's testimony. This is unfair and detrimental to the Gayes, and accordingly, Stewart, Wilcox, Veazey or Paterno should be excluded under Rule 37(c)(1).

---

[4] Paterno, a partner at the law firm representing Plaintiffs and Counter-Defendants, had initially been listed on Counter-Claimants' Witness Disclosure. However, any testimony he may offer is prohibited by Rule 5-210 of the California Rules of Professional Conduct and its accompanying Discussion.

1    Dated: February 3, 2015                    Respectfully submitted,

2                                               KING & BALLOW
3
4                                               By: /s/ Richard S. Busch
                                                RICHARD S. BUSCH
5                                               PAUL H. DUVALL

6                                               WARGO & FRENCH, LLP
7
8                                               By: /s/ Mark L. Block
                                                MARK L. BLOCK
9
10                                              *Attorneys for Defendants and Counter-Claimants*
                                                *Nona and Frankie Gaye*
11
12                                              THE LAW OFFICES OF PAUL N. PHILIPS

13                                              By: /s/ Paul N. Philips
                                                PAUL N. PHILIPS
14
15                                              *Attorney for Defendant and Counter-Claimant*
                                                *Marvin Gaye III*
16

17

18

19

20

21

22

23

24

25

26

27

28