1  KING, HOLMES, PATERNO & BERLINER, LLP
   HOWARD E. KING, ESQ., STATE BAR NO. 77012
2  STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
   ROTHSCHILD@KHPBLAW.COM
3  SETH MILLER, ESQ., STATE BAR NO. 175130
   MILLER@KHPBLAW.COM
4  1900 AVENUE OF THE STARS, 25TH FLOOR
   LOS ANGELES, CALIFORNIA 90067-4506
5  TELEPHONE: (310) 282-8989
   FACSIMILE:  (310) 282-8903
6
   Attorneys for Plaintiffs and Counter-
7  Defendants PHARRELL WILLIAMS,
   ROBIN THICKE and CLIFFORD
8  HARRIS, JR. and Counter-Defendants
   MORE WATER FROM NAZARETH
9  PUBLISHING, INC., PAULA MAXINE
   PATTON individually and d/b/a
10 HADDINGTON MUSIC, STAR TRAK
   ENTERTAINMENT, GEFFEN
11 RECORDS, INTERSCOPE RECORDS,
   UMG RECORDINGS, INC., and
12 UNIVERSAL MUSIC DISTRIBUTION

13              UNITED STATES DISTRICT COURT

14        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 15  PHARRELL WILLIAMS, an individual; ROBIN THICKE, an | CASE NO. CV13-06004-JAK (AGRx) Hon. John A. Kronstadt, Ctrm 750 |
| 16  individual; and CLIFFORD HARRIS, JR., an individual, | **PLAINTIFFS' TRIAL BRIEF** |
| 17                         Plaintiffs, | **Pretrial Conference:** |
| 18                vs. | Date:   February 20, 2015 Time:   9:00 a.m. Ctrm.:  750 |
| 19  BRIDGEPORT MUSIC, INC., a | **Jury Trial:** |
| 20  Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; | Date:   February 24, 2015 Time:   8:30 a.m. |
| 21  MARVIN GAYE III, an individual; NONA MARVISA GAYE, an | Ctrm.:  750 |
| 22  individual; and DOES 1 through 10, inclusive, | Action Commenced: August 15, 2013 |
| 23                        Defendants. | |
| 24 | |
| 25  AND RELATED COUNTERCLAIMS. | |
| 26 | |

27  / / /

28  / / /

4112.060/848598.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>**Page**</u>

I. INTRODUCTION ................................................................................ 1

II. ELEMENTS NOT FOUND IN DEPOSIT COPY PRECLUDED ........................ 1

III. CUMULATIVE MUSICOLOGIST TESTIMONY ............................................ 6

IV. EDITED SOUND RECORDINGS ......................................................... 7

V. THE EXTRINSIC/INTRINSIC TEST FOR SUBSTANTIAL
      SIMILARITY IS THE ONLY APPLICABLE STANDARD ........................ 8

VI. VIDEOTAPED DEPOSITIONS NOT PUBLIC RECORD ................................ 9

VII. INVERSE RATIO RULE INAPPOSITE ........................................................ 11

KING, HOLMES,
PATERNO &
BERLINER, LLP

4112.060/848598.1

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Apple iPod iTunes Antitrust Litig.*,
   No. 05-CV-0037 YGR, 2014 WL 7323399 (N.D. Cal. Dec. 17, 2014) ... 10, 11

*Newton v. Diamond*,
   204 F.Supp.3d 1244 (C.D. Cal. 2002) .................................................... 8

*Newton v. Diamond*,
   388 F.3d 1189 (9th Cir. 2003) ............................................................ 8

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) .......................................................................... 10

*Stern v. Cosby*,
   529 F. Supp. 2d 417 (S.D.N.Y. 2007) ................................................ 10

*Swirsky v. Carey*,
   376 F.3d 841 (9th Cir. 2004) ........................................................ 8, 9

*Three Boys Music Corp. v. Bolton*,
   212 F.3d 477 (9th Cir. 2000) ........................................................... 11

*United States v. McDougal*,
   103 F.3d 651 (8th Cir. 1996) ............................................................ 10

*Valley Broad. Co. v. U.S. Distr. Court for Dist. of Nev.*,
   798 F.2d 1289 (9th Cir. 1986) .......................................................... 10

## RULES

Federal Rules of Evidence, Rule 403 ........................................................ 6

Local Rules of Civil Procedure, Rule 83 ................................................. 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The Court has made numerous pretrial rulings affecting the scope of the issues and evidence for trial.  Defendants continue to treat the Court's Orders as mere suggestions to be ignored at leisure rather than binding directives Defendants are required to follow at trial.  Plaintiffs[1] submit this trial brief to outline certain issues in dispute for the February 20, 2015, pretrial conference and for trial.[2]

## II.

## ELEMENTS NOT FOUND IN DEPOSIT COPY PRECLUDED

The Court ruled that the Marvin Gaye sound recordings are excluded at trial, and that expert musicologist testimony on alleged similarities will be limited to elements found in the Deposit Copy compositions.  Defendants' demonstratives make clear that they intend to have their experts testify at trial about numerous alleged similarities found only in the Marvin Gaye sound recordings of "Got to Give It Up" ("GIVE") and "After the Dance" ("DANCE") and not in the deposit copy sheet music ("Deposit Copy") for each song that Defendants claim to own.

Attached as **Exhibit A** hereto are excerpts from Defendants' proposed PowerPoint demonstratives that discuss alleged similarities based on musical elements found only in the Marvin Gaye sound recording of GIVE, including hand

_____

[1] Plaintiffs and Counter-Defendants PHARRELL WILLIAMS, ROBIN THICKE individually and d/b/a I LIKE 'EM THICKE MUSIC and CLIFFORD HARRIS, JR. and Counter-Defendants MORE WATER FROM NAZARETH PUBLISHING, INC., PAULA MAXINE PATTON individually and d/b/a HADDINGTON MUSIC, STAR TRAK ENTERTAINMENT, GEFFEN RECORDS, INTERSCOPE RECORDS, UMG RECORDINGS, INC., and UNIVERSAL MUSIC DISTRIBUTION ("Plaintiffs").

[2] Plaintiffs' legal and factual contentions are set forth in their Memorandum of Contentions of Fact and Law filed January 5, 2015 (Document 155).

claps, cowbell, backup vocals, keyboard parts, Theme X, drums, percussion, vocal "woo," timing of parlando section in sound recording, etc.  These elements (circled in **Exhibit A** for ease of reference) are not found in the Deposit Copy.  Defendants should not be allowed to argue to the jury similarities based on the sound recording.

Several of the more egregious issues are discussed in more depth below.[3]

**Keyboard parts**:  There are no keyboard parts in the GIVE Deposit Copy.[4]

Defendants' musicologists, Judith Finell and Ingrid Monson, both testified that the keyboard is not in the Deposit Copy, and that the only alleged similarities found in the Deposit Copy are vocal melodies/lyrics, bass melodies, and harmony.[5]

In support of Defendants' ex parte application for reconsideration, Ms. Finell testified that the keyboard parts were not in the Deposit Copy (emphasis added):

> The following similarities only exist in the composition embodied in the sound recording of "Got to Give It Up" **and are not present in the deposit copies**:  …
>
> (c)   Keyboard parts[6]

Below is the keyboard part transcribed from the GIVE sound recording by Ms. Finell that she intends to opine at trial is a claimed similarity to BLURRED.



---

[3] *See generally* Declaration of Sandy Wilbur Regarding Defendants' Edited Sound Recordings/Powerpoints filed 02/13/15 (Document 261).

[4] A copy of the GIVE Deposit Copy with typewritten measure numbers added by Plaintiffs' musicologist, Sandy Wilbur, is attached hereto as **Exhibit B**.

[5] Declaration of Ingrid Monson, filed 01/13/15 (Document 196-14), p. 5 of 48, ¶ 15; Declaration of Judith Finell, filed 01/13/15 (Document 196-1), p. 18 of 41, ¶ 13; true and correct copies of relevant excerpts are attached hereto as **Exhibits C-D**.

[6] Declaration of Judith Finell, filed 01/29/15 (Document 232-3), p. 3 of 7, ¶ 7; true and correct copies of relevant excerpts from same are attached hereto as **Exhibit E**.

The above keyboard part—including its offbeat rhythm and the particular voicing (notes) of the A7 chord—clearly are not found in the GIVE Deposit Copy. [*See* **Exh. B** hereto.]  Defendants should be precluded from offering evidence or argument at trial concerning the keyboard part in Marvin Gaye's sound recording.

The Court ruled as much on summary judgment, finding *inter alia* that "the particular rhythm transcribed by Finell does not appear in the copyright deposit," and that the Deposit Copy does not have a keyboard part, and that "similar keyboard rhythms may not" be considered.  [10/30/15 Order (Document 139), 20-21.]

**Theme X**:  "Theme X" is a four-note vocal melody sung to the lyrics "dancin' lady" with scale degrees 3-3-2#-3 (pitches c#-c#-b#-c#).  These notes are not in the Deposit Copy.  The Court held on summary judgment that "Theme X" is not in the Deposit Copy:  "Thus, for purposes of this Motion, 'Theme X' is deemed unprotected by Defendants' copyright in 'Got to Give It Up.'"  [Minute Order filed 10/30/14 (Document 139), 18.]  Below is Ms. Finell's transcription of "Theme X" from her 10/17/13 Preliminary report attached to Defendants' Counterclaims:



Musical Example 4A: "Give It Up" Backup Hook - Theme X

This is the same transcription the Court included on page 18 of its 10/30/14 Minute Order when it found that "Theme X" is not in the Deposit Copy.  [A true and correct copy of pp. 17-18 of the 10/30/14 Order is attached as **Exhibit F** hereto.]

The issue has been decided.  "Theme X" is not part of this case.

Ms. Finell **now** opines that a completely unrelated four-note melody set to the lyrics "fancy lady" and found in the GIVE Part 2 Deposit Copy allegedly was "mistranscribed" and is meant to be Theme X.  Her opinion is inadmissible because:

- Her "mistranscription" opinion is not contained in her expert report[7], was not disclosed at her expert deposition, and thus is untimely and is not properly admitted at trial under FRCP 26;

- Ms. Finell has no basis on which to opine what allegedly was "intended" to be transcribed in the GIVE Deposit Copy in 1977;

- Whatever was supposedly "intended" is irrelevant—the Deposit Copy is the only manuscript copy published in 1977, and hence Defendants' copyright is limited to the notes that were published;

- There is no plausible "mistranscription" since:
  (i) the notes of "Theme X" are c#-c#-b#-c# (3-3-2#-3), while the notes of "fancy lady" are e-e-f#-e (5-5-6-5);

  (ii) "dancin' lady" is 4 eighth notes on beats 2- 3, "fancy lady" is 2 eighth notes and 2 quarter notes on beats 2-4; and

  (iii) the lyrics are different; and,

- The "fancy lady" vocal notated in the Deposit Copy is an <u>exact transcription</u> of the "fancy lady" vocal melody <u>sung</u> in the Marvin Gaye sound recording at approximately 5:42 seconds, which clearly is what was intended in the Deposit Copy Part 2.

As the Court noted in its summary judgment ruling, the "dancin' lady" phrase starts at approximately 3:13 seconds in the Marvin Gaye <u>sound recording</u>: "In the **recording**, "Theme X" begins after the lyric, "'think I'm gon-na let you do it.'" [10/30/14 Minute Order, 18 (emphasis added); *see* **Exh. F** hereto.]

The "think I'm gon-na let you do it" lyric is found in the Deposit Copy, but there is no "dancin' lady" after it (or anywhere else) in the Deposit Copy.  [*See* **Exh. B** hereto, measures 95-96.]  Ms. Finell opines that the Court allegedly was confused in its ruling because the melody that starts at measure 96 <u>of the Deposit Copy</u> is not "Theme X."  Ms. Finell misses the point and misconstrues (deliberately or otherwise) the Court's ruling—the Court correctly found that "Theme X" appears in the <u>sound recording</u> after the "think I'm gon-na let you do it" vocal but <u>does not appear in the Deposit Copy</u> after the "think I'm gon-na let you do it" vocal (or at all).  There is no ambiguity in the ruling.  Theme X is not in the Deposit Copy.

---

[7] Ms. Finell's expert report is Exhibit C to the Declaration of Seth Miller in Support of Plaintiffs' Motions *In Limine* ("Miller Decl") filed 01/07/15 (Document 175).

**Bass parts**:  The bass part on the GIVE sound recording is improvised by the bass player and contains different notes than what appears in the Deposit Copy.

The only point of proper comparison for the extrinsic test (for which musicologist testimony is admissible) is the actual notes in the Deposit Copy that Defendants own.  There is no reason to compare to any variation of those notes performed on a Marvin Gaye sound recording that Defendants do not own.  To do so would be prejudicial, misleading, and likely to confuse the jury and waste time.

Below is a transcription of the GIVE sound recording bass part starting at 0:05 seconds in the sound recording (top stave below) and measures 1-4 of the GIVE Deposit Copy "bass intro" (bottom stave below), with the notes that have a different pitch and/or rhythm in the recording from the Deposit Copy highlighted:



Below is a transcription of the GIVE descending bass part as transcribed by Ms. Finell from the GIVE sound recording (top stave below), followed by measures 4 and 7 of the GIVE Deposit Copy (middle and bottom staves below).

SOUND RECORDING BASS:



DEPOSIT COPY "BASS INTRO" (Bars 4, 7)

Measure 4:

Measure 7:

1   As can be seen from the above transcriptions, the descending bass in the

2   sound recording does not appear in measure 4 or 7 (or at all) in the Deposit Copy.

3   While the Court has allowed the musicologists to testify as to <u>what the notes</u>

4   <u>of the Deposit Copy are</u>, there is no dispute in that regard—any more than there is a

5   dispute as to what the words of this sentence are.  The notes in the Deposit Copy

6   speak for themselves.  They are <u>not</u> the notes in the GIVE sound recording as

7   transcribed by Ms. Finell and set forth above.  The differences are plain as day.

8   The only point of comparison for the extrinsic test is the Deposit Copy notes.

9   Transcriptions and opinions as to bass notes in the sound recording are inadmissible.

10   **III.**

11   <u>**CUMULATIVE MUSICOLOGIST TESTIMONY**</u>

12   Defendants have designated two musicologists, Ms. Monson and Ms. Finell.

13   The testimony of the two musicologists is entirely cumulative in that Ms. Monson

14   opines to the <u>exact same alleged similarities</u> that Ms. Finell addresses in her reports.

15   Moreover, Ms. Monson's opinions improperly are based on elements of the

16   GIVE and DANCE sound recordings not found in the Deposit Copies.[8]

17   The Court should exclude Ms. Monson from providing any cumulative expert

18   testimony at trial.  FRE 403.  At a minimum, the Court should require Defendants to

19   make an offer of proof at the pretrial conference as to the opinions that Ms. Monson

20   will express at trial that (a) are not based on material found in the sound recording;

21   and (b) that are not duplicative of Ms. Finell's opinions.  Just because Defendants

22   have paid to have two experts opine to exactly the same alleged similarities does not

23   mean the jury should have to hear both experts at trial.  Any such cumulative expert

24

25   _____

26   [8] The Finell and Monson reports are Exhibits C-D to the Declaration of Seth Miller

27   in Support of Plaintiffs' Motions *In Limine* ("Miller Decl") filed 01/07/15
(Document 175); *See also* Plaintiffs' Motion *In Limine* No. 2, filed 01/06/15

28   (Document 174).

1  testimony would be a waste of time, unhelpful to the jury, and would be prejudicial

2  if the jury incorrectly is led to believe that "two experts are better than one."

## IV.

### EDITED SOUND RECORDINGS

Plaintiffs have submitted sound recordings prepared under the direction of their musicologist, Sandy Wilbur, using professional musicians to faithfully perform the material embodied in the deposit copy sheet music ("Deposit Copy") for "Got to Give It Up" ("GIVE") and "After the Dance" ("DANCE").  Plaintiffs' fair and neutral recordings will allow the jury to assess the "total concept and feel" of the Deposit Copy songs.  Plaintiffs' recordings do not contain any recorded material from the Marvin Gaye sound recordings of GIVE and DANCE and do not contain any musical elements found only in the Marvin Gaye sound recordings and not in the Deposit Copies.

Defendants' edited sound recordings, by contrast, contain vocal, bass, and keyboard parts only from the Marvin Gaye sound recording of GIVE.[9]  Defendants' edited recordings of GIVE are improper because they contain: (a) the GIVE sound recording keyboard part, which is <u>not in the Deposit Copy</u>, and which Defendants claim is similar to "Blurred Lines" ("BLURRED"); (b) the GIVE sound recording (improvised) bass part, which does not contain the same notes (pitches/rhythms) as the eight measure "bass intro" in the Deposit Copy; and (c) portions of Marvin Gaye's vocals from GIVE, including the vocal "woo" found in the sound recording but not in the Deposit Copy and which Defendants' claim is a musical "fingerprint" of alleged copying.  Defendants' prejudicial, improper recordings are designed to disregard the Court's prior rulings on this issue and should not be played to the jury.

/ / /

/ / /

_____

[9] Defendants did not submit an edited sound recording of DANCE.

**V.**

**THE EXTRINSIC/INTRINSIC TEST FOR SUBSTANTIAL SIMILARITY IS THE ONLY APPLICABLE STANDARD**

Defendants argue that—separate and apart from the extrinsic/intrinsic test for substantial similarity—the jury, as a supposed alternative test, may find substantial similarity based solely on whether the portion claimed to be similar is qualitatively or quantitatively important to the Counter-Claimants' work.  Defendants have no authority to support their proposition and miscite the relevant case law.

The qualitative or quantitative importance of an alleged similarity to the plaintiff's copyrighted work is not a test for substantial similarity.  The issue of quantitative or qualitative importance of the elements claimed to be copied only is relevant to the issues of *de minimis* copying or to the issue of whether the material copied is protectable.  *Newton v. Diamond,* 388 F.3d 1189, 1195-96 (9th Cir. 2003).

For example, in *Newton v. Diamond*, 204 F.Supp.3d 1244 (C.D. Cal. 2002), the issue was whether the use of a short sample of a sound recording constituted *de minimis* copying of the underlying composition.  The district court, in the section of the opinion with the heading, "*Sampling of Plaintiff's Work Is De Minimis*," (italics in original), the court noted:  "Courts generally consider both quantitative and qualitative factors in determining whether a taking is *de minimis.*"  *Id.* at 1256-57 (italics in original).  Substantial similarity was not an issue in *Newton* because sampling of the plaintiffs' recording was conceded.  *Newton* did not address how to determine substantial similarity.  The issue was only *de minimis* copying.  *Id.*

Similarly, in *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004), the Ninth Circuit discussed the quantity of material allegedly copied in discussing whether the portion was too small to be protectable:  "This Court has stated that '[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.'"  *Id.* at 852 (citing *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987)).

1    In the Ninth Circuit, the two-part extrinsic/intrinsic analysis is the only test

2  for substantial similarity.  The jury must perform this test here.  Quantitative or

3  qualitative importance has no bearing on substantial similarity.  Rather, if the jury

4  finds substantial similarity based on the extrinsic/intrinsic test, the jury also must

5  decide whether the portion copied is *de minimis*, trivial, or not protectable.  *Swirsky*,

6  376 F.3d at 842.  The case law is crystal clear: the trier of fact performs an extrinsic

7  and intrinsic analysis to determine if original expression in the plaintiff's work is

8  substantially similar to the defendant's work.  If so, then a secondary issue to be

9  decided is whether the similar portion is quantitatively or qualitatively important

10  enough in the plaintiff's work for the copying to be actionable (not trivial copying).

11    There is no "test" for copying based only on the "qualitative or quantitative"

12  importance of the material in the plaintiff's work.  Defendants are wrong on the law.

13                                                **VI.**

14                    **VIDEOTAPED DEPOSITIONS NOT PUBLIC RECORD**

15    Defendants intend to play excerpts of the depositions of Robin Thicke and

16  Pharrell Williams at trial.  The parties have agreed that the deposition transcripts

17  may be marked for identification at trial when relevant excerpts are played to the

18  jury, but that the transcripts will not be introduced into evidence as exhibits.

19    The videotapes of the Thicke and Williams depositions were designated

20  confidential subject to the Protective Order and were ordered filed under seal in

21  connection with the summary judgment motion [Order re: Counter-Claimants'

22  Application to File Documents Under Seal, filed 09/12/15 (Document 119), 2.]

23    To the extent there are any requests by the media for copies of the videotapes

24  at trial, the Court should not allow the media to have access to the videotapes.  The

25  videotaped depositions should only be used for their intended purpose – as a

26  substitute for live testimony at trial.  They should not be made publicly available.

27    This result is consistent with the local rules of the Central District of

28  California, which forbid the audio-visual recording (and broadcast) of live

KING, HOLMES,
PATERNO &
BERLINER, LLP

1    testimony, except by official court reporters, recorders, or United States Magistrate

2    Judges.  *See* Local Civil Rule 83-6.3.1.  Cameras and audio-visual recording devices

3    are not permitted in the courtroom at all.  See Local Civil Rule. 83-6.2.1.

4         Courts have recognized that "videos can more easily be abused as they can be

5    cut and spliced and used as 'sound-bites' on the evening news or sports shows . . .

6    or, even worse, on 'celebrity gossip' talk shows."  *See Stern v. Cosby*, 529 F. Supp.

7    2d 417, 422 (S.D.N.Y. 2007) (citing *Felling v. Knight*, No. 01–0571, 2001 WL

8    1782360, *3, 2001 U.S. Dist. LEXIS 22827, at *9 (S.D.Ind. Dec. 21, 2001)).

9         It is well established that the public and media have a presumptive right to

10   hear and observe the proceedings in trial.  *See Richmond Newspapers, Inc. v.*

11   *Virginia*, 448 U.S. 555, 575 (1980).  They also have a common-law right to judicial

12   records, such as exhibits at trial.  *See Valley Broad. Co. v. U.S. Distr. Court for Dist.*

13   *of Nev.*, 798 F.2d 1289, 1292-94 (9th Cir. 1986).  Here, the videotaped depositions

14   will not be introduced as exhibits and thus will not become part of the public record.

15   Thus, the public and media should not have access to the videotapes.

16        The Ninth Circuit has not addressed the issue of whether videotaped

17   deposition testimony played at trial (but not entered into evidence) is a "judicial

18   record" subject to the common-law right of access.  However, both the Eight Circuit

19   in *United States v. McDougal*, 103 F.3d 651, 657 (8th Cir. 1996), and the Northern

20   District of California's recent opinion in *Apple iPod iTunes Antitrust Litig.*, No. 05-

21   CV-0037 YGR, 2014 WL 7323399, at *3 (N.D. Cal. Dec. 17, 2014), concluded that

22   video depositions do not become "judicial records" merely by being played at trial.

23   *See Apple iPod, at id.* ("the Jobs Deposition was merely presented in lieu of live

24   testimony due to the witness's unavailability, and was and should be treated in the

25   same manner as any other live testimony offered at trial.")

26        In this case, there is even less reason to enter the videotaped depositions of

27   Thicke and Williams as trial exhibits.  Both will be available to testify in person,

28   and the media can report on their live testimony and on any videotaped excerpts

1   from their depositions played to the jury.  The presence and availability of both

2   deponents at trial, unlike Steve Jobs in *Apple iPod*, makes this case an even less

3   compelling one for treating videotaped testimony played at the trial as an exhibit.

4        Moreover, if the videotaped depositions were entered as trial exhibits and thus

5   became "judicial records" subject to requests from the media for copying, the parties

6   would still have the right to object to individual requests.  The Court would have to

7   respond to every new request for a copy of the videotaped deposition by engaging in

8   an interests balancing test to weigh the interests advanced by the parties in the light

9   of the public interest and the duty of the courts.  *See Apple iPod*, No. 05-CV-0037

10   YGR, 2014 WL 7323399, at *2 (N.D. Cal. Dec. 17, 2014) (quoting *Nixon v. Warner*

11   *Commc'ns, Inc.*, 435 U.S. 589, 602, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)).

12        Here, the parties have agreed that the videotapes will not be introduced into

13   evidence but merely marked "for identification only" if played, and therefore the

14   videotapes should not become "judicial records" at all.  Such a result will avoid

15   prejudice, avert unnecessary side issues, and keep the focus on the trial.

16                             **VII.**

17              **INVERSE RATIO RULE INAPPOSITE**

18        Plaintiffs Thicke and Williams will testify (as they did in depositions) that

19   they admire Marvin Gaye and knew the songs at issue here.  There is no dispute

20   over access—access is conceded (and would be a stipulated fact if Defendants

21   would agree to take this issue off the jury's plate).  There cannot be "more" access

22   than access.  Defendants are still required to prove substantial similarity and

23   copying.  The inverse ratio rule only has bearing where a defendant denies access.

24   *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482, 485 (9th Cir. 2000).  The

25   inverse ratio rule is not a jury issue, nor is there any model instruction on this topic.

26        The inverse ratio rule is an issue of law for a court to decide.  Only a court

27   can analyze case law to assess what constitutes more or less access and how that

28   impacts the required threshold of similarity on a motion for summary judgment or

1  other motion.  More important, the only <u>purpose</u> of the inverse ratio rule is to

2  require a greater showing of similarity where there is a lower showing of access.  It

3  does not work in reverse, nor do Defendants cite any case where <u>access was</u>

4  <u>conceded</u> but the court nevertheless required a <u>lower</u> showing of similarity.

5       To prove copying, Defendants must show **substantial similarity**.  Complete

6  access to a work does not minimize the need to show "substantial" similarity under

7  the extrinsic and intrinsic tests.  The inverse ratio rule has no application here.  [*See*

8  **Exhibit G** hereto, an MCLE article discussing the history of the inverse ratio rule,

9  its rejection by the Second Circuit, and its questionable role in the Ninth Circuit.]

10

11  DATED:  February 18, 2015          KING, HOLMES, PATERNO &
                                       BERLINER, LLP
12

13

14                                     By: _____
15                                          HOWARD E. KING
                                            SETH MILLER
16                                     Attorneys for Plaintiffs and Counter-Defendants
17                                     PHARRELL WILLIAMS, et al.

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2015, I electronically filed the foregoing **PLAINTIFFS' TRIAL BRIEF** with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Joey S. Gossett