1  KING, HOLMES, PATERNO & BERLINER, LLP
   HOWARD E. KING, ESQ., STATE BAR NO. 77012
2  STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
   ROTHSCHILD@KHPBLAW.COM
3  SETH MILLER, ESQ., STATE BAR NO. 175130
   MILLER@KHPBLAW.COM
4  1900 AVENUE OF THE STARS, 25TH FLOOR
   LOS ANGELES, CALIFORNIA 90067-4506
5  TELEPHONE: (310) 282-8989
   FACSIMILE:  (310) 282-8903
6
   Attorneys for Plaintiffs and Counter-
7  Defendants PHARRELL WILLIAMS,
   ROBIN THICKE and CLIFFORD
8  HARRIS, JR. and Counter-Defendants
   MORE WATER FROM NAZARETH
9  PUBLISHING, INC., PAULA MAXINE
   PATTON individually and d/b/a
10 HADDINGTON MUSIC, STAR TRAK
   ENTERTAINMENT, GEFFEN
11 RECORDS, INTERSCOPE RECORDS,
   UMG RECORDINGS, INC., and
12 UNIVERSAL MUSIC DISTRIBUTION

13            UNITED STATES DISTRICT COURT

14      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| 15 | PHARRELL WILLIAMS, an individual; ROBIN THICKE, an individual; and CLIFFORD HARRIS, JR., an individual, | CASE NO. CV13-06004-JAK (AGRx) Hon. John A. Kronstadt, Ctrm 750 |
|----|----|----|
| 16 | | |
| 17 | Plaintiffs, | **NOTICE OF MOTION AND MOTION OF PHARRELL WILLIAMS, ROBIN THICKE AND MORE WATER FROM NAZARETH PUBLISHING, INC. FOR JUDGMENT AS A MATTER OF LAW, DECLARATORY RELIEF, A NEW TRIAL, OR REMITTITUR;** |
| 18 | vs. | |
| 19 | BRIDGEPORT MUSIC, INC., a Michigan corporation; FRANKIE CHRISTIAN GAYE, an individual; MARVIN GAYE III, an individual; NONA MARVISA GAYE, an individual; and DOES 1 through 10, inclusive, | |
| 20 | | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| 21 | | |
| 22 | | Date:    June 29, 2015 |
| 23 | | Time:   8:30 a.m. Ctrm.: 750 |
| 24 | Defendants. | |
| 25 | AND RELATED COUNTERCLAIMS. | Action Commenced: August 15, 2013 Trial Date:        February 24, 2015 |
| 26 | | |

27  / / /

28  / / /

# NOTICE OF MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on **June 29, 2015**, at **8:30 a.m.**, or as soon thereafter as the matter may be heard in Courtroom 750 of the above-entitled court, located at 255 East Temple Street, Los Angeles, California 90012, plaintiffs and counter-defendants PHARRELL WILLIAMS and ROBIN THICKE, individually and d/b/a I LIKE 'EM THICKE MUSIC, and counter-defendant MORE WATER FROM NAZARETH PUBLISHING, INC. (collectively, "Counter-Defendants"), will and hereby do move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for declaratory relief, or, alternatively, a new trial under Federal Rule of Civil Procedure 59(a), with regard to the first claim for relief in the respective counterclaims filed by counter-claimants NONA MARVISA GAYE, FRANKIE CHRISTIAN GAYE, and MARVIN GAYE III (collectively, "Counter-Claimants"), for alleged copyright infringement of "Got to Give It Up" by "Blurred Lines," or for a remittitur of the profits awarded to Counter-Claimants.

The grounds for this motion are that the jury's verdict finding that Counter-Defendants infringed "Got to Give It Up" and the damages and profits awarded by the jury are unsupported by any evidence, let alone substantial evidence, and are contrary to law; and evidentiary errors and legal errors in the jury instructions were prejudicial and prevented Counter-Defendants from receiving a fair trial.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Seth Miller and exhibits thereto filed concurrently, the Court's files and records in this action, and such other evidence, argument, or other matter as may be presented prior to or at the hearing on the Motion.

Counter-Defendants are filing this brief in excess of the 25 page limit in expectation that the Court will grant their request for additional pages.  (Dkt.374.)

1   If the request for additional pages is denied, in whole or in part, Counter-Defendants

2   respectfully request permission to re-file this brief within the applicable page limit.

3

4   DATED:  May 1, 2015                KING, HOLMES, PATERNO &
                                       BERLINER, LLP
5

6

7                                      By: _____
8                                            HOWARD E. KING
                                             SETH MILLER
9                                      Attorneys for Plaintiffs and Counter-Defendants
10                                     PHARRELL WILLIAMS, et al.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................ 2

I.    INSTRUCTIONAL ERRORS MANDATE A NEW TRIAL ......................... 3

II.   EVIDENTIARY ERRORS MANDATE A NEW TRIAL ............................. 7

    A.    Ms. Finell's Testimony Was Inadmissible and Prejudicial ................. 8

        1.    Ms. Finell's Testimony About Theme X Was Inadmissible ...... 11

        2.    Ms. Finell's Testimony About the Keyboard Parts Was Inadmissible ................................................................. 14

        3.    Ms. Finell's Testimony About the Bass Melody Was Inadmissible ................................................................. 17

        4.    Ms. Finell's Testimony About the Signature Phrase Was Inadmissible ................................................................. 18

        5.    Ms. Finell's Testimony About Lyrics Was Inadmissible .......... 19

        6.    Ms. Finell's Testimony About Edited and Transcribed Versions of the Sound Recording Was Inadmissible ............... 19

    B.    Testimony About the Gayes' Mash-Ups Was Inadmissible ................ 21

    C.    Testimony About Press Statements Was Inadmissible ....................... 22

    D.    The Court's Rulings Regarding Evidence of Lay Opinions On Similarity Were Erroneous, Unfair and Prejudicial ............................ 23

    E.    Nancie Stern's Opinions About Infringement Were Inadmissible ...... 25

III.  THE EVIDENCE DOES NOT SUPPORT THE INFRINGEMENT VERDICT .......................................................................................... 26

    A.    The  Verdict Is Not Supported By Legally Sufficient Evidence Of  Substantial Extrinsic Similarity ................................................. 26

    B.    The  Verdict Is Not Supported By Legally Sufficient Evidence Of  Substantial Intrinsic Similarity .................................................. 29

IV.   THE EVIDENCE DOES NOT SUPPORT THE DAMAGES AWARDS ............................................................................................ 30

    A.    The Jury's Actual Damages Award Is Not Supported By Evidence .................................................................................... 30

        1.    Ms. Stern's Testimony Should Have Been Excluded ............... 30

2.    Even In Consideration Of Ms. Stern's Testimony, the
Actual Damages Award Is Unsupported By Evidence ..............32

B.    The Jury's Profits Awards Are Not Supported By Evidence ...............33

C.    At a Minimum, the Court Should Remit the Profits Awards ..............35

CONCLUSION.......................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                   **Page**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000) ................................................................. 2

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014) ................................................... 7, 8, 14, 16

*Barabin v. Astenjohnson, Inc.*,
    700 F.3d 428 (9th Cir. 2012) ............................................................... 7, 8

*Brown Bag Software v. Symantec Corp.*,
    960 F.2d 1465 (9th Cir. 1992) .................................................................. 4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1985) ................................................................... passim

*Dream Games of Arizona, Inc. v. PC Onsite*,
    561 F.3d 983 (9th Cir. 2009) .................................................................... 4

*FTC v. BurnLounge, Inc.*,
    753 F.2d 878 (9th Cir. 2014) .................................................................... 8

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
    499 U.S. 340 (1991) ......................................................................... 1, 23

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989) ............................................................. 5, 20

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) .............................................................. 30

*Jessen Elec. & Serv. Co. v. Gen. Tel. Co.*,
    106 F.3d 407 (9th Cir. 1997) ............................................................. 3, 35

*L.A. Printex Industries, Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012) .................................................................... 4

*Lakeside-Scott v. Multnomah Cty.*,
    556 F.3d 797 (9th Cir. 2009) .................................................................... 2

*Mattel, Inc. v. MGA Entertainment, Inc.*,
    616 F.3d 904 (9th Cir. 2010) .................................................................... 4

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) .................................................................. 30

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) .................................................................... 3

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) .................................................................. 19

*Newton v. Diamond,*
   388 F.3d 1189 (9th Cir. 2003) ........................................................... 6, 28

*Oracle Corp. v. SAP AG,*
   765 F.3d 1081 (9th Cir. 2014) ..................................................... 30, 31, 33

*Pasillas v. McDonald's Corp.,*
   927 F.2d 440 (9th Cir. 1991) ....................................................................... 4

*Rattray v. City of National City,*
   51 F.3d 793 (9th Cir. 1994) .......................................................................... 3

*Rice v. Fox Broad. Co.,*
   148 F. Supp. 2d 1029 (C.D. Cal. 2001) ...................................................... 4

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,*
   562 F.2d 1157 (9th Cir. 1977) ................................................................... 10

*Smith v. Jackson,*
   84 F.3d 1213 (9th Cir. 1996) ....................................................................... 3

*Swirsky v. Carey,*
   376 F.3d 841 (9th Cir. 2004) ....................................................................... 3

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) .................................................................. 3, 7

*Uniloc USA, Inc. v. Microsoft Corp.,*
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................ 30

*VMG Salsoul, LLC v. Ciccone,*
   2013 WL 8600435 (C.D. Cal. Nov. 18, 2013) ......................................... 15

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
   259 F.3d 1101 (9th Cir. 2001) ............................................................. 14, 21

**Statutes and Rules**

Fed. R. Civ. P. 50(b) ........................................................................... 2, 26

Fed. R. Civ. P. 59(a) ........................................................................... 2, 26

Fed. R. Evid. 403 .................................................................................. 7, 21

Fed. R. Evid. 702 ....................................................................................... 8

Fed. R. Evid. 703 ................................................................................ 19, 25

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

The jury's verdict awarding $7.4 million in damages against Pharrell Williams, Robin Thicke and More Water From Nazareth Publishing, Inc. ("Counter-Defendants")[1] for infringing "Got to Give It Up" ("GIVE") with their song "Blurred Lines" ("BLURRED") is unfounded, illogical, and a miscarriage of justice.

The inconsistent verdict found liability against Thicke and Williams but exonerated the record company parties that distributed BLURRED and a co-writer and co-performer on the song, Clifford Harris, Jr.  Plainly, the jury did not find that BLURRED was "substantially similar" to GIVE—the only question before it. Instead, confused and misled by prejudicial evidence and erroneous instructions, the jury found that Williams and Thicke alone "infringed" the Gayes' copyright.  The defective verdict can be attributed only to the prejudicial and irrelevant evidence concerning Thicke's statements to the press that he wanted to create a song with the same "feel" or "groove" as Marvin Gaye's song.   But copyright law "*encourages others to build freely upon the ideas and information conveyed by a work*."  *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349–350 (1991) (emphasis added) (citation omitted).   Moreover, Thicke's statements about the Marvin Gaye sound recording are irrelevant since the recording has many elements, including ones that define its "groove," *e.g.*, hi-hat, cowbell, etc., that are not found in lead sheet music for GIVE that was deposited with the Copyright Office—which comprises the full extent of GIVE that the Gayes own.  Thicke's statements about his influence for BLURRED, probative of nothing, were the centerpiece of the Gayes' case and led to an erroneous result.

---

[1]  This Motion is brought solely on behalf of counter-defendants Williams, Thicke, and More Water From Nazareth.  All other counter-defendants prevailed at trial, were found not liable, and do not seek a new trial or any other relief herein.

In addition, the Gayes' musicologist, Judith Finell, improperly based the bulk of her testimony on the excluded Marvin Gaye commercial sound recording ("Sound Recording"), and offered an opinion on similarity based on the Sound Recording and elements of it that are not in the Deposit Copy composition, which is the only music the Gayes actually own.  Marvin Gaye's performance on the Sound Recording was not at issue but was the only music the jury heard from the Gayes.

The Court further erred by allowing a UMG executive (who had no role in BLURRED) to testify about his lay opinion of similarity between BLURRED and the Sound Recording—testimony that was not probative or even a party admission but was a focus of the Gayes' case and was highly prejudicial.

The jury's $7.4 million damages award also is plainly erroneous.  There was no admissible evidence of damages, including because the Gayes' licensing expert improperly opined based on the excluded Sound Recording that 100% of the music in BLURRED is copied from GIVE—even though she is not a musicologist and was ordered not to opine on this topic.  The jury also improperly awarded, as a supposed "apportionment" of Williams' profits attributable to alleged copying of GIVE in BLURRED, an amount that is *double* his total stipulated profits, and thus plainly excessive and contrary to the evidence.

Because of the instructional and evidentiary errors discussed below, and because the evidence in any case is insufficient as a matter of law to support the infringement verdict and the damages awards, the Court should grant judgment as a matter of law and declaratory relief in favor of Counter-Defendants, order a new trial, or, a very minimum, remit the damages awards.

## **Argument**

Judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50(b) is required where a plaintiff fails to present a legally sufficient basis for a reasonable jury to rule in its favor.  *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009).  A new trial is appropriate under Fed. R. Civ. P. 59(a) where "'the verdict is

-2-

against the weight of the evidence, [] the damages are excessive, or [] for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007); *Rattray v. City of National City*, 51 F.3d 793, 800 (9th Cir. 1994) (same, prevent "miscarriage of justice"); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1275 (Fed. Cir. 2000) (same, for "prejudicial legal error" in jury instructions).  Remittitur is appropriate under Rule 59 where the damages awarded by the jury are not supportable, and the "proper amount of a remittitur is the maximum amount sustainable by the evidence." *Jessen Elec. & Serv. Co. v. Gen. Tel. Co.*, 106 F.3d 407 (9th Cir. 1997).

## I.   <u>INSTRUCTIONAL ERRORS MANDATE A NEW TRIAL</u>

Errors in Instruction Nos. 42 and 43 misinformed the jury about how to assess copyright infringement.  These errors in the most critical instructions in the case were highly prejudicial, as they erroneously permitted the jury to find infringement based on alleged similarities in elements of the Gayes' work that are: (1) not protectable by copyright; (2) based solely on how often or important the element is in GIVE rather than on similarity to BLURRED; or (3) not in the deposit copy for GIVE (the "Deposit Copy").  As the Court held in its summary judgment order (Dkt. 139 at 7-11), the Deposit Copy is the full extent of the Gayes' ownership interest in GIVE.

"A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).  A plaintiff "may establish copying by showing that defendant had access to plaintiff's work and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

Substantial similarity is assessed under "an objective extrinsic test and a subjective intrinsic test." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004).  "The extrinsic test considers whether two works share a similarity of ideas and expression

as measured by external, objective criteria." *Id.* This test requires "breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by 'substantial similarity.''" *Id.* (quoting *Rice v. Fox Broad. Co*., 148 F. Supp. 2d 1029, 1051 (C.D. Cal. 2001)). The "intrinsic test is subjective and asks 'whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.'" *Three Boys*, 212 F.3d at 485 (quoting *Pasillas v. McDonald's Corp*., 927 F.2d 440, 442 (9th Cir. 1991)).

Under both the extrinsic and intrinsic tests, a "finding of substantial similarity between two works can't be based on similarities in unprotectable elements." *Mattel, Inc. v. MGA Entertainment, Inc*., 616 F.3d 904, 916 (9th Cir. 2010). To "the extent a plaintiff's work is unprotected or unprotectable under copyright, the scope of the copyright must be limited" before assessing substantial similarity. *Brown Bag Software v. Symantec Corp*., 960 F.2d 1465, 1476 (9th Cir. 1992); *L.A. Printex Industries, Inc. v. Aeropostale, Inc*., 676 F.3d 841, 849 (9th Cir. 2012) ("we distinguish protectible from unprotectible elements and ask only whether the protectible elements in two works are substantially similar."); *Swirsky*, 376 F.3d at 845 (same). An instruction that invites the jury to consider the "whole work" is thus proper only if "the unprotectable elements [are] identified." *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 1446 (9th Cir. 2009).

Instruction 43—which explained the burden of proving "there is substantial similarity between" the parties' works (Dkt. 322 at 46; Dkt. 339, 69:2-70:19)— failed to require the jury to limit its assessment of substantial similarity to protected extrinsic elements of GIVE—even though *both parties* argued it should (*see*, *e.g*., Dkt. 244 at 12; Dkt. 244-3 at 7, 244-3 at 9-10). The instruction invited the jury to make a freewheeling assessment of similarity based on any and all elements of the Gayes' work, or the work as a whole, including elements that are not protected by copyright as a matter of law or not in the Deposit Copy. To wit, Instruction No. 43 (Dkt. 322, 46 of 47):

-4-

- Erroneously told the jury to "consider the elements of each of the works and decide if they are substantially similar"—without limiting that consideration to only elements in the Deposit Copy and protectable by copyright;

- Erroneously instructed the jury that it "must" consider in assessing similarity both "Theme X" and the keyboard part, which are not in the Deposit Copy;

- Failed to identify unprotected elements of GIVE—including ones the Court ruled were "unprotected" (Dkt. 139 at 13-21)—or to instruct the jury that it must identify and factor out unprotected elements before assessing similarity;

- Erroneously instructed the jury that, in the extrinsic test, it could disregard similarities in "individual elements" and instead simply decide "there is enough similarity between a work of the Gaye Parties and an allegedly infringing work of the Thicke Parties to comprise a substantial amount";

- Erroneously instructed the jury that similarities between elements need not be "identical" to be "substantial," an argumentative, unnecessary instruction the Gayes requested that tipped the scales in favor of finding infringement; and

- Erroneously instructed the jury to apply the intrinsic test by determining "if an ordinary, reasonable listener would conclude that the total concept and feel of the Gaye Parties' work and the Thicke Parties' work are substantially similar," without limiting the test to protectable extrinsic elements of GIVE.

These errors in Instruction 43 were prejudicial to Counter-Defendants because they gave the jury permission to find infringement based on unprotected elements of GIVE.  The Ninth Circuit has held that a similar instruction that directed the jury to "ask yourself whether the ordinary reasonable person would find the total impact and effect of Defendants' work substantially similar to Plaintiff's work" improperly "encouraged the jury to put the two articles next to each other and determine whether they looked alike, not whether defendants copied protectable expression." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 206-208 (9th Cir. 1989) (ordering a new trial).  Here, Instruction 43 has the same basic error.

As discussed in Section II.A, *infra*, the Gayes seized on this error by having Ms. Finell focus her testimony on the so-called "heartbeat" of GIVE—the Sound

Recording keyboard and bass parts not found in the Deposit Copy—and the "Theme X" melody not in the Deposit Copy.  The Gayes improperly made these unprotected elements not found in the Deposit Copy the twin pillars of  their case for substantial similarity at trial.

Instruction 43 also erroneously instructed the jury that similarities may be "substantial" if they are "qualitatively or quantitatively" important to GIVE:  "In considering whether extrinsic or intrinsic similarities are substantial, you may consider whether portions allegedly copied are either qualitatively or quantitatively important to either of the Gaye Parties' works."  (Dkt. 322, 46 of 47.)  As Counter-Defendants argued (*e.g.*, Dkt. 244 at 12-13; Dkt. 270 at 11-12), this question is relevant only *after* a jury determines that there are, in fact, similarities under the extrinsic/intrinsic test; if so, then the jury must assess if those similarities are trivial and not actionable.  *See Newton v. Diamond*, 388 F.3d 1189, 1195-96 (9th Cir. 2003).  By including this "qualitatively or quantitatively" paragraph in the main instruction on the substantial similarity test, the Court invited the jury to find "substantial similarity" based only on how frequent an element appears in GIVE or how long it lasts.  The Gayes took advantage of this instructional error by arguing to the jury that it should find infringement if it concludes that even any one of Ms. Finell's eight alleged similarities was important to GIVE.  (Dkt. 339, 87:20-88:11.)

Compounding the prejudice, over Counter-Defendants' objections (Dkt. 244, 10:25-11:6 of 54), the Court erroneously instructed the jury in Instruction 42 that, in order for it "to find that the Thicke Parties copied" GIVE, it need not "find that the Thicke Parties consciously or deliberately copied" the song, but rather it is "sufficient if [it finds] that the Thicke Parties subconsciously copied" the song (Dkt. 322 at 45).  This instruction should not have been given.    The relevant question for determining whether there was legally actionable "copying" is whether the works are substantially similar based on the extrinsic/intrinsic test—not whether Counter-Defendants "subconsciously copied."  As explained in *Three Boys Music*, the issue

of "subconscious copying" concerns whether the defendant had *access* to a copyrighted work, 212 F.3d at 482-85—a question that was not in dispute here.

Instruction 42 also was erroneous, and compounded the prejudice to Counter-Defendants from the errors in Instruction 43.  Over Counter-Defendants' objections (Dkt. 244, 10:25-11:6 of 54), the Court instructed the jury that for it "to find that the Thicke Parties copied" GIVE, it need not "find that the Thicke Parties consciously or deliberately copied" the song, but rather it is "sufficient if [it finds] that the Thicke Parties subconsciously copied" the song (Dkt. 322 at 45; Dkt. 339 at 69:2-7). As *Three Boys Music* shows, however, the issue of "subconscious copying" concerns whether the defendants had *access* to a copyrighted work, 212 F.3d at 482-83—a question that was not in dispute here.  This instruction was irrelevant and misleading, as it improperly authorized the jury to find "copying" without even applying the substantial similarity test so long as it felt that Thicke and Williams had "subconsciously" copied GIVE. This instruction was highly prejudicial in light of the improper admission of evidence regarding Thicke's multiple statements to the press that he and Williams had set out to create a song with the same "groove" or "feel" as GIVE.

If judgment is not entered in favor of Counter-Defendants for the reasons discussed below, then the Court should grant Counter-Defendants a new trial so the Gayes' claim of infringement of GIVE can be assessed under the proper legal standards.

## II.   <u>EVIDENTIARY ERRORS MANDATE A NEW TRIAL</u>

Over Counter-Defendants' objections, the Court admitted a number of categories of evidence that should have been excluded under Federal Rules of Evidence 402, 403, 702 and 703.

A district court's erroneous failure to admit or exclude evidence is grounds for a new trial where the evidentiary error is prejudicial.  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 462 (9th Cir. 2014) (en banc).  Where a court

-7-

erroneously admits or excludes evidence, the "burden [is] on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Id*. at 464. The same standard applies to the improper admission of expert testimony after a district court fails to make "appropriate determinations under *Daubert* and Federal Rule of Evidence 702." *Id*. at 462; *see FTC v. BurnLounge, Inc*., 753 F.2d 878, 888 (9th Cir. 2014) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1985)) ("The Supreme Court in *Daubert* held that 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"). Indeed, the "decision to admit or exclude expert testimony is often the difference between winning and losing a case. . . . The potentially significant influence of expert testimony underscores the importance of assiduous 'gatekeeping' by trial judges." *Barabin v. Astenjohnson, Inc.*, 700 F.3d 428, 431 (9th Cir. 2012).

If the judgment as a matter of law is not granted here, then the Court's erroneous rulings on several material evidentiary issues mandate a new trial.

## A.    Ms. Finell's Testimony Was Inadmissible and Prejudicial

The Court should have prohibited the Gayes' primary musicology expert, Judith Finell, from testifying at all, or, at a minimum, should have conducted a *Daubert* hearing, which would have prevented her misleading and irrelevant opinions. *See Estate of Barabin*, 740 F.3d at 464 (a "district court cannot abdicate its role as gatekeeper," and "abuse[s] its discretion by admitting the expert testimony without first finding it to be relevant and reliable under *Daubert*"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("trial court must . . . [make] a preliminary determination that the expert's testimony is reliable").

Ms. Finell's initial expert opinions in the case, including in her Rule 26 Report and her deposition in December 2014, were based entirely on alleged similarities between BLURRED and the Sound Recording. (Dkt. 175-3; Dkt. 175-11.) Until late summer of 2014, Ms. Finell had never even seen the Deposit Copy.

1   (Dkt. 350, 9:15-12:14; Dkt. 175-10, p. 18 of 36 (as Finell Tr. 99:19-100:14.)

2   Counter-Defendants moved *in limine* to exclude Ms. Finell's testimony because her

3   opinion was improperly based on the Sound Recording, but the Court denied the

4   motion.  (Dkt. 174; 226 at 1.)  Counter-Defendants also asked the Court to hold a

5   *Daubert* hearing to ensure that Ms. Finell's testimony was relevant and reliable, but

6   the Court declined to do so.  (Dkt. 277; Dkt. 332, 92:6-93:19; Dkt. 348, 3:21-4:4.)

7        As a result of the Court's failure to exclude Ms. Finell's testimony, to hold a

8   *Daubert* hearing, or to make the requisite findings of reliability and relevance,

9   *Barabin*, 740 F.3d at 464, Ms. Finell improperly was permitted to testify

10  misleadingly and prejudicially about a number of purported "similarities" between

11  BLURRED and GIVE that should never have been presented to the jury, including

12  elements that Ms. Finell admitted are only "implied" from the Deposit Copy but do

13  not actually appear in it, or that allegedly would be "understood" by a musician to

14  be present in it.  (Dkt. 350, 82:20-83:16, 84:6-13, 92:21-93:19; Dkt. 334, 13:14-19.)

15  Indeed, Ms. Finell described the Deposit Copy as "musical shorthand," and admitted

16  that some of the "material" in the Sound Recording was "eliminate[d]" from the

17  Deposit Copy, and that the author of the Deposit Copy had to "pick and choose"

18  which elements of the song to include.  (Dkt. 334, 31:4-16, 43:15-19; Dkt. 336,

19  40:9-14; 102:13-17; Dkt. 350, 83:18-84:13, 87:18-25.)  She admitted that the twin

20  pillars of her opinion—the "heartbeat" (keyboard and bass) and Theme X—are not

21  written in the Deposit Copy.[2]  Her testimony was inadmissible.  FRE 402, 403, 703.

22

23

24

_____

25  [2] Ms. Finell admitted on cross-examination, consistent with the testimony of

26  Counter-Defendants' musicology expert Sandy Wilbur, that there is no limit to

27  which musical elements can be notated on sheet music or on the scope of the sheet

28  music that can be submitted as a deposit copy for a copyright registration.  (Dkt. 334, 49:14-19, 351, 104:5-105:6.)

Copyright protection extends only to the particular expression of a work—not to expressions that purportedly can be "inferred" or "implied" therefrom or that were "eliminated" from a work before registration.  *See*, *e.g.*, *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977) ("It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself."). Ms. Finell's opinions based on the Sound Recording were irrelevant and misleading.

Ms. Finell's testimony was unquestionably prejudicial to Counter-Defendants—the Gayes' entire infringement case was built around her testimony, which was easily the longest of any witness's in the case.  The Court's decision not to hold a pre-trial *Daubert* hearing compounded the prejudice by putting Counter-Defendants in the unenviable position of having to object repeatedly to Ms. Finell's testimony until the Court ultimately granted counsel a standing objection on the issue of material not found in the Deposit Copy.  (Dkt. 336, 115:14-15, 116:23-24, 123:21-25.)  Although many of Counter-Defendants' objections were sustained and much of Ms. Finell's testimony was stricken *after it was given*, the net effect of this cumbersome process was extremely prejudicial to Counter-Defendants: (1) the jury likely concluded that Counter-Defendants were overly concerned by Ms. Finell's testimony or were desiring to obstruct and delay the proceedings; (2) Ms. Finell was able to present to the jury testimony, demonstratives, and music that the jury never should have seen or heard; and, (3) the jury faced an impossible task of having to constantly distinguish between the select parts of what they saw and heard each day that they could consider later in reaching their verdict, and the parts they could not.

As discussed below, even if Ms. Finell's testimony should not have been precluded entirely, a number of her opinions were improper and should have been excluded.  Each of these evidentiary errors was prejudicial and justifies a new trial.[3]

## 1. **Ms. Finell's Testimony About Theme X Was Inadmissible**

The Court ruled on summary judgment that the so-called "Theme X"—a four-note melody consisting of scale degrees 3-3-2#-3—does not appear in the Deposit Copy.  (Dkt. 139, 18.)  Recognizing (albeit belatedly) that a central part of her expert opinion was rendered irrelevant by the Court's ruling, on February 4, 2015, Ms. Finell filed a declaration stating that "we wanted to clarify that 'my' Theme X, the four note vocal melody represented in the deposit copy lead sheets, is not the same as the Theme X the Court said was not in the lead sheet."  (Dkt. 246-2 at 3:2-4.)  Ms. Finell thus admitted that the 3-3-2#-3 vocal melody is not "her" Theme X.  Ms. Finell attached to her declaration a page from the Deposit Copy on which she had circled "her" Theme X, namely, a four-note melody with scale degrees 5-5-6-5 (and with a different rhythm than the 3-3-2#-3 melody the Court had ruled on).  (*Id.* at Exh. A.)  On February 18, 2015, Ms. Finell submitted another declaration, this time stating:  "I do not disagree with [the Court's] conclusion" that Theme X does not appear in the Deposit Copy for GIVE, Part 1.  (Dkt. 271 at 2:23-24, n. 1.)  Ms. Finell said nothing at the time about professional musicians being able to discern from the 5-5-6-5 melody that a different 3-3-2#-3 melody should be played.

---

[3]   For example, Ms. Finell testified about and showed the jury a chart depicting purported similarities between the "themes in terms of the story lines" the songs share.  (Dk. 336, 148:13-149:9.)  Counter-Defendants were compelled to object, as Ms. Finell has no basis to opine about literary themes (nor are themes alone protectable by copyright, since they are mere ideas).  Although the Court sustained the objection and struck the testimony, Counter-Defendants had already been prejudiced by the improper disclosure to the jury of this improper "similarity" opinion and by their need to argue in front of the jury that it should be excluded.

Ms. Finell thus admitted twice before trial that the 3-3-2#-3 melody was *not* in the Deposit Copy.  Nonetheless, at trial, and over Counter-Defendants' vigorous objections, Ms. Finell testified about and played excerpts of the original 3-3-2#-3 version of Theme X (*i.e.*, "dancin' lady") that she had stated before trial was not "her" Theme X.  She initially testified that Theme X was not in the Deposit Copy and that only a supposed "variant" of Theme X (*i.e.*, "fancy lady," which she admitted has different notes and rhythm) appears in the Deposit Copy.  (Dkt. 336, 98:18-110:7.)    After Counter-Defendants objected again to the admission of testimony about Theme X (Dkt. 336, 110:8-112:3), Ms. Finell changed course and testified that Theme X was, "in [her] opinion," in the Deposit Copy (Dkt. 336,112:18-24).    The Court then permitted Ms. Finell to testify about and play Theme X for the jury.  Ms. Finell proceeded to testify to broad purported similarities between Theme X and elements in BLURRED.

On cross-examination, Ms. Finell admitted that the Theme X 3-3-2#-3 melody she had just played to the jury is not contained in the Deposit Copy.  (Dkt. 350, 86:13-23.)[4]  She also admitted that she found Theme X in GIVE only by transcribing the Sound Recording—not by deriving it from the Deposit Copy.  (Dkt. 350, 78:7-81:25.)[5]  Nonetheless, Ms. Finell maintained that Theme X is "implied" in the Deposit Copy (Dkt. 350, 82:20-83:16), and that professional musicians "would understand" that Theme X is "what's meant here," even though it is not written in the Deposit Copy (Dkt. 350, 84:6-13; *see* Dkt. 350, 92:21-93:19).

Ms. Finell's "implied" Theme X testimony is irrelevant and highly misleading.  The Gayes own a copyright in the composition for GIVE as it was fixed

---

[4]   "Q:  The deposit copy does not contain the 'dancing lady' notes 'C Sharp,' 'C Sharp, B Sharp, C Sharp' in written form; right? . . .   The Witness:  Right."   (Dkt. 350, 86:13-23.)

[5]    "Q:  You found Theme X by listening to the edited sound recording and transcribing the notes that appear in it; correct?  A:  Yes."  (Dkt. 350, 78:7-81:25.)

in a tangible form in the Deposit Copy.  It is undisputed that the Deposit Copy does not contain Theme X.  According to Ms. Finell, Theme X exists only in the minds of professional musicians and not in writing.  The Gayes do not own a copyright in the musical interpretation that professional musicians supposedly "would understand" they might play *in addition to* the specific notes that actually appear in the written Deposit Copy.  Ms. Finell's testimony on Theme X should never have been allowed.

Ms. Finell's claim that there was room for expert opinion as to what the Deposit Copy contains was sheer sophistry.  The Deposit Copy contains certain notes written on paper—that is a fact.  There is no "opinion" involved.  Because those notes were written on paper, published in compliance with the 1909 Act, and submitted as a Deposit Copy, the Gayes own a copyright in those notes—and only those notes.  How Marvin Gaye or any other musician might choose to embellish the Deposit Copy notes in performing the song—*e.g.*, by adding vocals, keyboards, bass parts, or any other performance elements—is irrelevant to the music that was copyrighted and deposited on paper in the Library of Congress.  There is no possible "opinion" as to what is contained in the Deposit Copy—the sheet music speaks for itself.  Counter-Defendants' musicologist, Sandy Wilbur, testified that the 3-3-2#-3 Theme X melody is not in the Deposit Copy and even wrote out by hand a transcription on the Deposit Copy to show what the 3-3-2#-3 melody would look like had it been in the Deposit Copy:.



[Dkt. 351, 165:1-168:18; Tr. Exh. 248-A; *see also* Dkt. 337, 4:17- 8:23.]

The only permissible opinion was whether the Deposit Copy is extrinsically similar to BLURRED.  Ms. Finell's testimony was neither relevant nor reliable and should have been excluded, but the Court failed to conduct a *Daubert* hearing or to make the requisite findings of reliability.  *Estate of Barabin*, 740 F.3d at 464.

In addition, Ms. Finell's opinion that Theme X is "implied" in the Deposit Copy also was improper and prejudicial and should have been excluded because it was not disclosed at any time before trial, including in her Rule 26 expert report (Dkt. 175-3), at her deposition (Dkt. 175-11), or even in her subsequent declarations (Dkt. 263-1 at 32-33, ¶ 56).  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (Rule 37(c) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed").

Counter-Defendants were substantially prejudiced by Ms. Finell's testimony about Theme X, which was one of the twin pillars of the Gayes' similarity case. Ms. Finell improperly: (1) played edited sound recordings of Theme X and compared them to melodies in BLURRED; (2) testified that the Theme X 3-3-2#-3 melody appeared in more than 25% of BLURRED; (3) testified that there are "identical" notes in both songs; and (4) testified that this similarity is significant because the 2# in Theme X is a purported "broken rule" that makes it a "red flag" of alleged copying.  (Dkt. 336, 105:18-19, 113:1-121:5; Tr. Exh. 376, Slides 11, 13-15.)  The Gayes' counsel played several of Ms. Finell's Theme X 3-3-2#-3 edited sound recordings for Williams during his cross-examination, and Williams admitted that the 3-3-2#-3 notes sounded similar in GIVE and BLURRED—an admission that was harmful, prejudicial, and irrelevant because the Theme X 3-3-2#-3 melody is not in the Deposit Copy.  (Dkt. 338, 124:13-128:6; Tr. Exh. 376, Slides 11-14.)

## 2. **Ms. Finell's Testimony About the Keyboard Parts Was Inadmissible**

The Court ruled on summary judgment (Dkt. 139 at 21) that the Deposit Copy does not contain a keyboard part, other than the harmony of an A7 chord, which is

not protectable in itself as a matter of law, *see VMG Salsoul, LLC v. Ciccone*, 2013 WL 8600435, at \*7-8 (C.D. Cal. Nov. 18, 2013), and that the rhythm of the Sound Recording keyboard is not in the Deposit Copy.  Ms. Finell opined in her Rule 26 report that the keyboard is not in the Deposit Copy:  "the deposit copy (lead sheet) for 'Got to Give It Up' excludes all of the … instrumental lines, so there is no keyboard ….  Only rudimentary chord indications are shown."  (Dkt. 175-3 at 33, ¶ 80.)  Ms. Finell testified at her deposition that the voicing (actual notes) and rhythm of the Sound Recording keyboard are not in the Deposit Copy.  (Dkt. 277 at 16-18.)

Nonetheless, over Counter-Defendants' objections (Dkt. 332, 89:8-93:19; Dkt. 336, 42:6-57:8), Ms. Finell was permitted to testify that the keyboard part in the Sound Recording, including its rhythm, is similar to the keyboard in BLURRED. She also played edited sound recordings comparing the keyboard from the Sound Recording to the keyboard in BLURRED.  Ms. Finell referred to these keyboard parts as the "heartbeat" of GIVE, and she played them repeatedly for the jury and claimed they were similar to BLURRED.  (Dkt. 332, 89:8-91:24; Dkt. 336, 42:6-51:3, 52:24-57:8, 135:12-137:16, 138:13-142:17; Tr. Exh. 376, Slides 2, 19.)

Ms. Finell made it abundantly clear during her testimony that her opinion regarding the keyboard parts was based on a gross extrapolation of the music that actually appears in the Deposit Copy.  She prepared the following transcription of the GIVE Sound Recording keyboard part that she claimed is in the Deposit Copy:



(Tr. Exh. 376, Slide 19; *see* Dkt. 336, 135:12-136:16.)  Ms. Finell showed the above transcription to the jury and claimed that it (left and right hand parts) is contained in the first four measures of the Deposit Copy, which are set forth below:



(Tr. Exh. 248; Dkt. 334, 5:25-8:2.)  Ms. Finell later admitted on cross-examination that: (1) the specific notes and rhythms of the Sound Recording keyboard part are not in the Deposit Copy; (2) there a number of different ways to play the A7 chord on a keyboard; and, (3) the Deposit Copy does not indicate any keyboard part at all. (Dkt. 334, 8:21-14:13.)  As with Theme X, however, Ms. Finell testified that, in her opinion, professional musicians "would understand" to play the keyboard part as she transcribed it, even though it is not in the Deposit Copy.  (Dkt. 334, 13:14-19.)

What professional musicians supposedly may know to play but that is not fixed in a tangible form, was not published in 1977, and is not protected by copyright,  is not relevant.  FRE 402, 403, 703.  Indeed, that "all professional musicians" supposedly would know to play the keyboard part—even though it is not in the Deposit Copy—shows that the keyboard part is unprotectable as *scenes a faire*, and must be available for all musicians to use.  *See Mattel*, 616 F.3d at 913.

Finally, as discussed above with Theme X, that the keyboard is not in the Deposit Copy is not a topic for expert  opinion—it is an underlying fact.[6]  Ms. Finell's alleged keyboard part is not in the Deposit Copy; the Gayes do not own it.

Ms. Finell's testimony was prejudicial and misleading, and the Court failed to make the pretrial determination of relevance and reliability.  *Estate of Barabin*, 740 F.3d at 464.  Ms. Finell's testimony on the keyboard part should have been excluded.[7]

---

[6] Ms. Wilbur testified that the A7 chord in GIVE does not indicate any specific instrument, notes or rhythms, to play the A7 harmony (chord) in accompanying the GIVE vocal melody.  (Dkt. 351, 103:15-108:2, 111:8-11, 112:6-18; 113:16-116:17.)

[7] As a clear sign that Ms. Finell's testimony was prejudicial to Counter-Defendants and confusing to the jury, a juror submitted a written question for the Court to pose to Ms. Finell asking:  "In the expert witness's opinion, did she assert that there is only one way to write down a chord when making musical notation so although it implies several notes are played, it would always be written and implied

### 3. Ms. Finell's Testimony About the Bass Melody Was Inadmissible

Ms. Finell testified that the bass part used in her edited versions of the Sound Recording is found in the Deposit Copy, and that it is part of the "heartbeat" of GIVE that allegedly is similar to BLURRED.  (Dkt. 336, 121:7-135:10; Tr. Exh. 376, Slides 16-18.)  Yet the bass part Ms. Finell testified to and included in her edited sound recording differs from the Deposit Copy in numerous respects, including that the descending bass melody in the Deposit Copy starts on the 4th scale degree, yet Ms. Finell's transcription from the Sound Recording bass part starts on the 5th scale degree—a deliberate choice on her part because the 5th scale degree makes it more similar to the descending bass melody in BLURRED.  (Dkt. 334, 17:15-23:17; Tr. Exh. 376, Slide 18.)  In other words, because the Deposit Copy did not support her similarity claim, Ms. Finell very deceptively chose a bass part from the Sound Recording that was more similar to BLURRED in order to win the case.  And because she put that bass part in her edited sound recording, the Court allowed her to use it at trial—without ever determining whether it was in the Deposit Copy.   The Court erred by accepting—without conducting a *Daubert* hearing—that Ms. Finell's edited recording were reliable.   Ms. Finell thereby evaded scrutiny of the improper material she used in her edited recordings.  Ms. Finell admitted that her testimony and edited recordings were based entirely on her transcription of "Marvin Gaye playing his own bass" in the excluded Sound Recording.  (Dkt. 334, 23:13-17.)[8]  Neither Ms. Finell's transcriptions nor her edited

---

the exact same way in all music?"  (Dkt. 334, 104:22-105:2.)  This question was so confounding that the Court declined to even try to answer it.  (*Id*., 105:4-106:11.)

[8] "Q. In all of the recordings of the bass that you played yesterday, the edited recordings reflect what you notated on your transcription rather than the exact notes of the deposit copy; right?  A. Right.  I think that was Marvin Gaye playing his own bass."  (Dkt. 334, 23:13-17.)

1  audio examples of the bass taken from the Sound Recording are in the Deposit
2  Copy, and thus they should not have been presented to the jury.

3      The prejudice from Ms. Finell's improper testimony about the bass and
4  keyboard—the supposed "heartbeat" of GIVE—was exacerbated by the testimony
5  of the Gayes' other musicologist, Dr. Ingrid Monson, about those same elements
6  (Dkt. 334, 70:24-75:22, 78:10-24.)  The bass and keyboard were the only aspects of
7  GIVE that Dr. Monson addressed, thus underscoring their perceived importance.
8  Dr. Monson also played for the jury an audio "mash-up" that consisted solely of the
9  Sound Recording bass and keyboard parts (not found in the Deposit Copy) "mashed
10  up" with the vocal melody from BLURRED.  (Dkt. 334, 79:16-83:16.)  The Gayes'
11  experts thus improperly and prejudicially made the "heartbeat" of the Sound
12  Recording (along with Theme X) the two pillars of their similarity case at trial.

### 4.      Ms. Finell's Testimony About the Signature Phrase Was Inadmissible

15      Ms. Finell's transcription of the so-called GIVE "Signature Phrase" also was
16  based on the Sound Recording, not the Deposit Copy.  (Dkt. 350, 38:16-51:8; Tr.
17  Exh. 376, Slide 3.)  Her transcription and edited sound recording of the GIVE
18  Signature Phrase—which, as Ms. Finell testified, is how Marvin Gaye sings it on the
19  Sound Recording—differs from the notes in the Deposit Copy in that the last note
20  (f#) as transcribed by Ms. Finell has a different duration than in the Deposit Copy,
21  (Dkt. 350, 38:16-51:8; Tr. Exh. 376, Slide 3.)  Ms. Finell should not have been
22  permitted to offer irrelevant testimony about similarities in the Signature Phrase.

23      Indeed, every transcription that Ms. Finell used at trial was based on the
24  Sound Recording.  (Tr. Exh. 376, Slides 3, 16, 18-20 (*see* timing indications in the
25  Sound Recording below each transcription, *e.g.*, "0:19").)  The Deposit Copy is the
26  composition.  It is the best evidence of itself.  The only reason Ms. Finell transcribed
27  the Sound Recording is because its notes differed from the Deposit Copy and, in her
28  estimation, gave her a better argument on similarity that the song the Gayes own.

### 5.      Ms. Finell's Testimony About Lyrics Was Inadmissible

Ms. Finell testified to alleged similarities in the use of the words "up," "down," "shake," and "round" in each song.  (Dkt. 336, 142:22-147:3; Tr. Exh. 376, Slide 32.)  These ordinary words are not protected by copyright, and Ms. Finnel's testimony about them was irrelevant and misleading.  37 C.F.R. 202.1(a) (single words and short phrases are not protected); *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (same).[9] To compound the prejudice, Ms. Finell opined that, in both songs, the melodies went up in pitch on the word "up" and down in pitch on the word "down" (so-called "word painting"), which is simply an unprotected idea. The melodies, lyrics, and order of the phrases were different.  Ms. Finell prejudicially testified only to similar ideas, not expression.  (*Id.*; Dkt. 322 at 31 (Instruction No. 30) ("Similarity that is confined to ideas and general concepts is not infringing").)[10]

### 6.      Ms. Finell's Testimony About Edited and Transcribed Versions of the Sound Recording Was Inadmissible

Ms. Finell infused her testimony with her edited versions of the Sound Recording and her transcriptions of same.  (*See*, *e.g.*, Dkt. 336, 52:24-57:13, 59:25-73:15,  77:6-79:6,  99:18-110:7,112:12-117:18,121:19-127:15.)   This evidence was incredibly prejudicial and should not have been permitted because it was based to a large degree on elements of the Sound Recording not found in the Deposit Copy.

The Court ruled before trial that edited sound recordings could be used for purposes of the intrinsic test only, but only if limited to elements in the Deposit Copy.  The Court, however, did not conduct a *Daubert* hearing or make any specific findings that Ms. Finell's recordings were limited to the Deposit Copy and therefore

---

[9]    The Court denied Counter-Defendants' motion to exclude Ms. Finell's opinion on this topic. (Dkt. 174 at 16-18; Dkt. 226 at 2.)

[10]    The prejudice from this error was compounded by the Court's refusal to separately instruct the jury that ordinary words are not protected, as Counter-Defendants had requested.  (Dkt. 267 at 14.)

relevant and reliable.  Fed. R. Evid. 703.  And they were not:  the recordings included the keyboard part, Theme X, and the Sound Recording bass melody that differs from the Deposit Copy bass.  (Dkt. 336, 52:5-57:10, 105:5-116:12; 123:18-127:15; 129:7-131:21; 135:12-137:10, 138:13-142:17; Tr. Exh. 376, Slides 2, 11, 13-14, 16-20.)

There was no reason for the Court to expose the jury to edited versions of the Sound Recording.  The Court allowed audio examples to be played in response to the Gayes' concern about providing evidence of intrinsic similarity.  (Dkt. 231, 4-6; Dkt. 251 at 3-4.)  But, as noted above, the intrinsic test turns on whether the "ordinary, reasonable person would find the total concept and feel of the works to be substantially similar."  *Three Boys*, 212 F.3d at 485 (citation omitted).  Ms. Finell's brief, edited recordings by their very nature do not depict the "total concept and feel" of GIVE but instead were cherry-picked to select tiny fragments of GIVE that sounded the most similar to BLURRED—and primarily based on elements not found in the Deposit Copy that are wholly irrelevant and prejudicial.  *Harper House,* 889 F.2d at 206-208 (similarity cannot be based on unprotected elements).

Even if her edited sound recordings could have been useful for the intrinsic test, the Court repeatedly instructed the jury not to consider her edited recordings but instead to consider only her opinions.  (*E.g.*, Dkt. 336, 51:6-52:22, 70:24-71:25, 73:5-15.)  This limiting instruction was incredibly confusing—as the Court itself acknowledged.  (Dkt. 336, 52:12-19.)  It also ensured that the edited sound recordings would not be used by the jury in conducting the intrinsic test, thus *negating* the Court's sole purpose in allowing them to be played in the first place.

Similarly, Ms. Finell should not have been permitted to testify concerning written transcriptions of the Sound Recording.  These transcriptions likewise contained elements that were not included in the Deposit Copy.  Indeed, the transcriptions she used at trial were the same ones she relied on in her October 17, 2013, preliminary report—*before she had ever even reviewed the Deposit Copy.*

-20-

1  (*Compare,* Tr. Exh. 376, Slide 3, *with* Dkt. 175-3, p. 52 of 65 {Signature Phrase}

2  and Tr. Exh. 376, Slide 18, *with* Dkt. 175-3, p. 61 of 65 {Descending Bass}.)  Of

3  course, the only reason why Ms. Finell would find it necessary to use a transcription

4  of her own making was if she wanted to show the jury different notes from those in

5  the Deposit Copy—and, as shown above, this is precisely what she did.

6      **B.    Testimony About the Gayes' Mash-Ups Was Inadmissible**

7          The Court also erred by allowing the Gayes' other musicologist, Ingrid

8  Monson, to testify about and play audio "mash-ups" of BLURRED and GIVE.  Fed.

9  R. Evid. 403, 702.   The Court denied Counter-Defendants' pretrial motion to

10  exclude the mash-ups and overruled their subsequent objections to their use at trial.

11  (Dkt. 226 at 1; Dkt. 253 at 53-55.)   The Court also refused to conduct a *Daubert*

12  hearing or to otherwise assess whether the mash-ups of GIVE and BLURRED were

13  reliable or helpful to the jury.   *Barabin*, 740 F.3d at 464.   These mash-ups were

14  prejudicial and irrelevant and should not have been played to the jury for a number

15  of reasons.

16          *First*, the mash-ups were prepared after the close of expert discovery and thus

17  were not disclosed in Dr. Monson's Rule 26 report or expert deposition.  (Dkt. 175-

18  11.)  *See Yeti by Molly*, 259 F.3d at 1106.

19          *Second*, the mash-ups included the keyboard and bass elements of the GIVE

20  Sound Recording ("accompaniment" parts) that are not in the Deposit Copy.  (Dkt.

21  334, 79:16-83:16; *see also* Tr. Exh. 377, Slide 1; Dkt. 253 at 53-55.)

22          *Third*, the mash-ups should have been excluded under Rule 403 because any

23  limited relevance—and there was none—was far outweighed by their prejudicial

24  effect.  Dr. Monson admitted at trial that "any number of melodies . . . could fit over

25  the relatively simple chord pattern of" BLURRED, and that the mash-ups show only

26  that the melodies and harmonies in the two songs are "compatible in some way."

27  (Dkt. 334, 115:3-117:19.)  The probative value of the mash-ups was sorely lacking.

28

1    *Fourth*, the supposed "compatibility" of the melodies and harmonies in the

2    two songs is not one of Ms. Finell's claimed "extrinsic similarities" and thus was

3    irrelevant.   To the contrary, "compatibility" of melodies and harmonies is an

4    unprotectable  idea, not tangible expression.   But to a lay juror, that one song's

5    melody sounds crudely harmonious played over another's songs instrumental would

6    appear to have significance (when it has none)—the jury understood that the Court

7    had sanctioned these mash-ups and that Counter-Defendants were objecting to them.

8        Finally, the prejudice to Counter-Defendants from the Gayes' mash-ups was

9    compounded by the Court's decision to exclude mash-ups created by Counter-

10   Defendants' musicologist, Sandy Wilbur, that showed that the vocal melody of

11   GIVE could be "mashed up" with a number of old soul songs, as well as an "Axis of

12   Awesome" video showing that numerous popular songs could be played over the

13   same four chords.  (Dkt. 272 at 2.)  This evidence would have mitigated some of the

14   prejudice to Counter-Defendants by demonstrating, in an audible way, that the

15   concept of "mashing up" one song over another has no bearing on alleged copying.

16       **C.      Testimony About Press Statements Was Inadmissible**

17       The Court ruled on summary judgment that evidence of statements Thicke

18   and Williams made to the press about creating BLURRED "do not constitute direct

19   evidence of copying" because they do not show that Counter-Defendants "copied

20   protected elements of [the Gayes'] compositions, or that they engaged in virtual

21   duplication" of GIVE, and are not otherwise relevant to the "infringement analysis"

22   because Counter-Defendants concede they had access to GIVE.  (Dkt. 139 at 12-13.)

23   Nonetheless, the Court erred by denying Counter-Defendants' motion *in limine* to

24   exclude this evidence.  (Dkt. 226 at 2.)  Similarly, the Court erroneously permitted

25   the Gayes to present evidence that Marvin Gaye's name was invoked in the course

26   of publicity for BLURRED.  (Dkt. 226 at 2; *see* Dkt. 169.)

27       Seizing on these rulings, the Gayes made these press statements a central

28   focus of their case-in-chief and argued that there was direct copying.  The Gayes'

counsel also repeatedly asked questions and made arguments concerning Counter-Defendants' alleged improper use of Marvin Gaye's name in marketing BLURRED. (Dkt. 331, 26:21-27:5, 39:23-40:19; 43:1-6, 15-19; Dkt. 338, 14:19-26:14; Dkt. 339, 81:19-82:9.)

None of this evidence was relevant. As the Court recognized in its summary judgment order, press statements were of limited if any probative value to the case. At most, they showed that Counter-Defendants were inspired by the "feel" or "groove" of GIVE. But striving to emulate a sound, feel, or groove of another song, or to evoke its era or style, is not infringement—in fact it is precisely what the Copyright Act seeks to encourage. *See Feist Publications*, 499 U.S. at 349–350. Counter-Defendants' comments on wanting to create a song with the same feel as GIVE—regardless of their truth—are thus legally irrelevant. At the same time, these statements were highly prejudicial to Counter-Defendants—as evidenced by the Gayes' heavy emphasis on them, including in opening and closing—because they could be wrongly interpreted as evidence of "copying," even though the statements—even if true—do not tend to prove or disprove that BLURRED is "substantially similar" to GIVE. The Court should have excluded evidence of press statements.[11]

### D.   The Court's Rulings Regarding Evidence of Lay Opinions On Similarity Were Erroneous, Unfair and Prejudicial

The Court correctly granted Counter-Defendants' motion to exclude evidence of lay opinions regarding similarity of the songs as irrelevant and prejudicial. (Dkt.

---

[11]   The Court also overruled Counter-Defendants' objections and admitted Pharrell Williams' irrelevant and prejudicial videotaped deposition testimony where Mr. Williams refused to answer certain questions because he was "not comfortable" with his ability to read music. His testimony was not probative of any issue and was introduced by the Gayes merely to put Williams in a bad light. The Court erred further by refusing to instruct the jury to disregard this evidence. (Dkt. 332, 59:14-61:6; Dkt. 336, 93:24-97:23.)

226 at 2.)  Yet the Court undermined this ruling by erroneously permitting two lay witnesses—Harry Weinger and Janis Gaye—to testify to that issue.  (*See id*.; Dkt. 251 at 2.)

At trial, Ms. Gaye testified that when she first heard BLURRED, she thought it copied the Sound Recording and assumed that GIVE had been licensed for BLURRED; she then contacted the Gayes' music publisher, EMI, and learned there was no license.  (Dkt. 349, 11:6-12:16.)  She does not read music and does not know what elements of the Sound Recording are in the Deposit Copy.  (Dkt. 349, 15:4-9.)

Mr. Weinger testified that, in his lay opinion, BLURRED was "utterly based on" GIVE.  (Dkt. 336, 14:10-19.)  Mr. Weinger likewise had never seen the Deposit Copy, has no musical training, cannot read music, worked for a division of UMG that had nothing to do with the creation or distribution of BLURRED, and based his opinion entirely on the Sound Recording.  (Dkt. 336, 29:20-30:21; 38:12-17.)

These lay opinions regarding similarity were highly prejudicial to Counter-Defendants because they enabled the Gayes to argue that two individuals with experience in the music industry—including Mr. Weinger, who was characterized by the Gayes as a senior executive of the counter-defendants that had distributed BLURRED—had concluded that BLURRED infringed GIVE.   The Gayes emphasized Mr. Weinger's opinion in their opening statement and closing argument.  (Dkt. 331, 41:22-42:25;  Dkt. 339, 79:17-18,  80:8-18, 98:1-3.)   Because this testimony was irrelevant, confusing, and misleading and should have been excluded.

The Court compounded the prejudice from this testimony by excluding evidence that EMI—which is in the business of pursuing infringement claims for the library of compositions it administers, and which had the exclusive right to sue for infringement of GIVE under its administration agreement with the Gayes—not only determined not to pursue an infringement claim based on BLURRED, but concluded, after consulting an outside musicologist, that it could not do so consistent with Rule 11.  (Dkt. 226, 2-3; *see also* Dkt. 163, 164, 195; *see also*, Dkt.

349, 17:22-18:24.)  The Gayes were allowed to present prejudicial lay opinions of Ms. Gaye and Mr. Weinger that the songs sounded similar—based entirely on the excluded Sound Recording—but Counter-Defendants were precluded from: (1) presenting the contrary conclusion reached by EMI, the Gayes' own agent knowledgeble in and authorized to assert infringement claims; or (2) questioning Ms. Gaye about her discussions where EMI told her there was no infringement.  The rulings were error, tipped the scales unfairly, and warrant a new trial.

### E.   Nancie Stern's Opinions About Infringement Were Inadmissible

Counter-Defendants moved to exclude the testimony of the Gayes' licensing expert, Nancie Stern.  (Dkt. 170.)  The Court denied the Motion but ruled that "her testimony is limited to her claimed expertise, *i.e.*, the appropriate means of determining licensing valuation, *and shall not concern the ultimate issue of infringement*."  (Dkt. 272 at 2; *see also* Dkt. 226 at 2 (emphasis added).)  As discussed in Section IV.A, *infra*, Ms. Stern's testimony should have been excluded entirely.  At a minimum, the Court erred by allowing Ms. Stern to present a lay opinion regarding "similarity."

At trial, Ms. Stern gave an improper opinion that BLURRED copied 100% of GIVE.  Ms. Stern testified that the Gayes would have requested 50% of the copyright (*i.e.*, 50% of publishing revenue) in the BLURRED composition had a license been sought prior to the release of BLURRED, and 75% to 100% of the revenue if a license were sought after BLURRED's release.  (Dkt. 351, 27:18-28:22.)  Her opinion  was based entirely on listening to the Sound Recording.  At trial, however, given the Court's ruling excluding the Sound Recording, Ms. Stern suddenly claimed that her opinions were based "only" on Ms. Finell's edited sound recordings—she then opined to how much of GIVE is found in BLURRED.  (Dkt. 351, 25:20-28:15, 36:10-37:14.)  This testimony should have been excluded for several reasons.

-25-

*First*, Ms. Finell's edited sound recordings that Ms. Stern relied upon contain elements (*e.g.*, Theme X, keyboard) not found in the Deposit Copy, and thus are not a reliable source from which Ms. Stern could determine the amount of GIVE (Deposit Copy) that was used in BLURRED.  Fed. R. Evid. 703.

*Second*, by purporting to quantify "how much" of GIVE was used in BLURRED, Ms. Stern acted as a (lay) musicologist—contrary to the Court's ruling (Dkt. 272 at 2)—and gave an improper lay opinion on alleged infringement.  The only way Ms. Stern could opine to how much of a license fee the Gayes supposedly would have demanded for the use of GIVE in BLURRED was to assess how much of GIVE was in BLURRED.  Indeed, she testified that this is how she arrived at her opinion.  (351, 25:20-28:15,)  She gave an unfounded musicology opinion, and her testimony was prejudicial. Telling of the confusion and prejudice her testimony created, the jury sent a note during deliberations asking whether Ms. Stern was an expert on infringement.  (Dkt. 313, 1.)

## III.   THE EVIDENCE DOES NOT SUPPORT THE INFRINGEMENT VERDICT

The jury's inconsistent verdict answered the question whether Williams and Thicke were "infringers"—but not whether BLURRED infringed GIVE.  Because no properly instructed, reasonable juror could find that BLURRED infringes GIVE, and because in any case the jury's infringement finding here is against the clear weight of the evidence, even assuming its admissibility, the Court should grant JMOL or, alternatively, a new trial.  Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59(a).

### A.   The  Verdict Is Not Supported By Legally Sufficient Evidence Of Substantial Extrinsic Similarity

There is insufficient evidence of substantial "extrinsic" similarities between BLURRED and GIVE to support the jury's finding of infringement

Even assuming Ms. Finell's testimony was properly admitted notwithstanding the deficiencies described above, her testimony is insufficient to support a finding of

substantial similarity under the extrinsic test.  Of the eight alleged similarities she identified, Theme X and the keyboard part are not in the Deposit Copy, as explained above, and the lyrics have no similarities at all—there are not two words in a row in common in both songs.  (Dkt. 334, 26:18-27:24; Tr. Exh. 376, Slide 35.)

The other five similarities claimed by Ms. Finell are belied by the evidence and, even if they exist, plainly not "substantial":

1.  ***Signature Phrases***:  The so-called BLURRED Signature Phrase is 6 ½ beats long and contains 12 notes, of which only 5 notes are the same pitches as in the 10-note so-called GIVE Signature Phrase.  These 5 common pitches have different rhythms and placements in each song.  The beginning, middle, and ending notes are different.  The BLURRED Signature Phrase occurs only twice in the 4:20 minute recording, for about 6 seconds.  (Dkt. 350, 14:10-38:15.)  In sum, the claim is that six seconds of BLURRED contain a short melodic phrase, sung only twice, that has a few notes within it with the same pitch as the notes is a GIVE phrase,[12] but the common notes are in different locations and  rhythms.

2.  ***Hooks***:  The GIVE "hook" is 4 notes, 3 of which are the same pitch as 3 of the 12 notes in the BLURRED Signature Phrase (discussed above).  The rhythms and placement of the 3 common notes are different.  The most important note in GIVE (2nd scale degree) is not in BLURRED.  The GIVE hook appears only twice in BLURRED, and only in its Signature Phrase .  (Dkt. 350, 67:17-78:6.)  In sum, the claim is that a phrase that occurs for six seconds of BLURRED has a few notes within it that have the same pitch as a few notes in the hook phrase in GIVE.

3.  ***Bass Melody***:  There are only 3 notes in common between the 25-note bass part in BLURRED and the 21-note "bass intro" in the Deposit Copy of GIVE.  Those 3 common notes are merely the root, or 1st scale degree—the most common

---

[12] The term "Signature Phrase" was invented by Ms. Finell to refer to isolated vocal phrases in each song in which she found a few fragmented notes in common.

bass note in popular music.  In contrast, GIVE has a distinctive, repeated use of the 7th scale degree not in BLURRED.  (Dkt. 351, 146:18-161:10; Tr. Exh. 389.)

4.   ***Word Painting***:   The claimed similarity is that the words "up," "shake," "down," and "round" appear in the break sections in each song, and the melody goes up in pitch on the word "up" and down in pitch on the word "down." These ordinary words are not protected by copyright.  They are sung to different melodies, lyrics, word orders, and rhythms in each song, and appear only once for a few seconds in BLURRED.  The claim that both songs go up in pitch on "up" and down in pitch on "down" (so-called "word painting") is an unprotectable idea, and the actual expression differs.  (Dkt. 334, 27:25-28:14; Tr. Exh. 376, Slide 32.)

5.   ***Rap v. Parlando***:   There are no similarities between the *expressions* of the "rap" section in BLURRED and the so-called "parlando" section in GIVE. The only claimed similarity is both sections start at the same measure.   (Dkt. 336, 151:13-154:24.)  The Gayes do not own the "idea" of a measure number where a new section starts.[13]

Ms. Finell's admissible opinion of similarity boils down to the following:

- A 3-second vocal melody sung twice in BLURRED with a few pitches (but not their rhythm or placement) in common with two phrases in GIVE;

- A bass part that plays the root, or most common bass note in popular music, in the same place in only 3 out of 25 notes over an 8 measure phrase; and

- Both songs have dissimilar vocal sections that start at the same measure.

These purported similarities are "de minimis" and not substantial.  *See Newton*, 388 F.3d at 1193 (use is de minimis "if the average audience would not recognize the appropriation").   BLURRED is over four minutes long.   A few

---

[13]  Clifford Harris, Jr., performed the rap section of BLURRED months after Thicke and Williams created the song, and he chose where to place the rap section. (Dkt. 338, 112:10-23.)  The jury's verdict was in favor of Harris, thus reflecting its finding that the rap section was not substantially similar to the parlando in GIVE.

1   seconds of vocal melody with only a fraction of its notes in common, or 3 out of 25

2   notes in a bass part playing the root at the same time, or a particular vocal section

3   that starts at the same measure—even if considered as a "constellation" of

4   similarities—is not substantial extrinsic similarity.   If it were, the extrinsic test

5   would be meaningless, as virtually any two songs will have a few disparate notes in

6   common.  The Court should grant JMOL or order a new trial.

7      **B.      The  Verdict Is Not Supported By Legally Sufficient Evidence Of**

8           **Substantial Intrinsic Similarity**

9      There is likewise insufficient evidence of substantial "intrinsic" similarities

10  between BLURRED and GIVE to support the jury's finding of infringement.

11     The intrinsic test here turns on whether a reasonable observer would conclude

12  that the "total concept and feel" of the parties' works are substantially similar based

13  on the protectable extrinsic elements of GIVE discussed above.  To conduct this

14  test, the jury would have to compare BLURRED (Ex. 529) to the Deposit Copy of

15  GIVE.  The only admissible evidence of what the Deposit Copy sounds like is Ms.

16  Wilbur's recording of GIVE in Exhibit 141.  A comparison of Exhibits 529 and 141

17  shows that these works are not remotely similar.   They are different songs, with

18  different lyrics, melodies, musical parts, chord patterns (harmony), and structures.

19     But the jury never conducted the intrinsic test.  The jury was not instructed on

20  the intrinsic test until after the close of evidence.  Hence, during trial, the jury had

21  no idea what it would be asked to do with the music it heard.  In deliberations, the

22  jury never asked to hear any music, despite being told it could listen to music upon

23  request.  (*See generally* Dkt. 313-338, 339.)  The jury had been led to believe, based

24  on the prejudicial evidence and erroneous jury instructions, that it could find

25  infringement simply if it determined that Williams and Thicke sought to emulate the

26  ideas ("groove" or "feel") of Marvin Gaye's work, even if "subconsciously."  The

27  jury likely also was misled and confused by the Court's repeated instructions that

28

what mattered was the experts' opinions—not the music it had heard.  (Dkt. 336, 51:6-52:22, 70:24-71:25, 73:5-15.)  For the intrinsic test, that is contrary to law.

The songs are not remotely similar based on their "total concept and feel." Judgment as a matter of law or a new trial should be granted for this reason too.

## IV.   THE EVIDENCE DOES NOT SUPPORT THE DAMAGES AWARDS

The jury awarded actual damages of $4 million and infringer's profits of $1,768,191.88 against Thicke and $1,610,455.31 against Williams.  The damages awards are not supported by evidence, and thus JMOL or a new trial is warranted.

### A.   The Jury's Actual Damages Award Is Not Supported By Evidence

The jury's award of $4 million in actual damages is grossly excessive and not supported by any admissible evidence.

### 1.   Ms. Stern's Testimony Should Have Been Excluded

The sole evidence of actual damages was Ms. Stern's testimony about a hypothetical lost license fee.  In conducting a hypothetical license evaluation, an expert must link any proposed license rate "to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  The failure to conduct such analysis renders the expert testimony "arbitrary, unreliable, and irrelevant," such that it "fails to pass muster under Daubert and taints the jury's damages calculation," requiring a new trial.  *Id.*; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988).  Importantly, a negotiation "must be hypothesized as of the time infringement began," so that the license fee is based on "sales expectations at the time when infringement begins, … as opposed to an after-the-fact counting of actual sales."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001); *see Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014) (applying standard in copyright case).

Here, Ms. Stern did not conduct any analysis at all regarding a hypothetical licensing negotiation.  Instead, she briefly listened to the two songs and concluded (based on her lay opinion of similarity) that the Gayes would have requested 50% of the publishing revenues from BLURRED if a license had been sought before the release of BLURRED and 75% to 100% after the release (Dkt. 351, 27:18-28:22).  Her opinions were unreliable and should have been excluded for several reasons.

*First*, "the touchstone for hypothetical-license damages is 'the range of [the license's] reasonable market value."  *Oracle Corp*, 765 F.3d at 1088.  Ms. Stern made no attempt at all identify the "reasonable market value" for the portions of GIVE in BLURRED.  Her opinion should have been excluded for this reason alone.

*Second*, as discussed above, Ms. Stern's opinion about the copying of GIVE in BLURRED is unreliable because she is not a musicologist, was precluded by the Court from opining to the infringement of GIVE in BLURRED (*i.e.*, how much of GIVE is in BLURRED), and her opinion improperly was based on the Sound Recording and Ms. Finell's edited recordings that have elements such as keyboard and Theme X not in the Deposit Copy.  (Dkt. 351, 25:20-28:15; 36:5-37:14.)

*Third*, and significantly, Ms. Stern's licensing opinions were neither relevant nor reliable because they were premised on her estimation of a license fee that would have resulted *after* BLURRED's release—*i.e.*, post-infringement.  Ms. Stern testified in support of her excessive (75% to 100%) license fee opinions that after the release of a song, "it becomes an infringement issue.  So you lose your negotiation power."  (Dkt. 351, 24:24-25:1).  But the damages issue is not what an infringer might pay if caught red-handed (an issue on which she could not opine, anyway).  The issue is a negotiated fair market fee.  *Oracle Corp*, 765 F.3d at 1088.

Ms. Stern's testimony should have been excluded entirely.  Because Ms. Stern's inadmissible testimony was the only evidence of damages, there was no admissible evidence, the damages award was plain error.

### 2. Even In Consideration Of Ms. Stern's Testimony, the Actual Damages Award Is Unsupported By Evidence

Even if Ms. Stern's actual damages opinions are admissible, the jury's damages award of $4 million is grossly excessive and not supported by evidence.

The parties stipulated that Counter-Defendants' total publishing revenues from BLURRED were $5,697,693. (Tr. Exh. 1766, 2:6-7, 9-10.) Ms. Stern testified that the industry standard for negotiating the percentage of a new composition that the owner of an older composition should receive for its use in the new song is to allocate 50% of the copyright (*i.e.*, publishing revenue) to lyrics and 50% to music, and to negotiate from there. (Dkt. 351, 22:7-18.) Even though Ms. Stern acknowledged that the lyrics of BLURRED did not infringe (Dkt. 351, 32:4-33:11), she nonetheless concluded that the Gayes would have asked for 50% of the revenues from BLURRED had a license been sought prior to the release of BLURRED, and 75% to 100% of the revenues if the negotiation was after BLURRED's release. (Dkt. 351, 27:18-28:22.) Since 50% of the copyright is the music, and since there were no lyrical similarities here, Ms. Stern effectively opined that 100% of the music (50% of the copyright) in BLURRED came from GIVE—a claim wholly at odds with the musicology evidence (discussed above). Yet the jury awarded $4 million in damages, which amounts to an approximate 70% licensing fee.

Even under Ms. Stern's own analysis, the jury's award of $4 million in actual damages is excessive for a song that has no lyrical similarities with GIVE and, at most, has only fragmented musical similarities (*e.g.*, a so-called Signature Phrase and hook from GIVE that appear only twice for six seconds total in BLURRED). The award also is excessive (and, as noted above, contrary to law), because it approximates Ms. Stern's estimation of a license fee that would have resulted from a hypothetical negotiation occurring *after* BLURRED's release, when Counter-Defendants would have "lost their negotiation power." Furthermore, the award is speculative because it is not based on any evidence of any previous license for

1   GIVE or about the value of GIVE itself, because Ms. Stern did not offer any such

2   evidence, or any evidence of any prior license of any other Marvin Gaye song, or

3   any R&B song, or any license at all.  (*See* Dkt. 351, 17:12 -39:2); *see Oracle*, 765

4   F.3d at 1093 ("Oracle failed to provide sufficient objective evidence of the market

5   value of the hypothetical license underpinning the jury's damages award").

6        There is <u>no</u> admissible evidence of the Gayes' actual damages, let alone any

7   evidence that supports the jury's award of approximately 70% of the publishing

8   revenues of BLURRED, which is plain error.  The Court should enter JMOL or a

9   new trial on actual damages.

10       **B.    <u>The Jury's Profits Awards Are Not Supported By Evidence</u>**

11       The jury's awards of $1,768,191.88 in profits against Thicke and

12   $1,610,455.31 against Williams—200% of his stipulated profits!—also are

13   unsupported by any evidence.

14       To avoid impermissible double-counting of damages between actual damages

15   and profits, the Court instructed the jury that, in calculating actual damages, it

16   should take into consideration the "approximately $8 million" in publishing revenue

17   received by the writers of BLURRED, but that in awarding profits, the jury "should

18   not take into consideration the same $8 million."  (Dkt. 314 at 2.)[14]  The parties

19   stipulated that Williams' non-publishing profits were $860,333 and Thicke's non-

20   publishing profits were $4,253,645.  As a matter of law, however, the jury's awards

21   or profits had to be limited to "any profits of the defendant attributable to the

22   infringer."  (Dkt. 322 at 41 (Instruction No. 38); Dkt. 314 at 2.)

23       Here, the maximum profits attributable to infringement were low.  At most,

24   and even assuming the admissibility of the Gayes' expert musicology testimony,

25   only a small portion of the copyrighted musical expression of GIVE appears in

---

26/27/28   [14] The Court's reference to "approximately $8 million" was grossly inaccurate; the stipulated amount of publishing revenue was $6,377,055 for all three writers (Thicke, Williams, and Harris).  (Tr. Exh. 1766, 2:3-12.)

BLURRED.  Moreover, the evidence shows that the financial success of BLURRED is attributable in large part to factors that have nothing to do with any elements of GIVE that may have been used in BLURRED—including, primarily, the music video that went viral, the performances, promotional appearances, product tie-ins, the performers, the massive financial investment in marketing and promotion, the "star power" of the performers, and the production of Williams.  (Dkt. 352, 85:3-102:13; Dkt. 338, 27:11-51:20;  Tr. Exhs. 52, 55, 58, 126, 128-131, 293, 458, 1003.)

As to the music itself, Ms. Wilbur testified that the elements of GIVE claimed to have been copied amount to less than 5% of the BLURRED composition.  (Dkt. 337, 16:21-17:13.)   In addition, the sound recording elements of BLURRED, protected by a separate copyright, as Ms. Stern admitted, were not at issue.  Ms. Stern testified that her opinion as to a license fee was strictly for a portion of the BLURRED composition, and that the Gayes would have received zero percent of the copyright in the BLURRED sound recording.  (Dkt. 351, 31:4-32:1.)  Given the two copyrights in the BLURRED recording, and that no more than half of its success is attributable to the composition (Dkt. 338, 32:21-34:23), and given that the composition copyright is typically attributed half to the lyrics (*id.*), the profits attributable to the infringement could not possibly approach what the jury awarded.

There was no contrary evidence at trial on these apportionment issues.  Nonetheless, the jury awarded 200% of Williams' profits and 41.6% of Thicke's.  (Dkt. 320, 2:18; Tr. Exh. 1766, 2:6.)   These percentages clearly are contrary to the facts and law because they are not the same—whatever the percentage of earnings from BLURRED attributable to the copying of GIVE, that percentage has to be the same for both Thicke and Williams.  The inconsistent percentages here reflect a verdict based on who the jury disliked most and not on the jury instructions.  There is a complete absence of evidence that would support an "apportionment" of 200% of Williams' profits and 41.6% of Thicke's earnings.  Moreover, the profit awards also are grossly excessive.  GIVE earned only half a million dollars in the five-year

1   period from 2009 to 2013.  (Tr. Exhs. 254, 1765.)  Yet the jury attributed more than

2   $3 million in BLURRED profits to the few fragments of vocal or bass melodies

3   supposedly similar to GIVE.  The Court should enter JMOL or order a new trial.

4          **C.     <u>At a Minimum, the Court Should Remit the Profits Awards</u>**

5          If the Court is not inclined to order JMOL or a new trial, then, at a bare

6   minimum, the Court has a duty to remit the unsupported profits awards to "the

7   maximum amount sustainable by the evidence." *Jessen Elec. & Serv. Co.*, 106 F.3d

8   at *2.  While both profits awards are unsustainable, the award of <u>double</u> the amount

9   of Williams' profits stipulated to by the parties clearly is contrary to the evidence

10  and law and must be remitted.  Ms. Wilbur testified that the handful of elements in

11  GIVE claimed to be copied in BLURRED, even if credited, amount to no more than

12  5% of BLURRED.  There was no contrary apportionment opinion by Ms. Finell, nor

13  did Ms. Finell take the stand to rebut any of Ms. Wilbur's testimony.  Ms. Wilbur's

14  opinion, of course, does not reflect an apportionment analysis or take into account

15  evidence of the marketing efforts, music video, and other factors in BLURRED's

16  success.  The Court should remit the profits awards to no more than 5% of the actual

17  non-publishing profits of Thicke and Williams stipulated to at trial.  (Tr. Exh. 1766.)

18                              **<u>Conclusion</u>**

19         For the above reasons, the Court should grant this motion and enter JMOL

20  and declaratory relief in favor of Counter-Defendants, order a new trial on liability

21  and damages, or, at a minimum, order a remittitur of the award of profits.

22  DATED:  May 1, 2015                KING, HOLMES, PATERNO &
                                       BERLINER, LLP
23

24
                                       By: _____
25
                                            HOWARD E. KING
26                                          SETH MILLER
                                       Attorneys for Plaintiffs and Counter-Defendants
27                                     PHARRELL WILLIAMS, et al.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2015, I electronically filed the foregoing **NOTICE OF MOTION AND MOTION OF PHARRELL WILLIAMS, ROBIN THICKE AND MORE WATER FROM NAZARETH PUBLISHING, INC. FOR JUDGMENT AS A MATTER OF LAW, DECLARATORY RELIEF, A NEW TRIAL, OR REMITTITUR; MEMORANDUM OF POINTS AND AUTHORITIES** with the Clerk of the Court by using the CM/ECF system.   I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Joey S. Grossett