UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE PLAINTIFFS AND COUNTER-DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, DECLARATORY RELIEF, A NEW TRIAL, OR REMITTITUR; DEFENDANTS AND COUNTER-CLAIMANTS' JOINT POST-TRIAL MOTION FOR DECLARATORY RELIEF; DEFENDANTS AND COUNTER-CLAIMANTS' JOINT POST-TRIAL MOTION FOR INJUNCTIVE RELIEF, OR IN THE ALTERNATIVE, FOR ONGOING ROYALTIES; COUNTER-CLAIMANTS' JOINT MOTION FOR PREJUDGMENT INTEREST (DKTS. 345, 346, 375, 376, 377, 378, 385, 413, 421)**

## I.    Introduction

Robin Thicke, Pharrell Williams and Clifford Harris, Jr. composed the song "Blurred Lines," which was released in 2013. Interscope Records, UMG Recordings, Inc., Star Trak Entertainment, LLC, and Universal Music Distribution ("Interscope Parties") released "Blurred Lines" and manufactured and distributed the album on which it was published, which is also entitled *Blurred Lines.*

Nona Marvisa Gaye, Frankie Christian Gaye and Marvin Gaye III ("Gaye Parties," or "Counterclaimants") are the children of the influential American singer-songwriter Marvin Gaye. Marvin Gaye wrote, composed and recorded the song "Got to Give It Up" in 1976, and registered the musical composition "Got to Give It Up (Part 1 and 2)" with the United States Copyright Office in 1977. Dkt. 379-13. A jury found by a preponderance of the evidence that the Gaye Parties own this copyright. Dkt. 320 at 2.

On August 15, 2013, Thicke, Williams and Harris ("Plaintiffs") filed a Complaint seeking Declaratory Relief ("Complaint") from the Gaye Parties. Dkt. 1.[1]  The Complaint alleges that the Gaye Parties believed "Blurred Lines" infringed the copyright in "Got to Give It Up," the Plaintiffs disagreed, and that this created an actual and immediate controversy. *Id.* ¶¶ 19-22. Plaintiffs sought a declaration that "Blurred Lines" did

---

[1]  Bridgeport Music, Inc., which was also named as a defendant, was dismissed pursuant to the stipulation of the parties. Dkt. 62.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

not infringe the copyright in "Got to Give It Up." *Id.*

On October 30, 2013, Nona Marvisa Gaye and Frankie Christian Gaye filed Counterclaims against Plaintiffs. Dkt. 14. On November 19, 2013, Marvin Gaye III separately filed similar Counterclaims. Dkt. 36. The Gaye Parties alleged that Williams, his company More Water from Nazareth Publishing, Inc. ("Nazareth"), Thicke (together with Williams and Nazareth, "Thicke Parties"), Interscope Parties and Harris (collectively, "Counterclaim-Defendants") infringed the copyright in "Got to Give It Up" through their respective roles in the recording, reproduction, performance, distribution or sale of "Blurred Lines." 17 U.S.C. §§ 101 *et seq.* Dkt. 14 at ¶¶ 72-91. The Gaye Parties also alleged that Thicke's song, "Love After War," infringed the copyright to Marvin Gaye's composition, "After the Dance." *Id.* ¶¶ 92-112.[2] The parties stipulated that "[t]he Gayes' counterclaims shall be tried first to the jury, and then the Court will try any remaining issues and issue a judgment on [the Thicke Parties and Harris'] claim for declaratory relief." Dkt. 206-1 at 15.

On February 24, 2015, a jury was empaneled, and the trial proceeded for seven days. Dkts. 284, 285, 294, 295, 298, 307, 311. On March 10, 2015, after deliberating for two days, the jury returned a verdict. Dkts. 312, 320, 321. It found by a preponderance of the evidence that the Thicke Parties "infringed the Gaye Parties' copyright in the musical composition 'Got to Give It Up' in 'Blurred Lines.'" Dkt. 321 at 2. The jury also found that Harris and the Interscope Parties did not infringe this copyright. *Id.* The jury awarded $4,000,000 in actual damages to the Gaye Parties as a result of the infringement by the Thicke Parties. *Id.* at 3. It also found that Williams and Nazareth collectively had received profits of $1,610,455.31, and that Thicke had received profits of $1,768,191.88, which were not taken into account in calculating actual damages. These amounts were also awarded to the Gaye Parties. *Id.* The jury found that "Love After War" did not infringe the copyright in "After the Dance." *Id.* at 5-6. The entry of judgment was deferred for several reasons: Plaintiffs' declaratory claim had not yet been adjudicated; the parties disagreed as to the form of judgment; the parties planned several post-trial motions; and no party would be prejudiced by a deferral. Dkt. 372.[3]

On May 1, 2015, the Thicke Parties filed a "Motion . . . for Judgment as a Matter of Law, Declaratory Relief, a New Trial, or Remittitur" ("Thicke Motion"). Dkts. 378, 385.[4] Also on May 1, 2015, the Gaye Parties filed three motions: (i) a "Motion for Declaratory Relief," in which they seek a declaration that Harris and the Interscope Parties, as well as the Thicke Parties, are liable for infringement of the copyright in "Got to Give It Up"; (ii) a "Motion for Injunctive Relief, or in the Alternative, for Ongoing Royalties"; and (iii) a "Motion for Prejudgment Interest." Dkt. 376; Dkt. 377; Dkt. 375.
//
//

---

[2] The remaining counterclaims of Nona Marvisa Gaye and Frankie Christian Gaye were brought against Sony/ATV Music Publishing Acquisition, Inc., and its subsidiaries EMI April Music, Inc. and Jobete Music Co., Inc. These claims were settled prior to the trial proceedings in this matter. Dkt. 57. On January 14, 2014, the claims against these counterclaim-defendants were dismissed with prejudice. Dkts. 57-1, 59.

[3] Two post-trial motions of the Gaye Parties were withdrawn without prejudice. Dkts. 345, 346, 361.

[4] Because the original version of the motion filed by the Thicke Parties exceeded the permitted page limit, they subsequently filed a revised version.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

A hearing on the Motions was held on June 29, 2015, and they were taken under submission. Dkt. 410. For the reasons stated in this Order, the Thicke Motion is **GRANTED IN PART**. It is **DENIED** as to their request for judgment as a matter of law, declaratory relief or a new trial, and **GRANTED IN PART** as to their request for remittitur. The Gaye Parties' Motion for Declaratory Relief is **GRANTED**. The Gaye Parties' Motion for Injunctive Relief or an Ongoing Royalty is **GRANTED IN PART**. It is **DENIED** as to their request for injunctive relief, and **GRANTED** as to their request for an ongoing royalty. The Gaye Parties' Motion for Prejudgment Interest is **GRANTED IN PART**.

II.   **Analysis**

    A.    Thicke Parties' Motion for Judgment as a Matter of Law, a New Trial, or Remittitur[5]

        1.    Standard of Review

           a)    Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50

Judgment as a matter of law is warranted where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law under Rule 50(a) must be brought before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If it is denied, it may be renewed, and "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "A renewed motion for judgment as a matter of law is properly granted if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (internal quotation marks omitted). The following standards apply to a renewed motion brought pursuant to Rule 50:

> A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. While the court must review the entire evidentiary record, it must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe. If sufficient evidence is presented to a

---

[5] The Thicke Motion also requests "declaratory relief" in its caption, introduction and conclusion. Dkt. 385 at 1, 8, 37. The Memorandum in support of the Motion itself requests only judgment as a matter of law, a new trial or remittitur. Further, it does not include any statement as to how any declaratory relief would differ from these requests or that its issuance would be governed by a different standard of review. Therefore, this Order does not separately analyze the Thicke Parties' request for declaratory relief. *See* Fed. R. Civ. P. 7(b)(1)(B) (a request for relief must "state with particularity the grounds for seeking the order"). This Order sets forth the requirements for declaratory relief in addressing the Motion brought by the Gaye Parties. Even if these standards were applied to the Thicke Motion, the outcome would be the same as that reached as to the other bases for their claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict.

*Id.* (citations and internal quotation marks omitted).

> b) Request for a New Trial Pursuant to Fed. R. Civ. P. 59

Following a jury trial, a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Such a motion may be granted "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (citation omitted). However, "a district court may not grant a new trial simply because it would have arrived at a different verdict." *Id.* In assessing the clear weight of the evidence, "the judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Even if substantial evidence precludes the entry of judgment as a matter of law, a court may grant a motion for a new trial. *Id.* "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

In addition, Fed. R. Civ. P. 61 provides that

> Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is ground for granting a new trial, [or] for setting aside a verdict . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Thus, in considering a motion for new trial, the first step is to determine whether an error occurred. If it is so determined, the second step is to decide whether the error caused prejudice to the party seeking a new trial.

> 2. Application

> a) Whether the Thicke Parties Have Waived the Right to Move for Judgment as a Matter of Law

"In order to preserve a challenge to the sufficiency of the evidence to support the verdict in a civil case, a party must make two motions. First, a party must file a pre-verdict motion pursuant to Fed. R. Civ. P. 50(a). Second, a party must file a post-verdict motion for judgment as a matter of law or, alternatively, a motion for a new trial, under Rule 50(b)." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) (citations omitted). The "procedural requirement of filing a Rule 50(a) motion before filing a Rule 50(b) motion" is construed "strictly," and the "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009). However, "Rule 50(b) may be satisfied by an ambiguous or inartfully made motion under Rule 50(a)." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Where

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

a Rule 50(b) motion is brought on grounds not previously raised in a Rule 50(a) motion, the jury's verdict is reviewed for "plain error," and is reversible only "if such plain error would result in a manifest miscarriage of justice." *Id.*

On March 5, 2015, after the close of evidence, the Gaye Parties stated their intent to "move under Rule 50 for judgment as a matter of law on ownership and on access." Dkt. 339 at 6, 17. The Thicke Parties opposed the oral motion. *Id.* at 17. The Court then stated, "[j]ust a minute. I'm not going to grant motions of this type by either side. I'm going to have the jury address these issues." *Id.* at 17-18. The Thicke Parties neither moved for judgment as a matter of law nor expressed an intent to do so.

The Gaye Parties contend the Thicke Parties have waived any right to seek judgment as a matter of law by failing to make a Rule 50(a) motion. Opp'n, Dkt. 388 at 8-9. The Thicke Parties respond that it was "unnecessary (if even permissible) for Counter-Defendants to move for JMOL under Rule 50(a)" in light of the Court's statement that it would not "grant motions of this type by either side" and "have the jury address these issues." Reply, Dkt. 404 at 6.

The Thicke Parties failed to make a motion under Rule 50(a). Had they expressed their intention to do so, this might have been deemed "ambiguous or inartfully made" for purposes of the Rule, but they cite no authority for the proposition that the motion of another party, followed by their own silence, may be deemed a Rule 50(a) motion. The Court's statement that it would not "grant" motions of this type brought by either side could not reasonably be interpreted to mean that the Thicke Parties were not permitted to bring a Rule 50(a) motion. Even if such a motion is denied, it serves the important procedural functions of preserving claims of error and alerting the responding party to any claimed deficiencies in its proof. *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996). By remaining silent, the Thicke Parties failed to apprise the Gaye Parties of "the judgment sought and the law and facts that entitle the movant to the judgment," as required by Rule 50(a). Fed. R. Civ. P. 50(a)(2); *see Waters*, 100 F.3d at 1441. It is not sufficient that they made "repeated pre-trial motions on these same issues." Reply, Dkt. 404 at 6. "[M]otions made pre-trial and during trial [do not] suffice for a Rule 50(a) motion." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009).

The Thicke Parties' "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Id.* at 1083. At most, they may seek review of the sufficiency of the evidence in support of the verdict to determine whether there was plain error. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).[6] Thus, review is "limited to whether there was *any* evidence to support

---

[6] A request for plain error review may also have been waived by the failure to make a motion under Rule 50(a). *Tortu*, and the text of the Rule itself, require that a Rule 50(a) motion have been made as a condition to bringing a Rule 50(b) motion. *E.E.O.C.* concerned circumstances in which a Rule 50(a) motion had been made, but did not present the grounds offered in support of the later Rule 50(b) motion. Although certain Ninth Circuit case law permitted a Rule 50(b) motion for plain error review to be brought notwithstanding the failure to make a Rule 50(a) motion, *see Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 888 (9th Cir. 2002), the decision in *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006) may have changed the requirements. *See id.* at 405-06 (appellate courts lack jurisdiction to review verdict for sufficiency of the evidence, including presence of plain error, if Rule 50(b) motion is not properly brought; district court's jurisdiction to do so is not addressed). It is assumed for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

the jury's verdict, irrespective of its sufficiency." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) (citation omitted) (emphasis in original). However, even if appropriate motions under Rules 50(a) and 50(b) had been made, and the verdict were reviewed under the substantial evidence standard, for the reasons stated below, the Thicke Parties have not shown that such relief is warranted. Thus, they have not demonstrated that the clear weight of the evidence favors retrial, which is a lower burden than the substantial evidence standard. *See, e.g.*, *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence . . . .") (internal quotation marks omitted).

    b)    Alleged Evidentiary Errors

        (1)    <u>Admission of Testimony of Judith Finell</u>

            (a)    Procedural Background

Judith Finell is a musicologist whom the Gaye Parties designated as an expert pursuant to Fed. R. Civ. P. 26. They called her as a trial witness. Finell obtained a Master of Arts degree in musicology from the University of California, Berkeley, has been the president of a music industry consulting service since 1976, and has served as an expert witness in cases involving music copyrights. Dkt. 112-3 at 63-66. She prepared a "Preliminary Report," dated October 17, 2013, that identified several claimed similarities between "Got to Give It Up" and "Blurred Lines." Dkt. 112-3 at 44-61. She also submitted a declaration in support of the Gaye Parties' Opposition to Counterclaim-Defendants' motion for summary judgment. *Id.* at 1-42.

In support of their motion for summary judgment, Counterclaim-Defendants presented evidence, including the declaration and expert report of Sandy Wilbur, that some of the elements identified by Finell in her preliminary report and declaration appeared in the sound recording of "Got to Give It Up," but not in the deposit copy. *Id.* at 13-21. These unprotected elements were disregarded for purposes of the "analytic dissection" performed in connection with the "extrinsic test" for substantial similarity of two works. *Id.* On October 30, 2014, the motion was denied. Dkt. 139. That order determined that, because "Got to Give It Up" was registered while the 1909 Copyright Act ("1909 Act") was in effect, the lead sheets Marvin Gaye deposited with the Copyright Office defined the scope of the material protected by the copyright in the composition. *Id.* at 8-12. That order also concluded that, when only protected elements of "Got to Give It Up" were considered, the Gaye Parties still "made a sufficient showing that elements of 'Blurred Lines' may be substantially similar to protected, original elements of 'Got to Give It Up,'" and a reasonable jury could find infringement. *Id.* at 24.[7]

---

purposes of this Motion that plain error review is available. Further, the result would be the same even if the verdict were reviewed for substantial evidence.

[7]  The intrinsic similarity of the works, a jury question, was not evaluated. Dkt. 139 at 24 (citing *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

On January 6, 2015, Counterclaim-Defendants filed a motion in limine to exclude the testimony of Finell at trial. Dkt. 174. They claimed that her opinion was not admissible expert testimony under Fed. R. Evid. 702 because it was based solely on the sound recording of "Got to Give It Up," and so it was "not reliable, not helpful to the trier of fact, irrelevant, prejudicial, and likely to confuse the jury." *Id.* at 8-11. In the alternative, they requested that her testimony be limited to alleged similarities in the deposit copy. *Id.* at 11. The motion in limine was denied. Dkt. 225. However, at the hearing on the motions in limine, the Court stated, "I think [the Gaye Parties' expert] testimony is going to have to be based on the deposit copy. It's not to say they can't have listened to the sound recording as part of their analysis. They simply can't present to the jury an opinion that says, '[b]ecause I listened to the sound recording, I've reached this conclusion.'" Dkt. 229 at 14-17.

In Finell's declaration and preliminary report in support of the Gaye Parties' opposition to the motion for summary judgment, she opined that a "Theme X" and keyboard part were found in "Got to Give It Up" based on her analysis of the sound recording. For purposes of that Motion, these elements were deemed not protected by the Gaye Parties' copyright. Dkt. 138 at 17-18, 20-21. However, she subsequently declared that these elements also appeared in the deposit copy. Dkt. 263, ¶¶ 7-8 (keyboard parts); Dkt. 264 ("Theme X"). At the February 20, 2015 final pretrial conference, after reviewing these and other materials submitted, the Court concluded that Finell's position was "somewhat different than before," but her "opinion [that 'Theme X'] is something that's reflected in the sheet music [is] based on her experience and expertise in how to evaluate the sheet music." Dkt. 274 at 7.

On February 23, 2015, Counterclaim-Defendants filed a request for a *Daubert* hearing to determine whether Finell should be "allowed to opine as to whether Theme X and the keyboard part are found in the deposit copy sheet music." Dkt. 277; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). They claimed her analysis had no "reliable basis in musicological practice," and contradicted her earlier testimony. Dkt. 277. On February 24, 2015, this request was stricken as one for reconsideration of a prior ruling. Dkt. 284 at 2. During trial, the Gaye Parties were directed to be "be very focused in your questions and not just mention recordings and so on. It needs to be very, very focused." Dkt. 332 at 92. When Counterclaim-Defendants again raised their request for a *Daubert* hearing during trial, outside the presence of the jury, the Court stated that they could cross-examine Finell about the basis for her opinion, but that they had failed to demonstrate either that she was not a qualified expert or that there were any serious questions as to the admissibility of her anticipated expert testimony. *Id.* at 92-93.

        (b)    Analysis

                (i)    Whether the Admission of Finell's Testimony Was Prejudicial Error

The Thicke Parties argue that Finell's testimony should have been "precluded entirely," and the failure to exclude it or to conduct a pretrial *Daubert* hearing was prejudicial error. Mot., Dkt. at 13-15. They contend her opinion that certain elements were "'implied' from the deposit copy but do not actually appear in it, or that allegedly would be 'understood' by a musician to be present in it," was not supported by reliable methodology. *Id.* at 14. The Thicke Parties also point out that several of their objections to Finell's testimony were sustained and some of her testimony was stricken. They claim this was prejudicial because the jury likely concluded from these objections that the Thicke Parties were concerned by her

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

testimony and sought to delay or limit it. They also contend that jurors were exposed to unprotected elements about which they should not have heard, and then faced the "impossible task of having to constantly distinguish between the select parts of what they saw and heard each day that they could consider later in reaching their verdict, and the parts they could not." *Id.* at 15.

The Gaye Parties made a sufficient showing before trial as to each of the following: Finell's specialized knowledge would help the trier of fact; her testimony was based on sufficient facts or data and was the product of reliable principles and methods; and these principles and methods were reliably applied to the facts at issue. *See* Fed. R. Civ. P. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999). The Court determined that these showings were not vitiated by the revisions to Finell's opinion, that any inconsistencies between her written statements would be a proper subject for cross-examination, and that there was not a sufficient ground to exclude her testimony. Dkt. 274 at 7.

The Thicke Parties claim the Court "abdicate[d] its role as gatekeeper" by denying their request for a *Daubert* hearing. Mot., Dkt. 385 at 13 (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir.), *cert. denied*, 135 S. Ct. 55 (2014)). But as *Estate of Barabin* explains, "[w]hile pretrial '*Daubert* hearings' are commonly used, they are certainly not required." *Id.* at 463 (citation omitted). Here, sufficient evidence was presented before trial upon which the Rule 702 determination concerning the admissibility of Finell's testimony could be made. This was not affected by the subsequent declarations or evidence presented at trial. Although certain objections by the Gaye Parties to Finell's trial testimony were sustained, there is a "strong presumption that the curative instructions given by the district court were followed by the jury." *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000). The Thicke Parties have failed to rebut this presumption, or show that any questions to Finell to which their objections were sustained, or answers that were stricken, affected their substantial rights. *See* Fed. R. Civ. P. 61.

For these reasons, the admission of Finell's expert testimony was not prejudicial error.

(ii)     Subjects of Finell's Testimony

The Thicke Parties contend that, even if some of Finell's expert testimony should not have been excluded, six matters about which she testified should have been. Thus, they argue that it was prejudicial error to admit testimony as to the following: (i) a four-note core theme, or "Theme X"; (ii) keyboard parts; (iii) a bass melody; (iv) a "signature phrase"; (v) lyrical similarity; and (vi) edited and transcribed versions of the "Blurred Lines" sound recording, which were played at trial in connection with Finell's testimony. Mot., Dkt. 385 at 15, 16-23.

(a)     "Theme X"

Finell revised her opinion about "Theme X" after her declaration was prepared as part of the opposition to the motion for summary judgment. Thus, Finell initially opined that "Theme X" was a four-note sequence 3-3-2#-3, sung to the backup lyrics "dancin' lady." Dkt. 139 at 17-18. Because the backup vocals appear in the sound recording, but not the deposit copy, of "Blurred Lines," "Theme X" was deemed not protected for purposes of that Motion. *Id.* Shortly before trial, Finell submitted a revised declaration. Dkt. 271. There, she opined that the melody 5-5-6-5, which appears in Part 2 of the lead sheet, had a "modified

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

mirror relationship" to the sequence 3-3-2#-3. Before trial, the Court determined that, although Finell's position had changed, her opinion was "based on her experience and expertise in how to evaluate the sheet music," and still based on elements "reflected in the sheet music." Dkt. 274 at 7. Finell's testimony at trial followed this revised theory. *E.g.*, Dkt. 336 at 101-03, 112-14. She testified that this relationship would have been apparent to a knowledgeable musician. Dkt. 350 at 96-97.

The Thicke Parties argue that, because Finell's revised theory was not disclosed in her Rule 26 expert report, at her deposition or in subsequent declarations, it should have been excluded. Mot., Dkt. 385 at 17-18. However, they had notice of Finell's revised theory before trial, were able to prepare to respond, and have, therefore, failed to demonstrate any prejudice caused by late disclosure. *See* Fed. R. Civ. P. 37(c)(1) (untimely disclosed material may be used at trial where untimely disclosure is "substantially justified or is harmless").

The Thicke Parties also maintain that this testimony should have been excluded because "Theme X" does not appear in the deposit copy, and Finell's "modified mirror relationship" theory is not founded on accepted musicological practice. Dkt. 385 at 16-17. As the Court previously ruled, this argument goes to the weight and not the admissibility of the testimony. Whether the visible notation that appeared on the deposit copy was sufficient to include in the copyright in "Got to Give It Up" a protectable interest in this four-note sequence was a question of fact for which expert testimony was appropriate. Finell was a qualified expert, and the Gaye Parties made a sufficient threshold showing that she "reliably applied the principles and methods [of her expertise] to the facts of the case" with regard to "Theme X." Fed. R. Evid. 702(d).

For these reasons, the Thicke Parties fail to show that the admission of testimony about the revised "Theme X," or demonstrative exhibits or edited sound recordings that contained it, was prejudicial error.

(b)     Keyboard Parts

Finell also revised her opinion about the keyboard parts in "Got to Give It Up." In connection with the opposition of the Gaye Parties to the motion for summary judgment, she opined about certain keyboard parts that appear in the sound recording, but not in the deposit copy. Dkt. 139 at 20-21. However, subsequently, i.e., prior to trial, she declared that "[t]he keyboard pitches and rhythmic expression are clearly indicated by the lead sheet," and that this opinion had been expressed in an expert report prepared after the issuance of the order denying summary judgment. Dkt. 263, ¶¶ 7-8. Thus, she opined that the chords and bass parts reduced to notation in the deposit copy implied the keyboard parts that she testified about were protected by the Deposit Copy. *Id.* ¶¶ 9-10. Finell declared that it was "standard practice for a lead sheet to indicate rhythms of harmonic parts in this manner, along with the composer's expectation of the professional musician to manifest correctly the composer's intentions." *Id.* ¶ 11. Her testimony at trial was consistent with this revised theory. *E.g.*, Dkt. 334 at 14-15.

The Thicke Parties claim Finell's revised opinion was unreliable, and a "gross extrapolation of the music that actually appears in the Deposit Copy." Dkt. 385 at 19. However, the Gaye Parties carried their burden to show that this testimony was reasonably based on the expertise of Finell. The Thicke Parties also claim that the keyboard parts cannot have been protected because, even if Finell's testimony were credited, these parts were not fixed in the deposit copy in a tangible form. *Id.* The 1909 Act, unlike the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

1976 Act, required the use of visible notation to acquire protection in a composition. However, this limitation is not as stringent as claimed by the Thicke Parties. *See* M. Nimmer & D. Nimmer, 1 Nimmer on Copyright § 2.05[A] at 2-55 n.14 (under the 1909 Act, a "musical composition might . . . have claimed copyright if reduced to a visibly intelligible form using a system other than our conventional system of musical notes."). Thus, the notation on which Finell relied in opining that the deposit copy fixed the keyboard part was legally sufficient to claim copyright protection in that part. Whether it actually did, as a matter of musicological and industry practice, was a disputed factual issue for trial.

Finally, the Thicke Parties contend that if "all professional musicians" knew how to play this part based on what was notated, this would show that the keyboard part was an unprotectable *scene a faire.* Mot., Dkt. 385 at 19-20. Even if this assertion were deemed correct as a matter of law, the combination of unprotected elements may be protectable expression, and "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004).

For these reasons, the admission of Finell's testimony about the keyboard parts, as well as the demonstratives or edited sound recordings that contained them, was not prejudicial error.

(c)     Bass Melody

The "Got to Give It Up" deposit copy contains a bass melody. The edited sound recording of "Got to Give It Up" prepared by Finell for comparison with "Blurred Lines" contained a bass melody that differed in some respects from the melody in the deposit copy. For instance, it began on the 5th scale degree instead of the 4th. Dkt. 334 at 17-23. Finell testified that this difference was not material. *Id.* However, she acknowledged on cross-examination that her transcription was based on the bass melody that appears in the sound recording. *Id.* at 23. The Thicke Parties claim this was a "deliberate choice" because this made it "more similar to the descending bass melody in BLURRED." Mot., Dkt. 385 at 20. The Thicke Parties have failed to show that the differences between the bass melody prepared by Finell or the related sound recordings made them irrelevant, unfairly prejudicial, or otherwise inadmissible, or that the admission of this evidence "substantially prejudiced" them. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008).

(d)     Signature Phrase

The "Got to Give It Up" deposit copy contains a 10-note sequence that Finell described as the "Signature Phrase." Finell prepared an edited sound recording in which the final note lasted for half a beat instead of a beat and a half. Dkt. 350 at 49. On cross-examination, she testified that her transcription differed because it was based on the sound recording. *Id.* at 49-50. The Thicke Parties offer no argument why this difference caused undue prejudice.

In their Motion for Declaratory Relief, Counterclaim-Defendants argue that there is no extrinsic similarity between this phrase and the claimed signature phrase in "Blurred Lines," and that no two notes have the same pitch, rhythm and placement. Dkt. 393 at 17-21. However, this musicological analysis of these phrases is a matter on which reasonable experts could disagree. As a matter of law it cannot be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

determined that the analysis of the Thicke Parties was correct and that of the Gaye Parties was not. *See Swirsky v. Carey*, 376 F.3d 841, 847-48 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) ("Objective analysis of music under the extrinsic test cannot mean that a court may simply compare the numerical representations of pitch sequences and the visual representations of notes to determine that two [segments of compositions] are not substantially similar, without regard to other elements of the compositions.").

For these reasons, the Thicke Parties have failed to demonstrate that the admission of this testimony or the related sound recording was prejudicial error.

(e)    Lyrics

Finell opined that one similarity between "Got to Give It Up" and "Blurred Lines" was the use of "word painting," or the pairing of musical elements with lyrics. *E.g.*, Dkt. 336 at 143. She testified that the songs made similar use of the words "up," "down," "shake," and "round." For example, in each song, the scale degree moves up after the word "up" is used, and down after the word "down" is used. *Id.* at 145-46. The Thicke Parties do not dispute that these lyrics appear in the deposit copy of "Got to Give It Up." Instead, they argue that this testimony was "irrelevant and misleading" because "[t]hese ordinary words are not protected by copyright," and the so-called "word painting" was an unprotected idea. Mot., Dkt. 385 at 21-22. They claim this testimony was prejudicial "because the jury was not separately instructed that single words and phrases are not protectable." Reply, Dkt. 404 at 10. However, at the request of the Thicke Parties, the jury was so instructed. *See* Dkt. 322 at 36 ("single words and ordinary phrases are not protected by copyright, but the original expression of words or phrases may be copyrighted"). Although these words, and perhaps the "word painting" technique, were not subject to copyright, once again, "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirsky*, 376 F.3d at 848.

For these reasons, it was not prejudicial error to admit Finell's testimony as to the lyrics.

(f)    Edited and Transcribed Sound Recordings

The Thicke Parties argue that the edited sound recordings about which Finell opined should not have been admitted. Mot., Dkt. 385 at 22-23. In part, this argument presumes the inadmissibility of the keyboard part, Theme X and bass melody, each of which has been addressed. Prior to trial, the Court determined that these recordings, whose preparation was overseen by Finell, were sufficiently based on the contents of the deposit copy to be played at trial, and that any claimed differences could be a subject of cross-examination. Dkt. 274 at 6-7. The January 28, 2015 Order re: Admissibility of Sound Recording Evidence at Trial required an "appropriate balance between presenting a recording that contains what is reflected on the deposit copy, without including potentially prejudicial sounds that are not protected," not note-for-note identity. Dkt. 231 at 5.

The Thicke Parties also claim that the admission of the sound recordings was unnecessary. Thus, they contend that the same Order addressed in part the concern of the Gaye Parties that, without evidence in the form of sound recordings, they could not carry their burden to show intrinsic similarity of the works. Mot., Dkt. 385 at 22-23. However, during Finell's testimony, certain sound recordings were played as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

demonstrative exhibits to facilitate an understanding of that testimony. They were not admitted into evidence. The Thicke Parties have failed to show that the demonstrative exhibits did not facilitate an understanding of Finell's testimony or that their being played for the jury was unduly prejudicial. The jury was properly instructed on the purposes for which it could consider demonstrative exhibits. Dkt. 322 at 19.

Finally, the Thicke Parties argue that the sound recordings did not reflect the total concept and feel of "Got to Give It Up," as required to establish substantial intrinsic similarity, because they were "cherry-picked" to sound similar to "Blurred Lines." Mot., Dkt. 385 at 23. Once again, they fail to show prejudice. These recordings were not admitted into evidence. The Thicke Parties prepared an extended sound recording of what they contend was reflected in the "Got to Give It Up" deposit copy and played it for the jury. Based on this and other evidence, that sought to persuade the jury that there was no substantial similarity in the concept and feel of the two works.

For these reasons, the Thicke Parties have failed to show that the admission of the edited sound recordings was prejudicial error.

(2)    Admission of "Mash-Ups"

On January 6, 2015, Counterclaim-Defendants filed a motion in limine to exclude certain audio examples prepared by the Gaye Parties. This included "mash-ups" that the Gaye Parties sought to introduce in connection with the testimony of Dr. Ingrid Monson, a musicologist whom they had engaged as an expert witness. Dkt. 166. Counterclaim-Defendants' motion in limine was conditionally granted. However, the Gaye Parties were permitted to modify any sound recordings that had been prepared in an effort to make them compliant with the order excluding material not found in the deposit copy of "Got to Give It Up." Experts presented at trial by the Gaye Parties were not precluded "from relying on such recordings as a basis for elements of their opinions, as appropriate." Dkt. 226 at 2. Further clarification of these matters was provided in the January 28, 2015 Order. Dkt. 231.

The Gaye Parties lodged revised mash-ups, to which Counterclaim-Defendants continued to object. Dkt. 259. They argued that these contained elements from the sound recording not found in the deposit copy, and were "pitch-shifted" to give a misleading impression of similarity. *Id.* The Gaye Parties responded that non-protected elements had been "removed through digital processing," the remaining elements were present in the copyright deposit, and pitch-shifting was an "accepted musicological practice." *E.g.*, *id.* at 55.

At the February 20, 2015 final pretrial conference, the Court ruled that the mash-ups could be "played in connection with [Monson] presenting her opinion," but "would not be admitted as exhibits." Dkt. 274 at 8. It also granted Counterclaim-Defendants' request to permit their expert, Wilbur, to opine that this methodology was unreliable, in part by playing other melodies on a keyboard simultaneously with the "Blurred Lines" instrumental track to "demonstrate that there's a huge number of melodies that you could play over that," and "the whole mash-up concept is not probative of anything." *E.g.*, *id.* at 25.

Counterclaim-Defendants also sought to admit audio examples of prior art to support their contention that elements of "Got to Give It Up" were unprotected *scenes a faire*, which were deemed "appropriate." *Id.* at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

26. Their request to admit further audio examples comparing "Blurred Lines" to other popular songs was denied as cumulative of Wilbur's testimony, and "introduc[ing] [Fed. R. Evid.] 403 issues." *Id.* at 26-27. Similarly, a YouTube video by a musical comedy group called "Axis of Awesome," which purported to show that many popular songs use similar chord progressions, was excluded as cumulative and potentially prejudicial. *Id.* at 28-29.

The Thicke Parties contend it was prejudicial error to allow the mash-ups to be played at trial, for four reasons. First, they were prepared after the close of expert discovery, and not disclosed in Monson's Rule 26 report or expert deposition. Mot., Dkt. 385 at 24. Second, they included keyboard and bass elements not in the deposit copy. *Id.* Third, their limited relevance was greatly outweighed by their prejudicial effect. *Id.* Fourth, this prejudice was "compounded" by the exclusion of the "Axis of Awesome" video and Wilbur's demonstrative exhibit comparing "Blurred Lines" with other music. *Id.* at 24-25.

The Thicke Parties fail to show prejudicial error. First, they have not shown that any prejudice resulted from the late disclosure of the mash-ups. The timing of this production was justified by the requirement that the Gaye Parties revise them so that they would comport with the evidentiary rulings on the admissibility of sound recording evidence. *See* Fed. R. Civ. P. 37(c)(1) (untimely disclosed material may be used at trial where untimely disclosure is "substantially justified or is harmless"). The Thicke Parties had ample opportunity to evaluate the mash-ups before trial and to prepare to respond.

Second, as explained above, whether the keyboard and bass elements were in the deposit copy was a disputed factual issue. Therefore, their inclusion in the mash-ups was permitted and non-prejudicial.

Third, the concerns that provide the basis for raising issues under Fed. R. Evid. 403 as to the admission of the mash-ups were addressed by the manner in which they were presented at trial. They were played in connection with Monson's testimony, and were not admitted as exhibits. Further, the Thicke Parties were permitted to challenge their probative value on cross-examination and in rebuttal.[8] Under these circumstances, the probative value of the mashups was not substantially outweighed by the issues of prejudice raised by the Thicke Parties. Fed. R. Evid. 403.

Finally, the "Axis of Awesome" video and audio example comparing "Blurred Lines" to other popular songs were cumulative of the Thicke Parties' other evidence. These materials presented a substantial risk of prejudice and confusion such that their probative value was outweighed.

(3)     Admission of Press Statements

Thicke and Williams made many statements to the press about creating "Blurred Lines." These included certain statements as to inspiration resulting from the work of Marvin Gaye. During discovery in this action, they contradicted certain of these statements in interrogatory responses and deposition testimony. For example, in an interview published on May 7, 2013, Thicke told *GQ*, "Pharrell and I were in

---

[8] Among other evidence, Thicke, over the Gaye Parties' objection, played a piano medley of "different songs that can be played over each other" to support the proposition that "mash-ups" do not show that songs are similar. Dkt. 332 at 40-44.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

the studio and I told him that one of my favorite songs of all time was Marvin Gaye's 'Got to Give It Up.' I was like, 'Damn, we should make something like that, something with that groove.' Then he started playing a little something and we literally wrote the song in about a half hour and recorded it." Dkt. 121 at 46. At his deposition, Thicke said he had "lied in [his] story" about the creation of "Blurred Lines" because he "thought it would help sell records." *Id.* at 76. He also said he was not thinking of Gaye when he wrote "Blurred Lines." *Id.* at 86.

Counterclaim-Defendants filed motions in limine to exclude these statements. They argued that the statements were not probative of the issue whether "Blurred Lines" contained elements copied from "Got to Give It Up," and were irrelevant because access to "Got to Give It Up" was conceded. Dkts. 169, 172. These motions in limine were denied. The statements were found to be relevant as to copying and willfulness, and admissible as admissions of party-opponents. Dkt. 229 at 26-27, 43-44. The Thicke Parties contend "at trial, they showed that Counter-Defendants were inspired by the 'feel' or 'groove' of GIVE," which is not copyright infringement, but that the jury could have concluded incorrectly that they were evidence of the copying of protected material. Mot., Dkt. 26 at 25-26. The Thicke Parties argue the admission of this evidence at trial was prejudicial error. *Id.*

Even if such statements were not deemed to be direct evidence of copying, they were relevant to willfulness, impeachment of the party-witnesses, and the defense of the Thicke Parties that any protected materials in "Got to Give It Up" that also appeared in "Blurred Lines" were independently created. *See, e.g.*, Dkt. 339 at 108 (closing argument of counsel for Thicke Parties that "the testimony from our side is that whatever was created by Pharrell Williams and Robin Thicke was their own independent creation"). For these reasons, it was not error to admit these statements.

(4)     Admission of "Lay Opinions" of Janis Gaye and Harry Weinger

On January 6, 2015, Counterclaim-Defendants filed a motion in limine to exclude "lay opinions" about the similarity of the sound recordings of "Got to Give It Up" and "Blurred Lines." Dkt. 167. The motion applied to any such opinion of Janis Gaye, the spouse of the late Marvin Gaye. *Id.* The motion in limine was granted. Dkt. 226. Counterclaim-Defendants also filed a motion in limine to exclude the testimony of Harry Weinger, an employee of Universal Music Enterprises ("UME"), a division of Counterclaim-Defendant UMG. Dkt. 171. The parties were directed to file deposition pages in support of their competing positions whether Weinger was acting as the agent of UMG when he made certain statements. Dkt. 226. Upon review of these materials, it was determined that Weinger was acting in the scope of his employment when some of these communications were made, but not when he made several social media postings, which were excluded. Dkt. 274 at 33-34.

Weinger and UME promoted the Marvin Gaye catalog, but neither was involved in the marketing or promotion of "Blurred Lines." Nonetheless, it was determined that Weinger's statements could be admitted against UMG as those of an agent or employee. As noted at that time, the Thicke Parties had offered "no case under [Fed. R. Evid. 801(d)(2)(D)] which says that when there's an entity which has different components, that the statement that would qualify if the components were all one doesn't qualify because they're different components." *Id.* at 32. At the final pretrial conference, the Court stated that, in the interest of being "realistic," witnesses could testify that they had heard the sound recording "Got to Give It Up," and any prejudice or confusion this caused would be addressed by a limiting instruction and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

one that the jurors not undertake any investigation during the trial. *Id.* at 50-53.

Counterclaim-Defendants contend that it was error to have admitted the opinions of Janis Gaye and Weinger that "Blurred Lines" and "Got to Give It Up" were similar. Mot., Dkt. 385 at 26. They argue this was improper because these opinions were formed based on the sound recording of "Got to Give It Up," and the Gaye Parties were able to rely on these opinions in arguing to the jury that "two individuals with experience in the music industry . . . had concluded that BLURRED infringed GIVE." *Id.*[9]

Janis Gaye testified about the ownership of the Gaye Parties in the copyright for "Got to Give It Up." She also testified that the Thicke Parties did not receive a license or other permission to use material from "Blurred Lines" in "Got to Give It Up." Dkt. 349 at 9-16. She testified briefly about her view that "Blurred Lines" was similar to "Got to Give It Up." She did so as part of a narrative as to why she contacted the Thicke Parties and others after hearing "Blurred Lines." *Id.* at 14. The Thicke Parties did not object to this testimony or move to strike it. This incidental reference to Janis Gaye's personal opinion was not offered as evidence of similarity, and could not reasonably have been construed as such. Even if any objection by the Thicke Parties to its admission were not waived, there was no prejudicial error.

Weinger testified that he thought "Blurred Lines" was based on "Got to Give It Up" when he heard it, and included licensed samples of "Got to Give It Up." He went on to say that he contacted others within UMG to use the success of "Blurred Lines" to "help elevate the profile of 'Got to Give It Up'" based on this mistaken belief. Dkt. 333 at 14, 17, 20. He was cross-examined about his lack of an understanding about the contents of the deposit copy and that he and UME did not have any role in the promotion or marketing of "Blurred Lines." *Id.* at 27-30, 38. This testimony was an admission of UMG, and was relevant to willfulness of that Counterclaim-Defendant. It was not offered, and could not reasonably have been construed, as evidence of substantial similarity.

Counterclaim-Defendants argue that the Gaye Parties "emphasized Mr. Weinger's opinion in their opening statement and closing statement." Mot., Dkt. 385 at 27-28. In context, this argument concerned UMG's knowledge. Dkt. 331 at 41-43; Dkt. 339 at 94 (arguing that UMG was "just as much [a] willful infringer[]" as Thicke and Williams based on Weinger's statement). The Thicke Parties did not object when this statement was made or later seek any limiting instruction. Further, the jury was instructed that "[a]rguments and statements by lawyers are not evidence." Dkt. 322 at 7.

---

[9] Counterclaim-Defendants argue this prejudice was "compounded" because the Court excluded evidence that EMI "not only determined not to pursue an infringement claim based on BLURRED, but concluded, after consulting an outside musicologist, that it could not do so consistent with Rule 11." Mot., Dkt. 385 at 27. Because the testimony of Janis Gaye and Weinger was properly admitted, this argument lacks force. Nona Marvisa and Frankie Gaye sued, and eventually settled with, EMI, which they alleged to be a conflicted fiduciary with a financial interest in "Blurred Lines." Dkts. 57-1, 59. The claimed analysis by EMI was hearsay, which had very limited probative value and the potential for substantial prejudice. It also presented the prospect of a significant distraction as to what decisions were made by EMI, their basis and how they applied, if at all, to the matters at issue in the trial. For all of these reasons, the EMI evidence was excluded pursuant to Fed. R. Evid. 402, 403 and 802. Dkt. 229 at 56-57. Its exclusion did not affect the substantial rights of the Thicke Parties. Fed. R. Civ. P. 61.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

For these reasons, the Thicke Parties have failed to show that Weinger's testimony affected their substantial rights, or that its admission was prejudicial error.

(5)    <u>Admission of Testimony of Nancie Stern Regarding Infringement</u>

Nancie Stern is an independent sample "clearance" agent. Her work concerns obtaining consent by a copyright holder to the distribution of a similar work. She has had more than 20 years of experience in this field, and has "cleared well over 1000 samples and replays for some of the biggest artists in the music industry." Dkt. 196-13 at 44. She declared that she is "considered an expert in the field of clearance and understand[s] that there are only a handful of clearance experts." *Id.* ¶ 6. The Thicke Parties filed a motion in limine to exclude her testimony. Dkt. 170. After the parties provided supplemental deposition pages as to the foundational basis on which she would testify, the motion in limine was denied. Dkt. 272 at 2. However, Stern's testimony was "limited to her claimed expertise, i.e., the appropriate means of determining licensing valuation, and shall not concern the ultimate issue of infringement." *Id.*

The Thicke Parties contend Stern gave improper testimony as to the ultimate issue of infringement. Mot., Dkt. 385 at 27-28.[10] They claim she "purported to quantify 'how much' of GIVE was used in BLURRED." *Id.* at 28. This claim is not supported by the testimony. Stern did testify that she determined an appropriate royalty was 50 percent based on "A-B'ing" the songs, or "going back and forth and – against 'Got to Give It Up' with 'Blurred Lines[,]' and determining that the melody runs throughout 'Blurred Lines' from 'Got to Give It Up.'" Dkt. 351 at 31. This response was stricken "as to determining where the melody was." *Id.*

The Thicke Parties also claim that it was "[t]elling of the confusion and prejudice [Stern's] testimony created [that] the jury sent a note during deliberations asking whether Ms. Stern was an expert on infringement." Dkt. 385 at 28 (citing Dkt. 313). The Court's response to this note was that "Ms. Stern is an expert only on the valuation of a license for a musical work." Dkt. 313. It is presumed that juries follow instructions, *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1985), as well as the information provided by courts in response to questions that they pose. The jury note does not rebut this presumption. *Cf. Aczel v. Labonia*, 584 F.3d 52, 60 (2d Cir. 2009) (rejecting argument that jury note was probative of misconduct or error).

For these reasons, the Thicke Parties have failed to show that Stern's brief testimony about the overlap in the two songs, which was stricken immediately, affected their substantial rights. Therefore, they have not carried their burden to show prejudicial error that warrants the requested relief. Fed. R. Civ. P. 61.

//
//
//

---

[10]  The Thicke Parties also argue that Stern improperly relied on edited sound recordings that contained elements not found in the deposit copy, including "Theme X" and the keyboard part. Mot., Dkt. 385 at 28. Thus, they claim her opinion lacked a proper basis and should not have been admitted under Fed. R. Evid. 703. As discussed, neither the admission of these sound recordings at trial, nor permitting a damages expert to rely on them to form an opinion, was error.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

c)      Alleged Instructional Errors

(1)      Legal Standard

Jury instructions that are in error or inadequate may form the basis for granting a new trial pursuant to Fed. R. Civ. P. 50 & 59. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). "Where a challenge to jury instructions is at issue, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was not fairly and correctly covered." *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1092 (9th Cir. 2007) (internal quotation marks omitted). Jury instructions "may not be judged in artificial isolation, but must be judged in the context of the overall charge and the circumstances of the case." *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 420 (1985) (internal quotation marks omitted).

(2)      Jury Instruction 42

Prior to the trial, the Gaye Parties proposed an instruction about subconscious copying. Dkt. 244-3.[11] Counterclaim-Defendants objected, arguing that subconscious copying was not at issue because the Thicke Parties conceded access to the copyrighted work. They added that the instruction would confuse and mislead the jury for this reason. Dkt. 244 at 11-12. The Gaye Parties' proposed Instruction was "adopted in part" and incorporated as Instruction 42. Dkt. 283. The following is the text of the instruction as given:

> In order to find that the Thicke Parties copied either or both of the Gaye Parties' songs, it is not necessary that you find that the Thicke Parties consciously or deliberately copied either or both these songs. It is sufficient if you find that the Thicke Parties subconsciously copied either or both of the Gaye Parties' songs.

Dkt. 322 at 45. After ruling on the disputed jury instructions, the Court distributed draft instructions, and advised the parties, "I will invite – if they're editorial suggestions that either side has, I'll certainly accept those. But what I don't want is rearguing what I've already addressed in terms of what I've done in these instructions." Dkt. 348 at 4. The Thicke Parties did not object to the revised instruction on the record. *See, e.g.*, Dkt. 339 at 5-6.
//
//

---

[11] The proposed instruction stated:
> In order to find that Plaintiffs and Counter-Defendants copied Counter-Claimants' songs, it is not necessary that you find that one of them consciously or deliberately copied it. It is sufficient if you find that any Plaintiff and Counter-Defendant subconsciously copied Counter-Claimants' song through hearing that song at some time in the past. Unconscious plagiarism is just as actionable as deliberate.

Dkt. 244-3 at 5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

"For an objection to a jury instruction to be valid, the objection must be made on the record, stating distinctly the matter objected to and the grounds for the objection." *Medtronic, Inc. v. White*, 526 F.3d 487, 495 (9th Cir. 2008) (citing Fed. R. Civ. P. 51(c)(1)) (internal quotation marks omitted). The Gaye Parties claim the Thicke Parties waived any objection to Instruction 42 by failing to object to the revised instruction. Dkt. 388 at 10-12. The Thicke Parties argue there was no waiver because an objection to a jury instruction may be preserved "[w]here the district court is aware of a party's concerns and further objection would be unavailing," and the Thicke Parties had made clear their standing objections to the proposed instruction. Reply, Dkt. 404 at 13 (citing *Medtronic, Inc.*, 526 F.3d at 495).

The Thicke Parties preserved their objection to Instruction 42. This instruction omitted certain language from the instruction proposed by the Gaye Parties, and was revised by the Court to assure a more clear distinction between the two Gaye songs at issue. However, Instruction 42 otherwise maintained the substance of the proposed instruction to which the Thicke Parties previously had objected.

The Thicke Parties contend Instruction 42 should not have been given because "[t]he relevant question for assessing actionable 'copying' is whether the works are substantially similar based on the extrinsic/intrinsic test—not whether Counter-Defendants 'subconsciously copied.'" Mot., Dkt. 385 at 12. They claim subconscious copying is a relevant concept only where it is disputed that the defendant had access to a copyrighted work, which "was not in dispute here." *Id.* (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-85 (9th Cir. 2000)). The Thicke Parties claim this instruction "was prejudicial based on the improper admission of evidence that Thicke and Williams were influenced by the 'groove' and 'feel' of GIVE, and by the Gayes' efforts to portray Thicke and Williams as 'copiers.'" *Id.* Counterclaim-Defendants raise similar arguments in their Opposition to the Gaye Parties' Motion for Declaratory Relief. Dkt. 393 at 10. At the hearing on the Motion, they argued that Instruction 42 improperly presented an alternative route by which the jury could find copying without finding substantial similarity between the works. Dkt. 410. The Gaye Parties responded that the instruction correctly states the law and was appropriate, because "[t]he principle [of subconscious copying] has also been applied where access was conceded, but the infringer denied actual copying, as Plaintiffs did here." Opp'n, Dkt. 388 at 11-12.

Instruction 42 correctly stated the law. "Subconscious copying has been accepted since Learned Hand embraced it in a 1924 music infringement case: 'Everything registers somewhere in our memories, and no one can tell what may evoke it.... Once it appears that another has in fact used the copyright as the source of this production, he has invaded the author's rights. It is no excuse that in so doing his memory has played him a trick.'" *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-83 (9th Cir. 2000) (upholding verdict based on finding of subconscious copying) (citing *Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 147-48 (S.D.N.Y. 1924) (Hand, J.)); *see also Harold Lloyd Corp. v. Witwer*, 65 F.2d 1, 17 (9th Cir. 1933) ("[A]n intentional copying is not a necessary element in the problem if there has been a subconscious but actual copying."). Although *Three Boys Music* applied this doctrine where access was disputed, it did not limit it to these circumstances. *Fred Fisher* and *Harold Lloyd* support the conclusion that it has a broader application.

Instruction 42 was pertinent in light of the evidence presented at trial. And, it was not prejudicial or unfair to have included it. Although the Thicke Parties conceded access to "Got to Give It Up," the jury could have concluded that they intended only to copy unprotected elements of the song in "Blurred Lines," but

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

accidentally or subconsciously copied protected elements. "Direct infringement does not require intent or any particular state of mind." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1166 (C.D. Cal. 2002). The instruction illustrated that, if these facts were found, the Thicke Parties would be liable for infringement.

Considered in conjunction with the other instructions, Instruction 42 did not provide an alternative route by which infringement could be found without a finding of substantial similarity. Thus, Instruction 27 stated that it was the Gaye Parties' burden to show that the Thicke Parties copied protected elements of "Got to Give It Up." Instruction 28 stated that the Gaye Parties could show copying by proving that the Thicke Parties had access to "Got to Give It Up" and that there was substantial similarity between the work of the Thicke Parties and the original elements of the work of the Gaye Parties. Dkt. 322 at 28-29. Similarly, Instruction 35 stated that, to prove copying, the Gaye Parties had to show access and substantial similarity. *Id.* at 37-38. It is not plausible to read the statement of Instruction 42 on subconscious copying as advising the jury that it did not have to find facts that would establish the elements of access and substantial similarity that appear in other instructions on copying.

For these reasons, the Thicke Parties have failed to demonstrate that Instruction 42 misstated the law or was misleading. Therefore, they have not shown that the use of this instruction is a basis for granting their request for a new trial.

(3)     Jury Instruction 43

Jury Instruction 43 concerned substantial, extrinsic and intrinsic similarity. The parties agreed that, because the Ninth Circuit Manual of Model Civil Jury Instructions ("MCJI") did not adequately address these issues, a special instruction was warranted. Dkt. 244 at 12-14, 38-39. On March 5, 2015, the Court presented the parties with a redlined version of Instruction 43 that it prepared based on their input. Dkt. 339 at 6. Counsel for the Thicke Parties said they had "no objection to it as modified." *Id.* This version of Instruction 43, which was read to the jury, provided:

> In order for the Gaye Parties to meet their burden of proof to show by a preponderance of the evidence that there is substantial similarity between one of the Gaye Parties' works and one of the Thicke Parties' works, the Gaye Parties must show that there is both substantial "extrinsic similarity" and substantial "intrinsic similarity" as to that pair of works.
>
> Extrinsic similarity is shown when two works have a similarity of ideas and expression as measured by external, objective criteria. To make this determination, you must consider the elements of each of the works and decide if they are substantially similar. This is not the same as "identical." There has been testimony and evidence presented by both sides on this issue, including by expert witnesses, as to such matters as: (a) for "Got to Give It Up" and "Blurred Lines," the so-called "Signature Phrase," hook, "Theme X," bass melodies, keyboard parts, word painting, lyrics, rap v. parlando; and (b) for "After the Dance" and "Love After War," the chorus vocal melody and chords. The Gaye Parties do not have to show that each of these individual elements is substantially similar, but rather that there is enough similarity between a work of the Gaye Parties and an allegedly infringing work of the Thicke Parties to comprise a substantial amount.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Intrinsic similarity is shown if an ordinary, reasonable listener would conclude that the total concept and feel of the Gaye Parties' work and the Thicke Parties' work are substantially similar.

In considering whether extrinsic or intrinsic similarities are substantial, you may consider whether portions allegedly copied are either qualitatively or quantitatively important to either of the Gaye Parties' works. A portion of a work is qualitatively important if, regardless of its size, it is shown to be very important to that work. The copying of a qualitatively important portion of a work may support a finding of substantial similarity even if that portion is very short. A portion of a work is quantitatively important if it comprises a significant portion of the work.

Dkt. 322 at 46.

The Gaye Parties argue that the Thicke Parties have waived the right to object to Instruction 43 by stating they had "no objection to it." Opp'n, Dkt. 388 at 10 (citing *United States v. Perez*, 116 F.3d 840 (9th Cir. 1997)). However, the Thicke Parties timely objected to earlier versions of this instruction, *e.g.*, Dkt. 348 at 10, and their assent is deemed to be only to the manner in which it was edited. *Id.* at 4. Thus, the Thicke Parties preserved their right to object to Instruction 43.

The Thicke Parties contend this instruction was erroneous and prejudicial because it "permitted the jury to find infringement based on alleged similarities in elements of the Gayes' work that are not protectable by copyright or included in the Gayes' narrow copyright in the deposit copy for GIVE," and invited a "freewheeling assessment of similarity based on any and all elements of the Gayes' work, or the work as a whole." Mot., Dkt. 385 at 9-10. They advance seven bases for the claim of error. *Id.* at 10-12.

First, the Thicke Parties argue that Instruction 43 "[e]rroneously told the jury to 'consider the elements of each of the works and decide if they are substantially similar'—without limiting that consideration to only elements in the Deposit Copy and protectable by copyright." *Id.* at 10. The Thicke Parties contend that the instruction is similar to one that warranted a new trial in *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989). There, the instruction to "ask yourself whether the ordinary reasonable person would find the total impact and effect of Defendants' work substantially similar to Plaintiff's work" was found improperly to "encourag[e] the jury to put the two articles next to each other and determine whether they looked alike, not whether defendants copied protectable expression." *Id.* at 206-07. *Harper House* is distinguishable. The district court there declined to give certain proposed "cautionary instructions" that would have limited the jury review to protected elements, and, "viewing the jury instructions as a whole," they "did not adequately distinguish between protectable and unprotectable material." *Id.* at 206-08. Here, a review of the jury instructions as a whole shows that the jury was adequately instructed as to the elements to be considered in evaluating the copyright claim. For example, Instruction 30 provided:

Substantial similarity requires similarity of protected expression. Similarity that is confined to ideas and general concepts is not infringing.
Similarities derived from the use of common ideas are not protected.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|--------------------------|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

In determining whether the Gaye Parties' work is substantially similar to the Thicke Parties' work, you must not consider in your comparison any:

(1) ideas, as distinguished from the expression of those ideas;
(2) elements borrowed from another author or from the public domain;
(3) ideas that can only be expressed in one way, so that the idea and its expression merge;
(4) expression embodied in the work that flows from a commonplace idea; or
(5) expression that is so standard in the treatment of a given idea that it constitutes something that must be done in expressing that idea.

Dkt. 332 at 31.

Instruction 25 provided that copyright protection "does not extend to any idea, procedure, process, system, method of operation, concept, principle or discovery . . . ." *Id.* at 26. Instruction 26 contained similar language. *Id.* at 27. Instruction 31 provided that trivial copying is not copyright infringement. *Id.* at 32. Instruction 35 further described copyrightable versus uncopyrightable subject matter, and stated that, when "Got to Give It Up" was copyrighted, a deposit copy of the written music filed with the Copyright Office defined the scope of the copyrightable subject matter. *Id.* at 36-38. Instruction 37 provided that the original parts of the Gaye Parties' works are those independently created through the use of at least some minimal creativity. *Id.* at 40.

Counterclaim-Defendants contend these were insufficient because "passing references to general copyright principles buried within introductory instructions hardly 'cure' the plain errors in Instruction 43." Reply, Dkt. 404 at 13-14. These instructions were more than "passing references," and the jury is presumed to follow its instructions. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1985). Considered as a whole, the jury instructions fairly and accurately covered the applicable law, and did not permit the jury to consider improper subject matter. *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1092 (9th Cir. 2007).

Second, the Thicke Parties contend Instruction 43 "[e]rroneously instructed the jury that it 'must' consider in assessing similarity both 'Theme X' and the keyboard part, which are not in the Deposit Copy." Mot., Dkt. 385 at 10. This misconstrues the instruction. It states that the jury "must consider the elements of each of the works," but not that disputed "matters," including "Theme X" and the keyboard part, were necessarily protected "elements." Dkt. 322 at 46. The instruction told the jury that it could consider "testimony and evidence presented by both sides on this issue," and, together with Instruction 35, reserved for the jury the evaluation of the evidence of "what each side contends is shown in the deposit copy that was filed with the Copyright Office." Neither the use of the word "must" nor the reference to disputed matters about which the jury had heard testimony at trial was a prejudicial error.

Third, the Thicke Parties argue that Instruction 43 "[f]ailed to identify unprotected elements of GIVE—including ones the Court ruled were 'unprotected' (Dkt. 139 at 13-21)—or instruct the jury that it must identify and factor out unprotected elements before assessing similarity." Mot., Dkt. 385 at 10. The Thicke Parties claim there was error because "[a]n instruction that invites the jury to consider the 'whole work' is . . . proper only if 'the unprotectable elements [are] identified.'" Mot., Dkt. 385 at 10 (citing *Dream*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

*Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 989 (9th Cir. 2009) (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994))). This argument largely duplicates the one that the jury was not instructed to limit its consideration to protected subject matter. As explained above, this issue is addressed by Instructions 25, 26, 30, 31, 35 and 37.

There is no support for the Thicke Parties' claim that, in addition to giving these instructions, the Court was required to list for the jury unprotected elements of "Got to Give It Up." *Dream Games* addresses the factual setting in which a jury is permitted to assess a "whole work" containing protected and unprotected elements. In that case this consisted of an electronic video bingo game that contained protected source code and displayed unprotected elements such as bingo cards, called numbers and the player's balance and winnings.[12] 561 F.3d at 989. The present case is distinguishable. The jury here was not permitted to listen to the analogous "whole work," or the sound recording of "Got to Give It Up" that contained material protected by the copyright secured by the deposit copy as well as certain unprotected subject matter. The Thicke Parties' motion in limine to exclude this evidence was granted, Dkts. 165, 226, and a subsequent Order clarified that any recordings offered into evidence "would need to be edited to remove all unprotected elements such as percussion and backup vocals." Dkt. 231 at 5. These orders were adhered to throughout trial. The jury's exposure to indisputably unprotected subject matter was very limited. Whether certain remaining subject matter was protected by the copyright in "Got to Give It Up" was a disputed fact about which each side offered competing evidence. Instruction 43, when considered in the context of the jury instructions as a whole, adequately told the jury of its duty to factor out unprotected elements. There was, therefore, no requirement that the Court list unprotected elements.

Fourth, the Thicke Parties claim Instruction 43 "[e]rroneously instructed the jury that, in applying the extrinsic test, it could disregard similarities in 'individual elements' and instead decide 'there is enough similarity between a work of the Gaye Parties and an allegedly infringing work of the Thicke Parties to comprise a substantial amount.'" Mot., Dkt. 385 at 11. However, the jury was not instructed to "disregard" similarity in individual elements; rather, it was told that it did not have to find that "each of these individual elements is substantially similar." Dkt. 322 at 46. This statement is consistent with governing Ninth Circuit law of copyright in musical compositions. *See Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) ("To pull . . . elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis. Furthermore, to disregard chord progression, key, tempo, rhythm, and genre is to ignore the fact that a substantial similarity can be found in a combination of elements, even if those elements are individually unprotected.") (footnote omitted). This portion of Instruction 43 was not erroneous or misleading.

Fifth, the Thicke Parties contend Instruction 43 "[e]rroneously instructed the jury that similarities between elements need not be 'identical' to be 'substantial,' an argumentative and unnecessary instruction the Gayes requested that tipped the scales in favor infringement." Mot., Dkt. 385 at 11. The statement in this instruction that "substantially similar . . . is not the same as 'identical'" accurately states Ninth Circuit authority. *See Swirsky v. Carey*, 376 F.3d 841, 850 (9th Cir. 2004), *as amended on denial of reh'g* (Aug.

---

[12] *Dream Games* and *Apple Computer* concerned copyrights in source code and a graphical user interface, respectively. They are also distinguishable for applying the "virtual identity" standard, which is more stringent than the substantial similarity standard that was applied to the musical works in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

24, 2004); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). Much of the Thicke Parties' direct and cross-examination of expert witnesses concerned alleged differences between "Got to Give It Up" and "Blurred Lines," some of which was at the measure-by-measure or note-by-note level. *E.g.*, Dkt. 336 at 170-72.[13] Thus, the language to which the Thicke Parties object was not "argumentative," but was necessary to prevent possible confusion among the jurors as to whether exact duplication was required to find substantial similarity. This portion of Instruction 43 was not erroneous or misleading.

Sixth, the Thicke Parties argue Instruction 43 "[e]rroneously instructed the jury to apply the intrinsic test by determining 'if an ordinary, reasonable listener would conclude that the total concept and feel of the Gaye Parties' work and the Thicke Parties' work are substantially similar,' without limiting the test to protectable extrinsic elements of GIVE." Mot., Dkt. 385 at 11. Once again, this argument is based on an inappropriately narrow assessment of the language of Instruction 43 without considering the context provided by other jury instructions. As discussed, Instruction 30 directed the jury to exclude from any consideration of "[s]ubstantial similarity" a number of unprotected factors, and the scope of copyrightable subject matter was further delineated in Instructions 25, 26, 31, 35 and 37. Neither these instructions nor Instruction 43 stated that these considerations were limited to the analysis of extrinsic similarity. The jury is presumed to have correctly applied these instructions, and for this reason to have limited its consideration to protected elements. *See, e.g.*, Instruction No. 30, Dkt. 322 at 31 ("Substantial similarity requires similarity of protected expression . . . ." [Providing five types of unprotected expression].). This portion of Instruction 43, considered in the context of the jury instructions as a whole, was not erroneous or misleading.

Finally, the Thicke Parties claim that Instruction 43 erroneously instructed that, in evaluating substantial similarity, the jury was to consider "whether portions allegedly copied are either qualitatively or quantitatively important." They argue that this question is only properly posed "*after* a jury determines that there are, in fact, similarities under the extrinsic/intrinsic test, in which case the jury must assess if those similarities are trivial and not actionable." Mot., Dkt. 385 at 11   (citing *Newton v. Diamond*, 388 F.3d 1189, 1195-96 (9th Cir. 2003)). Although *Newton* analyzed qualitative and quantitative similarity in the context of a dispute over whether a particular act of alleged copying was de minimis, it did not limit this analysis to this context. And, other Ninth Circuit authority does not support the interpretation of the Thicke Parties. "[E]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 852 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) (citing *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987)). Further, the claimed prejudice arising from this wording, i.e., that it "invited the jury to find 'substantial similarity' based only on how frequent [sic] an element appears in GIVE or how long it lasts," Mot., Dkt. 385 at 12, is not plausible. This portion of Instruction 43 was not erroneous or misleading.

//

//

---

[13] The Court declined to adopt the Gaye Parties' proposed instruction that, "[i]n determining whether infringement exists, a note-by-note or measure-by-measure analysis is not necessary. Works do not have to be exactly identical on paper." Dkt. 244-3 at 35.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

      d)      Whether the Verdict Is Supported by Legally Sufficient Evidence

The Gaye Parties' sole cause of action was for copyright infringement. To prove infringement, "a copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work. Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000) (citation and internal quotation marks omitted). The Thicke Parties' admissions, while relevant in other respects, were deemed insufficient to show liability on a theory of direct copying because they did not specify that protected elements had been copied. Dkt. 139 at 12 (citing *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989)). The case proceeded on a theory of access and substantial similarity. The Gaye Parties presented evidence of ownership, which was not seriously disputed, and the Thicke Parties conceded access. Thus, the only contested element was substantial similarity. The Thicke Parties contend the evidence as to this issue that was presented at trial was not legally sufficient to support the verdict. Mot., Dkt. 385 at 28-32.

There is a two-step process in evaluating whether there is substantial similarity between two works. The first is the "extrinsic" test. It "considers whether two works share a similarity of ideas and expression as measured by external, objective criteria. The extrinsic test requires analytical dissection of a work and expert testimony. Analytical dissection requires breaking the works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) (citations and internal quotation marks omitted). The second step is the "intrinsic test." It "is subjective and asks whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir 2000) (citation and internal quotation marks omitted). Under both the extrinsic and intrinsic test, "a finding of substantial similarity between two works can't be based on similarities in unprotectable elements." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 916 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010). However, "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirsky*, 376 F.3d at 848.

The Thicke Parties argue that the "constellation" of extrinsic similarities between "Blurred Lines" and "Got to Give It Up" alleged by the Gaye Parties was not sufficient to support a finding of infringement. These similarities include "Theme X" and the keyboard part, which the Thicke Parties contend are not in the deposit copy. Mot., Dkt. 385 at 29. The other six elements, and the reasons the Thicke Parties contend they are dissimilar, are as follows: (i) the lyrics, because "there are not two words in a row in common in both songs"; (ii) the signature phrases, which have only five pitches in common, with different rhythms and placements, among other differences; (iii) the "hooks," which are passages that are written to catch and maintain the interest of listeners, because the "Got to Give It Up" hook appears only twice in "Blurred Lines," has only three notes in common, and the rhythms and placement of these notes are different; (iv) the bass melody, only three "common notes" of which are the same in the 25-note bass part in "Blurred Lines" and the 21-note bass intro in "Got to Give It Up"; (v) the "word painting," which consisted of obvious methods applied to ordinary words; and (vi) the "rap v. parlando," the only claimed similarity in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

which was that sections of each song began at the same measure. *Id.* at 29-30.[14]

As discussed above, at trial the Gaye Parties presented qualified, contrary expert testimony. Thus, Finell and Monson testified that these similarities were qualitatively and quantitatively significant. For example, Finell testified that almost all 130 measures of "Blurred Lines" contain protected material appropriated from "Got to Give It Up." Dkt. 336 at 160. She characterized the combination of certain of these elements as the "heartbeat of the songs," or the "pulse that runs through the song and drives each song," and "moves the song forward." *Id.* at 53. The Gaye Parties presented sufficient evidence of similar expression, as measured by external, objective criteria, based on which the jury could reasonably have found substantial extrinsic similarity between "Got to Give It Up" and "Blurred Lines."[15] Although the Thicke Parties disputed this methodology and its conclusions, and presented competing expert testimony, they did not show that the great weight of the evidence favored their musicological analysis. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (refusing to overturn jury finding of substantial extrinsic similarity where two expert musicologists presented competing testimony, despite certain disagreements).

The Thicke Parties claim the jury "never even conducted the intrinsic test," because it was not instructed on this test until after the close of evidence, and never asked to hear any music during deliberations despite being told it could upon request. Dkt. 385 at 31. The jury is presumed to have followed the instructions, and no inference is drawn from what evidence the jury did or did not choose to review during deliberations.

The Thicke Parties also argue that, even if the jury considered and applied the intrinsic test, the evidence presented at trial was not legally sufficient to support a finding of substantial intrinsic similarity. *Id.* Thus, they contend that the musical examples prepared by Finell and Monson were presented only as demonstrative exhibits, and that the only admissible evidence of what the "Got to Give It Up" deposit copy sounds like is Exhibit 141, a recording prepared by Wilbur. *Id.*[16] At the hearing on the Motions, the Thicke Parties requested that Exhibit 141 and the "Blurred Lines" sound recording be played in sequence so that they could be compared by the Court. Dkt. 411 at 68. They argued that this would show there was "no way the jury could have overcome the hurdle of the intrinsic analysis." *Id.* Following the hearing, the Court conducted this review.[17]

---

[14] The Thicke Parties argue that any similarities are no more than de minimis, and not protectable. *Id.* at 30-31. "[A] use is de minimis only if the average audience would not recognize the appropriation." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). It has not been shown that even the shorter sequences identified by the Thicke Parties are de minimis as a matter of law. *See Fisher v. Dees*, 794 F.2d 432, 434 n.2 (9th Cir. 1986) (citing with approval district court decision that held a "parodist's copying of four notes in a 100-measure composition was not merely a de minimis taking where that musical phrase was the heart of the composition") (citation omitted). Even if a particular element in the "constellation" were considered de minimis, it cannot be said that no reasonable juror could find a combination of these elements "quantitatively or qualitatively significant." *Newton*, 388 F.3d at 1195.

[15] *See also infra* Section II.B.3.b, which assesses similar arguments raised in the opposition of the Counterclaim-Defendants to the Gaye Parties' motion for declaratory relief.

[16] The jury also heard Finell play the descending bass line from "Got to Give It Up" on the keyboard. Dkt. 333 at 134.

[17] In response, the Gaye Parties submitted a request that the Court also listen to sound recording excerpts and mashups in determining the post-trial motions. Dkt. 413. They argued that, even if these were not evidence of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Established legal principles apply to a review of the application of the intrinsic test by a jury. "We will not second-guess the jury's application of the intrinsic test." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("Since the intrinsic test for expression is uniquely suited for determination by the trier of fact, this court must be reluctant to reverse it.") (citing *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977)); *see also Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1453 (9th Cir. 1988) ("considerable deference is due to a jury's finding of substantial similarity under the intrinsic test"). Applying this highly deferential standard, it has not been shown, and cannot be found, that the jury's conclusion that the two works have intrinsic similarity was against the clear weight of the evidence or otherwise improper.[18]

\*                    \*                    \*

The Thicke Parties have not shown any evidentiary or instructional error that warrants either a new trial or other relief. The verdict of the jury was supported by substantial evidence. The Thicke Parties have not demonstrated that the verdict was against the clear weight of the evidence, based upon false evidence, or reflects a miscarriage of justice. For these reasons, the Thicke Parties' request for judgment as a matter of law, declaratory relief or a new trial is **DENIED**.

      e)      Request for Remittitur

          (1)      <u>Legal Standard</u>

"If the amount of damages awarded [by a jury] is excessive, it is the duty of the trial judge to require a remittitur or a new trial." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66 (1966). Where remittitur is ordered, "[t]he prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified. If the prevailing party does not consent to the reduced amount, a new trial must be granted. If the prevailing party accepts the remittitur, judgment must be entered in the lesser amount." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). "A remittitur must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (internal quotation marks omitted).

//
//
//
//
//

---

intrinsic similarity, they could be considered in applying the intrinsic test. *Id.* at 2. This request is **DENIED**. These materials were not admitted as evidence during the trial. *See* Dkt. 373.

[18] To the extent certain claimed substantially similar elements, such as "Theme X," were not presented as evidence of intrinsic similarity, and could not be considered in the analysis of extrinsic similarity, it was still not against the clear weight of the evidence for the jury to find substantial extrinsic and intrinsic similarity based on some combination of the remaining elements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(2)    Application

(a)    Award of $4 Million in Actual Damages

(i)    Admissibility of Nancie Stern's Testimony on Damages

The Gaye Parties sought an award of actual damages under a hypothetical license theory. "[H]ypothetical-license damages . . . constitute an acceptable form of actual damages' recoverable under [17 U.S.C.] Section 504(b)." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014). "To calculate the 'market value' of the injury to the plaintiff based on a hypothetical-license theory, we look to the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work." *Id.* (internal quotation marks omitted).

Stern was the only damages expert presented by the Gaye Parties. She testified that an appropriate license for the portions of "Got to Give It Up" allegedly copied by "Blurred Lines" would have been 50 percent of publishing revenue if the license had been obtained before the release of "Blurred Lines," and 75 to 100 percent if it were obtained afterwards. Dkt. 351 at 30-31.The Thicke Parties contend her testimony should be excluded. From this they argue that the jury's award of $4 Million in actual damages, which was "not supported by any admissible evidence," should be set aside. Mot., Dkt. 385 at 32.[19] They claim Stern failed to conduct an analysis regarding a "hypothetical licensing negotiation," as required to support a claim of actual damages based on a hypothetical lost licensing fee. *Id.* They raise three related claims of error.[20] First, Stern failed to identify the "'reasonable market value' for the portions of GIVE in BLURRED." *Id.* at 33 (citing *Oracle Corp.*, 765 F.3d at 1093). Second, her opinion about copying is unreliable, because her opinion was improperly based on the analysis of Finell and edited recordings that contained elements not present in the deposit copy. *Id.* Third, her testimony on a licensing fee that would have been reached after the release of "Blurred Lines" was not appropriate because a licensing fee is to be hypothesized as of the time infringement began, not after the fact. *Id.*

First, Stern's testimony was based on sufficient expertise to which she applied an appropriate methodology. The "reasonable market value" of a hypothetical license may be determined by reference to similar licenses that have been granted in the past or "evidence of 'benchmark' licenses in the industry approximating the hypothetical license in question." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014). The testimony of Stern, a person with substantial experience in this market, was evidence of the second kind.

---

[19] As explained below, the parties agreed that the jury should be told that publishing revenues for "Blurred Lines" totaled $8 Million. Accordingly, the award of $4 Million is consistent with an application of the50% licensing fee about which Stern testified.

[20] The Thicke Parties also raise these arguments as bases to seek a new trial or judgment as a matter of law. Mot., Dkt. 385 at 32. For the same reasons they fail to show that the admission of Stern's testimony was error requiring remittitur, they do not carry their burden to show that this alternate relief is warranted. *See* Fed. R. Civ. P. 61.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

A *Daubert* hearing on Stern's qualifications and analysis was held outside the presence of the jury. Dkt. 334 at 120-139. She testified about matters including her professional experience, "industry practice" in determining sample licenses, and her analysis of the works. *Id.* She testified that she was guided by the industry standard that "[g]enerally speaking . . . in copyrights and compositions, there's 50 percent which goes to the music and 50 percent which goes to the lyrical content. So from there, when you have certain kind of usages, you evaluate it based on those parameters; however, there are variables to that as well." *Id.* at 125. She went on to describe these "variables." The Court determined that Stern "has an ability to opine as to an appropriate fee that would be charged," and, although she lacked "specific business training . . . the work that she has performed over the decades she mentioned qualifies her to opine on this." *Id.* at 138. Thus, her testimony was not "unduly speculative," and was a sufficient basis from which the jury reasonably could have determined the reasonable market value the Thicke Parties would have paid the Gaye Parties for the use of "Got to Give It Up" in a hypothetical negotiation. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014).

Second, it was not improper for Stern to rely on Finell's analysis in formulating her separate opinions. A damages expert may assume as a fact, for purposes of fashioning an opinion, that the technical conclusions of infringement experts are correct and reasonable. *See, e.g.*, *Apple, Inc. v. Samsung Electronics Co.*, 2013 WL 5955666, at *4 (N.D. Cal. Nov. 6, 2013). It was also permissible for Stern to listen to the edited sound recordings. The Thicke Parties had the opportunity to cross-examine Stern about the allegedly unreliable basis for her opinion, and did so. Dkt. 351 at 33-34.

Third, during the trial, the Thicke Parties did not object to Stern's testimony about a hypothetical royalty of 75 to 100 percent that would be applied if negotiations occurred after infringement had occurred. Further, there is no suggestion that the jury relied on this testimony in awarding actual damages. As noted, the award appears to have been based on an application of the 50% rate. The Thicke Parties fail to demonstrate that Stern's testimony about this hypothetical post-infringement royalty affected their substantial rights or led to an excessive verdict.

For these reasons, it was not prejudicial error to admit Stern's testimony concerning damages. Nor was this evidence so speculative that it could not form a reasonable basis on which the jury could determine a hypothetical licensing fee.

(ii)     Award of Actual Damages

(a)     Sufficiency of Evidence

The Thicke Parties next argue that, even if the testimony of Stern were admissible, the award of $4 Million in actual damages is excessive and not supported by evidence. Mot., Dkt. 385 at 33.

At trial, the parties stipulated that the total profit for *Blurred Lines* was $16,675,690. Dkt. 379-15 at 3. They also stipulated to the following profits earned by each Counterclaim-Defendant:

a. Mr. Thicke is credited with $5,658,214 of the total profit, consisting of artist royalties of $4,253,645 and publishing revenue of $1,404,569.
b. Mr. Williams is credited with $5,153,457 of the total profit consisting of producer

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | | Date | July 14, 2015 |
|----------|--------------------------|---|------|---------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | | |

royalties of $860,333 and publishing revenue of $4,293,124.
c. Mr. Harris is credited with $704,774 of the total profit, consisting of $25,412 of artist
royalties and publishing revenue of $679,362.
d. Interscope is credited with $1,343,674 of the total profit.
e. UMGD is credited with $217,159 of the total profit.
f. Star Trak is credited with $3,598,412 of the total profit[.]

*Id.*[21]

According to the stipulation, the publishing revenues received by Thicke, Williams and Harris totaled
$6,377,055. The revenues received by Thicke and Williams, the two Counterclaim-Defendants found
liable by the jury, totaled $5,697,693. Gary Cohen, the Gaye Parties' accounting expert, testified that "the
amounts reflected in the publishing revenue subtracts certain professional fees that Mr. Thicke, Mr.
Williams and Mr. Harris paid to accountants, lawyers and their managers." Dkt. 351 at 51. Cohen
calculated the publishing revenue for "Blurred Lines" without the subtraction of those professional fees to
be "a little bit over $8 Million." *Id.*

On March 6, 2015, during deliberations, the jury posed a written question to the Court that read, in
relevant part, "Q: Can you clarify or explain the intentions of what this sentence means? 'You may not
include in an award of profits any amount that you took into account in determing [sic] actual damages.'"
Dkt. 314. The parties could not initially agree on an appropriate response as counsel appeared outside
the presence of the jury. Dkt. 340. Counsel later agreed that approximately "$8 million went to
publishing," but disagreed on the wording of the Court's response to the jury question. *Id.* at 5, 11. The
parties eventually agreed to the following written response that would be presented by the Court: "The
parties agreed that approximately $8 million was received by the writers of 'Blurred Lines' in publishing
revenue. In calculating actual damages, it is the $8 million you should take into consideration. If you
decide to consider awarding profits, you should not take into consideration the same $8 million." *Id.* at 16.
This response was sent to the jury. Dkt. 314 at 2.

At the hearing on the Motions, counsel for the Thicke Parties stated that the answer to the jury question
was drafted by counsel for the Gaye Parties, and was a "mistake," Dkt. 411 at 72. He stated that he "didn't
go back and check the stipulation" to determine whether the $8 Million figure was correct. *Id.* The jury
awarded the Gaye Parties $4 Million in actual damages, and profits of $1,610,455.31 from the Williams
Parties and $1,768,191.88 from Thicke. Dkt. 320 at 3. The Thicke Parties characterize "[t]he Court's
reference to 'approximately $8 million'" as "grossly inaccurate," because "the stipulated amount of
publishing revenue was $6,377,055 for all three writers." Dkt. 385 at 35 n.5.

In light of the erroneous response to the jury question crafted by the parties, and the precision of the

---

[21]  The Gaye Parties also argued that Thicke's alleged touring revenue of $11,792,000 should be included in the
profits of *Blurred Lines* and added to the $16,675,690 in stipulated profits. *Id.*; *see* Dkt. 351 at 48-49. They made
certain claims about the overhead expenses of the Interscope Parties, and argued that these could not be deducted
from total profits if willful infringement by the Interscope Parties were shown. Dkt. 379-15 at 3-4. Because the jury
found that these parties did not infringe willfully, this issue is moot.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

award of $4 Million, it is reasonable to conclude that the jury applied Stern's rate of 50% to the misstated figure of $8 Million in publishing revenues.[22] Thus, there is no showing that passion and prejudice informed the award, and a new trial is not required. *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000), *as amended* (Aug. 11, 2000). However, there is substantial force to the argument that this award exceeded the amount that was supported by the evidence.

Although Cohen testified that the figure of $8 Million reflected the amount of publishing revenue if professional fees were not deducted, this figure could be used only if the jury found willful infringement. It was instructed that overhead expenses could not be deducted if a party's infringement had been willful. Dkt. 322 at 41. However, the jury did not find willful infringement. Dkt. 320 at 3. Therefore, the correct figure according to the operative stipulation was $6,377,055. The Gaye Parties advance no other argument as to how the jury could have determined, based on the evidence presented at trial, the publishing revenue equaled or exceeded $8 Million.

It is within the discretion of the Court to deem the response to the jury question a judicial admission by which the Thicke Parties would be bound, notwithstanding that it is inconsistent with the amount of stipulated actual damages. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court . . . . Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.") (internal citations and quotation marks omitted). However, because the response was not supported by other evidence, was drafted during jury deliberations, and there is a sufficient showing that the error was agreed to by the Thicke Parties due to the excusable neglect of counsel, it is not deemed a judicial admission.

For these reasons, the award of $4 Million exceeds the amount that can reasonably be supported by the evidence.

(b)     Amount of Remittitur

"The touchstone for hypothetical-license damages is the range of [the license's] reasonable market value." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (internal quotation marks omitted). Thus, where infringement is shown, the infringer "must accept the jury's valuation unless it exceeds the range of the reasonable market value." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004).

But for the erroneous response to the jury question, it may reasonably be inferred that the jury would have applied a royalty rate of 50% to the stipulated publishing revenue. Because Harris is liable as a matter of law based on the jury's other factual findings, the revenue he received must be included in determining

---

[22] The Gaye Parties do not argue that a royalty rate of greater than 50% is supported by the evidence. Dkt. 388 at 31-32.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

the maximum award sustainable by proof. *See infra* Part II.B. Thus, the maximum reasonable royalty the jury could have awarded was $3,188,527.50, which is 50% of $6,377,055. The award of actual damages is remitted to this amount.

(b)     Award of Profits

(i)     Sufficiency of Evidence

The Copyright Act permits the recovery of both "actual damages suffered . . . as a result of the infringement" and "profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b); *Polar Bear Prods., Inc.*, 384 F.3d at 718 ("§ 504(b) permits recovery of both actual damages and defendant's profits rather than just one or the other," consistent with its purpose to compensate fully a copyright owner for the misappropriated value of its property and to avoid unjust enrichment by defendants . . . .") (internal quotation marks omitted)). "When a copyright is infringed, all infringers are jointly and severally liable for plaintiffs' actual damages, but each defendant is severally liable for his or its own illegal profit; one defendant is not liable for the profit made by another." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985) (emphasis removed). Infringers may be found jointly liable for profits only where they "act as partners, or 'practically partners.'" *Id.*

The parties stipulated that the artist royalties to Thicke were $4,253,645, and that the producer royalties to Williams were $860,333. Dkt. 379-15 at 3. The jury found that Thicke's profits "attributable to his . . . infringement of the copyright in 'Got to Give It Up' and not tak[ing] into account" the award of actual damages were $1,768,181.88, which is approximately 40% of the amount of artist royalties to which to parties stipulated. Williams' profits from infringement were found to be $1,610,455.31, which is approximately 187% of the amount of the producer royalties to which the parties stipulated.

The Gaye Parties concede that the general rule is that "joint infringers are only severally liable for their own profits." Opp'n, Dkt. 388 at 32. However, they request a determination, pursuant to Fed. R. Civ. P. 49(a)(3) or their prayer for declaratory relief, that Thicke and Williams were "practical partners." *Id.* at 32-33. The Gaye Parties claim this request is supported by trial evidence that these two Counterclaim-Defendants had "nearly identical roles in the activity, ability to direct the activity, and shared financial interest in the activity," receipt of publishing income and royalties, and partnership in their infringing acts. *Id.* at 34.

The Gaye Parties have failed to show that they are entitled to the requested relief. Fed. R. Civ. P. 49(a)(3) is not an appropriate basis on which such request can be considered or granted. Rule 49 permits the district court to make findings on "any issue of fact raised by the pleadings or evidence but not submitted to the jury" in connection with a special verdict. Although the verdict in this action was labeled a "Special Verdict," this is not dispositive of the issue. Rather, whether a verdict is general or special depends upon the findings the jury is required to make. "If the jury announces only its ultimate conclusions, it returns an ordinary general verdict; if it makes factual findings in addition to the ultimate legal conclusions, it returns a general verdict with interrogatories. If it returns only factual findings, leaving the court to determine the ultimate legal result, it returns a special verdict." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003). The portion of the verdict that addressed liability and damages required only conclusions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

For this reason, it was a general verdict to which Rule 49(a)(3) does not apply.

The request by the Gaye Parties for a declaration that Thicke and Williams were "practical partners" is untimely. To grant such relief would be to draw unsupported inferences from the verdict, and unfairly prejudice the Thicke Parties. This issue was raised for the first time in the Opposition filed by the Gaye Parties. No pre-trial discovery was directed to this issue. Further, during trial, the Gaye Parties agreed that Counterclaim-Defendants "are not jointly and severally liable for each other's profits." Dkt. 351 at 37. The jury was not instructed about, or asked to make a determination as to a claim of, practical partnership liability. Nor is it appropriate to presume that the jury was somehow familiar with this theory. *Paradis v. Arave*, 20 F.3d 950, 955 (9th Cir. 1994). Although "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations" in granting equitable relief, *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011), whether Thicke and Williams were practical partners was neither a factual determination expressly made by the jury, nor one that necessarily arises from the evidence. "The propriety of issuing a declaratory judgment may depend upon equitable considerations." *Green v. Mansour*, 474 U.S. 64, 72 (1985). For these reasons, the request for such declaratory relief is **DENIED**.

Because there has been no finding that Williams was a practical partner of Thicke, with respect to an award of damages based upon his profits, Williams is liable to the Gaye Parties only for his share of them. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985). As noted, his share of the profits is $860,333. However, the jury awarded $1,610,455.31 in damages. This award was excessive. It reflects a profits-to-damages ratio of 187%, which is approximately 4.7 times greater than the 40% ratio that was used in the calculation of damages as to Thicke's profits. The award as to the profits of Williams was excessive.

The Thicke Parties contend the jury award is "so fundamentally flawed that it requires a new trial." Reply, Dkt. 404 at 12. "The final determination of whether a new trial or remittitur is appropriate is committed to the sound discretion of the trial court." Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.). "A new trial is necessary where it is found that passion and prejudice tainted the jury's verdict. But . . . . [w]here there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000), *as amended* (Aug. 11, 2000). Here, notwithstanding the arguments at the hearing by counsel for Williams that the award necessarily warranted a finding that the jury disliked Williams and sought to "punish[]" him, *see* Dkt. 411 at 75-76, there is no supporting evidence for that. Nor does this award support a finding that it reflects passion, prejudice or miscarriage of justice. Consequently, remittitur, rather than a new trial, is the appropriate remedy.[23]

//
//
//
//

---

[23] Consistent with the Seventh Amendment, the Gaye Parties may reject the remitted amount. If they do so, a new trial must be granted. *See Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998); *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(ii)     Amount of Remittitur

A remittitur must reflect "the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1085 (9th Cir. 2014). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 487 (9th Cir. 2000) (citing 17 U.S.C. § 504(b)). Thus, the statutory burden of proof lies with the infringer to prove what percentage of its profits was not attributable to copying. *Id.*

The Thicke Parties argue that the award of profits as to both Thicke and Williams should be remitted to "no more than 5% of the actual non-publishing profits of Thicke and Williams stipulated to at trial." Mot., Dkt. 385 at 37. This position is premised on the testimony of Wilbur that "the handful of elements in GIVE claimed to be copied in BLURRED, even if credited, amount to no more than 5% of BLURRED." *Id.* They also rely upon the testimony of Bania that the profits of "Blurred Lines" were attributable primarily to "the marketing efforts, music video, and other factors in BLURRED's success," no more than half of its success could be attributed to the composition, and half of the composition copyright is typically attributed to lyrics. *Id.* at 35-37. Finally, they claim the disparity between the award of profits against Williams and Thicke shows that the "inconsistent percentages . . . reflect a verdict based on who the jury disliked most and not on the jury instructions." *Id.* at 36.

These arguments are not persuasive. They are the same ones that were presented to the jury, which rejected them. The Gaye Parties presented expert testimony that protected elements copied from "Got to Give It Up" comprised "a heartbeat in that it's a pulse that runs through ['Blurred Lines'] and drives each song," Dkt. 336 at 53, as well as evidence that references to "Got to Give It Up" in the marketing of "Blurred Lines" were important to the success of "Blurred Lines." *E.g.*, Dkt. 338 at 12. The jury may have found this evidence credible and given little weight to the testimony of Wilbur and Bania. *See Three Boys Music Corp.*, 212 F.3d at 487 (upholding jury's apportionment of profits attributable to copyright infringement where "the burden of proof was on [defendant], and the jury chose not to believe [defendant's] experts"). To be sure, the jury made inconsistent damages awards by applying the aforementioned ratios of 40% to Thicke and 187% to Williams. But this inconsistency, in what the Thicke Parties acknowledge is a general verdict, Dkt. 404 at 12, is not a sufficient basis on which a new trial may be granted. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).

The jury's verdict as to Thicke reflects its factual determination that the profits of "Blurred Lines" attributable to the exploitation of protected elements of "Got to Give It Up" are approximately 40%. The Gaye Parties argue that the jury could have found that the Thicke Parties did not carry their burden to show any elements of profit attributable to factors other than the copyrighted work. From this they argue that the award against Williams should be "at or near 100% of his profits." Opp'n, Dkt. 388 at 36. At the hearing on the Motions, they also argued that the jury may have found it appropriate to award a greater percentage of Williams' profits due to his "greater role in the copyright infringement." Dkt. 411 at 89. However, this gives no weight to the factual findings implied by the award of profits earned by Thicke, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|----------|---------------------------|------|----------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

assumes that the jury disregarded the instruction. *See* Dkt. 322 at 41.[24] This assumption is without force because no factual finding can be inferred from the award of 187% of the profits earned by Williams, nor have the Gaye Parties provided any rationale for its calculation.

Under these circumstances, it is appropriate to draw inferences from the general verdict to determine the factual findings made by the jury. *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) (analogizing this to "traditional issue preclusion analysis"). Consistent with this approach, at the hearing, each side stated that the Court could exercise discretion in making a determination as to the amount of a remittitur based on what it determined to be an appropriate portion of the profits. *See* Dkt. 411 at 89-90. Using this approach, the Court applies the same ratio of approximately 40% that the jury applied to Thicke's profits. Thicke's stipulated artist royalties were $4,253,645, and the jury awarded the Gaye Parties profits of $1,768,191.88 from Thicke. This reflects a factual determination that 41.5689 percent, or 1,768,191.88 / 4,253,645, of the profits obtained by "Blurred Lines" were due to the appropriation of protected elements of "Got to Give It Up." The parties stipulated that $860,333 in producer royalties were paid to Williams. 41.5689 percent of $860,333 is $357,630.96. Based on the jury's factual determination of the percentage of profits attributable to appropriation, this is the maximum award of profits against Williams that can be sustained by the trial evidence. Therefore, the award of Williams' profits is remitted from $1,610,455.31 to $357,630.96.

\*          \*          \*

For these reasons, the Thicke Parties' Motion for Judgment as a Matter of Law, Declaratory Relief, a New Trial, or Remittitur is **GRANTED IN PART**. Their request for judgment as a matter of law, declaratory relief or a new trial is **DENIED**.[25] Their request for remittitur is **GRANTED IN PART**. The award of actual damages is remitted from $4 Million to $3,188,527.50. The award of profits from Williams is remitted from $1,610,455.31 to $357,630.96.

//
//
//
//
//

---

[24] Thus, the Gaye Parties adopt contradictory positions in their opposition to remittitur and their request for declaratory relief. In the former, the Gaye Parties argue that no weight should be given to the jury's implicit factual determination, notwithstanding the inconsistency in the general verdict. In the latter, they argue that factual determinations necessary to one conclusion in the general verdict should be used to correct another, inconsistent conclusion.

[25] Because the Motion for a New Trial is denied, the request by the Thicke Parties for summary judgment following the grant of a Rule 59 motion is **MOOT**. Reply, Dkt. 404 at 6 & n.3. The grant of a Rule 59 motion, followed by the reconsideration and grant of a previously denied Rule 56 motion, would ignore the exclusive procedures set forth by Rule 50. *But see Quinn v. Fresno Cnty. Sheriff*, 2013 WL 898136, at *5 (E.D. Cal. Mar. 8, 2013) (granting this relief). Even assuming such relief could be provided, the denial of a motion for summary judgment may not be reconsidered following a jury trial in which the jury verdict withstands post-trial motions. *See Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) ("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

    B.    Gaye Parties' Motion for Declaratory Relief

        1.    <u>Procedural Background</u>

            a)    Stipulated Facts

The parties agreed to the following stipulation regarding the respective roles of Counterclaim-Defendants in the ownership, release, licensing, manufacture and distribution of "Blurred Lines":

    1. Robin Thicke, Pharrell Williams, and Clifford Harris Jr. are credited as the songwriting [sic] of "Blurred Lines" and co-own the musical composition copyright in "Blurred Lines" in the following percentages: 22% Thicke, Williams 65%, and Harris 13%.
    2. "Blurred Lines" was partially recorded in Burbank, California at Glenwood Studios.
    3. Star Trak Entertainment, LLC and Interscope Records, a division of UMG Recordings, Inc. ("UMG") formed a venture doing business as Star Trak, LLC ("Star Trak");
    4. Star Trak Entertainment, LLC is owned by Pharrell Williams and Chad Hugo.
    5. Interscope Records ("Interscope") is an unincorporated division of UMG.
    6. Star Trak/Interscope released the recording and song "Blurred Lines" and the album *Blurred Lines.*
    7. Star Trak/Interscope licenses the sound recording to UMG affiliates in foreign territories to sell.
    8. Star Trak Entertainment, LLC and Interscope jointly own the sound recording of "Blurred Lines."
    9. Universal Music Distribution, a division of Universal Music Group Distribution Corp., manufactured and distributed the single "Blurred Lines" and album *Blurred Lines.* . . .

Dkt. 303. This stipulation was read to the jury and placed into evidence. Dkt. 376-1 at 13-15; Dkt. 373 at 40.

            b)    Disputed Jury Instructions

Before trial, the parties agreed to several proposed jury instructions. Dkt. 244-1. One was based on MCJI § 17.1, which describes the exclusive rights of copyright owners under 17 U.S.C. § 106. Dkt. 244-1 at 30. The relevant part of this instruction, which was given at trial, provides: "In general, copyright law protects against production, distribution, and performance of substantially similar copies of the owner's copyrighted work without the owner's permission. An owner may enforce these rights to exclude others in an action for copyright infringement." *Id.*; Dkt. 322 at 25.

The parties had disputes over 27 other jury instructions. Dkts. 244, 267. The Court declined to read several of the disputed instructions that were proposed by the Gaye Parties. These included "Instruction No. 39" proposed by the Gaye Parties, which provides:

    A distributor who distributes an infringing work is liable for copyright infringement. Any member of the distribution chain is joint [sic] and severally liable for the copyright

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

infringement. Members of the distribution chain include any persons or entities engaged in the sale, distribution, and/or publication of the infringing work. Joint and several liability means that infringing party is individually responsible for the entire damage obligation.

Dkt. 244-3 at 26. This instruction was not adopted because it was deemed "redundant with respect to other instructions." Dkt. 283 at 2.

On March 4, 2015, outside the presence of the jury, the Gaye Parties proposed additional jury instructions about vicarious and contributory copyright infringement. Dkt. 376-1 at 5. Counterclaim-Defendants opposed their use. *Id.* at 5-6. The Gaye Parties claimed that these instructions were necessary because the Interscope Parties were potentially liable as direct, contributory or vicarious infringers. *Id.* at 6-8. The Court stated that the proposed instruction was "hopelessly confusing" and unnecessary, because based on the evidence that had been presented, "anybody who distributed ['Blurred Lines'] is then potentially -- is liable without getting into this secondary issue." *Id.* at 6, 9. The parties continued to dispute the appropriate verdict form and jury instructions as each applied to this issue.

On May 5, 2015, the following colloquy occurred:

> THE COURT: . . . . I think there should be a separate determination because there are separate counterclaim defendants. There's going to be -- if this liability is found and if damages are awarded, we'll then be able to see how that -- how that occurred. I mean, if it's going to be listed. And then if, Mr. Busch, there is a finding of no liability as to a particular counterclaim defendant whom you contend has to be liable as a matter of law in light of the finding, other findings, you can make that motion to correct the verdict.
> MR. BUSCH [Counsel for the Gaye Parties]: That's fair enough, your Honor.

*Id.* at 12.

> c)      The Findings of the Jury

Question 2 on the "Special Verdict" form completed by the jury asked, "[d]o you find by a preponderance of the evidence that the Thicke Parties infringed the Gaye Parties' copyright in the musical composition 'Got to Give It Up' in 'Blurred Lines'? Please answer 'yes' or 'no' for each of the following . . . Parties[.]" Dkt. 320 at 2. The jury answered as follows:

Pharrell Williams and More Water From Nazareth Publishing, Inc. (the "Williams Parties")
Answer:      Yes      X
             No      ____

Robin Thicke
Answer:      Yes      X
             No      ____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Clifford Harris, Jr.
Answer:      Yes    ___
                   No     _X_

Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak Entertainment (the "Interscope Parties")
Answer:      Yes    ___
                   No     _X_

*Id.*

Question 1 asked whether the Gaye Parties owned a valid copyright in "Got to Give It Up." *Id.* Questions 3, 4, 5 and 8 concerned the calculation of actual damages, profits attributable to infringement and statutory damages. *Id.* at 3-5. Questions 6 and 7 asked whether any infringement was willful or innocent. *Id.* at 4-5.[26] Questions 9 through 16 concerned "After the Dance" and "Love After War." *Id.* at 5-8. Thus, the yes-or-no responses to Question 2 were the only place in which the jury set forth its conclusions as to whether each Counterclaim-Defendant infringed "'Got to Give It Up' in 'Blurred Lines.'" The jury did not separately present any factual findings upon which these conclusions were based.[27]

2.      Legal Standard

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, provides, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Declaratory relief may be granted where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Montana Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014) (citations omitted). "[A] declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Turner v. Gibson*, 2011 WL 4825646, at *2 (E.D. Cal. Oct. 11, 2011) (citing *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).[28] "In determining whether to exercise declaratory jurisdiction,

---

[26]  Despite finding that Harris and the Interscope Parties had not infringed the copyright in "Got to Give It Up," the jury answered "yes" to the question whether their "infringement of the copyright in 'Got to Give It Up' was innocent." Dkt. 320 at 4-5.

[27]  Before trial, Counterclaim-Defendants lodged a proposed special verdict that would have required the jury to make several separate factual findings, e.g., whether protectable elements of "Got to Give It Up" were extrinsically and intrinsically substantially similar to "Blurred Lines," and whether any copied protectable elements of "Got to Give It Up" were "non-trivial." Dkts. 219-1, 240-2. The Gaye Parties objected that this form was confusing, and could lead to an inconsistent verdict. Dkt. 249. Although the verdict form that was ultimately used, unlike that proposed by the Gaye Parties, required separate findings as to each set of counterclaim-defendants and omitted references to contributory and vicarious liability, it did not require the jury to make the separate factual findings requested by Counterclaim-Defendants.

[28]  Declaratory relief is not per se equitable. Thus, a "particular declaratory judgment draws its equitable or legal substance from the nature of the underlying controversy." *Transamerica Occidental Life Ins. Co. v. DiGregorio*, 811

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

federal courts should consider whether a declaratory judgment will serve a useful purpose in clarifying and settling the legal relations between the parties, and whether it will terminate the controversy." *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992).

The Seventh Amendment provides, "[i]n suits at common law . . . no fact tried by a jury[] shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Thus, "where legal claims tried by the jury and equitable claims tried by the court are based on the same set of facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011).

      3.    <u>Application</u>

          a)    Relief Requested

In their Counterclaims, the Gaye Parties requested a determination that Counterclaim-Defendants had willfully infringed "Got to Give It Up" in violation of the Copyright Act, and were "directly, vicariously, and/or contributorily liable for copyright infringement." Dkt. 14 at 43; Dkt. 36 at 17. Based on this prayer for relief, the jury's determination that the Thicke Parties infringed "Got to Give It Up" through "Blurred Lines," and the Court's statements and evidence presented at trial, the Gaye Parties seek a declaration "(1) confirming the jury's verdict and declaring that Thicke and the Williams Parties are liable for copyright infringement; and (2) confirming the Court's prior statement and declaring that Harris and the Interscope Parties are liable for copyright infringement as a matter of law based on the jury's finding that 'Blurred Lines' infringes the copyright in 'Got to Give it Up.'" Mot., Dkt. 376 at 9.

In response to Counterclaim-Defendants' argument that the verdict could not be altered through declaratory relief, the parties were ordered to file supplemental briefs that addressed whether the Motion could be construed as one for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Dkt. 406. The Gaye Parties contend that it may, but that this step is not required with respect to the relief they seek. Dkt. 407. Counterclaim-Defendants contend it may not because the Gaye Parties "waived relief under Rule 50(b) by failing to move under Rule 50(a), and do not seek relief for insufficient evidence even now." Dkt. 408 at 2.

          b)    Whether a Lack of Evidence Precludes Declaratory Relief or Judgment as a Matter of Law

Counterclaim-Defendants argue that declaratory relief should be denied because the Thicke Parties are entitled to a new trial. Opp'n, Dkt. 393 at 11-12. The Thicke Parties do not carry their burden to show that such relief is appropriate. Counterclaim-Defendant also raise claims of instructional error that are similar to those raised in the Thicke Motion, which have been addressed. Finally, Counterclaim-Defendants argue that declaratory relief should be denied because the Gaye Parties did not present legally sufficient

---

F.2d 1249, 1251 (9th Cir. 1987). The parties agree that, under the circumstances presented, the declaratory relief sought by the Gaye Parties is equitable in nature. *See* Mot., Dkt. 376 at 11; Opp'n, Dkt. 393 at 7-8, 11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

evidence of substantial similarity. *Id.* at 12.

Counterclaim-Defendants contend that the Court's analytic dissection performed on their motion for summary judgment "summarily observed that there were 'competing expert analyses' as to substantial similarity and that the expert reports did not 'warrant the exclusion' of any expert's testimony." *Id.* at 13. They argue that, with the benefit of a full trial record, the Court may assess substantial similarity anew, and will find it lacking. On this basis, they argue that the request for declaratory relief should be denied. *Id.* at 13-14.

They also contend there is no extrinsic similarity between the hooks, signature phrases and lyrics that appear in the "Got to Give It Up" deposit copy and elements of "Blurred Lines." They add that "Theme X," the keyboard parts, the bass melody and the extended parlando section about which Finell opined do not appear in the deposit copy. *Id.* at 14-28; *see Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria. The extrinsic test often requires analytical dissection of a work and expert testimony. . . .") (citation omitted). Counterclaim-Defendants argue that "[t]he Court should not presume that the jury's verdict against Thicke and the Williams Parties reflects an extrinsic analysis that the jury was not adequately instructed to make. This Court, however, can perform each step of that objective legal analysis now." Opp'n, Dkt. 393 at 29.

Counterclaim-Defendants urge that extrinsic similarity should be reevaluated based on certain factual conclusions that must be drawn from the trial testimony of their expert witness. For example, they argue that, as a matter of law, the 6-1-1-1 hook in "Blurred Lines," which is in the key of G and set to an E chord in the first measure and an A chord in the second measure, is not similar to the 6-1-2-1 hook in "Got to Give It Up," which is in the key of A and set to an A7 chord. Opp'n, Dkt. 393 at 14-17. They also argue that the 10-note signature phrase of "Got to Give It Up" cannot be found to be similar to the 12-note signature phrase of "Blurred Lines" because the two do not share "even a *single* note with the same pitch, rhythm, and placement." *Id.* at 17-18.

The method of musicological analysis advocated by Counterclaim-Defendants was presented to the jury through the testimony of Sandy Wilbur. However, the jury may have given more weight to the analyses that were presented through the testimony of the experts presented by the Gaye Parties, Finell and Monson. Their testimony was based on a different methodology, which they asserted was based on the deposit copy. *Cf. Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004), *as amended on denial of reh'g* (Aug. 24, 2004) ("no approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key, and thereby support a conclusion that compositions are dissimilar as a matter of law. . . . To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete and distorted musicological analysis."). "So long as the plaintiff can demonstrate, through expert testimony that addresses some or all of these elements and supports its employment of them, that the similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." *Id.* at 849.

The Gaye Parties met this standard at trial. Similarly, whether "Theme X," the keyboard parts, the bass melody or the extended parlando section appeared in the deposit copy required both factual and legal determinations. Although subject matter is protected by copyright under the 1909 Act following

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

"publication," which is a legal concept, whether the visible notation that appeared on the deposit copy covered these forms of expression required, among other things, the resolution of disputed facts based on expert testimony. The Gaye Parties made a sufficient showing that Finell's opinion on these matters was admissible because it appropriately applied accepted musicological principles and methods to the facts of the case. The jury found that the works were substantially similar after considering expert testimony. The Counterclaim-Defendants do not offer a sufficient basis to disturb that finding.

The jury reasonably could have found, based on substantial evidence, that there was substantial extrinsic as well as substantial intrinsic similarity between "Got to Give It Up" and "Blurred Lines." There is sufficient evidence to support granting the relief requested by the Gaye Parties.

c)      Declaration That the Thicke Parties Are Liable for Copyright Infringement

The jury found, by a preponderance of the evidence, that the Thicke Parties "infringed the Gaye Parties' copyright in the musical composition 'Got to Give It Up' in 'Blurred Lines.'" Dkt. 320 at 2. A declaration that the exploitation of "Blurred Lines" by the Thicke Parties infringes the Gaye Parties' copyright in "Got to Give It Up" is warranted. First, there continues to be a real and immediate controversy between the parties as required to sustain declaratory jurisdiction. *Montana Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014). Thus, in connection with their motion for injunctive relief or an ongoing royalty, the Gaye Parties present evidence that "Blurred Lines" has been played and distributed on certain media since the completion of the trial. Dkt. 377-1. Second, the relief requested by the Gaye Parties would clarify and settle the legal relations between the parties. Thus, to the extent the jury verdict did not do so, a declaration would put the Thicke Parties and others on notice of the legal consequences of the continued use and exploitation of "Blurred Lines." Third, this determination necessarily follows from the verdict rendered by the jury.

Based on the foregoing, the Gaye Parties' request for declaratory relief against the Thicke Parties is **GRANTED**.

d)      Declaration That the Interscope Parties and Harris Are Liable for Copyright Infringement, or Request for Judgment as a Matter of Law

(1)      Liability for Past Infringement

(a)      Basis for Relief

The Gaye Parties request a declaration that the Williams Parties and Harris are liable for infringement of "Got to Give It Up," directly and as participants in the distribution of "Blurred Lines." Mot., Dkt. 376 at 15-16. Alternatively, they argue that this request may be construed as one for judgment as a matter of law. Dkt. 407. Counterclaim-Defendants respond that this relief cannot be granted on either basis, because "the jury expressly found [Harris and the Interscope Parties] *not* liable for copyright infringement," and any purported correction to the verdict would be beyond this Court's equitable jurisdiction and a violation of the Seventh Amendment. Opp'n, Dkt. 393 at 6-11. Further, they argue that the Gaye Parties waived any right to seek this relief by failing to make a timely Fed. R. Civ. P. 50(a) motion or raise an objection based on inconsistency of the verdict during trial. Dkt. 408 at 2-3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

The Gaye Parties make several arguments why the requested amendment to the verdict would be consistent with the jury's factual determinations. On this basis, they contend there is jurisdiction to grant the requested declaratory relief. Mot., Dkt. 376 at 12-15; Reply, Dkt. 403 at 6-11; Dkt. 407 at 5-6. However, they cite no authority for the proposition that a jury verdict may be "corrected" by a judicial declaration. The Court has not found a single published opinion, in any jurisdiction, in which such relief was granted. Although "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," Fed. R. Civ. P. 57, there is no showing of a legal basis to grant this relief.

The Rules of Civil Procedure set forth distinct procedures to correct jury error, *e.g.*, Fed. R. Civ. P. 49, 50, and when a party fails to pursue these remedies in a proper and timely manner, the resulting waiver of rights may have significant consequences. *See, e.g., Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006) (failure to file post-verdict motion under Fed. R. Civ. P. 50(b) deprives appellate courts of jurisdiction to review verdict for sufficiency of evidence). To permit these procedures to be sidestepped based on a prayer for declaratory relief that is presented at the end of a complaint would contravene the "fundamental principle of equity jurisprudence . . . that 'equity follows the law.'" *In re Shoreline Concrete Co., Inc.*, 831 F.2d 903, 905 (9th Cir. 1987); *id.* ("Courts of equity are bound to follow express statutory commands to the same extent as are courts of law."); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959) ("Since in the federal courts equity has always acted only when legal remedies were inadequate, the expansion of adequate legal remedies provided by the Declaratory Judgment Act and the Federal Rules necessarily affects the scope of equity.") (footnote omitted).

Counterclaim-Defendants argue that Rule 50(b) is not a basis for relief because the Gaye Parties' Motion is not based on a claim of insufficient evidence. Dkt. 408 at 2. However, the argument advanced by the Gaye Parties is an evidentiary one. Their claim is not that the evidence presented at trial could support only a finding that Harris and the Interscope Parties are liable for infringement, but rather that the evidence presented at trial, combined with the jury's implicit factual findings in the general verdict, could support no other conclusion. *See Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) (likening this to "traditional issue preclusion analysis," and affirming district court's use of this analysis to correct inconsistent verdicts).[29] Thus, a post-trial motion for judgment as a matter of law is an appropriate procedural vehicle for the relief sought by the Gaye Parties. Further support for this conclusion is provided by *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005). There, the Ninth Circuit concluded that a motion for judgment as a matter of law was a basis for a similar correction of a jury verdict, albeit a special verdict. As a result, a finding of no liability was changed to one of liability. *Id.* at 1072, 1074-75.

Because the Gaye Parties' request to correct the verdict is made in the alternative as one for judgment as a matter of law and could be granted on this basis, whether it could be granted as declaratory relief need not be decided.

---

[29] Neither the Ninth Circuit decision nor the district court order in *Westinghouse* makes clear the procedural basis on which the verdict was corrected.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(b)     Whether the Gaye Parties Are Entitled to Judgment as a Matter of Law Against the Interscope Parties and Harris

At the close of trial, the Gaye Parties expressed their intent to move for judgment as a matter of law on the issues of ownership and access. Dkt. 339 at 17. The Court stated that it would not "grant motions of this type by either side." *Id.* at 17-18. The Gaye Parties later stated that they were concerned that the separate statements of liability on the verdict as to each of four sets of parties would "lead to confusion," and they were invited to move to correct the verdict if an inconsistent one were returned. *Id.* at 36-38. Even if the Motion is deemed a Rule 50(b) motion on a ground not advanced in their Rule 50(a) motion made during trial, the Gaye Parties are entitled to review of the verdict for plain error. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).[30]

The Gaye Parties contend that "the only logical conclusion in light of the verdict and the instructions is that the jury found the two songs to be substantially similar and held Thicke and Williams liable as the creators of the infringing work, but absolved Harris due to the timing of his limited involvement in the rap section of 'Blurred Lines' and the Interscope Parties because they did not create the work." Reply, Dkt. 403 at 8. However, they claim that this was a legally inconsistent verdict that was the result of instructional error. Thus, they argue that, as a matter of law, if "Blurred Lines" infringed, then the Interscope Parties, who distributed "Blurred Lines," and Harris, a co-owner of the composition "Blurred Lines" and who authorized its distribution, were also liable for the infringement. *Id.* at 9-11. The Gaye Parties contend that, had the jury been properly instructed on these points, there is no question it would have found Harris and the Interscope Parties liable.

In support of their position, the Gaye Parties rely principally upon *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005), and *Westinghouse Electric Corp. v. General Circuit Breaker & Electric Supply Inc.*, 106 F.3d 894 (9th Cir. 1997). In *El-Hakem*, an employee brought claims against his corporate employer and a manager, including one for intentional racial discrimination in violation of 42 U.S.C. § 1981. 415 F.3d at 1071. The jury "completed interrogatories on separate special verdict forms for each of the Defendants," and found the manager, but not the employer, liable. *Id.* at 1072. The parties filed cross-motions for judgment as a matter of law. *Id.* The defendants' motion was denied, the plaintiff's motion was granted, and the judgment was amended to "reflect [the employer's] vicarious liability on the racial discrimination claim." *Id.* The Ninth Circuit affirmed. It stated that, "[b]ecause the jury was not instructed that it must find against BJY if it found against Young, the jury responses could be reconciled by considering the probable effect on the jury of not having the benefit of the correct instructions. The district court reasonably concluded that the special verdicts were inconsistent due to the lack of appropriate instructions," because "inclusion of the vicarious liability instruction would have inevitably resulted in consistent verdicts of liability against both defendants." *Id.* at 1074-75. The Ninth Circuit described this as a reasonable application of the trial court's "duty to harmonize" "seemingly inconsistent responses to special verdict interrogatories." *Id.*[31]

---

[30] Because the Gaye Parties are entitled to relief on this basis, it is unnecessary to determine whether the colloquy at pages 36-38 of the transcript of the March 5, 2015 hearing is an "ambiguous or inartfully made" Rule 50(a) motion, which would entitle them to a substantial-evidence review as to this issue. Dkt. 339 at 36-38.

[31] Although *El-Hakem* describes them as "special verdicts," it appears from the district court opinion that the jury

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

In *Westinghouse*, a jury returned general verdicts finding the defendants proved affirmative defenses to all but one claim, although that affirmative defense was based on the same set of facts. 106 F.3d at 897-98. The district court determined that a jury instruction "misstated the law and that the error caused the jury's verdict in favor of [the plaintiff]." *Id.* at 898. In affirming this decision, the Ninth Circuit stated:

> In this case, there is an identifiable error that only could have affected one of the verdicts. If we presume the jury followed their instructions, as we must, it is possible to determine the facts necessarily found by the jury and thereby to remedy the error. Thus, a court in these very limited circumstances can reconcile the verdicts without intruding upon the jury's fact-finding role.
>
> In sum, the facts of this case present a seemingly rare situation. Despite an erroneous jury instruction, it is possible to examine the pattern of jury verdicts and logically determine what facts a rational juror must have found in order to reach those verdicts. As a result, it was possible for the trial judge to apply the correct law to these implicit factual findings and thereby to remedy the harm from the erroneous jury instruction without the expense and delay of a new trial. In circumstances such as these—where the necessary factual findings can be determined from the pattern of verdicts—justice has nothing to gain from a new trial.

*Id.* at 902.

"In interpreting jury verdicts, we must assume that the jury followed the trial court's instructions." *Id.* at 901 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1985)). Based on the evidence presented at trial, for the jury to have found that the Thicke Parties "infringed the Gaye Parties' copyright in the musical composition 'Got to Give It Up' in 'Blurred Lines,'" it must have determined that "Blurred Lines" contained original, non-trivial elements that had been copied from "Got to Give It Up," and was an infringing work. *See, e.g.*, *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); Jury

---

responses at issue may have been general verdicts under the functional analysis of *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003):

> Part I. Hostile Work Environment Discrimination Claim
> 1A. Has Plaintiff proved by a preponderance of the evidence that Defendant Young intentionally discriminated against Plaintiff by creating or maintaining a hostile work environment on the basis of Plaintiff's race?      Yes   _X_   No ___
> If your answer is "No," proceed to Part 2. If your answer is "Yes," proceed to Question 1B.
> 1B. What are Plaintiff's damages, if any, for intentional hostile work environment discrimination by Defendant Young? For emotional distress: $15,000[.] For punitive damages: $15,000.

*El-Hakem v. BJY Inc.*, 262 F. Supp. 2d 1139, 1146 (D. Or. 2003), *aff'd*, 415 F.3d 1068 (9th Cir. 2005). *See Zhang*, 339 F.3d at 1031 ("[G]eneral verdicts do not involve factual findings but rather ultimate legal conclusions.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
| --- | --- | --- | --- |
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Instructions, Dkt. 322 at 28. The parties stipulated that Harris had an ownership interest in "Blurred Lines," and that the Interscope Parties were involved in the manufacture, licensing and distribution of the work and the album on which it appeared. Dkt. 303; Dkt. 376-1 at 13-15. Given the jury's conclusion that "Blurred Lines" was an infringing work, these parties were necessarily liable for infringement as a matter of law. *See, e.g.*, *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1384 (C.D. Cal. 1993) ("It is well settled that the *distribution* of an infringing work subjects the distributor to liability.") (citations omitted). Thus, the jury verdict was legally inconsistent.

Counterclaim-Defendants contend the verdict cannot be changed to impose liability on Harris and the Interscope Parties without infringing their respective Seventh Amendment rights to a jury trial. Opp'n, Dkt. 393 at 6-11. They rely on the principle that "legally inconsistent verdicts 'may nonetheless stand on appeal even though inconsistent.'" *Id.* at 7 (citing *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). In *Zhang*, no new trial was required where a jury found a corporate entity liable for discrimination while finding, based on the evidence presented, that there was no liability as to the only individual associated with the corporation and the underlying discriminatory conduct. The Ninth Circuit concluded that it was the jury's "prerogative" to return inconsistent general verdicts, and cited numerous cases and authorities for the proposition that a new trial could not be granted on this basis. *Id.* at 1035-36.[32] However, this proposition applies only where "it is unclear whose ox has been gored; in other words, it is impossible to tell which verdict is the correct one." *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 902 (9th Cir. 1997). Under *Westinghouse*, there is no Seventh Amendment violation or interference with the fact-finding role of the jury where its factual conclusions may be determined from the general verdict, the inconsistency in the verdict may be traced to a missing or erroneous jury instruction, and the error may be "remed[ied]" by applying the correct legal standard to the "facts necessarily found by the jury." *Id.* These circumstances are present here.

That the jury did not find Harris and the Interscope Parties liable can be attributed to specific instructional error. Jury Instructions 24 and 35 were the only ones that addressed liability for distribution. Instruction 24 stated that a person can be liable for "distribution . . . of substantially similar copies of the owner's copyrighted work without the owner's permission." Dkt. 322 at 25. Instruction 35, which tracks MCJI § 17.0, states that, "[o]ne who . . . distributes . . . a copyrighted work without authority from the copyright owner during the term of the copyright, infringes the copyright." *Id.* at 38. Neither instruction adequately informed the jury that a person may be liable for distribution of an infringing work, as opposed to an unauthorized work of the author. Counterclaim-Defendants argue that the "substantially similar copies" language of Instruction 24 did so. Dkt. 408 at 4. This is not a persuasive reading of Instruction 24 or the instructions as a whole.

It was error not to instruct the jury that the distribution of infringing works constitutes copyright infringement, by using the Gaye Parties' proposed "Instruction No. 39" or some variation of it.[33] The

---

[32] The Gaye Parties do not dispute that the verdict, although labeled a "Special Verdict," was a general verdict as to these issues. See *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 ("[G]eneral verdicts do not involve factual findings but rather ultimate legal conclusions . . . . Thus in a general verdict the jury announces only the prevailing party on a particular claim, and may announce damages.").

[33] As proposed, the Gaye Parties' Instruction 39 was deficient because it stated that Counterclaim-Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

inclusion "would have inevitably resulted in consistent verdicts of liability." *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005).[34] Therefore, the verdict of no liability as to these Counterclaim-Defendants was plainly erroneous, and the Gaye Parties are entitled to judgment as a matter of law against Harris and the Interscope Parties.[35]

(2)     Liability for Future Infringement

The Gaye Parties' request that Harris and the Interscope Parties be deemed liable for any prospective infringement of "Got to Give It Up" in "Blurred Lines." This request may be granted as declaratory relief. Thus, it follows the jury's implicit and explicit factual determination that "Blurred Lines" infringes "Got to Give It Up," and the determination that the jury would have made had it correctly been instructed on distributor liability, which is reflected in the corrected verdict.[36] And, it will serve a useful purpose in clarifying and settling the legal relations between the parties, and terminating future controversies. *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992). Based on the foregoing, this request is **GRANTED**.

e)     Disposition

For these reasons, the Gaye Parties' Motion for Declaratory Relief or Judgment as a Matter of Law is **GRANTED**. Judgment shall be entered in favor of the Gaye Parties and against all Counterclaim-Defendants. It is declared that any past and ongoing reproduction, preparation of derivative works, distribution, sale or other transfer of ownership, rental, lease, lending or public performance of "Blurred Lines," or authorization of these activities, by Robin Thicke, Pharrell Williams, Clifford Harris, Jr., More Water From Nazareth Publishing, Inc., Star Trak Entertainment, Interscope Records, UMG Recordings, Inc. and/or Universal Music Distribution infringes the Gaye Parties' copyright in "Got to Give It Up."
//
//
//
//

---

would be jointly and severally liable for all infringement. This was correct as to actual damages, but not as to profits, for which they would only be severally liable. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985).

[34] Because Harris and the Interscope Parties are liable as direct infringers as a matter of law, it is not necessary to reach the contention of the Gaye Parties that they are also liable for vicarious or derivative infringement.

[35] The parties agree that the correction of the verdict makes Harris and the Interscope Parties jointly and severally liable for the award of actual damages, but not lost profits. Dkts. 417, 418, 420. The Gaye Parties' motion to strike the supplemental brief of Harris on this issue, Dkt. 421, is **DENIED**. However, arguments raised in this brief that are beyond the scope of the order directing supplemental briefing have not been considered.

[36] Counterclaim-Defendants oppose this request on the grounds that the jury "exonerated" Harris and the Interscope Parties for past infringement. *E.g.*, Dkt. 393 at 7 n.3. As noted above, the jury would have reached a contrary result had it been correctly instructed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

C.   Gaye Parties' Motion for Injunctive Relief, or in the Alternative, for Ongoing Royalties

1.   Legal Standard

The Copyright Act authorizes a district court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The "permissive" language of this statute does not "undermine the equitable principle that such relief is an extraordinary and drastic remedy that is never awarded as of right." *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 980 (9th Cir. 2011) (internal quotation marks omitted). In order to obtain a permanent injunction, a party that has prevailed at trial must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The Copyright Act provides "no explicit basis for a court to order ongoing royalties." 5-14 Nimmer on Copyright § 14.06[D] (2015). However, the Ninth Circuit has noted that a continuing royalty may be an appropriate alternative to the "harsh and drastic" remedy of injunctive relief under "special circumstances." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1979 (2014) (citing with approval Government's observation at oral argument that district court had "considerable leeway" to "fashion[] equitable remedies," including permitting the defendant to continue using the allegedly infringing work as "a derivative work upon payment of a reasonable royalty" to the plaintiff); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 519 (9th Cir. 1997), *as amended*, 133 F.3d 1140 (9th Cir. 1998) ("mandatory licensing at a reasonable royalty could be required" as remedy for infringement in lieu of injunction). An appropriate ongoing royalty "should be calculated based on a hypothetical, arms-length negotiation between the parties," in light of "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (citing *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007)).

2.   Application

a)   Whether Injunctive Relief Is Appropriate

(1)   Whether Injury Is Irreparable or Can Be Compensated with Damages

Irreparable harm is not presumed in issuing injunctive relief under the Copyright Act: rather, it is the copyright holder's burden to "demonstrat[e] irreparable injury." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994-95 (9th Cir. 2011). Irreparable harm in this context must be to the "legal interests" in authorship protected by copyright law, although a court may "consider collateral consequences as part of its irreparable harm analysis and remedy." *Garcia v. Google, Inc.*, No. 12-57302, 2015 WL 2343586, at *8, *10 (9th Cir. May 18, 2015) (en banc).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

The Gaye Parties contend they will suffer irreparable harm if an injunction does not issue because Counterclaim-Defendants have continued to infringe their "exclusive right to authorize others to[] reproduce, distribute, sell, perform, display, and prepare derivative works." Mot., Dkt. 377 at 10 (citing 17 U.S.C. § 106)). They present evidence that, since the time of the jury's verdict of infringement of "Got to Give It Up," "Blurred Lines" continues to be sold on iTunes and Amazon.com. Dkt. 377-1 at 8-16. The Gaye Parties claim that if an injunction is not entered, they will "be required to file a series of lawsuits, possibly against an ever-growing and changing group of defendants, at least every three years." Dkt. 377 at 11.[37] Thus, "[i]rreparable injury occurs with each sale of 'Blurred Lines' that . . . is not accounted to the Gayes for the use of 'Got to Give it Up.'" *Id.* at 12.[38]

The Gaye Parties acknowledge that they "do not seek to permanently prevent the exploitation of 'Blurred Lines,'" but claim they have no alternative to pursuing the requested relief because Counterclaim-Defendants "have not responded to the Gayes' request that the parties agree to reasonable steps to protect the Gayes' rights and interests pending Plaintiffs/Counter-Defendants' likely appeal." *Id.* at 8. If injunctive relief is not granted, the Gaye Parties request a running royalty in the amount of 50% of all future publishing revenues generated by "Blurred Lines." *Id.* at 19.[39]

The Gaye Parties have failed to show irreparable harm. Instead, the injury that they have identified can be remedied by monetary relief. A necessary basis for the verdict against Thicke and Williams is the factual finding that "Blurred Lines" infringes the copyright in "Got to Give It Up." Therefore, as a matter of law, under Section 106 of the Copyright Act, any reproduction, distribution, performance and sale of "Blurred Lines," or authorization of these actions, violates the exclusive rights of the Gaye Parties.

The Gaye Parties have presented sufficient evidence to show that future infringement is likely. Dkt. 377-1 at 8-16. However, any injury to their interests that is solely economic in nature is not "irreparable," because it can be remedied by money damages. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).[40] The principal argument advanced by the Gaye Parties is that, absent the issuance of an injunction, they would be required to relitigate damages issues "until the expiration of the copyrights in 2072," and that this would constitute irreparable harm. Reply, Dkt. 402 at 7-8 (citing cases). However, there is no showing that if such litigation were required, the Gaye Parties

---

[37] There is a three-year statute of limitations for civil actions under the Copyright Act. 17 U.S.C. § 507(b).

[38] The Gaye Parties also claim that they will suffer irreparable harm each time a copy of "Blurred Lines" is distributed that "does not acknowledge Marvin Gaye as a co-writer." Dkt. 377 at 12. However, "the right to attribution is not a protected right under the Copyright Act." *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1178 (E.D. Cal. 2006) (citations omitted).

[39] Counterclaim-Defendants also argue that Harris and the Interscope Parties cannot be enjoined because, at trial, the Gaye Parties failed to obtain success on the merits of their claim against them. Opp'n, Dkt. 390 at 9-11. Counterclaim-Defendants contend that, even if the jury "arguably found that the Williams Parties and Thicke infringed GIVE by *creating* BLURRED, that act of creation will not occur again," making unlikely the threat of future harm by these parties to the protected interests of the Gaye Parties. *Id.* at 14. These arguments were addressed in connection with the earlier discussion about the request for declaratory relief by the Gaye Parties.

[40] Although the Gaye Parties cite cases that concern "lost customer goodwill," which may not be remedied by an award of money damages, no evidence as to these interests or the likelihood of their infringement was presented at trial, and none had been proffered in connection with the present motions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

could not seek appropriate monetary relief, including the award of attorney's fees. *See* 17 U.S.C. § 505. Moreover, whether such litigation will be brought remains uncertain, because a running royalty is a feasible remedy under the circumstances presented, and will allow the Gaye Parties to recover the same monetary relief that would be sought in the hypothetical litigation.[41]

For all of these reasons, the first two *eBay* factors weigh against granting a permanent injunction.

(2)   Balance of Hardships

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (for the balance of hardships to favor a party, "the injunction must do more good than harm"), *cited with approval by Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011).

The Gaye Parties claim the continued exploitation of the copyrighted work by Counterclaim-Defendants imposes a hardship on them. Mot., Dkt. 377 at 12. Counterclaim-Defendants argue that any injunction would necessarily be "ambiguous and confusing" in light of the mixed jury verdict, create uncertainty over the legitimate exploitation of "Blurred Lines," and discourage third parties from "engag[ing] in future exploitation duly licensed by Harris or the Interscope Parties." Dkt. 390 at 18. Because the jury verdict as to Harris and the Interscope Parties is corrected by this Order, Counterclaim-Defendants' claims of hardship are entitled to little weight. The third *eBay* factor supports granting a permanent injunction.

(3)   Public Interest

The Gaye Parties contend the public interest will be served by the entry of the requested injunction because of the public policy that favors protecting the rights of those who hold copyrights. Mot., Dkt. 377 at 13-14 (citing cases). Counterclaim-Defendants respond that "[t]he public clearly loves BLURRED, and it would be a great public disservice to enjoin future sales and exploitation of this hugely popular hit song." Opp'n, Dkt. 390 at 19. They argue that many of the cases that found the issuance of an injunction in a copyright action served the public interest were default proceedings in which the defendants did not appear. Others involved pirated works, which they claim to be distinct from "Blurred Lines," in which "tremendous skills, creative energies, and resources" were invested. *Id.* at 19-20. The Gaye Parties respond that "[a]ll derivative works possess some creative content from its [sic] authors. However, this has not stopped courts from issuing injunctions against the exploitation of those derivative works." Reply,

---

[41] The Gaye Parties claim they would be "at the mercy of Plaintiffs and/or Counter-Defendants to timely and accurately disclose the revenues generated by exploitation of 'Blurred Lines.'" Reply, Dkt. 402 at 7. No showing is made that Counterclaim-Defendants would not comply with an obligation to pay a court-ordered running royalty, or that other appropriate relief could not be sought in a judicial proceeding in which the Counterclaim-Defendants and certain third parties were named. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 948 (9th Cir. 2014) ("[T]hose who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt powers.") (citation omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Dkt. 402 at 11 (citing *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 493 (6th Cir. 2007)).

The public interest advanced by the Gaye Parties is a strong one. *See, e.g.*, *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1015 (C.D. Cal. 2011) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work.") (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983)). The popularity of "Blurred Lines," and the evidence that it was in part the product of non-infringing creative work, also bear on the public interest analysis. *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988) ("special circumstances" presented where the success of the movie *Rear Window* "resulted in large part from factors completely unrelated to" allegedly infringed work, and "an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come"), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990). On balance, the public interest weighs slightly in favor of the Gaye Parties. The fourth *eBay* factor supports granting a permanent injunction.

(4)    Disposition

To be entitled to a permanent injunction, a prevailing litigant must demonstrate that all four *eBay* factors are present. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011). The Gaye Parties carry their burden only as to two of them. For these reasons, their request for injunctive relief is **DENIED**.

b)    Whether Impoundment Is Appropriate

Under the Copyright Act, district courts have the authority to impound certain articles, including "copies or phonorecords claimed to have been made or used in violation of the exclusive right of the copyright owner," "[a]t any time while an action under this title is pending. 17 U.S.C. § 503(a). "As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights . . . ." 17 U.S.C. § 503(b). The Gaye Parties seek an order of "impoundment of any and all infringing articles containing the composition or sound recording 'Blurred Lines.'" Mot., Dkt. 377 at 16.

"[T]he 1976 [Copyright] Act gives the court discretion whether to issue an impounding order." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1261 (N.D. Cal. 1995) (citing 3 Nimmer on Copyright § 14.07)). Although the Ninth Circuit has not identified appropriate factors to consider in making this determination, several courts have found that the standard for granting a request for impoundment "mirrors the standard for granting injunctive relief." *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011) (citation omitted); *see also Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 492 (6th Cir. 2007) (affirming district court's order of impoundment on consideration of traditional injunctive factors).

Seizure and impoundment are "drastic acts." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989). The Gaye Parties have not shown that this extraordinary relief is appropriate. Thus, the shortcomings in their request parallel those that applied to their request for an injunction. An ongoing royalty will fully compensate them for the injury caused by Counterclaim-Defendants' continued

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

exploitation of "Blurred Lines." For these reasons, the Gaye Parties' request for impoundment of articles containing "Blurred Lines" is **DENIED**.

        c)      Whether a Running Royalty Is Appropriate

           (1)     The Equities Warrant a Running Royalty

A running royalty is an equitable remedy that is less severe than a permanent injunction. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1979 (2014); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990). Both the Supreme Court and Ninth Circuit have approved of this remedy in principle. *See id.* However, neither has specified factors that should be considered in determining whether a running royalty should be awarded. Because a running royalty is, in part, analogous to a permanent injunction, the appropriate factors to consider in assessing this relief are similar to those that apply to a request for an injunction.

First, the movant must demonstrate actual success on the merits. *See Indep. Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013). Second, the balance of hardships must warrant a remedy in equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Third, the public interest must favor the imposition of a running royalty. *Id.* Fourth, the legal remedy of retrospective, compensatory relief must be inadequate, i.e., there must be a demonstrated threat of future infringement. *Id.*[42] Finally, the royalty rate must be "plain and easily calculable." *Broad. Music, Inc. v. Pamdh Enterprises, Inc.*, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (denying preliminary injunction where this was not the case); 5 Nimmer on Copyright § 14.06 (opining that injunction is not appropriate relief where there is "ease of computing precise monetary damages").

Counterclaimants have shown that each of these tests has been met. First, they succeeded at trial on the merits of their infringement claim against the Thicke Parties. Further, this Order provides that any future exercise of the 17 U.S.C. § 106 rights by Harris and the Interscope Parties with regard to "Blurred Lines" will presumptively violate the copyright in "Got to Give It Up." Thus, the Gaye Parties have demonstrated actual success on the merits as to all Counterclaim-Defendants. As to the next two tests, the Gaye Parties have demonstrated that the balance of hardships and public interest favor a required running royalty for the reasons stated above in the analysis of their request for injunctive relief. With respect to the fourth test, the Gaye Parties have demonstrated that "Blurred Lines" continues to be reproduced and distributed to the public, making future infringement likely. Finally, a running royalty rate is one that can be readily calculated. In light of these facts, the imposition of a running royalty is an appropriate equitable remedy.

---

[42] Generally, awards of money damages are legal, rather than equitable, in nature. *See, e.g.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998). However, an award of damages may be deemed a form of equitable relief where they are "restitutionary, such as in action[s] for disgorgement of improper profits," or "incidental to or intertwined with injunctive relief." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 571 (1990). *Abend* and *Petrella*, which categorize a running copyright royalty as equitable relief, imply that one or both of these exceptions applies.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(2)      Persons Subject to the Royalty

Neither the Federal Rules of Civil Procedure nor the Copyright Act specifies those parties that may be bound by an order imposing a reasonable running royalty. Fed. R. Civ. P. 65 provides that, following actual notice by personal service or otherwise, an order of injunctive relief binds: (i) the parties; (ii) their officers, agents, servants, employees and attorneys; and (iii) other persons in active concert or participation with persons described by (i) or (ii). Fed. R. Civ. P. 65(d)(2). A running royalty is a less severe but analogous remedy to a permanent injunction. *See Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988). Therefore, the application of the terms of Rule 65 is appropriate to define those bound by such an order. That approach is particularly sound in light of the history and outcome of this litigation.[43]

(3)      Terms of the Royalty

"[I]n a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are based on the same facts, in deciding the equitable claims the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828-29 (9th Cir. 2013) (internal quotation marks omitted). Ongoing copyright royalties "should be calculated based on a hypothetical, arms-length negotiation between the parties," in light of "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (citing *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007)).[44]

Stern, whom the Gaye Parties called at trial as an expert on damages, testified on direct examination that, had the owners of "Blurred Lines" sought a license for the use of "Got to Give It Up" before its release, the license would have been valued at "50 percent" of certain royalties. Dkt. 351 at 30-31. On cross-examination, Stern clarified that the "50 percent" figure referred to "the copyright to the composition," and that the license would entitle the licensor to "50 percent of the publishing income," but "zero percent . . . of the record company income," and "zero percent of the touring income." *Id.* at 34-35. On redirect examination, Stern testified that publishing income would also include mechanical royalties and public performance income from performance rights societies. *Id.* at 40-41. The Counterclaim-Defendants called Doug Bania to testify at trial as their damages expert. He testified that the success of "Blurred Lines" was due to factors unrelated to any similarity with "Got to Give It Up."

---

[43] Although both Harris and the Interscope Parties will be subject to this royalty under this Order, the evidence presented at trial showed that Harris, but not the Interscope Parties, received a share of the publishing revenue. Dkt. 379-15.

[44] *Jarvis* concerned an award of actual damages pursuant to 17 U.S.C. § 504(b), and did not address the possibility of a running royalty. 486 F.3d at 533-34. *Gaylord* extended the hypothetical-negotiation analysis of *Jarvis* and other out-of-circuit decisions to the determination of a reasonable running royalty. *See Gaylord*, 678 F.3d at 1344 (ordering the Court of Federal Claims to "determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license"). On remand, the Court of Federal Claims awarded an ongoing, per-unit royalty, and the Federal Circuit affirmed. *Gaylord v. United States*, 777 F.3d 1363, 1369-70 (Fed. Cir. 2015) (finding "no clear error in the trial court's determination of the royalty amount, considering the perspectives of the two parties to the hypothetical negotiation," and concluding that a "per-unit royalty is a logical way to tie the amount paid for the asset to the marketplace success it helps produce, which fits the objective of measuring market value").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

These included the manner in which "Blurred Lines" was promoted and marketed. *E.g.*, Dkt. 338 at 35-51. He agreed that the "custom and practice" of the music industry was that copyright owners of the sound recording receive 50 percent of publishing revenue and that the owners of the composition receive the other 50 percent of that revenue. *Id.* at 55-56.

The Gaye Parties contend that, from the evidence presented at trial, it is reasonable to conclude that the jury gave weight to the testimony of Stern, applied a rate of 50% to the stipulated publishing income of approximately $8 Million, and this is how it determined the actual damages were $4 Million. Reply, Dkt. 402 at 14; *see supra*. They argue that these presumed, factual findings should be used in determining a reasonable running royalty, which should be "50% of all future songwriter and publishing revenues generated by 'Blurred Lines,' from the date of the verdict and in perpetuity thereafter." Mot., Dkt. 377 at 18.

Counterclaim-Defendants respond that, for two reasons, this is misinterpretation of the verdict. First, "[t]he jury was not asked to determine a future royalty. The jury's damage award for past infringement has no bearing on any future royalty. There is no way to know how the jury came up with its damage award; it is irrelevant here." Opp'n, Dkt. 390 at 25. Second, Wilbur testified that, even if Finell's testimony were credited and the portions of "Got to Give It Up" that she claimed were copied by "Blurred Lines" were present there, these portions would "make up no more than five percent (5%) of the music in BLURRED." *Id.* Therefore, they argue that "any ongoing royalty the Court awards should be no more than 5% of future publishing revenue from BLURRED." *Id.*

As discussed in connection with the request of the Thicke Parties for remittitur, *see* Subsection II.A.2.e.2.a, *supra,* the verdict compels the conclusion that the jury applied the 50% royalty rate about which Stern opined. Counterclaim-Defendants advance no reason why this same rate would not also apply prospectively.[45] Their argument that the maximum royalty is 5%, which fails to consider the competing expert testimony or the qualitative significance of the appropriated elements, also lacks support. Thus, a running royalty of 50% of songwriter and publishing revenue would "follow the jury's implicit or explicit factual determinations." *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011).

The royalty will begin to run on the date judgment is entered. This date, rather than the date when the jury's verdict was received, is the appropriate date because several issues raised on these Motions, including the liability of Harris and the Interscope Parties, were not previously resolved. Thus, the basis for the award of a running royalty has only now been established. Further, the Gaye Parties requested a running royalty as an alternative to a permanent injunction, but did not seek interim relief. *See* Fed. R. Civ. P. 65(d)(2) (injunctive orders bind only the parties who receive actual notice of them). This also

---

[45] By contrast, the Gaye Parties have presented limited evidence that a post-judgment reasonable royalty would differ from one negotiated before infringement was found. *See* Dkt. 351 at 30-31 (Stern's testimony that a 75-100% royalty would be reasonable after infringement was established); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012) (ongoing royalties for patent infringement should "take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.") (citation omitted). Because the Gaye Parties do not seek an ongoing royalty of greater than 50%, these arguments are not addressed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

confirms the appropriateness of the start date.

The Gaye Parties' request for a running royalty of 50% of the songwriter and publishing revenue of "Blurred Lines" is **GRANTED**, on the terms set forth above.

      D.     The Motion for Prejudgment Interest

         1.    <u>Legal Standard</u>

Prejudgment interest is a "[s]tatutorily prescribed interest accrued either from the date of the loss or from the date when the complaint was filed up to the date the final judgment is entered. . . . Depending on the statute, it may or may not be an element of damages." Black's Law Dictionary 887 (9th ed. 2009). "[P]rejudgment interest is available under the Copyright Act of 1976." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 716 (9th Cir. 2004). There, the Ninth Circuit considered 17 U.S.C. § 504(b).[46] It determined that the purpose of this statute "is to compensate fully a copyright owner for the misappropriated value of its property and to avoid unjust enrichment by defendants, who would otherwise benefit from this component of profit through their unlawful use of another's work." *Id.* at 718 (internal quotation marks omitted). From this premise it concluded that the statute authorizes the award of prejudgment interest. This relief "may be necessary to discourage needless delay and compensate the copyright holder for the time it is deprived of lost profits or license fees." *Id.* Whether prejudgment interest should be awarded is left "to the district court's sound discretion." *Id.* at 716 n.12.

         2.    <u>Application</u>

            a)    Availability of Prejudgment Interest

The Gaye Parties argue that an award of prejudgment interest is required because the jury verdict did not fully compensate them for the infringement of "Got to Give It Up." Mot., Dkt. 375 at 3-4. They claim the actual damages and profits awarded did not account for the publishing revenues they would have received had Counterclaim-Defendants entered a license with respect to "Got to Give It Up" before releasing "Blurred Lines." *Id.* Further, the Gaye Parties argue that Counterclaim-Defendants were unjustly enriched by retaining these revenues in the interim. Therefore, they claim that the interest they seek is a "component of profit through the unlawful use of [the Gaye Parties'] work" that is recoverable

---

[46] That statute provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

under Section 504(b). *Id.* at 4 (citing *Polar Bear Prods., Inc.*, 384 F.3d at 718).

Counterclaim-Defendants respond that, under *Polar Bear Productions*, it is not appropriate to award prejudgment interest "where infringement is disputed or contested." Opp'n, Dkt. 391 at 3. *Polar Bear Productions* was a "case involving undisputed copyright infringement," although it did not expressly limit the award of prejudgment interest to these circumstances. 384 F.3d at 718. Counterclaim-Defendants also rely on an unpublished decision in which the Ninth Circuit found that a district court did not abuse its discretion in denying prejudgment interest where copyright infringement was "vigorously contested" and the parties disputed whether the copyrighted material had entered the public domain. *Societe Civile Succession Guino v. Renoir*, 305 F. App'x 334, 339 (9th Cir. 2008) (unpublished disposition), *as amended on denial of reh'g* (Apr. 1, 2009). Counterclaim-Defendants also point out that several district courts that have applied *Polar Bear Productions* have given great weight to the evidence of the intent to infringe as well as the degree to which infringement was contested. *E.g.*, *Brighton Collectibles, Inc. v. Pedre Watch Co.*, 2014 WL 29008, at *8 (S.D. Cal. Jan. 2, 2014) ("Prejudgment interest . . . may only be awarded in situations of 'indisputable infringement.'") (citing *Polar Bear Prods., Inc.*, 384 F.3d at 718)). They claim district courts have awarded prejudgment interest only "where infringement is not contested . . . or where infringement was willful." Opp'n, Dkt. 391 at 3-4.

Counterclaim-Defendants' position is not persuasive. *Polar Bear Productions* did not limit this remedy to instances in which willful or undisputed infringement were present. Such a limitation would not be consistent with 17 U.S.C. § 504(b). Unlike the section of the statute that authorized statutory damages, 17 U.S.C. § 504(c), § 504(b) does not require a consideration of the state of mind of the infringing party. Instead, it requires the consideration of "the actual damages suffered by [the copyright owner] as a result of the infringement, and any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). Further, "[p]rejudgment interest is an element of compensation, not a penalty." *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001).

b)      Amount of Prejudgment Interest

28 U.S.C. § 1961(a) provides that post-judgment interest shall be calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." The Ninth Circuit has held that Section 1961 provides an appropriate rate of prejudgment interest in an action for copyright infringement. *See Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1552-53 & n.12 (9th Cir. 1989) (remanding infringement action under the 1909 Act to district court with instructions to award prejudgment interest at the rate fixed by 28 U.S.C. § 1961(a)); *see also Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 837 (9th Cir. 2012) (§ 1961 applies to the calculation of prejudgment interest on awards under ERISA, the Longshore Act, and Title VII of the Civil Rights Act of 1964); *Excelsior Coll. v. Frye*, 2007 WL 672517, at *4 (S.D. Cal. Feb. 21, 2007) (awarding prejudgment interest at the rate fixed by 28 U.S.C. § 1961(a) in infringement action under the Copyright Act of 1976). The parties do not dispute that, if prejudgment interest is awarded, it should be calculated at the rate set by 28 U.S.C. § 1961, which is 0.25%. Mot., Dkt. 375 at 5; Opp'n, Dkt. 391 at 5. This rate is applied for purposes of this Motion.

"Blurred Lines" was released in March 2013. Counterclaim-Defendants have received profits on an ongoing basis since this time. The Gaye Parties contend prejudgment interest should be calculated by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

assuming that all of these profits were received on the same date, May 8, 2014, and then applying the statutory rate of 0.25%. Mot., Dkt. 375 at 5. They rely on the declaration of Gary Cohen, a Certified Public Accountant. Cohen Decl., Dkt. 375-2, ¶ 2. Cohen declares:

> The "Blurred Lines" single was released on March 23, 2013. Based on my experience in the industry, I assume that royalties began to be paid 45 days after the end of the quarter in which the release occurred, or May 15, 2013. If royalties were paid evenly between that date and the present, on average the payout date of the royalties would have been May 8, 2014. In fact, the weighted average date is almost certainly earlier because more royalties were earned during the first year following release than the second. Accordingly, in my professional opinion, it is conservative (and not prejudicial to the Williams Parties and Thicke) to use May 8, 2014 as the accrual date.

*Id.* ¶ 6.

Counterclaim-Defendants respond that "[f]ull financial records regarding royalties were produced in discovery. Mr. Cohen improperly 'assumes' when monies were received rather than analyze the reported income. His opinion on the accrual date is not a proper subject for expert testimony, and his methodology is not reliable." Dkt. 392, ¶ 6. In addition, they object that Cohen did not offer any opinions on an accrual date in his Rule 26 report. *Id.*

In light of the evidence presented at trial as well as the pre-trial proceedings in this matter, in the exercise of discretion, the Court concludes that the Gaye Parties should be awarded certain prejudgment interest. The starting date that the Court deems appropriate is March 10, 2015, which is when the jury verdict was received. The entry of judgment has been deferred more than four months since the jury reached its verdict. Although this deferral was required in light of unresolved post-trial issues, *see* Dkt. 372, the recovery of prejudgment interest for this period would further the compensatory purpose of 17 U.S.C. § 504(b).

The Gaye Parties fail to offer admissible evidence of the amount of revenues that were received as of the earlier dates that they propose. For this reason, their proposed calculation of interest to be awarded from any earlier date, which is based on the methodology used by Cohen, is not reliable. Even if admissible evidence had been presented on this issue, the Court would decline to award prejudgment interest from any earlier date than the one adopted in this Order, in light of the nature of the claims, the vigorous litigation of certain legal and factual matters and the general history of this litigation.

**III.     Conclusion**

1. The Thicke Parties' Motion for Judgment as a Matter of Law, Declaratory Relief, a New Trial, or Remittitur is **GRANTED IN PART**. Their request for judgment as a matter of law, declaratory relief or a new trial is **DENIED**. The award of actual damages is remitted from $4 Million to $3,188,527.50. The award of profits from Williams is remitted from $1,610,455.31 to $357,630.96.

2. The Gaye Parties' Motion for Declaratory Relief or Judgment as a Matter of Law is **GRANTED**. Judgment shall be entered in favor of the Gaye Parties and against all Counterclaim-Defendants. It is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV13-06004 JAK (AGRx) | Date | July 14, 2015 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

declared that any past and ongoing reproduction, preparation of derivative works, distribution, sale or other transfer of ownership, rental, lease, lending or public performance of "Blurred Lines," or authorization of these activities, by Robin Thicke, Pharrell Williams, Clifford Harris, Jr., More Water From Nazareth Publishing, Inc., Star Trak Entertainment, Interscope Records, UMG Recordings, Inc. and/or Universal Music Distribution infringes the Gaye Parties' copyright in "Got to Give It Up."

3. The Gaye Parties' Motion for Injunctive Relief, or in the Alternative, for Ongoing Royalties is **DENIED** as to their request for injunctive relief, and **GRANTED** as to their request for an ongoing royalty of 50% of songwriter and publishing revenues of "Blurred Lines." This royalty will begin to run on the date judgment is entered.

4. The Gaye Parties' Motion for Prejudgment Interest is **GRANTED IN PART**. The Gaye Parties are entitled to prejudgment interest from the date of the jury's verdict, March 10, 2015, through the date judgment is entered, at the rate set by 28 U.S.C. § 1961.

After meeting and conferring with counsel for the Counterclaim-Defendants as to an appropriate form of judgment, on or before July 29, 2015, the Gaye Parties shall lodge a proposed judgment that conforms to the terms of this Order. If Counterclaim-Defendants have agreed to the form of that proposed judgment, which shall not constitute any waiver of their rights to object to its substance, they shall so state in connection with the lodging of the proposed judgment. If the parties are unable to agree on the form of a judgment, then on or before August 5, 2015, the Counterclaim-Defendants shall file any objections to the proposed form of judgment submitted by the Gaye Parties.

**IT IS SO ORDERED.**

: 

Initials of Preparer    ak