UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    **(IN CHAMBERS) ORDER RE MOTION FOR RELIEF FROM AMENDED JUDGMENT (DKT. 577)**

## I.    Introduction

Pharrell Williams ("Williams"), Robin Thicke ("Thicke") and Clifford Harris, Jr. (collectively, "Thicke Parties") composed "Blurred Lines." Dkt. 1 ¶ 6. Frankie Christian Gaye, Nona Marvisa Gaye and Marvin Gaye III (collectively, "Gaye Parties") claim an ownership interest in two compositions by Marvin Gaye: "Got To Give It Up" and "After the Dance." Dkt. 12 ¶ 11; Dkt. 35 ¶ 11; Dkt. 36 ¶ 3. The Thicke Parties filed this action for declaratory relief, seeking a finding that "Blurred Lines" does not infringe the copyright in "Got To Give It Up." Dkt. 1. The Gaye Parties then filed various counterclaims, including one in which they claimed that "Blurred Lines" infringed the copyright held by the Gaye Parties for "Got To Give It Up," and that another song by Thicke, "Love After War," infringed the copyright for "After the Dance." Dkt. 14; Dkt. 36.

At the conclusion of the jury trial on the counterclaims, on March 10, 2015, a verdict was returned that the Thicke Parties infringed the copyright for "Got To Give It Up," but that the infringement was not willful. The jury also determined that the Thicke Parties did not infringe the copyright for "After the Dance." Dkts. 320, 321. The jury made the following awards to the Gaye Parties: $4,000,000 in actual damages; $1,610,455.31 in profits received by Williams and his company More Water from Nazareth Publishing, Inc. (together, "Williams Parties"); and $1,768,191.88 in profits received by Thicke. Dkt. 320 at 3. Through rulings on certain post-trial motions, the award of $4,000,000 in actual damages was reduced to $3,188,527.50, and the award of profits from Williams was reduced from $1,610,455.31 to $357,630.96. Dkt. 423 at 55. The request by the Gaye Parties for a running royalty in the amount of 50% of the songwriter and publishing revenue of "Blurred Lines" was also granted. *Id.* at 56. Judgment was entered on December 2, 2015. Dkt. 450. It did not address attorney's fees.

On January 11, 2016, Frankie and Nona Gaye filed a Motion for Attorney's Fees, in which Marvin Gaye III joined. Dkt. 479, 502. On January 12, 2016, Marvin Gaye III filed a separate Motion for Attorney's Fees. Dkt. 502. On April 12, 2016, the motions for attorney's fees were denied, and costs were apportioned for the counterclaims of the Gaye Parties on which they prevailed. Dkt. 554.

Appeals and cross-appeals followed. Dkts. 457, 473, 508, 558. The Ninth Circuit affirmed in part and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

reversed in part. The Ninth Circuit reversed a portion of a post-judgment order that granted a general verdict as a matter of law against Harris and the Interscope Parties. *Williams v. Gaye*, 895 F.3d 1106, 1130-32 (9th Cir. 2018), *as amended on denial of reh'g en banc*; Dkt. 566 at 42-46. An amended judgment entered on December 6, 2018. Dkt. 573.[1] The Ninth Circuit also affirmed the denial of the request for an award of attorney's fees. *Williams*, 895 F.3d at 1133; Dkt. 566 at 47.

On December 6, 2019, the Gaye Parties filed a motion for relief from amended judgment for fraud on the court pursuant to Fed. R. Civ. P. 60(b)(3), 60(b)(6) and 60(d)(3) ("Motion"). Dkt. 577. In support of the Motion they argue that, because in a November 4, 2019 video interview, Williams admitted to having relied on "Got To Give It Up" when composing "Blurred Lines," Thicke and Williams committed perjury by testifying that Thicke was not involved in the songwriting process, and that Williams -- who was principally responsible for writing "Blurred Lines" -- did not think about "Got To Give It Up" when he composed Blurred Lines. Through the Motion, the Gaye Parties seek an award of the fees and costs incurred in prosecuting their claims. The Motion was supported by a memorandum of points and authorities (Dkt. 577-1) and seven supporting exhibits (Dkts. 577-4 to 577-10). The Williams Parties opposed the Motion ("Opposition" (Dkt. 585)), and Thicke joined in the Opposition (Dkt. 587). The Williams Parties filed 11 exhibits in support of the Opposition. Dkt. 588. The Gaye Parties filed a reply in support of the Motion ("Reply"). Dkt. 591.

For the reasons stated in this Order, the Motion is **DENIED**.

**II.**   **Factual Background**

Before, during and after the trial, Williams and Thicke each made statements about his state of mind when "Blurred Lines" was composed and recorded. Some of these statements could be construed as being inconsistent with others.

A.   Interviews of Thicke and Williams

During interviews between May 6, 2013 and July 20, 2014, Thicke stated that "Got To Give It Up" influenced "Blurred Lines." For example, in a June 11, 2013 interview with Hot 97, Thicke said that he told Williams that "[he'd] love to make something like this, feel like 'Got To Give It Up.'" Thicke stated that Williams "started with the percussion, trying to get that rhythm," and that they quickly created the song. Thicke acknowledged that "Blurred Lines" had similarities with "Got to Give It Up, Part II." Dkt. 112, Ex. 3, Track 1. *Accord id.* Track 2 (in a May 6, 2013 interview with VH1, stating that "[w]e tried to get a groove like ["Got To Give It Up"] going"); *id.* Track 3 (making a similar statement on July 20, 2014); *id.* Track 4 (making a similar statement on July 29, 2013); *id.* Track 5 (when asked about this in an interview with Oprah on October 13, 2013, Thicke stated that he told Williams that he wanted to create a song with the "feel" of "Got To Give It Up"); *but see id.* Track 6 (in an unknown context on September 26, 2013, Thicke's general denial of the assertion that he thinks about Marvin Gaye).

In an interview on September 26, 2013, Williams made similar statements:

---

[1] The Interscope Parties, which distributed "Blurred Lines," are comprised of Interscope Records, UMG Recordings, Inc., Universal Music Distribution and Star Trak, LLC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Q. "Blurred Lines," which is like, everyone's favorite. Like me, my mom, my grandmother, like it, it crosses generations. And I'm dead serious. But I think it's the Marvin Gaye-like feeling, with the sample --

A. No sample.

Q. -- No sample. [inaudible] But the -- is there – were you inspired by him for that song?

A. Oh, for sure, totally. But what I try to, see, this is the thing. What I tried to do, was I tried to take the feeling that "Got To" -- "Got To Give It Up" gave me, uh but I also tried to do -- blend in like, Southern White Baptist harmonies, on the chorus, and then, you know, sex is always a good element to inject in anything.

*Id.* Track 7.

B.     Thicke's Response to Interrogatories

On March 28, 2014, Thicke responded to the first set of interrogatories from Nona Gaye and Frankie Gaye:

**INTERROGATORY NO. 16**:

Please describe step by step how "Blurred Lines" was created, including any and all conversations you had with Williams or anyone else involved in the creation or recording of "Blurred Lines" about what you were attempting to achieve with the song (i.e., whether you were trying to evoke Marvin Gaye at all or create something that sounded like "Got To Give It Up"). . . .

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**:

Subject to and without waiver of the foregoing objections, Responding party responds as follows: The track was created from scratch in about an hour and a half. Robin Thicke told Pharrell Williams that Thicke would love to create a song that evoked the musical era of "Got To Give It Up." Williams created the instrumental track and the first verse, and then Thicke and Williams created the rest of the verses, improvising four lines at time. Clifford Harris later added a vocal track.

Dkt. 520-9 at 4-5. These interrogatory responses were signed and verified. Thicke Depo., Dkt. 577-6 at 69:9-14.

C.     Subsequent Statements by Thicke and Williams

1.     Deposition Testimony by Williams

During his April 2014 deposition, Williams denied intending to evoke "Got To Give It Up" when creating "Blurred Lines." Williams testified as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

> Q. Is it your testimony that you and Mr. Thicke never once during the creation of "Blurred Lines" spoke about, discussed, referenced the song "Got To Give It Up" by Marvin Gaye?
>
> A. I did not go in the studio with intention of making anything to feel like -- or to sound like Marvin Gaye.

Williams Depo., Dkt. 577-5 at 86:4-10.

> Q. Did you ever have the thought -- did Marvin Gaye's "Got To Give It Up" ever cross your mind at all while you were creating "Blurred Lines"?
>
> A. No.

*Id.* at 90:13-17.

Williams was then questioned about his statements in an interview that was published with the title "Pharrell Has Found His Happy Place in the Mainstream." *Id.* at 104:7-11. During that interview, Williams made the following statements:

> Well, listen, I have the utmost respect -- the most -- utmost respect for Marvin Gaye and his music and he is one of the patriarchs. He is one of the best. But here's the thing. You can't trademark a groove.
>
> If I play a song, which a lot of my new hip hop and rap records are, that's done in a six-eight time signature, Charlie Parker's family is not going to sue me for that. Do you understand what I'm saying? . . .
>
> Because that's what we're dealing with. We're dealing with the idea that someone feels like a groove is proprietary, and it's not. Music is and the notes are and when you look at the sheet music, then you know.
>
> And just for a bit of humor, the percussion, that I use in "Blurred Lines," aside from the music notation being completely different . . . the sheet music is available online, by the way, but the percussion -- I was trying to pretend that I was Marvin Gaye and what he would do, had he went down to Nashville and did a record with pentatonic harmonies and more of a bluegrass chord structure.
>
> So unfortunately, there's no comparison between the minor bluesy chords he was playing and my major bluesy chords. . . .

*Id.* at 105:11-107:4.

During his deposition, Williams was asked to reconcile his statements in the interview with his earlier statement that "Got To Give It Up" did not "cross [his] mind at all" when he was creating "Blurred Lines."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

This testimony is in the following colloquy:

Q. So do you remember before the break, I asked you if Marvin Gaye at all came into your mind at all in the creation of "Blurred Lines" --

A. Uh-huh.

Q. And you said "No"?

Do you remember that?

A. Yep.

Q. You say in this interview:

"I was trying to pretend that I was Marvin Gaye."

A. Uh-huh.

Q. So I guess Marvin Gaye did, in fact, come into your mind?

A. You asked me about "Got To Give It Up."

Q. I asked you about "Got To Give It Up"?

A. Yeah. You asked me about "Got To Give It Up."

Q. So Marvin Gaye came into your mind when you were created "Blurred Lines," but not --

A. No. When I look back. When I look back.

Q. Do you see here anywhere where you say when you look back?

A. No, no, no. I'm telling you. I'm answering you.

Q. You said:

"I was trying to pretend that I was Marvin Gaye."

When you were creating --

A. The feeling of the music.

Q. Hold on.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

When you were creating "Blurred Lines," were you trying to pretend that you were Marvin Gaye?

A. At that particular time, no, but as I look back, I feel that feeling.

Q. Okay. Why didn't you say that "now that I look back, I must have been trying to pretend like I was Marvin Gaye?"

Because here you say --

A. Do you want me to answer that?

Q. -- Quote:

"I was trying to pretend I was Marvin Gaye."

That seems inconsistent, doesn't it?

A. I'll tell you why. Because at the time, I was thinking about like what the music turned out to feel like and what it turned into.

And at the time, when I'm searching for music, which I don't expect you to understand this, but we look into oblivion. We look into that which does not exist.

As I told you before, when I went into the studio to work with [Thicke], I started out for a bluegrassy -- you know, a bluegrassy chord structure that I felt like could be interesting with a soulful voice.

When I looked back, when I was answering that question, yes, it was like -- and that's what I should have said. And I'm sorry for not being clear.

But it -- it should have read, "It -- it felt like Marvin Gaye going into Nashville, making a groove." That's what I should have said.

*Id*. at 107:16-110:9.

2.    Deposition Testimony of Thicke

In Thicke's deposition testimony, he described his motives when he was interviewed, and claimed that they were for promotion:

Q. Did you have any conversation with [Williams] during or before the creation of "Blurred Lines" in which you discussed with him Marvin Gaye's song "Got To Give It Up"?

A. No. . . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Q. Do you make it a habit of being dishonest when you give interviews?

A. When I do -- when I give interviews, I tell whatever I want to say to help sell records. . . .

Q. -- You were present when the tracks were being laid down, but you offered no suggestion, thoughts or input about what to do or what style to evoke or anything?

A. Absolutely not.

Thicke Depo., Dkt. 577-6 at 31:7-11, 31:15-19, 82:23-83:2.

Thicke also testified that he falsely stated to members of the press that he had told Williams to create a song that evoked "Got To Give It Up," because he was jealous that, as to "Blurred Lines," the public credited Williams and not him for writing and producing this very successful song. *Id.* at 85:7-86:2, 87:4-87:19. Thicke also testified that he believed -- when giving interviews -- that claiming credit in the creative process would help him sell other records. *Id.* at 87:20-88:19. Thicke also represented that he was intoxicated during the creation of "Blurred Lines" and was unable to participate in the creative process, and that he was intoxicated during many of the interviews in which he claimed personal credit in the creative process that resulted in "Blurred Lines." *Id.* at 103:15-104:19; 105:17-19; 118:3-119:5; 143:24-144:5.

Thicke also testified that Williams never told him that when Williams was working on "Blurred Lines," Williams was trying to pretend to be Marvin Gaye. *Id.* at 142:23-143:4.

        D.     Trial

             1.    <u>Trial Testimony by Williams</u>

At trial, Williams testified that, on the day he created "Blurred Lines," he started alone in the recording studio and wrote most of the song before Thicke arrived. Dkt. 577-7 at 102:18-19, 109:1-109:15. Williams denied ever having spoken to Thicke about "wanting to do a song in the genre or the style of "Got To Give It Up." *Id.* at 109:23-110:9. Williams also testified as follows:

Q. In any way, shape or form, did you copy any aspect of "Got To Give It Up" when you created "Blurred Lines"?

A. No, sir.

Q. Don't you think that maybe subconsciously you could have done it?

A. No, sir.

Q. Why not?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

A. Because if I would have, we would have contacted our musicologist and dealt with it properly. It's -- it's the fair and just and right thing to do.

*Id.* at 113:20-114:4.

Q. Now, in the direct examination of you, Mr. Williams, Mr. King asked you what you were thinking about when you were creating "Blurred Lines," how you came up with the song. Do you recall that?

A. Yes, sir.

Q. Okay. Isn't it true, Mr. Williams, that you were pretending that you were Marvin Gaye when you were creating "Blurred Lines"?

A. I've said in the past that I can see where people felt like that and I'm -- and I must have been channeling that feeling, you know, that late '70s feeling.

Q. Okay.

A. And sometimes when you look back on your past work, you see inflections of people, but it doesn't mean that's what you're doing when you're in it. . . .

Q. Okay. And in your interview with XXL, you stated as follows: "I was trying to pretend that I was Marvin Gaye and what he would do had he went down to Nashville and did a record with pentatonic harmonies."

You did say that; correct?

A. Yes. Yes. That's summary, when you're summarizing like what you -- what your work is like and what you're doing. Sometimes we don't know when we're in it, just to clarify for you.

Q. So is it your testimony that it's not true that you were trying to pretend that you were Marvin Gaye when you were creating "Blurred Lines"? It was something that you realized after the fact?

A. Yes. It was -- well, no. What you're reading is my interpretation of my work after I had done it. But it wasn't a preconceived notion to go into it and I wasn't thinking about those things.

As musicians, we look back at our work and we give a description. Sometimes we know what we're doing when we're in it and sometimes we look back and see what comes out. That's the truth.

Q. Okay. And, Mr. Williams, it's your position that you did not go into the studio with the intention of making anything to feel like or to sound like Marvin Gaye; correct?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

A. To sound like "Got To Give It Up."

Q. Okay. You did not go into the studio --

A. Or Marvin Gaye.

Q. You did not go into the studio with the intention of making anything to feel like "Got To Give It Up" or to sound like Marvin Gaye; correct?

A. No, sir.

Q. Okay. I would like to play -- and it's your testimony that Marvin Gaye's -- or it's your -- yes. It's your testimony that Marvin Gaye's "Got To Give It Up" did not cross your mind at all at any time in the creation of "Blurred Lines"; correct?

A. Not during the creation, no, sir. . . .

[Exhibit played]

Q. Okay. Mr. Williams, it is your testimony that you and Robin Thicke did not have any conversations whatsoever before or during the creation of "Blurred Lines" in which he asked you to create a song like "Got To Give It Up" or even a song that evoked the era of "Got To Give It Up"; isn't that correct? . . .

A. Yes. That is correct.

*Id.* at 135:13-138:15; *see also* Dkt. 577-8 at 7:20-8:3 (similar).

        2.    <u>Trial Testimony by Thicke</u>

Thicke testified on cross-examination about his response to interrogatories and statements in interviews. These questions focused on whether shortly before "Blurred Lines" was recorded, he told Williams that he wanted to create a song that evoked the era of "Got To Give It Up." Thicke stated that these earlier statements were inaccurate, because he was intoxicated when he made them, and because -- upon hearing Williams' testimony that he had created most of "Blurred Lines" before Thicke arrived at the studio -- "[Thicke] realized that [Thicke] convinced himself, you know, that ["Blurred Lines"] was [Thicke's] idea." Dkt. 577-8 at 28:22-29:12; 32:19-33:25; Dkt. 588, Ex. 3, at 7:20-11:7. Thicke testified that instead, he only added minor elements to the song. *Id.* at 32:19-33:25.

        3.    <u>Opening and Closing Statements</u>

The opening and closing statements at trial reflect that the parties extensively litigated the question whether the trial testimony of Thicke and Williams was credible. This included whether Thicke told Williams that he wanted to create a song that evoked "Got To Give It Up" or its historical era before "Blurred Lines" was created; whether Williams had "Got To Give It Up" in mind -- and tried to evoke its

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

composition or feeling -- when creating "Blurred Lines"; whether statements by Thicke and Williams in interviews directed to certain audiences were accurate and promotional; whether Thicke was intoxicated during interviews; and whether -- in general -- the prior statements by Thicke and Williams were irreconcilable with their trial testimony. Dkt. 588, Ex. 1, at 26:7-9, 27:17-24, 28:7-38:16, 40:9-17, 45:3-46:15 (opening statement); Dkt. 588, Ex. 5, at 83:2-84:20; 96:1-7, 127:8-12; 129:21-130:10; 131:10-18 (closing argument).

     E.     Jury Verdict

As noted, on March 10, 2015, the jury unanimously found that "Blurred Lines" infringed "Got To Give It Up," but that this infringement was not willful. Dkt. 320 at 2-3.

     F.     April 12, 2016 Order Denying Attorney's Fees (Dkt. 554)

The April 12, 2016 Order (Dkt. 554) addressed several post-trial motions. It denied two motions by the Gaye Parties for an award of attorney's fees and costs. One was brought by Frankie Gaye and Nona Gaye, and joined by Marvin Gaye III. The other was brought by Marvin Gaye III. The Gaye Parties sought an award of approximately $2.66 million in attorney's fees and $780,000 in costs.

The Order that addressed these motions evaluated the factors in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ("*Fogerty I*"), as well as the *Lieb* factors. *Id.* at 534 n.19 (adopting the factors from *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)). Together, these factors were as follows: (i) the degree of success obtained by the moving party; (ii) the purposes of the Copyright Act; (iii) whether an award of attorney's fees would have an excessive chilling effect or would impose an inequitable burden on an impecunious plaintiff (along with the first two factors, the *Fogerty* factors); (iv) frivolousness; (v) motivation; and (vi) objective unreasonableness as to both the factual and the legal elements of the case (along with the fourth and fifth factors, the *Lieb* factors). As noted, the denial of attorney's fees was affirmed by the Ninth Circuit.

     G.     November 2019 Interview

On November 4, 2019, Williams participated in a video interview ("November 2019 Interview") with Rick Rubin ("Rubin"). Williams made statements that were focused on his creative process:

     1:07 / 47:58 Williams: Intrigue for me is … first of all, this moment is intriguing. Doing this with you right now, that's intriguing. Umm, but for me musically, I feel like, I'm not …I'm not one of those guys that are like … you know, oh this is a 9/8 time signature, this is amazing, that just feels like math to me. I think I get blown away by chord progressions that make me feel something that I'd never felt before. Like, to me, chords are coordinates.

     1:39 / 47:58 Rubin: Wow.

     1:41 / 47:58 Williams: You know what I mean, they like send you to a place.

     1:43 / 47:58 Rubin: Beautiful.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

1:45 / 47:58 Williams: And uh, when I'm lucky enough to be in the right elevator. And I'm looking up, and I'm doing… and I'm doing three things at once. I am going what is that?

1:57 / 47:58 Rubin: Uhmm

1:58 / 47:58 Williams: Number two, I'm trying to like remember the feeling because when I go to chase it later, that is .. I'm gonna have to reverse engineer the feeling in order to get to the chord structure.

2:11 / 47:58 Williams: And third is just back it by trying to Shazam it right then and there. . . .

3:31 / 47:58 Williams: Everything is catalogued by and, and categorized by the feeling of it. If I can't. If I can't see how I feel about it, then I don't even really know what it is, it's just music. . . .

4:33 / 47:58 Williams: That's what it's like, if I'm not … if my feeling is not connected to the song then, I don't really know what I'm listening to, couldn't really tell you what it was.

4:42 / 47:58 Rubin: When you're working on music with other artists, are you always working on it with them in mind, are you're working on your favorite music and then depending on who you're collaborating with, it applies to, it may or may not apply to them.

5:03 / 47:58 Williams: I am always channeling other people, usually the person that I'm working with, I am sort of channeling them. Other times, I think they should be channeling someone else. So I'll do that for them. . . .

12:16 / 47:58 Williams: I have to channel. I channel all the time. I'm always pretending I'm someone else, in order to get it to come out, because I just feel like I'm the best version of myself is as a producer is I'm like a mirror for people. I try to show them sides of themselves that they don't ever use. It's like, when, people take selfies, they only take like, they only use like, one side all the time. So I'm the guy who's like, "Hey, you know, God made another side, like, it's very interesting, you should try it."

Dkt. 578, Ex. A.[2]

The Gaye Parties focus on the following passages. They contend that they show that Williams contradicted his trial testimony by acknowledging that he "reverse engineered" "Got To Give It Up":

27:35 / 47:58 Rubin: When you first started making music you went from not seeming

---

[2]  The Gaye Parties provided a transcript of the November 2019 Interview. It has what appear to be several transcription errors. The excerpted text was corrected based on a review of a copy of the video of the interview.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

like a hip-hop fan, into -- What's the first thing you ever made regardless whether you put it out or not, what was your first experiments in making your own music?

27:47 / 47:58 Williams: We, Chad and I, um -- and I haven't mentioned Chad yet, but, 'cuz I think you asked me a lot of questions in reference to my own personal process, but for a very big part of my career, Chad and I worked together. And I think what we tried to do -- and we still work together -- but I think for the most part what we always tried to do, was reverse-engineer the songs that did something to us emotionally, and figure out where the mechanism is in there. And I said to you before, try to figure out if we can build a building that doesn't look the same but makes you feel the same way.

28:29 / 47:58 Rubin: Yeah.

28:33 / 47:58 Williams: I did that in "Blurred Lines" and got myself in trouble.

28:36 / 47:58 Rubin: Yeah. Ridiculously.

28:40 / 47:58 Williams: Stevie Wonder told me, he said . . . you gotta get the right musicologists in there, because juries don't understand. It's very technical what you've done.

28:54/ 47:58 Rubin: Yeah -- and it's the song is nothing like the song.

28:56 / 47:58 Williams: Nope, but the feeling was. . . .

29:13 / 47:58 Williams: Yeah, but here's the difference. What we failed and -- it hurt my feelings because I would never take anything from anyone --

29:22 / 47:58 Rubin: Of course!

29:26 / 47:58 Williams: And it really set me back. I made Missy Elliott's "Where They From" in the middle of that trial, when I was really hurt because what I realized all too late, was what he was trying to tell me, is that I needed to use my gift to make music, to reverse-engineer the disparity between the truth and people's, and the jury's uneducated opinions. And I say that because rayon and silk feel the same, but we understand that there's a clear difference.

30:23 / 47:58 Rubin: Yeah.

30:23 / 47:58 Williams: And that was what happened. Like I really made it feel so much like it, that people were like, "Oh, I hear the same thing." And it's like, "Nah, look at the notes." Well you don't know, then you know when you get like, you know, an ambulance chaser, which is who they got, it's got another one, like, let me not speak negatively about them. This was my lesson. I didn't take Stevie's advice to the fullest extent. . . .

39:05 / 47:58 Rubin: Yeah since, since the "Blurred Lines" issue -- it's interesting, I

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|----------|--------------------------|------|-------------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

wasn't even going to bring it up -- but since, since you brought --

39:12 / 47:58 Williams: Because we was talking about feelings, and I know that's my -- I know that's what the universe has given me, one of the things it has given me, is like the ability to, is to make things, is to reverse-engineer a feeling, and make a tangible item.

39:27 / 47:58 Rubin: So since what happened, happened, has it changed anything about the way you work?

39:32 / 47:58 Williams: No.

*Id.*

III.   **The Positions of the Parties**

   A.      Summary of the Motion (Dkt. 577)

The Gaye Parties acknowledge that the Motion -- to the extent that it is brought under Fed. R. Civ. P. 60(b)(3) – could be found to be time-barred by Fed. R. Civ. P. 60(c). They then state that, if the Court concludes that the entry of judgment occurred on December 6, 2018, when an amended judgment was entered following remand from the Ninth Circuit (Dkt. 573), a motion under Fed. R. Civ. P. 60(b)(3) would be timely. However, in the briefing of the Motion, they concede that, under Ninth Circuit precedent, the prior April 12, 2016 order denying attorney's fees would likely have been the start-date for the one-year period. Dkt. 554. Therefore, their briefing of the Motion focuses on whether relief is warranted under Fed. R. Civ. P. 60(b)(6) and Fed. R. Civ. P. 60(d)(3).

The Gaye Parties argue that the November 2019 Interview -- when viewed together with the public statements by Thicke and Williams prior to trial, as well as their representations during discovery, and testimony at trial -- shows that Thicke and Williams made "intentional, material misrepresentations to the jury and this Court as part of an unconscionable scheme to improperly influence" decisions. The Gaye Parties also contend that Williams' statements during the November 2019 Interview cannot be characterized as ones that were made for self-promotion; that Williams' statements during the November 2019 interview show that he provided false testimony at trial; and that Williams' statements are admissible as an opposing party statement or a declaration against interest.

The Gaye Parties argue that this conduct constituted fraud on the court that was effected through a coordinated plan by Thicke and Williams to recant and justify prior inconsistent statements. The Gaye Parties contend that Ninth Circuit caselaw supports a finding that a person who knowingly provides false trial testimony that adverse parties did not then know was false, may be deemed to have committed "fraud on the court." The Gaye Parties contend that the issue of Williams' state of mind when writing "Blurred Lines" was the central issue at trial, and was very material to the decision by the Court to deny the motion of the Gaye Parties for an award attorney's fees.

The Gaye Parties advance several arguments to support the position that, a reassessment of the *Lieb* and *Fogerty* factors that were considered when their requests for attorney's fees were denied in 2016, shows that an award of fees is warranted. *First*, an award would further the purposes of the Copyright

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|----------|--------------------------|------|-------------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Act, because the defenses of the Thicke Parties were not meritorious, and were based on material misrepresentations. *Second*, Williams and Thicke acted in what was subjective bad faith. *Third*, the actions of Williams and Thicke were objectively unreasonable, because their pre-litigation statements were not promotional and were truthful. *Fourth*, the jury's decision not to find willful infringement warrants little weight in the analysis, because it was based on misrepresentations by Thicke and Williams during their testimony at trial. *Finally*, an award would deter others not to implement a plan to controvert prior admissions through trial testimony and thereby and perpetuate a fraud on a court.

B.      Summary of Opposition (Dkt. 585)

The Williams Parties respond with several arguments. *First*, it would be improper to reopen the judgment pursuant to Fed. R. Civ. P. 60(b)(3).

*Second*, Williams' statements in the November 2019 Interview were consistent with his trial testimony, because -- when read in its complete context -- the November 2019 Interview does not reflect that Williams "reverse engineered" "Got To Give It Up," that Williams had "Got To Give It Up" in mind when he wrote "Blurred Lines," or that Williams intended to copy the elements of "Got To Give It Up."

*Third*, the Williams Parties contend that, even if the November 2019 Interview supported a claim of perjury, that alone would not constitute fraud on the court, which requires a "grave miscarriage of justice." The Williams Parties contend that *In re Levander*, 180 F.3d 1114 (9th Cir. 1999), is the only case where perjury alone was held to constitute fraud on the court, and that the decision there is narrow and distinguishable. The Williams Parties argue that the claimed perjury could not have been fraud on the court because the Gaye Parties prevailed on their infringement claim, any supposed perjury did not undermine the adversarial process, and there is no direct and non-speculative evidence of an unconscionable plan or scheme to defraud the court. The Williams Parties also argue that the central question of infringement did not turn on willfulness.

*Fourth*, the Williams Parties contend that the question of inconsistent statements is not a newly discovered issue that warrants reopening the judgment. The Williams Parties state that at trial, the Gaye Parties presented substantial arguments and evidence about whether the pre-litigation statements by Thicke and Williams were inconsistent with their trial testimony, thereby undermining its credibility.

*Finally*, the Williams Parties contend that even if the Court were to reconsider the issue of attorney's fees, none of the *Fogerty* factors warrants a different outcome. The Williams Parties also urge that if the Court were to reconsider the 2016 order denying attorney's fees, additional briefing should be permitted.

C.      Summary of Reply (Dkt. 591)

In the Reply, the Gaye Parties argue that the Williams Parties did not rebut the argument that the statements by Williams during the November 2019 Interview are irreconcilable with his trial testimony. The Gaye Parties also state that they are not seeking to reopen the jury's findings about infringement and willfulness, but rather seek redress for perjury by Williams that affected the decision by the Court not to award attorney's fees. The Gaye Parties also argue that the long history of inconsistent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|----------|---------------------------|------|-------------------|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

statements by Thicke and Williams is sufficient to raise the inference that Thicke and Williams engaged in a scheme to commit perjury.

IV. <u>**Analysis**</u>

        A.      Legal Standards: Fed. R. Civ. P. 60

The relevant portions of Fed. R. Civ. P. 60 are as follows:

    (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

        (1) mistake, inadvertence, surprise, or excusable neglect;

        (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

        (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

        (4) the judgment is void;

        (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

        (6) any other reason that justifies relief.

    (c) Timing and Effect of the Motion.

        (1) Timing. A motion under Rule 60(b) must be made within a reasonable time— and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

        (2) Effect on Finality. The motion does not affect the judgment's finality or suspend its operation.

    (d) Other Powers to Grant Relief. This rule does not limit a court's power to:

        (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

        (2) grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(3) set aside a judgment for fraud on the court.

B.    Application

1.    Whether the One-Year Period in Fed. R. Civ. P. 60(c) Bars the Motion, to the
Extent It Seeks Relief Under Fed. R. Civ. P. 60(b)(3)

To the extent that the Motion is brought under Fed. R. Civ. P. 60(b)(3) it is subject to the one-year
limitation period in Fed. R. Civ. P. 60(c). However, under that provision, there is an issue as to the
proper date to use for "the entry of the judgment or order or the date of the proceeding." As noted by
the parties, one potential date is April 12, 2016, when the motions by the Gaye Parties for an award of
attorney's fees were denied. Dkt. 554. The other is December 6, 2018, when an amended judgment
entered following remand from the Ninth Circuit. Dkt. 573.

The order that issued on April 12, 2016 denied the motions by the Gaye Parties for an award of
attorney's fees. It was the "final judgment, order, or proceeding" that caused the start of the one-year
period for a motion under Fed. R. Civ. P. 60(b)(1)-(3). Courts give a "practical rather than a technical
construction" of the finality to post-judgment orders, because such orders do not raise a significant risk
of piecemeal review. Further "unless such orders are found final, there is often little prospect that
further proceedings will occur to make them final." *United States v. Washington*, 761 F.2d 1404, 1406
(9th Cir. 1985) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 375 (1981); 15 Charles
Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3916 (1976)).

A post-judgment order may be a final, appealable one under three circumstances: (i) when it is "an
'integral part' of the final judgment on the merits even though not entered concurrently with that
judgment;" (ii) when it is "an independent final order in a single case involving two 'final' decisions;" or
(iii) when it is "a collateral interlocutory order subject to immediate review under [*Cohen v. Beneficial
Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)], if it is viewed as preliminary to a later proceeding."
*United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1185 (9th Cir. 1995) (quoting *United States v.
Shaibu*, 957 F.2d 662, 663-64 (9th Cir. 1992)); *accord Natural Res. Def. Council, Inc. v. S.W. Marine,
Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (post-judgment orders are final and appealable if they
"dispose[] completely of the issues raised in the post-judgment proceedings").

The April 12, 2016 order is "an independent final order in a single case involving two final decisions."[3]
The April 12, 2016 order conclusively decided the question whether attorney's fees should be awarded.
If the April 12, 2016 order were not considered final, and if there had been no appeal that resulted in an
amended judgment, there would have been "little prospect that further proceedings" would have
occurred to make the April 12, 2016 order final. Moreover, awards of attorney's fees that set the
amount to be paid, are final and appealable. *Intel Corp. v. Terabyte Int'l., Inc.*, 6 F.3d 614, 617 (9th
Cir.1993). The April 12, 2016 order was not a "mere ministerial order, such as an order executing a
judgment or . . . an order to disburse funds from the court registry, [that] is not a final appealable order."
*Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898 (9th Cir. 2001). *Cf. Hilao v.*

---

[3]  In the Ninth Circuit, a judgment that finally disposes the merits in an action is appealable, even where the issue
of attorney's fees has not been resolved. *Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers'
Local Union 75 v. Madison Indus., Inc.*, 733 F.3d 656, 658-59 (1984). Therefore, the determination of a request
for the award of such fees is not an "integral part" of the final judgment on the merits.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

*Estate of Marcos*, 103 F.3d 762, 764 (9th Cir.1996) (post-judgment contempt orders are final and appealable). Applying these standards, the April 12, 2016 order caused the start of the one-year period that applies to a motion brought pursuant to Fed. R. Civ. P. 60(b)(1)-(3).

This one-year period is not tolled by an appeal. *Nevitt v. United States*, 886 F.2d 1187, 1188 (9th Cir. 1989); *accord United States v. McGrew*, 716 F. App'x 704 (9th Cir. 2018) (memorandum opinion) (citing *Nevitt*, 886 F.2d at 1188). The one-year period ended on April 11, 2017. The Motion was not filed until December 6, 2019. Therefore, the one-year limitations period bars the Motion, to the extent the Gaye Parties seek relief pursuant to Fed. R. Civ. P. 60(b)(3).

> 2.  Whether Thicke and Williams Committed "Fraud on the Court" Pursuant to Fed. R. Civ. P. 60(d)(3)

> a)  Specific Legal Standards

The Ninth Circuit has held that Fed. R. Civ. P. 60 distinguishes between mere "fraud," which is within Fed. R. Civ. P. 60(b)(3), and "fraud on the court," which is within Fed. R. Civ. P. 60(d)(3). However, there is not a precise definition of "fraud on the court."

"The power to vacate a judgment that has been obtained by fraud upon the court is inherent in courts." 11 Mary Kay Kane, Federal Practice and Procedure § 2870 (3d ed. Aug. 2019) (citing, *Univ. Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946)). Therefore, Fed. R. Civ. P. 60(d)(3) is not the original source of this power, and provides that it does not limit this inherent authority. The principles developed by some courts to define claims of fraud on the court, are based on *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238 (1944). There, the Court recognized the equitable power of a court to set aside a judgment, modify it, or prevent parties from benefiting from it, where "sufficiently gross" "injustices" "demand a departure from rigid adherence" to the finality of judgments. 323 U.S. at 244-45; 11 Federal Practice and Procedure § 2870 (identifying *Hazel-Atlas Glass Co.* as the basis for the modern doctrine).

Given the potentially broad scope of such equitable authority, courts have acted in a careful manner when determining whether it is appropriate to set aside a judgment due to fraud on the court. *United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1167 (9th Cir. 2017) (quoting *Hazel-Atlas Glass Co.*, 322 U.S. at 244). It is "available only to prevent a grave miscarriage of justice." *Id.* (quoting *United States v. Beggarly*, 524 U.S. 38, 47 (1998)). Thus, "not all fraud is fraud on the court." *Id.* (quoting *Levander*, 180 F.3d at 1119). The Ninth Circuit provided the following summary of the rules in this area:

> "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harmed the integrity of the judicial process.'" *Estate of Stonehill*, 660 F.3d 415, 444 (9th Cir. 2011) (internal alterations omitted) (quoting *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)). Fraud on the court must be an "intentional, material misrepresentation." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1097 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Thus, fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

1131 (9th Cir. 1995) (quoting *Abatti v. Commissioner*, 859 F.2d 115, 118 (9th Cir.
1988)).

In addition, the relevant misrepresentations must go "to the central issue in the case,"
*Estate of Stonehill*, 660 F.3d at 452, and must "affect the outcome of the case," *id*. at
448. In other words, the newly discovered misrepresentations must "significantly change
the picture already drawn by previously available evidence." *Id*. at 435. In that vein,
"[m]ere nondisclosure of evidence is typically not enough to constitute fraud on the court,
and 'perjury by a party or witness, by itself, is not normally fraud on the court' " unless it
is "so fundamental that it undermined the workings of the adversary process itself." *Id*. at
444–45 (quoting *In re Levander*, 180 F.3d at 1119). However, perjury may constitute
fraud on the court if it "involves, or is suborned by, an officer of the court." 12 J.W.
Moore, Moore's Federal Practice § 60.21[4][c]; *see In re Intermagnetics Am., Inc.*, 926
F.2d 912, 917 (9th Cir. 1991). . . .

Finally, relief for fraud on the court is available only where the fraud was not known at
the time of settlement or entry of judgment. *See, e.g.*, *Hazel-Atlas Glass Co.*, 322 U.S. at
244 (allowing relief for "after-discovered fraud"); *Haeger v. Goodyear Tire & Rubber Co.*,
813 F.3d 1233, 1243–45 (9th Cir. 2016) (analogizing to fraud on the court, where crucial
information was concealed until after settlement and entry of judgment), overruled on
other grounds, 137 S.Ct. 1178 (2017); *Pumphrey*, 62 F.3d at 1133 (finding fraud on the
court where crucial information was concealed and came to light after entry of
judgment); *In re Levander*, 180 F.3d at 1120 (same). This limitation arises because
issues that are before the court or could potentially be brought before the court during
the original proceedings "could not be exposed at trial." *In re Levander*, 180 F.3d
at 1120 (citing *Gleason v. Jandrucko*, 860 F.2d 556, 560 (2d Cir. 1988)); *see also id*. at
1119–20 (explaining that there is no fraud on the court where "the plaintiff had the
opportunity to challenge the alleged perjured testimony or non-disclosure because the
issue was already before the court"). As the district court correctly explained, allowing
parties to raise issues that should have been resolved at trial amounts to collateral
attack and undermines "the deep rooted policy in favor of the repose of judgments."
*Hazel-Atlas Glass Co.*, 322 U.S. at 244.

*Sierra Pac. Indus., Inc.*, 862 F.3d at 1167-68 (citations altered to include full citations and to eliminate
parallel ones). Intentional and material deception may be inferred from a "long trail of small
misrepresentations." *Sierra Pac. Indus., Inc.*, 862 F.3d at 1173 (9th Cir. 2017). Fraud on the court must
be shown by clear and convincing evidence. *Estate of Stonehill*, 660 F.3d at 443-44.

             b)     Application

             (1)    Whether the November 2019 Interview Supports a Finding that
                    Thicke and/or Williams Committed Perjury

As noted, at deposition and trial, Thicke testified that his previous statements in public interviews and in
his response to interrogatories -- in which he stated that he told Williams that he wanted to create a
song that evoked "Got To Give It Up" -- were false. Thicke stated that his false statements were caused

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

by intoxication, by a desire to claim credit in the creative process for a successful song, and by extension -- a desire to sell records.

During his deposition, Williams testified that "Got To Give It Up" did not come into his mind when he was creating "Blurred Lines." When asked about prior inconsistent statements in which he said, "I was trying to pretend that I was Marvin Gaye [when creating "Blurred Lines"]," Williams testified that he realized that in retrospect, the feeling that he had when creating "Blurred Lines" was one that he associated with Marvin Gaye. Williams Depo., Dkt. 577-5 at 90-13-17; 105:11-110:0. Williams also testified that as an artist, he "look[s] into oblivion" when creating a song. *Id.*

At trial, Williams testified that Thicke did not have a material role in creating "Blurred Lines." Dkt. 577-7 at 102:18-19, 109:1-15. Williams also testified that he did not think that he had subconsciously copied any aspect of "Got To Give It Up," when creating "Blurred Lines." *Id.* at 113:20-114:4. Williams also maintained that, when he created "Blurred Lines," he had no intention of copying Marvin Gaye or "Got To Give It Up," or the feelings associated with that song. *Id.* at 135:13-138:15. Instead, Williams testified that "[his] interpretation of [his] work after [he] had" created "Blurred Lines," was that he was somehow affected by Marvin Gaye.

In the November 2019 Interview, Williams represented that when creating songs, he "channels" other people "all the time." He also stated that he frequently "reverse-engineer[s] the songs that did something to [him] emotionally, and figure[s] out where the mechanism is in there." Williams also stated that he "did [reverse-engineering] in 'Blurred Lines' and got [him]self in trouble."

The Gaye Parties argue that Williams' statements in the November 2019 Interview contradict the sworn statements that he and Thicke made about the process through which they created "Blurred Lines." They add that they also contradict the testimony about the general process that Williams uses in creating music. This argument is unpersuasive. The statements by Williams during the November 2019 Interview were cryptic and amenable to multiple interpretations. For example, it is unclear what Williams meant by "reverse-engineer[ing]." Read in context, Williams statement about "reverse-engineering" could be interpreted as a process in which he remembers his feelings when listening to particular music, and then attempts to recreate those feelings in his own works. This is not inconsistent with his deposition testimony, in which he claimed that he realized after creating "Blurred Lines" that the feeling he tried to capture in the song, was one that he associated with Marvin Gaye.

Also unclear is what Williams meant by his reference to "channel[ing]" other musical artists. Read in concert with his deposition and trial testimony, this may refer to the process in which he tries to place in his own works his earlier feelings about certain music. For these same reasons, it is cannot be readily determined that the statements by Williams during the November 2019 Interview were inconsistent with the one that he looks "into oblivion" when creating music. Further, nothing in the November 2019 Interview controverts Thicke's sworn testimony that he played little or no part in the creation of "Blurred Lines," and that his previous out-of-court statements to that effect were false.

For these reasons, the Gaye Parties have not shown by clear and convincing evidence that there are sufficiently material inconsistencies between Williams' statements in the November 2019 Interview and his sworn testimony, to support a finding of perjury.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

(2)    Whether, Assuming that Thicke and/or Williams Committed Perjury, There Is Clear and Convincing Evidence of Aggravating Conduct Necessary to Constitute a Fraud on the Court

Even if it were assumed that Thicke and/or Williams had committed perjury, there is insufficient evidence of aggravating conduct necessary to constitute a fraud on the court. As noted, the Ninth Circuit has explained that "perjury by a party or witness, by itself, is not normally fraud on the court unless it is so fundamental that it undermined the workings of the adversary process itself." *Sierra Pac. Indus., Inc.*, 862 F.3d at 1167 (internal quotation marks and citations omitted). The Ninth Circuit has also identified two key aggravating factors that may elevate "fraud" to "fraud on the court". The first is an "intentional, material misrepresentation" that "involve[s] an unconscionable plan or scheme which is designed to improperly influence the court in its decision" and goes "to the central issue in the case." *Id.* (internal quotation marks and citations omitted). Such intentional, material deception may be inferred from a "long trail of small misrepresentations." *Sierra Pac. Indus., Inc.*, 862 F.3d at 1173 (9th Cir. 2017). The second aggravating factor is perjury involving, or suborned by, an officer of the court. *Id.* (citing *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991); 12 J.W. Moore, Moore's Federal Practice § 60.21[4][c]).

The Gaye Parties have not shown that the first aggravating factor applies. Even if Thicke and Williams each testified falsely about his state of mind when "Blurred Lines" was created, the question of willfulness was not a "central issue in the case." Although the parties -- in framing their arguments to the jury -- addressed whether the conduct by Thicke and Williams was willful, this element of a claim of infringement goes primarily to whether enhanced statutory damages and attorney's fees should be awarded. 17 U.S.C. § 504(c); *see infra* Section IV.B.4. For a copyright infringement claim, infringement, not willfulness, is plainly the central issue. Moreover, in this action, the Gaye Parties elected to seek actual not statutory damages. This also results in less significance on the issue of willfulness.

The Gaye Parties also failed to show that the second aggravating factor is met. There is not sufficient evidence that any claimed misrepresentations by Thicke and Williams involved an officer of the court.

(3)    Whether, Even Assuming that Thicke and/or Williams Committed Perjury, the Issue Could Have Been Addressed at the Trial

"[R]elief for fraud on the court is available only where the fraud was not known at the time of settlement or entry of judgment." *Sierra Pac. Indus., Inc.*, 862 F.3d at 1167-68 (collecting cases). "This limitation arises because issues that are before the court or could potentially be brought before the court during the original proceedings 'could and should be exposed at trial.'" *Id.* (quoting *In re Levander*, 180 F.3d at 1120). "[T]here is no fraud on the court where 'the plaintiff had the opportunity to challenge the alleged perjured testimony or non-disclosure because the issue was already before the court.'" *Id.* (quoting *Gleason v. Jandrucko*, 860 F.2d 556, 560 (2d Cir. 1988)).

At the time of the trial, the Gaye Parties believed that the trial and deposition testimony of Thicke and Williams about the creative process that led to "Blurred Lines" and their respective states of mind was not truthful. The Gaye Parties repeatedly cross-examined Thicke and Williams about what the Gaye Parties deemed inconsistent out-of-court statements. Although the Gaye Parties claim that the November 2019 Interview constitutes new evidence of perjury that warrants reopening the judgment,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

the Gaye Parties do not -- and cannot -- argue that they did not hold the view at the time of the trial, i.e., that Thicke and Williams were not testifying honestly. Nor can they show that they did not cross-examine Thicke and Williams on these very issues.

For these reasons, even assuming that Thicke and/or Williams did not testify truthfully, it is not a sufficient basis to reopen the judgment.

> 3.  Whether Relief Is Warranted Under the Catchall Provision in Fed. R. Civ. P. 60(b)(6)

Fed. R. Civ. P. 60(b)(6) permits a court to grant relief to a party from a final judgment, order, or proceeding for "any other reason that justifies relief." The Gaye Parties do not identify any other reasons that justify relief, nor is one apparent on the record. *See* 11 Mary Kay Kane, Federal Practice and Procedure § 2864 (3d ed. Aug. 2019) (cataloging reasons why courts have exercised their discretion pursuant to Fed. R. Civ. P. 60(b)(6)). Therefore, no relief is warranted under Rule 60(b)(6).

> 4.  Whether, Even If It Were Appropriate to Reopen the April 2016 Order Denying Attorney's Fees, an Award of Attorney's Fees Would Be Warranted

Even if it were determined that the April 2016 Order should be reconsidered, based on an application of the relevant factors, once again, an award of attorney's fees would not be warranted. A district court enjoys "equitable discretion" in deciding whether to award attorney's fees. Dkt. 554 at 3 (quoting *Fogerty I.*, 510 U.S. at 534). As noted, in assessing such a request, a court must consider: (i) the degree of success obtained by the moving party; (ii) the purposes of the Copyright Act; (iii) whether an award of attorney's fees would have a chilling effect that is too great or would impose an inequitable burden on an impecunious plaintiff (along with the first two factors, the *Fogerty* factors); (iv) motivation; (v) frivolousness; and (vi) objective unreasonableness as to both the factual and the legal elements of the case (along with the fourth and fifth factors, the *Lieb* factors). Although not determinative, objective reasonableness of the position of the non-prevailing party is afforded "substantial weight." *Tresona Multimedia, LLC v. Burbank High School Vocal Music Ass'n*, 953 F.3d 638, 653 (9th Cir. 2020) (citing *Shame On You Prods., Inc. v. Banks*, 893 F.3d 661, 666 (9th Cir. 2018)).

As to the first factor, the April 2016 Order noted that the Gaye Parties prevailed in this litigation, which supported an award of attorney's fees. Therefore, the first factor would remain unchanged.

With respect to the second factor, the April 2016 Order identified certain issues of first impression under copyright law that were raised as a result of the defenses presented by the Thicke Parties. The April 2016 Order concluded that resolution of those issues furthered the purposes of the Copyright Act. Dkt. 544 at 5-6. These issues included: the scope of the copyright held by the Gaye Parties under the 1909 Copyright Act; the admissibility of sound recordings where a copyright is limited to sheet music; and the nature of the appropriate jury instructions and verdict forms for musical compositions. The positions taken by the Thicke Parties as to these matters, were not affected by whether their alleged infringement was willful. Therefore, the second factor would remain unchanged.

As to the third factor, the April 2016 Order noted that the defenses presented by the Thicke Parties were objectively reasonable and potentially meritorious. Dkt. 554 at 6. Thus, granting an award of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
|---|---|---|---|
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

attorney's fees "could reasonably be seen as causing a chilling effect on those against whom future infringement actions are brought." *Id.* Because these defenses included those that were not tied to any alleged willful conduct by Thicke and Williams, the third factor would remain unchanged.

Regarding the fourth factor, the April 2016 Order noted that there was no admissible evidence that the litigation was brought in bad faith. Dkt. 554 at 6-8. A finding that Thicke and/or Williams had committed perjury when testifying about his state of mind when creating "Blurred Lines," might provide some support for an inference that the litigation was brought in bad faith. However, this would not be a strong inference. As noted, the core issue in this action was infringement about which there was a substantial disagreement between the adverse parties. The unique issues as well as the substantial competing evidence as to infringement, including that of the parties' respective expert witnesses, does not support a finding of bad faith. Therefore, the fourth factor would not support an award of attorney's fees.

As to the fifth and sixth factors, the April 2016 Order addressed in detail whether the claimed inconsistencies between the out-of-court statements by Thicke and Williams and their sworn testimony could support a finding of frivolous or unreasonableness. The April 2016 Order concluded:

> Although some of the statements by the Thicke Parties both before and during the litigation were inconsistent, the Thicke Parties have shown that their overall defense against the claims of infringement was reasonable and non-frivolous. And, it is not at all uncommon for a party to make inconsistent statements during the course of litigation. That is what leads to cross-examination to impeach such a witness.

> Finally, given the expert opinions that were provided to the Thicke Parties prior to the commencement of their declaratory relief action and their success on certain legal and factual issues, there is insufficient evidence to show that the Thicke Parties "should have known from the outset" that their chances of success "were slim to none."

Dkt. 554 at 10.

Even if Thicke and Williams had committed perjury in their testimony about the role of "Got To Give It Up" in the creation of "Blurred Lines," their "overall defense as to the claims of infringement" -- the core issue in this action -- would remain "reasonable and non-frivolous."

For these reasons, even if it were assumed that Thicke and Williams had committed perjury, the application of the relevant factors would not warrant an award of attorney's fees.

## V.   <u>Conclusion</u>

For the reasons stated in this Order, the Motion is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV13-06004 JAK (AGRx) | Date | February 12, 2021 |
| --- | --- | --- | --- |
| Title | Pharrell Williams, et al. v. Bridgeport Music, Inc., et al. | | |

Initials of Preparer      TJ